IN THE UNITED STATES COURT

FOR THE DISTRICT OF ALASKA

VALERIE ROUNTREE, individually and as
Personal Representative of THE ESTATE OF
APRIL LYNNE COX; MORGAN
SCHEDIWY, a minor, through her natural
Mother and guardian VALERIE ROUNTREE;
and CHRISTOPHER COX,
        Plaintiffs,

vs.

CHING FENG BLINDS INDUSTRY
CO., LTD., a Taiwanese corporation;
JENCRAFT CORPORATION a/k/a
JENCRAFT MANUFACTURING CO., INC.,
A New Jersey corporation; WAL-MART
STORES, INC., a Delaware corporation; and
WINDOW COVERING MANUFACTURERS
ASSOCIATION,

        Defendants.

Case No. A04-0112 CV (JWS)

DEPOSITION OF ILENE ROUNTREE,

Pages 1-20, inclusive

Commencing at 1:06 p.m.

Wednesday, July 27, 2005

Anchorage, Alaska



**Alaska Stenotype Reporters**
511 West Ninth Avenue
Anchorage AK 99501-3520
*Serving Alaska Since 1953*

Rick D. McWilliams, RPR, Ret.
Fred M. Getty, RPR, Ret.



EXHIBIT E
PAGE 1 OF 4

Telephone 907.276.1680
Email AkSteno@aol.com
Fax 907.276.8016

```
 1                IN THE UNITED STATES COURT
 2                FOR THE DISTRICT OF ALASKA
 3
 4   VALERIE ROUNTREE, individually and as
     Personal Representative of THE ESTATE OF
 5   APRIL LYNNE COX; MORGAN
     SCHEDIWY, a minor, through her natural
 6   Mother and guardian VALERIE ROUNTREE;
     and CHRISTOPHER COX,
 7            Plaintiffs,
 8   vs.
 9   CHING FENG BLINDS INDUSTRY
     CO., LTD., a Taiwanese corporation;
10   JENCRAFT CORPORATION a/k/a
     JENCRAFT MANUFACTURING CO., INC.,
11   A New Jersey corporation; WAL-MART
     STORES, INC., a Delaware corporation; and
12   WINDOW COVERING MANUFACTURERS
     ASSOCIATION,
13
              Defendants.
14   _____
     Case No. A04-0112 CV (JWS)
15
16
17              DEPOSITION OF ILENE ROUNTREE,
18   taken on behalf of the Plaintiffs, pursuant to notice, at
19   the offices of Alaska Stenotype Reporters, 511 West
20   Ninth, Anchorage, Alaska, before Rosie S. Scott,
21   Certified Shorthand Reporter for Alaska Stenotype
22   Reporters and Notary Public for the State of Alaska.
23
24
25
```

EXHIBIT E
PAGE 2 OF 4

Page 9

1  with that.
2     A.  I only keep records for taxes a few years.
3     Q.  Would you be able to say whether it was likely
4  that your purchase of the blinds, whether these or other
5  blinds, were made with check, credit card or cash?
6     A.  Well, if I don't know where I bought it, and I
7  don't know when I bought it, I'm sure in the heck not
8  going to know how I bought it.
9     Q.  And the inquiry I suppose could be a little
10 broader. And that is --
11    A.  Again, what did you buy 11 years at the grocery
12 store? Would you remember how you paid for it?
13 Honestly, can you tell me on Memorial Weekend in 2002,
14 what you purchased that day?
15    Q.  Probably not.
16    A.  Can anybody tell me that? How much they bought
17 it for? What stores they went to? If they paid a check
18 or credit card? Who would know that?
19    Q.  But I can tell you that it's likely what form
20 of -- you know, I can tell you what form of payment I
21 used I could likely tell you.
22        So that's my question. What would have been
23 the likely form of payment?
24    A.  Honestly, I don't even know if they had debit
25 back then. I used credit cards. I used checks. I can

