0001

1

2  UNITED STATES DISTRICT COURT

3  DISTRICT OF ALASKA

4  Case No. A04-0112cv (JWS)

5  ----------------------------------------x

6  VALERIE ROUNTREE, Individually and as

7  Personal Representative of the Estate of

8  APRIL LYNNE COX, MORGAN SCHEDIWY, a minor,

9  through her natural mother and guardian

10  VALERIE ROUNTREE; and CHRISTOPHER COX,

11                    Plaintiffs,

12      - against -

13  CHING FENG BLINDS INDUSTRY CO. LTD., a

14  Taiwanese corporation; JENCRAFT

15  CORPORATION a/k/a JENCRAFT MANUFACTURING

16  CO., INC., a New Jersey Corporation;

17  WAL-MART STORES, INC., a Delaware

18  Corporation; and WINDOW COVERING

19  MANUFACTURERS ASSOCIATION,

20                    Defendants.

21  ----------------------------------------x

22                    February 16, 2006
                      10:20 a.m.

23

24

25

EXHIBIT ___3___

Page _1_ of _34_

0002
1
2
3          DEPOSITION of WINDOW COVERING
4   MANUFACTURERS ASSOCIATION by PETER RUSH,
5   taken by the Plaintiffs, pursuant to
6   Notice, held at the offices of King &
7   Spalding, LLP, 1185 Avenue of the
8   Americas, New York, New York, before
9   Debbie Zaromatidis, a Shorthand Reporter
10   and Notary Public of the State of New
11   York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT___3

Page__2_of 3 4

0003

1

2  A P P E A R A N C E S :

3

4    BURKE & BAUERMEISTER, PLLC

5    Attorneys for Plaintiffs

6       921 West 6th Avenue

7       Suite 250

8       Anchorage, Alaska 99501

9    BY:  DON C. BAUERMEISTER, ESQ.

10        - AND -

11   LAW OFFICES OF CHARLES W. RAY, JR.

12       711 H Street, Suite 310

13       Anchorage, Alaska 99501

14

15

16   RICHMOND & QUINN, LLP

17    Attorneys for Defendant

18   Ching Feng Blinds Industry Co., Ltd.

19       360 K Street, Suite 200

20       Anchorage, Alaska 99501

21   BY:  DANIEL T. QUINN, ESQ.

22

23

24

25

EXHIBIT___3___

Page__3__ of_34_

0004
1
2   A P P E A R A N C E S:  (CONTINUED)
3
4     LANE POWELL, LLP
5     Attorneys for Defendant
6     Wal-Mart Stores, Inc.
7         Suite 301
8         301 W. Northern Light Boulevard
9         Anchorage, Alaska 99503-2648
10    BY:  WILLIAM A. EARNHART, ESQ.
11
12    KING & SPALDING, LLP
13    Attorneys for Defendant
14    Window Covering Manufacturers
15    Association
16        191 Peachtree Street
17        Atlanta, Georgia  30303-1763
18    BY:  JAMESON B. CARROLL, ESQ.
19        MICHAEL WEISS, ESQ.
20
21
22
23  ALSO PRESENT:
24    DWIGHT WALLACE, Wal-Mart Corporation
25

EXHIBIT___3___
Page_4_ of_34_

0029
1            RUSH
2    standards which are then used by
3    manufacturers and/or other groups as a
4    basis for their product.
5        Q.   Sir, I -- I gues I am having
6    trouble understanding whether or not these
7    standards are supposed to protect the
8    public or not.  You can't give me any more
9    answer than you have?
10       A.   The purpose of a performance
11   standard is to provide a baseline for the
12   manufacture of a product.
13       Q.   Can public consumers of these
14   products rely on this standard to tell
15   them anything?
16       A.   In as far as a product is
17   manufactured to a particular performance
18   standard and if that performance standard
19   goes through the process of ANSI
20   accreditation and has -- it provides again
21   a certain level of confidence that a
22   product has been manufactured to an
23   acceptable level of performance.
24       Q.   What kind of confidence do you
25   have?

