Page 1

IN THE UNITED STATES COURT
FOR THE DISTRICT OF ALASKA

VALERIE ROUNTREE, individually and )
as Personal Representative of THE )
ESTATE OF APRIL LYNNE COX; MORGAN )
SCHEDIWY, a minor, through her )
natural mother and guardian VALERIE)
ROUNTREE; and CHRISTOPHER COX, )
)
)
                          Plaintiffs, )
    vs.                                )   NO. A04-0112 CV (JWS)
                                       )
WINDOW COVERING MANUFACTURERS          )
ASSOCIATION,                           )
                                       )
                          Defendant.   )
_____)

DEPOSITION OF

JON O. JACOBSON, Ph.D.

SEATTLE, WASHINGTON

FEBRUARY 1, 2008

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY: JUDY BONICELLI, CSR NO. 9091

FILE NO: A20080F


EXHIBIT A
page 1 of 28

1209b1f8-92e8-4900-b54d-b773acfbba1b

Page 9

```
1    A.   Yes.
2    Q.   There are some court documents -- let's put these
3  aside, as well.
4         Actually, Dr. Jacobson, is this the sum of your
5  reliance material in this case?
6    A.   Yes.
7    Q.   So I know that on your expert disclosure you listed
8  all the documents you relied on.  Is that coextensive with this
9  or should be?
10   A.   I hope that is correct, yes.  I had those digitally.
11 And except for the deposition, I printed everything out so you
12 can put your hands on it.
13   Q.   Thank you.
14   A.   And I didn't bring a computer so we could --
15   Q.   That's perfectly fine.
16   A.   The deposition was only done digitally over the
17 Internet.
18   Q.   And we'll look at those later if that is okay.
19        I'm looking at the file called "Outgoing
20 Correspondence."  This is a fax from you, Dr. Jacobson, to Chuck
21 Ray, and it's a PDF of your report.  That's the report that was
22 filed in this case?
23   A.   Yes.
24   Q.   Okay.  And legal notices is the only other file that
25 has material in it.
```



EXHIBIT A
page 2 of 28

1209b1f8-92e8-4900-b54d-b773acfbba1b

```
 1  listed here?
 2      A.  As far as I know, yes.  When I had the file, I asked
 3  my secretary to print those out last week.
 4      Q.  So the stack that's in front of me here, this is not a
 5  subset of what was provided to you.  This is the material that
 6  was provided to you?
 7      A.  As far as I know, yes.  I did my best to do that.
 8      Q.  Okay.  We also asked for all drafts and outlines of
 9  your expert disclosure.  There is none of those that exist?
10      A.  The draft gets overwritten while I'm doing the report,
11  so I don't know how to -- it's erased and gone.
12      Q.  There are no notes that you used in preparation of the
13  report?
14      A.  No.
15      Q.  We talked about No. 2, all materials referenced in
16  your expert disclosure, all documents created by you or on your
17  behalf related to the hazards of cords on window-covering
18  products.  None of those?
19          No documents that indicate any advocacy or
20  investigation or research into the hazards report?
21      A.  No.
22      Q.  And we've already gone through the invoices.  The last
23  item is your most recent CV.  You've attached a CV to your
24  current disclosure.  Is that current?
25      A.  Yes.
```


EXHIBIT A page 3 of 28

```
 1   24 items.  I know you may not know that, but does that sound
 2   fair?
 3       A.   I've done a lot more things than that.  Some are
 4   summary, some are specific.
 5       Q.   I'm not saying you've only done 24 jobs.  I'm saying
 6   there are 24 items listed.
 7       A.   That's fine, sure.
 8       Q.   Have you ever had any experience with window blinds,
 9   professional experience with window blinds?
10       A.   No.
11       Q.   Any experience with a product that is linked to
12   strangulation?
13       A.   I have had experience with litigation with
14   strangulation cases but not specifically a product, per se.  I
15   have had one product, yes.  Others have been strangulations due
16   to other entanglements with cord-like devices.
17       Q.   Well, let's talk about the first one when you said
18   there was experience with a product that was linked to
19   strangulation or strangulation hazard.
20       A.   Yes.
21       Q.   What was that?
22       A.   Seatbelts in automobiles.
23       Q.   And are you saying that you had experience in a matter
24   that dealt with strangulation by seatbelts, or are you saying
25   that seatbelts in theory could cause --
```


