Page 47

```
 1      Q.   And you don't know that now, but you think you may
 2   have seen it, or you don't recall --
 3      A.   I don't even know if they manufactured it.
 4      Q.   You don't know who the manufacturer is?
 5      A.   I think they have possibly indicated who they believe
 6   the manufacturer is, but I don't know -- I don't recall who it
 7   would be.
 8      Q.   When you say "they have indicated who they believe,"
 9   who are you talking about?
10      A.   I have seen a references that's to a Asian
11   manufacturer of the window blinds, but I don't recall the name
12   at this time.
13      Q.   Do you know who -- when you say you saw a reference to
14   an Asian manufacturer, do you know who made that?
15      A.   No.
16      Q.   Okay.  Do you know who sold the window blinds, the
17   retailer?
18      A.   No.
19      Q.   Do you know if there is a distributor or importer,
20   anybody in between?
21      A.   No.  There probably is, but it is likely that there
22   was not.
23      Q.   Understood.  I may have asked this before.  I want to
24   make sure we're clear.
25           Do you know of the start time before which these
```



EXHIBIT A page 15 of 28

Page 49

1   A.   Yes.
2   Q.   I'm assuming, which maybe I shouldn't do, that when
3 you say that WCMA -- well, you said you don't know exactly what
4 they did, but you're talking about the time frame prior to the
5 manufacture of the blinds?
6   A.   Yes.
7   Q.   But I believe you testified a moment ago that the CPSC
8 did some sort of investigation or investigative work into child
9 strangulations on window blinds.
10   A.   I -- there was -- there appeared to be a motivation on
11 their part as a result of accumulated data to motive the Window
12 Covering Manufacturing Association to proceed and to be aware of
13 the data and to begin to write the ANSI document.
14   Q.   Do you know if the CPSC presented its data to the
15 WCMA?
16   A.   I don't know what the process was.  I just know, in
17 reading through Mr. Rich's [sic] deposition, he was aware that
18 they had to begin the process of writing the standard.
19   Q.   I believe you mean Mr. Rush.
20   A.   Sorry.  I know a Peter Rich, and this is a Peter Rush.
21   Q.   No problem at all.  CPSC has expertise in the product
22 safety issues, would you agree?
23   A.   Well, they are aware of this.  I'm not sure what all
24 their expertise is, but they do have employees that are part of
25 product safety, yes.  But I don't know the entire personnel and


EXHIBIT A page 16 of 28

1209b1f8-92e8-4900-b54d-b773acfbba1b

1   Q.   So is it fair to say that generally speaking you
2   believe a cord stop is an effective design to reduce the risk of
3   inner cord strangulation?
4   A.   Yes.
5   Q.   Do you know if these blinds -- the blinds at issue in
6   this case were manufactured in accordance with the 2000
7   standard?
8   A.   I don't believe they were.
9   Q.   How do you know that?
10  A.   From the information that is presented, they were not.
11  And the indication from the information I had was the Rountrees
12  said that they believed the blinds were bought in the early
13  1990s, whereas the presence of warning sticker indicates that
14  they were probably purchased after the application of the '96
15  standard but not after the second publication of the revised
16  standard, because the accident happened before that happened, I
17  believe.
18  Q.   Are you aware if there were any changes to the product
19  prior to the publication of the 2000 standard?
20  A.   No.
21  Q.   Do you know -- have you examined the blinds?
22  A.   No.
23  Q.   Have you seen them?
24  A.   No.
25  Q.   Have you read any report that examines -- report that


EXHIBIT A
page 17 of 28

1    memorializes an inspection or report?
2         A.   No.
3         Q.   Do you know if they comply with the 1996 standard?
4         A.   Only insofar as the dates the time of manufacture is
5    after the '96 standard. That's all I know.
6         Q.   Have you read the '96 standard?
7         A.   I have reviewed it.
8         Q.   You're aware that it contains a number of requirements
9    to meet the standard; is that fair?
10        A.   It's liking in the document.
11        Q.   I'll ask this sort of again. Are you -- can you say
12   one way or the other whether the blinds, as a whole, comply with
13   that standard?
14        A.   I haven't seen the blinds and I haven't seen a report,
15   so I can't say.
16        Q.   What is the 1996 standard intended to address?
17        A.   It's to address the problem with strangulation, the
18   problem with cords.
19        Q.   Does it include a design change?
20        A.   It appears to have a design change that relates to
21   part of the strangulation problem.
22        Q.   And what is that?
23        A.   There is a test that is there that indicates the force
24   with which strangulation cords should not reach -- a loop
25   underneath the mannequin's chin would separate under a given



