## DEPOSITION OF STUART M. STATLER
## CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

VALERIE ROUNTREE, individually )
and as Personal Representative )
of THE ESTATE OF APRIL LYNNE )
COX; MORGAN SCHEDIWY, a minor, )
through her natural mother and )
guardian VALERIE ROUNTREE; and )
CHRISTOPHER COX, )
)
      Plaintiffs, )
)
vs. )
)
WINDOW COVERING MANUFACTURERS )
ASSOCIATION, )
)
      Defendant. )

Case Number:

A04-0112 CV (JWS)

DEPOSITION OF

STUART M. STATLER

Washington, D.C.

Thursday, January 24, 2008

9:58 a.m.

Job No.: 1-121137
Pages 1 through 263
Reported by: John L. Harmonson, RPR


EXHIBIT
B
page 1 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 35

1    instructed the staff to contact the industry?

2        A.    It would have been either in 1981 or early

3    1982.

4        Q.    Now, you said later you recall a series of

5    meetings in 1985?

6        A.    It was either '85 -- definitely '85 towards

7    the end and early 1986 I remember as well.  But there

8    were ongoing -- we would meet with the voluntary --

9    that is "we" the commissioners, en banc would meet

10   with the voluntary standards group about once every

11   three months.  Sometimes they had very little to

12   report because there was no activity within the

13   industry.

14           My recollection of any kind of substantive

15   reporting back from the voluntary standards group came

16   about in the '85-'86 period.

17       Q.    Are you aware of whether the staff made

18   contact with anyone in the industry in 1981 or early

19   1982?

20       A.    I am aware that contacts were made.  I

21   couldn't tell you with any specificity who those

22   contacts were made with.  I am certain, given how the

EXHIBIT

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 36

1    commission functioned, the American Window Covering

2    Manufacturers Association would have been one of the

3    primary groups contacted.

4        Q.    But in your review of all of these

5    materials, do you have anything that indicates any

6    contact with the --

7        A.    No.  My earliest recollection is what I've

8    told you, and that was meetings by the commissioners,

9    myself included, as part of a regular tri-monthly

10   review of what was going on.

11              Keep in mind, there were about 40 different

12   voluntary standards efforts then underway.  And one of

13   the reasons why that was so important was because also

14   in 1981 a major change in the way the commission did

15   business took place, namely Congress had rewritten the

16   Consumer Product Safety Act to require the commission

17   to defer to voluntary standards efforts before the

18   commission could enact any mandatory product safety

19   standard on its own.  In other words, prior to 1981,

20   the commission, if it felt compelled to do so, could

21   without regard for what was going on in an industry,

22   issue a mandatory private safety standard.

EXHIBIT B
page 3 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 51

1      The first opinion that I pulled out I think

2  is at the beginning, which -- and certainly this is

3  summarizing a broad thought, but that it's not the

4  number of deaths or instances that make the severity

5  of the hazard or the importance of addressing the

6  hazard?

7      A.    That's correct.

8      Q.    The second one I came up with, which is

9  something we have already begun discussing, which is

10  that CPSC knew the risk of strangulation in 1981 and

11  informed the WCMA of that risk in 1981.

12      A.    Right.

13      Q.    And as we've talked a little bit, we've

14  already addressed some of that, but we'll go back to

15  that in a moment.

16      The third is that WCMA knew or should have

17  known of the risk of inner cord strangulation and I --

18  at some point in time, and I guess we'll figure out

19  what that time was.  Is that fair?

20      A.    Yes.

21      Q.    The next is that the WCMA did not

22  adequately warn the public of the risk.



EXHIBIT
B
page 4 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 52

1        A.    That's correct.

2        Q.    The fifth is that WCMA undertook a duty to

3   adequately design and warn of the hazard.

4        A.    Can you just hold on for a minute?

5        Q.    Of course.

6        A.    I want to get these down myself.

7        Q.    No, I'm sorry.  Please continue.

8        A.    The fourth was that they did not adequately

9   inform the public?

10       Q.    Yes.  And by "the public," I'll include

11   purchasers of the blinds.

12       A.    Okay.

13       Q.    The fifth is that WCMA undertook a duty to

14   adequately design and warn of the hazard.  Is that

15   fair, Mr. Statler?

16       A.    To adequately warn and what?

17       Q.    And adequately design -- I guess I cut that

18   short a little.  Design the product and warn of the

19   hazard.

20       A.    I wouldn't put it in quite those terms.  I

21   would say they undertook a duty not to adequately

22   design the product but to adequately come up with an

EXHIBIT B
Page 5 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 53

1    adequate standard for the product that would otherwise

2    render it reasonably safe.

