DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 112

1   Q.   So am I understanding that some branch of
2  the CPSC were aware of it but the compliance and
3  enforcement branch in 1993, we'll even say, was not?
4  When I say it --
5   A.   I'm not saying they weren't aware of it,
6  but their focus was to get immediate action, immediate
7  response with respect to the issue of the pull cords.
8  And my only hesitation in saying that is that I don't
9  know because the documentation is not before me what
10 may have transpired in the discussions with the
11 industry back in 1993-94.
12       There may have been, as a quid pro quo, for
13 focusing only on the pull cord issue, the industry may
14 have agreed to that, and if the CPSC at that time had
15 raised the inner cord issue, the quid pro quo may have
16 been to drop that issue at that time.
17  Q.   I have a couple of questions about that
18 that I want to ask you.  One is, have you seen any
19 evidence whatsoever, any documents that show that the
20 CPSC asked the industry to address the inner cord
21 hazard and the industry said no?
22  A.   No.  Those documents tend to be

EXHIBIT B
page 116 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 113

1 confidential documents because they are -- they may
2 well be available to the association, but CPSC
3 typically would not make them available.
4     MR. WEISS: Let's go off the record for
5 just one moment, please, Don.
6     (Off-the-record discussion.)
7 BY MR. WEISS:
8     Q. You've seen documents from that time frame?
9     A. I've seen documents from that time frame.
10 I haven't seen the -- any negotiating strategies or
11 discussions or reflecting negotiating strategies and
12 discussions. I've seen the voluntary corrective
13 action plan itself.
14     Q. You haven't seen any correspondence back
15 and forth between the WCMA and the CPSC about what
16 that plan might entail and what efforts might be
17 taken?
18     A. Not that I can recall at this point.
19     Q. Okay. But regardless of that, you have not
20 seen anything to suggest that happened? I understand
21 you think that you don't know that it hasn't.
22     A. No, I'm not even suggesting that it could

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 114

1    happen.
2        Q.    I just want to make sure that we're not --
3        A.    I'm saying that it could have happened.
4        Q.    Okay.  But you don't --
5        A.    I'm not suggesting -- what I am -- I do
6    know the way the Section 15 group, the enforcement
7    group has typically operated, and particularly where
8    they're dealing with a generic industrywide hazard,
9    they try and keep that as narrow as possible because
10   they're on -- they're on slimmer legal grounds when
11   they're dealing with an industry at large than when
12   they're dealing with a specific either production or
13   design defect associated with one manufacturer's
14   product.
15       Q.    You had said that the CPSC was prepared
16   to -- and I hope I've got the phrasing right, I know
17   it's a term of art -- declare window blinds a
18   substantial product hazard and go to formal rulemaking
19   if the industry did not comply.  Did I say that wrong?
20       A.    Yes.
21       Q.    Okay.  Please correct me.
22       A.    There's a -- It's two different animals.

EXHIBIT B page 13 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 122

1    flagrant and blatant hazard.
2         Q.    So assuming the CPSC -- and I'm not even
3    going to talk about them as an agency, but the people
4    involved in this portion, making this decision to go
5    to WCMA and request a corrective action plan, assuming
6    they knew about the inner cord hazard and knew that it
7    was, as you said, 10 percent of all incidents, they
8    made a conscious decision not to request that the
9    industry take any action?
10        A.    I don't know that they didn't request.
11   That's what we discussed earlier.
12        Q.    Sure.  But you have not seen any evidence
13   that shows they did request it?
14        A.    No, I don't know one way or the other.
15        Q.    And didn't do so for the subsequent six
16   years, that you know about?
17        A.    That's correct.
18        Q.    You wrote -- Let's go back to your report a
19   little bit.  On page 12 you wrote that "During the
20   1980s the Association needed only to study the
21   in-depth investigations of these incidents conducted
22   by the staff to realize that while the bulk of such

EXHIBIT D
page 4 of 4

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 140

1  "i."

2       Now, this letter concerns an incident
3  involving a child who was strangled on a cord in the
4  back of a woven wood shade. That's what it says in
5  the beginning.

6       A.    Right.

7       Q.    What is a woven wood shade?

8       A.    My recollection -- It's been a while, but
9  my recollection of woven wood shades is that they are
10 a window covering that roll up and down, and there are
11 both pull cords and internal cords associated with
12 them.

13      Q.    Would you agree that's a description of any
14 horizontal blinds?

15      A.    It probably is, but I couldn't say with
16 authority.

17      Q.    Well, I guess what are the blinds at issue
18 in this case, in the Rountree case? Were they woven
19 wood shades?

