DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 195

1      A.     A person installing has a job to do to

2   install those blinds.  He or she may have no interest

3   whatsoever in anything other than what the

4   instructions are for the appropriate installation of

5   the blinds.

6      Q.     So if a grandfather were to install blinds,

7   it's actually -- I understand you're saying that he

8   may not read it.  You're saying there is no reason for

9   him to read it?

10     A.     I'm not saying there is no reason.  There

11  may be a reason.  But the likelihood of it being read

12  is very, very tiny, minuscule.

13     Q.     How tiny?

14     A.     Minuscule.  Negligible.

15     Q.     How do you know that?

16     A.     I'm thinking of when I moved into a new

17  home and all the window coverings had hang tags, it

18  was the first thing that I removed from the window

19  coverings.

20     Q.     And did it say warning on them?

21     A.     I don't know what it said on them.

22     Q.     You didn't read them?

EXHIBIT
B
page 31 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 196

1       A.      I didn't read them.

2       Q.      So you're a former commissioner of the

3   CPSC?

4       A.      That's correct.  And that confirms my

5   position that hang tags are probably the least

6   effective means of all, other than owner's manuals

7   which may have in certain circumstances somewhat a

8   higher level of efficacy but not much in terms of

9   helping to resolve or attenuate a product risk which

10  ideally should have been and should be attenuated and

11  even eliminated by proper design, which is the real

12  issue in this case.

13      Q.      Okay.  Let's turn, please, to page 6 of the

14  standard, which is 0028188.

15      A.      You said 88 at the end?

16      Q.      Yes.

17      A.      Okay, I've got it.

18      Q.      And 5 is labeling and operational tags,

19  correct?

20      A.      Right.

21      Q.      And that shall require that if a

22  manufacturer is to comply with the standard, they will

EXHIBIT
B
page 32 of 41

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664
f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 197

1    comply with the -- they will include a generic warning

2    bottom rail label, and if you will turn the page, also

3    a generic warning hang tag; is that correct?

4        A.    Correct.

5        Q.    Can you read the text of the generic

6    warning hang tag?

7        A.    The text of the generic warning hang tag?

8        Q.    Yeah.

9        A.    "Young children can strangle in the loop of

10   pull cords, chains and bead cords and cords that run

11   through window coverings.  They can also wrap cords

12   around their necks."

13              Do you want me to continue?

14       Q.    Sure.

15       A.    "To avoid strangulation and entanglement,

16   keep cords out of reach of young children.  Also, one,

17   install safety devices that remove the cord loop or

18   reduce access to cords; and two, move cribs and

19   furniture away from window covering cords."

20       Q.    Does this warning address inner cords?

21       A.    It does not.

22       Q.    How do you define cords that run through

EXHIBIT B
page 33 of 41

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664
f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 198

1   window coverings?

2        A.    I would define it in the same way that the

3   official representative of the WCMA defines it in his

4   testimony where he says that nothing in the standard

5   addresses inner cords.

6        Q.    I'm not asking you what he said.  When you

7   read that, do you think that refers to inner cords?

8        A.    No, I don't know what it refers to, but it

9   does not conjure up for me inner cords.  And if inner

10  cords was intended here, again, using WCMA's own

11  words, clearly communicate that, don't use some

12  language that is not -- is not clear in its meaning.

13       Q.    Tell me how cords that run through window

14  coverings is unclear.

15       A.    Cords that run through window coverings,

16  inasmuch as most people are aware of the pull cord

17  problem, I think they would identify that as pull

18  cords.

19       Q.    And it says "pull cords."  What is unclear

20  about the phrase "cords that run through window

21  coverings"?

22       A.    What is unclear about it?

EXHIBIT
B
page 34 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 208

1    that?

2         A.    No.  It's probably something that may or

3    may not come up.  I don't know.

4         Q.    Okay.  And this is -- It's not the last but

5    one of the last areas is that WCMA undertook a duty.

6    And that's a large portion of your report as well; is

7    that correct?

8         A.    Right.

9         Q.    What I'm trying to -- What I would like to

10   understand here is when it assumed that duty.

11        A.    Okay.

12        Q.    At what point -- I'll just ask.  At what

13   point in time did WCMA assume a duty -- Well, let's go

14   back a little bit.

15              What duty did they assume?

16        A.    I think they assumed a duty of leading an

17   entire industry in a standards -- or in an effort to

18   appropriately deal with the hazard of child

19   strangulation from window covering cords.  I guess I

20   would leave my answer at that.

21        Q.    And when did it assume that duty?

22        A.    I would say it certainly assumed that duty

EXHIBIT B
page 35 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 211

1    plaintiff?

2        Q.    I'm just talking about a legal duty as

3    opposed to a moral duty or what should be done, to the

4    extent there is a difference between them.

5        A.    Okay.

6        Q.    You understand if there is a car accident

7    out there, all of us may have a moral duty or

8    obligation to go help.

