two typical scenarios which it identified above applied equally regardless whether a pull cord or inner cord was the precipitating cause of the child strangulation.

The study went on to note: "The mortality rate from window cords makes them among the greatest threats to children three years old and younger. Other products that present a strangulation hazard to children in the home and have been redesigned include strings on pacifiers, recliner chairs, accordion-style baby gates, and electric garage doors." The report further identified that 86% of the window coverings involved in the incidents were venetian blinds or mini-blinds; and that 9% were venetian-type vertical blinds.

With an estimated 85 million units or corded window coverings sold each year by this industry, and an estimated 850 million units all told in homes in America, the known and foreseeable hazard of so many previously sold, uncorrected units went unaddressed by WCMA and individual producers. So too, the known child strangulations from entanglement with inner cords went unaddressed by WCMA for another five years. In the interim, the CPSC was conducting in-depth investigation [IDIs] and reporting on an ongoing toll of child strangulations. In 1999, the Commission commenced a new investigation of window blind deaths, this time focusing on inner cord loop entanglements.

Only then, again under pressure from the CPSC, did the WCMA begin to undertake, in 2000, a second Corrective Action Plan to broadly warn the public about inner cord strangulations, and to immediately include a stop cord to reduce the possibility of that inner cord being pulled upon and entangling a young child. Also, the WCMA, in its standards-setting role, began a review of the existing WCMA-initiated ANSI-sanctioned industry standard. But a comparable change in the standard itself did not become effective until November 2002 – a two-year delay which the Association, in testimony by Peter Rush [at pp.68-69] attributed to the cumbersome nature of the ANSI standards process.

During that interim, the Commission reported anew that, since 1991, it had received reports of another 160 child strangulations associated with cords on window blinds, of which 140 strangulations involved outer pull cords and 20 involved the inner cords which run through the blind slats. The WCMA's review of its existing (1996) standard, with the CPSC's urging, finally led the Association, as the standard's sponsor and developer, to include coverage of inner cord loops.


EXHIBIT C
page 1 of 9

12

On May 27, 2002, April Cox -just 14 months old- was found dead in her crib, her neck entangled by the inner cord of a venetian blind.

### WCMA's Obligations

At least one additional, significant fact is omitted from the chronology of window cord strangulations just discussed. Back in 1990, the then-American Window Covering Manufacturers Association –WCMA's predecessor- received a letter dated September 5, 1990, from Toni Griesbach [*see* Rush/WCMA Deposition, Exhibit 6]. He was an attorney from St. Louis, Mo., who had recently represented a family whose 18-month old son was killed –back in October, 1986- when he was entangled in a cord on the back of a woven-wood shade. Mr. Griesbach stated that he was writing to the Association to expand its efforts to warn the public about the dangers posed by cords on window coverings. But he explicitly pointed out that "limiting the warnings to 'pull cords' may be misleading." For the family he was representing, they were very much aware of the danger of pull cords and had "in fact, placed the crib at the opposite end of the window from where the pull cord was located." Their child became entangled, instead, in the support or *inner* cord on the back of the woven shade, well out of view of the parents or anyone else.

The letter points out, "This 'support cord' was an even more insidious danger than the 'pull cords' because the support cord was hidden from view. The cord did not even show from the front, when the shade was rolled up, because the shade flapped up in such a way that the cords were invisible." Mr. Griesbach then suggests,

> [L]imiting warnings to simply the 'pull cord' is insufficient because parents will be misled into thinking that the pull cord is the only danger on a window covering when, in fact, all cords on window coverings are potential strangulation hazards to young children. During our investigation of this particular case, we learned that the cording on many models of venetian blinds and mini-blinds can be pulled out away from the blinds to form a noose-like strangulation hazard, even though the cording is threaded to each individual slat. This can occur when the blinds are in the completely lowered position because, in some models, there is no tension on the cording when it is in that position.

Finally, the letter urges the Association to share and "discuss these issues with its members and recommend that they take action immediately."

At any time during the decade of the '80s, as child deaths from window cord strangulation were mounting, the Association needed only to study the in-depth investigations of these incidents conducted by CPSC staff to realize that, while the bulk of such incidents involved outer pull cords, not all of them did. Some



were identified as arising from the inner, support cord at the rear of the window covering. If, for whatever reason, the Association had *not* undertaken that kind of rudimentary assessment of the available risk information available to it, then, conceivably, it may not have been aware of this additional facet of the strangulation hazard associated with window coverings. But once apprised by the specifics of the Griesbach letter of this additional lethal risk from child strangulation associated with the inner support cord which was hidden from view to parents, it behooved the WCMA to conscientiously share and discuss that danger with and amongst its members, and in consultation with the CPSC. It did not do that. In his deposition on behalf of the WCMA, former executive director Peter Rush, to whom the letter was addressed, was largely unaware of its content, and clearly had never shared the letter, or its import, with Association members even though child strangulations, understandably, was the singular, most important issue confronting the industry.

