IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| RONALD J. THOMAS and<br>JANETTE THOMAS,<br><br>    Plaintiffs,<br><br>v.<br><br>THE NAUTILUS GROUP, INC.,<br>d/b/a BOWFLEX POWERPRO,<br><br>    Defendant. | §§§§§§§§§§§§ | CIVIL ACTION NO. 9:05CV215-TH<br>JURY |

## AFFIDAVIT OF STUART M. STATLER

### Personal Background and Experience

1. I am over the age of 18, of sound mind, competent in all respects to make this affidavit and all statements contained herein are true and correct of my own personal knowledge.

2. I served for seven years as Commissioner of the United States Consumer Product Safety Commission [CPSC], the federal regulatory panel having exclusive jurisdiction over thousands of consumer products used in and around the home and in recreation. Exercise equipment constitutes one of those products. The CPSC is the *only* federal agency having authority to ensure against unreasonable risks related to such exercise equipment. I was appointed by the President and unanimously confirmed by the United States Senate, serving as Commissioner from August 1979 through the end of May 1986. I also served as Acting-Chairman and Vice-Chair of the agency for extended periods.

3. During that tenure in office, my responsibilities centered on protecting American citizens from unreasonable risks of injury and other product risks. On a daily basis over a period of those seven years, my attention was wholly focused on issues of product safety, which included injuries from exercise equipment. I was the designated Commissioner on issues related to product recalls and



EXHIBIT
E
page 1 of 9

effective product warnings. I worked closely with the staff, along with affected companies and entire industries, to make recalls of faulty products, and the warnings associated with them, as targeted and efficacious as was possible under the circumstances. In that capacity, I frequently directed staff efforts on recalls and other remedial relief aimed at correcting a design or production flaw, so as to prevent the recurrence of serious injury. As part of that process, I typically assisted in devising appropriate on-product warnings and instructional materials to reduce the likelihood of serious injury from known risks.

4.  While serving at the helm of the CPSC, in public meetings, private sessions with affected industries and companies, and in authoring various articles for publication, I explicitly addressed the critical responsibilities of manufacturers, distributors and sellers of consumer products. Both then, and as a consultant and expert witness in the 20 years since, I have consistently stressed the prime importance for companies to actively investigate instances of serious injury or death occurring from their products - *to find out why, and to fix any problem*. I have repeatedly emphasized the pressing need on their part to focus, to the maximum extent possible, upon improving a product's safety through changes to its design as a first principle. I also have urged firms to fully comprehend and assess a product's risk *before* ever bringing it onto market, to consider the efficacy of targeted, on-product risk warnings and other cautionary information, to maintain adequate records and files of hazard investigations and assessments, and to timely report safety risks to the CPSC, pursuant to the reporting requirements of the Consumer Product Safety Act [CPSA], 15 U.S.C. 2051 *et seq.*, and the Federal Hazardous Substances Act [FHSA], 15 U.S.C. 1261 *et seq*.

5.  At a previous point in time, almost a decade before being appointed as CPSC Commissioner, I served as Special Assistant to the Chairman of the precursor panel to the CPSC, the National Commission on Product Safety [NCPS]. That panel, created by Congress in 1968, conducted a comprehensive, two-year study to determine what measures needed to be undertaken to ensure a higher level of safety to Americans from consumer products found in and around the home. Among my primary responsibilities, I supervised several staff investigations into unreasonable hazards needing to be addressed by manufacturers, importers and retailers, and by industry at large. For situations where voluntary, industry remedial efforts may prove to be unsatisfactory or inadequate, I helped to devise a regulatory plan for ensuring appropriate compliance or enforcement action on the part of the federal government. I also served as editor–in-chief of the NCPS *Final Report,* and was instrumental in drafting the basic outline for the later-enacted Consumer Product Safety Act. Subsequently, I was privileged to serve as a principal staff member on one of two U.S. Senate committees responsible for recommending enactment of this landmark product safety legislation to the full United States Senate.



2

6. Upon completing my term as CPSC Commissioner, I became vice-president and partner with the international management consulting firm of A.T. Kearney [1986-89], heading up the firm's risk management and product liability practice. I advised companies, and their law firms, how best to anticipate and avoid health, safety and environmental risks. I regularly shared with them my analysis and recommendations on how to manage those risks so as to limit downstream damage and costs. And I counseled these companies –primarily manufacturers of consumer products- as to their potential liability and how best to avoid costly litigation, principally by factoring safe product design and responsible manufacturing practices into every facet of developing and marketing safer consumer products.

