Donald C. Thomas, Esq.
Delaney Wiles, Inc.
1007 W. Third Avenue, Suite 400
Anchorage, AK  99501
phone: (907) 279-3581
fax:     (907) 277-1331
dct@delaneywiles.com

Jameson B. Carroll, Esq.
Michael Weiss, Esq.
King & Spalding LLP
1180 Peachtree Street
Atlanta, GA  30309
phone: (404) 572-2804
fax:     (404) 572-5137
jcarroll@kslaw.com
mweiss@kslaw.com

Attorneys for Defendant
Window Covering Manufacturers Association

IN THE UNITED STATES COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| VALERIE ROUNTREE, individually and as Personal Representative of THE ESTATE OF APRIL LYNNE COX; et al. | ) ) ) Case No. A04-0112 CV (JWS) |
| Plaintiffs, | ) ) __WINDOW COVERING__ |
| vs. | ) __MANUFACTURERS__ ) __ASSOCIATION'S__ ) __BRIEF IN SUPPORT__ |
| WINDOW COVERING MANUFACTURERS ASSOCIATION, | ) __OF ITS MOTION IN LIMINE__ ) __TO EXCLUDE THE TESTIMONY__ ) __OF STUART STATLER__ |
| Defendants. | ) ) |

Window Covering Manufacturers Association ("WCMA"), named as a defendant in the above-styled action, files this Brief in Support of its Motion in Limine to Exclude the Testimony of Stuart Statler, respectfully showing the Court as follows:

# I.
# **INTRODUCTION**

Stuart Statler is a former commissioner of the U.S. Consumer Products Safety Commission and a longtime consultant on product safety issues. But the opinions offered by Mr. Statler in this case do not live up to that impressive resume. They are unsupported by the facts, inappropriate in tone and content, and generally based on speculation and irrelevant personal observations instead of a reliable methodology. His testimony does not meet the standards of Rule 702 of the Federal Rules of Evidence and should be excluded.

When determining the admissibility of expert testimony, federal courts are instructed to focus not on the opinions themselves, but on the methodology the expert used in making his conclusions. For each of the opinions he delineates in his testimony, Mr. Statler offers as support conjecture instead of facts, and guesswork instead of reason. And when his opinion is unsupported in the record, or even contradicted by it, he responds by speculating – with no basis in the evidence whatsoever – on some explanation that will prop up his opinion. His opinions are grounded in speculation instead of evidence, and they are not admissible:

- His opinion that WCMA assumed a duty to Plaintiffs is an impermissible legal conclusion.

- His opinion that the warnings that were part of the safety standard at issue were inadequate is based not on research but anecdotal evidence from Mr. Statler's own life.

- His opinion that WCMA should have known about the risks of inner cord strangulation by 1994 is based on conjecture and inference with no factual basis.

- His opinion that WCMA was informed about window blind strangulation hazards in 1981 is unsupported by the evidence.

- His unsupported characterization of WCMA as a sham organization concerned only with profits has no factual basis and is unfairly prejudicial.

It is no wonder, then, that at least one other federal court has looked beyond Mr. Statler's resume and excluded his testimony, citing the same issues present in this case and calling him the "quintessential expert for hire." *See Hayes v. MTD Products, Inc.,* 518 F. Supp. 2d 898 at 901 (W.D. Ky. 2007) (Exhibit A).  Mr. Statler's opinions in that case are remarkably similar to those he offers here, even down to the use of near-identical phrases.  Rule 702 does not permit an expert to rest on a education, experience, or professional accolades – it his opinions themselves that must be tested before they can be admitted.  It is a test Mr. Statler's opinions fail.

## II.
## FACTUAL BACKGROUND

Defendant WCMA is a trade association of North American window covering manufacturers that, since 1996, has been the sponsor of safety standards for corded window coverings developed in conjunction with CPSC.  Plaintiffs are the family of April Lynne Cox, a child who died May 27, 2002 from strangulation on the inner cord of a set of window blinds. Although Plaintiffs have no evidence of the identity of the manufacturer, importer, or retailer of the blinds, they have filed negligence claims against WCMA under Restatement (Second) of Torts § 324A in connection with WCMA's development of safety standards.  For further background, WCMA incorporates its Statement of Undisputed Material Facts in the Brief in Support of its Motion for Summary Judgment, filed contemporaneously herewith.

