DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

|  |  |
|---|---|
| VALERIE ROUNTREE, individually ) and as Personal Representative ) of THE ESTATE OF APRIL LYNNE ) COX; MORGAN SCHEDIWY, a minor, ) through her natural mother and ) guardian VALERIE ROUNTREE; and ) CHRISTOPHER COX, ) ) Plaintiffs, ) ) vs. ) ) WINDOW COVERING MANUFACTURERS ) ASSOCIATION, ) ) Defendant. ) | Case Number: A04-0112 CV (JWS) |

DEPOSITION OF

STUART M. STATLER

Washington, D.C.

Thursday, January 24, 2008

9:58 a.m.

Job No.: 1-121137
Pages 1 through 263
Reported by: John L. Harmonson, RPR

EXHIBIT
H
page 1of18
Blumberg No. 5119

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 53

1   adequate standard for the product that would otherwise

2   render it reasonably safe.

3           In other words, I think -- I'm not saying

4   that -- at least not directly that -- and I think in

5   Peter Rush's testimony, he's not saying that they --

6   that WCMA was to design or redesign the product, but

7   that as part of an effective voluntary standards

8   process which they undertook to oversee and steer on

9   behalf of the industry, that whatever it took in the

10  way of eliminating or alleviating the relevant risks,

11  which may include design factors, that that's what the

12  WCMA undertook.

13      Q.    So their undertaking was --

14      A.    For example, I'm not saying that they

15  undertook to design.  They didn't have an engineer on

16  board.  So they couldn't design.  But through a

17  process which they agreed to undertake, which as I

18  understand it included the engineering expertise from

19  the individual companies, that if it were necessary to

20  have an adequate standard, that such design

21  reformulation would be a part of that.

22      Q.    Okay.  So is there -- Is their undertaking



EXHIBIT
H
page 2 of 18
Blumberg No. 5119

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 64

1    with members in the industry.

2        A.      That's correct.

3        Q.      Okay.  And I think you testified earlier

4    that you don't have any specific recollection or

5    knowledge, or, frankly, any documents that show any

6    contact between the CPSC and what's now the WCMA prior

7    to the '85-86 time frame; is that correct?

8        A.      That's correct.

9        Q.      I have a document here we'll mark as

10   Exhibit 7.  I'll ask you what it is.

11       (Exhibit 7 marked for identification and attached

12   hereto.)

13   BY MR. WEISS:

14       Q.      And you can read the whole thing if you

15   would like.

16       A.      If I can just take a minute.

17       Q.      Sure.

18       A.      Okay.

19       Q.      Have you seen this before?

20       A.      Probably not.

21       Q.      And this --

22       A.      This would be an internal staff memorandum

EXHIBIT
**H**
page 3 of 18
Blumberg No. 5119

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 97

1    A.    No.  I did not say that.

2    Q.    I'm confused about that.  I'm sorry.

3    A.    No, what I said is that a study, an

4 independent study of the material that CPSC generated

5 would have told you that approximately one out of

6 every ten were inner cord strangulations.

7    Q.    Did you know that when you were at CPSC?

8    A.    I did not, no.

9    Q.    Are you aware of any CPSC study --

10    A.    Let me take that back.  I did know -- And

11 this was probably in 1986 when the commission staff

12 talked to us about that this isn't just a problem that

13 could be solved by an education campaign, that there

14 were design considerations, the staff did discuss with

15 us that there were two aspects of the problem,

16 primarily the pull cord, and that constituted the bulk

17 of the incidents, but there was a residue of incidents

18 that involved the inner cord, and they did share that

19 with us.  And that was something they said they shared

20 with the industry as well.

21    Q.    Do you have any paper that shows that you

22 reviewed for your --

EXHIBIT
**H**
Blumberg No. 5119
page 4 of 18

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 98

1      A.    No.  No.

2      Q.    In 1985, the CPSC, in conjunction with the

3  WCMA, issued a public safety alert?

4      A.    That's right.

5      Q.    Did that alert mention the hazard of inner

6  cords?

7      A.    No.  It referred only to the pull cords.

8      Q.    You were on the commission at that time?

9      A.    I was.

10      Q.    Why didn't it mention inner cord hazards?

11      A.    There are a couple of explanations for

12  that, and I'm not sure what the correct one is.  The

13  most logical explanation is that since by far the bulk

14  of the incidents had to do with the pull cords, the

15  purpose of this release was to identify that problem,

16  to identify where the maximum risk was and perhaps not

17  to confuse the issue.

