Page 1

IN THE UNITED STATES COURT
FOR THE DISTRICT OF ALASKA


VALERIE ROUNTREE, individually and )
as Personal Representative of THE  )
ESTATE OF APRIL LYNNE COX; MORGAN  )
SCHEDIWY, a minor, through her     )
natural mother and guardian VALERIE)
ROUNTREE; and CHRISTOPHER COX,     )
                                   )
                                   )
                 Plaintiffs,       )
      vs.                          )    NO. A04-0112 CV (JWS)
                                   )
WINDOW COVERING MANUFACTURERS      )
ASSOCIATION,                       )
                                   )
                 Defendant.        )
_____)


DEPOSITION OF

JON O. JACOBSON, Ph.D.

SEATTLE, WASHINGTON

FEBRUARY 1, 2008




ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com


REPORTED BY:  JUDY BONICELLI, CSR NO. 9091

FILE NO:  A20080F



1209b1f8-92e8-4900-b54d-b773acfbba1b

1    should be aware of that and should be doing that.  They should

2    have something that is going to assess and evaluate the hazards

3    in the product if it's universal to the industry, because that

4    would be a service, a function, a part of the association that

5    would be reasonable to be undertaken.  And, if not, it would be

6    surprising that it's not part of their overall task.

7        Q.    I guess I'm having a little trouble, and I'll ask you

8    a little more about the obligations of a trade association.  And

9    if I'm hearing you correctly, I think you're saying that a trade

10   association needs to be aware of any safety issues facing its

11   members.

12       A.    I would expect that to be the case, yes.

13       Q.    What would you say a trade association is obliged to

14   do?  I guess any manufacturer trade association.

15       A.    I don't know all the things they should do, but they

16   should have -- it would appear that the sale of a product that

17   they all universally were putting out in the marketplace should

18   be as safe and hazard free as they can do in concert.  If there

19   is a universal problem to all manufacturers, they should work

20   together to do that.  It should be one of the tasks that a

21   combined organization should have.  To not do so would be

22   negligent.  To not do so is avoiding the task that should be

23   done.

24       Q.    So any trade group that does not address any safety

25   issues of its members is negligent?


EXHIBIT

J

Blumberg No. 5119

page 2 of 19

Page 35

1  problems.

2        So am I ultimately responsible?  Usually not.  An

3  organization of individual members who are employees usually

4  don't have that risk.

5        Q.  Why is that?

6        A.  Because usually the organization has an overarching

7  responsibility.

8        Q.  And that responsibility supersedes that of the

9  engineer?

10       A.  No.  The engineer should be designing safe products.

11       Q.  I understand.  But does the overarching responsibility

12  stem from the fact that the ultimate responsibility for the safe

13  product is the manufacturer?

14       A.   The manufacturer is responsible for producing a safe

15  product, yes.  And they would assume that their engineers are

16  operating in a professional manner, assisting in producing safe

17  designs.

18       Q.  If an engineer designs a product that turns out to be

19  unsafe, is the American Society of Manufacturing Engineers

20  liable or responsible?

21       A.  Not for an individual product.

22       Q.  Why not?

23       A.  If they haven't been part of monitoring that specific

24  group.

25       Q.  So their responsibility comes from what they -- the



EXHIBIT
J
page 3 of 19
Blumberg No. 5119

1  that do do that for particular products that they believe are --

2  that do require that.  So if it is a dominant thing that needs

3  to be tested and evaluated, then they have a standard.

4         So there are ASME standards associated with some of

5  the products that are hazardous and they must follow the rules

6  of design on the front end and also performance standards on the

7  back end.  Some standards are only performance standards at the

8  back end and some are design standards at the front end.

9    Q.   Do you know if they do that for any consumer products?

10   A.   I don't know.

11   Q.   If they go through that process with a boiler and

12  there is a boiler accident -- I assume there may be boiler

13  accidents with products that meet the standard?

14   A.   There can be, yes.

15   Q.   Is the ASME responsible, in your opinion?

16   A.   If they have done their duty to be sure that the

17  product meets final functional responsibility and they've

18  established it, then they have done their, probably, due

19  diligence because they have provided the standards and

20  performance standards at the back end.

21   Q.   What if it's a product that has a standard but does

22  not require ASME inspection?

23   A.   Well, they have at least put out a standard if there

24  is something there that says there is a guideline for someone to

25  follow.


