THE JOHN J. FRANK PARTNERSHIP
ATTORNEYS AT LAW
THE BOATMEN'S TOWER
100 NORTH BROADWAY
SUITE 850
SAINT LOUIS, MISSOURI 63102
(314) 421-2811
FAX (314) 421-3121

JOHN J. FRANK
TONI GRIESBACH
MARY COFFEY

September 5, 1990

American Window Covering
   Manufacturer's Association
355 Lexington Avenue
New York, NY 10017

ATTN: PETER RUSH, EXECUTIVE SECRETARY

Dear Mr. Rush:

   As you may or may not be aware, I am an attorney that represented a family whose 18 month old son was killed on October 5, 1986, when he was accidently entangled in a cord on the back of a woven wood shade. My client's lawsuit was just recently settled.

   I am writing at this time to urge you and your organization to expand your efforts in warning the general public about the dangers posed by cords on window coverings. I realize that most of the members of your organization initiated warnings regarding pull cords in the past two years. These efforts are commendable, but I am afraid they don't go quite far enough. In fact, limiting warnings to "pull cords" may be misleading.

   In the particular case that I handled, the parents were aware of the danger of pull cords and, in fact, placed the crib at the opposite end of the window from where the pull cord was located. The window shade was 8 feet long, and so the child's crib was approximately 7 feet away from the pull cord. The child became entangled in what was referred to as a "support cord" on the back of the woven shade. His crib overlapped the shade by only several inches, but he got behind the shade to look out the corner of the window and became entangled and was unable to free himself. His parents found him at the end of his nap.

0029793

Exhibit 5
p. 1 of 4

Page 2
September 4, 1990

This "support cord" was an even more insidious danger than the "pull cords" because the support cord was hidden from view. The cord did not even show from the front, when the shade was rolled up because the shade flapped up in such a way that the cords were invisible.

In my opinion, as well as the opinion of the expert safety analyst that consulted with me in this case, limiting warnings to simply the "pull cord" is insufficient because parents will be mislead into thinking that the pull cord is the only danger on a window covering when, in fact, all cords on window coverings are potential strangulation hazards to young children. During our investigation of this particular case, we learned that the cording on many models of venetian blinds and mini blinds can be pulled out away from the blinds to form a noose-like strangulation hazard, even though the cording is threaded to each individual slat. This can occur when the blinds are in the completely lowered position because in some models, there is no tension on the cording when it is in that position.

It would seem a simple matter to re-word the existing warnings to include "cording on all window shades or drapes, including cording on the back and cording running through the slats". Our safety analyst believes that this type of warning should be included in the installation instructions with the diagram, as well as on hanging tags attached to pull cords, cording on the back and threaded cording through slats. He also feels that a permanent label should be affixed to the headrail on each product.

I hope you will discuss these issues with your members and recommend that they take action immediately. It would certainly be better for the industry if the industry policed itself on these matters.

I would appreciate any comments you care to make in response to this letter.

Very truly yours,

Toni Griesbach

TG/ldr
CERTIFIED RETURN
RECEIPT REQUESTED
cc: Hannoch Weisman

0029794

Exhibit 5
p. 2 of 4

from inconsistent results in Bendectin cases, as well as over the potential for abuse that exists whenever an expert is permitted to testify to an opinion that is based upon reasoning that has not been reviewed by the expert's peers.

However, the court said:

> [O]ur concern over these issues is tempered by our recognition that we do not have the authority to create special rules to address the problems posed by continued Bendectin litigation. Principles of issue preclusion have not developed to the point where we may bind plaintiffs by the findings of previous proceedings in which they were not parties. Nor are we at liberty, especially in a case to be decided under our diversity jurisdiction, to impose different burdens of proof on Bendectin plaintiffs than those that would apply in analogous product liability suits.

### Applying Rule 703

In analyzing the district court's application of Rule 703, the Third Circuit commented that the rule seeks to limit the acceptable bases for expert testimony. In *In re Japanese Electronics Products Antitrust Litigation*, 723 F2d 238 (1983) the Third Circuit held the rule requires the district court to "make a factual inquiry .. as to what data experts in the field find reliable."

The proper inquiry is not what the court deems reliable, but "what experts in the relevant discipline deem it to be," the court said. While the district court purported to apply the correct standard, "its cursory ruling that Done's testimony was inadequate under Rule 703 does not comply with the standard set forth in *Japanese Products Litigation*," the Third Circuit said. The district court's analysis referred only to Dr. Done's qualifications and the case law indicating that his, or similar testimony, is inadmissible under Rule 703.

