## UNITED STATES DISTRICT COURT

## DISCTRICT OF ALASKA

| | |
|---|---|
| THE ESTATE OF APRIL LYNN COX,<br>Et al., )<br><br>Plaintiffs, )<br><br>vs. )<br><br>WINDOW COVERING MANUFACUTERERS )<br>ASSOCIATION, )<br><br>Defendant. )<br> ) | 3:04-cv-00112 CV (JWS) |

**THE ESTATE OF APRIL LYNN COX,**
**Et al.,**                                    )
                                               )
                    **Plaintiffs,**            )
                                               )
          **vs.**                              )          **3:04-cv-00112 CV (JWS)**
                                               )
**WINDOW COVERING MANUFACUTERERS**  )
**ASSOCIATION,**                               )
                                               )
                    **Defendant.**             )
_____            )

## PLAINTIFF'S OPPOSITION TO WCMA
## MOTION FOR SUMMARY JUDGMENT DATED MARCH 3, 2008

**I.**    **Introduction**

Defendant WCMA bases its motion for summary judgment on three major grounds:

(1)    The elements of an assumed duty under the Restatement (Second) of Torts cannot be proven;

(2)    Defendant did not undertake to address the inner cord strangulation risk for small children in its 1996 standard applicable to this case; and

(3)    The policy underlying a common law tort theory of liability prohibits imposing a duty on defendant in this case.

None of these claims are grounded in the facts or law as it must be applied to this case. To

understand the application in this case of the Restatement (Second) of Torts assumed duty

sections, and Alaska's interpretation of the same, it is important to get a clear history of the facts.

**II.**    **Document Record Facts**

The timeline of significant events in this case is as follows:

1.    4/7/90—AWCMA (WCMA predecessor) Board of Directors meet and get an update on the number of cases involving child strangulation from legal counsel Ira Marcus.  Minutes indicate: "Mr. Marcus mentioned the possibility of looking into a database of strangulation litigation cases and all present agreed that this was a good idea."  (Exhibit 1, p. 101)  (All page reference are to the large 3 digit numbers in lower right hand corner of all exhibits)  No such database was created (or at least not produced) in this litigation;

2.    8/14/90—Child strangulation death settlement reached for defendant manufacturer's failure to warn consumers about the danger of "support cords" where <u>inner cord</u> strangulation occurred of 20-month-old boy.  Case is reported in Product Safety and Liability Reporter.  (Exhibit 2, p. 003).  Case defendant claims this is the first incident resulting in an inner cord death.  Attorney calls the distinction spurious "noting that pull and support cords are actually two ends of one cord."  Attorney further notes CPSC study attributed six deaths to pull cords but didn't specify what cords are responsible for more than 70 other deaths. (p.004);

3.    9/5/90—Attorney Tony Griesbach (who represented a family of child strangulation victim in death settlement described in preceding paragraph) writes Peter Rush of the AWCMA and describes the inner cord death.  She informs Rush that "limiting warnings to 'pull cords' may be misleading."  She states "parents will be mislead into thinking that the pull cord is the only danger on the window covering when, in fact, all cords in window coverings are potential strangulation hazards to young children."  (Exhibit 3, p. 002).

4.    4/7/94—WCMA Membership meeting.  Minutes reflect 37 deaths in three years.
(Exhibit 4, p. 021).  New CPSC Commissioner wants action within two to three
weeks.  CPSC says warning is not enough since there has been no decrease in
deaths.  <u>CPSC is reportedly willing to forego promulgating a consumer product
safety rule with respect to future products based on WCMA's progress in devising
voluntary safety standard through ANSI</u>.  Rush notes two items in two weeks
have been recalled by CPSC.  Minutes note CPSC "has a large number of
weapons in its arsenal" including:  public notice of the defect, a recall, a repair, a
replacement order, or refund order for such products.  John Schnebly, of Comfort
Text Corp., is reported to believe "<u>all cordage is a problem.</u>"  (underline added).
(p. 022).  The summary of recommendation includes independent testing for
whatever products are produced in the future and an application to ANSI to begin
drafting a safety standard with respect to future products.  (p. 024);

5.    5/3/94—WCMA Technical Committee meeting minutes.  Peter Rush, Executive
Director, explains that the safety alerts developed by WCMA and CPSC were
released in '85, '89, '93.  Nevertheless, the number of deaths remains high.
(Exhibit 5, p. 025).  Rush notes the CPSC has made safety of window covering
cords a priority and is investigating corrective actions.  Rush emphasizes that if a
standard can be produced using ANSI, the CPSC will adopt it.  Rush notes
WCMA has applied for accreditation as a standards writing organization under
ANSI.  (Id.);

6.    5/10/94—CPSC identifies 118 deaths related to young children entangled in pull
cords between 1981 and 1991.  (Exhibit 6).  Deaths continue despite warning.

Public information release by Rush states WCMA Technical Committee will be involved in writing the standard.  (p. 082).  Article notes "CPSC and the WCMA are working together to develop safety devices" to be part of the window coverings.  (Id.);

7.    9/00/94—Rush memo to WCMA members states the strangulation hazard "is primarily though <u>not exclusively the looped cord.</u>"  (underline added).  (Exhibit 7);

8.    10/15/95—Newspaper articles report WCMA effort "to eradicate this danger" by altering free tassel ends that can be installed after a looped cord is cut.  The article reports "Free tassel ends take danger out of blinds" and provides a phone number for the WCMA tassel end outlets.  (Exhibit 8);

9.    12/22/95—WCMA Executive Director Rush writes corporate member who is balking about dues payment: "In 1994, the Window Covering Industry confronted the potential hazard of Window Covering Products to young children.  <u>Through a combined effort, the industry prevented a recall of the products and negotiated some time to effectively modify its products.</u> . . . In 1995, the number of deaths from window coverings has not diminished significantly. . . . <u>[Y]ou and your manufacturers must look at this issue based upon the potential liability</u> and other costs you will incur not participating in this program."  (underline added).  (Exhibit 9);

10.    2/23/96—CPSC writes Rush noting since October 4, 1994 CPSC/WCSC press conference, 14 child deaths have occurred and one serious near strangulation in which a child lost both his sight and hearing.  (Exhibit 10);

11.     12/5/96—WCSC Meeting minutes indicate CPSC officials note an unchanged number of deaths associated with window coverings.  (Exhibit 11, p. 038).  Rush notes "the industry needed to work quickly to adopt the standard."  He asks members to supply him with production timeframes under the assumption an ANSI standard is adopted in January of 1997.  WSC notes indicate its membership represents the lion's share of the industry and that "WCSC as an organization wanted to be leading the way in setting standards."  (p. 039);

12.     00/00/96—undated document listing ANSI canvas list shows 15 participants including five manufacturers, four retailers, three professional trade associations, and only three consumer contacts.  One consumer abstains, another does not return its ballot, and the third (a CPSC employee) is an affirmative vote.  (Exhibit 12).  (The industry dominated canvas group soon passes a November 27, 1996 standard number A100.1.  (Exhibit 50).  It contains no protection for children from inner cord death hazards).

