1

```
 1
 2    UNITED STATES DISTRICT COURT
 3    DISTRICT OF ALASKA
 4    Case No. A04-0112cv (JWS)
 5    ------------------------------------------x
 6    VALERIE ROUNTREE, Individually and as
 7    Personal Representative of the Estate of
 8    APRIL LYNNE COX, MORGAN SCHEDIWY, a minor,
 9    through her natural mother and guardian
10    VALERIE ROUNTREE; and CHRISTOPHER COX,
11                            Plaintiffs,
12        - against -
13    CHING FENG BLINDS INDUSTRY CO. LTD., a
14    Taiwanese corporation; JENCRAFT
15    CORPORATION a/k/a JENCRAFT MANUFACTURING
16    CO., INC., a New Jersey Corporation;
17    WAL-MART STORES, INC., a Delaware
18    Corporation; and WINDOW COVERING
19    MANUFACTURERS ASSOCIATION,
20                            Defendants.
21    ------------------------------------------x
22                            February 16, 2006
                              10:20 a.m.
23
24
25
```

## Page 2

```
 3    DEPOSITION of WINDOW COVERING
 4    MANUFACTURERS ASSOCIATION by PETER RUSH,
 5    taken by the Plaintiffs, pursuant to
 6    Notice, held at the offices of King &
 7    Spalding, LLP, 1185 Avenue of the
 8    Americas, New York, New York, before
 9    Debbie Zaromatidis, a Shorthand Reporter
10    and Notary Public of the State of New
11    York.
```

## Page 3

```
 2    APPEARANCES:
 4    BURKE & BAUERMEISTER, PLLC
 5    Attorneys for Plaintiffs
 6        921 West 6th Avenue
 7        Suite 250
 8        Anchorage, Alaska 99501
 9    BY:  DON C. BAUERMEISTER, ESQ.
10         - AND -
11    LAW OFFICES OF CHARLES W. RAY, JR.
12        711 H Street, Suite 310
13        Anchorage, Alaska 99501
16    RICHMOND & QUINN, LLP
17    Attorneys for Defendant
18    Ching Feng Blinds Industry Co., Ltd.
19        360 K Street, Suite 200
20        Anchorage, Alaska 99501
21    BY:  DANIEL T. QUINN, ESQ.
```

## Page 4

```
 2    APPEARANCES: (CONTINUED)
 4    LANE POWELL, LLP
 5    Attorneys for Defendant
 6    Wal-Mart Stores, Inc.
 7        Suite 301
 8        301 W. Northern Light Boulevard
 9        Anchorage, Alaska 99503-2648
10    BY:  WILLIAM A. EARNHART, ESQ.
12    KING & SPALDING, LLP
13    Attorneys for Defendant
14    Window Covering Manufacturers
15    Association
16        191 Peachtree Street
17        Atlanta, Georgia 30303-1763
18    BY:  JAMESON B. CARROLL, ESQ.
19         MICHAEL WEISS, ESQ.
23    ALSO PRESENT:
24    DWIGHT WALLACE, Wal-Mart Corporation
```

## Page 5

```
 2         THE VIDEOGRAPHER:  Good
 3    morning.  We are on the record.  Today's
 4    date is February 16, 20006, and the time
 5    is 10:20 a.m.  This is the videotape
 6    deposition of Peter Rush in the case of
 7    Rountree versus Ching Feng Blinds Industry
 8    Company Limited, et al., case number
 9    804-0112 CV, case filed in the United
10    States Court for the district of Alaska.
11         At this time will counsel please
12    state their appearances.
13         MR. EARNHART:  William Earnhart
14    for Wal-Mart.
15         MR. QUINN:  Dan Quinn for Ching
16    Feng.
17         MR. CARROLL:  Jamie Carroll for
18    WCMA.
19         MR. BAUERMEISTER:  Don
20    Bauermeister here for plaintiff in the
21    action.  Chuck Ray is also with me for
22    plaintiff in this action.
23         MR. WEISS:  I am Mike Weiss
24    dialing in for WCMA in this an action.
25         MR. EARNHART:  We also have on
```

Page 6

```
 1              RUSH
 2   the phone device Dwight Wallace from
 3   Wal-Mart.
 4        MR. BAUERMEISTER: Mike Weiss,
 5   do I understand you are not in the room?
 6        MR. WEISS: That is right. I
 7   am actually back in Atlanta calling in.
 8        MR. BAUERMEISTER: Okay. Are
 9   you going to be making the objections for
10   the witness, if any, or is another lawyer
11   going to do that?
12        MR. CARROLL: Jamie Carroll.
13   I have already put my appearance on the
14   record. I will.
15        MR. BAUERMEISTER: I
16   understand. Okay.
17   P E T E R   R U S H,
18   having first been duly sworn by a Notary
19   Public of the State of New York, was
20   examined and testified as follows:
21   EXAMINATION BY MR. BAUERMEISTER:
22        Q. Would you state your name for
23   the record, please.
24        A. Peter Rush.
25        Q. Would you spell your last name?
```

Page 7

```
 1              RUSH
 2        A. R-U-S-H.
 3        Q. And could you given us your day
 4   time address and phone number, Mr. Rush?
 5        A. 355 Lexington Avenue, New York,
 6   New York 10017, (212) 297-2122
 7        Q. Mr. Rush, my name is Don
 8   Bauermeister. I don't believe you and I
 9   previously met. I am an attorney in
10   Anchorage, Alaska, and I am speaking to
11   you on the phone from Anchorage, Alaska
12   doing a telephonic deposition.
13           What I would like to do -- have
14   you had your deposition taken before, sir?
15        A. Yes.
16        Q. How many times?
17        A. Probably four or five.
18        Q. All right.
19           Sir, if at any point you want to
20   take a break during this deposition, just
21   please say I would like to take a break,
22   and we will stop immediately, give you a
23   chance to stretch your legs or get a glass
24   of water, whatever you would like to do.
25           If at any point you don't
```

