RUSH

root cause of entanglement?

MR. CARROLL: I object to the extent that he didn't write the document. The document speaks for itself. Subject to that, he can answer.

A. That is not all potential strangulations would happen -- would necessarily happen in a noose.

Q. All right, sir. Could you read the next paragraph for the record, please.

A. "Ideas to rereview. In the process of cleaning up the clerical errors and trying to organize the data in our own minds we discovered a few inconsistencies that we think the committee needs to revisit before we can proceed. One or two relate to the description of the operating system and system type and design versus what we actually know. Most deal with whether the cord was wrapped around the victim's neck, the victim was caught in a loop or we just don't know. It appears that often we were swayed by the casual word choices in the incident reports and



RUSH

the police report narratives rather than the medical examiner's finding of the ligature marks if available to determine if the victim was caught in a loop or the cord was wrapped around the neck. In turn, this can cause whether -- this can change whether the cause of entanglement should be listed as victim caused, product caused or unknown."

Q. Now, can you tell the jury what ligature marks are?

A. I can't tell you from a technical standpoint. I --

Q. Do you have any understanding as a nineteen-year employee of the WCMA that promulgated the two standards here?

MR. CARROLL: I object to the extent it has already been established that he is not an employee, but subject to that objection he can answer.

A. Based upon my just say general knowledge I would say ligature would mean some sort of mark on someone's body based upon -- I don't know it is a medical term.



RUSH

Q. You've not seen it before?

A. I don't have a definition in my mind. No, I don't, sir.

Q. Why are your employees concerned with ligature marks if you've never heard what they are before?

A. Consumer Products Safety Commission is involved in this with their human factors development. Again, as I say, this was a technical report done in conjunction with the Consumer Products Safety Commission to try to examine these in more detail.

Q. Well, if you know, can you tell me how the existence of ligature marks can change whether the cause of entanglement should be listed as victim caused, product caused or unknown?

A. I cannot elaborate more than what is in the document, sir.

Q. All right.

Now, could you read the paragraph following the numerical listings there called "inner cord categorization."



RUSH

A. "Inner cord categorization. Finally we like the group to rethink our original decision to automatically list victim manipulation as a root cause factor with inner cord death. Although we agree that the victim had to manipulate the inner -- manipulate the product to activate -- actively cause the loop, in retrospect it seems wrong not to list the inner cord death as product caused given the inherent design deficiencies of the blind not having cord stops. Please consider this and let us know if you think inner cord deaths should be listed as victim caused, product caused or both victim and product caused."

Q. Sir, why would the original listing process decision automatically list victim manipulation as the root cause factor with inner cord deaths?

A. I do not know.

Q. Why would Caroline Jennings state that in retrospect it seems wrong not to list the inner cord deaths as





EXHIBIT 42-B

RUSH

product caused given the inherent design deficiencies of blinds not having cord stops?

A. The Window Covering Manufacturers Association -- safety council, I am sorry, the safety council had entered into a corrective action plan with the Consumer Products Safety Commission prior to this actually in 2000 at which point products had been modified and redesigned to include products -- cord stops. In looking at that information or in developing that new safety standard to address that potential hazard, the industry was fairly -- well, the industry was aware of it at that point and was certainly wanting to make certain that we got this report as right as possible.

Q. How is it that initially the industry in attempting to get this as right as possible made the original decision to automatically list victim manipulation as the root cause factor with inner cord deaths?



RUSH

MR. CARROLL: Let me object to the extent there is no foundation. It hasn't been established that the agency -- that the association did that. You can answer subject to that objection.

A. Well, and I can't say that the industry did because CPSC was involved in setting up many of these original categories as well.

Q. Sir, given your 18 years of involvement with the WCMA, do you agree or disagree with Caroline Jennings that in retrospect it seems wrong not to list inner cord deaths as product caused given the inherent design deficiencies of blinds not having cord stops?

MR. EARNHART: Vague as to time.

MR. CARROLL: Subject to that, you can answer.

A. As of the date this is written, I would agree with Caroline's assessment.

Q. Okay. The date this was written was 10/9/03; is that right?



RUSH

A. Yes, it was.

Q. How much earlier from that point in time would you have disagreed with her assessment?

A. This is looking at the particular discussion of this report, so this report was only being done in this time frame.

Q. So before this date, you would not have agreed in retrospect it seems wrong not to list inner cord death as product caused?

A. I'm not quite sure I understand your question.

Q. I thought I asked you whether or not you agreed with Ms. Jennings' opinion, and I thought you said you did but qualified it as to this point in time; that is the point in time of her E mail here.

What I am trying to establish is how much earlier than that was it when you first decided this opinion was correct?

