110
RUSH

1  That would be fine with me.
2  MR. CARROLL: Yes. Why don't
3  we try to get back on in like 45 minutes
4  because I would assume that there would be
5  something across the street.
6  MR. BAUERMEISTER: Okay. 40
7  minutes would be 1 o'clock your time.
8  MR. CARROLL: Why don't we say
9  about 1:05 call back in.
10 MR. BAUERMEISTER: 1:05. I
11 will call back at 1:05. If you are five
12 or ten minutes later, I won't complain.
13 MR. CARROLL: We will do that,
14 and as soon as Mike calls back in we will
15 tie you in and you could tie Dwight in.
16 MR. WEISS: Okay.
17 MR. BAUERMEISTER: That sounds
18 good.
19 THE VIDEOGRAPHER: The time is
20 12:22 p.m. We are off the record.
21 (Luncheon recess: 12:22 p.m.)

111
RUSH
AFTERNOON SESSION.
1:14 p.m.
THE VIDEOGRAPHER: We are back
on the record. The time is 1:14 p.m.
MR. BAUERMEISTER: Are we on the
record?
MR. CARROLL: I think we are
now.
MR. BAUERMEISTER: All right.
Thank you, sir.
PETER RUSH, resumed.
CONTINUED EXAMINATION
BY MR. BAUERMEISTER:
Q. Mr. Rush, you should have in
front of you the notebook that is labeled
1. You should be looking at exhibit tab 3
with page 003.
Do we have that in front of you,
sir?
A. Yes, we do.
MR. CARROLL: And for
the -- for the record, fellas, this is
another document that is not in the
production set. October 20, 2005, CPSC

112
RUSH
news release.
MR. BAUERMEISTER: Yes, sir.
Q. Okay. Mr. Rush, that was the
correct date on this news release, right,
October 20, 2005.
A. That is what it says on it.
Q. All right.
And the -- if you read the large
black lettering title, there is two lines
and titles up there.
Could you read that for the
record, please?
A. "Federal government warns of
hidden hazard to young children. Old
window coverings pose strangulation risk."
Q. All right.
And could you read the second
paragraph down beginning with "most
people"?
A. "Most people" --
MR. CARROLL: Let me just make
one global objection so as not to
interrupt the record. I'll just object to
the extent that of course the witness can

113
RUSH
read what the document says, but we are
not waiving any objections as to
admissibility or hearsay, whatever else,
but he can certainly read whatever
somebody else wrote. Go ahead, Mr. Rush.
A. "Most people don't think about
window coverings as something that can
harm their child, said CPSC Chairman Hal
Stratton. We continue to lose children in
tragic incidents of entanglement and
strangulation in older window covering
cords."
Q. Could you read the next
paragraph, sir?
A. "Since 1991, CPSC has received
reports of about 200 strangulation deaths
involving cords and chains on window
coverings. Most strangulation deaths
involve the outer pull cords. At least 20
of these deaths involve the inner cords
which run through the horizontal blinds."
Q. This really seems to be pretty
much the same statement that the chairman
released on September 30, a year earlier,

## Page 114

```
                    RUSH
 1
 2  isn't it?
 3       MR. CARROLL: The document
 4  speaks for itself. You can answer.
 5       A. I think they are similar
 6  statements, yes.
 7       Q. Well, they are identical in
 8  terms of the quote about most people don't
 9  think about window coverings as something
10  that could harm their child; isn't that
11  correct?
12       A. It does seem to be an identical
13  quote.
14       Q. Now, in your conversation with
15  Mr. Stratton, did you ever raise with him
16  your opinions at any time following
17  October 20 of 2005 that he is wrong about
18  this fact that he claims that most people
19  don't think about window coverings as
20  something that can harm their child?
21       MR. CARROLL: I object to the
22  extent I believe it mischaracterizes the
23  witness' testimony. Subject to that, he
24  can answer.
25       A. I have never had that discussion
```

## Page 115

```
                    RUSH
 1
 2  with Chairman Stratton.
 3       Q. Okay. Have you seen this
 4  document before in the ordinary course of
 5  business?
 6       A. The 2005 document?
 7       Q. Yes, sir.
 8       A. I believe I did, yes.
 9       Q. All right.
10       Would you look at CPSC public
11  information about window covering
12  strangulation problems; is that right, as
13  part of your job?
14       MR. CARROLL: I object to the
15  form or -- or object to the form of the
16  question is labeling that document as CPSC
17  problem.
18       A. No, this particular document was
19  in conjunction with window coverings
20  safety month that the Window Covering
21  Safety Council and Consumer Product Safety
22  Commission jointly sponsored in 2005.
23       Q. And what was your role with the
24  Window Covering Safety Council at that
25  time?
```

## Page 116

```
                    RUSH
 1
 2       A. I was the executive director of
 3  the Window Covering Safety Council.
 4       Q. So you have been highly familiar
 5  with this document?
 6       MR. EARNHART: I am going to
 7  object as beyond the scope of the 30(b)6
 8  deposition notice at this point.
 9       A. I -- yes, I am familiar with
10  this document.
11       Q. All right, sir.
12       Isn't it true that between
13  September 30, 2004 and October 20, 2005
14  the CPSC reports an additional 20 deaths
15  by strangulation of children?
16       A. Would you repeat that question?
17       Q. Yes, sir. At page 001, the
18  document indicates from January '91
19  through August '04 CPSC received reports
20  of about 180 strangulation deaths, right?
21       A. Yes.
22       Q. And at 003, it says since 1991,
23  CPSC has received reports of about 200
24  strangulation deaths?
25       A. Yes.
```

