166

RUSH

1  "CPSC is concerned that since the
2  voluntary corrective action went into
3  effect in 1994 there have been 60 deaths."
4  Is that correct?
5      A.  Yes, that is what it says.
6      Q.  And is that number correct, were
7  there 60 deaths?
8      A.  I will assume at this time,
9  2000, I was -- I would accept that that
10 was the correct number.
11     Q.  Okay.  Now, the first sentence
12 of the third paragraph reads, "Many
13 companies have not focused on this issue
14 for a number of years."
15         What did you mean by that?
16     A.  Have not focused on the Window
17 Covering Safety Council public information
18 and education program.
19     Q.  Well, I thought companies were
20 participating in this corrective action
21 program.  How could they not be focused on
22 the issue?
23     A.  They can participate but not
24 necessarily be focused on it.

167

RUSH

1      Q.  What does that mean?
2      A.  It was not a prime issue for a
3  number of companies.
4      Q.  The sentence after that reads
5  "However, significant government action is
6  very likely in the near future."  That is
7  your sentence?
8      A.  Yes, it is.
9      Q.  And why were you telling them
10 that?
11     A.  Because we were in the process
12 of negotiating a new corrective action
13 plan.
14     Q.  What is the single large black
15 letter word at the middle at the top of
16 this memo?
17     A.  Urgent.
18     Q.  Why did you put that up there?
19     A.  To get the attention of the
20 membership.
21     Q.  And what is urgent?
22         MR. CARROLL:  I object to
23 form.  You can answer if you understand
24 it.

168

RUSH

1      A.  Two issues.  One sis that they
2  participate in the organization.  Secondly
3  to make certain that they are paying their
4  dues.
5      Q.  And was it urgent that
6  significant government action is very
7  likely in the near future?
8      A.  That was one of the elements,
9  yes.
10     Q.  How is that an element of
11 urgency?
12     A.  Companies, if they wanted to
13 participate in the discussion, would have
14 to be participatory and would have to be
15 members.  The companies that were members
16 were actively participating in all of the
17 discussions we had with the government.
18     Q.  Is one of the purposes of
19 voluntary participation in standard
20 setting by an organization like the WCMA
21 the avoidance of government action?
22         MR. CARROLL:  I object to the
23 form.  You can answer.
24     A.  Not necessarily.  Under the

169

RUSH

1  Consumer Product Safety Commission law,
2  Consumer Product Safety Commission is
3  encouraged to work with industry and to
4  adopt industry standards where applicable.
5  The U.S. Consumer Product Safety
6  Commission in discussion with us urged the
7  Window Covering Manufacturers Association
8  to become a standards writing
9  organization, but there are many standards
10 out there that have nothing to do with a
11 government action.
12     Q.  So in your view the industry is
13 not really concerned with government
14 regulation as much as getting standards
15 that are useful to the industry and the
16 public set?
17         MR. CARROLL:  I object.  It
18 mischaracterizes the witness' testimony.
19 Subject to that, he can answer.
20     A.  No, the industry from the
21 beginning has been voluntarily cooperating
22 with the government to address issues that
23 they brought before us, and we -- the
24 industry has responded very quickly and

170

```
1        RUSH
2   and has cooperated with the Consumer
3   Products Safety Commission at every turn.
4       Q.   But in your view that is because
5   they are trying to do the right thing, not
6   because they are afraid of urgently
7   avoiding government regulation?
8       A.   I -- we were not at all
9   concerned about urgently avoiding
10  government regulation.
11      Q.   If you turn to 076, me.
12          MR. CARROLL:   11304.
13      Q.   Is that an April 18 letter from
14  Peter Rush?
15      A.   2001.
16      Q.   And to Mr. Drew Bentley,
17  president of Marietta Drapery and Window
18  Coverings?
19      A.   Yes, it is.
20      Q.   Would you read the third
21  paragraph of your letter to Mr. Drew
22  Bentley, sir?
23      A.   "Until deaths from window
24  coverings are at zero, the industry will
25  continue to be under the threat of ongoing
```

171

```
1        RUSH
2   regulation. I am certain that Marietta
3   Drapery continues to believe that its
4   contribution of 2500 dollars annual is an
5   insignificant price in potentially
6   preventing the death of a young child".
7       Q.   Would you tell the jury, sir,
8   what is the threat of ongoing regulation?
9       A.   That under the consumer product
10  safety, they always had the power to go
11  under a rule 15 rule making that was
12  always available to them. However, they
13  never did undertake that because of the
14  actions that the industry continued to do.
15      Q.   Could you explain to us please
16  how an industry is under the threat of
17  ongoing regulation? What does that mean?
18      A.   Any industry or a company who
19  sells a product in the United States that
20  comes under the perview of the U.S.
21  Consumer Products Safety Commission is
22  always under the threat of regulation.
23      Q.   Threats are all something we all
24  seek to avoid, aren't there?
25          MR. CARROLL:   Argumentative.
```

172

```
1        RUSH
2   Form. You can object -- I mean you can
3   answer.
4       A.   Personally, I don't particularly
5   like them. No.
6       Q.   Okay. So why do we want to
7   avoid ongoing regulation?
8       A.   There was -- we were not being
9   regulated at that point, and in fact the
10  voluntary standards approach with
11  cooperation of the U.S. Consumer Products
12  Safety Commission and their participation
13  not only would allow us to get a standard
14  to the public sooner it would probably be
15  more complete, and if Consumer Product
16  Safety Commission found it to be -- meet
17  their criteria that they would be the
18  organization that had the enforcement
19  power of that standard.
20      Q.   That might cost your members
21  money, mightn't it?
22          MR. CARROLL:   I object to the
23  form.
24      A.   Would you repeat the question?
25          MR. BAUERMEISTER:   Madam
```