Page 10

1  tell you I rarely use cash.
2     Q.  I'm sorry, you what?
3     A.  I rarely use cash. But back then I don't know.
4     Q.  And when you say "back then" what time frame
5  are you speaking of?
6     A.  Could have been so far as 11 years. We moved
7  into the April '94.
8     Q.  It's important to at least the people that are
9  gathered here and less important to you I understand, to
10 determine as best we can and as certain as we can, where
11 the blinds were purchased.
12    A.  And I can't. And I wrote a letter to our
13 attorney to pass on to Wal-Mart I cannot tell you where I
14 bought the blinds for sure. I cannot.
15    Q.  And --
16    A.  I would just be guessing if I were to tell you.
17    Q.  And during the course of your discussions with
18 Mr. Kell, and his discussions with you, we really are not
19 entitled to know about that. Those are between you and
20 him. And he's not here to tell you that, so you don't
21 have to tell us what you talked to him about.
22    A.  I wrote a letter to him which I'm pretty sure
23 you have as well -- a copy of that letter. I don't know
24 if you have the same letter.
25    Q.  I do not. You and I have not corresponded

Page 11

1  except me to you.
2     A.  Well, I don't know how many of you guys share
3  things. I have no idea how it works.
4     Q.  I may know the answer to this. But would you
5  be agreeable to allowing an inquiry to either your bank
6  or your credit cards?
7     A.  No.
8     Q.  For the narrow purpose of determining whether
9  this purchase can be tracked?
10    A.  No.
11    Q.  And would that include you would not be
12 agreeable if we went through that with Mr. Kell?
13    A.  No. I don't think you need to look at my
14 financial records.
15    Q.  Well, I'm not interested in --
16    A.  No, you would be looking at my financial
17 records. You would know everything there is to know
18 about me. And, no, you may not have that access.
19    Q.  Ms. Rountree, I'm not trying to --
20    A.  Don't ask in a different way. I've already
21 answered your question. No, I will not give my
22 permission for you to get into any of my bank records.
23    Q.  Would you allow Mr. Kell to do that?
24    A.  I do believe I answered that, but I will answer
25 it again if you didn't hear me the first time.

Page 12

1     Q.  Well, you --
2     A.  Nobody is looking into my financial records.
3     Q.  Okay.
4     A.  Let's ask the question again.
5     Q.  That's fine. I was just trying to explore
6  whether Mr. Kell was excluded.
7     A.  We're done. Let's go to the next question,
8  please. I'm missing work. I want this to be -- you
9  know, I don't want to keep repeating myself. I'm
10 sounding ruder by the minute. Let's just get on with it.
11    Q.  We can do that more efficiently if you just
12 answer the questions. Okay?
13    A.  I'll answer one time. Don't ask the second
14 time and I won't answer. Okay? Fair enough?
15    Q.  We'll see.
16        Did you have any role in putting the crib and
17 the bed into that room?
18    A.  No.
19    Q.  Did you ever suggest to Valerie that you did
20 not think the crib should be where it was?
21    A.  I can't recall. I rarely went down in that
22 room.
23    Q.  Okay. As you sit here today, do you recall
24 having any concerns at all about the location of the
25 furnishings within that room?

| Ilene Roundtree | Deposition | July 27, 2005 |

Page 5

1  Anchorage, Alaska, Wednesday, July 27, 2005
2              ILENE ROUNTREE,
3        called as a witness herein on behalf of the
4        Plaintiffs, having been duly sworn upon oath
5        by Rosie S. Scott, Notary Public, was
6        examined and testified as follows:
7                 EXAMINATION
8  BY MR. RAY:
9     Q.  For our record, your name and your residence
10  address, please.
11     A.  Ilene Rountree, 4257 Charing Cross Circle,
12  Anchorage, Alaska, 99504.
13     Q.  And we had a chance to have a chat before we
14  went on record. And I think understand or I heard what
15  you said. I'm not sure that you and I understand each
16  other.
17     A.  That's okay.
18     Q.  Yeah, I hope so. Let me start, Ms. Rountree,
19  by asking, do you know how many children five years or
20  less have lost their lives through strangulation in
21  venetian blinds?
22     A.  One child is too many. And I do know that at
23  the time Valerie went on record at the "Daily News" she
24  said 16 died the way April died, and over 100 died
25  through the pull cord. So that is definitely too many