EXHIBIT  3
Page 5 of 34

0035
1              RUSH
2   then a phone number to the right of that.
3        Do you see that?
4   A.   Yes, I do.
5   Q.   Is that your signature?
6   A.   Yes, it is.
7   Q.   Can you tell the jury what the
8   WCSC is?
9   A.   Window Coverings Safety Council
10  is a not for profit C 6 New Jersey
11  corporation.
12  Q.   Okay.  Were you employed as
13  executive director of the Window Coverings
14  Manufacturers Association on December 5,
15  1996?
16  A.   Yes, I was.
17  Q.   And why isn't WCMA behind your
18  name here?
19  A.   I was also the executive
20  director of the Window Coverings Safety
21  Council at that time.
22  Q.   So you held two executive
23  directorships?
24  A.   I actually held more than that.
25  Q.   Well, let's talk about those

EXHIBIT 3

Page 6 of 34

0050
```
 1              RUSH
 2  assignment.
 3    Q.   So does she work in public
 4  relations?
 5    A.   No, she does not.  She works in
 6  association management.
 7    Q.   Okay.  Could you read the first
 8  three sentences there that begins Tom,
 9  bash and I, for the record, please?
10    A.   Okay.  This is the one dated
11  October 10, 2003?
12    Q.   It looks like October 9 to me,
13  but --
14    A.   October 9.  Okay.
15    Q.   Caroline 10/9/03, 10:56 a.m.  Do
16  you have that entry?
17    A.   Yes.
18    Q.   And what is the first -- if you
19  could read the first paragraph below that?
20    A.   "Tom, Barb and I met on Tuesday
21  to review the IDI data and to begin
22  drafting a preliminary summary.
23  Unfortunately the more we look at the data
24  the more questions kept cropping up.
25  Consequently we are asking for some
```

EXHIBIT 3

Page 7 of 34

0051
1              RUSH
2  additional input from all of you to help
3  us proceed."
4     Q.    Okay.  Now, who is are Tom, Barb
5  and I?
6     A.    Tom Mazerack from Comfort Techs,
7  who is a member, and Barb would be Barb
8  Miller from our our firm, and I would be
9  Caroline Jennings.
10        MR. EARNHART:  Just for the
11  record, member of what?
12        THE WITNESS:  Member of -- Tom
13  Mazerack would be a member of
14  manufacturers association and of safety
15  council.  Comfort Techs is the company.
16     Q.   And what is it that Barb Miller
17  does for your company?
18     A.   She is on I would say the
19  government affairs technical side and some
20  public relations.
21     Q.   Okay.  Now, do you see the
22  heading there at the bottom of the page
23  errors, heading changes?
24     A.   Yes.
25     Q.   And then that goes into a

EXHIBIT  3

Page  8  of  34

0052
1             RUSH
2   paragraph at the top of the next page?
3      A.   Yes.
4      Q.   Could you read that for the
5   record, please.
6      A.   "Errors:  Heading changes.  The
7   errors we caught are pretty insignificant.
8   Wrong incident death dates, data cell
9   transpositions, errors in ages, those that
10  should not be applicable, et cetera.  The
11  recommended heading changes center on the
12  cause of noose.  Tom suggested it should
13  be changed to root cause of entanglement
14  since noose still connotes a loop to most
15  readers.  I agree entangle is much
16  better -- is much better but please let me
17  know if you disagree.  In the
18  subcategories under the root cause of
19  entanglement we are also suggest we be a
20  little bit more descriptive for clarity's
21  sake and change victim to victim
22  manipulation, consumer to consumer alert
23  and product to product design."
24     Q.   Sir, does consumer -- should
25  that be consumer altered?

EXHIBIT___3___

Page__9__ of _34_

0053
1           RUSH
2    A.   Consumer altered, yes.  I am
3  sorry.
4    Q.   Thank you.  Now, can you tell me
5  what your employees are talking about
6  here, what are they trying to do?
7    A.   The WCMA set up a technical
8  subcommittee in 2003 to work directly with
9  the Consumer Products Safety Commission
10  who was involved in this committee to
11  develop a report to analyze in more detail
12  the number of strangulation deaths that
13  the Consumer Products Safety Commission
14  had in their database over a period of
15  time.
16    Q.   All right.
17         And your staff is talking here
18  about changing cause of noose to root
19  cause of entanglement?
20    A.   This is still from what I could
21  see very preliminary discussions as to how
22  best to classify, how to categorize and
23  how to develop an understandable report.
24    Q.   How does it benefit
25  understanding to change cause of noose to