EXHIBIT A page 4 of 28

Page 16

1  A.  No. I have had vehicular collision cases where the
2  seatbelt resulted in a strangulation death.
3  Q.  And did you offer an opinion in that case?
4  A.  As of today, I have not been asked to comment on that,
5  although that was the method -- that was how the fatality
6  occurred in the accident.
7  Q.  Is that matter still ongoing?
8  A.  I think so.
9  Q.  What about -- you said there were some that were not
10  product-related?
11  A.  Well, they were -- yeah. There was some -- I'm
12  recalling right now a strangulation having to do with some
13  playground equipment that had some ropes on it that resulted in
14  strangulation.
15  Q.  Was that also in litigation?
16  A.  Yes.
17  Q.  Did you offer an opinion in that case?
18  A.  Yes. But I haven't been deposed or it hasn't gone to
19  trial as far as I know.
20  Q.  Has your opinion been disclosed in the expert report
21  or some analogous format?
22  A.  Possibly. Except that the attorney I was working for
23  has been appointed as a judge, and he gave the case to someone
24  else. So I'm waiting for that to take place.
25  Q.  Okay. Can you tell me roughly what you were asked to



EXHIBIT A
page 6 of 28

1209b1f8-92e8-4900-b54d-b773acfbba1b

1  offer in that report or what you decided to offer in that
2  report, depending on what stage it is in?
3     A.  I was offering the mechanism as to how the loop
4  occurred that ensnared the head and neck of a young boy.
5     Q.  And what was your opinion?
6     A.  That it was very likely that this rope on a flagpole
7  attached to playground equipment would produce a large enough
8  loop that could readily capture somebody's chin, neck and head
9  and result in strangulation.
10    Q.  This is a rope on a flagpole, and the rope was
11 attached to flagpole equipment?
12    A.  Correct.  And it was an old rope that became very
13 stiff so it formed a hanging loop that was large enough to catch
14 something.
15    Q.  Is part of your opinion in that case that that danger
16 should have been known to the owner of the equipment or the
17 manufacturer of the equipment or whoever the defendant may be?
18    A.  Should have been known to somebody.
19    Q.  Okay.  Do you have any experience with strangulation
20 hazards outside of litigation?
21    A.  No.
22    Q.  Let me back up, then, a little bit.  Is litigation
23 consulting your only business?
24    A.  No.
25    Q.  What is your other business?


EXHIBIT A
page 6 of 28

Page 18

```
 1      A.   Well, not on my rèsumè was a major job I had over the
 2  last two years rebuilding the monorail in Seattle for a couple
 3  events that occurred.
 4      Q.   I guess sometimes you work as a nonforensic engineer;
 5  is that fair to say?
 6      A.   I have done a lot of nonforensic work, yes.
 7      Q.   How would you describe the split in your job?  What
 8  percentage is forensic-related and what, for lack of a better
 9  word, is straight engineering?
10      A.   As of this year, it was 100 percent forensic, because
11  I had a major job that took up virtually all of January.  And
12  prior to the problems with the Seattle monorail, my forensic
13  work was becoming virtually my entire professional income.  And
14  then that went to virtually nothing for a year and then last
15  year it was the process of reestablishing contacts with people.
16      Q.   Excluding the monorail job, looking back, how long ago
17  would you say the forensic engineering became a predominant part
18  of your work?
19      A.   Well, I kind of tried to see what the percentage was.
20  When I started 30 years ago, it was not at all except for one
21  case that I carried over from my last employer.  And it sort of
22  grew a few percent a year to the point, by the time I had been
23  in business 30 years, it was probably 90 -- over 90 percent of
24  my business until a few years ago.
25      Q.   So, say, ten years ago in 1988 -- sorry, I wish --
```