Page 64

1   A.   I don't believe so.
2   Q.   There was no -- it is not a guarantee that the product
3   that complies with the standard is safe?
4   A.   There is no guarantee associated with the standard.
5   Q.   And a person who buys an RV that complies with the
6   standard, does that person have a right to believe that there is
7   no danger associated with that RV?
8   A.   No.  There are dangers associated with it because of
9   its use factor.  They could drive it into another RV and the
10  occupants in both could be injured.
11  Q.   Let's go back.  You had specified earlier in the
12  deposition that you had two main opinions, and I think we went
13  through the first one.
14       Did I miss any elements of the first one that you
15  recall?
16  A.   I don't recall.
17  Q.   In the second one, I think if I can summarize -- and,
18  again, please correct me if I'm misstating -- the opinion was
19  that essentially the design change that addressed inner cord
20  stops, I think your term was slow in coming and only because it
21  was encouraged by the CPSC.
22  A.   That appeared to be the case.
23  Q.   Does that accurately address your summary?
24  A.   That's a good summary.
25  Q.   You said it was long in coming.  Is it your belief



1  you?
2  A.  That would sound similar to something I read.
3  Q.  Do you know if Chiang Fang is a member of WCMA?
4  A.  No.
5  Q.  Do you know what kind of entity can be a member of the
6  WCMA?
7  A.  I don't know their member requirements.
8  Q.  You don't know if an Asian manufacturer could be a
9  member?
10 A.  I don't know that.
11 Q.  You said that it came as a consequence of being pushed
12 by the CPSC?
13 A.  That appeared to be the case from my reviewing of the
14 information.
15 Q.  When you say that, are you speaking of the inner cord
16 hazard specifically.
17 A.  I would believe all of the work that went into the
18 development of the standards was motivated by interaction with
19 the CPSC.
20 Q.  Are you aware of at any time prior to -- well, let's
21 just say prior to the time of the development of the 1996
22 standard, of the CPSC discussing the issue of inner cord
23 strangulation with the WCMA?
24 A.  I'm not aware of that.
25 Q.  Have you seen any documents in which the CPSC brings



1  that to the WCMA's attention?
2      A.  I'm not aware of that.
3      Q.  Are you aware of any request by CPSC to address inner
4  cord strangulation in the 1996 standard?
5      A.  No.
6      Q.  Are you aware of any by the CPSC to address it in the
7  2000 standard?
8      A.  I don't recall. It may have been because it was
9  included, but I can't cite a source.
10     Q.  So, from your knowledge, it may have been encouraged
11 by the CPSC, or it may have been -- I was going to say respond
12 to lawyers, but on the WCMA's own initiative?
13     A.  I don't know the overall motivation. Since they claim
14 they were working in concert, then I can't say exactly how that
15 did come about.
16     Q.  Sure. If it's okay with you, I'm going to turn back
17 to your expert report, which I've already forgotten the exhibit
18 number. But you should have it in front of you.
19     A.  No. 4.
20     Q.  I'll just go through it quickly and make sure I
21 understand all the points you made here. Again, if an opinion
22 in here comes outside of the scope of the two we discussed
23 earlier, please call it to my attention; although I understand
24 it could be subsets of the same opinion.
25          You talked about the -- you mention in the bottom of



```
1     A.    Okay.
2     Q.    Does that change your --
3     A.    No.
4     Q.    Are you aware if any of these concerns were addressed
5   by WCMA?
6     A.    This would be probably after the graph or the
7   publication of the 2002 standard, so I don't believe they were
8   included.  But I haven't looked.
9     Q.    So you didn't prepare this letter to the 2002 standard
10  to see if it was addressed?
11    A.    No.
12    Q.    You don't have any knowledge as to whether this
13  actually made it into the standard?
14    A.    I can't say at this time.
15    Q.    Given that this may not have affected the incident and
16  you don't know whether they were actually responded to, would
17  that change your decision to put this paragraph in your report?
18    A.    No.
19    Q.    And the last paragraph, you talk about warnings in the
20  form of hang tags.
21    A.    Yes.
22    Q.    And you say that is the least certain of the measures?
23    A.    Yes.
24    Q.    Is that hang tags specifically or warnings in general?
25    A.    Warnings in general; hang tags even more specifically,
```



Page 84

1    A.    Not that I recall from the discussion I had with
2  Mr. Bauermeister prior to this.
3    Q.    Do you know when WCMA learned about the hazard of
4  inner cord strangulation?
5    A.    Well, there was a letter from an attorney in the early
6  '90s, and then I think the major impact of inner cord
7  strangulation is -- see, inner cord strangulation probably came
8  from the information from CPSC.
9    Q.    In the letter part of your material?
10    A.    I don't recall. I think the information was probably
11  communicated to Mr. Rush in a manner that is not included in the
12  materials I have.
13    Q.    Have you read the letter itself?
14    A.    I don't recall.
15    Q.    Do you know what product is identified in the letter?
16    A.    No.
17    Q.    Do you know if it's a product that is made by any
18  member of the WCMA?
19    A.    No.
20    Q.    Do you know if it's a type of product that is made by
21  any member of the WCMA?
22    A.    No.
23    Q.    Do you know who else, if anybody, received a copy of
24  the letter?
25    A.    No.