3              In other words, I think -- I'm not saying

4    that -- at least not directly that -- and I think in

5    Peter Rush's testimony, he's not saying that they --

6    that WCMA was to design or redesign the product, but

7    that as part of an effective voluntary standards

8    process which they undertook to oversee and steer on

9    behalf of the industry, that whatever it took in the

10   way of eliminating or alleviating the relevant risks,

11   which may include design factors, that that's what the

12   WCMA undertook.

13        Q.    So their undertaking was --

14        A.    For example, I'm not saying that they

15   undertook to design.  They didn't have an engineer on

16   board.  So they couldn't design.  But through a

17   process which they agreed to undertake, which as I

18   understand it included the engineering expertise from

19   the individual companies, that if it were necessary to

20   have an adequate standard, that such design

21   reformulation would be a part of that.

22        Q.    Okay.  So is there -- Is their undertaking

EXHIBIT
page 6 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 54

1    to produce a standard that adequately addresses the

2    hazard?

3        A.    That's correct.

4        Q.    And that may include design factors?

5        A.    At the time they undertook it, it may have

6    included it.  We now know in retrospect that it would

7    have had to include it because there was an identified

8    design defect that came to be in the course of their

9    participation in that process, their leadership in

10   that process.

11       Q.    And that may also include warnings, product

12   warnings?  Is that part of that?

13       A.    It would have included any reasonable means

14   to attenuate or eliminate the hazard, which would

15   include product redesign as well as warnings as well

16   as any other guarding or fail-safe means aimed at

17   accomplishing that result.

18       Q.    And the last one I came up with, the last

19   opinion, and I'll use your words because I think

20   they're good, "WCMA was a sham organization."

21             Is that fair?

22       A.    Yes.


EXHIBIT
B
page 7 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 55

1    Q.    Are there any opinions -- again, knowing

2    there might be subsets of these, are there any more

3    broad opinions that you intend to offer at trial in

4    this case?

5    A.    Well, you know, I think you've made an

6    effort to try and -- try and capture what I've said in

7    the report.  I think sometimes in doing that things

8    can get lost.  It may well be, or at least my concerns

9    in limiting my opinions to these areas may be that --

10   that may be assuaged by your reference to there are

11   subsets of these opinions.

12        But I would have to say that one of the

13   most important things that I would add that is

14   certainly deserving of an opinion category in and of

15   itself as opposed to a subset is that there is a clear

16   identification in this case -- in the case of

17   strangulations -- in the instance of strangulations of

18   children from window coverings, there is a clear

19   identification of a design problem, and indeed a

20   design defect associated with looped cords, be they

21   pull cords or middle or inner cords, in that while the

22   WCMA undertook with some degree of success to deal

EXHIBIT 8
PAGE 8 OF 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 56

1    with the pull cord problem, both retrospectively and

2    prospectively, in terms of the inner cord problem, it

3    only dealt with that design flaw prospectively.

4           And as a result, there are -- there

5    continue to be something on the order of some

6    850 million ticking time bombs out there because those

7    units have not been corrected.

8           And as a subset of that opinion but

9    particularly important to mention, that had the WCMA,

10   based upon all the information it had or could have

11   had in the 1994-95 period, factored that information

12   into account in terms of the standard that it

13   ultimately produced in 1996, then an additional

14   approximately 400 million units of that 850 million

15   figure that I just referenced would have been

16   corrected.

17          That is, as a result of the prolonged delay

18   and the warnings issues that I otherwise deal with in

19   the report, I don't think I satisfactorily point out

20   here, and I'd make it clear in these remarks, is that

21   from a design perspective, had the problem been

22   properly dealt with as of 1996 or even 1994 when first

EXHIBIT B
Page 9 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 57

1  brought to their attention -- I'm sorry, or as of 1994

2  when they agreed to the first corrective action plan,

3  since the inner cord problem had been brought to

4  WCMA's attention way earlier, but at least as of 1994,

5  some 400 to 500 million units that embody a defective

6  design in terms of the inner cord would not currently

7  still be on the market and pose a problem to all the

8  rest of the American public along the same lines that

9  it presented to the Rountree family in this case.

10     Q.    Okay.  Are there any other -- Are there any

11  other sort of broad-structured opinions?  And

12  certainly if you think of some as we're going, that's

13  fine.  At the end we can go through this again if you

14  would like.  I'm not trying to --

15     A.    Why don't we put an asterisk at this point,

16  kind of an imaginary asterisk, and if you would ask

17  that question at the end of our deposition today, if I

18  have anything that I feel needs to be supplemented, I

19  will do that.

20     Q.    That would be great.  I'm really just

21  trying to make sure I ask you everything I need to ask

22  you today.

EXHIBIT B
page 10 0

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 68

1         So while I can't say for sure that there

2    was a contact with AWCMA, I know there were contacts

3    and the sharing of that previous information with the

4    individual manufacturers.  And there probably -- they

5    probably would have identified an industry group, and

6    the only one relevant would have been AWCMA.