20      A.    No. I understand them to be horizontal
21 blinds.

22      Q.    Do you know the difference between the

EXHIBIT B page 20 of 41

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

f7cdbd99-e658-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 141

1   blinds in this case and a woven wood shade?
2       A.   They appear different.  You know, a wood
3   shade is a wood shade, and it totally covers up the
4   area.  They're not individual slats.
5       Q.   Okay.  Do you know if any members of the
6   WCMA make woven wood shades?
7       A.   I don't.
8       Q.   Do you know if any WCMA members, or any
9   members who used to be in the WCMA ever made woven
10  wood shades?
11      A.   No, I don't.
12      Q.   In your report when you're discussing this
13  letter, which is on page 13 I believe -- you start
14  talking about it on page 12, but if we could turn to
15  page 13 -- give me a second.
16           You wrote that "In his deposition on behalf
17  of the WCMA" -- and I'm looking at the first paragraph
18  on the top of page 13 of your expert --
19      A.   Is that the first full paragraph?
20      Q.   No, starting at the top of the page.  It's
21  one, two, three, four, five lines.
22      A.   I see.

EXHIBIT B
page 21 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 142

1  Q.  "Former Executive Director Peter Rush, to
2  whom the letter was addressed, was largely unaware of
3  its content and clearly had never shared the letter or
4  its import with Association members even though child
5  strangulations understandably were the singular most
6  important issue confronting the industry."
7      Is that correct?
8  A.  That's what it reads. I would correct that
9  to say not that he never shared the letter, but he
10 never discussed the letter.
11 Q.  Okay. But you would agree that he
12 testified that he did send it out to members of the
13 association?
14 A.  That's correct.
15 Q.  So should we change that in your report?
16 A.  Yeah, I would say he never discussed the
17 letter.
18 Q.  Okay. Does that change anything in your
19 opinions?
20 A.  No.
21 Q.  Now, also when you're discussing the Toni
22 Griesbach letter in your report, and I'm looking lower

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 144

1    A.    The request is: "Please admit that in 1995
2  WCMA knew that accessible inner cords presented a risk
3  of injury or death to children and/or infants."
4          Response: "WCMA admits it was aware of at
5  least one report, a child had strangled in the inner
6  cords of a corded window covering product in 1995.
7  WCMA --"
8    Q.    You may if you wish, but you don't have to
9  read the objection.
10         Do you read that to say that WCMA was aware
11  of a 1995 incident?
12   A.    That's how I read it, yeah.
13   Q.    If you'll read the question again, do you
14  read the request to be that WCMA is asked what it knew
15  in 1995?
16   A.    Yes, I agree with that.
17   Q.    Is it possible that this response, however
18  inartfully worded, is WCMA attempting to say the
19  number of reports it was aware of in 1995 rather than
20  it's aware of a 1995 incident?
21   A.    Did you write this inartfully worded
22  response? Yeah, that's how I interpreted it.

EXHIBIT B
page 23 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 145

1   Q.   Does that change the interpretation?  I'm
2   trying to understand exactly.  When you read the
3   response in light of that question, is it a fair
4   reading that what WCMA is attempting to say here is
5   that it was aware in 1995 of at least one report as
6   opposed to --
7   A.   I understand that.  If that's what you're
8   saying, I understand that now.  But that's not how I
9   read it.
10  Q.   And that's perfectly fair.
11       Would you agree, if that reading is
12  correct, that WCMA is not admitting here that it was
13  not aware of the incident in the Toni Griesbach
14  letter?
15  A.   I'm sorry, repeat that.
16  Q.   Would you agree that if the second reading
17  is correct, that WCMA is not admitting that it was not
18  aware of the Toni Griesbach incident, that it's
19  admitting that in 1995 it was aware of one incident,
20  which may or may not be the incident referred to in
21  the letter?
22       I can explain better if that will help.

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 146

1   A.   No, I think I understand.

2        Okay, what is the question again?

3   Q.   The question is:  If in fact WCMA is saying
4   here that it was -- that in 1995 it was aware of one
5   incident, that is not an admission that it was not
6   aware of a letter reference by Ms. Griesbach in her
7   letter?

8   A.   I think if that's what you're trying to
9   say, you're being a little too cute here, in all
10  fairness.  The question is not that you were aware of
11  the Toni Griesbach letter or not, but to say what WCMA
12  knew about the risk of injury or death from accessible
13  inner cords.

14       Reading this now according to what you've
15  advised me, you're telling me, well, we were aware of
16  at least one incident as of 1995, but it doesn't say
17  what you are aware of.