9        A.    Yeah.  I guess I was thinking of it more in

10   terms of there were certain duties or obligations or

11   responsibilities that an association has to its

12   members.  If the mission of the organization is to

13   promote the organization, to promote the interest of

14   its members, there are certain duties you have.  I

15   take it that's not what you're referring to.

16       Q.    We can talk about all of those things.  I

17   just want to make sure that when we're talking about

18   them, we understand each other as to what we're

19   saying.

20       A.    I think in terms of legal duty in the

21   context of the facts of this case, that legal duty

22   arises in the context of it taking on the role of the

EXHIBIT B

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664
f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 212

1    manufacturers in being a sponsor of the national

2    safety standard which was meant to ensure the safety

3    and adequacy of the product in terms of it being fit

4    for the purpose intended, and it did not do that.

5         Q.    Okay.  And so there are a number of places

6    in your report where you talk about duty and

7    obligation.  Do you know -- Shall we go through those

8    and try to figure out what you mean?  Is that all

9    right?

10        A.    By all means.  I think in large part it's

11   going to relate to what we just discussed.

12        Q.    The duty to the Rountree --

13        A.    Duties to the public at large once you --

14   once you take on the role of the manufacturers in

15   sponsoring and ensuring the adequacy of a safety

16   standard.

17        Q.    Because the manufacturers in the United

18   States jurisprudence, they have a duty to make a

19   product that is free of unreasonable dangers and

20   hazards?

21        A.    Correct.

22        Q.    And a distributor and a retailer may also

EXHIBIT
B
page 37 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 250

1    standard?

2        A.    No, they do not.

3        Q.    Do they punish anybody for noncompliance?

4        A.    No, they do not.  And if they did, they

5    would be in violation of the law, as with any other

6    voluntary standards group.

7        Q.    Do you have an opinion about the adequacy

8    of the retrofit campaign?

9        A.    No, I don't.

10       Q.    You said on page 13 of your report again

11   that the association's primary loyalties are to its

12   members' profits?

13       A.    Correct.

14       Q.    And you wrote "That's reflected in the

15   testimony of Mr. Rush"?

16       A.    Yes.

17       Q.    Where does it say that in the testimony of

18   Mr. Rush?

19       A.    He doesn't use the term profit, but he used

20   the term the purpose of the organization is to ensure

21   the -- ensure the interest of its members.  And one of

22   the -- surely whatever the other interests of its

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 251

1    members are, maximizing their profits is certainly a

2    role of any trade association.

3        Q.    Okay.  So because he said the purpose of

4    the organization is to serve the interest of its

5    members, you have determined that the primary loyalty

6    is to the profits of the --

7        A.    Yeah, it's partly.  If you look at the

8    mission statement of the WCMA on its website, it's

9    along the same lines.  And interestingly, it doesn't

10   identify anything in the way of safety, which I

11   believe it should.

12       Q.    Is it possible it doesn't say anything

13   about safety because it's not a safety organization?

14       A.    Well, if it's not a safety organization,

15   it's a sham, because it's representing itself to the

16   federal government as a sponsor of safety standards.

17       Q.    I think you also wrote in the same

18   paragraph that "The formulation of a truly effective

19   safety standard may imperil members' profits"?

20       A.    It may.

21       Q.    Did Peter Rush say that at all?

22       A.    I'm not saying that it would.  I mean, in

EXHIBIT
B
page 39of41

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 252

1    this particular case, there's very little that would

2    indicate that the solutions, plural, that are arrived

3    at for both the pull cord and the inner loop are going

4    to cost a whole lot more, if any more, than without

5    such solutions.

6         Q.    And along those lines -- I'm sorry.

7         A.    That being the case, it doesn't

8    necessarily, but often -- I guess I was using the

9    example here, often safety considerations can be

10   against -- can be contrary to or adverse to the profit

11   interest of an association's members.

12        Q.    Is there anything in this record that shows

13   that there was a fear they would imperil their

14   profits?

15        A.    No.

16        Q.    A moment ago --

17        A.    This is meant to be more of a theoretical

18   statement.

19        Q.    Okay.  You said just a moment ago that WCMA

20   was a sham organization?

21        A.    Yeah.

22        Q.    A facade.  And one of the things you

EXHIBIT
B
page 40 of 41

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 253

1    pointed to was it didn't have actual employees, it had

2    a contract with an association management service.

3          A.    Right.

4          Q.    Are consultants not able to do the same job

5    as employees?

6          A.    That's not anything I said.

7          Q.    I'm asking you.

8          A.    Oh, it can.

9          Q.    You're a consultant?

10         A.    I'm a consultant, yes.

11         Q.    And you're dedicated to the work you do, I

12   imagine?

13         A.    I am.

14         Q.    You wrote that "Peter Rush was running the

15   organization out of his side pocket"?

16         A.    Yes.

17         Q.    Because he had other obligations; is that

18   correct?

19         A.    He had many other obligations and

20   organizations for which he headed.

21         Q.    You've been the head of organizations?

22         A.    I have.