In initially assuming leadership of the window covering industry's safety effort -and later, its standards-setting effort- to prevent cord strangulations of children, the WCMA in effect positioned itself in the lead safety role routinely assumed by manufacturers and sellers of the product. It was a voluntary undertaking on WCMA's part to develop and recommend window covering design and warnings standards for safety to its members and to the industry at large. By arrogating such responsibility to itself, and having unfettered discretion to set product safety standards, the WCMA, like any such industry trade association, runs the risk of a conflict of interest. After all, as reflected in the deposition of Peter Rush on WCMA's behalf, the Association's primary loyalties are to its members' business success. When the formulation of a truly effective safety standard may imperil members' profits, an association in the WCMA's vaunted position may have an incentive to set the bar unrealistically low, oblivious to the safety concerns it is purporting to address. Thus, the Association took on certain duties and responsibilities to perform that standards-setting function in a conscientious manner and with reasonable care.

But by ignoring, from the outset, its responsibility to scrutinize and understand the underlying reasons for child strangulations, the WCMA failed in that. It also failed in arriving at, and promoting a 1996 standard which did not even recognize any risk at all associated with inner cord strangulations Even the most casual review of the available in-depth investigations, and literature on the subject, would have revealed that. That, of course, assumes that the Association wasn't already acutely aware of the inner cord risk, but chose – for reasons known only to itself – to shift the focus entirely to the problem of pull cords. In its November 28, 2005, Response to Plaintiff's Request for Admission No 22, "WCMA admits it was aware of at least one report a child had strangled in the inner cords of a corded window covering product in 1995." What about the incident back in 1986 which Mr. Griesbach so thoroughly brought to its attention? Ironically, by


EXHIBIT C
page 13 of 19

admitting to knowing only about the one 1995 incident, the WCMA is effectively conceding that it failed to exercise reasonable care in assessing the causal or precipitating circumstances for each of the 170+ reported child strangulations which, by then, the CPSC had documented. That should have been the first step, on the Association's part, in any reasonable and prudent standards undertaking for such a prominent and troubling risk as this was.

But equally important, and directly relevant to this litigation, by failing to acknowledge the inner cord risk, the Association also, as a consequence, failed -in its standards role- to adequately *warn* about that risk. It owed that duty to parents and caregivers; it owed it to the parents and grandparents of April Cox. Instead, the literature the Association disseminated, and the warning it promoted as part and parcel of the 1996 version of WCMA A100.1, Standard of Safety for Corded Window Covering Products (*see* para.5.1.1), is deafeningly silent as to any inner cord risk which parents need to know about. The warning reads: "Young children can become entangled and strangle in cord or bead loops. Use safety devices to reduce access to eliminate loops." Accompanying that warning is a pictograph of a child reaching *for a pull cord* with the international 'Don't Do This' symbol stamped over his hand. Even caregivers aware of the much-publicized problem of child strangulations from pull cords on window blinds would not in any way be cautioned or sensitized by this language to believe that there was any problem or risk at all from an inner, support cord which could not even be seen.

Moreover, as a practical matter, what purpose is accomplished by placing a critical safety warning —one addressed to the most tragic of risks involving the strangulation of a young child- in a place and a manner where it is *least likely* to be seen? That was the situation here. And that was what the WCMA-developed, ANSI-approved, industry standard for window coverings allowed. The officially-sanctioned warning, *sans* any mention of inner cord risk, was only to be found, inconspicuously, underneath the bottom rail of the window covering, hidden from plain sight. It could only be seen if the blinds were open, and not otherwise. Why hide such important safety information? What went wrong in the WCMA-led, industry-dominated process, which failed to adequately take into account the needs of the pubic?

Parents and caregivers need to have ready access to conspicuous and succinct language, warning about any material hazard about which the Association and the window covering industry knew or should have known. Certainly by the time, in 1996, that this WCMA standard was approved, the inner cord strangulation hazard fit that description. But just as certainly, such a warning was nowhere to be found. And what warning was present, *on the bottom of the bottom rail*, might just as well not have been there at all in view of its hidden placement. Whatever



reasons the Association may have had for approving or acquiescing to these failures to communicate a known hazard and risk, such actions, at the very least, reflect an absence of reasonable or due care.

Under the circumstances in this litigation, the WCMA's collective failures involved promoting a substantive product standard *and* a product warning which *both* pointedly failed to address a critical risk. Those failures necessarily increased the risk of harm to unsuspecting young children from inner cord strangulation. As such, WCMA's actions reflect reckless disregard for the safety interests and rights of persons affected.