7. I have continued consulting in the areas of product liability, risk management and avoidance, and corporate responsibility ever since, for some 20 years up to the present. I do so based upon the specialized knowledge and experience I have -addressed in the previous paragraphs- in matters concerning consumer product safety generally, manufacturer and seller responsibility, and the consideration of dangerous and defective products by the Consumer Product Safety Commission. A current copy of my CV, which includes a list of my publications, is appended to this Affidavit. Also attached is a complete listing of consumer product-related litigation over the past half-dozen years in which I have testified at trial or in deposition, and a current fee schedule.

*Factual Context and Materials Reviewed*

8. It is my understanding that Janette Thomas purchased a Bowflex PowerPro XLT home exercise machine in December, 2003. Shortly thereafter, on January 18, 2004, her husband Ronald Thomas was exercising at home on the machine, pushing up some 160 lbs. from an inclined position. Suddenly and without warning, the unit's seat became unattached when the pin holding the seat unexpectedly came out. The seat slipped forward and the bench collapsed, causing Mr. Thomas to be pulled backward violently. This, in turn, resulted in his falling and landing in a horizontal position. He sustained serious, long-term, debilitating injuries to his shoulders, neck and back, as a result of this incident.

9. I have reviewed approximately 60 comparable instances reported to Nautilus/ Bowflex -and provided through discovery by the Defendant- where the seat pin of a Bowflex exercise machine broke, disengaged, or came out. Some of the incidents involved multiple failures of the seat retention system. I have also reviewed the following:



> Plaintiffs' First Amended Complaint;
> Deposition of Bowflex designated corporate representative, Ben Monette;
> Opinion letter of Defendant's expert, David G. Brown;
> Deposition of David Brown;
> Deposition of Gary L. Jackson;
> Affidavit of 10.16.06 of Gary Jackson;
> Letter of 03.07.07 of Gary Jackson;
> Photo of the subject Bowflex PowerPro XLT exercise machine;
> Settlement Agreement [03.28.05] and Order [04.04.05] between the U.S. Consumer Product Safety Commission and Nautilus [CPSC Docket No. 05-C0008];
> Defendant's Response to Plaintiffs' Second Set of Interrogatories;
> Plaintiffs' First Amended Complaint;
> Defendant's Response to Plaintiffs' Motion to Compel;
> redacted copy, from Defendant, of Letter of 04.16.04 from Nautilus to the CPSC, concerning a series of identified hazards and safety problems, and resultant incidents and and user injuries, attributable to Bowflex PowerPro exercise equipment;
> Notebook of the Bowflex Product Safety Council Minutes for August 14, 2002 thru November 4, 2003;
> CPSC Press Release [#05-048] of 11.16.04, titled "CPSC, The Nautilus Group Announce Recall to Repair Bowflex Power Pro and Ultimate Fitness Machines";
> CPSC Press Release [#05-152] of 04.12.05, titled "Nautilus Inc. Agrees to Pay $950,000 Penalty for Failing to Report Bowflex Fitness Machines' Defects and Injuries";
> Bowflex PowerPro Owner's Manual and Fitness Guide;
> Bowflex PowerPro Assembly Guide;
> and related materials

10. While the subject Bowflex PowerPro home exercise machine was purchased in December 2003, *more than a year earlier,* since August 2002, the Nautilus in-house Product Safety Council met to consider a series of disturbing safety problems and incidents reported by Bowflex customers. These concerns included the identified hazard of the seat pin breaking off, disengaging or coming loose. This Council met approximately every two weeks thereafter, and was presented numerous instances of seat pins "popping out" on the Bowflex equipment. After 15 months of examining those reports and studying the problem, at the November 4, 2003 Council meeting -fully a month before the Thomas'



4

purchase of their Bowflex PowerPro and two months prior to the collapse of its seat- under the subheading "Action Item Review," item #6, the minutes note: "Ben, Robert, provide status of Seat Rail Pin. Status: Have a new design and prototype."

11.  Drawings for a "seat bracket stop" for the Bowflex equipment were not approved until August and September 2004. The "seat bracket stop" sought to remedy the known and foreseeable problem of the seat pin coming out or disengaging. But in all the intervening time, Ronald Thomas did not ever receive a notice from Nautilus/ Bowflex that the seat pin of his PowerPro unit could disengage when exercising in the incline position and lead to serious injury during exercise. He didn't receive such information because the company never sent it. Yet Nautilus/ Bowflex knew seat pins were disengaging and customers were getting hurt well before the purchase of his Bowflex machine.