On October 31, 1997, Plaintiffs disclosed three expert witnesses, including Stuart Statler, an attorney and consultant who served as a CPSC commissioner from 1979 to 1986.  Mr. Statler intends to offer the following opinions at trial:

- WCMA undertook a duty to produce an adequate standard that would render window blinds reasonably safe;

- WCMA did not adequately warn the public of the risk;

- CPSC informed the WCMA of the risk of strangulation from window cords in 1981;

- The WCMA knew or should have known of the risk of inner cord strangulation at least by 1994;

- The WCMA was a sham organization; and

- The WCMA failed to deal with the design flaw with respect to inner cords in a retrospective manner.[1]

(Exhibit B - Statler Dep. at 51-57.[2])

### III.
### ARGUMENT AND CITATION OF AUTHORITY

A.  **THE FEDERAL RULES OF EVIDENCE SET FORTH THE STANDARD FOR EXPERT OPINIONS.**

Before Mr. Statler can offer these opinions, the Court must ensure that his opinions meet the prerequisites set forth in Federal Rule of Evidence 702, as interpreted by the Supreme Court in *Daubert* and its progeny. The trial court's "gatekeeping" role requires courts to make a threshold determination of relevance and reliability for all expert witnesses. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Federal Rule of Evidence 702 sets out the standard for admissibility of expert opinions:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

[1] Although Mr. Statler identified this opinion in his deposition, it does not seem to appear in his disclosure, and he offered no testimony about it in his deposition.

[2] For consistency in briefing, the page references to Mr. Statler's deposition transcripts are to the pages of the transcript itself, not to the pages of the exhibit.

The *Daubert* Court distilled the standard of admissibility presented by Rule 702 into two lines of inquiry: relevance and reliability. *See Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 595, 597 (1993). The trial court's scrutiny of both the relevance and reliability of expert testimony "is vital to ensure accurate and unbiased decision-making by the trier of fact." *Elsayed Mukhtar v. Calif. State Univ.,* 299 F.3d 1053, 1063 (9th Cir. 2002). If expert testimony lacks either relevance or reliability, "it must be excluded." *See Cooper v. Brown,* 510 F.3d 870, 942 (9th Cir. 2007).

Expert opinions must have a basis in the underlying facts. *Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 830-32 (9th Cir. 2001). Rule 702 states this explicitly, requiring expert testimony to be "based upon sufficient facts or data." Opinions based on speculation or conjecture are not admissible: "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *General Electric Co. v. Joiner,* 522 U.S. 136, 146 (1997).

**B.  EACH OF MR. STATLER'S OPINIONS SHOULD BE EXCLUDED.**

Mr. Statler is a former commissioner of the CPSC and a longtime consultant on product safety issues. Because of this impressive background, it may not appear obvious that Mr. Statler's opinions themselves are not based on that knowledge and experience, and certainly not based on the evidence in the case. *See Hayes,* 518 F. Supp. 2d at 901. ("Statler is well credentialed, with service on the CPSC and years of consulting work. However, his expertise in this area is generic … No objective proof has been provided to the Court that Statler is, for instance, a recognized expert in the field of riding mower safety…"). Instead, he relies on speculation and assumption, particularly when there is in fact no support for his opinion. Federal Rule of Evidence 702 clearly requires that an expert's opinion be reached through the reliable

application of a reasonable methodology, and Rule 703 requires expert opinions to be based on evidence of the type reasonably relied upon by those in his profession. As shown below, Mr. Statler's opinions are neither.

### 1. Mr. Statler's opinion that WCMA undertook a duty is an impermissible legal conclusion.

When an expert offers legal conclusions in his testimony, he steps beyond the appropriate role of an expert witness and impermissibly invades the province of the jury. *Crow Tribe of Indians v. Racicot,* 87 F.3d 1039, 1045 (9th Cir. 1996) ("Expert testimony is not proper for issues of law. 'Experts interpret and analyze factual evidence. They do not testify about the law.'") (quoting *U.S. v. Brodie,* 858 F.2d 492, 496 (9th Cir. 1988)); *U.S. v. Arvin,* 900 F.2d 1385, 1389 (9th Cir. 1990) (expert testimony explaining the parameters of a statutory term "would usurp the jury's function."). Rather than *assisting* the jury reach an informed decision on the facts, expert testimony on legal conclusions *substitutes* the expert's judgment for that of the jury. *U.S. v. Duncan,* 42 F.3d 97, 101 (2d Cir. 1994); *Arvin,* 900 F.3d at 1389.