18          But an explanation might also be contained

19  in the fact that all those product safety alerts --

20  every product safety alert the commission has ever

21  issued, not only in this area but with respect to any

22  consumer product covering just about all

EXHIBIT
H
Blumberg No. 5119
page 5 of 18

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 183

1   won out in this area.

2       Q.    CPSC has human factors experts, right?

3       A.    They do.

4       Q.    Are you aware that there are CPSC human

5   factors experts that were on the technical committee

6   that came up with the standard?

7       A.    I am.

8       Q.    Would you expect them to raise an issue

9   about the placement of those?

10      A.    I would expect that there were probably a

11  number of issues that were raised in conjunction with

12  the voluntary -- so-called voluntary corrective action

13  plan and that the end language and the end

14  requirements came about through a compromise of all

15  the interests involved.

16      Q.    And why do you expect that was --

17      A.    Because that's always -- I was involved in

18  several hundred voluntary action plan discussions and

19  considerations, and I can't think of one of them that

20  wasn't a negotiated settlement.

21      Q.    So is your guess as to what happened here

22  is that the CPSC wanted the warning somewhere else,

EXHIBIT
H
page 6 of 18
Blumberg No. 5119

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 187

1      A.    From the original titling of the case.

2      Q.    And Ching Feng is in China?

3      A.    I believe they are.

4      Q.    Are you aware of any evidence in the case

5   that indicates whether there was a hang tag on the

6   blinds?

7      A.    No, I'm not.

8      Q.    Are you aware of any witness who has

9   testified that he or she saw or didn't see it?

10     A.    No, I'm not.

11     Q.    You mentioned that the blinds would have to

12  have --

13     A.    I take that back.  You said saw or didn't

14  see it?  Yeah, there is some testimony in the case

15  that no one saw the -- no one testifies that they did

16  see it.

17     Q.    Okay.  You said a moment ago that the

18  blinds would have to have a hang tag to comply with

19  the safety standard?

20     A.    That's correct.

21     Q.    But we don't know if they did?

22     A.    That's correct.

EXHIBIT
**H**
Blumberg No. 5119
page 7of 18

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 208

1    that?

2        A.    No.  It's probably something that may or

3    may not come up.  I don't know.

4        Q.    Okay.  And this is -- It's not the last but

5    one of the last areas is that WCMA undertook a duty.

6    And that's a large portion of your report as well; is

7    that correct?

8        A.    Right.

9        Q.    What I'm trying to -- What I would like to

10   understand here is when it assumed that duty.

11       A.    Okay.

12       Q.    At what point -- I'll just ask.  At what

13   point in time did WCMA assume a duty -- Well, let's go

14   back a little bit.

15            What duty did they assume?

16       A.    I think they assumed a duty of leading an

17   entire industry in a standards -- or in an effort to

18   appropriately deal with the hazard of child

19   strangulation from window covering cords.  I guess I

20   would leave my answer at that.

21       Q.    And when did it assume that duty?

22       A.    I would say it certainly assumed that duty

EXHIBIT
H
page 8 of 18
Blumberg No. 5119

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 209

1    when it offered itself as a -- as a promoter and

2    supporter and sponsor of a national safety standard

3    for window blind safety.

4         Q.    Okay.  Did it assume that duty before that

5    time?

6         A.    I think that becomes more of a matter of --

7    it assumes responsibility, but how much of a duty,

8    probably not to the same degree as it does as a

9    national -- as an association representing an entire

10   industry in conjunction with ensuring the safety of a

11   product of that industry.

12        Q.    Okay.  You had testified earlier today that

13   the CPSC -- I'm sorry, the WCMA -- I think you may

14   have said, although I may be misquoting you.  I think

15   you used the phrase obligation, that in 1985 or sooner

16   when it was informed of the hazard of window blind

17   strangulation, it had an obligation to search the

18   files, go through the files at CPSC and find out more

19   about that hazard.

20        A.    I think that's right.  That's why I was

21   hesitant in my prior response.  Because there are

22   certain obligations and there's certain additional

EXHIBIT
4
Page 9 of 18
Blumberg No. 5119

L.A.D.  REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 210

1    obligations or duties that go with being a sponsor of

2    a national standard.