EXHIBIT
J
page 4 of 19

1    Q.   And that would mean they're not responsible for an

2   accident or incidents that occur?

3    A.   If they've done something, then they have taken that

4   into account rather than having a known hazard to the industry

5   and avoiding anything.  So they should do something.

6    Q.   They have taken what into account?

7    A.   If there is a standard associated with the product.

8    Q.   So they've done something and that's sufficient?

9    A.   They should be aware of the problem.  There are

10   industries that are aware of the problems that their product

11   presents to the public: electrical hazards, explosion hazards,

12   impact hazards.

13    Q.   Let's go back to where we were a bit earlier about the

14   studies and such that were not undertaken.

15        MR. BAUERMEISTER:  This is Don.  I'd like to apologize

16   for the interruption, but I've got about 10:20 here.  If we

17   could have a break in the short-term, I would appreciate it.

18        MR. WEISS:  Whenever anybody wants a break, I'm happy

19   to have one.

20        Dr. Jacobson, do you want to take one now?  This is a

21   perfect time for one.

22        THE DEPONENT:  Fine.

23        (Recess taken.)

24        MR. WEISS:  Back on the record.

25    Q.   (By Mr. Weiss) Before the break we had, I guess, just



EXHIBIT J
page 5 of 19
Blumberg No. 5119

1      A.    It prevents the inner cord from being pulled out of

2    the line while it is extending, so it cannot, you know, be

3    pulled out further and produce a loop.

4      Q.    Does it do that effectively?

5      A.    I've not evaluated its effectiveness.  That cord stop

6    performance is left to the judgment of the manufacturer and

7    designer.

8      Q.    I'm not sure what you mean.

9      A.    Well, they're the ones that are going to put it on.

10   You don't need to have a design that apparently is a cord stop

11   that doesn't function right.  So just to require that doesn't

12   necessarily tell you how it performs in the field.

13     Q.    So --

14     A.    You could produce something you say is a cord stop,

15   and it may not be.  So it's basically, you know, dictated on a

16   performance standards that you have to evaluate to see whether

17   they have accomplished that properly.  But it recognizes that it

18   should be there.

19     Q.    Okay.  And maybe my question is too broad.  If a

20   manufacturer were to follow the 2000 standard design

21   requirements, would it prevent the inner cord from being pulled

22   out?

23     A.    I hope so.

24     Q.    Aside from a manufacturing issue with that cord stop.

25     A.    I would hope it does, yes.



EXHIBIT
J
page 6 of 19

Blumberg No. 5119

1209b1f8-92e8-4900-b54d-b773acfbba1b

Page 56

1    Q.   So is it fair to say that generally speaking you

2    believe a cord stop is an effective design to reduce the risk of

3    inner cord strangulation?

4    A.   Yes.

5    Q.   Do you know if these blinds -- the blinds at issue in

6    this case were manufactured in accordance with the 2000

7    standard?

8    A.   I don't believe they were.

9    Q.   How do you know that?

10   A.   From the information that is presented, they were not.

11   And the indication from the information I had was the Rountrees

12   said that they believed the blinds were bought in the early

13   1990s, whereas the presence of warning sticker indicates that

14   they were probably purchased after the application of the '96

15   standard but not after the second publication of the revised

16   standard, because the accident happened before that happened, I

17   believe.

18   Q.   Are you aware if there were any changes to the product

19   prior to the publication of the 2000 standard?

20   A.   No.

21   Q.   Do you know -- have you examined the blinds?

22   A.   No.

23   Q.   Have you seen them?

24   A.   No.

25   Q.   Have you read any report that examines -- report that



EXHIBIT
J
page 7of 19

Blumberg No. 5119

1  memorializes an inspection or report?

2      A.  No.

3      Q.  Do you know if they comply with the 1996 standard?

4      A.  Only insofar as the dates the time of manufacture is

5  after the '96 standard.  That's all I know.

6      Q.  Have you read the '96 standard?

7      A.  I have reviewed it.

8      Q.  You're aware that it contains a number of requirements

9  to meet the standard; is that fair?

10      A.  It's liking in the document.

11      Q.  I'll ask this sort of again.  Are you -- can you say

12  one way or the other whether the blinds, as a whole, comply with

13  that standard?

14      A.  I haven't seen the blinds and I haven't seen a report,

15  so I can't say.

16      Q.  What is the 1996 standard intended to address?

17      A.  It's to address the problem with strangulation, the

18  problem with cords.