The district court improperly discarded Done's re-analysis of the epidemiological data on grounds he does not have a degree in epidemiology, the Third Circuit said. Merrell Dow had conceded Done was qualified to interpret epidemiological data, and an expert's qualifications should be analyzed under Rule 702, not 703, according to the appeals court.

Furthermore, the court said, opinions in previous Bendectin cases cannot sustain the district court's ruling because they do not address the question whether reasonable experts would base their opinions on the data Done used:

> Rather, they primarily turn on the failure of that data to show a 'statistically significant' link between Bendectin and an increased incidence of birth defects, and on the weight of scientific opinion contrary to Dr. Done's view that Bendectin is a teratogen.
> We do not view the absence of statistically significant findings or the great weight of contrary opinion as being relevant to the Rule 703 question posed here. Rule 703 is satisfied once there is a showing that an expert's testimony is based on the type of data a reasonable expert in the field would use in rendering an opinion on the subject at issue; it does not address the reliability or general acceptance of an expert's methodology. When a statistician refers to a study as 'not statistically significant,' he is not making a statement about the reliability of the data used, rather he is making a statement about the propriety of drawing a particular inference from that data.

Drazin and John R. Connelly Jr. of Drazin and Warshaw P.C in Red Bank, N.J., represented the DeLucas. Merrell Dow was represented by Susan Scott and David W. Garland of Riker, Danzig, Scherer & Hyland in Morristown, N.J.

### Window Shades

### MANUFACTURER, COUPLE REACH SETTLEMENT OVER STRANGULATION DEATH OF COUPLE'S CHILD

ST. LOUIS—(By a BNA Special Correspondent)—A window shade manufacturer reached a settlement Aug. 14 with a Ladue, Mo., couple who alleged the company's failure to warn consumers about the dangers of "support cords" on its shades resulted in the strangling death of their son (*Palank v. Home Fashions Inc.*, DC EMo, No. 88-1018-C-4, settlement reached 8/14/90).

Defendant Home Fashions Inc. agreed to pay the couple $395,000, to add warnings to its window shade packaging, and to notify the United States' 350 largest newspapers and the Consumer Product Safety Commission that the support cords on its window shades can pose a hazard to children.

Home Fashions differentiated between so-called "pull cords," which hang beside the shade, and support cords, which rest behind the shade and are not readily visible. According to the company, a 1981 CPSC study addressing the dangers of window shade cords did not mention support cords, and therefore Home Fashions was unaware that type of cord could pose a hazard.

According to plaintiffs' attorney Toni Griesbach, the Palanks will use the payment to establish a foundation to promote children's product safety.

Griesbach said the problem is not unique to the shade's manufacturer, but is industry-wide. Griesbach said she has tracked 95 accidental strangulations attributable to window shade cords.

### Support Cord Becomes 'Noose'

Joseph Palank was strangled in 1986 on a support cord located on the rear, window-side portion of a 7-foot "Del Mar Woven Wood Roman Shade."

According to court records, the shade was manufactured by Del Mar Window Coverings, a division of Home Fashions, and sold by a Sherwin-Williams Co. outlet in Hazelwood, Mo.

Police reports and court documents show Joseph was left in his crib—situated so the toddler could stand up and look out a window covered by the shade—for an afternoon nap. Several hours later, Joseph's father dis-

covered the 20-month-old boy dead, entangled in cords behind the shade.

Griesbach said that when the shades are raised, the support cord draws taut to hold the shade up. But when the shade is fully lowered, as it was in Joseph Palank's room, the support cord is slack and forms a "noose" in which youngsters can become entangled.

In 1988, the Palanks filed suit in U.S. District Court for the Eastern District of Missouri, asserting strict liability and negligence theories in claiming Home Fashions deficiently designed the shade, inadequately tested the product, and failed to give consumers sufficient notice of the dangers associated with support cords, despite a 1981 CPSC report outlining 76 child strangulation deaths attributed to window shade cords.

### Defendant Differentiates Between Cords

Home Fashions argued in court documents that it had no prior knowledge of "any substantially similar accidents involving the cords on the back of the product." Given a lack of such knowledge, company attorneys claimed Home Fashions had no way to know the cords could present a danger to consumers.