13.     1/15/97—WCMA Press Release notes "most cord-entanglement incidents occur with children between the ages of 8 months and 3 years; their natural curiosity draws them to the dangling loops of window cords.  (Exhibit 13, p. 054).  Of particular concern are cords within the reach of a child's crib or at a window.  "WCSC says most older blinds and shades can be fixed by cutting the pull loop just above the pull tassel, and placing separate tassels at the ends of the resulting two cords."  (Id.);

14.     11/19/97—WCSC minutes: members indicate they are in full compliance with standard 100.1.  (Exhibit 14);

15.    2/18/00—Retired firefighter Robert Nevins writes ANSI to complain that WCMA had plenty of notice of inner cord death of strangulation and nevertheless passed its first standard without addressing inner cord strangulations.  (Exhibit 15, p. 044).  Nevins writes that he has done two years of research and believes the public "is being deceived because they are not aware that the WCMA and ANSI Committee are one in the same."  (p. 045);

16.    3/31/00—Rush writes WCSC stating the CPSC is concerned since 60 deaths have occurred since voluntary corrective action was begun in '94.  Rush says "CPSC is determined to re-launch the effort on window cords including the new issue of the interior cord."  Rush notes "however, significant government action is very likely in the near future."  (Exhibit 16);

17.    4/3/00—Rush writes memorandum to WCSC including articles on $400,000 civil penalty against toy manufacturers for keeping known problems quiet by conducting internal investigations on product injuries but never telling the owners of the product or the government.  Rush says "the article is self-explanatory." (Exhibit 17);

18.    4/5/00—CPSC draft Product Safety Report issued to determine if cord stops can prevent strangulation of children by the inner cords.  (Exhibit 18).  CPSC tests reveal "the cord stop prevented the blind cord from being pulled from the internal slide through the locking mechanism . . . all three types of washers/cord stops were effective in preventing the window blind cord from being pulled through the slots of the blinds and through the head railing locking mechanism" (p. 005);

19.    5/5/00—Notes of Peter Rush meetings indicating importers and retailers will resist internal cord fixes because they will have 3 million units in route over the ocean that will be non-compliant.  (Exhibit 19, p. 043);

20.    7/6/00—Peter Rush gets handwritten notes from Maria Ungaro indicating CPSC proposed warning that the "product is unquestionably a danger and that consumer must install cord stops" is unacceptable.  "In other words, suggest if they try for stronger language then they'll have to go to court to prove it."  (Exhibit 20, p. 117);

21.    0/0/96—WCMA publication indicates "the association advises government agencies on technical and safety issues to insure that views and concerns of its members are considered.  Recently, WCMA met with the Consumer Product Safety Commission (CPSC) in response to a CPSC alert that young children might be strangled by blind cords.  WCMA helped shape the report on the subject."  (underline added).  (Exhibit 21);

22.    11/1/00—CPSC announces largest ever product recall, but it is limited to "a recall to repair" which means that consumers who call in can get free cord stops which they themselves install.  (Exhibit 22).  WCSC talking points note products manufactured after September 15, 2000 have been redesigned to eliminate the inner cord problem.  (p. 029).  The WCSC recommends not installing cord stops if you don't have children living in your home.  (p. 031).  The WCSC recommends that if it is noted that deaths go back as far as 1991, and a question is raised why this problem wasn't addressed earlier, you should answer: "No one was actually aware of the problem until this year, when the Consumer Product

Safety Commission did an in-depth investigation of past cord death reports and discovered the involvement of inner cords."  (p. 032);

23.    12/00/00—WCSC article claims window covering industry assumes a leadership role with consumer product safety by transforming itself into a consumer product safety advocate.  (Exhibit 23);

24.    4/18/01—WCMA director Rush writes business member that "the industry will continue to be under the threat of ongoing regulation."  (Exhibit 24);

25.    6/10/01—Retired firefighter Nevins again writes Peter Rush noting at least 16 inner cord strangulation deaths and stating "the Window Covering Manufacturer's saved money by not addressing the inner cord strangulation problems . . ." (Exhibit 25).  Nevins further complains that Rush wrote the CPSC on August 20, 2000 claiming that shades with a stop ball don't have this problem even though five months earlier "a two-year-old infant child strangled to death in the loops above the cord stop."  Nevins says "I can not believe the secretary of the Window Covering Safety Council does not know [this]."  (p. 005);

26.    6/25/01—WCSC Press Release from Sumner Rider and associates noting 85 million window blinds are sold each year while only about 1 million per year call the safety hotline.  "This means that millions of homeowners may still be using potentially dangerous blinds."  (Exhibit 27);

27.    7/17/01—WCMA President Peter Rush writes letters to eight separate manufacturers and retailers confirming that they have decided not to participate in the corrective action plan dated September 12, 2000.  (Exhibit 28);

28. 00/00/01—WCSC document claims inner cord strangulation risk was discovered in late 2000.  (Exhibit 29);

29. 5/2/00—Fax to Sumner Rider with documents using charts and columns to show annotated inner cord deaths from 1991 – 1999 (with final document showing deaths as late as 2001).  (Exhibit 30, p. 028).  Document confirms ten inner cord strangulation deaths and one near death from 1991 – 1996.  (p. 016).  The summary of internal cord strangulation incidents notes: "It is important to note that at least 12 out of 16 consumers were aware of the pull cord hazard and had placed the pull cord out of reach from the child."  (underline added).  (p. 016).  Document also notes that approximately 10% of deaths since '94 are internal cord deaths.  (p. 028);

30. 00/00/02—WCSC marketing plan for 2002 from Sumner Rider & Associates. "Ironically, WCSC's success in its communication efforts now defines its major obstacle: overcoming the 'we already know that' attitude of both the media and the general consumer.  Specifically, WCSC needs to convince its targeted audiences that window cord hazards are indeed real and need to be conscientiously and continually addressed to avoid child strangulations. Moreover, the council must work to differentiate for the consumer the 'inner cord' versus the 'looped cord' hazard, and to persuade the consumer that fixing the looped pull cords of yesteryear has not addressed the inner cord hazard nor the inherent danger of any cord (looped or otherwise) within a child's reach." (underline added).  (Exhibit 31);