Page 8

```
 1              RUSH
 2   understand a question I have asked because
 3   I mumble my words, I don't speak loud
 4   enough or I use a word that is unfamiliar,
 5   would you please stop me and ask me to
 6   reask the question, so we have clear
 7   communication?
 8        A. Yes.
 9        Q. This is not meant to be a long,
10   grueling event. If you want to take a
11   break just because you are a little bit
12   tired, feel free to tell me that, and I am
13   happy to let you have the time you want
14   just to let you stretch your legs. All
15   right?
16        A. Yes.
17        Q. Have you had a chance to look at
18   the two notebooks of materials that we
19   have sent to New York that are in the room
20   there with you?
21        A. I had a chance to briefly glance
22   at them this morning before coming into
23   this deposition.
24        Q. Okay. Let me represent to you
25   that the bulk of those materials are
```

Page 9

```
 1              RUSH
 2   documents that were produced in this
 3   litigation from WCMA, and to the extent at
 4   any point you want to stop and read the
 5   whole document or you want to look for
 6   other documents that will help you give us
 7   your best answer to any question, would
 8   you feel free to do that?
 9        A. Yes.
10        Q. I want you to feel free at any
11   point to take the time that is useful to
12   you. I don't want to delay the procedure.
13   I would like to get done earlier today if
14   we can, and you folks can be done early as
15   well. On the other hand, I want you to
16   feel like you could use the materials and
17   give us your best answer. It is not a
18   memory contest. We are simply trying to
19   get the clearest record we can. Is that
20   understandable?
21        A. Yes, it is.
22        MR. CARROLL: Just -- just for
23   record, we got them about 9:15 this
24   morning, so I don't know that -- that Mr.
25   Rush has had an opportunity to look
```

**Page 10**

```
                    RUSH
 1
 2   through all of them. Really we just had
 3   an opportunity to glance through the two
 4   notebooks. So if there is anything else
 5   you can point out for him that would be
 6   useful, I would appreciate it if you
 7   would.
 8       MR. BAUERMEISTER:  Okay. Let
 9   me point out a couple of things for
10   everybody. We did this a little bit off
11   the record, but you'll notice the
12   notebooks are divided into twelve
13   sections. The sections are marked as each
14   one with a separate exhibit, but really
15   some of the sections contain multiple
16   documents. Within each section, there is
17   a three-digit number stamped by the
18   reproducing company in the lower
19   right-hand corner. So at any point if I
20   wanted to get you to a particular
21   document, I will simply announce a number
22   from one of the tabs, which is the exhibit
23   number. For example, 10 and then I will
24   announce a number in the lower right-hand
25   corner such as 003, and that should take
```

**Page 11**

```
                    RUSH
 1
 2   you to the same page that I am on.
 3       Q.  Does that seem clear, sir?
 4       A.  Yes.
 5       Q.  In the same way, if you want to
 6   direct my attention to a document that
 7   helps you explain your answer that you
 8   happen to see is in the group, please feel
 9   free to ask me to turn to the appropriate
10   exhibit number and then the page number
11   within the exhibit number, and we will get
12   on the same page. If counsel at any point
13   wants us to put into the record also the
14   Bates stamp number that -- with the
15   production number we are happy to do that
16   as well.
17       MR. CARROLL:  Yes, if we could
18   at any time we refer to it, I think it
19   will be easier to define the documents
20   later. So I would appreciate if we could
21   try to do that.
22       MR. RAY:  I am going to speak
23   just briefly, Jamie. I am not going to be
24   voicing things, but for record the other
25   number that is referred to will be the
```

**Page 12**

```
                    RUSH
 1
 2   seven-digit number beginning with zeros.
 3   For example, I am looking at our Exhibit
 4   4, page 2. The equivalent is 001583. If
 5   we can dispense with the zeros, but that
 6   is just so everybody understands -- some
 7   of -- there are multiple numbers on these
 8   documents.
 9       MR. CARROLL:  Right. If -- if
10   we go with the one that starts with zeros
11   and then just give the actual number
12   without the zeros in front that will be
13   fine because I think -- I believe Wal-Mart
14   requested a copy of those documents, so I
15   know that for us and Wal-Mart it will be
16   easier. I don't know that Ching Feng has
17   a copy, but obviously you are welcome to
18   them if you want them, Dan.
19       MR. QUINN:  Right. I would --
20   I would at some point like to get them.
21       MR. BAUERMEISTER:  All right,
22   gentleman.
23       Q.  Mr. Rush, this again is Don
24   Bauermeister, do you have any questions at
25   all before we start?
```

**Page 13**

```
                    RUSH
 1
 2       A.  No.
 3       Q.  All right, sir.
 4           Have you had a chance to look at
 5   the 30(b)6 deposition notice here today?
 6       A.  Yes, I had.
 7       Q.  And when did you first see that
 8   notice?
 9       A.  I don't recall exactly. I guess
10   once it was delivered to us.
11       Q.  Okay. When you say delivered to
12   us, who is us?
13       A.  Delivered to the association.
14       Q.  Okay. And have you been
15   selected by the association to appear here
16   on behalf of the association to give
17   testimony as a 30(b)6 deponent?
18       A.  Yes, I have.
19       Q.  And do you understand that means
20   that you will be testifying on behalf of
21   the association?
22       A.  Yes, I do.
23       Q.  All right.
24           And your answers will be those
25   of the association?
```