MR. CARROLL: I object to



RUSH

form. You can answer.

A. In 1999, the Window Coverings Safety Council was notified by the U.S. Consumer Products Safety Commission regarding the evaluation that a number of window covering cord deaths had occurred within the inner cord of window covering products. The industry at that point worked very quickly with the U.S. Consumer Products Safety Commission to redesign the products, to enter into a corrective action program, and to reopen the ANSI standard to make certain that we included inner cords in the -- in the WCMA product standard.

Q. So if I understand you and Caroline, you would have had Caroline's opinion that inner cord deaths should be listed as product caused given the inherent design deficiencies of blinds not having cord stops from approximately 1999?

A. I -- in 1999, I would say that would be the correct position. I believe it was late in the year 1999.

62

RUSH

Q. Okay. And you haven't changed that belief from then until today, have you?
A. That in 1999 the action that we took was in conjunction with Consumer Products Safety Commission, no, I have not changed that opinion.
Q. Okay. So from 1999 until today, which is 2006, you would have had the opinion that inner cord deaths are product caused given the inherent design deficiencies of blinds not having cord stops?
A. From 1990 -- as of 1999 the products needed to be redesigned in order to have cord stops, yes.
Q. All right, sir.
Can you tell me who April Cox was?
MR. CARROLL: If you are looking at a document, it would be helpful if you would mention it to him.
Q. Have you seen the complaint in this action?

63

RUSH

A. Yes, I have.
Q. Is April Cox the child who died in an inner cord strangulation here in Alaska on May of 2002?
A. May I refer to the document?
MR. CARROLL: Sure.
A. To make certain.
Q. Yes, sir.
MR. CARROLL: It is at tab one.
(Pause.)
MR. CARROLL: The second document.
(Pause.)
A. Yes, sir.
Q. April is the little girl that brings us here, right?
A. Yes. Yes, she is.
Q. Can you tell the jury what you know about her death?
A. That she died in a window covering cord accident.
Q. Do you know anything more than that?

64

RUSH

A. I believe that she was entangled in an inner cord.
Q. Do you know anything else?
A. No, sir.
Q. Do you know what standards the window covering that strangled April Cox was manufactured to?
A. No, I do not.
Q. Do you know if it met the November '96 standard promulgated by the WCMA?
A. No, I do not.
Q. Have you attempted to find that out?
A. No, I have not.
Q. Has anybody from the WCMA attempted to find that out?
A. Not that I know of.
Q. Does the WCMA have any interest in whether or not the blind that April Cox was strangled by had the WCMA first standard warning on it?
MR. CARROLL: I object to the form. Argumentative. You can answer.

65

RUSH

A. The Window Covering Manufacturers Association has no enforcement powers over the standard. That rely -- that remains with the U.S. Consumer Products Safety Commission.
Q. Let me represent to you, sir, that the warning on the blind which killed April Cox in May of '02 was the standard warning produced by the WCMA in November of 1996.
Can you tell the jury what that standard warned April Cox's family about concerning inner cord strangulation?
MR. CARROLL: Let me object to -- to the form of the question and a lack of foundation that any standard was produced by the WCMA on that blind. Subject to that, you can answer.
A. The standard WCMA standard had a variety of warning labels depending upon the particular product. I am not familiar with the particular product that is involved in this case. The warnings, which were agreed to and approved by the

66

RUSH

ANSI process as well as the Consumer Products Safety Commission, had a variety of warnings regarding cords.

Q. Sir, can you tell me whether or not these standards have been important in the attempt in America to stop child strangulation by window coverings?

MR. CARROLL: Let me object to the form of the question. You -- subject to that, you can answer.

A. I believe that the U.S. Consumer Products Safety Commission and the Window Covering Manufacturers Association developed a standard that was a significant step forward in providing a -- a safer product in the market place.

Q. How does the standard promote a safer product in the marketplace?

A. There are a variety of fairly specific design requirements, performance tests that a product must meet in the standard.

Q. How does that make a safer product?

67

RUSH

A. It -- it has eliminated the loop cord for the most part or provided other methods of I guess -- other methods that companies could take in terms of how to deal with corded window covering products.

Q. And who did that standard make safer?

MR. CARROLL: I object to the form. If you understand it, you can answer it.

A. The -- the product -- the standard itself was a standard for the manufacturing process and is a performance standard regarding how to make the product. How the product is used is something that is certainly not covered in the particular standard.

Q. Okay. The WCMA promulgated a second standard in September of 2002; is that right?

A. That's correct.

Q. And how did that standard differ from the earlier standard of November '96?

A. The major difference between the

68

RUSH

two standards was the specific inclusion of inner cord strangulation potential danger and inclusion of some sort of mechanism on the cord to reduce the possibility of it being pulled through the head rail.