## Page 117

```
                    RUSH
 1
 2       Q. We have gone up 20 in a year's
 3  time?
 4       MR. EARNHART: Foundation.
 5       A. I did not think the actual
 6  numbers back -- the actual statistics from
 7  Consumer Products Safety Commission
 8  actually backed those numbers.
 9       Q. Okay. There are about 20
10  children a year dying in America from cord
11  strangulation?
12       A. In 1995, I believe the number
13  was four according to the U.S. consumer
14  products safety commission.
15       MR. CARROLL: You said -- I
16  think we have got an error in the witness'
17  statement. What year do you believe you
18  were saying?
19       THE WITNESS: 2005.
20       MR. CARROLL: Okay. I think
21  you said 1995.
22       A. No, 2005. There were four.
23       Q. How -- how do you know that many
24  deaths are happening in that year?
25       A. A report from the Consumer
```

## Page 118

```
 1            RUSH
 2  Products Safety Commission.
 3      Q.   Does your organization ask your
 4  members to count deaths that they become
 5  aware of?
 6      A.   No, it does not.
 7      Q.   Does your organization do
 8  anything to canvass consumers to identify
 9  actual deaths?
10         MR. EARNHART:  Which
11  organization are we talking about?
12         MR. CARROLL:  Mr. Rush can
13  respond on behalf of the WCMA.  He is here
14  for that purpose.
15      Q.   Go ahead, sir.
16      A.   No, it does not.
17      Q.   Does the WCMA have any
18  understanding as to the number of average
19  annual deaths due to window cord
20  strangulation of children in America?
21      A.   We have the reports from the
22  U.S. Consumer Products Safety Commission.
23      Q.   And what do you know about those
24  reports?
25      A.   That U.S. Consumer Products
```

## Page 119

```
 1            RUSH
 2  Safety Commission compiles incidents on an
 3  annual basis.
 4      Q.   Do they have a statistical
 5  coding system whereby they project the
 6  actual number of losses compared to the
 7  known losses?
 8      A.   You would have to ask CPSC that
 9  question.
10      Q.   So you don't know?
11      A.   I do not know.
12      Q.   So if the factor of known losses
13  is one and they project three, you don't
14  know whether that is true or not?
15         MR. CARROLL:  I object to the
16  form of the question.  I don't understand
17  it, but if the witness does he can answer
18  it.
19      A.   No, I did not understand.
20      Q.   All right.  Let's try to make it
21  simple.
22         The CPSC may have mathematical
23  modeling systems by which their long
24  experience teaches them that that they
25  don't get every known product danger,
```

## Page 120

```
 1            RUSH
 2  death or injury report when they all
 3  happen.  Instead what they get is a
 4  percentage of them.  Based on that long
 5  history from the percentage that they
 6  actually get, they can project a number
 7  that they believe is the actual number
 8  occurring.
 9         Have you ever heard that before,
10  sir?
11         MR. CARROLL:  Let me object to
12  the question as vague, ambiguous, calls
13  for speculation, involves a hypothetical
14  for which there is no basis.  They may
15  have a lot of things.  If a frog had
16  wings, he may not bump his ass when he
17  jumped.  I would ask for another question.
18  If you understand it, however, you can
19  answer it.  Let --
20      A.   No, I do not understand it or
21  know anything about it.
22      Q.   You've never heard of a
23  statement that CPSC uses to protect actual
24  deaths from known deaths?
25      A.   No, I have not.
```

## Page 121

```
 1            RUSH
 2      Q.   Do you know if anybody at the
 3  Window Covering Manufacturers Association
 4  has ever become familiar with that system?
 5      A.   I don't know of anyone, no.
 6      Q.   Do you think not knowing that
 7  system is in any way detrimental to your
 8  understanding of the scale of the problem
 9  of child strangulation deaths due to
10  window coverings?
11         MR. CARROLL:  I object to the
12  form.  You can answer.
13      A.   Not knowing about a system that
14  I don't know about, I -- I -- it is very
15  difficult for me to answer about something
16  I don't know about.
17      Q.   Okay.  Let's go back to notebook
18  number 2, sir.  We are looking at exhibit
19  tab 10.  We are going to page 061.
20         MR. CARROLL:  That would be
21  24566.
22      Q.   Okay.  Now, we previously
23  discussed this letter from Mr. Nevins that
24  had been received by your office even
25  though it had had been directed to ANSI,
```

Page 122

```
1            RUSH
2    correct?
3        A.   It had been sent to our office
4    by ANSI though it was directed to ANSI.
5        Q.   Okay.  Does ANSI normally send
6    you correspondence?
7            MR. CARROLL:  Asked and
8    answered.  You can answer this one again.
9        A.   Only when it would pertain to
10   us.
11       Q.   Okay.  Let's look at 067, sir.
12   Do you see that there?
13           MR. CARROLL:  That is document
14   Bates numbered 24572, gentlemen.
15       Q.   Have you seen that before, sir?
16       A.   I can't recollect that I have.
17       Q.   Do you know was this an
18   attachment to one of Mr. Nevins' letters
19   to ANSI, which was then referred to you?
20       A.   I do not know whether it was or
21   it was not.
22       Q.   Okay.  What is 067?
23       A.   I am -- I am speculating based
24   upon what it says on it is that --
25           MR. CARROLL:  I would ask the
```