173

```
1        RUSH
2   reporter, would you read the question back
3   to the witness, please.
4           (Record read.)
5           MR. CARROLL:   And if you
6   didn't hear that, I'll object.
7   Argumentative, form. You can answer.
8       A.   I do not ever remember a
9   question of cost being brought up in a
10  meeting.
11      Q.   Turn to 077, please.
12          MR. CARROLL:   11306.
13      Q.   Is that a letter draft from you,
14  Mr. Rush?
15      A.   Yes, it is.
16      Q.   Do you know who that was to be
17  sent to?
18      A.   Members of the Window Covering
19  Safety Council.
20      Q.   Okay. Could you read the first
21  sentence of the second paragraph from the
22  end beginning with "the first reason"?
23  Actually read that whole paragraph,
24  please.
25      A.   "The first reason is the
```

174

RUSH

existing campaign has been so successful in reaching households with potential situations that we have spent over 350,000 dollars in hot line and fulfillment costs alone. We are still running at nearly 10,000 inquiries a month. Two, there are still hundreds of millions of products in place in households around the country. Three, tragically there have already been three deaths in this -- in this year already with window covering products. Four, the window covering industry is committed to safety and does not want any child to be injured with our products."

Q. You wrote that paragraph, correct?

A. Yes, I did.

Q. Who spent 350,000 dollars in hot line and fulfillment costs?

A. The Window Covering Safety Council.

Q. Where did they get that money?

A. From its members.

Q. Now, this indicates they are

175

RUSH

running at 10,000 inquiries a month?

A. Yes, that is what it indicates.

Q. That would be about 120,000 dollars inquiries a year?

A. I -- with that math, yes.

Q. And that costs about 350 dollars to get that type of inquiry response?

A. Yes, it did.

Q. And then in point two you say there is still hundreds of millions products in place in households around the country; is that right?

A. Yes.

Q. 10,000 inquiries a month will never reach hundreds of millions of product placements, will it?

A. Eventually it will.

Q. How long would that eventually be?

A. The issue for the industry of course was that potentially affected subsets of the number of households that have products was substantially smaller than a hundred -- the hundreds of

176

RUSH

millions. Secondly is that each inquiry represented multiple windows rather than one single window.

Q. And when you say eventually that will reach these folks, how long is the Window Covering Manufacturers Association willing to wait to reach out to people who have these dangerous products in their home?

MR. CARROLL: I object to the form. You can answer.

A. Window Covering Manufacturers Association was not doing anything on the public information and education program.

Q. How about the WCSC?

A. WCSC was actively involved in a public information and education program.

Q. Now, has a program of some type of education been going on for more than 20 years?

A. A public information and education program began in 1994.

Q. So about 12 years?

A. Yes.

177

RUSH

Q. What percentage of households that have these products that threaten the lives of very young children have been contacted with this information?

MR. CARROLL: I object to form. You can answer.

A. I do not have that information.

Q. So the WCMA does not know that?

A. The WCMA does not know that.

Q. The WCSC does not know that?

A. We do not know that either.

Q. All right, sir.

Turn to 078, please.

MR. CARROLL: 12768.

Q. Now, this document says "Draft only. Not for use" in the upper right-hand corner; is that right?

A. Yes, it does.

Q. And was this document just a draft that was never used?

A. Yes, it is.

Q. All right.

If you turn to 081, please.

MR. CARROLL: 12756.

45 (Pages 174 to 177)

178

1  RUSH
2  Q.  Can you tell me what this
3  document is, sir?
4  A.  It seems to be a -- an article
5  from a trade magazine, a window fashions
6  magazine.
7  Q.  Okay.  Does it have a WCMA
8  production number of 12757?
9  A.  Yes it does.
10 Q.  Why was this in your file?
11 A.  Because we probably put it in
12 the file as a -- we tend to document any
13 coverage that we have gotten of -- of the
14 issue over the years.
15 Q.  Okay.  Now, if you would read
16 the last sentence of the second paragraph.
17 A.  "But beyond advising means to
18 secure cords out of reach -- out of
19 children's reach.  CPSC and WCMA are
20 working together to develop safety devices
21 which are a part of the window covering
22 itself."
23 Q.  Okay.  Was the Window Covering
24 Manufacturers Association working to
25 develop safety devices that are part of

179

1  RUSH
2  the window covering itself?
3  A.  No.
4  Q.  So this is incorrect?
5  A.  That is incorrect.
6  Q.  Right.  And this special report
7  is written by Lenia C. Addison?
8  A.  Yes.
9  Q.  Who is that?
10 A.  I do not recall.
11 Q.  Okay.  Let's look at page 082,
12 please.
13    MR. EARNHART:  What is the
14 Bates number?
15    MR. CARROLL:  12757.
16 Q.  Could you read the first full
17 paragraph of that page, please?
18 A.  "Indeed the Window Covering
19 Manufacturers Association has already
20 begun work on ANSI, American
21 Standard -- National Standards Institute
22 safety standard for window covering
23 products.  According to Peter Rush,
24 executive secretary for WCMA, the
25 technical committee will actually be

180

1  RUSH
2  involved in the writing of the standard on
3  a performance basis, meaning it will
4  explain what the product has to do, but it
5  it will not tell manufacturers how to make
6  the product.  When the ANSI standard is
7  approved, it will be adopted by the CPSC."
8  Q.  Now, are you Peter Rush,
9  executive secretary to the WCMA at this
10 time?
11 A.  Actually my title at this point
12 was executive director.
13 Q.  Do you recall a conversation
14 with Lenia C. Addison before this article
15 was published?
16 A.  I don't recall it specifically,
17 no.
18 Q.  Do you know whether or not you
19 would have said that the technical
20 committee will be actually involved in
21 writing the standard on a performance
22 basis, meaning it would explain what the
23 product has to do?
24 A.  That is the nature of an ANSI
25 specification.  So yes, that is true.