Page 6

1  people.
2     Q.  And do you know when the first reported death
3  in that fashion occurred?
4     A.  I have no idea.
5     Q.  Do you know whether there were any changes to
6  venetian blinds as a result of the first 10 child deaths?
7     A.  I do believe there was. I do believe the blind
8  companies made some efforts to put some recalls out. And
9  I believe they put in free kits available to people to
10  fix their old blinds. And I do believe they made
11  changes.
12        I don't think that they made that information
13  available as I would have liked it to have been, but I
14  believe they tried -- put an effort.
15     Q.  And how would you have liked that information
16  to have been made available to you?
17     A.  Well, everybody doesn't have web. So, you
18  know, you can't just do it on the computers. I think
19  that, you know, if one child dies, then they need to
20  figure out a way -- and I'm looking at you personally
21  because you say you're the one that might be the blind
22  guy, but I shouldn't do that because you don't know --
23  but if a child dies they should put more effort towards
24  it I believe. I really do.
25        If that means that they have to send out a

Page 7

1  recall personally to every single residence there is then
2  so be it. If it needs, they need to call every apartment
3  building and, you know, do something about it, I think
4  that they definitely need to put more efforts towards
5  that.
6     Q.  And if that is not done in a way that you think
7  is appropriate, would you take steps to try to see that
8  that was done?
9     A.  To see that those things were done, yes, not to
10  line my pockets, no. But I would definitely -- that
11  would be my fight -- and I would have been on my
12  daughter's side 100 percent of the way if for one minute
13  I thought that was her plan. If money was not her object
14  her dad and I would still be by her side.
15     Q.  As you know, we spoke with your husband earlier
16  today. Do you know that the blinds that April died in,
17  where those were purchased?
18     A.  No. I thought it was Wal-Mart. And after we
19  started doing calculations we realized that K-Mart was up
20  here at the time. I didn't realize K-Mart was up here at
21  the time. I do a lot of my shopping at Wal-Mart.
22  Wal-Mart has cheap prices. They also have cheap
23  products. You know what you're getting. You know what
24  you're getting. And it's not anything against Wal-Mart.
25  You know, I know a lot of people who won't even step into

Page 8

1  Wal-Mart because they say they're cheap products. Well,
2  you know what, you know what you're getting when you go
3  to Wal-Mart. So if you don't want to have a cheap
4  product then don't go to Wal-Mart. If you want to pay
5  more money go to a more expensive store.
6        I bet I didn't pay more than $20 for it. We
7  just moved into the house and we didn't have a lot of
8  money. It was an older house and it needed a lot of
9  things. I can't even tell you exactly when I bought it.
10  I don't even know for sure if my husband or myself put it
11  up, you know. I know the blind was broke. I know
12  Valerie knew the blind was broke. I knew Valerie knew
13  the blind was in the window, you know. And, you know,
14  nobody in a million years would have put that child
15  against that blind had they one inkling of a thought that
16  it would kill her.
17     Q.  I would agree with that.
18     A.  Nobody would have.
19     Q.  And you believe you bought it at Wal-Mart?
20     A.  Probably. But I don't know for sure because
21  I've bought blinds at Fred Meyers. I've bought blinds at
22  Lowe's -- it used to be Eagle at the time. So, you know,
23  I can't say for sure. Who has receipts of 11 years ago?
24  I bet you couldn't tell me what you bought 11 years ago.
25     Q.  I would have some difficulty. I would agree