EXHIBIT___3___

Page_1 0_ of_34_

0054

```
 1              RUSH
 2 root cause of entanglement?
 3       MR. CARROLL:    I object to the
 4 extent that he didn't write the document.
 5 The document speaks for itself.  Subject
 6 to that, he can answer.
 7    A.    That is not all potential
 8 strangulations would happen -- would
 9 necessarily happen in a noose.
10    Q.    All right, sir.  Could you read
11 the next paragraph for the record, please.
12    A.    "Ideas to rereview.  In the
13 process of cleaning up the clerical errors
14 and trying to organize the data in our own
15 minds we discovered a few inconsistencies
16 that we think the committee needs to
17 revisit before we can proceed.  One or two
18 relate to the description of the operating
19 system and system type and design versus
20 what we actually know.  Most deal with
21 whether the cord was wrapped around the
22 victim's neck, the victim was caught in a
23 loop or we just don't know.  It appears
24 that often we were swayed by the casual
25 word choices in the incident reports and
```

EXHIBIT____3____

Page__11__of__34__

0055
1              RUSH
2   the police report narratives rather than
3   the medical examiner's finding of the
4   ligature marks if available to determine
5   if the victim was caught in a loop or the
6   cord was wrapped around the neck.  In
7   turn, this can cause whether -- this can
8   change whether the cause of entanglement
9   should be listed as victim caused, product
10  caused or unknown."
11     Q.   Now, can you tell the jury what
12  ligature marks are?
13     A.   I can't tell you from a
14  technical standpoint.  I --
15     Q.   Do you have any understanding as
16  a nineteen-year employee of the WCMA that
17  promulgated the two standards here?
18        MR. CARROLL:   I object to the
19  extent it has already been established
20  that he is not an employee, but subject to
21  that objection he can answer.
22     A.   Based upon my just say general
23  knowledge I would say ligature would mean
24  some sort of mark on someone's body based
25  upon -- I don't know it is a medical term.

EXHIBIT  3
Page 12 of 34

0056

1          RUSH
2     Q.   You've not seen it before?
3     A.   I don't have a definition in my
4  mind.  No, I don't, sir.
5     Q.   Why are your employees concerned
6  with ligature marks if you've never heard
7  what they are before?
8     A.   Consumer Products Safety
9  Commission is involved in this with their
10  human factors development.  Again, as I
11  say, this was a technical report done in
12  conjunction with the Consumer Products
13  Safety Commission to try to examine these
14  in more detail.
15     Q.   Well, if you know, can you tell
16  me how the existence of ligature marks can
17  change whether the cause of entanglement
18  should be listed as victim caused, product
19  caused or unknown?
20     A.   I cannot elaborate more than
21  what is in the document, sir.
22     Q.   All right.
23          Now, could you read the
24  paragraph following the numerical listings
25  there called "inner cord categorization."

EXHIBIT___3___

Page _13_ of _34_

0057

```
1              RUSH
2    A.   "Inner cord categorization.
3    Finally we like the group to rethink our
4    original decision to automatically list
5    victim manipulation as a root cause factor
6    with inner cord death.  Although we agree
7    that the victim had to manipulate the
8    inner -- manipulate the product to
9    activate -- actively cause the loop, in
10   retrospect it seems wrong not to list the
11   inner cord death as product caused given
12   the inherent design deficiencies of the
13   blind not having cord stops.  Please
14   consider this and let us know if you think
15   inner cord deaths should be listed as
16   victim caused, product caused or both
17   victim and product caused."
18   Q.    Sir, why would the original
19   listing process decision automatically
20   list victim manipulation as the root cause
21   factor with inner cord deaths?
22   A.   I do not know.
23   Q.    Why would Caroline Jennings
24   state that in retrospect it seems wrong
25   not to list the inner cord deaths as
```

EXHIBIT 3
Page 14 of 34

0058
1           RUSH
2  product caused given the inherent design
3  deficiencies of blinds not having cord
4  stops?
5     A.   The Window Covering
6  Manufacturers Association -- safety
7  council, I am sorry, the safety council
8  had entered into a corrective action plan
9  with the Consumer Products Safety
10  Commission prior to this actually in 2000
11  at which point products had been modified
12  and redesigned to include products -- cord
13  stops.  In looking at that information or
14  in developing that new safety standard to
15  address that potential hazard, the
16  industry was fairly -- well, the industry
17  was aware of it at that point and was
18  certainly wanting to make certain that we
19  got this report as right as possible.
20     Q.   How is it that initially the
21  industry in attempting to get this as
22  right as possible made the original
23  decision to automatically list victim
24  manipulation as the root cause factor with
25  inner cord deaths?