EXHIBIT A page 7 of 28

```
                                                          Page 24
 1            Let's go on now to your expert report, which I also
 2   have a copy of here.
 3            (Exhibit No. 4 marked for identification.)
 4       Q.   (By Mr. Weiss) This is your disclosure in the case.
 5       A.   I'm sorry.
 6       Q.   This is your disclosure or a copy of it?
 7       A.   This is a copy of my report.  It was a statement by
 8   you.  I didn't think it was a question.  If you want to phrase
 9   it differently -- I want to answer a question.  I thought you
10   were handing it to me and telling me what it was.
11       Q.   That's perfectly fair.
12            What I'd like you to do is look at this.  It's not
13   particularly long, so hopefully this should go -- but I would
14   like you to, if you could, tell me what opinions you intend to
15   offer in this case.
16       A.   Well, the manner in which the Window Manufacturers
17   Association functions to guide research develop, the hazards
18   associated with the product appear to be limited in their own
19   effort unless dictated by the government agency, the Products
20   Safety Commission.  There appears to be no safety studies,
21   engineering studies, engineering safety studies that were
22   developed by the Window Manufacturers Association or the safety
23   council, other than in response to the Consumer Product Safety
24   Commission.
25            I'm not sure how you would want to put the spin on
```


EXHIBIT A page 8 of 28

1209b1f8-92e8-4900-b54d-b773acfbba1b

1  encouragement, but it was at their direction whether it be a
2  mandate, a threat or a hint.  But it appeared that nothing
3  happened until the Consumer Products Safety Commission was on
4  the scene with the prospect of reducing the hazard of
5  strangulation with window coverings, which had hanging cords and
6  internal cords as part of their function.
7      Q.  Are there other opinions?
8      A.  The design of window coverings that did not initially
9  include cord stops as part of the design was very slow in
10 coming, and the information that would have been available was
11 only done as a consequence of the data collected by the Consumer
12 Product Safety Commission.
13         The Window Manufacturers Association appeared to be
14 lacking in their accumulating of this data that would show the
15 existence of a hazard in the use of application, installation of
16 window coverings that included cords.
17         That kind of covers it.
18     Q.  Certainly I'm not here to limit you to those.  If you
19 come up with anything else during the course of the deposition,
20 please let me know.  I'm just trying to sort of focus the
21 questions a little bit.
22         Well, let's look at the first one, and please tell me
23 if I'm misstating it.  It's the matter in which the WCMA went
24 about dealing with window blind safety was limited and dictated
25 by the CPSC?



Page 26

1   A.   Well, they apparently had no function in that area
2 until CPSC had taken on as a task to have the hazard addressed.
3   Q.   Let's go with the first question, then.  Should the
4 WCMA have addressed that before the CPSC brought it to their
5 attention?
6   A.   If they're representing an industry that presents a
7 product that is hazardous to the public, it should be something
8 that they are aware of.  And there was no awareness of the
9 existence of strangulation hazards in the WCMA operation, as I
10 believe Mr. Rush stated in his deposition.
11   Q.   When did WCMA become aware of the risk of
12 strangulation?
13   A.   From Mr. Rush's deposition, I think somewhere within
14 the mid-'90s, probably in 1994, although there was, I believe,
15 some other information communicated to them probably earlier.
16   Q.   What do you mean when you say "earlier"?  I know what
17 earlier meanings.  What time are you talking about?
18   A.   They may have known earlier, but there is no record of
19 their having any information, as I understand.
20   Q.   We've talked a bit about it before that you've had
21 experience with NFPA?
22   A.   Yes.
23   Q.   That's not a trade association of manufacturers; is
24 that correct?
25   A.   I don't believe so.