EXHIBIT A page 23 of 28

1209b1f8-92e8-4900-b54d-b773acfbba1b

Page 85

```
 1          MR. WEISS:  Don?
 2          MR. BAUERMEISTER:  Yeah.
 3          MR. WEISS:  Are you there?
 4          If it's okay with you, I think I may be done.  I'd
 5  like, if it's okay, to take a couple minutes to go over my notes
 6  and make sure I'm not missing anything.  But certainly I don't
 7  have much more if anything.  That may be it.
 8          Is that all right with you?
 9          MR. BAUERMEISTER:  All right.
10          (Recess taken.)
11          MR. WEISS:  Back on the record.  Unfortunately, I do
12  have just a few more questions that I would like to ask, but I
13  think we'll be done quickly.
14     Q.   (By Mr. Weiss) We talked a bit, Dr. Jacobson, about
15  your prior testimony in cases.  Have you ever testified in a
16  case before where the product met a safety standard?
17     A.   Probably.
18     Q.   Have you ever -- let me narrow it down, then.  Have
19  you ever testified in a case where the safety standard, whether
20  met or unmet, was an issue in the case?
21     A.   Probably.  I don't recall.  Maybe, maybe not.
22     Q.   Do you recall giving any testimony about whether or
23  not a product met a safety standard?
24     A.   No.
25     Q.   And do you recall giving any testimony before about
```


EXHIBIT A page 24 of 25

Page 86

1   the adequacy of the safety standard?
2       A.   No.
3       Q.   And do you recall giving testimony or otherwise being
4   involved in a case in which the sponsor of the safety standard
5   was a party?
6       A.   No.
7       Q.   I think we talked before that you're not sure whether
8   the manufacturer was a member of WCMA?
9       A.   Yes.
10      Q.   How about the retailer?
11      A.   Give me a better question.
12      Q.   Do you know if the retailer was a member of the WCMA?
13      A.   No.
14      Q.   Can a retailer be a member of the WCMA?
15      A.   I don't think so because they're not a manufacturer.
16  That would be my assumption, although I don't know the
17  requirements for membership.
18      Q.   The WCMA, did they inspect the blinds in this case?
19      A.   I haven't seen any information that they had.
20      Q.   Do you know if WCMA inspects any products?
21      A.   I have not seen any information that they do.
22      Q.   Do they certify any products?
23      A.   I have not seen any information that they do.
24      Q.   And so you, then, don't have any information as to
25  whether they go out to the plant and look at the manufacturing



Page 87

1  process?
2     A.   No information on that at all.
3     Q.   Does anybody -- anybody outside the manufacturer
4  inspect or certify compliance with the safety standard?
5     A.   Not that I'm aware of because there are no members --
6  there are no staff members of the WCMA.
7     Q.   I'm asking if anybody does in the world.
8     A.   I'm sure the manufacturer does.
9     Q.   Does anybody aside from the manufacturer inspect the
10 manufacturer's product for compliance?
11    A.   Probably the retailer and purchaser, maybe the
12 distributor.
13    Q.   And they inspect for compliance with the safety
14 standard we're discussing today?
15    A.   I wouldn't know.
16    Q.   Just to make sure I'm clear on something -- you still
17 have it in front of you, the pile of documents that you relied
18 on for your report?
19    A.   Yes.
20    Q.   And those were sent to you by the attorneys for the
21 plaintiff?
22    A.   Yes.
23    Q.   And you didn't seek out documents aside from those?
24    A.   Yes.
25    Q.   No, you didn't, right?  Bad question.


EXHIBIT A page 26 of 28

Page 88

```
1        Is it correct to say that you did not seek out
2   documents aside from those provided to you by plaintiffs'
3   counsel?
4        A.   Yes.
5        Q.   Did you request any additional documents?
6        A.   No.
7        Q.   And to your understanding, the documents listed on the
8   first page of your report and actually continuing to the top of
9   the second page is the sum total of your reliance material
10  specific to this case?
11       A.   Yes.
12       Q.   Which is in theory coextensive to that pile?
13       A.   And the disk.
14       Q.   And the disk from the deposition.
15            We've gone through your report, and I've asked you
16  about some of the documents that are listed here.  Is it fair to
17  say that, for the extent you rely on these documents, it's
18  reflected in the body of your report?
19       A.   I hope so.  That's all I had to go on.
20            MR. WEISS:  Then in that case I have no further
21  questions.  I don't know if Don has anything to ask or add.
22            MR. BAUERMEISTER:  Yes.
23
24
25
```



EXHIBIT A page 27 of 28

Page 89

```
 1                    EXAMINATION
 2  BY MR. BAUERMEISTER:
 3      Q.   This is Don Bauermeister.  Just one question, sir.
 4           Is it your opinion that April Cox would be alive today
 5  if the inner cord had been made a part of the window blinds in
 6  her room?
 7      A.   From what information I have at this time, apparently
 8  so.
 9           MR. BAUERMEISTER:  I have no further questions.
10           MR. WEISS:  I just have a couple.
11                 FURTHER EXAMINATION
12  BY MR. WEISS:
13      Q.   Dr. Jacobson, did you review any reports -- medical
14  examiner's, police reports -- regarding the death of April Cox?
15      A.   No.
16           MR. WEISS:  I have no further questions.
17           MR. BAUERMEISTER:  Thank you, sir.  And thank you
18  Dr. Jacobson.  We'll be in touch soon.
19           (Discussion off the record.)
20           (Ending time:  1:32 p.m.)
21
22
23
24
25
```



EXHIBIT A
page 26 of 28