7         And so I suspect that even though that may

8    have been the first telephone conversation, there was

9    undoubtedly a sharing ahead of time of the information

10   that had been shared with the commission.

11   Q.    But you're not aware of any specific

12   communication with the WCMA about that?

13   A.    No.  I can only share with you the ongoing

14   protocol that was established for all product risk

15   areas.

16   Q.    Would there have been a record of any of

17   those prior contacts in the CPSC files?

18   A.    There would be a record of anything sent to

19   WCMA or individual manufacturers in the way of

20   letters.  But where you would find them at this point

21   in time, they're probably, you know, somewhere in the

22   archives and who knows what tomes you would have to go

EXHIBIT
B
Page 11 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 91

1              Oh, actually back up.  Do you have an

2      opinion as to when it did become aware of the risk?

3          A.     Inner cord?

4          Q.     Inner cord strangulation.

5          A.     Well, we know it certainly became aware of

6      the risk as of the letter from Toni Griesbach in 1990

7      which I refer to in my report.  There couldn't have

8      been a more clear and definitive enunciation of what

9      the problem was and what the consequences of that

10     problem were and inviting the association and its

11     members to address that problem.  And certainly to

12     address it, if nothing else, in terms of the

13     appropriate warnings about the inner cord problem and

14     not limit those warnings to the pull cord problem.

15             So without question, to identify some date

16     as to which they knew about the problem would have to

17     be no later than the Griesbach letter in 1990 which

18     reflected, by the way, an incident occurring back in

19     October of 1986.  The Griesbach letter is September 5,

20     1990.

21             I would argue, however, that -- your

22     question is when did they know about the problem.

EXHIBIT
B
page 12 of 14

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664
f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 98

1       A.    No.  No.

2       Q.    In 1985, the CPSC, in conjunction with the

3  WCMA, issued a public safety alert?

4       A.    That's right.

5       Q.    Did that alert mention the hazard of inner

6  cords?

7       A.    No.  It referred only to the pull cords.

8       Q.    You were on the commission at that time?

9       A.    I was.

10      Q.    Why didn't it mention inner cord hazards?

11      A.    There are a couple of explanations for

12  that, and I'm not sure what the correct one is.  The

13  most logical explanation is that since by far the bulk

14  of the incidents had to do with the pull cords, the

15  purpose of this release was to identify that problem,

16  to identify where the maximum risk was and perhaps not

17  to confuse the issue.

18            But an explanation might also be contained

19  in the fact that all those product safety alerts --

20  every product safety alert the commission has ever

21  issued, not only in this area but with respect to any

22  consumer product covering just about all

EXHIBIT B

page 13 of 41

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 99

1    the probably -- product safety alerts have been issued

2    for probably every one of the products that are listed

3    on page 1 of my C.V., and in some cases more than a

4    dozen such alerts.  For example, for ATVs.

5           But in every single case, those are

6    negotiated -- the language is negotiated with the

7    industry affected so that the Window Covering

8    Manufacturers Association would have had a say in what

9    language was used.  I don't at this point in time know

10   whether the original draft said both pull cords and

11   inner cords and WCMA said "No, let's talk about only

12   the pull cords because the inner cords isn't that much

13   of a problem."  Or it may well have been the original

14   draft had no reference to inner cords.  I don't know

15   the answer to that.

16          But that could be an explanation for if the

17   CPSC had wanted to mention -- and I'm not sure it did

18   or did not -- had wanted to mention the inner cord

19   problem, since this was a cooperative effort in terms

20   of issuing a product safety alert, the WCMA and the

21   industry that it represented would have had a role in

22   what the final language was.

EXHIBIT B
Page 14 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 106

1   eliminating loop cord hazards.  Well, they hadn't

2   eliminated loop cord hazards.  But that's okay.

3           "However, Schoem noted that the Commission

4   had uncovered a new safety problem, the ability of

5   some lift cords to be pulled out to loose length when

6   a window covering is in the down position and the cord

7   lock is not engaged.  Renae Rauchschwalbe of the CPSC

8   Compliance Staff went on to demonstrate this potential

9   hazard, noting 15 infant deaths since 1991

10  attributable to inner cord strangulations.  Schoem

11  said the Commission was now seeking a fix of this

12  problem from industry, both in terms of retrofit of

13  existing products and a design solution for future

14  products."

15      Q.    You're welcome to continue reading.  You

16  don't need to read any more, but you're welcome to if

17  you like.

18      A.    Why don't you give me a minute to read

19  this.

20      Q.    Of course.

21          MR. BAUERMEISTER:  Mr. Weiss, this is Don

22  Bauermeister.  The date of this document is what?

EXHIBIT B
page 15 of 41