18  Q.   That's true.

19  A.   In other words, you're not really
20  responding to the question in its full and complete
21  way.

22       As I now understand it, you're saying this



L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 175

1   Q.   Are you aware this is an ANSI standard?

2   A.   I'm aware it's an ANSI standard.

3   Q.   Let's talk about placement first, if that's
4   okay.  You testified --

5   A.   That's a much more secondary point to the
6   points I make in the report.  But seeing it at this
7   point, the word "warning" is the wrong word.

8   Q.   Danger is the word?

9   A.   The appropriate word where the risk is one
10  of serious injury or death.

11  Q.   You testified -- You wrote in your report
12  that the warning label was in a place where it was
13  least likely to be seen?

14  A.   Yeah.  I guess there -- least likely, maybe
15  it was more least likely to be seen if it was in the
16  upper corner of the part that's -- of the part of the
17  blind -- I don't know what you call that, the window
18  covering, which is up against the wall.  Then it
19  wouldn't be seen there either and may be less likely
20  to be seen still.  But certainly at the bottom of a
21  window covering, particularly when the window covering
22  is closed, it ain't likely to be seen.





DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 176

1    Q.    What about when the window covering is
2  open?
3    A.    When the window covering is open, it's
4  still not likely to be seen, but it's a little bit
5  more exposed.  But if the purpose of a warning is to
6  clearly -- and WCMA has stated this -- is to clearly
7  communicate a message, putting it at the bottom of
8  your window covering doesn't clearly communicate that
9  message.
10   Q.    Okay.  Do you have any consumer studies,
11 reports, evidence, anything that would tell you that
12 consumers are not likely to see a warning on the
13 bottom rail of the blind?
14   A.    I'm in agreement here, I would just take
15 the view of Judge Sedwick.  He says it's not likely to
16 be seen there.
17   Q.    I'm asking you.
18   A.    Do I have any?
19   Q.    Yes.
20   A.    Yeah.  I've spent almost 30 years in the
21 area of consumer product safety, and I was the
22 commissioner who was the designated person in charge



L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 177

1    of working with the staff on warnings.  I've advised
2    companies on warnings.  And I would be laughed at if I
3    ever advised a company or in the context of my
4    responsibilities at the CPSC advised a company that to
5    be efficacious, you put your warning label in a place
6    that's not likely to be seen.
7        Q.    I'm not asking you about whether you should
8    put them in a place that's not likely to be seen.  I'm
9    asking you if you have any evidence, any experience,
10   anything that tells you whether the bottom rail is
11   likely to be seen.
12       A.    Whether the bottom rail is --
13       Q.    Sure.
14       A.    No, I have not done any independent
15   research.  But it belies logic, knowing that the
16   bottom rail probably in 50 percent or more of the
17   instances is banging up against the bottom of the sill
18   or so far below the sight line that it can't be seen,
19   that that would be an appropriate or optimal place to
20   communicate a message about the possibility of a
21   strangulation death to young children.
22       Q.    Are you saying that 50 percent of the

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 178

1   incidents, the blinds are never opened?  I'm confused.
2       A.    No, I'm saying just judging from my own
3   observations over the years, 50 percent of the time or
4   more probably the blinds are in a down position.
5       Q.    And are never opened?
6       A.    No.  Well, many times they are.  You might
7   simply open or close or change the angle of the slats,
8   but the blinds may well be in a down position the
9   entire time.
10      Q.    Where should the warning be on the blinds?
11      A.    I would put it in as prominent a place as
12  possible.  I think given the seriousness of the risk,
13  I probably would put it in more than one place.
14      Q.    You would have more than one warning?
15      A.    More than one place.
16      Q.    Where would you put it?  Well, okay, where
17  would you put it if there was a second warning?
18            Let me ask you this:  If there was another
19  warning in a more prominent location, is the bottom
20  rail a bad location for the warning then?
21      A.    I think -- there would need to be some
22  research done, but I think research would probably

EXHIBIT B page 39 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 179

1  tend to reveal that a place perhaps on the side of the
2  top part of the window covering and possibly on the
3  outer side of the bottom window covering; and, if not
4  that, possibly on the outer front edge of the bottom
5  window covering would be the two places that would be
6  most ideal.
7          But I think some research probably ought to
8  go into that.
9      Q.  When you say "the side of the top," what do
10 you mean?
11     A.  Up at the top end on the side portion.
12     Q.  On the head rail on the side?
13     A.  I'm sorry, on the front side.
14     Q.  The side that faces out?
15     A.  The side that faces out, yes.
16     Q.  Or the side that faces out on the bottom
17 rail?
18     A.  That's correct.
19     Q.  What about on the cord?
20     A.  Possibly on the tassel.
21         Again, I don't want to give you a
22 seat-of-the-pants expertise. But those, to me, would

EXHIBIT B
page 30 of 41