## CONCLUSION

The prolonged inaction of WCMA in the face of child strangulations from the inner cords of window coverings is indicative of a safety effort gone awry. In the aggregate, such conduct -in the context of a product known almost from the outset to be fraught with the foreseeable risk of death to children- contravenes all known principles of responsible practice within the manufacturing community or by the association which purports to represent it. As a result, safety was seriously compromised -both in theory and in fact. An unsuspecting youngster, 14 months of age, needlessly allowed to strangle from the inner cord of a window blind, due to the wholly foreseeable chain of events set in motion by the Association's systemic disregard for safety, at all levels and over such a long period of time.

WCMA unquestionably knew, from very early on, about the specific hazard to infants from the support or inner cords of window coverings. Yet the Association chose steadfastly to ignore the hazard, throughout the decade of the 80's, and throughout the decade of the 90's. It undertook to develop and oversee the process for setting an industry safety standard, officially sanctioned by ANSI, for corded window coverings, in effect standing in for its own individual companies who otherwise were duty-bound to ensure the safety of their product; to make sure that it was fit for the purpose for which it was intended and not a lethal risk to the most vulnerable of populations of infants and toddlers. How many youngsters must suffer entanglement deaths before an industry association, which undertakes a critical safety function on behalf of its members, acts forcefully and fully to address or eliminate such an insidious hazard? The inner cord strangulation risk was known to the Association and its members, but hidden from view of the parents of young children at risk, and from the children themselves.

There is no tragedy more jarring than the sudden and needless death of a child. WCMA knew that a *highly-vulnerable population* -namely, infants and toddlers-



EXHIBIT C
page 15 of 19

16

were almost always the victims of these incidents. This industry association and its member companies had access to the persistent injury reports compiled by the CPSC, annually, over each of the 20+ years preceding this incident which identified these youngest of children as the most likely victims of incidents involving corded window blinds.

WCMA also knew the nature of the hazard was hidden or *latent*, not open and obvious. In the injury reports it received from the CPSC, repeatedly, parents, grandparents and parent surrogates related that the incidents occurred "suddenly," "unexpectedly," and "without warning." They occurred at a time and in a place where the parent believed their child to be safe and did not even have an inkling of any danger. From previous injury reports (if not from their own safety analysis), the industry association and its members knew that corded window coverings strangle infants in adjacent cribs and playpens. Parents and others entrusted with the care of infants don't necessarily know that. Here –just like the situation described to WCMA by Toni Griesbach- the grandparents knew about the hazard associated with window blind pull cords and took appropriate preventive measures. But they had no idea –as the supplier and sellers did, and the WCMA even more acutely – that the *inner* cords on the backings of window blinds, which were hidden from view to the grandparents, also present a strangulation hazard and could lead to death. And did lead to the death by strangulation of April Cox.

WCMA knew that the *design* of window blinds was directly tied to the prominence of these incidents. Yet, in representing itself as the agent of the industry producing these blinds, and sponsor and developer of the very standard for safety which would bind its members, the Association failed in its primary responsibility. That responsibility was -having accepted the obligation to develop and sponsor an adequate safety standard- to carefully scrutinize the facts and circumstances associated with the repeated reports of serious injury, and respond, in an affirmative way, so as to materially improve the design safety of the product. It was a responsibility and obligation to ensure and help promote effective and meaningful safety standards. Having undertaken the task of spearheading a standards effort on the part of the corded blind industry, WCMA dropped the ball. It permitted a demonstrably unsafe looped design for inner cords to persist, even after it had finally -after many long years of unconscionable foot-dragging and delay- eliminated that same looped cord hazard from the design of outer, pull cords on the industry's window coverings.

Directly and foreseeably, a flawed standards process, supervised and heralded by the WCMA, compromised safety. As a result, April Cox became one more victim of the negligent actions and omissions of the WCMA – which at all times represented itself to the federal government, in the form of the CPSC, as the


EXHIBIT C
page 16 of 19

17

responsible industry leader on all matters affecting window blind safety. The WCMA failed to redress a known danger. It failed to act responsibly to successfully identify, warn against, promote an industry-wide recall of, and help to come up with, prospectively, a viable standard against a known danger. By allowing this unsafe, looped, inner cord design to persist on the market in the face of repeated reports of the grievous danger and risk to young children *specifically from this cause*, the Association acted in complete disregard of the safety risks to the most vulnerable of populations.