12.  Subsequently, when brought to its attention by reports of injury, the U.S. Consumer Product Safety Commission identified the very same seat pin disengagement danger as a substantial product hazard in violation of federal law - specifically, the Consumer Product Safety Act, 15 U.S.C. 2051. The agency issued a finding that *"The seat pins on the Bowflex Power[Pro] and Ultimate Fitness machines can disengage or break unexpectedly during normal and foreseeable use. If a seat pin disengages or breaks unexpectedly during use, it may cause the seat to move suddenly and cause the consumer to fall and suffer serious injuries."* [at para. 15, p.5 of Settlement Agreement and Order, attached hereto] Moreover, the federal agency determined that Nautilus/Bowflex failed to timely report information which reasonably supported the conclusion that the Bowflex PowerPro and Ultimate Fitness Machines *"contains a defect which could create a substantial product hazard... or an unreasonable risk of serious injury or death."* Such hazard reporting is required by the explicit terms of the Consumer Product Safety Act [15 U.S.C. 2064 and 2068], so as to assist the agency in preventing a recurrence of injury to consumers. Even more to the point, the agency further determined that the company *"knowingly"* failed to timely report what it knew of the risk, in violation of 15 U.S.C.2069.

13.  As a result of the company's repeated failure, in violation of federal law, to timely report this seat pin hazard, as well as two other serious safety failures associated with its PowerPro exercise equipment, the CPSC exacted a very substantial civil penalty. Pursuant to the Consumer Product Safety Act, in April 2005, the CPSC imposed a fine in the amount of $950,000 upon Nautilus/ Bowflex for "failing to report defects and injuries." An accompanying agency press release, tracking the language of the Settlement Agreement, noted that, between August 2002 and April 2004, Nautilus had received 32 reports of consumers suffering injuries when the seat pin on the Bowflex PowerPro or Ultimate fitness machines broke or became disengaged during use. None of those injury reports had been



5

communicated to the CPSC, as the law required. The Commission Chairman Hal Stratton explained in that same press release: *"The recent penalties levied by CPSC send a strong message that failing to report potential hazards is illegal. Companies need to understand that the quicker they report product safety problems to the CPSC, the quicker we can take action together and protect consumers from injuries."* As of February 2007, when Nautilus/Bowflex responded to Plaintiffs' discovery request in this litigation, the number of incident reports of seat pin failures on Bowflex equipment exceeded 60, with much of the essential information from those reports unfortunately expunged.

### *Conclusions*

14. In view of my tenure and experience at the CPSC -and subsequent involvement for more than 20 years a consultant to both product manufacturers and retailers, and to law firms, on product safety and risk management concerns- I anticipate testifying as to the actions of the CPSC in the context of the subject PowerPro exercise equipment; Nautilus/ Bowflex's violation of the CPSA; the basis for the Settlement Agreement and Order as between the CPSC and Nautilus; the underlying efforts of the CPSC with respect to affording the American consuming public adequate protection against unreasonable risk in the context of dangerous or flawed products, such as the Bowflex PowerPro exercise equipment; and the extent to which Nautilus/ Bowflex actions in this matter, *or inaction*, reflected responsible manufacturing practice, or otherwise.

15. A federal safety agency like the CPSC exists to protect the American public from unreasonable product risks and to ensure the safety of products used or found around the home, such as home exercise equipment. The regulatory panel also exercises safety oversight as to the responsibilities of companies like Nautilus/ Bowflex -as a leading producer and marketer of such exercise equipment- by virtue of, and pursuant to the Consumer Product Safety Act. The several critical safety problems known to Nautilus/ Bowflex, associated with the PowerPro home exercise equipment -including the reported tendency of the seat pins of these units to become loose or disengaged during use- presented a substantial and undue risk which the company hid from the public. Early on, the company knew about the risk, yet ignored the safety interests of its own customers as a result of its inadequate response to a known hazard. The CPSC ultimately undertook forceful agency action to get the company to adequately and effectively address a known hazard, correct it, and alert owners and operators of these faulty units. But the correction came too late to avoid predictable, lasting injury to Ronald Thomas, when the seat collapsed during his routine use.


EXHIBIT E
page 6 of 9

6

16.  There are certain critical considerations which help to determine whether any particular hazard associated with a consumer product renders that product a reasonable or unreasonable risk. Of primary importance is product design.  Other such considerations include frequency and severity of injury; vulnerability of the population affected;  availability of similar-use products and of alternative, safer designs;  the transparency or latency of the risk;  comparative safety, cost-benefit, and other economic considerations; and the extent to which a company demonstrates responsible manufacturing and marketing practices.

17.  From an overall policy standpoint, Nautilus/ Bowflex failed to demonstrate responsible manufacturing and marketing practices.  The company failed to adhere to the primacy of safety at all stages of product design, testing, production, distribution, and sales.  The company lacked commitment, first and foremost, to making its line of PowerPro home exercise equipment materially safer by incorporating, from the outset, safer design features which were both technologically feasible and cost effective.  Likewise, the management and organization of the product safety function within the company kept important risk information from being openly discussed, debated, shared and dealt with -in terms of their implications for death and serious injury- at the highest corporate and executive levels within the company, and by and between design and engineering professionals.