Mr. Statler's expert report and deposition testimony reveals that he has made no attempt to remain within the appropriate sphere of expert testimony. Even in his report, where he is not prompted by questions, Mr. Statler repeatedly offers opinions on WCMA's purported legal duty and whether that duty was breached:

- "[T]he Association took on certain duties and responsibilities to perform …[a] standards-setting function in a conscientious manner and with reasonable care." (Exhibit C - Statler Rep. at 13.)

- In discussing WCMA's purported failure to adequately warn, he asserts that the WCMA "owed that duty to parents and caregivers; it owed that duty to the parents and grandparents of April Cox." (Exhibit C - Statler Rep. at 14.)

- By undertaking to set standards for corded window coverings, the WCMA was "in effect standing in for its own individual companies who otherwise were duty-bound to ensure the safety of their product." (Exhibit C - Statler Rep. at 15.)

- WCMA had "affirmatively taken on the formidable responsibility to ensure the safety of unsuspecting infants and toddlers from the known and foreseeable risk of window cord strangulation, and the legal obligations attendant to that role." (Exhibit C - Statler Rep. at 17.)

- "WCMA is effectively conceding that it failed to exercise reasonable care." (Exhibit C - Statler Rep. at 14.)

- WCMA "failed – in its standards role – to adequately warn." (Exhibit C - Statler Rep. at 14.)

- WCMA's "actions, at the very least, reflect an absence of reasonable or due care." (Exhibit C - Statler Rep. at 15.)

- "WCMA's actions reflect reckless disregard for the safety interests and rights of the persons affected." (Exhibit C - Statler Rep. at 15.)

He continued to offer such opinions in his deposition:

> I think [WCMA] had assumed a duty of leading an entire industry in a standards – or in an effort to appropriately deal with the hazard of child strangulation from window covering cords.

(Exhibit B - Statler Dep. at 208.) There cannot be any doubt that Mr. Statler, an attorney, is using the word "duty" in its legal sense: "I think in terms of legal duty in the context of the facts of this case, that legal duty arises in the context of it taking on the role of the manufacturers in being a sponsor of the national safety standard…" (Exhibit B - Statler Dep. at 211-12).

Mr. Statler may be an attorney, but in this case he is an expert witness and the scope of his testimony must be limited accordingly. By offering the jury opinions on a question of law, Mr. Statler is impermissibly attempting to supplant the independent judgment of the jury and the Court. *See Elsayed Mukhtar,* 299 F.3d at 1063 n.10. This is not the first time: At least one other federal court has found that Mr. Statler wandered far afield of permissible expert testimony when he tried to share his legal conclusions with the jury. Judge Heyburn of the District Court of the Western District of Kentucky took issue with an expert report submitted by Mr. Statler, stating

that "[h]is report at many points deviates from opinions – which are certainly allowed from expert witnesses – to legal conclusions – which are reserved for the jury." *Hayes v. MTD Products, Inc.,* 518 F. Supp. 2d 898, 901 (W.D. Ky. 2007).  Judge Heyburn excluded the testimony.  *Id.*

Tellingly, two of Judge Heyburn's examples of inappropriate legal conclusions from Mr. Statler's report in the *Hayes* case appear nearly verbatim in Mr. Statler's report in this matter. Judge Heyburn quoted Mr. Statler's report for the conclusion that the accident at issue in that case was

> caused by a "'systemic disregard for safety, at all levels, on the part of MTD' and by MTD's 'reckless disregard for the safety of its customers.'"

*Id.*  In his report in this case, Mr. Statler opines that the incident was caused by WCMA's

> systemic disregard for safety, at all levels and over such a long period of time

and that WCMA's actions

> reflect reckless disregard for the safety interests and rights of persons affected.

(Exhibit C - Statler Rep. at 15.)  These near-identical opinions were inadmissible in *Hayes,* and they are inadmissible in this case.