3        Q.    You're an attorney, I assume?

4        A.    I am.

5        Q.    And presumably a much better attorney than

6    I am.  You understand that duty is a legal term as

7    well as a general term that the jury might understand?

8        A.    I do.

9        Q.    And that one of the -- and I don't want to

10   get too into legal issues, but one of the elements of

11   a tort claim is a duty to the plaintiff?  Do you

12   understand?

13       A.    That's right.

14       Q.    And that in the field of tort law, certain

15   entities have duties to certain people and certain

16   ones don't, correct?

17       A.    Right.

18       Q.    And for the sake of clarity here, can we

19   agree that when I use the word "duty," I'm referring

20   to a legal duty, and we can use another term,

21   obligation --

22       A.    You're referring to a legal duty to the

EXHIBIT H
page 10 of 18
Blumberg No. 5119

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 211

1    plaintiff?

2         Q.    I'm just talking about a legal duty as

3    opposed to a moral duty or what should be done, to the

4    extent there is a difference between them.

5         A.    Okay.

6         Q.    You understand if there is a car accident

7    out there, all of us may have a moral duty or

8    obligation to go help.

9         A.    Yeah.  I guess I was thinking of it more in

10   terms of there were certain duties or obligations or

11   responsibilities that an association has to its

12   members.  If the mission of the organization is to

13   promote the organization, to promote the interest of

14   its members, there are certain duties you have.  I

15   take it that's not what you're referring to.

16        Q.    We can talk about all of those things.  I

17   just want to make sure that when we're talking about

18   them, we understand each other as to what we're

19   saying.

20        A.    I think in terms of legal duty in the

21   context of the facts of this case, that legal duty

22   arises in the context of it taking on the role of the

f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 212

1   manufacturers in being a sponsor of the national

2   safety standard which was meant to ensure the safety

3   and adequacy of the product in terms of it being fit

4   for the purpose intended, and it did not do that.

5        Q.    Okay.  And so there are a number of places

6   in your report where you talk about duty and

7   obligation.  Do you know -- Shall we go through those

8   and try to figure out what you mean?  Is that all

9   right?

10       A.    By all means.  I think in large part it's

11  going to relate to what we just discussed.

12       Q.    The duty to the Rountree --

13       A.    Duties to the public at large once you --

14  once you take on the role of the manufacturers in

15  sponsoring and ensuring the adequacy of a safety

16  standard.

17       Q.    Because the manufacturers in the United

18  States jurisprudence, they have a duty to make a

19  product that is free of unreasonable dangers and

20  hazards?

21       A.    Correct.

22       Q.    And a distributor and a retailer may also

EXHIBIT
H
page 12 of 18
Blumberg No. 519

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

Page 213

1    have that duty.

2         A.    Correct.

3         Q.    And I think what you said a moment ago was

4    that when it chose to sponsor the standard, it assumed

5    some of that duty from the manufacturers.

6         A.    Yes.

7         Q.    Is that correct?

8         A.    Yes.

9         Q.    Prior to that date, did it assume any duty

10   that would normally be held by the manufacturers in a

11   legal sense?

12        A.    Again, from a legal context, we're talking

13   about I think no.  I think it did have an obligation

14   to its members to -- I've been associated with several

15   trade associations, professional ones.  But you have a

16   duty as an association to serve your members.  And so

17   some of the things it should have been doing in the

18   context of the single most important issue before its

19   members, other than profits, namely safety of the

20   product, it should have undertaken on behalf of its

21   members, and it appears not to have done that.

22        Q.    I think you said earlier that it was



EXHIBIT
H
page 13 of 18

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 216

1    Q.    Built a factory and made blinds for them,

2    the manufacturers made the blinds.

3    A.    I don't know that that would help the

4    members.  It would be seen as a competitor.

5    Q.    Okay.  Let's go through -- Actually, at the

6    time when you say the WCMA assumed a legal duty by

7    choosing to sponsor the standard, did the manufacturer

8    still have the duty to make a -- to manufacture a

9    product free of --

10   A.    Absolutely.  They can't delegate that

11   responsibility.

12   Q.    And the importer or distributor also had

13   whatever legal obligations it had before?