19      Q.  Does it include a design change?

20      A.  It appears to have a design change that relates to

21  part of the strangulation problem.

22      Q.  And what is that?

23      A.  There is a test that is there that indicates the force

24  with which strangulation cords should not reach -- a loop

25  underneath the mannequin's chin would separate under a given



EXHIBIT
J
page 8 of 19
Blumberg No. 5119

Page 58

1    mode with the separation device.

2        Q.    And where is the loop you're talking about, and would

3    it be helpful to mark that as an exhibit and look at the

4    standard?  I'm not trying to test your memory of it.

5        A.    There is -- Figure 1A has a sketch and a drawing, and

6    they indicate the mannequin's specs and other things.  And they

7    tell you what the force is for the cord release or cord sheer

8    device to function.  They give you a release force.

9        Q.    So the standard -- I guess I'm a little confused with

10   what you're saying.  Is the hazard the standard addresses

11   different from the inner cord strangulation?

12       A.    Yes.

13       Q.    How so?

14       A.    Because it doesn't specifically call out the inner

15   cord, and it appears to have a loop that is covered by what

16   would be possibly a tassel or a multiple cord that extends down

17   and in its fashion, which could be a circular loop, has a

18   separation device on it that will break if it goes over or under

19   the chin of an infant, whereas the inner cords are not

20   specifically identified in this standard.

21       Q.    Okay.  I'm still a little confused.

22       A.    There is no separation device called for like this in

23   the standard for the inner cords.  It appearance that this is

24   maybe the end tassel for raising and lowering the blinds.

25       Q.    So this would be the pull cord that is on the side of



EXHIBIT
J
page 9 of 19

Blumberg No. 5119

1209b1f8-92e8-4900-b54d-b773acfbba1b

1    the set of blinds to lift them up and down.

2        A.    That appears to be what is indicated and what the

3    warning labels are illustrating when they have an illustration

4    on the warning label.

5        Q.    Okay.

6        A.    And they don't specifically call out the inner cord.

7        Q.    And if I'm understanding you correctly, you're talking

8    about the pull cord.  This would prevent there being a loop at

9    the bottom of the pull cord?

10        A.    It would not prevent there being a loop; but if there

11    were a loop, this loop would separate the forces and would not

12    be sufficient to produce strangulation.

13        Q.    Can it actually -- can it actually eliminate the loop

14    on the pull cord to meet the standard by, say, having separate

15    tassels?

16        A.    I don't recall if it could or not.

17        Q.    Does the 1996 standard address strangulation

18    incidents?  Does it --

19        A.    Well, if it's got a test at the back that shows a cord

20    underneath a mannequin or an infant's chin, the simple

21    conclusion would be that that appears to be a strangulation

22    event that it's testing for.  It would be hard to make a

23    judgment otherwise.  It's pretty clear that that is what it's

24    testing for.  At least it's clear to me.

25        Q.    The separation device, is it effective?



Page 60

1    A.   It would appear to be effective.  If it is at that

2  level that it requires, which is about five pounds, I would hope

3  that that is effective.

4    Q.   Do you have any reason to say that a product meeting

5  the standard would not be effective in reducing strangulations

6  on the pull cord part?

7    A.   I would think it would have an effect at reducing

8  strangulations at the test level, five pounds.

9    Q.   Are you aware -- do you know why five pounds is

10 selected?

11   A.   No.  But I would think it would be greater than the

12 weight of an infant; so, therefore, they would find their volume

13 weight caused the cord to separate.

14   Q.   Is it fair to say that children who are able to move

15 around are more than five pounds?

16   A.   From my knowledge of young children, I would assume

17 that is a proper statement.

18   Q.   Do you know the proportion of strangulations that are

19 reported that are on the pull cord versus the inner cord?

20   A.   I believe there are more strangulations on the pull

21 cord than on the inner cords.

22   Q.   By what factor?

23   A.   Probably 9 to 1 -- 8 to 1, 9 to 1.

24   Q.   Okay.  We haven't done this yet, but why don't we mark

25 this as an exhibit, the 1996 standard.



Page 61

1          THE WITNESS:  Do you mind if I take a quick run to the

2     restroom for a minute?

3          MR. WEISS:  That is okay.

4          (Recess taken.)

5          (Exhibit No. 10 marked for identification.)