"There is no evidence that injury from cords on the back was foreseeable," Home Fashions said in court documents. "The lack of any credible argument that defendants knew or should have known about the alleged dangers of these cords undercuts any potential for a negligence action and precludes recovery on this issue."

Home Fashions officers had been made aware of the CPSC study through the American Window Coverings Manufacturers Association, of which Home Fashions is a member, the company admitted in interrogatories. However, the company alleged the CPSC study cited only pull cord deaths.

Home Fashions also said that as far as the company knows, the Palank death is the first incident resulting from the support cords on its shades. The company said it participated in a CPSC program designed to warn consumers about potential strangulation dangers from pull cords.

Griesbach called the distinction spurious, noting that pull and support cords are actually two ends of one cord. Further, the CPSC study attributed six deaths to pull cords, but did not specify whether pull cords or support cords were responsible for more than 70 other deaths, she said.

Home Fashions has 180 days from the Aug. 14 settlement date to notify newspapers and the CPSC of the dangers of the support cords in its product and to draft a package warning acceptable to the Palanks.

Griesbach is with the St. Louis-based John J. Frank Partnership. Home Fashions was represented by Dan Ball, of Thompson and Mitchell, also in St. Louis.

### Industrial Equipment

### FEDERAL LAW DOES NOT PRE-EMPT INJURY CLAIM BY U.S. SAILOR AGAINST DECK MANUFACTURER

Federal law governing claims against the government does not pre-empt a U.S. sailor's personal injury action against the manufacturer of a deck in a government-owned nuclear plant, the U.S. Court of Appeals for the Ninth Circuit held Aug. 14 (*Chapman v. Westinghouse Electric Corp.*, CA 9, No. 89-35192, 8/14/90).

The defendant argued that the suit was in effect a claim against the government because the manufacturer's contract with the government contained a clause under which the government agreed to indemnify the manufacturer for all claims. The court said the injured plaintiff's claim was not barred by the contract's indemnity clause.

The Ninth Circuit reversed and remanded an entry of summary judgment by the U.S. District Court for the District of Idaho.

The plaintiff was represented by John X. Combo of Weinpel, Woolf, Just, Combo & Davis in Idaho Falls, Idaho. The defendant was represented by Joseph Charles Burgess of Anderson, Pike & Bush, also in Idaho Falls.

[Digest of Opinion] Leonard Chapman appeals from the district court's summary judgment in favor of Westinghouse Electric Corp. on the ground of federal pre-emption.

Westinghouse, a private corporation, operated a government-owned nuclear plant in Idaho. Chapman, a Navy enlisted man stationed at the reactor, was injured while on duty when a deck on which he was standing collapsed. Westinghouse designed and manufactured the deck for use at the plant pursuant to a cost-plus-fixed-fee contract with the Department of Energy. The DOE-Westinghouse contract provided that the government would reimburse Westinghouse for all judgments and litigation expenses incurred in connection with the contract.

Chapman sued Westinghouse in federal district court for personal injuries under Idaho state tort law. Westinghouse successfully moved for summary judgment, arguing that, because of the reimbursement clause, Chapman's suit was in effect a suit against the government and as such was pre-empted by the Veterans' Benefits Act, 38 USC 301 et seq.

Westinghouse contends that Chapman's action impinges on an area of uniquely federal interest, and that allowing Chapman's suit would frustrate the act's objectives. Chapman does not dispute that a uniquely federal interest arises from the government's potential liability under the indemnification clause should Chapman prevail against Westinghouse.

Similarly, Chapman does not contest that the act's intent is to limit recovery against the government to payments made pursuant to the act when compensated injury arises out of military service.

The plaintiff also concedes that he cannot sue the government directly for his injuries. His benefits from that source must be under the act. He contends, however, that even given the lesser degree of conflict required for pre-emption in areas of uniquely federal interest, the limitation of liability policy expressed in the act does not pose a significant conflict with the operation of state law in Chapman's suit against Westinghouse.

The U.S. Supreme Court has held that requiring the government to indemnify third parties for injuries sustained by service members is akin to requiring the government to compensate the injured party directly. As the latter is specifically precluded by the act, suits for indemnification constitute an impermissible end-run around the act. *Stencel Aero Engineering Co. v. United States*, 431 US 666 (US SupCt 1977).

In *Stencel*, a government subcontractor sued by an Air Force pilot for injuries sustained when an ejection system