31.    2/6/02—CPSC writes Rush about limited progress being made on the revision of the ANSI/WCMA 100.1 standard.  (Exhibit 32).  Letter states: CPSC staff believes the voluntary standard must contain provisions that will <u>reasonably attempt to eliminate all strangulation hazards from window covering products</u>.  (underline added)  (p. 007);

32.    12/5/02—Rush writes WCMA member company stating "[I]t must be acknowledged that there are still hundreds of millions of potentially dangerous products in place around the country. . . . A new ANSI safety standard for window coverings was adopted this year that you must be in compliance with for current production . . . Please help insure that no more children will be injured or killed because <u>someone didn't know</u> that the product in their home was potentially dangerous."  (underline added)  (Exhibit 33);

33.    12/17/02—WCMA member representative writes Rush saying that after five years of involvement he understands that the WCSC, like the WCMA Technical Committee, is just one of the subdivisions under the hierarchy of WCMA.  (Exhibit 34, pp. 079-080).  He notes "we have made several payments in amount due but could have cut checks for such payments by confusing the payables to WCSC with WCMA, or vice versa.  In short, we had no idea what and whom we had paid for."  (p. 079);

34.    00/00/02—Estimated U.S. window covering market units shows close to 100 million units a year of new production are added with approximately a billion-and-a-half units in the market by 2002.  (Exhibit 35);

35.  00/00/02—Total window covering market annual dollar sales at retail are approximately $7,100,000,000.00. Total sales of corded products are $4,387,800,00.00. Approximately 96 million units of corded products are sold annually. (Exhibit 36);

36.  1/6/03—Rush writes WCSC member and notes WCMA "is the author and publisher of ANSI/WCMA A100.1. (Exhibit 37);

37.  4/3/03—Window covering strangulation deaths from 1991 – 2003 (April) show 21 inner cord deaths.

38.  10/13/03—Carolynn Jennings memoranda concerning WCMA tech committee action being needed. (Exhibit 39). She notes that in a review of death case information print-outs that "we discovered a few inconsistencies." "It appears that often we were swayed by the casual word choices in the incident report . . . This can change whether the cause of entanglement should be listed as victim-caused, product-caused, or unknown. . . . [W]e'd like the group to rethink our original decision to automatically list 'victim manipulation' as the root cause factor with inner-cord deaths. . . . In retrospect it seems wrong not to list inner-cord deaths as product-caused, given the inherent design deficiencies of blinds not having cord stops." (p. 013).

## III.  **Formal Admissions Facts**

WCMA has made formal admissions summarized as follows:

1.  Any manufacturer can utilize the warnings promulgated in WCMA A100.1-1996 or WCMA A100.1-2002. (Exhibit 40 p. 044);

2.  WCMA admits it has never developed a plan for facilitating a full recall of corded window covering products. WCMA further states "it would not recall window

coverings—even if it could—that comply with these voluntary standards, <u>since such blinds would not be defective</u>."  (underline added)  (Exhibit 40 p. 045);

3. WCMA admitted it is not "aware what its members knew and when" concerning the strangulation death information possessed by its members.  (Exhibit 40 p. 047);

4. WCMA admitted it was aware of one report of a strangled child in inner cords at the time WCMA A1001.1-1996 was published.  (Exhibit 40 p. 048);

5. WCMA admitted "it has never required its members to report to it any claims of injuring related to their products."  (Exhibit 40 p. 070);

6. WCMA admitted "it has never engaged an employee, independent contractor or otherwise, any engineer or other professional to examine the safety of corded window covering products."  (Exhibit 40 p. 073);

7. WCMA has admitted "it has no procedure for tracking injuries or deaths caused by corded window covering products."  (Exhibit 40 p. 074);

8. WCMA admits that the photograph of the label attached to the bottom rail of the window coverings involved in the death of April Cox "appears to have been produced after the adoption of WCMA A100.1-1996."  (Exhibit 40 p. 077);

In response to a request for production, WCMA indicated <u>it could locate no documents that it relied upon in identifying the risk of strangulation in corded window covering products prior to the publication of the 1996 standard</u>.  It made the same statement concerning not finding any documents responsive to a request for those relied upon to identify the risk of strangulation in corded window coverings between the publication of the 1996 standard and publication of the 2002 standard.  (Exhibit 41 p. 084).

## IV.    WCMA 30(b)(6) Deposition Admissions

Exhibit 42 is a copy of the 30(b)(6) deposition of the former long-time executive director of the WCMA, Peter Rush.  He admitted on behalf of the WCMA to the following (all cites are to Exhibit 42 with page numbers for specific cites):

1. Mr. Rush was the Executive Director of the WCMA for twelve years and was with the entity for eighteen (p. 24);

2.  Rush is now a Senior Advisor to the WCMA (p. 14);

3.  Rush is not an expert on the ANSI process.  (pp. 16-17);

4.  Rush was the Executive Director when the 1996 A100.1 standard was issued as well as when the A100.1-2002 standard was issued.  (pp. 24-25);

5.  Rush refused to answer whether or not the standards were meant to provide protection for the public.  (pp. 27-28);

6.  Rush is not an expert in safety.  (p. 30);

7.  Rush said he couldn't answer what safe means. (p. 30);

8.  Rush is not a safety engineer. (p. 31);

9.  Rush has no engineering background. (p. 31);

10.  Rush has no safety professional training. (p. 32);

11.  Rush has no occupational or work-place safety training. (p. 32);

12.  Rush has college degrees in International Relations and English. (p. 32);

13.  The WCMA had no safety engineers on staff when it passed the two safety standards. (p. 32);

14.  The WCMA did not ask any persons with any special expertise to be involved in the development of the standards.  (pp. 33-34).