Page 14

```
 1              RUSH
 2     A.   Yes.
 3     Q.   Do you know how you were
 4  selected to -- perhaps you selected
 5  yourself. I don't know. How were you
 6  selected to be the
 7  responding -- responding person today?
 8     A.   I selected myself with -- in
 9  conjunction with discussion with the
10  president.
11     Q.   Okay. And now what is your role
12  with the WCMA?
13     A.   Right now I am the senior
14  advisor to the WCMA.
15     Q.   Okay. And for the record, would
16  you tell the jury what the WCMA is?
17     A.   The Window Covering
18  Manufacturers Association is an
19  association -- trade association a 501 C 6
20  not for profit corporation registered in
21  New Jersey that represents manufacturers
22  and suppliers of hard -- window coverings
23  manufactured in North America.
24     Q.   Okay. When you say represents
25  manufacturers and suppliers of window
```

Page 15

```
 1              RUSH
 2  coverings, what do you mean by represents?
 3     A.   We conduct business that can be
 4  lawfully conducted on behalf of
 5  manufacturers under U.S. law.
 6     Q.   Can you help the jury understand
 7  a little more particularly what it is you
 8  do that represents manufacturers?
 9     A.   The association is a accredited
10  standards writing organization under the
11  American National Standards Institute. In
12  that capacity, it develops ANSI standards,
13  which are recognized throughout the United
14  States. The association also runs an
15  annual product innovations award program
16  to help recognize and encourage
17  innovations in the industry.
18     Q.   Does the organization do any
19  lobbying on behalf of the industry?
20     A.   No.
21     Q.   Is there an arm of the
22  organization that does such lobbying?
23     A.   No.
24     Q.   Is there any organization of
25  which you are aware that does lobbying for
```

Page 16

```
 1              RUSH
 2  window covering manufacturers in America?
 3        MR. CARROLL:   Beyond the scope
 4  of the notice. The witness can answer.
 5     A.   No organization does lobbying as
 6  far as I know.
 7     Q.   Okay. Can you tell us what an
 8  ANSI standard is?
 9     A.   ANSI -- American National
10  Standards Institute is a body that
11  oversees thousands of voluntary standards
12  that are promulgated throughout the United
13  States. ANSI is the official United
14  States representative to the International
15  Standards Organization. An ANSI standard
16  by its development process goes through a
17  fairly rigorous consensus process allowing
18  a broad involvement across all interested
19  parties as well as general public,
20  government agencies to comment on the
21  development of an ANSI standard.
22     Q.   Can you tell us about that
23  rigorous process before the standards are
24  adopted?
25     A.   I will confess I am not an
```

Page 17

```
 1              RUSH
 2  expert on the ANSI process. The -- my
 3  understanding, however, of the process
 4  that we use and the process that the
 5  window covering manufacturers have used,
 6  which is a canvass method approach, is
 7  that a standard is developed by an open
 8  group of people knowledgeable about the
 9  product. The standard has a specific
10  form, which is an ANSI dictated type
11  format stating the purpose and working
12  through the particulars of the product at
13  which point once the draft standard is
14  developed, the draft standard is balloted
15  within the group of developers.
16        Once that ballot is counted, any
17  negatives in that ballot must be
18  addressed. Once acceptance of the
19  internal balloting is completed, the
20  standard is sent to ANSI for consideration
21  as an ANSI standard. The ANSI standard
22  process provides a public notification of
23  the -- of the proposed standard. The
24  proposed standard is then opened for
25  public comment.
```

18

RUSH

At the same time the proposed standard is sent to a -- a what is called a canvass committee. The canvass committee, which can represent no more than -- can have no more than one third representation among manufacturers, it usually -- our particular case included users, retailers as well as general consumers. The canvass process has a certain period of time in which it -- ballots must be received. Once the ballots are received, any negatives must be addressed by the standards developer and once -- if there are significant negative ballots, then the standard generally has to be either reworked or a satisfactory addressing of those negatives must be within the ANSI process.

Upon acceptance at the canvass level, ANSI will as an organization affirm the standard, and the standard will then be published. Under the ANSI rules, a standard must be revised or reaffirmed ever five years.

19

RUSH

Q. Okay. Does ANSI do that work or does it accept the work as done by organizations that propose the standard?
A. The --
MR. CARROLL: I object to the form. You can answer.
A. The -- under the ANSI process, organizations are recognized -- must apply and be recognized as standard developing bodies.
Q. And is the WCMA so recognized?
A. Yes, it is.
Q. So when you produce a standard and provide it to ANSI, they accept it?
MR. CARROLL: I object to the form. Not what the witness stated. You can answer.
A. No, ANSI does not accept it. It must go through ballot and must be accepted at the -- through the canvass process.
Q. Yes. No, I understood that. I mean once -- once you are done with it and the WCMA has a standard it wishes to