Q. Okay. So the September '02 standard attempted to do both a warning about the inner cord hazard as well as manufacturer out of the risk by changing whether the cord could be pulled out from the center; is that right?

A. Those -- those are two, yes, major changes in the 2002 standard.

Q. Why weren't those changes made in 1999 when you were aware that the inner cord risk of strangulation was such that these products were defective?

A. In fact, the corrective action plan that Window Covering Safety Council and the U.S. Consumer Products Safety Commission agreed to in 2000 required or the manufacturers agreed to immediately make that change in manufacturing to

69

RUSH

include the stop cord. The process of revising a standard however has a time lag over the -- what could be changed in the manufacturing process because the ANSI process requires a certain amount of time for notification, for review, but rather than wait for the standard to actually be formally changed the manufacturers changed production very quickly and began producing to what later would become the standard.

Q. Why did the manufacturers immediately begin changing production?

A. I -- you would have to ask each individual manufacturer, but the sense of the industry I had was that as we had from the very beginning that the industry was very quick to when a problem was identified that we would try to address it immediately in cooperation with the U.S. Consumer Products Safety Commission.

Q. So the manufacturers recognized the serious threat to children's lives this posed and then immediately corrected

RUSH

it in their manufactured products. Is that what you are telling me?

MR. CARROLL: I object to form. You can answer.

A. That is -- yes, we signed a corrective action program with the U.S. Consumer Products Safety Commission in which manufacturers changed the production of their products.

Q. You say we signed. Who is we?

A. The Window Covering Safety Council.

Q. Why would the Window Covering Safety Council sign an agreement with the CPSC?

A. The Window Covering Safety Council had been the organization that had been working with the Consumer Products Safety Commission since 1994 and had a corrective action program already in place with CPSC, and it was the organization that represented the broad scope of companies involved in the window covering industry.



RUSH

MR. EARNHART: I am going to interject an objection again. We are going beyond the scope of the deposition notice.

Q. Sir, do you feel that the manufacturers did the right thing upon learning that there was this inner cord risk to immediately begin manufacturing new product to eliminate that risk to the best of their ability?

A. Yes, I believe that the -- the members of the WCSC acted correctly in doing that.

Q. Why is that?

A. As we had done in previous situations when a -- in 1994 is that the industry would rather be proactive and begin change -- change in manufacture rather than wait for a standard to be developed.

Q. Is that because if you are not proactive children can die?

MR. CARROLL: Object to the form. Argumentative. You can answer.



RUSH

A. The industry has been concerned very -- from the very beginning regarding the the potential hazard that corded window covering products could have for children.

Q. What do you mean by from the very beginning?

A. From the first time that the manufacturers association was notified by the Consumer Products Safety Commission.

Q. When was that?

A. 1985.

Q. Sir, what did the manufacturers do as they immediately responded to this inner cord problem by changing their manufacturing processes, what did they do with products that had already been manufactured?

A. I could not speak for all manufacturers. The -- the Window Covering Safety Council, however, provided free retrofit kits that included the ball stop for products existing in the field.

Q. Tell me which manufacturers



RUSH

withdrew the products that they no longer would manufacture because they weren't safe according to the standard.

MR. CARROLL: Beyond the scope of the notice. If Mr. Rush knows, he can answer.

A. I do not know.

Q. Do you know of a single manufacturer that took their shelf -- their product off the shelf because it was no longer safe according to their manufacturing standards?

MR. CARROLL: Asked and answered. Argumentative. You can answer again.

A. I did not know.

Q. Could you tell me, sir, why an industry would begin an immediate change in manufacture to prevent the risk to children from occurring from a known risk and not take its known defective products off the shelf?

A. I would say the major issue would be to make certain that the products

RUSH

being currently manufactured were being manufactured as best they could be.

Q. Don't you put children at risk by leaving those products on the shelf and having them walk out of the store?

MR. EARNHART: Speculation. Beyond the scope of the notice.

MR. CARROLL: Foundation. Subject to that, you can answer.

A. Retrofit kits were readily available for all products, and they are available free.

Q. Were they effective?

A. I can't say that I have knowledge to answer that one way or another, sir.

Q. Well, let's look at Exhibit 10, 001 --

MR. EARNHART: What is the Bates number on that?

MR. BAUERMEISTER: 31645.

A. Is it --

MR. CARROLL: The same one. Oh, I am sorry. You are right, Peter.



RUSH

Exhibit 10, the first page.