Page 123

```
1            RUSH
2    witness not to speculate.
3        A.   All right.
4            Then it says it is window
5    covering related strangulations of
6    children reported to the U.S. Consumer
7    Products Safety Commission since
8    19 -- 1/1/81.
9        Q.   And it has columns listed,
10   dates, age, sex and investigation number;
11   is that right?
12       A.   Yes, that is what it has.
13       Q.   And we have got about, what,
14   three or four pages of these single space
15   typed cases of deaths?
16       A.   Yes.  One, two, three, four.
17       Q.   All right, sir.  You've never
18   seen these documents before?
19       A.   If I have, I can't recollect in
20   what regard I did.
21       Q.   Okay.  Do you see the column on
22   page 067 there under age?
23       A.   Yes.
24       Q.   Could you read the first ten
25   entries or so, please?
```

Page 124

```
1            RUSH
2            MR. CARROLL:  I'll object
3    again that the document speaks for itself,
4    but he can answer.  Go ahead.
5        A.   Twelve months, three years, two
6    years, two years, 12 months, four months,
7    eighteen months, thirteen months, two
8    years, thirteen months, two years, 11
9    months.
10       Q.   Sir, do those ages reflect what
11   you know to be the typical ages of
12   children strangled by window cords?
13       A.   Window Covering Safety Council
14   and the Consumer Products Safety
15   Commission recommends for children under
16   the age of 5 that cords be kept out of
17   their reach.
18       Q.   Yes, but in this column
19   virtually everything is under two, isn't
20   it?
21       A.   No, there is a four-year -- four
22   years, a four years.
23       Q.   Read the next ten, please.
24       A.   Two years, twelve months,
25   sixteen months, twenty-one months, ten
```

Page 125

```
1            RUSH
2    months, sixteen months, fifteen months,
3    two years, fourteen months, seven months,
4    seventeen months, three years, four years,
5    three years, two and a half years.
6        Q.   All right.
7            Are these from your knowledge
8    and experience typical ages for kids that
9    have been strangled by these cords?
10       A.   It is -- according to the
11   Consumer Product Safety Commission's data,
12   children under the age of five are at more
13   risk, yes.
14       Q.   Is this a particularly
15   vulnerable age of -- for consumers?
16           MR. EARNHART:  Vague.
17           MR. CARROLL:  I object to the
18   form.
19       A.   I don't think I can answer that
20   question.
21       Q.   Okay.  Is your WCMA standard
22   concerned with the age of the victims of
23   cord strangulation?
24       A.   The standard is concerned with
25   the exposure of the cord.  I would -- I
```

126

RUSH

1 don't know -- I cannot recall whether
2 there is any mention of specific age in
3 the standard itself though.
4    Q.   Okay. But in analyzing the
5 risks that these cords pose, does WCMA in
6 any way consider age of the known victims?
7    A.   WCMA?
8    Q.   Yes.
9    A.   In terms of what data was -- has
10 been worked on in developing the standard
11 with Consumer Products Safety Commission,
12 specifically children under the age of
13 five are a prime area that we may -- try
14 to make certain that the product is -- the
15 product standard was directed at.
16    Q.   Why are children under the age
17 of five the prime persons the product
18 standard was directed at?
19    A.   Because according to this
20 Consumer Product Safety Commission, that
21 is the age of most of the incidents that
22 they have -- are reported.
23    Q.   So kids of this age group are
24 the most vulnerable that strangulation by

127

RUSH

1 these cords posed. Is that true?
2    A.   Yes.
3    Q.   Sir, I would like you to turn to
4 page 077, please.
5         MR. CARROLL:   That is 5660.
6         MR. BAUERMEISTER:   Yes, sir.
7    Q.   Do you recognize that, sir?
8    A.   Let me read it a second.
9    Q.   All right.
10        (Pause.)
11   A.   Yes, sir. I do.
12   Q.   What is that, please?
13   A.   It is a membership renewal
14 letter to Roll Ease and to an Terry
15 McDonald.
16   Q.   Who is Roll Ease?
17   A.   Roll Ease is a member of
18 the -- they are a manufacturer of
19 component parts for window covering
20 products.
21   Q.   Okay. And the letter is signed
22 by you?
23   A.   Yes, it is.
24   Q.   Now, would you read the

128

RUSH

1 paragraph third from the bottom beginning
2 "even though"?
3    A.   "Even though the existing
4 campaign has been very successful in
5 reaching many, it must be acknowledged
6 that there are still hundreds of millions
7 of potentially dangerous products in place
8 around the country. Strategically the
9 CPSC has reported seven deaths to date
10 caused by window covering products, this
11 in 2002. Our efforts will not be
12 completely successful until we are able to
13 report that no children have died or
14 injured because of window covering
15 product."
16   Q.   Would you read the last
17 paragraph of your letter, sir?
18   A.   "WCSC is committed to fulfilling
19 its mission but we could not do it without
20 your continuing support. Please help us
21 ensure that no more children will be
22 injured or killed because someone didn't
23 know that the product in their home was
24 potentially dangerous."

129

RUSH

1         MR. EARNHART:   I am going to
2 object to the question, and, you know, I
3 think part of this is brought on by not
4 having a set of exhibits for all of us,
5 but again the scope of this deposition is
6 the WCMA not WCSC.
7         MR. BAUERMEISTER:   I will give
8 you a standing objection to that point if
9 you want it, sir. I think the --
10        MR. EARNHART:   That is --
11        MR. BAUERMEISTER:   The -- the
12 inquiry is whether or not I am asking a
13 question that is seeking relevant
14 information or may lead to relevant
15 information.
16        MR. EARNHART:   Then you
17 shouldn't have done a 30(b)6 deposition
18 notice of WCMA within -- that asks a
19 specific scope of questions.
20        MR. BAUERMEISTER:   Well, I am
21 happy to give you that objection for every
22 question I ask on the record. If you want
23 to make it a record once, that is fine
24 with me.