181

1  RUSH
2  Q.  Okay.  Did you write or call
3  Ms. Addison when you received this article
4  to explain to her that she had made an
5  error on the first page of the article in
6  saying that the CPSC and WCMA are working
7  together to develop safety devices?
8  A.  No, I did not.
9  Q.  Why not?
10 A.  I didn't call her to tell her
11 that CPSC and Window Covering
12 Manufacturers Association are warning
13 parents, which would have been the window
14 covering -- safety council or that O.B.
15 Kelly was in fact the president of Window
16 Covering Safety Council, not the Window
17 Covering Manufacturers Association.  So
18 this was already in print.  It really did
19 not make much difference to try to correct
20 her at this point but rather to try and
21 correct information going forward.
22 Q.  All right, sir.
23    Could you look at 083, please.
24    MR. CARROLL:  24386.
25 Q.  Do you recognize that letter,

**Page 182**

```
1            RUSH
2   Mr. Rush?
3      A.   Yes, I do.
4      Q.   You wrote it on December 22,
5   1995 to Mr. Michael McCullough at Window
6   Concepts?
7      A.   Yes, I do.
8      Q.   What was the purpose of the
9   letter?
10     A.   To try and enlist their support
11  for the Window Covering Safety Council.
12     Q.   Could you read the last
13  paragraph, please?
14     A.   "While I appreciate the concerns
15  you have regarding costs, you and your
16  manufacture -- and your manufacturers must
17  look at this issue based upon the
18  potential liability and other costs you
19  will incur by not participating in this
20  program. Our costs for 1996 are 50
21  percent less per unit than in 1995. I
22  urge you to consider all the potential
23  ramifications of nonparticipation in the
24  next year of the program."
25     Q.   Why did you tell Mr. McCullough
```

**Page 183**

```
1            RUSH
2   the things in that paragraph?
3      A.   Which specifically?
4      Q.   Okay. You say you appreciated
5   the concerns he had concerning costs.
6   What concerns were those?
7      A.   Everything is a cost. They did
8   not particularly want to spend money.
9      Q.   They didn't want to spend money
10  on making window coverings safer?
11     A.   You would have to ask him that
12  question.
13     Q.   Well, but you wrote to him
14  saying "While I appreciate the concerns
15  you have regarding costs." What did you
16  mean when you wrote that?
17     A.   That he was not going to renew
18  his membership in the Window Covering
19  Safety Council.
20     Q.   That is the only cost you are
21  referring to?
22     A.   Yes.
23     Q.   You then say "You and your
24  manufacturers must look at this issue
25  based upon the potential liability and
```

**Page 184**

```
1            RUSH
2   other costs you will incur by not
3   participating in the program." What did
4   you mean by that?
5      A.   Potential liability. We told
6   each of our member companies they should
7   consult with their own attorneys to decide
8   what that was. Not participating in the
9   program opened them up to potentially for
10  having to recreate the program on their
11  own totally at their own cost.
12     Q.   Was part of the mission of the
13  Window Covering Manufacturers Association
14  to assist its members in limiting
15  potential liabilities?
16     A.   No.
17     Q.   How do you know that?
18     A.   It would probably be -- fall
19  under the antitrust rules that we could
20  not participate in any such activity as a
21  joints basis.
22     Q.   Tell me the kind of activity you
23  could not participate in.
24     A.   Anything covered under the U.S.
25  antitrust laws, including any discussion
```

**Page 185**

```
1            RUSH
2   of price, terms of sale, channels of sale,
3   any collective actions that would
4   potentially impact the market, any
5   collusion of any sort. It is a fairly
6   broad statute.
7      Q.   Well, when you refer to
8   potential liability in this sentence,
9   aren't you talking about manufacturers
10  being liable for deaths their products
11  caused to children?
12     A.   I am not speaking specifically
13  of that, no.
14     Q.   What are you speaking about?
15     A.   Of any product liability that
16  you might have as a manufacturer.
17     Q.   Go to 084, please.
18         MR. CARROLL:  The next page in
19  the index, 24387.
20         MR. BAUERMEISTER:  That's
21  correct.
22     Q.   This is a memo to John Baker
23  from Peter Rush dated February 6, 1997; is
24  that correct?
25     A.   Yes, it is.
```

Page 186

```
1         RUSH
2    Q.   And under the first bullet it
3  states, "label number 1: According to
4  standard, Products without bottom rails or
5  in your case too small to fit a label
6  shall be labeled at a location visible to
7  consumers to be determined by manufacturer
8  or importer." Is that correct?
9    A.   Yes, that is what it says.
10   Q.   Okay. Now, what are we talking
11 about there?
12   A.   Compliance with the ANSI
13 standard.
14   Q.   Okay. So tell me what a product
15 without a bottom rail is?
16   A.   A vertical blind that does not
17 have a bottom rail.
18   Q.   Okay. And it says "shall be
19 labeled in location visible to consumers."
20 Where would you label a vertical blind so
21 consumers could see the label?
22   A.   That would be determined by the
23 manufacturer or the importer.
24   Q.   Okay. Has labeling blinds been
25 a difficult problem because of the limited
```