EXHIBIT 3
Page 15 of 34

0059
1        RUSH
2        MR. CARROLL:   Let me object to
3   the extent there is no foundation.  It
4   hasn't been established that the
5   agency -- that the association did that.
6   You can answer subject to that objection.
7      A.   Well, and I can't say that the
8   industry did because CPSC was involved in
9   setting up many of these original
10  categories as well.
11     Q.   Sir, given your 18 years of
12  involvement with the WCMA, do you agree or
13  disagree with Caroline Jennings that in
14  retrospect it seems wrong not to list
15  inner cord deaths as product caused given
16  the inherent design deficiencies of blinds
17  not having cord stops?
18        MR. EARNHART:   Vague as to
19  time.
20        MR. CARROLL:   Subject to that,
21  you can answer.
22     A.   As of the date this is written,
23  I would agree with Caroline's assessment.
24     Q.   Okay.  The date this was written
25  was 10/9/03; is that right?

EXHIBIT___3___
Page _16_ of _34_

0060

1              RUSH

2     A.   Yes, it was.

3     Q.   How much earlier from that point

4  in time would you have disagreed with her

5  assessment?

6     A.   This is looking at the

7  particular discussion of this report, so

8  this report was only being done in this

9  time frame.

10    Q.   So before this date, you would

11  not have agreed in retrospect it seems

12  wrong not to list inner cord death as

13  product caused?

14    A.   I'm not quite sure I understand

15  your question.

16    Q.   I thought I asked you whether or

17  not you agreed with Ms. Jennings' opinion,

18  and I thought you said you did but

19  qualified it as to this point in time;

20  that is the point in time of her E mail

21  here.

22         What I am trying to establish is

23  how much earlier than that was it when you

24  first decided this opinion was correct?

25         MR. CARROLL:    I object to

EXHIBIT  3

Page 17 of 34

0061

1         RUSH
2   form.  You can answer.
3       A.   In 1999, the Window Coverings
4   Safety Council was notified by the U.S.
5   Consumer Products Safety Commission
6   regarding the evaluation that a number of
7   window covering cord deaths had occurred
8   within the inner cord of window covering
9   products.  The industry at that point
10  worked very quickly with the U.S. Consumer
11  Products Safety Commission to redesign the
12  products, to enter into a corrective
13  action program, and to reopen the ANSI
14  standard to make certain that we included
15  inner cords in the -- in the WCMA product
16  standard.
17      Q.   So if I understand you and
18  Caroline, you would have had Caroline's
19  opinion that inner cord deaths should be
20  listed as product caused given the
21  inherent design deficiencies of blinds not
22  having cord stops from approximately 1999?
23      A.   I -- in 1999, I would say that
24  would be the correct position.  I believe
25  it was late in the year 1999.

EXHIBIT   3

Page 18 of 34

0066
1           RUSH
2   ANSI process as well as the Consumer
3   Products Safety Commission, had a variety
4   of warnings regarding cords.
5      Q.   Sir, can you tell me whether or
6   not these standards have been important in
7   the attempt in America to stop child
8   strangulation by window coverings?
9           MR. CARROLL:   Let me object to
10  the form of the question.  You -- subject
11  to that, you can answer.
12     A.   I believe that the U.S. Consumer
13  Products Safety Commission and the Window
14  Covering Manufacturers Association
15  developed a standard that was a
16  significant step forward in providing
17  a -- a safer product in the market place.
18     Q.   How does the standard promote a
19  safer product in the marketplace?
20     A.   There are a variety of fairly
21  specific design requirements, performance
22  tests that a product must meet in the
23  standard.
24     Q.   How does that make a safer
25  product?

EXHIBIT  3

Page 19 of 34

0067

1          RUSH
2      A.   It -- it has eliminated the loop
3   cord for the most part or provided other
4   methods of I guess -- other methods that
5   companies could take in terms of how to
6   deal with corded window covering products.
7      Q.   And who did that standard make
8   safer?
9          MR. CARROLL:   I object to the
10  form.  If you understand it, you can
11  answer it.
12     A.   The -- the product -- the
13  standard itself was a standard for the
14  manufacturing process and is a performance
15  standard regarding how to make the
16  product.  How the product is used is
17  something that is certainly not covered in
18  the particular standard.
19     Q.   Okay.  The WCMA promulgated a
20  second standard in September of 2002; is
21  that right?
22     A.   That's correct.
23     Q.   And how did that standard differ
24  from the earlier standard of November '96?
25     A.   The major difference between the