EXHIBIT A page 10 of 25

1  Q. Does every trade association -- and I'm not talking
2  about individual manufacturers, I'm talking about a trade group.
3  Does every trade group have an obligation to be aware of safety
4  issues involving products that its members make?
5  A. I would certainly hope so.
6  Q. Does it matter what the function of the association
7  is?
8  A. I would think that they should be aware of it. I
9  would think that that would be a responsible part of the
10 knowledge base to understand the hazards.
11 Q. And how would a trade group go about finding this
12 information out?
13 A. The members should have that as part of their
14 knowledge base, and the overall organization should assist -- it
15 would seem like assist in concert to have the product as
16 presented to the public for safe sale, merchantability. If they
17 can't do it at home, they should be doing it in cooperative
18 organization.
19 Q. I'm not sure that answered the question. How should a
20 trade association find out about possible safety risks?
21 A. I think their best function is to present a safe
22 product to the general public. And if they're part of an
23 overarching organization, they should be aware of it and
24 assisting the members to reduce the risk, hazard, danger to the
25 public. So they should accumulate the information.



EXHIBIT A
page 11 of 25

1  Q. I understand that, but my question is: How should
2  they go about finding out about it? If I'm involved in the
3  national widget society, how would I find out if there are any
4  risks with widgets?
5  A. They would take the data that comes to them or take
6  the data from their organizations and have essentially a
7  clearinghouse for that data and discuss that.
8  Q. Why would the data come to them?
9  A. Because it's going to be a universal problem to all
10 the manufacturers of the product.
11 Q. What if this data is not brought to them?
12 A. That's not a proper function on the part of the
13 organization or the members.
14 Q. Let's break that up. Am I correct that you're saying
15 that the manufacturers have an obligation whenever -- any
16 manufacturer has an obligation, when it learns about a potential
17 safety issue with its product, to bring it to the attention of
18 whatever trade group it might belong to?
19 A. Right. And the trade group has an obligation to seek
20 that out to make sure that the product is safely marketed to the
21 general public.
22 Q. And should seek that out from its members?
23 A. Sure.
24 Q. Should it call them every year and say, "Any safety
25 issues?" How should they do it?



EXHIBIT A page 12 of 28

1209b1f8-92e8-4900-b54d-b773acfbba1b

1   Q.   When did I say that?
2   A.   When you asked me about that.
3   Q.   Well, I certainly don't mean any confusion. The
4   testimony you've given before, does that apply to the WCMA?
5   A.   I would think so, yes.
6   Q.   Do you know of an organization called the Window
7   Covering Association?
8   A.   No. But you're the one that mentioned it earlier. I
9   thought that was a trick question.
10  Q.   No. I'm not going to give you trick questions. For
11  the rest of the deposition is WCMA understandable to you as an
12  acronym for the Window Covering Manufacture Association?
13  A.   Yes.
14  Q.   Do you know who the members of the WCMA were, say, in
15  1994?
16  A.   No.
17  Q.   Do you know who they were in 1990?
18  A.   No.
19  Q.   How about 1985?
20  A.   No.
21  Q.   Do you know when an individual member of the WCMA
22  first became aware of the hazards of window blind strangulation?
23  A.   No. There are no records in my file that indicate
24  that, although I understand there was a -- I believe a case with
25  an attorney's that happened in the late '80s. That resulted in



EXHIBIT A page 13 of 28

1209b1f8-92e8-4900-b54d-b773acfbba1b

Page 46

```
 1    Q.   Do you know when the blinds involved were sold?
 2    A.   No.
 3    Q.   Do you know when they were made?
 4    A.   No.
 5    Q.   Do you have any idea of a time frame for when they
 6  might have been made?
 7    A.   I don't think the records are clear in that regard.
 8    Q.   I assume they couldn't have been manufactured after
 9  the accident, so assuming that is the end point --
10    A.   It's a barrier on the time, yes.
11    Q.   -- is there a time earlier than that where you can say
12  it had to have been made or sold before that?
13    A.   I don't know that.  You're going to have to go to the
14  records of the parties in this case.
15    Q.   You didn't look at those records that would show that?
16    A.   Not precisely, no.
17    Q.   Is there a starting point?
18    A.   The only way I have it is from reviewing the expert
19  reports that makes some reference to that.
20    Q.   The expert reports of plaintiffs' experts or
21  Defendant's excerpts?
22    A.   Defendant's experts.
23    Q.   So at the time you made your own expert report, you
24  didn't know when the blinds were made?
25    A.   Yes.
```


EXHIBIT A page 14 of 28