From the standpoint of promoting effective standards for window blind safety, WCMA was, in essence, a sham organization. A façade. With no safety engineers, no human factors or safety professionals, no epidemiologists or statisticians to assess and quantify the risk, the WCMA was wholly lacking in the kind of expertise it needed, as a certified developer of safety standards, to even approach the level of professionalism and sophistication that responsibility required. The Association was, by the testimony of its own Executive Director, a shell organization. It did not "maintain statistics on accidents, deaths, injuries [or] causes of accidents, deaths and injuries relating to window coverings." [*see* Rush/WCMA Deposition, p.48]. It turns out that there was no WCMA staff - nobody on the payroll! Mr. Rush himself was an employee of an association management and public relations company. Even more remarkable, while serving as the Association's sole executive, he was at the same time responsible for the management and public relations functions of several other trade association entities. He was running the WCMA out of his side pocket, which otherwise would be perfectly okay - had the Association not affirmatively taken on the formidable responsibility to ensure the safety of unsuspecting infants and toddlers from the known and foreseeable risk of window cord strangulation, and the legal obligations attendant to that role.

Having undertaken, for more than a decade, to lead the industry it collected dues from, in all matters pertaining to window blind safety, including the adequacy of product warnings, the WCMA ignored the identified risk of inner cord infant strangulations and engaged in a protracted stall. Having come forward and represented itself to the CPSC as the responsible party to lead an industry-sponsored effort to establish effective safety standards and product warnings, this shell Association demonstrably fell down on the job. It failed to summon the necessary resources, and the conviction of its members, to fulfill the obligation it willingly volunteered for on behalf of its more reluctant individual manufacturers. And that was, to promote and develop a viable safety standard for the industry; and, through appropriate safety warnings and otherwise, to timely act to reduce infant exposure to a known hazard.



EXHIBIT C page 17 of 19

The WCMA had agreed to undertake a successful correction of corded window blinds previously sold and in people's homes, or – at least minimally – to effectively warn the public about the problem from the time it first knew about the hazard. And most critically, the WCMA stepped forward to undertake to oversee and promote a safety standard which all new corded blinds would need to meet. Yet, in accepting that role, for six years –up until November 2002 when its revised standard [WCMA A100.1-2002] took effect- the Association conspicuously ignored the same looped cord hazard it had years earlier identified with respect to pull cords. All that time, from 1996 through most of 2002, the WCMA standard allowed looped, inner, support cords to continue to be produced as a result of its flawed, earlier standard.

WCMA's Peter Rush testifies in his deposition [at pp. 67-69] that, once pressed by the CPSC in 2000 to conduct a second Corrective Action to deal with this inner cord risk, the manufacturers "immediately" agreed to include some sort of mechanism on the inner cord to reduce the possibility of it being pulled through the head rail. But even accepting his testimony at face value, and assuming 100% compliance on the part of manufacturers, which is unlikely, for the five years covering 1995-2000 -with some 85 million such units produced each year just during that time frame- the WCMA's inexplicable, earlier inaction allowed at least another 400+ million defective units onto the market and into people's homes! And at no point did the WCMA suggest that those faulty units –now known and identified as being capable of child strangulations- be recalled.

The WCMA actions -and its corresponding inaction for so long in failing to respond to the unreasonable risk of inner cord strangulations- reflect a reckless indifference to the problem at hand. Those actions mark an indifference to the safety interests of young children and their concerned parents. The Association knew that the very conduct it was engaged in put others -infants and toddlers- at risk. It accepted an undertaking -a risk, if you will- that a reasonable and responsible organization, in like circumstances, would not take on. It pretended to have a process in place for developing a viable standard, when it had neither the staffing background or the wherewithal or the commitment of the large segments of the industry to see it through to successful fruition. It pretended to come up with an effective warning for the risks associated with one type of window blind cord when, in reality, the warning needed to extend to another cord –the inner, support cord- as well.

The WCMA had to know that a responsible association with such limited funding and with no safety engineers or professionals on its staff wouldn't dare to assume the awesome responsibility of developing safety standards to protect young children. Yet it chose to do so anyway. A responsible Association would not misrepresent itself and its capabilities in these ways.


EXHIBIT C
page 18 of 19

In the final analysis, had the WMCA - from the start - conducted itself in a manner more consistent with reasonable norms for an association purporting to represent an entire industry in all matters affecting the safety of corded window blinds, it is decidedly more likely than not that 14-month-old April Lynne Cox would *not* have died.

If the association and the companies it represented had simply engaged in what each knew to be responsible conduct from the standpoint of safe product design, and effective warnings and standards setting, this consequence could have been altogether avoided. The incident was clearly foreseeable and preventable, had the WMCA only taken the time and interest, and shown the requisite concern and due care, to address this known hazard.

* * * *

Kindly let me know if there is any other assistance I can provide in this matter by virtue of the specialized knowledge and experience I bring to bear.

Sincerely,

Stuart M. Statler

Enclosures:
CV
Recent Testimony
Fee Schedule


EXHIBIT C
page 19 of 19