18.  Nautilus/ Bowflex failed to thoroughly identify and understand the extent of the injury risk associated with its home exercise equipment.  At no point prior to manufacture and sale, did the company undertake a straightforward assessment of the relevant risk factors associated with the product.  That, in turn, could have provided a basis for determining how best to deal with those risks by designing reasonable safety into the product in the first instance.  Such an assessment also could have led to such other critical safety measures as providing fail-safe mechanisms, effective guarding or damage mitigation systems, meaningful product warnings, user training, educational and informational literature specific to the hazard, and whatever else may have been appropriate under the circumstances to lessen the likelihood of harm to its customers.  Failure to do so needlessly endangered the lives of customers like Ronald Thomas, who reasonably assumed that a responsible producer or seller would fully understand those product risks and exercise due care to protect against them.

19.  Another key predicate of responsible manufacturing practice is the extent to which a company undertakes to maintain thorough documentation of any hazard arising from its product.  For Nautilus/ Bowflex, the company's internal data sharing practices appear flawed.  Ideally, a company should promote open and full disclosure of incident and investigative reports so as to facilitate prompt repair or recall of a product line should that action ever become necessary, as it did in the



EXHIBIT E
page 7 of 9

7

end.  Here, there was a notable absence of corrective action or recall guidelines within the company.  Nor was there in place any semblance of a crisis management plan.  Both are integral facets of an effective product safety program.  At no point did Nautilus/ Bowflex undertake a comprehensive recall campaign with multiple public reminders, and paid advertising, to highlight the serious risk of injury from its faulty PowerPro line of home exercise equipment.  And at no point did the company demonstrate any firm commitment to task, so as to maximize public awareness and appreciation of the sizeable risk, and maximally reduce public exposure to this hazard which it knew about early-on.

20.    From the outset, the prolonged inaction of Nautilus/ Bowflex in the context of this risk is indicative of a safety program gone awry.  It is a response which defies and contravenes all known principles of responsible manufacturing and marketing practice.  As a result, safety was seriously compromised.  Directly and foreseeably, a flawed product design, left uncorrected, led to widespread incidents and injuries.  One such incident on January 18, 2004, occurring to Ronald Thomas, will adversely impact both him and his family the rest of his life.

21.    Nautilus/ Bowflex inexplicably allowed this unsafe design onto the market and persisted in keeping it there in the face of repeated reports of serious danger and risk to unknowing customers. In doing that, the company acted in a reckless manner, in complete disregard of the safety risks to product owners and users. Nautilus/ Bowflex acted in flagrant disregard of the safety of both its customers and unsuspecting family members who were victimized by  (i) such evident lack of a reasonably safe product design;  (ii) the absence of any fail-safe device, as well as any accompanying on-product warning to highlight the risk and help to avert it; and (iii) protracted and inexplicable foot-dragging, in failing to promptly correct the problem and to immediately act to reduce exposure to a known hazard by offering a repair option, or otherwise removing the product from the market and effectuating a successful recall.

22.    Had Nautilus/ Bowflex simply engaged in what it knew to be responsible corporate conduct from the standpoint of safe product design and manufacturing practice, the dire consequences in this case could have been avoided altogether. The sudden and total failure of the seat pin, and resulting injuries to Ronald Thomas, were clearly foreseeable and preventable on the part of the company, had it only taken the time and interest, and shown the requisite concern, to timely address this known hazard.

24.    Based on my specialized knowledge and long-term involvement in product safety, I believe that Ronald Thomas' injury could have been altogether avoided had Nautilus/Bowflex chosen, when it first learned of the hazard, to properly notify



EXHIBIT
E
page 8 of 9

8

its customers and potential users that the seat rail pin could come loose or come out during use, particularly in the incline position. Further, from the time the company first identified the serious seat pin disengagement flaw, officials immediately should have told customers and potential users not to use the machines in the incline position until a repair kit could be sent to them and be properly installed. Nautilus/Bowflex had enough information based on numerous reports from customers and users -received well before Ronald Thomas' injury- that the seat rail pin was "popping out," to know of a substantial risk to then-current and future users. Ronald Thomas was one of them who were left unaware and unprotected.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
Stuart M. Statler

Attachments
Settlement Agreement & Order
CV
Listing of Previous Testimony
Fee Schedule

**STATE OF VIRGINIA**      §
                           §
**COUNTY OF ARLINGTON**    §

Before me, a Notary Public, on this day personally appeared Stuart M. Statler, known to me to be the person whose mark is made on the foregoing instrument and acknowledged to me that he executed the same for the purpose and consideration therein expressed.

GIVEN under my hand and seal of office this 30 day of May, 2007.

My Commission expires: December 31, 2010

_____
Notary Public in and for the
Commonwealth of Virginia

MANUEL GONZALEZ
Notary Public
Commonwealth of Virginia
My Commission Expires Dec 31, 2010

9



EXHIBIT E
page 9 of 9