> **2.    Mr. Statler's opinion about the adequacy of the warning is not based on a reliable methodology, or any methodology at all.**
>
>> **a.    Mr. Statler bases his opinion about the placement of the warning label on his memories of seeing other window blinds in his life.**

Mr. Statler testified that the warning label on the window blinds was inadequate because it was affixed to the bottom rail, "in a place and manner where it is least likely to be seen." (Exhibit C - Statler Rep. at 14; Exhibit B - Statler Dep. at 175.)  But although there is a large body of empiric, scientific research into the design and placement of warnings, Mr. Statler cites

none of this as the basis for his opinion. He admits he has seen no studies that determined whether window blinds – which are designed to be raised and lowered – are actually raised or lowered, nor has he conducted any of his own research. (Exhibit B - Statler Dep. at 176-77.) Instead, Mr. Statler relied on his memories of seeing window blinds during his lifetime: "[J]ust judging from my own observations over the years, 50 percent of the time or more probably the blinds are in a down position."[3] (Exhibit B - Statler Dep. at 178.)

### b. Mr. Statler has done no research into alternative locations for warning labels.

Nor can Mr. Statler offer a reliable suggestion for where the warning label should be instead:

> I think – there would need to be some research done, but I think research would probably tend to reveal that a place perhaps on the side of the top part of the window covering and possibly on the outer front edge of the bottom window covering would be the two places that are most ideal.
>
> But I think more research probably ought to go into that.

(Exhibit B - Statler Dep. at 178-79.) Later, he cautioned that he did not want to offer "seat-of-the-pants expertise" on the issue. (Exhibit B - Statler Dep. at 179.)

### c. Mr. Statler's arrived at his opinions about hangtag warnings based solely on whether *he* would read a hangtag warning.

Finally, Mr. Statler testified that the hang tag warning required to comply with the safety standard was "useless" because it was unlikely to be read, though he again could cite no scientific basis for that opinion. Instead, that opinion is apparently based on his recollection that when *he* moved into a new home, he removed the hang tags from the window blinds without reading them. "And that confirms my position that hang tags are probably the least effective means of all." (Exhibit B - Statler Dep. at 195-96.)

---

[3] Of course, blinds that are down 50 percent of the time are up 50 percent of the time, making the warning label regularly visible.

### d. "Common sense" opinions are not helpful to the jury.

Mr. Statler is an expert witness in a federal lawsuit, not a casual observer commenting from an easy chair. Expert opinions must be based on a reliable methodology, one that is testable and repeatable and, ideally, approved by one's professional peers in juried publications. They are not to be based on one's memories of whether window blinds are more often up than down, or the expert's anecdotal belief of how he would have responded to a warning. *See Edwards v. Safety-Kleen Corp.*, 61 F. Supp. 2d 1354, 1359 (S.D. Fla. 1999) (excluding opinion testimony because it was an untested hypothesis based largely on expert's own belief). If, as Mr. Statler conceded, "there would need to be some research done" before developing an opinion, it is incumbent on the expert to locate or conduct that research before offering that opinion under oath.

Perhaps Mr. Statler considers these opinions simply common sense. But "common sense" opinions are not helpful to the jury, because the jury is perfectly capable of interpreting that evidence by itself. *See White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002) ("A layman, which is what an expert witness is when testifying outside his area of expertise, ought not to be anointed with ersatz authority as a court-approved expert witness for what is essentially a lay opinion."). Mr. Statler said he was hesitant to offer a "seat-of-the-pants" opinion, but that is precisely what he has done here. These opinions should be excluded.

### 3. When Mr. Statler's opinion about what WCMA "should have" known is belied by the evidence, he simply makes unfounded excuses to brush off the discrepancy.

Any expert witness may at one time or another find himself faced with evidence that contradicts his opinion. That expert is free to attempt to explain the discrepancy by pointing to facts that support his conclusion. But if instead he offers an explanation that is mere conjecture rather than one based on the evidence, it is not reliable and must be excluded.