14   A.    Yes.

15   Q.    And the retailer as well?

16   A.    Yes.

17   Q.    So WCMA did not take this responsibility or

18   duty from the manufacturers and other people, other

19   parties; it added on to the number of entities that

20   had this duty?

21   A.    I'm not quite sure of the semantics here.

22   But the fact of the matter is they assumed a

EXHIBIT
H
Page 14 of 18

Blumberg No. 5119

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 221

1    front of you?

2        A.    Yes, I do.

3        Q.    If you'll turn to page 4.  On Item 2, you

4    list the objective of the standard.

5        A.    Page 4, Item 2?

6        Q.    Yeah.

7        A.    Okay.

8        Q.    That's on that 0028186.  Can you read the

9    objective, please?

10        A.    "The objective of the standard is to

11    provide requirements for covered products in 1.3 that

12    reduce the possibility of injury, including

13    strangulation to young children from the bead, chain,

14    cord, or any type of flexible loop device used to

15    operate the product."

16        Q.    I'm understanding your testimony to be that

17    WCMA did not have a legal duty to the plaintiffs until

18    they undertook to create the safety standard; is that

19    correct?

20        A.    Yes.

21        Q.    So what I'm asking here, I think, is what

22    are the limitations in the scope of that duty?  It's

EXHIBIT
pages 15 of 18
Blumberg No. 5119

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 231

1    Q.    And does that make the standard adequate or

2  inadequate?

3    A.    It's adequate in terms of pull cords.  It's

4  silent as to inner cords.  But the purpose of the

5  standard's role was to ensure the safety of the

6  product through the standards procedures.  And this

7  standard's procedure, while it identified and dealt

8  with the problem of pull cord safety, did not identify

9  and deal with in any way the problem of inner cord

10  safety, which as I've stated several times today is

11  really another facet of the same problem.

12    Q.    Are there other strangulation hazards on

13  window blinds aside from being caught in the loop of a

14  pull cord and caught in the loop of an inner cord?

15    A.    Yes.  As you quoted from, among other

16  places, as you quoted from the article in the JAMA

17  publication, Ms. -- and I'm having as hard a time with

18  her name as you are -- Rauchschwalbe identified

19  several other means -- or several other types of

20  scenarios which may or may not be conducive to a

21  solution.

22        But we know that inner cords work conducive

EXHIBIT
page 16 of 18
Blumberg No. 5119

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 249

1     A.    Because they took on the role as the -- as

2  the sponsor and promoter of the national standard.

3         MR. BAUERMEISTER:  Mr. Weiss, this is Don

4  Bauermeister.  I apologize for interrupting.  I notice

5  it's six and a half hours since we started.  Are we

6  nearing the end?

7         MR. WEISS:  I would love to be, Don.  I'm

8  trying to get an answer here.  If I have to move on, I

9  have to move on.

10        All right, let's go forward.

11        MR. BAUERMEISTER:  Mr. Statler, do you need

12  a break?

13        THE WITNESS:  No, I'm fine.  Thank you for

14  inquiring.

15  BY MR. WEISS:

16     Q.    Does the WCMA inspect products?

17     A.    Does the WCMA inspect products?  So far as

18  I know, they do not.

19     Q.    Do they certify compliance with the

20  standard?

21     A.    So far as I know, they do not.

22     Q.    Do they mandate compliance with the



EXHIBIT
H
page 17 of 18

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY

f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 250

1    standard?

2        A.    No, they do not.

3        Q.    Do they punish anybody for noncompliance?

4        A.    No, they do not.  And if they did, they

5    would be in violation of the law, as with any other

6    voluntary standards group.

7        Q.    Do you have an opinion about the adequacy

8    of the retrofit campaign?

9        A.    No, I don't.

10        Q.    You said on page 13 of your report again

11    that the association's primary loyalties are to its

12    members' profits?

13        A.    Correct.

14        Q.    And you wrote "That's reflected in the

15    testimony of Mr. Rush"?

16        A.    Yes.

17        Q.    Where does it say that in the testimony of

18    Mr. Rush?

19        A.    He doesn't use the term profit, but he used

20    the term the purpose of the organization is to ensure

21    the -- ensure the interest of its members.  And one of

22    the -- surely whatever the other interests of its

EXHIBIT
H
Blumberg No. 5119
page 18 of 18

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45