6          MR. WEISS:  We're back on the record.

7     Q.   (By Mr. Weiss) Dr. Jacobson, you testified earlier

8     about your involvement with the safety standard involving

9     recreational vehicles for the NFPA.

10    A.   Yes.

11    Q.   And I think you said there were a number of

12    incarnations of that standard that you were involved with.

13    A.   I was with several versions.

14    Q.   And with each version they would make alterations

15    presumably in the interest of furthering the safety of the

16    product?

17    A.   Yes.

18    Q.   The first version, what year was that, roughly?

19    A.   I don't recall.  I started in the early '80s.

20    Q.   I can gather that each standard is an improvement on

21    the previous?

22    A.   Let's hope it is.

23    Q.   It's certainly intended to be?

24    A.   That's the purpose, yes.

25    Q.   And does the fact that there is a second standard, a



EXHIBIT
J
page 12 of 19

Blumberg No. 5119

1209b1f8-92e8-4900-b54d-b773acfbba1b

Page 62

1    revised standard, mean that there was a problem with the first

2    one?

3        A.    At NFPA they have a standard cycle time where they go

4    back and review and reissue.

5        Q.    And that's every certain amount of years, the standard

6    must be --

7        A.    Apparently so.  It allows them to have an updated

8    standard and sell new copies and make more money.

9        Q.    Do you know if ANSI has a similar requirement?

10       A.    I don't know.  I can't recall.

11       Q.    The first standard you helped develop for the NFPA,

12   was it inadequate?

13       A.    I don't recall.  It addressed the things that we were

14   working on at that time.

15       Q.    Did it address every hazard that could occur on a

16   recreational vehicle.

17       A.    Probably not.  I'm sure you could find a hazard that

18   was not.

19       Q.    Are there hazards that are addressed in subsequent

20   standards that weren't addressed in the first standard?

21       A.    Yes.

22       Q.    Does the fact that it didn't -- the fact that the

23   first standard didn't address hazards that are addressed

24   subsequently, does that mean that the first standard was

25   inadequate?



EXHIBIT

J

page 13 of 19

1209b1f8-92e8-4900-b54d-b773acfbba1b

1        A.    It was a standard that was adequate at the time.

2        Q.    Does a safety standard for a product have to address

3    every possible hazard involved with that product?

4        A.    It should address the things that are most evident and

5    most important.

6        Q.    Are the hazards that were addressed only in subsequent

7    additions of the NFPA standards the ones that were not

8    important?

9        A.    I don't recall.  There is changing technology, there

10    was changing use, there was changing design, there was new

11    alterations in how people were building that came up that

12    weren't in existence before.

13        Q.    Is that everything that was a change?  Does every

14    change fall into that category?

15        A.    No.  There were a variety of reasons why things were

16    changed.

17        Q.    When determining what to address with the standard,

18    was there any analysis of which was the most pervasive hazard?

19        A.    I don't think there was a scaling factor used.

20        Q.    Was there any study of which one was most likely to

21    occur.

22        A.    It would have been the previous answer.  There was no

23    scaling factor.

24        Q.    Was there -- was there any guarantee issued with the

25    standard?


EXHIBIT
J
page 14 of 19

1209b1f8-92e8-4900-b54d-b773acfbba1b

1    that that was addressed in the 2000 standard we addressed

2    earlier?

3        A.    It was addressed in the second standard, yes.

4        Q.    When you say "slow in coming," when should it have

5    been addressed?

6        A.    Initially in the first standard.

7        Q.    So the slow and coming is really the time difference

8    between the first and second standard?

9        A.    Yes.  But it should have been included in the product

10   prior to even the first standard.

11       Q.    The manufacturer should have included cord stops prior

12   to the first standard?

13       A.    The association of manufacturers should have had that

14   hazard designed out of the product initially.

15       Q.    Is that the manufacturers' responsibility?

16       A.    I would say the manufacturer and the manufacturers

17   association are all involved in that, yes.  If the manufacturers

18   were not, the association would have identified that.

19       Q.    What role does the association have in dictating the

20   designs of window blind products?