15.  When the '96 standard was adopted, the WCMA had zero employees (p. 37).  The same was true of the WCSC. (p. 37);

16.  Neither of these organizations paid Rush a direct salary (p. 37).  Both of these organizations had a contract for management with Sumner Rider & Associates (p. 37);

17.  Rush was President of Sumner Rider.  (p. 38);

18.  Sumner Rider was in the business of association management and public relations. (p. 39);

19.  WCMA work at the time the standard was passed in 1996 only took about 10% of the Director's time (p. 40).  The rest of the time he worked with other clients.  (p. 41);

20. He was at the same time the Executive Director of the Building Hardware Manufacturing Association. (p. 42);

21. He at the same time did the public relations work for the Cooper Development Association. (pp. 42-43);

22. Sumner Rider was paid $3500 a month to run the WCMA. (p. 45);

23. The WCMA never maintained statistics on accidents, deaths, injuries or causes of accidental death and injuries relating to window coverings (p. 48). It has never done so. (p. 48);

24. He did not know what the medical examiners reference to ligature marks around the strangulation victim's neck would mean. (p. 55-56);

25. He agreed with the Carolyn Jennings report that it was wrong not to list inner cord deaths as product caused given the inherent design deficiencies of blinds not having cord stops (p. 59). He has had that opinion since 1999. (p. 62);

26. The major difference between the November 1996 standard and the September 2002 standard "was the specific inclusion of inner cord strangulation potential danger and inclusion of some sort of mechanism on the cord to reduce the possibility of it being pulled through the head rail" (pp. 67-68). A corrective action with the CPSC was agreed to by the WCSC in 2000 to immediately make the change in manufacturing to include the stop cord. (pp. 68-69);

27. Rush knew of no manufacturer who took their product off the shelf after it was determined that products without stop cords were unsafe. (p. 73);

28. Rush was unable to say whether the WCMA warning to parents to correct only the hanging cord could mislead them into believing the product was now safe for children to be around. (p. 86);

29. Rush stated that if the association (or CSP) had identified this as an issue in 1994, "we would have addressed in the first standard, and we would have addressed it in the first corrective action program." (p. 98);

30. (With the statistics in hand), this correction would have happened whether or not the CPSC had raised the issue. (p. 98);

31. The WCMA does not ask its members to count deaths that they become aware of. (p. 118);

32. Rush was unaware of how the CPSC reporting system for death or injury and product connections operated. (pp. 119-120);

33. Rush knew of no one at the WCMA who would understand the CPSC system. (p. 121);

34. Rush said the voluntary standards approach (as opposed to regulation by the CPSC) would get a standard to the public sooner and that standard would probably be more complete. (p. 172);

35. Rush said the WCMA does not know what percentage of households with dangerous window coverings threatening the lives of young children have been contacted with WCSC corrective information. (p. 177);

36. Rush had never discussed the issue of whether or not consumers tend not to read warning labels at the bottom of window shades. (pp. 187-188);

37. Rush admitted he had received a letter about an inner cord child death by strangulation approximately <u>ten years</u> before the CPSC investigation concerning inner cord death risk announced its findings. (pp. 209-210).

38. Rush stated that WCMA members are required upon learning of a safety omission or defect in any standard to bring that issue to the intention of the WCMA. <u>No member had ever done so.</u> (pp. 219-220);

39. Rush admitted that all of the concerns of Terry Griesbach to him in 1990 had finally been addressed in the September 2002 standard including inner cord risks. (p. 221);

40. During the time Rush was Executive Director of the WCMA his business also represented the Builder's Hardware Manufacturer Association, The New York Women in Communication, The Comic Magazine Association of America, The Health Care Food Services Managers Association, The New York Women in Communications Foundation, The New York Chapter of the International Design Association, The Plastic Bag Association, The Certified Plastic Manufacturers Association, and the National Table Top Association. (pp. 263-264).

## V.     <u>Summary Judgment Standards</u>

This is an action that sounds, *inter alia*, in negligence for the highly improper execution of a voluntary undertaking. That undertaking was to prepare and promulgate an appropriate safety standard to protect America's children from a strangulation hazard endemic to corded window coverings. It is this claim to which defendants' motion for summary judgment is directed.

It is well settled that the party moving for summary judgment has the burden of demonstrating that the Federal Rule 56(c) test-"no genuine issue as to any material fact"- is satisfied and that the movant is entitled to judgment as a matter of law.  "The movant is held to a stringent standard.  Before summary judgment will be granted it must be clear what the truth is and any doubt as to the existence of a genuine issue of material fact will be resolved against the movant.  Because the burden is on the movant, the evidence presented to the court always is construed in favor of the party opposing the motion and the opponent is given the benefit of all favorable inferences that can be drawn from it.  Finally, facts asserted by the party opposing the motion, if supported by affidavits or other evidentiary material, are regarded as true."  Wright, Miller and King, Federal Practice & Procedure: Civil 3d Section 2727 at pp. 455-461.

"Although a motion for summary judgment under Rule 56 may be made in any civil action, it is not commonly interposed and even less frequently granted, in negligence actions.  This is not surprising given the fact that the judge and jury each have a specialized function in negligence actions.  Indeed, particular deference has been accorded to the jury in this class of cases in light of its supposedly unique competence in applying the reasonable person standard to a given fact situation."  Wright, Miller and King, Id. at Section 729 pp. 533-534.  "The language used by courts in denying summary judgment in negligence actions often is strong, indicating that summary judgment rarely is appropriate in these cases."  Id. at p. 534.  The remarks of Chief Judge Parker in Pierce v. Ford Motor Co., are typical:

> It is only where it is perfectly clear that there are no issues in the case that a summary judgment is proper.  Even in cases where the judge is of opinion that he will have to direct a verdict for one party or the other on the issues that have been raised, he should ordinarily hear the evidence and direct the verdict rather than attempt to try the case in advance on a motion for summary judgment, which was never intended to enable parties to evade jury trials or have the judge weigh evidence in advance of its being presented.

Wright, Miller and King, Id. at Section 2729 at p. 536.

### VI.    Law Controlling Liability for the Negligent Performance of An Undertaking

The Restatement (Second) of Torts section 323 relates to the negligent performance of an undertaking to render services. It is shown at Exhibit 43. A sister section, section 324a, relates to the liability to third persons for negligent performance of an undertaking. It is shown at Exhibit 44. Together these sections set out the basic law that a gratuitous undertaking, recognized as necessary for the protection of another or a third person, subjects the undertaker to liability for physical harm resulting from negligence by the undertaker if: (1) the negligence increases the risk of such harm; or (2) the harm is suffered because of reliance by another or a third person on the undertaking; or (3) (as to 324a alone) a negligent actor has undertaken to perform a duty owed by another to the third person. (Both 323 and 324(a) can be properly applied to the case at bar.)