20

RUSH

promulgate, it then sends it over to ANSI, and ANSI accepts that as opposed to doing any work before accepting the standard; is that right?
A. I am not --
MR. CARROLL: I object to the form. You can answer.
A. I am not quite sure I understand what your question is.
Q. Okay. Once the WCMA sets a standard and it sends that standard over to ANSI, does ANSI do anything further with the standard or simply accept it and publish it?
A. WCMA works through the ANSI canvass process, so before a standard is accepted it must be publicly balloted. There is public notification and a public ballot. If there are objections on the public ballot, then the standards developers are required to respond to those negative ballots. When all negatives are resolved and the process then allows the standard to be affirmed

21

RUSH

and there is no appeal to the ANSI board of standards review, then the standard will be accepted.
Q. Okay. Now, when you talked about -- I may not have the second word right, but a third of the canvass group or circle could be manufacturers representatives but not more than that. Did I get that right?
A. That's correct.
Q. And that canvass circle, is it called a circle?
A. No, canvass list.
Q. Canvass list. Okay.
Why is there a rule that no more than one third of the canvass list can be manufacturers representatives?
A. I can't answer that. I do not know.
Q. Who would know?
A. ANSI.
Q. Can you think of any reason from your years of experience with this why they would limit that canvass list to

Page 22

```
 1        RUSH
 2  manufacturers having only one third of the
 3  contacts?
 4      A.  ANSI standards are concensus
 5  documents, and thereby needing a broad
 6  concensus for a -- for a standard to be
 7  adopted, and ANSI's process has been to be
 8  inclusive to permit multiple points of
 9  view.
10      Q.  Okay.  Sir, do you have notebook
11  one in front of you?
12      A.  Yes.
13      Q.  Could you look at exhibit tab 5
14  and page 028, the lower right-hand corner.
15         MR. EARNHART:  Don, what is the
16  longer Bates number on it?
17         MR. CARROLL:  Is that 19357?
18         MR. BAUERMEISTER:  Yes.
19         MR. CARROLL:  I will try to
20  help with that, Will.  Don, the way we
21  have it, just so you know, I've got one
22  notebook, and Mr. Rush has the other.
23         MR. BAUERMEISTER:  Okay.
24      Q.  Mr. Rush, did you have a chance
25  to look at document 028 and the page
```

Page 23

```
 1        RUSH
 2  following 029 from exhibit tab 5?
 3      A.  Yes.
 4      Q.  Can you tell us what that
 5  document says?
 6      A.  It says ANSI canvass list for
 7  WCMA 100.1.
 8      Q.  And what is WCMA 100.1?
 9      A.  That is the first standard that
10  WCMA issued.
11      Q.  And when was that issued?
12      A.  1997 I believe.
13      Q.  Might it have been November of
14  '96?
15      A.  November of '96.  You may have
16  that in front of you.  I don't have the
17  standard in front of me.
18      Q.  Okay.  Now, this is the canvass
19  list for that standard?
20      A.  Yes, that is correct.
21      Q.  And --
22         MR. CARROLL:  Let me
23  just -- are you -- do you know that that
24  is the whole document?  Yes or no because I
25  need to know that in order to make an
```

Page 24

```
 1        RUSH
 2  objection or not.
 3         THE WITNESS:  I cannot tell you
 4  absolutely that this is the list that went
 5  out.
 6         MR. CARROLL:  Don, sorry to
 7  interrupt.  I'll just object to the extent
 8  that I do not know apparently and witness
 9  does not know if this is the en -- the
10  entire document produced or if it is
11  merely a subset.
12      Q.  Mr. Rush, how long were you the
13  executive director of the WCMA?
14      A.  Actually, executive director
15  probably 12 years.
16      Q.  And how many years total have
17  you been with the WCMA?
18      A.  Probably eighteen.
19      Q.  Okay.  How many standards have
20  you used a canvass list in those eighteen
21  years to set --
22      A.  For WCMA?
23      Q.  Yes, sir.
24      A.  Two.
25      Q.  Okay.  So your first standard
```

Page 25

```
 1        RUSH
 2  was in November of '96.  Your second
 3  standard was in September of '02?
 4      A.  That is correct.
 5      Q.  Can you tell us, sir, whether or
 6  not this exhibit at tab 5, page 028, 029
 7  is the total list of the ANSI canvass
 8  group or the first standard?
 9      A.  This appears to be the list that
10  we sent the canvass ballot to, yes.
11      Q.  All right.  And looking at page
12  1, the first two persons are listed as
13  interested consumers?
14      A.  Yes.
15      Q.  And then the next six entities
16  are what?
17      A.  There is a trade association.
18  There are two retailers, and there are
19  manufacturers.
20      Q.  Okay.  Now, let's look at the
21  next page.  How many canvass persons or
22  entities are on that page?
23      A.  Seven.
24      Q.  How many of them are a retailer,
25  professional trade association or
```

## Page 26

RUSH

manufacturer representative?

A. There are two retailers, two manufacturers, two trade associations, and one interested consumer.

Q. Okay. Does this group meet the ANSI standard of only one third of the group being involved in the industry?

A. I -- the ANSI rules in this list goes to ANSI for approval prior to us using it as a canvass list. It does in fact meet that criteria.

Q. I am sorry. You say it does meet that?

A. It does meet the criteria of having no more than one third manufacturers.

Q. Okay. So when you say only one third manufacturers, you don't just mean people in the business. You mean literally people who manufacture these items?

A. Manufacturers, yes, sir.

Q. Okay. Would it be possible to have an ANSI canvass list made entirely of

## Page 27

RUSH

people who are in the business as professional trade associations, retailers and manufacturers?

A. I do not know, sir.

Q. Would there be any problem with such a canvass list if it was composed of those three groups and no other persons?

MR. CARROLL: I object to the extent it is beyond the scope of the notice. The witness may answer.