Q. Mr. Rush, do you have that document?

A. Yes, I do.

Q. Have you seen that document before?

A. Yes, I have.

Q. What is it?

A. It is notes from a window covering technical committee of 2002.

Q. Were you present for that meeting?

A. No, I was not.

Q. Was Caroline Jennings?

A. Yes, she was.

Q. Who was she at that time?

A. She was program director at WCMA.

Q. Okay. Now, at the third dot from the bottom under notes, do you see those bullets there?

A. Yes.

Q. Do you see the heading note, and then there is a bunch of bullets down on



RUSH

the side? The third one from the bottom says "The committee voted unanimously to recommend reopening the standard."

Does your document say that?

A. Yes, it does.

Q. All right.

The first bullet at the top says, "committee met to discuss reopening ANSI WCMA A 100.1-202 for revision"; is that right?

A. Yes.

Q. So this is the second standard that WCMA produced, and now November 26, 2002 it is being reopened; is that right?

A. That's correct.

Q. Can you tell the jury what reopening means?

A. Reopening means that the document is in a form that additional work can be considered. A reopening of the document must happen at the least every five years, and in this case the committee wanted to keep the -- the document open or reopen the document as -- soon after it



RUSH

had been accepted rather than wait for the five years.

Q. Why is that?

A. In order to make certain that the document continues to be in a situation where it can be updated if need be.

Q. Had problems been reported with the second standard?

A. Not that I can attribute to the second standard.

Q. Do you know whether a third standard is being developed as we speak?

A. I believe a third standard is in development.

Q. Why is that?

A. As I said, to continue to refine the document to make it the best document available.

Q. What are you aware of needs to be changed with the second standard that will be reflected by changes in the third standard?

A. I believe there are issues over

RUSH

testing methodology in terms of the break away tassel. I believe there are some changes in the type of and the amount of warning labels. Aside from that, I can't tell you specifically without referring to the document.

Q. All right, sir.

If you would turn to page 018 of Exhibit 10.

MR. CARROLL: 2790 is the Bates number.

MR. BAUERMEISTER: Yes.

Q. Could you tell the jury what that document is, Mr. Rush?

A. It is --

MR. CARROLL: Take your time to read it if you need to.

(Pause.)

A. It -- they are minutes of an April 1991 committee meeting of the windows -- of the -- meeting of the Window Covering Manufacturers Association.

Q. And is your name listed as in attendance?



RUSH

A. Yes, it does.

Q. And you are listed as in attendance on behalf of who?

A. At that time it was the American Window Covering Manufacturers Association.

Q. And is that any different than the WCMA?

A. It is a predecessor organization -- well, it is the same organization with a different name.

Q. Okay. Now, under revision of by-laws, the last paragraph on this page indicates "Agenda item 12 on future direction from the association was discussed."

Do you see that entry?

A. Yes.

Q. "Two key areas were identified, education and government regulation." Do you see that entry?

A. Yes.

Q. What was the key area about government regulation that was discussed at this executive committee meeting of the



RUSH

American Window Covering Manufacturers Association?

A. Environmental Protection Agency and issues at that point of volatile organic chemicals or VOCs out gassing in indoor areas.

Q. And why would the WCMA be concerned about government regulation?

A. It is an informational program primarily.

Q. All right.

Would you turn to the next page, sir, 019.

A. Um hum.

Q. Do you have that, sir?

A. Yes, I do.

Q. And please note at any point if you want more time to read more parts of these documents, you can take as much time as you want. I have only a few questions for you on each page, so it is probably faster for everybody if I direct you to a section. But when I do so, if you prefer to read more, feel free to do so. I want



RUSH

your best available answer.

Do we understand each other?

A. Yes, sir.

Q. Thank you very much.

MR. QUINN: What is the Bates number on that one?

MR. BAUERMEISTER: 2791. That is the next one.

Q. Mr. Rush, do you have that?

A. Yes, I do.

Q. The second paragraph at the top indicates that "Education of retailers to be more effective in selling products was addressed."

What does that mean?

A. There were several initiatives going on by both the magazines in the industry and the decorative products association on training retailers to sell different types of window coverings.