130

1  RUSH
2  MR. EARNHART: To the extent
3  you are asking for WCSC information or
4  WCSC documents other than within the scope
5  of the -- of the deposition notice, which
6  I think would entail the knowledge of the
7  WCMA, I have an objection, and please give
8  me a continuing objection to that.
9  MR. BAUERMEISTER: I will.
10 Q. Mr. Rush, could you turn Exhibit
11 11, page 006.
12 MR. CARROLL: That is 19333.
13 MR. BAUERMEISTER: Yes, sir.
14 A. Yes, I have it.
15 Q. All right, sir.
16 Could you tell us what that is,
17 please?
18 A. It appears that it is a list of
19 the ANSI canvass list as of
20 7/1990 -- 1996.
21 Q. Okay. So this is July of '96,
22 which is about four or five months before
23 November of '96 when you -- WCMA listed
24 the first standard, correct?
25 A. That's correct.

131

1  RUSH
2  Q. All right.
3  Now, there is a series of names
4  and some people just have addresses, some
5  have titles or companies they are
6  connected with. Can you tell me, for
7  example, the third name here on the list
8  is David Bowlen, Director Of building,
9  American Institute of Architects, and you
10 have no response. What does that mean?
11 A. The way I would read this and
12 without checking ANSI records is how they
13 voted on the -- the ANSI canvass.
14 Q. Okay. So what would no response
15 mean?
16 A. That we had not heard back from
17 him.
18 Q. Okay. Now, Kay Villa down at
19 the bottom for American Textile
20 Manufacturers, behind her name or
21 manufacturers institute, behind her name
22 is no. Correct?
23 A. Yes. No -- I will correct that
24 statement. In looking at it, I believe
25 this list is asking them if they want to

132

1  RUSH
2  participate on the ANSI canvass.
3  Q. Okay. So this is just
4  questioning for participation?
5  A. Correct.
6  Q. How do you know that?
7  A. Because on the actual ballot
8  itself we did not receive -- receive any
9  negative responses.
10 Q. How many responses did you
11 receive on the actual ballot?
12 A. I don't recall that information.
13 I believe we looked at that previously
14 though.
15 Q. Would it be several hundred?
16 A. No.
17 Q. 50?
18 A. No.
19 Q. A dozen?
20 MR. CARROLL: I believe the
21 document that you showed him a little
22 earlier speaks to it. So we could go
23 through this, and you could show him the
24 document. Go ahead, Mr. Rush.
25 A. I believe the canvass list was

133

1  RUSH
2  fifteen.
3  Q. Okay. Could we turn, sir, to
4  Exhibit 11, page 002, please.
5  MR. CARROLL: It is 19347.
6  MR. BAUERMEISTER: Yes, sir.
7  Q. To get your bearings on this
8  document, if you look back to 020, it
9  appears to be a Consumer Product Safety
10 Commission letter dated February 3, '96 to
11 Mr. Peter Rush, executive director of
12 Window Coverings Safety Council.
13 A. Where are we?
14 MR. CARROLL: Exhibit 11, 002
15 is not that. Exhibit --
16 MR. BAUERMEISTER: I am sorry.
17 It is 020.
18 MR. CARROLL: Okay. That is
19 27399, fellas.
20 Q. Do you have that in front of
21 you, Mr. Rush?
22 A. Yes, I do.
23 Q. If we go back to page 022, it
24 shows the letter signed by a Mark
25 S-C-H-O-E-N. Do you know how to pronounce

Page 134

RUSH

1  that?
2  A.  022?
3  Q.  In the lower right-hand corner
4  would be 022.
5  A.  Mark Schoen.
6  Q.  Okay. Now, Mr. Schoen wrote you
7  this letter, correct?
8  A.  Yes, he did.
9  Q.  In the first sentence of the
10 second paragraph from the end, he says
11 "The compliance staff realizes that for
12 the program to be a success all industry
13 members must participate. What is he
14 talking about there?
15 A.  That all people involved in the
16 window covering industry should
17 participate in the program.
18 Q.  What program is he talking
19 about?
20 A.  I would say the Window Covering
21 Safety Council. I believe this was
22 addressed to me at the Window Covering
23 Safety Council.
24 MR. EARNHART: Same objection.

Page 135

RUSH

1  Q.  So he is talking just about
2  joining that council or about that
3  council's attempt to educate the public?
4  MR. CARROLL:  I would ask the
5  witness to read the paragraph before
6  responding.
7  Q.  Feel free, Mr. Rush. Whatever
8  you need to look at.
9  (Pause.)
10 A.  Would you repeat your question?
11 Q.  Yes, sir. I am trying to
12 understand why Mr. Schoen is saying the
13 compliance staff realizes that for the
14 program to be a success all industry
15 members must participate. What was
16 he -- what did you understand when you
17 received the letter from him that that
18 sentence meant?
19 A.  That all companies should be
20 part of and agree to the activities that
21 we had agreed -- that the Window Coverings
22 Safety Council has agreed to with Consumer
23 Products Safety Commission in the
24 corrective action program.