Page 187

```
1         RUSH
2  number of places the labels could be
3  placed?
4        MR. CARROLL:   I object to the
5  form. You can answer.
6    A.   I have not heard any complaints
7  about ability to label or comply with the
8  standard.
9    Q.   Have you had any survey of
10 consumer response to labels placed on the
11 bottom of the rail at the bottom of a mini
12 blind?
13   A.   No.
14   Q.   Do you have any information that
15 consumers tend not to read labels on the
16 bottom of the rail on the bottom of a mini
17 blind?
18   A.   No, I do not.
19   Q.   No one has ever brought that to
20 your attention before today?
21       MR. CARROLL:   I object to the
22 fact it hasn't been brought to his
23 attention yet because there is no evidence
24 supporting that, but subject to that he
25 can answer.
```

Page 188

```
1         RUSH
2    A.   No, I have no information on
3  that subject.
4    Q.   All right, sir. Go to page 087,
5  please.
6        MR. CARROLL:   23963.
7        MR. BAUERMEISTER:   Yes, sir.
8    Q.   And this document runs all the
9  way over to 095.
10   A.   87.
11   Q.   Do you know what this document
12 is, Mr. Rush?
13   A.   Give me a minute to read it.
14   Q.   All right.
15       (Pause.)
16       MR. CARROLL:   While he is
17 reading, I'll just go ahead and put an
18 objection on the record. It does not look
19 like a document at all but rather
20 nonconsecutive Bates numbers cobbled
21 together.
22       (Pause.)
23   A.   Okay.
24   Q.   Do you recognize what these
25 pages are from?
```

Page 189

```
1         RUSH
2    A.   The best I can tell is they are
3  a variety of notes taken at different
4  times. I can't even tell that all these
5  times are consecutive. I do not know
6  about the first page.
7    Q.   Do you recognize the printing of
8  any of the pages?
9    A.   The first page I do not
10 recognize.
11   Q.   Right.
12   A.   The other -- let's see 088, 089,
13 090, 091 and 092 I would say maybe 093 I
14 am -- I am not positive, but I can -- of
15 who they belong to, but I do believe they
16 belong to Maria Ungaro.
17   Q.   Could you spell that name for
18 us, please?
19   A.   U-N-G-A-R-O.
20   Q.   Who was Maria Ungaro?
21   A.   She was a program director for
22 me at WCSC.
23   Q.   Do you know why these notes
24 would have been in production materials
25 from the association?
```

190

```
1           RUSH
2    A.  Because when we were subpoenaed
3  to supply all information, we supplied all
4  information.
5    Q.  Why would the notes of the WCSC
6  meetings be in the WCMA production
7  materials?
8    A.  I believe that all of the
9  materials that were supplied to King &
10 Spalding covered both organizations.
11   Q.  And why did you do that?
12   A.  Under subpoena.
13   Q.  All right, sir.
14       If we could look at 090, please.
15       MR. CARROLL:  24012.
16       MR. BAUERMEISTER:  What was
17 that, Jamie?
18       MR. CARROLL:  24012.
19       MR. BAUERMEISTER:  Okay.  That
20 is sort in the middle of the page.
21   Q.  Actually I wanted to go to 092,
22 which would be 24092, and we are looking
23 at tab 11.
24   Q.  Mr. Rush, do you know if you
25 participated in a meeting at which
```

191

```
1           RUSH
2  Ms. Ungaro took these notes?
3    A.  I would say yes, I did.
4    Q.  Okay.  And down here there is a
5  note "Peter-send names recalcitrant
6  players."  What does that refer to?
7    A.  Companies who are not
8  participating in the Window Coverings
9  Safety Council.
10   Q.  And what -- what names for
11 recalcitrant players were you trying to
12 identify?
13   A.  I would have to go back and look
14 at the time periods that this was written
15 in, but companies who had not renewed
16 Window Coverings Safety Council
17 participation.
18   Q.  Okay.  Let's look at the next
19 page 093.
20       MR. CARROLL:  24015.
21   Q.  Now, this document has a date on
22 it, correct?
23   A.  Yes, it does.
24   Q.  6/2/2000?
25   A.  That is correct.
```

192

```
1           RUSH
2    Q.  All right.
3        Do you have any reason to
4  believe that is not the date this document
5  was created?
6    A.  I have no reason not to believe
7  that that is a correct date.
8    Q.  Okay.  There is a question or
9  rather it looks like a statement "Peter,
10 can we advertise cordless?"
11       Did you make such a statement at
12 a meeting?
13   A.  I think that is a question.
14   Q.  You were asking could we
15 advertise cordless?
16   A.  Yes.
17   Q.  Why was that being asked?
18   A.  Was there enough product in the
19 marketplace.
20   Q.  Okay.  An then under that it
21 says "Alan says yes," and then under Peter
22 it says "Recall, a legal term."
23       Do you know what you are talking
24 about there?
25   A.  No -- what specific -- what the
```

193

```
1           RUSH
2  specific legal definition of recall is.
3    Q.  And why was that being
4  discussed?
5    A.  Because we were about to work
6  out a recall to repair.
7    Q.  Okay.  And then the next longer
8  entry next to the name Peter, could you
9  read that for the record, please?
10   A.  "Importers and retailers will
11 resist 90 days products on sea.  40
12 million, 3 to 4 million.
13   Q.  Okay.  What do your comments
14 "importers and retailers will resist"
15 mean?
16   A.  That importers and
17 retailers -- importers of products who had
18 had product in transit might resist a
19 specific date for the changeover of
20 production.
21   Q.  And it say 90 days of products
22 on sea.  What does that mean?
23   A.  That that was an approximate
24 time of -- between shipment and delivery
25 of product coming from the Orient.
```

**Page 194**

RUSH

Q. And then you say, 40 million and then 3-4 million. What did those numbers mean?

A. That I do not recall.

Q. Will that be the number of products, that 40 million?

A. That would be an annual production probably, so that is -- that is too high.

Q. So it states importers and retailers will resist 90 days of products on sea, 40 million and then 3-4 million, but you don't know what that means?