EXHIBIT___3___

Page__20__ of__34__

0098
1          RUSH
2   Nevins correct or incorrect in alleging
3   that the window covering manufacturers
4   saved money by not addressing the inner
5   cord strangulation problem and a large
6   number of infants and children lost their
7   lives in strangulation deaths?
8      A.   I would say the manufacturers
9   did not save money by not addressing it.
10  In fact, it would have -- if -- if the
11  association and if CPSC had identified
12  this -- this as an issue in 1994, we would
13  have addressed it in the first standard,
14  and we would have addressed it in the
15  first corrective action program.
16     Q.   Now, if the CPSC didn't raise
17  the issue, would you have addressed it as
18  an industry organization anyway?
19     A.   If we had had the statistics to
20  back it up, CPSC presented us with
21  the -- the industry with their analysis
22  based upon their research and their
23  professional knowledge of product safety
24  in terms of where products were causing
25  potential dangers and where accidents had

EXHIBIT___3___

Page__21_ of_34_

0208

1          RUSH
2  acted upon with a new corrective action
3  plan and product modification in
4  conjunction with CPSC.
5    Q.  All right.
6        Had you heard about inner cord
7  deaths of children at any time prior to
8  that?
9    A.  Yes.
10    Q.  And how much earlier had you
11  heard about it?
12    A.  I believe I received a letter at
13  least ten years earlier.
14        MR. EARNHART:  Just for
15  clarification, are we talking about WCMA,
16  the WCSC or Mr. Rush personally or any
17  other organization he may be involved
18  with?
19        MR. BAUERMEISTER:  Let's work
20  with Mr. Rush personally.
21    Q.  Okay.  Let's turn to the other
22  notebook at tab 6.  All right.  Page 001.
23        MR. CARROLL:  5087.
24        MR. BAUERMEISTER:  Yes, sir.
25  That is correct.

EXHIBIT  3
Page  22  of  34

0209
1          RUSH
2     Q.   Mr. Rush, do you recall
3   receiving this letter from Mr. Or Ms. Toni
4   Greisbach?
5     A.   Yes, I do.
6     Q.   Okay.  Is Toni a gentleman or a
7   lady?
8     A.   I believe she is a lady.
9     Q.   Okay.  And did you receive this
10  letter shortly after September 5, 1990,
11  which is the date at the top of the
12  letter?
13    A.   Yes, I did.
14    Q.   And what did the letter tell
15  you?
16    A.   It related a case that this
17  attorney had been involved in regarding
18  the death of a child in a window covering
19  cord.
20    Q.   And that occurred on October 5,
21  1986; is that right?
22    A.   I do not --
23       MR. CARROLL:   It calls for
24  speculation by the witness.
25    A.   I do not not see that

EXHIBIT 3
Page 23 of 34

0210

```
 1            RUSH
 2  information in the letter.
 3     Q.   Would you read for the jury the
 4  first paragraph of the letter, please.
 5     A.   Okay.  "As -- as you may or may
 6  not be aware, I am an attorney that
 7  represented a family whose 18-month old
 8  son was killed on October 5, 1986 when it
 9  was entangled on a cord in the back of a
10  woven wood shade.  My client's lawsuit has
11  just been settled."
12     Q.   Okay.  And could you read the
13  last paragraph on that front page?
14     A.   "In the particular case that I
15  handled, the parents were aware of the
16  danger of pull cords and in fact placed
17  the crib at the opposite send of the
18  window from where the pull cord was
19  located.  The window shade was eight feet
20  long, and so the child's crib was
21  approximately seven feet away from the
22  pull cord.  The child became entangled in
23  what was referred to as the support cord
24  on the back of the woven shade.  His crib
25  overlapped the shade by only several
```

EXHIBIT 3

Page 24 of 34

0211
```
 1            RUSH
 2  inches, but he got entangled -- but he got
 3  behind the shade to look out the corner of
 4  the window and became entangled and was
 5  unable to free himself.  His parents found
 6  him at the end of his nap."
 7     Q.   And could you read the middle
 8  paragraph, please.
 9     A.    "I am writing at this time to
10  urge you and your organization to expand
11  your efforts in warning the general public
12  about the dangers posed by cords on window
13  coverings.  I realize that most of the
14  members of your organization initiated
15  warnings regarding pull cords in the past
16  two years.  These efforts are commendable,
17  but I am afraid that they don't go far
18  enough.  In fact, limiting warnings to
19  pull cords may be misleading."
20     Q.   Go to the next next page at
21  5088, please 02002.
22     A.   Where --
23     Q.   And read the first two
24  paragraphs there, please.
25     A.    "This support cord was an even
```