      **a.**    **Mr. Statler simply speculates about why the evidence does not match his opinion about what WCMA should have known.**

In his report and deposition, Mr. Statler offered the opinion that WCMA knew or should have known about the risks of inner blind strangulation in 1994, when it began development of the safety standard that Plaintiffs claim was inadequate. (Exhibit C - Statler Rep. at 12-14; Exhibit B - Statler Dep. at 51.) He then was asked about the absolute lack of documentary evidence that CPSC ever mentioned inner cords to WCMA, despite a close involvement between the organizations that included jointly issuing public alerts and working together on product design and warnings.

This lack of evidence suggests that perhaps even CPSC was not aware of the risks of inner cords until years later, and it is not insubstantial: Not only is there no indication CPSC ever considered warning parents against inner cord strangulations in its press releases or addressing the hazard in the safety standard, but minutes of a 1999 meeting between CPSC and WCMA describe the inner cord risk as a "new safety problem." (Exhibit B - Statler Dep. at 98-99, 106.) Mr. Statler's response was to offer "a couple of explanations" for why CPSC – the agency formed to improve the safety of consumer products in the United States – would work side by side with an industry for years to reduce the risk of a particular safety hazard, yet *never* suggest that a related, obvious, and serious danger be addressed as well. (Exhibit B - Statler Dep. at 98.) First, he suggested the CPSC could have been afraid that addressing inner cords would "confuse the issue." (Exhibit B - Statler Dep. at 98.) Second, he wondered if WCMA may have somehow convinced CPSC that the danger wasn't "that much of a problem." (Exhibit B - Statler Dep. at 98-99.) Mr. Statler testified that he "is not sure what the correct one is." (Exhibit B - Statler Dep. at 98.)

In fact, there is no evidence that *either* explanation is correct. Mr. Statler can point to no evidence that CPSC made a judgment call not to address inner cords at any time prior to 1999, and no evidence that CPSC raised the issue but was resisted on any point by WCMA. (Exhibit B - Statler Dep. at 112-13, 122.) He has no evidence that anything he suggests *could have* occurred actually *did* occur. (Exhibit B - Statler Dep. at 114 ("I'm saying that it could have happened.")) This conjecture is not based on any fact; it is merely a rationalization to explain why the evidence – or lack thereof – fails to support his opinion. It indicates that his opinion was not sufficiently grounded in the facts in the first place.

        **b.**      **Mr. Statler's opinion about a so-called "notice" letter is based on his own speculation about the letter.**

Equally problematic is Mr. Statler's opinion that WCMA was alerted to the hazards of inner cord strangulations on its member's products in 1990, when an attorney wrote to WCMA to inform it of a strangulation incident on the "support cord" of a "woven wood shade." (Exhibit B - Statler Dep. at 91.) According to Dr. Statler, this is the precise hazard involved in this case. (Exhibit C - Statler Rep. at 12.) But Mr. Statler apparently did not investigate what a woven wood shade is: He describes one as "a window covering that rolls up and down, and there are both pull cords and internal cords associated with them," which, of course, describes *all* horizontal window blinds. (Exhibit B - Statler Dep. at 140-41.) He also has no idea whether any WCMA member manufactures woven wood shades. (Exhibit B - Statler Dep. at 141.) Thus, while a key portion of his testimony is that this letter should have informed WCMA of an issue with its member's products, he never bothered to find out if the letter described any member's product. (Exhibit B - Statler Dep. at 141.) Needless to say, this is not the level of "intellectual rigor" Rule 702 calls for. *Mukhtar,* 299 F.3d at 1063-64.

        **4.**      **Mr. Statler's opinion that CPSC informed WCMA about the risk of strangulation in 1981 is pure speculation.**

Mr. Statler contends with his typical certainty that CPSC informed the WCMA specifically about the risks of window blind strangulations in 1981, the time CPSC first became aware of those hazards. (Exhibit C - Statler Rep. at 8-9, Exhibit B - Statler Dep. at 51.) But in his deposition, it takes only one question to reveal that Mr. Statler in fact has no evidence – only a guess – that WCMA was contacted by the CPSC in that time frame:

> Q. Are you aware whether the [CPSC] staff made contact with anyone in the industry in 1981 or early 1982?
>
> A. I am aware contacts were made. I couldn't tell you with any specificity who those contacts were made with. I am certain, given how the commission functioned, the American Window Covering Manufacturers Association[4] would have been one of the primary groups contacted.