21       A.    I'm not sure they dictate the design.  They have the

22   performance, which is part and parcel of the design.  The design

23   should be to performance, but they should be aware of the

24   predominant -- the hazards, the risks, the incidents, the nature

25   that presents to the public and then have that information



EXHIBIT
J
page 15 of 19

1209b1f8-92e8-4900-b54d-b773acfbba1b

Page 75

1      Q.   One is concur?

2      A.   Yes.

3      Q.   And one is object?

4      A.   Yes.

5      Q.   And one is abstain?

6      A.   Right.

7      Q.   He didn't object to the standard?

8      A.   No.  He wanted a more complete standard.

9      Q.   Why did he choose to abstain rather than object?

10     A.   He attached some comments and he wanted those included

11  in the standards; and, therefore, he said he was abstaining

12  because he had additional information that he wanted to include.

13  He didn't object to it as it was proposed.  He wanted more

14  information, and he offered additional information which was

15  part of the attached.

16     Q.   Because he believed it was an improvement; is that

17  correct?

18     A.   Yes.

19     Q.   Do you take that to mean that he believed this was

20  better than not having a standard?

21     A.   Yes.

22     Q.   Do you believe this is better than not having a

23  standard?

24     A.   Yes.

25     Q.   And he attached some comments.  These are the changes



EXHIBIT
J
page 16 of 19

1    he proposed?

2        A.    Yes.

3        Q.    And you mentioned what I think is the second one,

4    essentially, these were minimum standards.

5        A.    Right.

6        Q.    Would that have changed the efficacy of the standards

7    by having the word minimum as he proposed?

8        A.    It would have indicated if it's a minimum that the

9    design produced by the manufacturers should be to a higher

10   standard than just meeting this as the gold standard.  It should

11   be a higher standard.

12       Q.    Does the 1996 standard limit or restrict a

13   manufacturer from taking -- making any other design changes or

14   safety devices?

15       A.    No.

16       Q.    Is there anything in the document that suggests that

17   it restricts a manufacturer from taking additional steps?

18       A.    No.

19       Q.    Do you have any reason to state that if the word

20   minimum was included in Section 2.1, as Mr. Vasls suggested,

21   that it would have prevented the incident that occurred?

22       A.    No.

23       Q.    What is the objective of the 1996 standard?

24       A.    To produce a document that will remove the hazard

25   strangulation deaths due to window coverings.



EXHIBIT
J
page 17 of 19

1      Q.    You're aware there is a section in the standard called

2   "Objective"?

3      A.    Yes.

4      Q.    Could you pull that out, please.  Here is my copy.

5   Would that be all right?

6      A.    I'm sorry.

7      Q.    Does that appear to be the 1996 standard, as well?

8      A.    Yes.

9      Q.    Did you find it?

10     A.    Yes.

11     Q.    Is the objective of the standard to remove the risk of

12  strangulation from window blinds?

13     A.    (Witness reading.)

14     Q.    Doctor, you're welcome to read the whole thing, but

15  the section is on Page 4.  Again, you're welcome to read more

16  than that.

17     A.    Yes.  What --

18          MR. WEISS:  Can you read back the last question,

19  please.

20          (Record read.)

21          THE WITNESS:  Only from the flexible loop device used

22  to operate the product.

23     Q.    (By Mr. Weiss) okay.

24     A.    It doesn't include the interior cords.

25     Q.    Okay.  And does the objective say that it's to remove



EXHIBIT
J
Blumberg No. 5119
page 18 of 19

1209b1f8-92e8-4900-b54d-b773acfbba1b

Page 78

1    the possibilities of injury?

2        A.    Reduce the possibility of injury.

3        Q.    Let's go back through your report.  I think we're

4    halfway down the report.

5              In the third paragraph -- you're still on the second

6    page of your report, but the first page -- you talk about the

7    warnings.  I'm a little confused by the last sentence in your

8    report, in which you state, "In the 2002 version, Section 6.6,

9    acknowledges the inner cord may be accessible and give

10   guidelines and cover the amount of cord that can be pulled out

11   to create a loop."

12             Why did you put that in your report?

13       A.    Because that identifies the fact that the inner cord

14   was covered, and they give you a criteria on how that may

15   produce a loop and the requirements for that, which are not at

16   all in the first version.

17       Q.    Okay.

18       A.    So it gives a quantitative assessment of how that

19   would function.

20       Q.    And you agree, to the best of your knowledge, that

21   would be appropriate?

22       A.    Four-inch diameter would be more likely than not less

23   than the diameter of the head of an infant.

24       Q.    Do you know what the diameter of the head of an infant

25   is?



EXHIBIT
J
page 19 of 19

Blumberg No. 5119

1209b1f8-92e8-4900-b54d-b773acfbba1b