Three Alaska cases, two of them very recent, are important to understanding the application of the law of liability for voluntary undertakings in this state. The first important case is Smith v. State, 921 P.2d 632 (Alaska 1996) (Exhibit 45). That case involved a May 1992 fluoride-poisoning incident in the village of Hooper Bay. The cause of the poisoning was traced to excessive fluoride in the town site water system. The village owned and operated the system. However, in April 1992, the State installed new parts in the fluoride pump at the town site wellhouse. Prior to installing the new parts, the State had made plans to "rehabilitate" the aging townsite water system in its entirety. The parties agreed that the State, by its voluntary actions, assumed a duty of care to residents of the village. The parties disagreed, however, as to the precise nature of the duty the State did assume regarding the Hooper Bay water system.

The State conceded that by working on the fluoride pump, it assumed a duty to use reasonable care in performing that work. This narrow duty is the only one the State would admit to having assumed. Because there was no evidence that the work was negligently performed by the State, the State contended that summary judgment was appropriate.

Plaintiff, however, argued that the State assumed a broader duty, for it "undertook to resolve the fluoride problem." Plaintiff contended that the State should be held liable if it negligently failed to complete this undertaking and if this failure was a cause of plaintiff's decedent's death. Plaintiff claimed that the evidence and the record supported two inferences:

(1) The inference the State undertook to perform the duty Hooper Bay owed its citizens to protect them from over fluoridation; and

(2) The inference that the State undertook only to replace parts in the fluoride pump.

It was claimed this uncertainty precluded summary judgment and left a question of fact for the jury. The trial court disagreed and granted summary judgment.

Upon review, Alaska's Supreme Court reversed. The Court first quoted Restatement Second of Torts Section 324a noting that the State could have assumed certain duties towards third persons who relied on the water system. This was true if the State had undertaken to perform a duty owed to those persons by the city of Hooper Bay. Id. at p. 634. Our Supreme Court noted:

> Although the precise nature and extent of [an assumed] duty is a question of law, however, it depends on the nature and extent of the act undertaken, a question of fact. . . . Where reasonable people could differ over the nature and extent of the act undertaken, summary judgment is inappropriate since the scope of the assumed duty will vary depending on the inferences drawn from the facts.

Id. at pp. 634-635. The court reasoned that reasonable person could infer either that the State had undertaken to resolve the fluoride problem or that it had merely determined it would repair

the pump alone.  Even where the factual record was uncontested on the underlying facts of what was said and what was done, "[T]hese underlying facts may be capable of supporting different inferences as to the nature and extent of the State's undertaking in working on the Hooper Bay water system."  Where competing inferences from the same facts are possible, a genuine issue of material fact concerning the nature and extent of the duty assumed by the State existed.  Id.  This genuine issue of precluded summary judgment.  The trial court grant of summary judgment was therefore reversed.

The second important Alaska case in the area of liability for assumed duties is Anderson v. PPCT Management Systems, Inc., 145 P.3d 503 (Alaska 2006).  That case is shown at Exhibit 46.  The case involved a state employee who sued a company under theories of vicarious liability for injuries incurred during a use-of-force training program designed by the company but taught by company-certified state employees.  The trial court had granted summary judgment.  Our Supreme Court reversed.

Plaintiff Deborah Anderson had attended the State of Alaska Department of Corrections training academy in 2001.  During one week of the six-week training program, students were trained in use of force techniques through a program developed by PPCT Management Systems, Inc.  PPCT designs use of force programs that provide criminal justice agencies with (1) a system for training employees, (2) a model use of force policy an report forms, and (3) litigation assistance.  Plaintiff alleged she was injured as a result of the use of excessive force during a dynamic simulation training exercise with PPCT-certified instructor McLain.  Dynamic training is full-speed role-playing.  PPCT does not require dynamic training for certification.

The appellate court agreed with the trial court that PPCT did not possess sufficient control over the State employed instructors to create a master-servant relationship and liability

connected to the same. Id. at p. 509. The court also found that the State employees were not

agents of PPCT nor did they have apparent authority to act on PPCT's account. Additionally,

there was no retained control theory because PPCT did not retain sufficient control for liability to

attach. Id. at p. 509.

The case resolved finally on the single issue of negligent training. Anderson argued that

PPCT negligently trained instructor trainers and instructors regarding safety and the use of non-

PPCT moves during PPCT training. The trial court originally dismissed (via summary

judgment) the negligence claim on the basis that plaintiff could not show she was injured during

a PPCT maneuver. Our Supreme Court reversed, stating:

> The superior court framed Anderson's negligence claim
> too narrowly. Anderson argues that a reasonable training program
> should include safety precautions that were not included in the PPCT
> course. While the general rule is that a person is not required to act to
> protect another, we have concluded that when an actor undertakes to render
> services to another, Section 323 of the Restatement (Second) of Torts sometimes
> establishes a duty of care [footnote omitted]. In Bryson v. Banner Health
> System we recognized that multiple provisions of the Restatement reflect the
> 'overarching view that undertakings can create a duty of care' in that 'one who
> voluntarily assumes a duty must then perform that duty with reasonable care.'

Id. at p. 511. In footnote 34 the court cites three Alaska cases for the similar proposition that

someone who assumes a duty must exercise that duty with reasonable care. The third cite is to

Adams v. State, 555 P.2d 235, 240-41 (Alaska 1976). There the State voluntarily conducted a

building fire safety inspection and it was determined that it must exercise reasonable care in

conducting the inspection and abating known fire hazards. Section 324a of the Restatement was

cited as a "parallel provision, [that] applies this liability to harms to a third party." Id. p. 511

footnote 34.

The PPCT court next stated:

> Having undertaken to train instructor trainers and instructors,

> PPCT had a duty of care in developing and implementing its training program to avoid exposing the eventual students of those instructors to an unreasonable risk of danger. This duty is not as the superior court suggested, limited to danger from PPCT techniques and does not, as PPCT claims, require PPCT to control the DOC's conduct or warn DOC trainees. Nor does the claim require a showing that PPCT had control over the DOC academy or had an agency, independent contractor, or master-servant relationship with the instructors. Rather the duty extends to all the techniques and procedures that are part of the training program. Anderson alleges that PPCT developed a program that, as a whole, produced instructor trainers and instructors who lacked the training they reasonably needed to protect their future students from harm.

Id. at p. 512. Alaska's Supreme Court then ruled that the question for the jury on remand "is whether PPCT's training program failed to take reasonable steps such as providing sufficient warnings and safety precautions for instructor trainers and instructors, that would have prevented Anderson's injury. Id. at p. 512.