A. The different organizations represent different levels of interests within a product or product group.

Q. Sir, is setting these safety standards an important safety protection for the public?

A. Any standard is important to provide at least a baseline of product performance.

Q. In your opinion, do these standards protect the public?

A. I would say that the WCMA standards are a significant improvement over the fact that no standard was in

## Page 28

RUSH

existence prior to their development.

Q. Do these standards protect the public?

MR. CARROLL: Asked and answered. You can answer again.

A. They are a significant step in terms of providing a baseline for products to be judged as to whether they are -- meet that standard.

Q. Are the standards meant to protect the public?

A. The standard is meant to provide a baseline for products to be manufactured. They are performance based standards.

Q. So it is not meant to provide protection for the public?

MR. CARROLL: Asked and answered. You can answer again.

A. The -- the purpose of the standard is stated in the first, I believe, opening paragraph of the standard. Standards that are voluntary standards are developed as performance

## Page 29

RUSH

standards which are then used by manufacturers and/or other groups as a basis for their product.

Q. Sir, I -- I gues I am having trouble understanding whether or not these standards are supposed to protect the public or not. You can't give me any more answer than you have?

A. The purpose of a performance standard is to provide a baseline for the manufacture of a product.

Q. Can public consumers of these products rely on this standard to tell them anything?

A. In as far as a product is manufactured to a particular performance standard and if that performance standard goes through the process of ANSI accrediation and has -- it provides again a certain level of confidence that a product has been manufactured to an acceptable level of performance.

Q. What kind of confidence do you have?

Page 30

```
1                RUSH
2     A.    Of the acceptable level of
3   performance, I think the products that
4   meet these -- products that meet these
5   standards are acceptable products.
6     Q.    Does that mean safe products?
7     A.    I don't think I am in a position
8   to answer what safe means.
9     Q.    Why is it that you couldn't
10  answer what safe means?
11    A.    I am not an expert in safety.
12    Q.    But you were the executive
13  director of the WCMA for 12 years?
14        MR. CARROLL:   Asked and
15  answered.
16    A.    Yes, sir.
17    Q.    And during your tenure, the two
18  safety standards issued by your
19  organization were issued; is that correct?
20    A.    Yes, sir.
21    Q.    Were those important standards
22  from the point of view of job work that
23  you wanted to get done?
24    A.    They were important standards,
25  yes.
```

Page 31

```
1                RUSH
2     Q.    What made them important?
3     A.    They advanced the -- the
4   baseline ability to manufacture products.
5   They were excellent performance standards
6   which were developed with the complete
7   cooperation of the United States Consumer
8   Products Safety Commission.
9     Q.    Did America become safer after
10  these standards were produced?
11        MR. CARROLL:   I object to the
12  form of the question.
13    A.    The United States Consumer
14  Products Safety Commission, who is the
15  recognized authority in the United States,
16  I believe feel that the products did
17  address their significant concerns.
18    Q.    Now, you told us you were not a
19  safety professional?
20    A.    That is correct.
21    Q.    So you are not a safety
22  engineer?
23    A.    No, sir.
24    Q.    Do you have any engineering
25  background?
```

Page 32

```
1                RUSH
2     A.    No, sir.
3     Q.    Do you have any safety
4   professional training?
5     A.    No, sir.
6     Q.    Do you have any occupational or
7   workplace safety training?
8     A.    No, sir.
9     Q.    What is your educational
10  background?
11    A.    I have a bachelors degree and a
12  masters degree.
13    Q.    And in what areas were you
14  trained?
15    A.    International relations and
16  English.
17    Q.    How many safety engineers did
18  the WCMA have on staff when it passed
19  these two safety standards?
20        MR. CARROLL:   I object to the
21  form of the question.  You can answer.
22    A.    No safety engineers on staff.
23    Q.    How many safety professionals on
24  staff when the WCMA passed these two
25  standards?
```

Page 33

```
1                RUSH
2         MR. CARROLL:   I object to
3   passed these two standards.  Subject to
4   that, you can answer.
5     A.    No safety engineers on staff.
6     Q.    How many safety professionals
7   and occupational safety workplace or
8   product safety were consulted by the WCMA
9   to produce these standards?
10    A.    The U.S. Consumer Products
11  Safety Commission, who participated in the
12  development of both standards, included
13  human factors, engineering, product
14  compliance people, all who were part of
15  the technical committee that developed
16  both of these standards.
17    Q.    And were there any industry
18  representatives or only government
19  representatives?
20    A.    There were industries.
21    Q.    Did you select any of those
22  persons?
23    A.    No, I did not.
24    Q.    Did WCMA ask that any persons
25  with any special expertise be involved in
```

Page 34

```
 1              RUSH
 2   the development of these standards?
 3      A.   No, they did not.
 4      Q.   Sir, I would like you to look at
 5   notebook 2 at Exhibit 10.
 6           MR. CARROLL:   Notebook 2,
 7   Peter.
 8           (Pause.)
 9      Q.   Do you have that in front of
10   you, sir?
11      A.   Yes, I do.
12      Q.   All right.
13           I would like you to look at page
14   010, page 10.
15           MR. CARROLL:   8464 is the
16   Bates number.
17           MR. EARNHART:   Thanks.
18      Q.   There should be a document with
19   the caption at the top "Meeting on window
20   blind cord strangulation, December 15,
21   1996."
22           Do you have that, sir?
23      A.   Yes, I do.
24      Q.   About midway down the left hand
25   column, there is a Peter Rush, WCSC and
```