Q. So does the WCMA today concern itself with educating retailers to be more effective in selling products?

A. No, it does not.

RUSH

Q. And why is that?
A. There is no member interest in the association doing that.
Q. How do you know that?
A. Because they have not asked for the program.
Q. If you would turn to the next page, which is 020 in Exhibit 10.
MR. CARROLL: 2762.
MR. BAUERMEISTER: Yes, sir.
Q. Mr. Rush, do you recognize that document?
A. Yes, I do.
Q. What is it?
A. It is a warning label order form for bottom rail labels and/or hang tags that date to I would say circa 1986, '87.
Q. I don't see any date on here. How could you tell that?
A. Because the Window Covering Manufacturers Association after the initial product alert in conjunction with the Consumer Product Safety Commission in 1985 a number of member companies



RUSH

voluntarily decided to begin labeling -- putting warning labels on their products. There had been an initial thought that if the companies purchased these products in masse through the association that they would get better pricing. They used the language and pictogram from the U.S. Consumer Products Safety Commission's product alert as its -- as the warning.
Q. Okay. Now, when you say pictogram, are you talking about this warning picture here on the right side?
A. Yes.
Q. And that warning, could you read for the record what the warning says under the big black letter warning?
A. "Warning. Parents should know that children could accidentally get strangled in window covering cords. Keep cords out of the reach of children. Use these devices available at local hardware stores or window covering stores, clamp or close pin, cleat, tie cord to itself. Tie



RUSH

down device."
Q. And below that is a picture of a child reaching for a cord with the international don't do this symbol stamped over his hand, right?
A. Yes, that's correct.
Q. And then at item 2 of the four listed there, you've got a pictorial for each one of the one through four how to make this safer advice, correct?
A. That's correct.
Q. And number two is cleat, and then there is a cleat shown there at number two, correct?
A. Correct.
Q. How does the use of the cleat make these windows coverings safer for children?
A. It would take the cord out of the reach and hold it in place.
Q. Okay. So a parent who saw this warning would deduce that taking the cord and putting it up on a wall on a cleat would make the window covering safe for



RUSH

kids; is that right?
A. It would make it safer, yes.
Q. Okay. Is that what April Cox's parents did?
A. I do not know.
Q. If they did that, would they have been making it safer for their child?
A. If the cord had been cleated to the wall?
Q. Yes, sir.
A. It should have been safer than hanging -- having a hanging cord.
Q. But this warning doesn't say anything about middle cord strangulation, does it?
A. No, in 1985, it -- '86 it did not.
Q. Okay. How about the 1996 warning promulgated by WCMA, did it say anything about middle cord strangulation?
A. Are you -- are you referring to the ANSI standard, sir?
Q. Yes.
A. The ANSI standard in 1996 did

not have a specific warning about inner cord strangulation as --

Q. Sir, would a warning that told a parent to cleat up the hanging end cord to make this thing safe mislead a parent into believing they have done what they could to protect their child and now their child can be around this device?

MR. CARROLL: I object to form. Argumentative. You can answer.

A. I wouldn't know the specific answer to that. A cleated window covering cord is definitely safer than a loose, hanging window covering cord.

Q. But the child exposed to the cleated cord isn't going to get hurt from that cord, but it could still be strangled to death by the inner cord which isn't even mentioned in this warning, correct?

MR. EARNHART: Which warning?

MR. BAUERMEISTER: The one right here at page 020 from whatever year that is as well as the warning in 1996.

A. The inner cord strangulation





hazard is not mentioned in this warning.

Q. Sir, could we go to page 050 in Exhibit 10.

MR. CARROLL: That is 24548 for everybody on the call. The document appears to be in at 24546.

Q. I am sorry, sir. I think the document begins at 048, 049 through 052, the one I am speaking about. It begins with ANSI at the top. It is dated December 1, 2000.

MR. CARROLL: I believe we are on the same document.

Q. Mr. Rush, have you seen that document before?

A. Yes, I have.

Q. And it is dated December 1, 2000?

A. Yes, it is.

Q. And it is written to a Mr. Robert Nevins in New York, Mr. Peter Rush in New York, and Mr. Dick Hudna in New Jersey, correct?

A. Yes.





Q. And at that time Mr. Peter Rush was executive director of the WCMA?

A. Yes, he was.

Q. Who was Robert Nevins?

A. Robert Nevins is a private citizen.

Q. Do you know him?

A. No, I have never met him.

Q. Have you read any correspondence from him?

A. I have received correspondence from him.

Q. What correspondence has he sent you?

A. A number of documents over the years.

Q. And what were they about?

A. Product modifications and -- regarding window covering cords or window coverings and safety.

Q. Is he a knowledgeable private citizen about those issues?

A. I could not tell you that.

Q. Do you know anything about his





background?

A. I believe he said he was a former firefighter, but I cannot validate that or confirm it.

Q. Do you recall ever acting on any of the information that Mr. Nevins sent you about his concerns about safety cords or window cords? Excuse me.

A. I believe Mr. Nevins was advancing specific product designs, which he was looking to sell to manufacturers.

Q. Okay.

A. Those products, designs and/or information were given to manufacturers and/or sent to manufacturers by Mr. Nevins. The association was not involved nor could it be involved in commercial development of products.