Page 136

RUSH

1  Q.  Okay. So this was about the
2  corrective action program?
3  A.  I would think so. Yes, sir.
4  Q.  And this man is saying that for
5  that program to be a success all industry
6  members must participate?
7  A.  That is what the language in the
8  document says.
9  Q.  All right. Could you turn to
10 page 032, tab 11, please.
11 MR. CARROLL:  15022 is the
12 Bates number.
13 MR. BAUERMEISTER:  Yes, sir.
14 A.  I have it.
15 Q.  Could you tell us what that is,
16 sir?
17 A.  It is a letter to Akeem Import
18 discussing the fact that they decided not
19 to participate in the corrective action
20 plan in 2001.
21 Q.  Okay. And you wrote that
22 letter?
23 A.  Yes, I did.
24 Q.  Why did you write them that

Page 137

RUSH

1  letter?
2  A.  Because they were no longer
3  participating in the corrective action
4  plan.
5  Q.  You carbon copied that to Alan
6  Schoen at the CPSC?
7  A.  Yes, I did.
8  Q.  Let's look at 033, the letter
9  that follows.
10 MR. CARROLL:  15023.
11 Q.  Is that a similar letter
12 confirming that Custom Craft Company,
13 craft Ridgefield name made has decided not
14 to participate in the corrective action
15 plan?
16 A.  Yes, it is.
17 Q.  And it is signed by you?
18 A.  Yes, it is.
19 Q.  And it is carboned to CPSC?
20 A.  Yes, it is.
21 Q.  Look at 034. Is that a letter
22 written by you?
23 A.  Yes, it is.
24 Q.  Of July 17, 2001?

Page 138

```
1                RUSH
2    A.  Yes, it is.
3    Q.  To the Home Depot confirming
4  that Home Depot has decided not to
5  participate in the corrective action plan
6  dated September 12, 2000 between the WCSC
7  and CPSC?
8    A.  That's correct.
9    Q.  Okay.  035.
10       MR. CARROLL:  15025.
11   Q.  The same letter written by you
12 to J.C. Penney's confirming that they will
13 not participate, correct?
14   A.  That's correct.
15   Q.  036.  Is that the same letter
16 written by you confirming that Kenny
17 Manufacturing Company will not
18 participate?
19   A.  Yes, it is.
20   Q.  037.
21       MR. CARROLL:  15027.
22   Q.  Is that the same letter written
23 by you confirming that Loew's companies
24 has decided not to participate?
25   A.  Yes, it is.
```

Page 139

```
1                RUSH
2    Q.  038.
3        MR. CARROLL:  15028.
4    Q.  Is that the same letter written
5  by you indicating that Marietta Drapery
6  and Window Coverings has decided not to
7  participate?
8    A.  Yes, it is.
9    Q.  039.  Is that the same letter
10 written by you indicating that Tex Decs
11 Corporation and Rich View Window Coverings
12 has decided not to participate?
13   A.  Yes, it is.
14   Q.  Did those participation declines
15 decrease the effectiveness of the
16 attempted program of consumer education
17 and refitting of these dangerous cords?
18       MR. CARROLL:  I object to the
19 form.  You can answer.
20   A.  Several of the companies
21 in -- in here decided to rejoin the Window
22 Coverings Safety Council efforts.  Some
23 have not.  I don't think that that
24 materially effected the ongoing program
25 that we had had or the activity that we
```

Page 140

```
1                RUSH
2  had with the U.S. Consumer Products Safety
3  Commission.
4    Q.  Could you turn to page 042,
5  please.
6        MR. CARROLL:  It is 14443.
7        MR. BAUERMEISTER:  I am sorry.
8  It is 14428.
9        MR. CARROLL:  Oh.  I was on
10 41.  14428.
11       MR. BAUERMEISTER:  Okay.
12   Q.  Mr. Rush, the number in the
13 lower right-hand corner should be 042.
14   A.  Okay.
15   Q.  Do you recognize that, sir?
16   A.  Yes, I do.
17   Q.  And it is June 25, 2001 for
18 immediate release.  What is it?
19   A.  It is a press release.
20   Q.  And who is the press release
21 from?
22   A.  The Window Coverings Safety
23 Council.
24   Q.  And who is the contact person
25 listed in the press release?
```

Page 141

```
1                RUSH
2    A.  Natalie Klein at Sumner Rider &
3  Associates.
4    Q.  Is that the same Sumner Rider
5  Associates that was your employer?
6    A.  Yes, it is.
7    Q.  Are they still your employer
8  today?
9    A.  No, they are not.
10   Q.  Is it the same company with a
11 different name today?
12   A.  It is a subsequent company, yes.
13   Q.  What is the name of that
14 company?
15   A.  Kellen, K-E-L-L-E-N company.
16   Q.  And what business is Kellen in?
17   A.  Association management.
18   Q.  Is that their only business?
19   A.  They have divisions in
20 communications and in web design.
21   Q.  And when you say communications,
22 what do you mean?
23   A.  It is a broad range of
24 communications.  It is public relations.
25 It is also industry information, trade
```

**Page 142**

```
1            RUSH
2  show promotion, meeting promotion.
3     Q.  I am sorry.  You said public
4  relations, trade show promotion.  What was
5  the third one?
6     A.  Meetings promotion.
7     Q.  Meetings promotion?
8     A.  Yes.
9     Q.  So these are services to trade
10 associations?
11    A.  Trade associations and
12 professional societies.
13    Q.  Okay.  Do they do public
14 relations work for any other entities?
15    A.  They do some public relations
16 work for outside associations and a few
17 corporations.
18    Q.  Looking at 042, which you have
19 in front of you, would you read the second
20 paragraph for the record, please.
21    A.  "Although some 85 million
22 window blinds are sold each year, the
23 number of consumers who call the Consumer
24 Products Safety Council is only about one
25 million.  This means that millions of home
```

**Page 143**

```
1            RUSH
2  owners may still be using potentially
3  dangerous blinds."
4     Q.  Is that true, sir?
5     A.  I cannot verify that.
6     Q.  Why would Sumner Rider &
7  Associates send that out if it were not
8  true?
9     A.  I believe there is a note there
10 to check those numbers.
11    Q.  Do we have a document where that
12 number has been checked?
13    A.  I do not know if -- I -- if it
14 had been, it would have been produced.
15        MR. CARROLL:  Or for the
16 record, it would have been made available.
17    A.  Made available.
18        MR. CARROLL:  Plaintiff's
19 counsel decided what was to be produced.
20    Q.  All right, sir.
21        Could we look to the 052,
22 please.
23        MR. CARROLL:  12612.
24        MR. BAUERMEISTER:  Yes, sir.
25 That's correct.
```