A. No, not specifically. I do not recall.

Q. Okay. Look at 094, please.

MR. CARROLL: 24021.

Q. Now, there we have a different date up at the top. It looks like 5/5/00; is that right?

A. Yes, it is.

Q. So this might have been notes from a meeting before the meeting of the page that preceded it; is that correct?

**Page 195**

RUSH

A. That is what it looks like.

Q. Okay. There is a large arrow under -- at the top there is Peter Rush with a phone number and then an arrow "doesn't pass the choke test."

Can you tell me what that means, please?

A. Yes, the original product fix that the Consumer Products Safety Commission proposed did not meet its own standards for choking hazard.

Q. And what standard are we talking about?

A. It is a toy safety standard.

Q. Okay. Then there is a note by Peter, "180 days to change new production of imported blinds." What did you mean by that?

A. That that would be the approximate time it would take to totally change production of products based upon what I was told by the importers.

Q. So that is about six months?

A. That is about six months.

**Page 196**

RUSH

Q. And then below that it says, "For six months no internal cord production." Is that right?

A. That is what it says, yes.

Q. What did you mean by that?

A. I do not recall. Just it would take them that long to manufacture and get into production, this change.

Q. So for six months they would be without any produced internal cord products?

A. At this point, I would say there is not an agreement in place, so there is no particular deadline one way or another.

Q. Doesn't the specter of six months of nonproduction cause manufacturers to fear for loss of profits?

MR. CARROLL: I object to the form. You can answer.

A. I would assume it would, yes.

Q. Now, your name next appears under the Fed Ex thing. It says Peter -- could you read what follows there, please?

A. "If not installed at OEM."

**Page 197**

RUSH

Q. And.

Below that?

A. "3 million on water."

Q. Okay. What does "if not installed on OEM" mean?

A. It would go back to the comment above of Alan, which would have been Alan Schoen, that a sticker lable on the outside with the fix and a warning in a package was his proposal for product that was not already installed.

Q. What does OEM mean?

A. Original equipment manufacturer.

Q. Okay. So does your comment mean if the original equipment manufacturer doesn't install that label, there will be 3 million on the water -- three million products at sea coming in that don't have a fix?

A. That would be a guess.

Q. Where did you get that guess?

MR. CARROLL: I would ask you not to guess.

A. I can't tell you where I got it

**Page 198**

```
 1              RUSH
 2   at the time.
 3       Q.  Okay.  Page 096, please.
 4       MR. CARROLL:   23858.
 5       Q.  Now, this document begins with
 6   the line stating "suggested Peter Rush
 7   sound bites for VNR."
 8           Can you tell our jurors what VNR
 9   is, Mr. Rush?
10       A.  It is a video news release.
11       Q.  Okay.  Is that something to be
12   placed on network news or cable news or
13   all of that?
14       A.  It is sent out for news -- to
15   news stations to decide upon its -- its
16   value as a news item.
17       Q.  Okay.  Could you read the third
18   paragraph to us, please?
19       A.  "Because cords of any kind can
20   pose a danger to young children, the
21   Window Covering Safety Council, encourages
22   parents to consider using cordsless blinds
23   in rooms where children sleep or play."
24       Q.  When -- did you record a sound
25   bite making that statement and was it put
```

**Page 199**

```
 1              RUSH
 2   over the air?
 3       A.  I believe I did record this, and
 4   it would probably have been as part of
 5   the -- after 2000.
 6       Q.  Okay.  And is it your feeling as
 7   you sit there today that parents should
 8   consider using cordless blinds in rooms
 9   where children sleep or play?
10       A.  I do, and -- and or the wide
11   variety of other window covering products
12   that they can use such as curtains,
13   shutters, roll up blinds.
14       Q.  Okay.  And why do you have that
15   opinion?
16       A.  We have -- as a representative
17   of the Window Covering Manufacturers
18   Association and as a message of the Window
19   Covering Safety Council, we believe that
20   some of the cords -- the cordless product
21   is a safer alternative than the
22   traditional corded product.
23       Q.  Sir, could you get the other
24   notebook, which is notebook number 1, and
25   look at tab 3 or page 025.
```

**Page 200**

```
 1              RUSH
 2       A.  Tab 3,. 025.
 3       MR. CARROLL:   This is
 4   a -- from the Window Covering Safety
 5   Council web site, so it wasn't produced by
 6   us.  It is 2/13/06 is the date it was
 7   printed.
 8       Q.  Mr. Rush, do you recognize that
 9   document?
10       A.  I recognize the look of the
11   document, yes.  It is from the Window
12   Covering Safety Council web site.
13       Q.  So you can go on the web site,
14   and you can find this window covering,
15   learn how to keep your children safe
16   section, and then you can actually play
17   this audio clip by clicking on that icon
18   there, correct?
19       A.  That's correct.
20       Q.  Have you done that?
21       A.  I cannot say I have done it
22   recently.
23       Q.  Do you know what the audio clip
24   says?
25       A.  What the current one says?
```