EXHIBIT 3

Page 25 of 34

0212

1          RUSH
2    more incidious danger than pull cords
3    because the support cord was hidden from
4    view. The cord did not even show from the
5    front where the shade was rolled up
6    because the shade flapped up in such a way
7    that the cords were invisible."
8    Q.   All right. And the next
9    paragraph, please.
10   A.    "In my opinion as well as the
11   opinion of the expert safety analyst that
12   consulted with me in this case, limiting
13   warnings to simply the pull cord is
14   insufficient because a parent
15   would -- will be mislead into thinking
16   that the pull cord is the only danger on
17   the window covering when in fact all cords
18   on window coverings are potential
19   strangulation hazards to young children.
20   During our investigation of this
21   particular case, we learned that pulling
22   that -- that -- we learned that the cord
23   on many models of venetian blinds and mini
24   blinds can be pulled away from the blinds
25   to form a noose like strangulation hazard,

EXHIBIT 3

Page 26 of 34

0213
1           RUSH
2   even though the cording is threaded to
3   each individual slat.  This can occur when
4   the blinds are in the completely lowered
5   position because in some models there is
6   no tension on the cording when it is in
7   that position."
8       Q.   Okay.  Now, the letter ends with
9   the second paragraph with a request that
10   you and your members take action
11   immediately, does it not?
12       A.   "I hope you will discuss these
13   issues with your members and recommend
14   that they will take action immediately.
15   It would certainly be better for the
16   industry if the industry policed itself on
17   these matters."
18       Q.   And the date on the
19   letter -- the date is actually a different
20   date.  It says September 4, 1990 on page
21   2, but it was September 5, 1990 on page 1,
22   right?
23       A.   Yes, that's correct.
24       Q.   What steps, if any, did you take
25   in response to this letter from Toni

EXHIBIT___3

Page 27 of 34

0214
1              RUSH
2  Griesbach?
3      A.   I forwarded copies of the letter
4  to the members of the Window Covering
5  Manufacturers Association.
6      Q.   What steps did they take?
7      A.   I do not know what steps they
8  particularly took.
9      Q.   Now, the first standard for
10  outer pull cord warning and a
11  manufacturing was promulgated by WCMA in
12  November of '96, correct?
13      A.   That's correct.
14      Q.   And that is six full years after
15  you received this letter, right?
16      A.   Yes, it is.
17      Q.   Why did it take six years?
18      A.   The industry was not involved in
19  producing standards at that point.  The
20  association was not an accredited
21  standards writing organization, and the
22  industry was not -- did not have
23  sufficient information.
24      MR. CARROLL:   Let's go off the
25  record for a second.

EXHIBIT___3___

Page 28 of 34

0240
1          RUSH
2   Do you have that page, sir?
3      A.   Yes, I do.
4      Q.   Now, admission answer 62 states
5   that WCMA admits that at the time of April
6   Cox's death Peter Rush was executive
7   director of both WCMA and WCSC, and that
8   is true, isn't it?
9      A.   Let me double-check.
10     Q.   Is that true, sir?
11        MR. CARROLL:   May 27, 2002
12   would be the date of death.
13     A.   2002.  I believe that to be
14   true.
15     Q.   Sir, for how many years were you
16   the executive director of both the WCMA
17   and the WCSC?
18     A.   I have been the executive
19   director of WCSC from 1994 to the present.
20   I was the executive director, and I do not
21   have the specific date when I was
22   appointed executive director of WCMA, but
23   I would -- my recollection would be
24   somewhere about 1989.
25     Q.   Until what date?