(Exhibit B - Statler Dep. at 35-36.) This is not an opinion based in evidence – indeed, it is contradicted by the evidence in the record. It is speculation about what "probably" happened, and should be excluded. (*See* Exhibit B - Statler Dep. at 68.)

### 5. Mr. Statler's description of WCMA as a "sham" is inflammatory and should be excluded.

Throughout his testimony – and particularly in his expert disclosure – Mr. Statler repeatedly exits the realm of appropriate expert opinion and becomes a full-blown advocate. His report is not a "complete statement of all opinions the witness will express and the basis and reasons for them," Fed. R. Civ. P. 26(a)(2)(B)(i), but a 19-page tirade that "reads less like an expert's unbiased assessment and more like counsel's closing argument." *Hayes,* 518 F.Supp. 2d. at 901 (discussing a prior report by Mr. Statler). These strident assertions present a substantial risk of "unfair prejudice, confusion of the issues, or misleading the jury" that outweighs any probative value of such inflammatory statements. Fed. R. Evid. 403. As the Supreme Court noted in *Daubert*, expert testimony must be carefully scrutinized under Rule

---

[4] WCMA was formerly known as the American Window Covering Manufacturers Association.

403's balancing test due to the tendency of experts to exert a strong influence on juries. 590 U.S. at 595.

Nowhere is this more evident than in his testimony that WCMA is, in his words, a "sham organization," or "façade," or "shell organization." (Exhibit C - Statler Rep. at 17.) But he does not limit this provocative language to describing WCMA itself: He also attacks WCMA director Peter Rush – who likely will testify as a fact witness in this trial – as "running the WCMA out of his side pocket," apparently because he had other obligations. (Exhibit C - Statler Rep. at 17; Exhibit B - Statler Dep. at 253.) Regardless of whether he believes these words are fitting, it is improper to use inflammatory language about another party – or another witness – in the courtroom. The danger of unfair prejudice from these insults surely outweigh any probative value they may have.

Most egregious, however, is Mr. Statler's insinuation that WCMA chose not to address the hazards associated with inner cords out of greed. In his expert report, Mr. Statler wrote:

> When the formulation of a truly effective safety standard may imperil members' profits, an association in the WCMA's vaunted position may have an incentive to set the bar unrealistically low, oblivious to the safety concerns it is purporting to address.

(Exhibit C - Statler Rep. at 13). He added that WCMA's primary loyalties are to its members' "business success," and attributed that statement to the testimony of Mr. Rush. (Exhibit C - Statler Rep. at 13.)

In his deposition, however, he admits that he has no evidentiary basis for saying that WCMA was in any way motivated by profit and, in fact, admitted that there is no evidence that profit *could* be a motive, because the design changes in either safety standard have no more than a minimal effect on the manufacturers' bottom lines. (Exhibit B - Statler Dep. at 250-52.) Mr. Statler also admits that while Mr. Rush never discussed "profit" in his testimony, he was justified

in putting those words in Mr. Rush's mouth because Mr. Rush testified that WCMA acted on behalf of its members interests, and Mr. Statler assumed that one of those interests would be maximizing profits. (Exhibit B - Statler Dep. at 250-51.)  Even so, he was undeterred by the fact that his accusation that the defendant put profits before lives was utterly unfounded: "This is meant to be more of a theoretical statement." (Exhibit B - Statler Dep. at 252.)

This is not the only area of testimony in which Mr. Statler crossed over the line from expert opinions to prejudicial advocacy.  For example, in his report, Mr. Statler wrote about WCMA's actions: "As a result, April Cox became *one more victim* of the negligent actions and omissions of the WCMA…" (Exhibit C - Statler Rep. at 16) (emphasis added).  He also repeatedly poses – though does not answer – florid rhetorical questions:

> [W]hat purpose is accomplished by placing a critical safety warning – one addressed to the most tragic of risks involving the strangulation of a young child – in a place or manner where it is least likely to be seen?

(Exhibit C - Statler Rep. at 14.)

> What went wrong in the WCMA-led, industry-dominated process, which failed to adequately take into account the needs of the public?

(Exhibit C - Statler Rep. at 14.)