The third important assumed duty liability case is Parnell v. Peak Oil-Field Service Co., 174 P.3d 757 (Alaska 2008). The case involved a claim by a vehicle passenger who was injured when the car in which she was riding struck a dead moose in the road. She sued the employer of the driver of one of two other vehicles that had initially struck the moose nearly simultaneously. The theory of liability was that either of the striking drivers had a duty to warn oncoming traffic of the moose hazard in the roadway. The defense theory was that the defendant was not the first driver to hit the moose and therefore he had no duty to remove it or warn other motorists since that was the responsibility of the first driver. The jury found for defendant on this theory. Our Supreme Court reversed on appeal.

Alaska's Supreme Court determined that what is at issue in a case of this type is not who caused the moose's carcass to be in the road, but rather who had the duty to warn the public of the hazard thus created. Alaska's Court recognized that generally, the law of torts imposes no

duty on a person to protect others from harm by a third party. But Alaska's Supreme Court also noted that Section 321 of the Restatement (Second) of Torts carves out an exception to this rule by imposing a duty of care upon an "actor who does act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another." (The Restatement (Second) of Torts Section 321 is shown at Exhibit 47. The Peak case is shown at Exhibit 48).

Alaska's Supreme Court stated:

> The controversy here turns on the precise meaning of Section 321's language requiring that the actor's act must have 'created' the ensuing danger. Because the proper interpretation of 'created' raises a question of duty, we must answer this question by focusing on the protective policies underlying Section 321, not by supporting an analysis designed to decide issues of proximate causation.

Id. at p. 762.

Alaska's Supreme Court noted that Peak argued that Section 321 should be construed to mean that the danger posed by the moose's carcass's presence on the highway should have been "created" only by the driver whose vehicle actually killed or disabled the moose. Alaska's Court rejected this idea saying that "Peak's attempt to equate the creation of a hazard with what amounts to the requirement of but-for causation unduly restricts the scope of a duty contemplated by Section 321 and undermines that provision's basic purpose." Id. at p. 763. The State Supreme Court further explained:

> As the facts of this case illustrate, hazardous conditions can often reflect the actions of multiple actors. In such cases, however, the immediate circumstances surrounding the hazard's creation will frequently make it difficult to tell exactly which actor and actions primarily caused the new danger; and in many such cases, definitive proof of actual or primary causation might never be found.
> In these situations, a rule that hinders the hazard creating actors' duty of due care on proof of but-for causation would invite all involved actors to disclaim any duty until the question of

causation could be resolved.  The purpose of the duty established in
Section 321 is to encourage immediate efforts to avoid future harm.
It would make little sense, and would frustrate the duty's purpose, to
interpret Section 321 as hinging the imposition of the duty on
causational determinations that commonly require careful invest-
igation and often prompt considerable debate.

       Nor does the plain language of Section 321 compel such a
narrow definition of its phrase referring to an act that creates a
hazard.  The section describes two key ingredients required to
establish creation.  The first is affirmative action on the part of the
actor: the duty can attach only when the 'actor does an act.'  The
second is the actor's awareness (objectively measured) of a
substantial potential for resulting danger: the duty can attach only
when the actor 'realizes or should realize' that 'an unreasonable
risk of causing physical harm to another has resulted from the act.'
As Section 321's own text describes its creation requirement, then,
a hazard can be 'created' by multiple actors when each actor
actively participates in the circumstances immediately surrounding
the creation of a hazard and each actor realizes that these circum-
stances have resulted in a condition that poses a substantial risk of
physical harm to others.

Id.  Alaska's Supreme Court further stated:

       Rather, Parnell's theory of the case presents a more limited
question: who bears the duty when two motorists both take substantial
actions that combine to create the hazard?  In this unique situation, as
we have noted, the crucial policy issue becomes whether the protective
duty imposed by Section 321 should fall to both drivers based on their
active participation and actual awareness of resulting danger, or just to
the driver who, in retrospect, might be determined to be the primary cause
of the hazard's existence.  In our view, the policy's underlying Section
321 weigh heavily in favor of imposing the duty on both drivers. . . .

       [W]e conclude that when the combined actions of two
actors result in a hazardous condition, Section 321 allows each to be
treated as having 'created' the hazard so long as each actor's conduct
substantially contributed to the resulting hazard and each actor realizes
the resulting danger of harm to others.

Id.  Alaska's Supreme Court further determined that a jury instruction recognizing that both

drivers could be found to have created the hazardous condition, even though the same hazard

might have existed if only one or the other had struck down the moose, was a required

instruction in a case of this type.  Id. at p. 765.

VII.    **Argument**

A.    **There is evidence that the WCMA safety standard increased the risk of harm to April Cox (Responding to Argument A1 at p. 9 of defendants' brief).**

The above factual record, when interpreted in the light most favorable to plaintiff, overwhelmingly establishes that the WCMA had plenty of information in 1996 by which it should have determined to write a standard that would have protected children from the strangulation hazard presented by inner courts.  The 1986 strangulation death of a ten-month-old boy by an inner cord was clearly reported to Peter Rush of the AWCMA by the September 5, 1990 letter by the attorney Tony Griechbach.  (See, Exhibit 3).  As early as April 7, 1990, councel to the WCMA recommended the creation of a database of strangulation litigation cases and the board approved the recommendation.  (Exhibit 1, at p. 101).  That approval was either not followed up (leaving the WCMA without the record information it could have gathered), or such has not been produced in this litigation.

By April 7, 1994, WCMA member John Schnebly, of Comfort Text Corporation, is reported in WCMA membership meeting minutes as saying that "all cordage is a problem." (See, Exhibit 4, at p. 022).  Peter Rush himself, Executive Director for the WCMA at the time of the issuance of both its standards, had noted as early as September of 1994 that the hazard of strangulation to children from corded window products was not limited to pull cords.  (See, Exhibit 7).  Nevertheless, the WCMA has seen fit to not inquire of its own members concerning claims of injuries or deaths caused by their window products.  (See, Exhibit 40, at p. 070 and p. 074).  Further, while acknowledging awareness of one inner cord child strangulation death, See, Exhibit 40, at p. 48, the WCMA has no explanation for its complete claimed lack of awareness of

the ten inner cord child strangulations caused by window cord industry products from 1991

through 1996 (in addition to the 1986 death).  (See, Exhibit 38).

With all of the above information available, perhaps simply for the asking, WCMA

apparently chose to bury its head which it was permitted to do until it determined itself to write

the safety standard that would (or would not) protect America's children from the known

strangulation hazard.  It was that decision which began an undertaking that required the WCMA

to gather the available information in a serious fashion and engage serious safety professionals to

assist in writing the standard upon which so many children's lives would depend.