Page 35

```
 1              RUSH
 2   then a phone number to the right of that.
 3           Do you see that?
 4      A.   Yes, I do.
 5      Q.   Is that your signature?
 6      A.   Yes, it is.
 7      Q.   Can you tell the jury what the
 8   WCSC is?
 9      A.   Window Coverings Safety Council
10   is a not for profit C 6 New Jersey
11   corporation.
12      Q.   Okay.  Were you employed as
13   executive director of the Window Coverings
14   Manufacturers Association on December 5,
15   1996?
16      A.   Yes, I was.
17      Q.   And why isn't WCMA behind your
18   name here?
19      A.   I was also the executive
20   director of the Window Coverings Safety
21   Council at that time.
22      Q.   So you held two executive
23   directorships?
24      A.   I actually held more than that.
25      Q.   Well, let's talk about those
```

Page 36

```
 1              RUSH
 2   two.  These both relate to window
 3   coverings safety; is that right?
 4      A.   Not necessarily, sir.
 5      Q.   And what do you mean by that?
 6      A.   Window Coverings Safety Council
 7   was specifically a safety -- set up
 8   regarding the safety issue in window
 9   coverings.  Window Covering Manufacturers
10   Association had been in existence for many
11   years prior to, and its specific focus
12   continued to evolve.
13      Q.   On December 5, 1996, were you
14   the executive director of both the Window
15   Coverings Safety Council and the Window
16   Covering Manufacturers Association?
17      A.   Yes, I was.
18      Q.   Do you see any conflict in
19   holding those two positions?
20      A.   No, sir.
21      Q.   Did these two nonprofits as you
22   call them maintain separate offices?
23      A.   No, sir.
24      Q.   Do they have separate staff?
25      A.   They have some overlapping staff
```

Page 37

```
 1              RUSH
 2   and some separate staff.
 3      Q.   Okay.  In December 5, 1996 in
 4   that time frame, how many employees did
 5   the Window Covering Manufacturers
 6   Association have?
 7      A.   Zero.
 8      Q.   How many employees did the
 9   Window Coverings Safety Council have?
10      A.   Zero.
11      Q.   Well, if you were the executive
12   director, weren't you an employee?
13      A.   No, I was not.
14      Q.   Did neither of these
15   organizations pay you a salary?
16      A.   Neither of the organizations
17   paid me a direct salary.
18      Q.   What do you mean by a direct
19   salary?
20      A.   Both of these organizations
21   were -- had a contract for management with
22   Sumner Rider & Associates.
23      Q.   Okay.  What is a contract for
24   management?
25      A.   It's a contract by which the
```

**Page 38**

```
1          RUSH
2  organization contracted with a company to
3  provide it with association management
4  services.
5     Q.  Okay.  And who -- I am sorry.
6  That other phrase or name you used was
7  Sumner Rider Corporation?
8     A.  Sumner Rider & Associates, yes,
9  sir.
10    Q.  Could you spell that for the
11 record?
12    A.  S-U-M-N-E-R R-I-D-E-R and
13 associates.
14    Q.  Okay.  And Sumner Rider &
15 Associates provides association management
16 services?
17    A.  Yes, it did.
18    Q.  And you were an employee then of
19 Sumner Rider?
20    A.  Yes, I was.
21    Q.  And what was your title with
22 Sumner Rider?
23    A.  I was president.
24    Q.  And how many employees does
25 Sumner Rider have?
```

**Page 39**

```
1          RUSH
2     A.  At the time of 1996, we had I
3  would venture 21 employees.
4     Q.  What kind of work does Sumner
5  Rider do?
6     A.  It was in the business of
7  association management.
8     Q.  Anything else?
9     A.  A well as communications.
10    Q.  And what do you mean by
11 communications?
12    A.  The general area of
13 communications including public relations
14 was the prime focus.
15    Q.  Is Sumner Rider primarily a
16 public relations agency?
17    A.  No, it had equal split of
18 business between association management
19 and public relations.
20    Q.  Can you tell me about the public
21 relations work you did at Sumner Rider?
22    A.  We did general corporate and
23 trade association public relations.
24    Q.  For the jurors that don't know
25 what general corporate and trade
```

**Page 40**

```
1          RUSH
2  association public relations is, could you
3  be a little more specific?
4     A.  We put out press releases.  We
5  created brochures.  We put out -- those
6  are the two major functions that we were
7  involved in.  Brochures, collateral and
8  press releases.
9     Q.  For trade associations?
10    A.  For trade associations and
11 corporations.
12    Q.  Okay.  In December 5 of 1996
13 when you were meeting on the window blind
14 cord strangulation group that we show here
15 at tab 10, Exhibit 010, how much of your
16 time were you spending on Window Covering
17 Manufacturers Association work versus
18 public relations work?
19    A.  Window Covering Manufacturers
20 Association --
21    Q.  Yes, sir.
22    A.  -- was probably only 10 percent
23 of my time.
24    Q.  How about the Window Covering
25 Safety Council, how much of your time was
```

**Page 41**

```
1          RUSH
2  that?
3     A.  That may have been -- at this
4  point in time, that may have been 30 to 40
5  percent of my time.
6     Q.  What did you do with the other
7  50 to 60 percent of your time?
8     A.  Work on other clients, run the
9  business.
10    Q.  What clients were those?
11       MR. CARROLL:  Don, he said
12 work -- work on other clients, run the
13 business.  I want to make sure the record
14 was clear that he was answering the same
15 time you were asking, so you could hear
16 what he said.
17    Q.  Let me apologize.  Mr. Rush, I
18 am a long ways away on the phone, and I
19 can't see you all the time although you
20 are a good witness and pausing between
21 questions and answers, and I appreciate
22 that.
23       If at any point I start asking a
24 second question because I can't see you
25 pausing and restarting an answer, just
```