Q. Could we turn to page 051 of this document.

MR. CARROLL: 24549, gentlemen.

MR. BAUERMEISTER: Yes, sir.

Q. Do you have that, Mr. Rush?

RUSH

A. Yes, I do.

Q. Now, the center paragraph there kind of sticks out on the left -- of all the indented paragraphs. I will read it quickly and tell me if I read it correctly. "Finally, the BSR wishes to point out that WCMA recently submitted an announcement that revision activity would soon commence in connection with this standard."

Did I read that correctly?

A. Yes, you did.

Q. What standard is -- are you referring to or is being referred to there?

A. The WCMA 00.1.

Q. Okay. And is this entire correspondence about a withdrawal for cause request of the WCMA 100.1 standard?

MR. CARROLL: I object to the misstatement of what the document is. Subject to that, you can answer.

A. Yes, the document is a -- is a response by ANSI to Mr. Robert Nevins and



RUSH

with -- with copies to us regarding his request for withdrawal of the safety standard, of the WCMA standard.

Q. And why did he want to withdraw the WCMA standard?

MR. CARROLL: I object to foundation. You can answer.

A. I don't recall the specifics. I have to go back and look at it.

Q. Was the WCMA standard ultimately withdrawn?

A. No, it was not.

Q. Is it present to this date?

A. Excuse me?

Q. Is standard 100.1 still an effective standard to today, 2006?

A. No, it is -- it is superceded by a subsequent standard.

Q. Okay. So it is not withdrawn. It is merely superceded?

A. Correct.

Q. What does superceded means?

A. It means that the next revision of that standard takes precedent over the



RUSH

previous standard.

Q. Okay. Can you tell the jury what a member of the public should do if they find a product attempting to be sold to them that has this superceded standard on it? Should they buy that product?

MR. CARROLL: I object to the form. Lack of qualification. You can answer.

A. Well, the current standard that is in effect is the accepted ANSI standard for window covering products.

Q. All right.

But there are products on the shelf that have the standard from November of '96, isn't that right?

A. I do not know that answer.

Q. Do you have any reason to believe all of the pre-September 2002 manufactured window covering products have been withdrawn from the market?

A. I would have no way of knowing that one way or another.

Q. Do you have any information



RUSH

about a single window covering shade being withdrawn from the market because it was manufactured to the November '96 standard which doesn't meet the September '02 standard?

A. I would have no information on that.

Q. You don't know of one?

A. I do not personally, no, sir.

Q. Sir, I have got just a minute or so after 12. Do you want to break for lunch or would you like to go forward? Gentlemen, let me know what you would like to do. I will follow your wishes.

A. I'll go another half an hour if you want.

MR. CARROLL: Okay. The witness said he is glad to go for another half hour if we could stop at 12:30.

MR. BAUERMEISTER: That would be fine.

MR. CARROLL: Okay. Thanks.

Q. If we turn to Exhibit 10, page 053, please.





RUSH

MR. CARROLL: 24634.
Q. Do you have that, Mr. Rush?
A. Yes, I do.
Q. And does that appear to be a three-page letter from Robert Nevins to you?
A. Yes, sir.
Q. And it was dated June 10, 2001?
A. Yes, sir.
Q. Have you read it before?
A. Yes, I have.
Q. Okay. Could you read the first two paragraphs for the record, please.
A. "In 1987 and 1990 the U.S. Consumer Products Safety Commission and the Window Covering Manufacturers Association were notified by certified mail from lawyers Toni Greisbach and Jeffrey Morris that the inner cords on blinds and shades were a potential deadly strangulation hazard to infants and children. Ms. Greisbach indicated the infants she represented in a successful lawsuit against a window manufacturer had



RUSH

been strangled to death in the inner cord of a blind or shade. A member or members of the Window Covering Manufacturers Association stated that this is a once in a lifetime freak accident and could never happen again."
Q. All right, sir.
Do you remember reading this letter from Mr. Nevins in 2001?
A. Yes, I do.
Q. And did you take any steps to confirm the information presented to you in those first two paragraphs?
A. At this point, the U.S. -- the U.S. Consumer Products Safety Commission and the Window Covering Manufacturers Association were already in process of changing the manufacture. In fact, the letter dated to us in December '99 from U.S. Consumer Products Safety Commission did identify that there were a number of deaths on inner cords.
Q. Did you investigate whether or not anybody from the WCMA stated as is



RUSH

quoted in the letter "This is a once in a lifetime freak accident and could never happen again"?
A. No, I did not.
Q. So you don't know whether that is true or not?
A. I do not know.
Q. All right.
Could you read the next paragraph, sir?
A. "Since 1990, there are more than sixteen freak accident -- freak infant and child strangulation deaths in the inner cords of window covering -- inner cords of corded window covering products. Lawyer Greisbach's inner cord death is not among this list of inner cord strangulation deaths. It occurred in 1987 and is not included. I believe the number to be around 20. The window covering manufacturers save money by not addressing the inner cord strangulation problem, and a large number of infants and children lost their lives in strangulation deaths.