**Page 144**

```
1            RUSH
2     A.  052, okay.
3     Q.  Mr. Rush, have you seen that
4  document before?
5     A.  I may have seen when it came in.
6     Q.  Okay.  It is carboned to you
7  down at the bottom, is it not?
8     A.  Yes.
9     Q.  It is a letter from who to who?
10    A.  I do not know who Fred Tanenbaum
11 is.
12    Q.  Okay.
13    A.  Vince Paul was vice president of
14 marketing of Joanna which was a window
15 covering producer.
16    Q.  Okay.  Would you read the last
17 two sentences of first full paragraph,
18 please?
19    A.  Of the last -- again
20 which -- which document?
21    Q.  The last two sentences of the
22 first full paragraph.
23    A.  "The association estimates that
24 the industry's approximately seven
25 manufacturers would face -- would be faced
```

**Page 145**

```
1            RUSH
2  with a conservative estimate of
3  approximately 3 million dollars to supply
4  the tassel with postage being the largest
5  cost.  Our question is what, if any, is
6  our legal obligation to such a settlement.
7  The association must respond to the CPSC
8  by May 7."
9     Q.  Okay.  Who is the association?
10    A.  At this point it would be Window
11 Coverings Manufacturers Association.
12    Q.  Okay.  And who at the WCMA
13 estimated that the industry approximately
14 seven manufacturers would be faced with a
15 conservative estimated costs of
16 approximately 3 million dollars to supply
17 the tassel with postage being the largest
18 cost?
19    A.  I cannot tell you.
20    Q.  What was your role in April of
21 1994 such that you would have received
22 this letter?
23    A.  I was the executive director of
24 the Window Covering Manufacturers
25 Association.
```

## Page 146

RUSH

Q. And is it possible that the association made this estimate of a 3 million dollar cost without you knowing about it?

A. I don't believe the association ever made an official estimate of anything.

Q. Can you tell me what this reference to the association is then?

A. I would think it is Mr. Paul's opinion as to what he thinks it might cost.

Q. Do you know why he would say the association estimates if it is in fact Mr. Paul estimating it?

A. Mr. Paul did not regularly participate in the association.

Q. Sir, could we look at page 063.

MR. CARROLL: 12478.

MR. BAUERMEISTER: That's correct.

A. 63, yes.

Q. Sir, have you seen this document before?

## Page 147

RUSH

A. I see the document, yes. I -- I would assume I have seen it before, but it is undated, so I can't tell you exactly.

Q. Well, that is exactly the question I was going to ask you. Are -- can you tell me the date or approximate time that this WCMA roster of members represents?

A. I would say sometime late '80s perhaps.

Q. Is it true that the roster of members for the WCMA vacillates with some repetition?

A. Yes, there were changes in membership of WCMA.

Q. Okay. Are some of the members that have been with it since its inception still there today?

A. As -- in terms of corporate successors to original members, yes, I believe there are at least one or two.

Q. Tell me who that is, please.

A. Hunter Douglas and Levolor Corporation, which is no longer Levolor

## Page 148

RUSH

but now part of Newell.

Q. Okay. Why is there so much turnover in the other members?

A. Because of buying and selling of the companies.

Q. Could we turn to 064, please.

MR. EARNHART: Is there a document number on what?

MR. CARROLL: I apologize. 12459.

MR. BAUERMEISTER: Yes, sir. That is correct.

Q. Mr. Rush, that is a letter dated May 16, 1997 to you as executive director of the WCSC, correct?

A. Yes, it is.

Q. Could you read the paragraph please of the letter?

A. "After careful review, we have decided not to participate in the 1997 WCSC public information program. This decision is based primarily on our need to direct our attention to the extraordinary requirements brought about by the led

## Page 149

RUSH

situation. Our participation in the 1998 program will be reviewed next year."

Q. And it is signed?

A. Ron Gitkin -- Ronald Gitkin, president.

Q. Of Jencraft Corporation?

A. Jencraft Corporation.

Q. Tell me what you know about Jencraft.

A. Jencraft was an importer of primarily vinyl blinds.

Q. What as the program they were being asked to participate in that they are declining here?

A. The corrective action program signed to by the Window Covering Safety Council and the Consumer Products Safety Commission.

Q. By not participating in that program, what difference does it make to their consumers?

MR. CARROLL: Calls for speculation on the part of the witness. If you know, you can answer.

Page 150

RUSH

A. To their particular consumers, it is -- I cannot answer for their corporation.

Q. Well, you wanted them to participate, right?

A. We -- we wanted all members -- all companies involved in the window covering industry to participate.

Q. Why is that?

A. Because the more participation we had the broader reach we felt we had and the -- and the overall program would be more successful.

Q. For the greater protection of the public that would be achieved, correct?

A. We would expect -- we would hope that the program would help increase public safety, yes.

Q. What does Jencraft have to do with the death of April Cox?

MR. CARROLL: I object to the form. You can answer.

A. I believe that the product

Page 151

RUSH

alleged is a Jencraft product.

Q. Sir, could you turn to 066, please.

MR. CARROLL: 12418.

MR. BAUERMEISTER: That's correct.