**Page 201**

```
 1              RUSH
 2       Q.  Yes, sir.
 3       A.  I do not recall it by memory.
 4       Q.  Does Karen Jennings appear on
 5   that clip?
 6       A.  On the audio clip, I -- she has
 7   recorded one.  Whether that is the current
 8   one up there, I cannot tell you.
 9       Q.  Have you heard one that she
10   records where she says "kids and cords
11   don't mix"?
12       A.  Yes, I do.
13       Q.  And tell me why kids and cords
14   don't mix?
15       A.  Well, as the U.S. Consumer
16   Products Safety Commission has established
17   over the years, any cord in the hands of a
18   young child is potentially dangerous such
19   as with clothing, toys, and many other
20   products that CPSC has worked with
21   industry to eliminate.  The same thing
22   with the window covering cord.
23       Q.  Do you believe along with Carol
24   Jennings that kids and cords don't mix?
25       A.  In fact, it is a -- it has been
```

## Page 202

RUSH

the major theme of the window covering safety month over the last four years.

Q. All right, sir.

If we could go back to the other notebook. We are at tab 11. I want to look at page 098.

MR. CARROLL: 23842.

MR. BAUERMEISTER: That's correct.

Q. Mr. Rush, I note on my watch here that we have been going about an hour again. Would you like a break or shall we go ahead and continue?

A. Yes, let's take a break.

THE VIDEOGRAPHER: The time is 3:01 p.m. and we are off the record.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:12 p.m.

BY MR. BAUERMEISTER:

Q. Mr. Rush, are you ready?

A. Yes.

Q. All right, sir.

You should have in front of you

## Page 203

RUSH

the second notebook with the tab 11, page 098 before you.

A. Yes.

Q. This is a document produced by the WCMA as 0023842.

Do you recognize this document?

A. Yes, I do.

Q. What is it?

A. It is a draft press release from the Consumer Products Safety Commission, which would be jointly with the Window Covering Safety Council announcing the recall and repair with the fix of the inner cord.

Q. Okay. So the CPSC and the WCMA or WCSC are working together on this release?

A. That's correct.

Q. And are these your draft notes on the release?

A. Yes, they are.

Q. Okay. Could you read for us the paragraph that begins "Last year," the kind of big paragraph or before the last

## Page 204

RUSH

one on the page.

A. "Last year CPSC began a new investigation of window blind deaths. In an extensive review of incidents, CPSC found that children could also become entangled in the inner cords that are used to raise the slats of blinds. This entrapment occurs when a young child pulls on the inner cord, and it forms a loop that can hang the child. All of these deaths involve children in either cribs placed next to windows. In most cases the outer pull cords were placed out of reach, but the children strangled when they pulled on the inner cord of the blind. The strangulation victims ranged in age of nine months to seventeen months."

Q. Could you read the next paragraph as well, sir?

A. "As a result of the new CPSC investigation, the industry has agreed to further redesign window blinds. Newly manufactured blinds will have attachments on pull cords, so that the inner cord

## Page 205

RUSH

can't form a loop if pulled by a young child. Consumers with existing blinds should have them repaired. The repair can be done in minutes without removing the blinds."

Q. Now, this replease was sent to you before the CPSC released it to the public; is that correct?

A. That's correct.

Q. And they wanted your notations and changes for their consideration before the release; is that correct?

A. Yes, it was ultimately their release however.

Q. Okay. And the two paragraphs that you read, were those ultimately released to the public?

A. I don't have the final draft in front of me, and whether they put the minor editorial changes we suggested I do not recall.

Q. Okay. But the substance of what you just read was released to the public. CPSC released shortly after you did these

**Page 206**

```
 1              RUSH
 2  notes; is that correct?
 3     A.   Yes, that's correct.
 4     Q.   Okay. Now, the date on this in
 5  the upper left top is shown as I guess
 6  there is a -- mine has got kind of a half
 7  line that looks like a fax indicator
 8  showing 10/15/2000, 17:58.
 9          Can you read that on yours?
10     A.   Yes, it says October 15, 2000.
11     Q.   Okay. It looks like it is a fax
12  coming over to you, correct?
13     A.   That is what it looks like, yes.
14     Q.   All right.
15          Do you remember getting this and
16  making these changes?
17     A.   I don't recall the actual
18  process of it, no.
19     Q.   Okay. Now, in the first
20  paragraph you read it says, "Last year
21  CPSC began a new investigation of window
22  blind deaths."
23          Can you tell me why it wasn't
24  until -- well a year or so before October
25  of 2000 that inner cord window blind
```

**Page 207**

```
 1              RUSH
 2  deaths were being investigated?
 3     A.   Repeat the question, please.
 4     Q.   Yes, sir. Why wouldn't -- why
 5  did the CPSC begin a new investigation,
 6  this says last year and it is dated
 7  October 5, 2000, so approximately a year
 8  earlier, why did they begin an
 9  investigation of inner cord death at that
10  time?
11     A.   That is a question that can be
12  better answered by the Consumer Products
13  Safety Commission.
14     Q.   Well, didn't you personally know
15  and say so in your earlier testimony about
16  these inner cord problems as early as
17  1999?
18     A.   That would be the prior year to
19  2000.
20     Q.   Okay. And didn't you know about
21  it at that point?
22     A.   CPSC presented a report to us in
23  December of 1999 which spelled out this
24  investigation that we are talking about in
25  this particular release that the industry
```