EXHIBIT  3
Page 29 of 34

0241

RUSH

1
2    A.    Until sometime in 2002.
3    Q.    And that is when Caroline
4  Jennings became executive director?
5    A.    That's correct.
6    Q.    Now, during the entire time that
7  you were the executive director for both
8  organizations, they had the same office
9  address, the same mailing address, and the
10  same facsimile number; is that correct?
11    A.    That is correct.
12    Q.    Tell me what steps the WCMA
13  participated in to start the WCSC.
14    A.    The WCMA -- I represent -- I
15  participated in meeting with the U.S.
16  Consumer Products Safety Commission I
17  believe it was March 30, 1994 as a -- as
18  the executive director of the Window
19  Covering Manufacturers Association in
20  addition to a -- a number of other
21  companies, both members of WCMA and
22  members -- companies who were not members
23  of WCMA.
24        At that meeting, the issue of
25  a -- some type of corrective action

EXHIBIT  3

Page 30 of 34

0254
1              RUSH
2   it denies that by developing the voluntary
3   standard the WCMA assumed any duty or
4   responsibility of any other entity or
5   acted on any other entities behalf.  What
6   does that mean to you as the former
7   executive director of the WCMA?
8        MR. CARROLL:   I will still
9   interpose an objection.  Since it was
10  crafted by lawyers, it is going to seek an
11  understanding of  -- of language that was
12  put in there by lawyers, but to the extent
13  he can answer, he is allowed to.
14     A.   The WCMA standard is a voluntary
15  ANSI based standard.
16     Q.   Is that your total answer, sir?
17     A.   Yes, it is.
18     Q.   Does the WCMA intend for product
19  purchasers to rely on the standards when
20  they are shown on products that are
21  purchased?
22        MR. CARROLL:    I object to the
23  form.  You can answer.
24     A.   The voluntary standard is a
25  standard which the U.S. Consumer Products

EXHIBIT____3____

Page 31 of 34

0255

```
 1              RUSH
 2  Safety Commission relies on to be  -- that
 3  window covering products must comply with.
 4  As far as I know, it is the only standard
 5  that a window covering product must comply
 6  with, but that is a -- that is based upon
 7  the U.S. government's Consumer Products
 8  Safety Commission's enforcement of that
 9  standard.  The WCMA has no enforcement
10  power at all.
11      Q.   I understand that.  What I am
12  trying to determine is if the WCMA expects
13  that when consumers buy products
14  manufactured under the WCMA standard and
15  carrying the WCMA warning as promulgated
16  that those consumers can rely on that
17  warning as something that will help make
18  the product that they use safe?
19          MR. CARROLL:    To the extent
20  the question calls for a legal conclusion
21  about reliance or consumer expectations, I
22  object.  Mr. Rush can answer based on his
23  knowledge and experience.
24      A.   The WCMA has no particular
25  program to consumers regarding the
```

EXHIBIT___3___

Page_32_ of_34_

0258
```
 1              RUSH
 2   Consumer Products Safety Commission to a
 3   level that they feel is acceptable in
 4   terms of the product performance.
 5       Q.   So people who go to the store
 6   and buy window coverings that bear the
 7   exact warning that the WCMA standards say
 8   should be on these blinds shouldn't assume
 9   that that warning tells them accurately
10   how safe this blind is?
11       MR. CARROLL:   I will object,
12   and -- to the extent it asks for a comment
13   beyond what the WCMA itself can say, but
14   with that objection Mr. Rush can answer.
15       A.   Again, WCMA has no way of
16   knowing or policing how a product is
17   manufactured.
18       Q.   Well, as a general matter,
19   manufacturers of these products owe
20   consumers a duty to make reasonably safe
21   products.  Isn't that true?
22       MR. CARROLL:   To the extent
23   you are not asking Law Professor Rush, he
24   can answer.
25       A.   Manufacturers of window covering
```

EXHIBIT___3___

Page __33__ of __34__

0259

1          RUSH
2  products should be complying with the
3  current ANSI standard on any product that
4  they are -- that they are offering to the
5  public for sale.  If not, they are subject
6  to enforcement actions by the U.S.
7  Consumer Products Safety Commission.
8     Q.    And why is that?
9          MR. CARROLL:    Asked and
10  answered.  You can answer again.
11     A.    Because the U.S. Consumer
12  Products Safety Commission has the
13  statutory authority to determine products
14  which are safe to sell in the United
15  States.
16     Q.    And the way we tell whether a
17  product is safe to sell is whether it
18  meets the ANSI WCMA standard, correct?
19          MR. CARROLL:    I object.
20  Mischaracterizes the witness' testimony.
21  You can answer again.
22     A.    The U.S. Consumer Products
23  Safety Commission enforces voluntary
24  industry standards that -- accepted
25  standards that it feels are sufficient to

EXHIBIT   3

Page 34 of 34