> How many youngsters must suffer entanglement deaths before an industry association, which undertakes a critical safety function on behalf of its members, acts forcefully and fully to address or eliminate such an insidious hazard?

(Exhibit C - Statler Rep. at 15.)

Nor is this the first time Mr. Statler has crossed that line.  In his order excluding Mr. Statler from testifying in a case in the Western District of Kentucky, Judge Heyburn criticized Mr. Statler's proposed report because it "reads less like an expert's unbiased assessment and more like counsel's closing argument." *Hayes,* 518 F.Supp. 2d. at 901.  This is equally true of Mr. Statler's report and testimony in this case. Mr. Statler's inflammatory assertions create a

clear risk of "unfair prejudice, confusion of the issues, or misleading the jury" – a risk that far outweighs any probative value of this testimony. They should be excluded.

**C.   MR. STATLER'S REPEATED DISMISSALS OF THE RECORD FURTHER DEMONSTRATE THAT HIS TESTIMONY IS CONNECTED TO THE EVIDENCE ONLY BY HIS OWN *IPSE DIXIT*.**

As described above, an expert's opinions must be grounded in the evidence. But on a number of occasions, Mr. Statler demonstrated that the evidence had little connection to the opinions he wished to offer. Several times in his expert disclosure, Mr. Statler made much of assertions of "evidence" that turned out to be false, and each time he was confronted with the true evidence, he brushed off the suggestion that his opinions should be affected as a consequence. For example:

- In his disclosure, Mr. Statler testified that WCMA President Peter Rush had failed to circulate a letter purportedly warning of the danger of inner cords among WCMA's members – evidence, he claimed, that WCMA did not treat the issue with sufficient import. (Exhibit C - Statler Rep. at 13). But Mr. Statler conceded in deposition that Mr. Rush in fact testified that he *did* share the letter with WCMA's members, though he said that change has no effect on his opinions. (Exhibit B - Statler Dep. at 142.)

- Mr. Statler testified, based on a WCMA discovery response, that WCMA denied being aware of the incident described in the 1990 letter discussed above. (Exhibit C - Statler Rep. at 13). When a closer review of the response with its accompanying discovery request revealed a different reading, he dismissed the issue. (Exhibit B - Statler Dep. at 144-46.)

- Mr. Statler testified that the 1996 safety standard made no mention of inner cords. When he read the actual standard (perhaps for the first time, *see* Exhibit B - Statler Dep. at 196-97), he learned that it warns parents to keep children away from the "cords that run through the blinds." He denied knowing what that meant. (Exhibit B - Statler Dep. at 197-98.)

The fact that these pieces of evidence – so prominently discussed in his voluminous expert report – turned out to have so little importance to his actual opinions suggests that Mr. Statler is guided by the conclusions he wishes to reach, not the facts as they are. Far from finding bases in "sufficient facts or data," as required by Rule 702, these opinions rest solely on

the "*ipse dixit*" of Mr. Statler.  As such, they must be excluded as unreliable.  *Joiner,* 522 U.S. at 146.

**D.     MR. STATLER'S OPINIONS ARE NOT RELIABLE BECAUSE THEY WERE PREPARED SOLELY FOR LITIGATION.**

Courts also consider whether expert testimony was prepared solely for litigation when determining its reliability. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1317 n.4 (9th Cir. 1995); *see also* F.R.E. 702 Advisory Notes.  Expert testimony prepared solely for litigation is more likely to be biased towards the outcome desired by the party that hired the expert.  *Daubert*, 43 F.3d at 1317.  Therefore, the proponents of the expert's testimony must submit additional indicia of reliability, such as proof that the expert's conclusions have been subjected to peer review, or that they reference an objective source such as a learned treatise, policy statement, or a published article.  *Id.* at 1318-19.  In these cases, the expert must "explain precisely how they went about reaching their conclusions." *Id.* (citing *U.S. v. Rincon,* 28 F.3d 921, 924 (9th Cir. 1994)).