Instead, the standard was written without hiring any safety engineers, any safety

professionals of any kind, and without hiring outside consultants with safety knowledge.  This

was an organization where the director had no safety training and testified he could not say what

safe means.  He woefully lacked any adequate knowledge concerning safety standards setting,

ANSI standard setting, risk evaluation methodology, and the knowledge of how safety

assessments could be made that would provide a foundation for informed safety standards.  (See,

the expert report of Mr. Jacobson (at Exhibit 54) and his testimony (at Exhibit 55) for a

description of how engineering safety analysis would normally be applied to identifying safety

standards or at least be reviewed for assistance in writing them). It is no wonder the organization

led by this man produced a woefully inadequate standard.

Executive Director Rush testified at the WCMA 30(b)(6) deposition that if either the

association or the CPSC had identified the inner cord strangulation problem as an issue before

the 1996 WCMA standard was released, WCMA "would have addressed it in the first standard,

and we would have addressed in the first corrective action program."  Rush deposition, Exhibit

42, at p. 98.  (That is a critical admission because the new standard requires cord stops which

prevent center cords from being pulled out by children.  See, Exhibit 18, CPSC test report

documenting efficaciousness of all three types of proposed cord stops.  It was the lack of a cord

stop that killed April Cox when she pulled the center cord from the window shade near her crib.)

With all of the factual information listed above at sections II and IV, Rush gave no credible

explanation of why he wasn't familiar enough with the inner cord risk to include it in the 1996

standard.  That inclusion would likely have saved the life of April Cox.

   Importantly, minutes of the November 19, 1997 WCSC meeting show that all members

indicated they were in full compliance with the new ANSI/WCMA Standard 100.1.  (See,

Exhibit 14).  It is clear that the manufacturer of the covering in April Cox's room subscribed to

that standard because its 5.11 standard number is clearly printed on the product label affixed to

the subject window covering.  See, admission to the same effect, including photo blow-up of the

WCMA identification number, at Exhibit 49, p. 4, the report of defense expert Dorris &

Associates.  It is highly probable, that if the 1996 standard had required cord stops, then the

manufacturer following that standard would have provided them.  If that had occurred, April Cox

would be alive today.

   The fundamental question in this case is why weren't cord stops incorporated into the

1996 WCMA standard?  Just as importantly, did that failure increase the risk of death to April

Cox?  These are important questions that must go to the jury in this case.

   There can be no legitimate question that the WCMA assumed a duty to create an

effective standard at the time it agreed with the CPSC that it would create an ANSI standard for

the child strangulation risk.  The act undertaken by the WCMA was to identify the best current

practice with regard to fixing the strangulation hazard that threatened children and window

corded products.  We know this because the WCMA standard itself notes:

> Each standard represents general agreement among maker,
> seller, and user groups as to the best current practice with regard
> to some specific problem.

<u>See</u>, Exhibit 50, 1996 WCMA standard at the final page.  Certainly, it was the understanding of

the CPSC staff that the undertaking by the WCMA was to create a voluntary standard that "will

reasonably attempt to eliminate all strangulation hazards from window product coverings."  <u>See</u>,

Exhibit 32, at p. 007.

Now, however, the WCMA claims it only agreed to address the pull cord hazard.  With

this in mind, significant questions of fact prevent summary judgment in this case.  Did the

WCMA act negligently in issuing a 1996 standard that did not require cord stops to protect

children from the strangulation hazard of inner cords?  At minimum, questions of fact remain

concerning whether a negligent adoption of the wrong standard (when plenty of information was

available to get the standard right) not only increased the risk of strangulation to April Cox, but

actually caused it by encouraging the manufacturer to believe its product was safe because it had

followed the standard produced by the WCMA.

Moreover, under <u>Smith v. State</u>, the Hooper Bay fluoride case, another important

question of fact prevents summary judgment in this case is: did the WCMA assume the duty (as

understood by the CPSC) to write a standard that would reasonably protect children from <u>all</u>

risks of strangulation presented by corded window products?  In answering any of these

questions of fact, the jury will hear substantial evidence that the wrong standard written by the

WCMA increased and probably caused the death of April Cox.  In answering all of these

questions, the jury will necessarily determine the breadth of the duty assumed by the WCMA to

manufacturers and to April Cox.

**B. WCMA assumed duties to the manufacturer of the blinds and to April Cox (response to defendants' argument 2 at p. 11).**

WCMA argues that it cannot be found to have assumed a duty to the manufacturer or to April Cox because no Alaska court has ever applied Section 324a to a defendant lacking control over the person responsible for the injury. First of all, plaintiff disputes defendants' claim that Smith v. State, *supra*, demonstrates control by the defendant over the instrumentality of injury. The State of Alaska in that case simply responded to a fluoride-poisoning incident by changing a pump part. It did not create the poison problem. Nevertheless, our Court ruled it was a question of fact for the jury as to whether or not the breadth of the duty assumed was actually to make the water safe for the persons relying on that system. The Smith case actually supports plaintiff's right to make a 324a claim in this case.

More recent cases also show the wrongfulness of defendants' claim it owed no duties under the Restatement (Second) of Torts. See, Exhibit 46, Anderson v. PPCT Management Systems, Inc., *supra*, and Exhibit 48, Parnell v. Peak Oil Field Services, *supra*. (While the PPCT case was determined under Section 323 of the Restatement (Second) of Torts, the opinion notes at footnote 34 that a parallel provision in third party cases is 324a). Plaintiff asserts here that it has valid claims under both Section 323 and Section 324a of the Restatement (Second) of Torts.

The 324a claim lies because there is a jury question (shown above) on whether or not the gratuitous undertaking by the WCMA actually increased the risk of harm to April Cox. This section also applies because the WCMA undertook to perform the duty of creating a safe design for window covering products and invited all manufacturers to rely on the WCMA's safe design by the promulgation of standard A 100.1-1996.

Of course, as shown above, that standard was woefully inadequate to meet the known risks that such a standard should have been designed to prevent concerning inner cord

strangulation hazards for small children.  Having undertaken to create a proper safety standard, the WCMA is responsible for having invited manufacturers to produce a product to that standard even where that standard is clearly unreasonably dangerous.

In support of this proposition, see, in addition to the evidence outlined in the written record above, the report of plaintiff's expert Stuart Statler shown at Exhibit 51.  Discussion of that report is shown at Exhibit 52, Statler's deposition.  Remember, the WCMA admitted that it successfully engaged in a combined industry effort to prevent a product recall (Exhibit 9).  Further, the WCMA documents discussed at section II strongly suggest the organization promulgated its 1996 standard to avoid having the CPSC set a standard or order recall.  By stopping the recall and heading off a CPSC standard, the WCMA increased the danger to April Cox when it negligently issued the 1996 standard.