Page 42

```
1          RUSH
2  interrupt me, so you could get your whole
3  answer on the record. Would you do that,
4  please?
5     A.   That is fine.
6     Q.   I will do my best not to
7  interrupt because I want to get your whole
8  answer. Is that clear?
9     A.   Yes, sir.
10    Q.   Thank you.
11       So in on December 5, 1996 you
12 worked for other clients besides the WCMA,
13 WCSC. Who were those clients?
14    A.   To the best of my memory, the
15 Builders Hardware Manufacturers
16 Association, the Cooper Development
17 Association.
18    Q.   And were you executive director
19 of the Builders Hardware Manufacturing
20 Association?
21    A.   Yes, I was.
22    Q.   And were you executive director
23 of the Cooper Development Association?
24    A.   No, I was not.
25    Q.   What did you do for them?
```

Page 43

```
1          RUSH
2     A.   They -- public relations work,
3  press releases.
4     Q.   Tell me about the brochures that
5  your company created. What were those
6  for?
7     A.   Mostly general informational
8  brochures, product brochures.
9     Q.   Were these to promote an
10 industry, an association or a specific
11 company or all three?
12    A.   Each brochure would have a
13 specific purpose. Some were to
14 create -- promote an industry. Some were
15 to promote industry products in general.
16 If it was a corporate brochure, it might
17 be for a specific product.
18    Q.   Did you ever work on a brochure
19 for a window covering manufacturer?
20    A.   For a manufacturer, no.
21    Q.   Why not?
22    A.   We did not handle any window
23 covering manufacturers as clients.
24    Q.   Why not?
25    A.   There would be a perceived
```

Page 44

```
1          RUSH
2  conflict in our own mind of working for
3  one manufacturer while handling the
4  association.
5     Q.   What would the perceived
6  conflict be?
7     A.   The other members of the
8  association wouldn't particularly be happy
9  with it.
10    Q.   Why is that?
11    A.   Because they are competitors.
12    Q.   What were the terms of the
13 contract between Sumner Rider and the WCMA
14 in December of '96?
15    A.   We were engaged on a monthly
16 retainer fee.
17    Q.   And you were engaged to do what?
18    A.   Run the association.
19    Q.   Do you know how much that fee
20 was?
21    A.   I believe from memory it was
22 3500 dollars a month.
23    Q.   Did the WCMA have any other
24 source of income during that time?
25    A.   Other than what?
```

Page 45

```
1          RUSH
2     Q.   The 3500 a month.
3          MR. CARROLL:  I object. That
4  is not the witness' testimony.
5     Q.   I see. So the WCMA paid Sumner
6  Rider?
7     A.   That's correct.
8     Q.   And where does the WCMA get
9  funds to pay Sumner Rider?
10    A.   Membership dues.
11    Q.   How many members would the WCMA
12 have had in December of '96, if you know?
13    A.   Perhaps ten.
14    Q.   And what were the dues for those
15 entities?
16    A.   It varied depending upon
17 classification, but if I remember
18 correctly the dues went from 6,000 dollars
19 a year to 1500 dollars a year.
20        MR. EARNHART:  Don, can we
21 take --
22    Q.   So total budget for the WCMA in
23 '96 would have been approximately how
24 much?
25    A.   Under a hundred thousand
```

Page 46

```
 1              RUSH
 2   dollars.
 3        MR. EARNHART:  Don, can we take
 4   a five-minute break just to use the rest
 5   room here real quick?
 6        MR. BAUERMEISTER:  Any time,
 7   gentlemen, and, Mr. Rush, any time you
 8   need a break you let me know as well.
 9        THE WITNESS:  Okay.  Thank you.
10        MR. BAUERMEISTER:  We will
11   stay on the phone.
12        MR. CARROLL:  Yes, we will
13   leave you muted.  The rest room is about
14   ten steps away.
15        THE VIDEOGRAPHER:  The time is
16   11:05 a.m.  We are off the record.
17        (Recess taken.)
18        THE VIDEOGRAPHER:  We are back
19   on the record.  The time is 11:10 am.
20   BY MR. BAUERMEISTER:
21      Q.  Mr. Rush, looking at Exhibit 10,
22   page 010, just below your name is -- it
23   looks like Doug MacElwayne from Wal-Mart.
24   Is that right?
25      A.  Yes.
```

Page 47

```
 1              RUSH
 2      Q.  And he was at this meeting with
 3   you on window blind cord strangulation on
 4   December 5, 1996?
 5        MR. EARNHART:  I am going to
 6   object.  This a window covering -- this
 7   is -- I don't think this is a window
 8   covering manufacturers meeting.  I think
 9   it is beyond the scope of the 30(b)6
10   deposition.
11      Q.  All right.
12        Can you answer the question,
13   sir?
14      A.  Yes, he was at the meeting.
15      Q.  And what was the meeting about?
16      A.  It was a meeting -- I don't have
17   the -- I don't see the notes to the
18   meeting, but it was a meeting regarding
19   window covering strangulation hazard.
20      Q.  Do you know why Wal-Mart would
21   have a representative there?
22      A.  The safety council.  This is a
23   safety council meeting.
24      Q.  Right.
25      A.  And Wal-Mart was a member of the
```