RUSH

These infant and children strangulation deaths will probably never stop now because instead of fixing the problem back in 1990, the window covering association and other manufacturers have sold another billion corded window covering products or a billion products with an inner cord problem."
Q. All right, sir.
What did you do upon reading that paragraph in 2001, if anything?
MR. CARROLL: Asked and answered. You can answer again.
A. As -- as I have already stated, the Window Covering Safety Council was already actively working with the U.S. Consumer Products Safety Commission to address the inner cord issue both by changing its manufacturing process, by entering into a corrective action program, and in reopening the standard in order to address it at the standard -- the ANSI standard level as well.
Q. Sir, in your view, was Mr.

98

RUSH

Nevins correct or incorrect in alleging that the window covering manufacturers saved money by not addressing the inner cord strangulation problem and a large number of infants and children lost their lives in strangulation deaths?
A. I would say the manufacturers did not save money by not addressing it. In fact, it would have -- if -- if the association and if CPSC had identified this -- this as an issue in 1994, we would have addressed it in the first standard, and we would have addressed it in the first corrective action program.
Q. Now, if the CPSC didn't raise the issue, would you have addressed it as an industry organization anyway?
A. If we had had the statistics to back it up, CPSC presented us with the -- the industry with their analysis based upon their research and their professional knowledge of product safety in terms of where products were causing potential dangers and where accidents had

99

RUSH

happened, and the industry acted upon that information extremely quickly and with the full cooperation and input from the Consumer Products Safety Commission, in fact with their oversight in most cases.
Q. If you would turn to page 061 please in Exhibit 10.
MR. CARROLL: 24566.
Q. Do you have that document, sir?
A. Yes, I do.
Q. It is another letter by Mr. Nevins, correct?
A. Yes, it is.
Q. Have you seen it before?
A. Yes, I believe I have.
Q. At page 063, he signs "Robert L. Nevins, retired New York City firefighter." Is that right?
A. Yes, he does.
Q. Was he a retired New York City firefighter?
A. I do not know.
Q. Have you ever attempted to determine that?

100

RUSH

A. No, I have not.
Q. Okay. Going back to page 061, sir. Do you have that page?
A. Yes, I do.
Q. This was a letter dated April 8, 2000, correct?
A. Yes, it is.
Q. If you look down the left side under "Dear ANSI," the letter is actually written to the American National Standards Institute board of standards review, correct?
A. Yes, that is who it is addressed to.
Q. Do you know how this came to be in the files of the Window Covering Manufacturers Association?
A. I would believe that ANSI would have forwarded it to us based upon the fact that this looks to be a -- what we previously referred to in terms of an ANSI review of the -- of the window covering standards that this may be the letter that prompted that review.

101

RUSH

Q. Okay. So this letter did some good.
MR. CARROLL: I object to the -- lack of foundation. You can answer.
A. I believe the issue was that it prompted a review, and the review affirmed that the window covering standard was in fact a -- was not withdrawn and the window covering standard was upheld.
Q. Isn't that standard reopened right now?
A. Yes, it is.
MR. CARROLL: Asked and answered.
Q. Isn't there a third standard being proposed right now?
A. Yes -- no, there is a revision of the existing standard being proposed right now.
Q. All right.
At page 061, if you go down to the left side, it is kind of hard to read the typing here. It doesn't look like he

RUSH

spaces all that well. You see a paragraph that begins "This list of strangulation deaths"?

A. Yes, sir.

Q. Okay. Would you read that, about the next four sentences, please?

A. "This list of strangulation deaths also includes the length of time that these window covering manufacturers have had to make these strangulation cords infant and child safe. In 19 -- 1991 until the present year 2000, that is nineteen years or you can go back to 1971 when the U.S. CPSC began to count, and that would be 29 years that the Window Covering Manufacturers Association have had to come up with a solution to corded window products and the deadly strangulation cords. 29 years without a solution from an industry that grosses 3 billion dollars a year. To allow an industry such as the Window Covering Manufacturers Association to set standards for their own products that are involved



RUSH

in such a high number of strangulation deaths over such a long period of time is contrary to the public interest and to our national interest. It is my own personal opinion a national disgrace."