Q. Is this a list of the WCSC participants in 1994 and '97?

A. Yes.

Q. And there is two columns here. One is '94,'97 and one is '97 only. Can you tell me what that means?

A. That those companies only participated in that particular year..

Q. Okay. We show Jencraft in the only column down there about eight from the bottom, right?

MR. CARROLL: I believe the document has been mischaracterized. It is '94,'96 under which Jencraft is listed, not '97 only.

A. Yes, under 1994 through 1996 Jencraft is included.

Q. Excuse me. I am looking at 066.

Page 152

RUSH

MR. CARROLL: Yes, you just --

Q. Association -- I see. I see. I thought there was only one year at the top of the column. This column actually has multiple years in it. All right. I thought that the left column was 1994 through '97.

You tell me what this means because if -- if you have seen this before.

A. It just basically is a document which lists what companies participated during what period of time from '94 through '97.

Q. Okay. So these -- this full list on the left side here starting with three-day blinds, Wal-Mart is third from the bottom there, ends with Wilmar, those companies all participated in '94, '95, '96 and '97 with the WCSC?

A. That's correct.

Q. And on the right -- and there is only one yearly range on that whole

Page 153

RUSH

column. On the left side we actually have multiple yearly ranges; is that correct?

A. That's correct.

Q. But you have '97 only at the top, and then you've got '96 only, '94-'96 only, and '94-'95 only.

So tell me what each of those headings mean for the companies below the company of headings?

A. It means that the companies in those categories only participated with the WCSC during those particular years.

Q. Okay. Now we have got Jencraft under the 1994 through 1996 only, correct?

A. That's correct.

Q. So we could tell it didn't participate in 1997?

A. That's correct.

Q. Go to page 067, please.

MR. CARROLL: 11959.

MR. EARNHART: 959?

MR. CARROLL: 11959.

Q. Mr. Rush, is that a letter dated April 21, 1995?

39 (Pages 150 to 153)

```
                                              154
 1              RUSH
 2   A.   Yes, it is.
 3   Q.   And it is signed by you?
 4   A.   Yes, it is.
 5   Q.   And it is directed to Mr. David
 6  Smeltzer at the CPSC?
 7   A.   Yes, it is.
 8   Q.   All right.
 9        Could you read the second
10  paragraph for the record, please?
11   A.   "However, let me set the record
12  straight on several points raised in your
13  letter.  First importers are well
14  represented on the technical committee.
15  Newell and Kenny are primarily importers
16  and have -- and have ranked in the top ten
17  importers for the last ten years.
18  Springs, Kirsch and Joanna are also top
19  ten importers.  Those other importers who
20  are not present at the technical meetings
21  are not there by their choice.  This
22  process has been open from the beginning.
23  Getting companies to participate has been
24  the challenge.  Consumer participation is
25  welcome at the canvass level.  Any
```

```
                                              155
 1              RUSH
 2  consumer can be asked by supplying the
 3  name to WC -- WCMA.  However, individuals
 4  with commercial interests in any products
 5  must reveal that information upon
 6  submission of the name."
 7   Q.   Okay.  Now, why were you telling
 8  Mr. Smeltzer that getting companies to
 9  participate has been the challenge?
10   A.   There were a number of companies
11  who were not -- were not interested in or
12  did not feel they needed to participate in
13  this program.
14   Q.   What program are we talking
15  about?
16   A.   Window Coverings Safety Council
17  program and the corrective action program
18  with the Consumer Products Safety
19  Commission.
20   Q.   Okay.  Now, your sentence "those
21  other importers who were not present at
22  the technical meetings are not there by
23  their choice," what did you mean by that?
24   A.   This is referring to the
25  technical committee that anyone who was
```

```
                                              156
 1              RUSH
 2  not showing up for meetings, it was not
 3  because they were not invited but because
 4  they were not showing up.
 5   Q.   Okay.  Do you have statistics
 6  kept by the WCSC indicating what
 7  percentage of the industry players
 8  participated in this effort?
 9        MR. CARROLL:   Beyond the scope
10  of the notice.  I object.  Subject to
11  that, you can answer.
12   A.   No, we don't have specific
13  statistics.
14   Q.   Do you have any idea roughly
15  speaking whether you had 90 percent of the
16  players or 10 percent of the players or 50
17  percent of the players?
18        MR. CARROLL:   Again, to the
19  extent it involves WCSC, I object.  You
20  can answer.
21   A.   I would say that the WCSC
22  cumulatively may have represented about
23  between 75 percent and maybe 80 percent of
24  the total number of units.
25   Q.   I am sorry.  Total number of
```

```
                                              157
 1              RUSH
 2  what?
 3   A.   Units sold in a given year.
 4   Q.   Oh.  So that while there may be
 5  multiple manufacturers or dealers or
 6  importers, some are small players and some
 7  are larger players, you are giving me a
 8  weighted average for unit sales or --
 9   A.   Well --
10   Q.   Was that what your answer was
11  connected to?
12        MR. CARROLL:   I object to the
13  form of the question as vague, but to the
14  extent you understand it you can answer.
15   A.   The industry has small
16  players -- small players and large
17  players, yes.
18   Q.   Okay.  Do you know the total
19  number of companies that have been
20  involved in window covering manufacturing
21  or import in the eighteen years that you
22  have been involved in the industry?
23   A.   No, I do not.
24   Q.   Do you have any idea of that
25  number?
```

**Page 158**

RUSH

A. Total number, no. I -- I do not know that total number.

Q. Do we know if it is hundreds or thousands?

A. Probably would be closer to the hundred side.

Q. Do you have any idea of what the total number of members of WCMA have ever been out of those hundreds of industry players or hundred players?

A. Would you repeat your question?

Q. Yes, sir. Of the industry -- the companies that are importing or selling or manufacturing, what percentage of those companies have ever belonged to the WCMA?