**Page 208**

```
 1              RUSH
 2  acted upon with a new corrective action
 3  plan and product modification in
 4  conjunction with CPSC.
 5     Q.   All right.
 6          Had you heard about inner cord
 7  deaths of children at any time prior to
 8  that?
 9     A.   Yes.
10     Q.   And how much earlier had you
11  heard about it?
12     A.   I believe I received a letter at
13  least ten years earlier.
14          MR. EARNHART: Just for
15  clarification, are we talking about WCMA,
16  the WCSC or Mr. Rush personally or any
17  other organization he may be involved
18  with?
19          MR. BAUERMEISTER: Let's work
20  with Mr. Rush personally.
21     Q.   Okay. Let's turn to the other
22  notebook at tab 6. All right. Page 001.
23          MR. CARROLL: 5087.
24          MR. BAUERMEISTER: Yes, sir.
25  That is correct.
```

**Page 209**

```
 1              RUSH
 2     Q.   Mr. Rush, do you recall
 3  receiving this letter from Mr. Or Ms. Toni
 4  Greisbach?
 5     A.   Yes, I do.
 6     Q.   Okay. Is Toni a gentleman or a
 7  lady?
 8     A.   I believe she is a lady.
 9     Q.   Okay. And did you receive this
10  letter shortly after September 5, 1990,
11  which is the date at the top of the
12  letter?
13     A.   Yes, I did.
14     Q.   And what did the letter tell
15  you?
16     A.   It related a case that this
17  attorney had been involved in regarding
18  the death of a child in a window covering
19  cord.
20     Q.   And that occurred on October 5,
21  1986; is that right?
22     A.   I do not --
23          MR. CARROLL: It calls for
24  speculation by the witness.
25     A.   I do not not see that
```

**Page 210**

RUSH

1  information in the letter.
2  Q. Would you read for the jury the first paragraph of the letter, please.
3  A. Okay. "As -- as you may or may not be aware, I am an attorney that represented a family whose 18-month old son was killed on October 5, 1986 when it was entangled on a cord in the back of a woven wood shade. My client's lawsuit has just been settled."
4  Q. Okay. And could you read the last paragraph on that front page?
5  A. "In the particular case that I handled, the parents were aware of the danger of pull cords and in fact placed the crib at the opposite send of the window from where the pull cord was located. The window shade was eight feet long, and so the child's crib was approximately seven feet away from the pull cord. The child became entangled in what was referred to as the support cord on the back of the woven shade. His crib overlapped the shade by only several

**Page 211**

RUSH

inches, but he got entangled -- but he got behind the shade to look out the corner of the window and became entangled and was unable to free himself. His parents found him at the end of his nap."
Q. And could you read the middle paragraph, please.
A. "I am writing at this time to urge you and your organization to expand your efforts in warning the general public about the dangers posed by cords on window coverings. I realize that most of the members of your organization initiated warnings regarding pull cords in the past two years. These efforts are commendable, but I am afraid that they don't go far enough. In fact, limiting warnings to pull cords may be misleading."
Q. Go to the next next page at 5088, please 02002.
A. Where --
Q. And read the first two paragraphs there, please.
A. "This support cord was an even

**Page 212**

RUSH

more incidious danger than pull cords because the support cord was hidden from view. The cord did not even show from the front where the shade was rolled up because the shade flapped up in such a way that the cords were invisible."
Q. All right. And the next paragraph, please.
A. "In my opinion as well as the opinion of the expert safety analyst that consulted with me in this case, limiting warnings to simply the pull cord is insufficient because a parent would -- will be mislead into thinking that the pull cord is the only danger on the window covering when in fact all cords on window coverings are potential strangulation hazards to young children. During our investigation of this particular case, we learned that pulling that -- that -- we learned that the cord on many models of venetian blinds and mini blinds can be pulled away from the blinds to form a noose like strangulation hazard,

**Page 213**

RUSH

even though the cording is threaded to each individual slat. This can occur when the blinds are in the completely lowered position because in some models there is no tension on the cording when it is in that position."
Q. Okay. Now, the letter ends with the second paragraph with a request that you and your members take action immediately, does it not?
A. "I hope you will discuss these issues with your members and recommend that they will take action immediately. It would certainly be better for the industry if the industry policed itself on these matters."
Q. And the date on the letter -- the date is actually a different date. It says September 4, 1990 on page 2, but it was September 5, 1990 on page 1, right?
A. Yes, that's correct.
Q. What steps, if any, did you take in response to this letter from Toni

214

1  RUSH
2  Griesbach?
3  A.  I forwarded copies of the letter
4  to the members of the Window Covering
5  Manufacturers Association.
6  Q.  What steps did they take?
7  A.  I do not know what steps they
8  particularly took.
9  Q.  Now, the first standard for
10 outer pull cord warning and a
11 manufacturing was promulgated by WCMA in
12 November of '96, correct?
13 A.  That's correct.
14 Q.  And that is six full years after
15 you received this letter, right?
16 A.  Yes, it is.
17 Q.  Why did it take six years?
18 A.  The industry was not involved in
19 producing standards at that point. The
20 association was not an accredited
21 standards writing organization, and the
22 industry was not -- did not have
23 sufficient information.
24    MR. CARROLL:  Let's go off the
25 record for a second.