Mr. Statler has been called the "quintessential expert for hire." *Hayes,* 518 F. Supp. 2d at 901 (outlining the court's rationale for excluding Mr. Statler from testifying).  He has offered his services in cases involving products as varied as pharmaceuticals, exercise equipment and motor vehicles.  (*See Salden v. Matrixx Initiatives,* (Exhibit D - Statler Discl. at 3.); *Thomas v. The Nautilus Group, Inc.,* (Exhibit E - Statler Aff. at 8.)  As in those cases, Mr. Statler formed his opinions in this case only after being contacted – and paid a retainer of two thousand dollars – by Plaintiffs' counsel. (Exhibit F - Statler Statement of Fees.)

Perhaps the most telling indication that Mr. Statler's opinions were prepared solely for litigation is the near-verbatim lifting of language in his report in this case from those other cases

in which he was designated to testify. For example, in his disclosure in *Thomas v. The Nautilus Group, Inc.*, he states:

> Had Nautilus/ Bowflex simply engaged in what it knew to be responsible corporate conduct from the standpoint of safe product design and manufacturing practice, the dire consequences in this case could have been avoided altogether.

Compare that statement with his concluding remark in his report in this case:

> If the association and the companies it represented had simply engaged in what each knew to be responsible conduct from the standpoint of safe product design, and effective warnings and standards setting, this consequence could have been altogether avoided.

(Exhibit C - Statler Rep. at p. 19). He also wrote in *Thomas* that:

> From the outset, the prolonged inaction of Nautilus/ Bowflex in the context of this risk is indicative of a safety program gone awry. It is a response which defies and contravenes all known principles of responsible manufacturing and marketing practice. As a result, safety was seriously compromised.

(Exhibit E - *Thomas* Discl. at 8.) Again, a comparison to his report in the instant case reveals a strikingly similar assertion:

> The prolonged inaction of WCMA in the face of child strangulations from the inner cords of window coverings is indicative of a safety effort gone awry. In the aggregate, such conduct … contravenes all known principles of responsible practice within the manufacturing community… As a result, safety was seriously compromised."

(Exhibit C - Statler Rep. at 15.)

      Mr. Statler's use of recycled language in coming to nearly identical conclusions in cases involving a variety of different facts and products shows that he truly is the "quintessential expert for hire." Further, his repeated use of inflammatory language and his submission of legal conclusions, as discussed above, indicates a clear lack of impartiality. Plaintiffs are therefore presented with the heavy burden of bringing forth independent indicia of reliability. *See Daubert*, 43 F.3d at 1318-19. They cannot do so, because Mr. Statler's opinions have no independent

indicia of reliability. They have not been subjected to peer review. They are not based on any learned treatise, published articles, or any other objective, outside source that affirms Mr. Statler's conclusions or methodology. This falls short of the Ninth Circuit's demanding standard for expert testimony prepared solely for litigation, which requires experts to "explain *precisely* how they went about reaching their conclusions and point to some objective source" to show that their methodology is reliable. *Daubert,* 43 F.3d at 1319 (emphasis added).

## CONCLUSION

For the reasons stated above, the WCMA respectfully requests that this Court exclude the testimony of Mr. Stuart Statler.

Respectfully submitted, this 3d day of March, 2008.

        DELANEY WILES, INC.

        Attorneys for Defendant Window Covering Manufacturers Association

        _s/ Donald C. Thomas_____
        Donald C. Thomas
        Delaney Wiles, Inc.
        1007 W. Third Avenue, Suite 400
        Anchorage, Alaska 99501
        phone: (907) 279-3581
        fax:    (907) 277-1331
        dct@delaneywiles.com

        Jameson B. Carroll
        Michael Weiss
        King & Spalding LLP
        1180 Peachtree Street
        Atlanta, GA  30303
        phone: (404) 572-2804
        fax:    (404) 572-5143
        jcarroll@kslaw.com
        mweiss@kslaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on 3 March 2008, I caused to be electronically served a copy of the foregoing **WINDOW COVERING MANUFACTURING ASSOCIATION'S BRIEF IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF STUART STATLER** upon:

>Charles W. Ray, Jr.
>Law Offices of Charles W. Ray, Jr., P.C.
>205 E. Dimond Blvd., No. 531
>Anchorage, AK  99515
>
>Don C. Bauermeister
>Burke & Bauermeister, P.L.L.C.
>921 West 6th Avenue, Ste. 200
>Anchorage, Alaska 99501

This 3d day of March, 2008.

>_s/ Donald C. Thomas_____
>Donald C. Thomas