Finally, under Parnell v. Peak Oil, *supra*, the WCMA is jointly responsible with the manufacturer for this increased risk to April Cox.  In addition, the WCMA was responsible to warn the public of the risks created by its standard.[1]

It is remarkable that defendant continues to claim it has not assumed a duty to the manufacturer (with dire consequences for April Cox) or directly to April Cox concerning the design standard for the window product which killed her.  See, for example, Exhibit 48, the 1996 standard itself, which states at p. 2: "an American national standard implies a consensus of those substantially concerned with its scope and provisions.  An American national standard is intended as a guide to aid the manufacturer, the consumer and the general public."  (underline added). A Section 323 claim exists because the WCMA undertook a duty to protect the public— including April Cox by the promulgation of the 1996 standard.  In the light most favorable to

---

[1] The duty to warn is not further discussed in this brief in the interest of saving space and the court's time.  That issue was previously before the court in the summary judgment practice which resulted in the court's order recognizing the duty to warn on a *prima facie* basis in its order of February 9, 2005.

*Rountree, et al. v. Window Covering Manufacturers Association*

plaintiff, the WCMA failed in that duty.  It is liable for such failure to April Cox's estate.  At a minimum there exists a question of fact for the jury in this regard.

      C.  **There is evidence that the WCMA undertook to provide a best current practice standard which would have to include protection for children from the inner cord hazard (response to defendants' argument labeled C at p. 15).**

Defendant first claims that the scope of WCMA's undertaking is clearly expressed in the text of the safety standard itself.  It then quotes the objective of the standard as being to "reduce the possibility of injury, including strangulation, to young children".  Defendant then deduces from this that it did not undertake any broader duty.  Well, the CPSC certainly had a different view of defendant's undertaking, because in a letter to Peter Rush the CPSC staff stated its belief that "the voluntary standard must contain provisions that will reasonably attempt to eliminate all strangulation hazards from window covering products."  See, Exhibit 32 at p. 007.

Even Peter Rush admitted at his deposition that if the WCMA or the CPSC had identified the inner cord strangulation hazard before it issued the '96 standard, "we would have addressed it in the first standard, and we would have addressed it in the first corrective action program."  If that were not enough evidence to at least raise a question of fact concerning what the scope of the undertaking was, it is instructive to look at the objective of the second standard promulgated by WCMA which is shown at Exhibit 53 at p. 5.  The objective of the standard attempting to control risk concerning inner cord strangulation hazards is identical, word for word, to the language describing the objective of the first standard.

In sum, defendants' claim that the narrowness of its undertaking as a matter of law should prohibit the trial in this case from going forward is just wrong under Alaska law.  At a minimum, a question of fact remains for the jury as to the scope of the duty assumed by the WCMA when it issued the first standard.

**D.** **The DSW factors would support the imposition of a common law duty on the WCMA but they're not applicable here because the WCMA assumed a duty (responding to defendants' argument D at p. 19).**

The DSW analysis serves to determine whether a common law duty should be recognized where none otherwise exists. For this reason, the Alaska Supreme Court has consistently stated that DSW is appropriate only "in the absence of any other source of duty of care (imposed, for example, by statute, contract, or doctrine of law)." See, Parnell, *supra*, at p. 767. Nevertheless, it is clear that those factors, as applied to the facts of this case, would establish tort duties.

It is unquestionably foreseeable that the negligent failure to create an effective safety standard will injure those intended to be protected by the standard. Here, plaintiff's decedent suffered the ultimate harm, death. Further, she did so in a way that is difficult to imagine for the pain it must have caused. The conduct of the WCMA in refusing to pay attention to the words of its own members, written warnings from those who previously had this problem, or even seek out the available information involving ten additional inner cord deaths before producing its "safety" standard, foreseeably and negligently led to the death of April Cox.

The question of moral blame here is undeniable. WCMA undertook the most serious of public undertakings—to provide safety standards for products to save children's lives—while hiring no safety engineers, and no safety consultants, and promulgating a standard (at the behest of a heavily weighted industry group canvas) which ignored strong evidence of serious strangulation risks.

Any claim of an unacceptable chilling effect from the recognition of a duty in this case must be highly muted. The deterrence of safety organizations setting safety standards with no safety engineers, no field reports, no collections of data concerning risks that are being assessed, no employees, and no safety training of any sort in their executive director, is a good thing.

The availability of insurance to legitimate safety standard setting organizations is highly probable.  All of these factors point to society's interest in recognizing a duty in the WCMA to be responsible for reasonably protecting the April Coxs of the world.

**VIII.    <u>Conclusion</u>**

Plaintiff's principal claim against defendant WCMA sounds in negligence.  Federal summary judgment procedural law makes negligence cases highly unlikely subjects for summary judgment.  This is the type of case for which juries are best suited in our system of justice for determining a just outcome in this case.  A summary judgment can only take the case from the jury and should do so only where there is strong evidence that the defendant has not breached its duty of care.  Here the evidence is overwhelming that defendant has breached that duty.  Even if the court doesn't share that view of the evidence, there is no question that multiple material questions of fact remain and summary judgment cannot be an appropriate resolution of the fact intensive inquiry that this case represents.

For all of these reasons, defendants' motion for summary judgment should be denied.

DATED this 18th day of April, 2008, at Anchorage, Alaska.

<u>/s/Don C. Bauermeister</u>

Burke & Bauermeister, P.L.L.C.
921 W. 6th Ave., Ste. 250
Anchorage, AK 99501
Phone: (907) 277-6177
Fax: (907) 277-6111
E-mail: <u>bblaw@alaska.com</u>
<u>dcblaw@alaska.com</u>
ABA# 82060005

I hereby certify that on 18 April 2008, a copy of the foregoing document
Was served electronically on:

Donald C. Thomas
Delaney, Wiles, Hayes, Gerety, Ellis & Young
DCT@delaneywiles.com
jaf@delaneywiles.com
usdcuser@delaneywiles.com

Charles W. Ray, Jr.
Law Offices of Charles W. Ray, Jr., P.C.
Craylaw@aol.com
dlcraylaw@acs.alaska.net

Michael Weiss
King & Spalding LLP
191 Peachtree St.
Atlanta, GA 30303
Mweiss@KSLAW.com

Dan Quinn
Richmond & Quinn
dquinn@richmondquinn.com
cesary@richmondquinn.com

By: s/Don C. Bauermeister