Page 48

```
 1              RUSH
 2   safety council.
 3      Q.  Were they selling products that
 4   were involved in window blind cord
 5   strangulation?
 6        MR. CARROLL:  I object to the
 7   form.
 8        MR. EARNHART:  I object.
 9   Foundation.
10        MR. CARROLL:  You can answer.
11      A.  Wal-Mart was a retailer of
12   window covering cords -- of window
13   covering products.
14      Q.  Sir, did the WCMA maintain
15   statistics on accidents, deaths, injuries,
16   causes of accidents death and injuries
17   relating to window coverings?
18      A.  No, it did not.
19      Q.  Has it ever done so?
20      A.  No, it has not.
21      Q.  Sir, could you turn forward two
22   pages to 012, please.
23        MR. CARROLL:  That would be
24   Bates number 29666.
25        MR. BAUERMEISTER:  Yes, sir.
```

Page 49

```
 1              RUSH
 2      Q.  Do you have that, Mr. Rush?
 3        MR. CARROLL:  No, he does not,
 4   Don.  He meant -- he said turn forward,
 5   but he meant back.  Go to 012 by those
 6   three numbers, yes.
 7      Q.  It should just be three pages
 8   down in the document.
 9        MR. CARROLL:  I believe he has
10   it.
11      Q.  In the bottom of that document
12   there appears to be an E mail from a
13   Caroline Jennings; is that right?
14      A.  Yes, it is.
15      Q.  And can you tell the jury who
16   Caroline Jennings is, please?
17      A.  Caroline Jennings works for me.
18      Q.  And what does she do for you,
19   sir?
20      A.  She was -- she is an account
21   executive with our firm.
22      Q.  Okay.  What does an account
23   executive do?
24      A.  She will handle certain
25   activities depending upon the client
```

**Page 50**

```
 1              RUSH
 2   assignment.
 3       Q.  So does she work in public
 4   relations?
 5       A.  No, she does not.  She works in
 6   association management.
 7       Q.  Okay.  Could you read the first
 8   three sentences there that begins Tom,
 9   bash and I, for the record, please?
10       A.  Okay.  This is the one dated
11   October 10, 2003?
12       Q.  It looks like October 9 to me,
13   but --
14       A.  October 9.  Okay.
15       Q.  Caroline 10/9/03, 10:56 a.m.  Do
16   you have that entry?
17       A.  Yes.
18       Q.  And what is the first -- if you
19   could read the first paragraph below that?
20       A.  "Tom, Barb and I met on Tuesday
21   to review the IDI data and to begin
22   drafting a preliminary summary.
23   Unfortunately the more we look at the data
24   the more questions kept cropping up.
25   Consequently we are asking for some
```

**Page 51**

```
 1              RUSH
 2   additional input from all of you to help
 3   us proceed."
 4       Q.  Okay.  Now, who is are Tom, Barb
 5   and I?
 6       A.  Tom Mazerack from Comfort Techs,
 7   who is a member, and Barb would be Barb
 8   Miller from our our firm, and I would be
 9   Caroline Jennings.
10           MR. EARNHART:  Just for the
11   record, member of what?
12           THE WITNESS:  Member of -- Tom
13   Mazerack would be a member of
14   manufacturers association and of safety
15   council.  Comfort Techs is the company.
16       Q.  And what is it that Barb Miller
17   does for your company?
18       A.  She is on I would say the
19   government affairs technical side and some
20   public relations.
21       Q.  Okay.  Now, do you see the
22   heading there at the bottom of the page
23   errors, heading changes?
24       A.  Yes.
25       Q.  And then that goes into a
```

**Page 52**

```
 1              RUSH
 2   paragraph at the top of the next page?
 3       A.  Yes.
 4       Q.  Could you read that for the
 5   record, please.
 6       A.  "Errors:  Heading changes.  The
 7   errors we caught are pretty insignificant.
 8   Wrong incident death dates, data cell
 9   transpositions, errors in ages, those that
10   should not be applicable, et cetera.  The
11   recommended heading changes center on the
12   cause of noose.  Tom suggested it should
13   be changed to root cause of entanglement
14   since noose still connotes a loop to most
15   readers.  I agree entangle is much
16   better -- is much better but please let me
17   know if you disagree.  In the
18   subcategories under the root cause of
19   entanglement we are also suggest we be a
20   little bit more descriptive for clarity's
21   sake and change victim to victim
22   manipulation, consumer to consumer alert
23   and product to product design."
24       Q.  Sir, does consumer -- should
25   that be consumer altered?
```

**Page 53**

```
 1              RUSH
 2       A.  Consumer altered, yes.  I am
 3   sorry.
 4       Q.  Thank you.  Now, can you tell me
 5   what your employees are talking about
 6   here, what are they trying to do?
 7       A.  The WCMA set up a technical
 8   subcommittee in 2003 to work directly with
 9   the Consumer Products Safety Commission
10   who was involved in this committee to
11   develop a report to analyze in more detail
12   the number of strangulation deaths that
13   the Consumer Products Safety Commission
14   had in their database over a period of
15   time.
16       Q.  All right.
17           And your staff is talking here
18   about changing cause of noose to root
19   cause of entanglement?
20       A.  This is still from what I could
21   see very preliminary discussions as to how
22   best to classify, how to categorize and
23   how to develop an understandable report.
24       Q.  How does it benefit
25   understanding to change cause of noose to
```