Q. Sir, if you stop there. Could you tell the jury your response to Mr. Nevins?

A. The window covering industry has cooperated a hundred percent with the United States Consumer Products Safety Commission. We have implemented a significant change -- significant changes both in the manufacture and the production of window covering products. We have established and worked with the U.S. Consumer Products Safety Commission and the American National Standards Institute to put in place a national standard for window coverings, and that standard has been updated and will continue to be updated as -- as frequently as necessary.

Q. But Mr. Nevins seems to be charging that this has been going on for



RUSH

30 years. It is a 3 billion dollar industry, and it hasn't stopped the death.

Is that an industry that is taking care of business?

MR. CARROLL: I object to the form. You can answer.

A. That is probably one best answered by Mr. Nevins.

Q. Sir, is it your opinion that the public education programs undertaken by the WCMA or the WCSC have effectively alerted the public to the dangers that window coverings present to children?

A. The public information and education programs have been very effective in notifying the general public.

Q. All right.

Sir, I am going to ask your attorney to hand you the other notebook and let's go to Exhibit 3.

MR. CARROLL: We have it.

Q. All right. The first document is 001.

MR. CARROLL: Guys, this is



RUSH

not a Bates numbered document. It is -- it looks like a printout on 2/13/06 from the CPSC. So I don't have anything to refer you to.

MR. EARNHART: Do we have copies of this document, Don?

MR. BAUERMEISTER: You have it in your hands. I mean do you -- I don't understand your question.

MR. EARNHART: Has it been produced in this litigation?

MR. BAUERMEISTER: No, we just pulled it off the Internet yesterday or whenever the date shows there.

MR. CARROLL: Yes, 2/13/06.

MR. BAUERMEISTER: Right.

MR. CARROLL: It is -- it was actually released September 30, '04.

Q. Mr. Rush, have you seen this document before?

A. Yes, I have.

Q. What is it?

A. It is a news release from the U.S. Consumer Products Safety Commission.

RUSH

Q. All right.

Could you read the paragraph for the record that has the quote beginning "most."

A. "Most people don't think about window coverings as something that can harm their child, said CPSC chairman Hal Stratton. We continue to lose children in tragic incidents due to entanglement and strangulation in older window covering cords."

Q. Read the next paragraph, please.

A. "From January 1991 through August 2004 CPSC received reports of about 180 strangulation deaths involving cords and chains on window coverings. Most strangulation deaths involve the outer pull cord. At least 20 of these deaths involve inner cords which run through the horizontal blinds."

Q. All right, sir.

Can you tell me have you ever had any discussions with CPSC chairman Hal Stratton about his opinion on September 30



RUSH

of 2004 that most people don't think about window coverings as something that could harm their child?

A. We have had -- I have had conversations with Chairman Stratton regarding CPSC's continued support for the window covering industry and the Consumer Products Safety Commission public information and education campaign, and Mr. Stratton has been supportive and cooperative in assisting the window covering industry in continuing to get this message out.

Q. Is he correct in saying that most people don't think about window coverings as something that can harm their child?

A. I don't know what basis he has of that information.

Q. And you don't know whether he is correct or not in that regard?

A. The Window Covering Safety Council has on an annual basis conducted national public opinion research to



RUSH

ascertain where and what knowledge there is out there of window -- potentially window covering strangulation, and the indications of that research has shown that the -- the -- the general public is very knowledgeable about the potential strangulation hazards of window coverings.

Q. So, in your view, the chairman of the Consumer Products Safety Commission thinking that most people don't think of window coverings as something that could harm their child is just wrong?

MR. CARROLL: Misstates the witness' testimony. You can answer.

A. As I said, I don't know where commissioner Stratton has gotten this particular information. We supplied to CPSC the results of that survey, and they have been involved with us at the very beginning of designing that -- those questions to the public.

Q. All right, sir.

Could you turn to page 003 in Exhibit 3.



RUSH

MR. CARROLL: Hay, Don, before you give Peter questions on this document, our videographer needs to change tapes. If we could go off the record for just a second.

MR. BAUERMEISTER: Would this be a good time to do the noon break?

MR. CARROLL: Yes, 12:20. It probably is.

MR. BAUERMEISTER: All right. We will go off the record and then take the break until 1:20.

MR. CARROLL: That sounds great.

MR. BAUERMEISTER: Thank you, gentlemen. If we could, I would ask that people try and cooperate be back at 1:20 if that is possible. I would like to get done with you and keep you as much as I can out of rush hour, but I imagine that is kind of all afternoon there. I don't know. That is not in New York.

MR. EARNHART: I will defer to Jamie, but we can take a shorter break.