A. In terms of total volume of products or just in terms of total number of companies that are out there?

Q. Given us both numbers if you can help us with both.

MR. CARROLL: Let me object to the extent the question is ambiguous because I don't know what time frame we

**Page 159**

RUSH

are talking about, since the WCMA has been around for many years.

A. Well, the --

MR. CARROLL: If you understand it, you can answer.

A. No -- answering for the WCSC has represented on aggregate somewhere between 70 and 75 percent of the unit products sold in the United States as part of the original corrective action plan. In terms of number of the companies involved in the business, the number of smaller marginal players I can't really speculate how many of those are out there.

Q. Okay. How about for the WCMA?

A. Well, WCMA's by-laws have restricted membership to companies who manufacture product in North America.

Q. And how many such companies are there of that type at present?

A. At present in 2005 -- 2006, I believe there are three companies who manufacture in North America.

Q. And how many of those companies

**Page 160**

RUSH

belong to the WCMA?

A. All three.

Q. Okay. How about ten years earlier?

A. Independent companies who manufactured in North America, there may have been eight or nine.

Q. And how many belong to the WCMA?

A. Pretty much all of them.

Q. All right. Sir. Could you turn to page 068, please.

MR. CARROLL: 11936.

Q. Mr. Rush, by my watch, we have been going about an hour. I would rather get done earlier today than later. On the other hand, I don't want you to feel either rushed or tired any more than necessary.

If you want to take a break at any point, I want to remind you that is your right, and I will acquiesce in any request for a break that you have.

MR. CARROLL: Let's go off for just a second because somebody called the

**Page 161**

RUSH

conference room.

THE VIDEOGRAPHER: The time is 2:06 p.m. We are off the record.

(Discussion held off the record.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:12 p.m.

BY MR. BAUERMEISTER:

Q. Mr. Rush, we are looking at page 068 of Exhibit 11.

A. Yes.

Q. That is a memorandum from you to several company representatives; is that right?

A. That's correct.

Q. In fact, you are writing for the gentlemen working for Three Day Blinds, Pier One Imports, J.C. Penney and Hunter Douglas?

A. That's correct.

MR. EARNHART: What is the number on the document?

MR. CARROLL: Same one as we finished with, 119367.

### Page 162

```
                        RUSH
 1
 2    Q.   And you are writing as Peter
 3   Rush, WCSC executive director on November
 4   21, 1995; is that correct?
 5    A.   That's correct.
 6    Q.   And concerning your response to
 7   the CPSC November 7 letter?
 8    A.   Yes.
 9    Q.   Okay. Now, the first line there
10   is "Following is our response to CPSC's
11   'Investigation' of retail distribution,"
12   and it is the letter that follows that
13   your response?
14    A.   Yes, it is.
15    Q.   Okay. What was the CPSC's
16   investigation that you are responding to?
17    A.   CPSC had -- had visited several
18   stores in the metropolitan Washington
19   area. So it was not a formal
20   investigation rather it was anecdotal
21   information at which point the major
22   concern they had was that the display
23   models of units of window coverings in
24   those stores did not have the
25   corrective -- correct -- corrective action
```

### Page 163

```
                        RUSH
 1
 2   program product on display.
 3    Q.   And was that complaint accurate
 4   or not accurate?
 5    A.   I did not investigate it
 6   personally, but what I came to find out
 7   was in fact that it was probably accurate
 8   in terms of the display models. However,
 9   all the products on the shelves did comply
10   with the corrective action program.
11    Q.   Now, what was the problem with
12   the display models?
13    A.   Is that that they had not yet
14   been changed out.
15    Q.   So they were still defective
16   products?
17    A.   It --
18         MR. CARROLL:  I object to the
19   form.
20    A.   They for the most part still had
21   loop cords.
22    Q.   Does that mean they were
23   defective?
24    A.   That meant --
25         MR. EARNHART:  Legal
```

### Page 164

```
                        RUSH
 1
 2   conclusion.
 3    A.   That meant that they did not
 4   comply with the corrective action plan.
 5    Q.   In your opinion as the director
 6   of the two organizations, the
 7   CPSC -- excuse me -- the CPSC and the
 8   Window Covering Manufacturers
 9   Association -- excuse me -- WCSC, were
10   those products defective?
11         MR. CARROLL:  I object to the
12   extent it calls for a legal conclusion.
13   You can answer.
14    A.   Well, in as much as those
15   products were not for sale, since they
16   were display models only I don't know
17   whether that would really apply.
18    Q.   Okay. So exhibiting defective
19   products to the public that aren't for
20   sale makes them nondefective?
21         MR. CARROLL:  I object, form.
22   Argumentative.
23    A.   The products that were for sale
24   did comply with the corrective action
25   plan.
```

### Page 165

```
                        RUSH
 1
 2    Q.   Ultimately were the improper
 3   product displays changed out?
 4    A.   Yes, they were.
 5    Q.   Did you have any participation
 6   in making sure that happened?
 7    A.   No, I did not.
 8    Q.   Who did?
 9    A.   That is a -- that was between
10   the individual manufacturer and retailer.
11    Q.   Okay. Could we look at 075,
12   please.
13         MR. CARROLL:  11308.
14    Q.   Could you tell us what that is,
15   Mr. Rush?
16    A.   It is a letter to the Window
17   Covering Safety Council from me regarding
18   the corrective action plan of 2000 which
19   the Window Covering Safety Council and the
20   industry undertook the manufacturing
21   change to include the inner cord stop ball
22   as well as to relaunch the public
23   information and education program.
24    Q.   Okay. Now, the last sentence of
25   the first paragraph in your memo says,
```