215

1  RUSH
2    MR. BAUERMEISTER:  All right.
3    THE VIDEOGRAPHER:  The time is
4  3:25 p.m. We are off the record.
5    (Discussion held off the
6  record.)
7    THE VIDEOGRAPHER:  We are back
8  on the record. The time is 3:27 p.m.
9    MR. CARROLL:  We are back on.
10 Q.  Remembering what we were just
11 talking about, as -- I had asked a
12 question about why it took six years from
13 Toni Griesbach's letter being received by
14 you for the first standard issuance in
15 November of '96 by the WCMA and your
16 answer was?
17 A.  The Window Covering
18 Manufacturers Association at that point in
19 time in 1990 was not an accredited
20 standards writing organization. The
21 organization was not involved in writing
22 any standards, and in fact the idea of
23 standards was -- had never been discussed
24 in the organization.
25 Q.  Okay. Could we go to notebook

216

1  RUSH
2  number 2 and look at tab 11, please.
3  A.  Okay.
4  Q.  That document is entitled
5  "Window Covering Manufacturers Association
6  Inc."
7    MR. CARROLL:  What -- what
8  page are you at?
9    MR. BAUERMEISTER:  Sorry,
10 001.
11   MR. CARROLL:  19346.
12   (Pause.)
13 Q.  Are you ready, Mr. Rush?
14 A.  Yes, I am.
15 Q.  And the title of this document
16 is "Window Covering Manufacturers
17 Association Inc.;" is that right?
18 A.  That's correct.
19 Q.  And what was the address there?
20 A.  355 Lexington Avenue.
21 Q.  17th floor, New York, New York?
22 A.  Correct.
23 Q.  (212) 292- 122?
24 A.  That's correct.
25 Q.  That is your office?

217

1  RUSH
2  A.  That's correct.
3  Q.  Is that your number?
4  A.  Yes, it is.
5  Q.  What does the first paragraph of
6  this document say, please? Would you read
7  it into the record?
8  A.  "Window Covering Manufacturers
9  Association, WCMA, has been engaged in
10 developing standards since January 1966.
11 In 1970 a policy of offering those
12 standards to the American National
13 Standards Institute, ANSI, for approval
14 was adopted by most of the WCMA
15 organizational sections."
16 Q.  Is that true, sir?
17 A.  No.
18 Q.  All right. And what document is
19 this?
20 A.  That opening section actually
21 refers to the Builders Hardware
22 Manufacturers Association from which these
23 procedures were borrowed.
24 Q.  Okay. So the Builders Hardware
25 Manufacturers Association does this, but

218

RUSH

2 the window covering folks don't?
3  A.  The Builders Hardware
4 Manufacturers Association has been engaged
5 in developing product standards since
6 January 1966 and in 1970 began offering
7 them as ANSI standards.
8  Q.  So if the public received this
9 document, it would be misleading for them
10 to read this and think that the WCMA has
11 been engaged in developing product
12 standards since January 1966?
13      MR. CARROLL:  I object to the
14 foundation that the public received it.
15 Subject to that, you can answer it.
16  A.  This is an internal document for
17 development of standards within the WCMA.
18  Q.  All right, sir.
19      Could you turn to page 002,
20 please.
21      MR. WALLACE:  What is the
22 Bates?
23      MR. CARROLL:  Next page,
24 19347.
25  Q.  That's correct. Could you read

219

RUSH

2 paragraph 11 into the record, sir?
3  A.  "A WCMA member company upon
4 learning of safety omission or defect of
5 any WCMA standard or WCMA ANSI standard
6 shall bring to the attention WCMA for
7 appropriate discussion and revision of the
8 standard."
9  Q.  Now, is that false as well or is
10 that true?
11  A.  That is --
12      MR. CARROLL:  I object to the
13 form. You can answer.
14  A.  That would be a procedural
15 direction, yes.
16  Q.  So that is accurate?
17  A.  Yes.
18  Q.  But the introductory paragraph
19 should be deleted because it is not
20 accurate?
21  A.  The dates should be revised to
22 correctly reflect when WCMA actually
23 became an ANSI accredited standards
24 writing developing association.
25  Q.  Now, with paragraph 11 at 002,

220

RUSH

2 tell me what the responsibility is of a
3 member company who believes that a
4 standard has a defect?
5  A.  It shall bring it to the
6 attention of the WCMA for section
7 discussion and an appropriate revision of
8 the standard.
9  Q.  Can you tell me the names of
10 companies that were members of the WCMA
11 that have brought to the WCMA notice that
12 there is a -- ommission or defect in WCMA
13 standards?
14  A.  I do not know of any.
15  Q.  Never happened on your watch?
16      MR. CARROLL:   Asked and
17 answered.
18  A.  No, it has not.
19  Q.  Does the system of voluntary
20 policing within an industry perform
21 actually poorly?
22      MR. CARROLL:  I object to the
23 form. You can answer.
24      MR. EARNHART:  Foundation.
25  A.  The Consumer Products Safety

221

RUSH

2 Commission seems very happy with the
3 current voluntary standard and has
4 actively participated in the revisions
5 and feels comfortable that the industry is
6 in compliance with the standards.
7  Q.  Has the present standard
8 promulgated in September of '02 adopted
9 virtually all the positions that Terri
10 Griesbach wrote you about in 1990 as far
11 as risks of internal cords?
12  A.  The standard goes well beyond
13 what she wrote.
14  Q.  But certainly what she wrote was
15 correct, wasn't it?
16  A.  Those areas are definitely
17 covered in the existing standards as are
18 the dangers from vertical blinds, drapery
19 cords and other window covering products.
20  Q.  How could the WCMA and the
21 industry have that letter at hand and not
22 produce a standard for six years?
23  A.  The industry was not -- WCMA was
24 not in a position to write standards at
25 that time.