**Page 222**

        RUSH
Q. When did it become accredited?
A. I believe 1995.
Q. All right, sir. I would like you to turn back to exhibit volume 1, and we want to look at the first tab.
    MR. CARROLL: Okay.
Q. All right.
    This is the notice of the 30(b)6 deposition, and have you had a chance to read through that notice prior to this deposition?
A. Yes, I did review it.
Q. Can you tell me, sir, whether all of the previously produced documents from the WCMA are true and accurate copies of the original?
A. Yes, to the best of my ability.
    MR. BAUERMEISTER: Counsel, can we have a stipulation to that point?
    MR. CARROLL: You can have a stipulation that they are true and correct copies of what was made available to you. Of course it doesn't go to admissibility, but sure as for production in discovery,

**Page 223**

        RUSH
yes.
    MR. BAUERMEISTER: I am looking for the stipulation as to foundation that they are authentic, accurate and true copies.
    MR. CARROLL: They are authentic and true as to the foundation. That still doesn't go to whose going to put it into evidence, and I will not give you that stipulation.
    MR. BAUERMEISTER: No, I understand that.
    MR. CARROLL: Okay.
    MR. BAUERMEISTER: But you are stipulating that all documents produced by WCMA with their production numbers on them are authentic and true copies of the originals?
    MR. CARROLL: That's correct.
    MR. BAUERMEISTER: Thank you, sir.
Q. Mr. Rush, were you consulted on the responses to the admissions given in this case?

**Page 224**

        RUSH
A. Yes, I believe I was consulted.
Q. Were you consulted as well on the responses to the complaint answer?
A. Yes, I was.
Q. Okay. I would like to go to the complaint in this case and refresh your recollection of paragraph 11, which is at 011. We are looking at tab one, and now we are looking for 011, and paragraph 11 on page 011.
    Do you have that, sir?
A. Yes, I do.
Q. Okay. Let me read that, and you correct me if I make a mistake on it. "The blinds were defectively designed, manufactured and/or packaged in that the accessible inner cord could pull to form a loop which posed an unreasonable risk to young children of death or injury by strangulation, and the blinds lacked any warning of the danger posed by accessible inner cord."
    Did I read that correctly?
A. Yes, you do.

**Page 225**

        RUSH
Q. All right.
    Could we turn to the answer by the Window Covering Manufacturers Association to that paragraph shown at page 018.
    Do you have that, sir?
A. Yes, I do.
Q. And it states "WCMA denies all allegations contained in paragraph 11 of plaintiff's complaint," correct?
A. Yes, it does.
Q. Actually, sir, going back to page 11 and looking at paragraph 11, can you tell me what facts, if any, to your knowledge are true in that paragraph?
    MR. CARROLL: To the extent it calls for a legal conclusion, I'll object.
A. I can't answer any of the questions since I have never seen the product. I don't know what is in the product, and I would not be in a position to decide whether it was correctly done or not.
Q. Have you ever asked to see the

226

1  RUSH
2  product?
3  A. No, I have not.
4  Q. Does the Window Covering
5  Manufacturers Association have any
6  interest in seeing the product that killed
7  April Cox?
8      MR. CARROLL: I object to the
9  form. You can answer.
10  A. No, it does not.
11  Q. All right, sir.
12     Going back to the 30(b)6 notice,
13  sir, I have already asked you about your
14  knowledge of the factual basis of the
15  events relating to the death of April Cox.
16     Is there any employee of the
17  WCMA that would have more knowledge about
18  that factual basis than yourself?
19  A. No, there is not.
20  Q. Okay. Would there be anyone,
21  sir, at Kellen who would have more
22  knowledge than yourself about the factual
23  basis for the death of April Cox?
24  A. No, there would not.
25  Q. Okay. Now, sir, if you'll look

227

1  RUSH
2  at page 003 of the 30(b)6 notice, I would
3  like to ask you about paragraph 10. What
4  knowledge does the WCMA have about all
5  field engineers reports concerning matters
6  identified in the preceding paragraph, and
7  that preceding paragraph relates to the
8  incident probability, possibility and/or
9  risk of injury or death to children by
10  strangulation connected in any way to any
11  of the products described in the ANSI
12  standards WCMA A 100.1.
13     So the question to you, sir, is
14  what knowledge does the WCMA have about
15  field engineer's reports concerning all of
16  those probalities, possibilities, and
17  risks?
18  A. I don't know of any field
19  engineer's reports.
20  Q. Have you ever sought any field
21  engineer's reports?
22  A. No, we have not.
23  Q. Do you know what a field
24  engineer's report is?
25  A. No, I do not.

228

1  RUSH
2  Q. Now, the WCMA standard 100.1
3  issued in 1996 contains a warning to
4  consumers; is that correct?
5  A. It -- it contains several
6  warning labels.
7  Q. Were you involved in the warning
8  label construction?
9  A. No, I was not.
10  Q. Do you know of any safety
11  engineer who was involved in that warning
12  label construction?
13  A. Human factors division of the
14  Consumer Products Safety Commission.
15  Q. Okay. But other than government
16  officials, do you know of any persons from
17  private industry including the WCMA that
18  had any engineering background that was
19  used to create the warning signs of -- for
20  that standard?
21  A. There were a number of engineers
22  from the industry on the technical
23  committee.
24  Q. Can you name those persons,
25  please?

229

1  RUSH
2  A. Paul Josephson from Springs, Don
3  Frasier from Hunter Douglas are two names
4  that come to mind.
5  Q. And they are engineers?
6  A. Yes, they are.
7  Q. Have you ever discussed with
8  them the problem of the warning labels
9  suggesting to parents as a letter to you
10  from the lawyer in 1990 suggested that by
11  informing parents that they can take away
12  the risk of the cord by putting it out of
13  reach that they are falsely lulling the
14  parent into believing the cord window
15  covering is now safe for their children to
16  be around?
17     MR. CARROLL: I object to the
18  form. Mischaracterizes the witness'
19  testimony and argumentative. Subject to
20  that, you can answer.
21  A. I do not remember any discussion
22  along those lines.
23  Q. Do you know what number of -- I
24  apologize if I have asked you this
25  question already. Perhaps you've already

**Page 230**

```
 1              RUSH
 2   testified. WCMA does not know the number
 3   of children who died from strangulation by
 4   these cords; is that correct?
 5        A.   I --
 6        MR. CARROLL:   I just object to
 7   what by these cords means. Inner cord,
 8   pull cord.
 9        MR. BAUERMEISTER:   Both.
10        MR. CARROLL:   All right. With
11   that -- with that explanation, you can
12   answer.
13        A.   The information regarding the
14   number of children who have died with
15   window covering cords is the information
16   kept and provided to us by the U.S.
17   Consumer Products Safety Commission.
18        Q.   As you are sitting here today,
19   sir, do you know what number of child
20   deaths the CPSC has attributed to inner
21   and outer cords?
22        A.   The exact number right now, no,
23   I do not.
24        Q.   Do you know a general number?
25        A.   Somewhere in the neighborhood of
```

**Page 231**

```
 1              RUSH
 2   185.
 3        Q.   All right, sir.
 4             We have noticed in this 30(b)6
 5   notice several claims or question
 6   inquiries that are shown at items 19, 20
 7   and 21.
 8        MR. BAUERMEISTER:   Counsel, I
 9   can ask these questions of the witness or
10   you can state an objection for the record,
11   and I'll move on if you believe that
12   discovery at this time is premature.
13        MR. CARROLL:   Well, it depends
14   on what you want to ask, but we have
15   lodged objections that I believe you
16   received to portions or all of 19, 20 and
17   21. I am glad to restate them on the
18   record. If you want to ask, it doesn't
19   matter to me.
20        MR. BAUERMEISTER:   No, I am
21   willing to accept that you are going to
22   object at this time and instruct the
23   witness not to answer on these three, 19,
24   20 and 21.
25        MR. CARROLL:   Well, I -- I
```

**Page 232**

```
 1              RUSH
 2   guess the best thing I can say is we
 3   objected to portions, but I think we
 4   answered as best we could 19. I believe
 5   that we objected but said we didn't have
 6   anyone to bring to you to talk about 20,
 7   and then on 21 the only thing we said is
 8   that we can't provide any information on
 9   net income of member companies because we
10   don't get that, and then we did object to
11   providing net worth, but as a 501 C 6 our
12   job is not to have any net worth. It is a
13   nonprofit. So I -- you know, I am -- I'm
14   glad to do that. I am not instructing the
15   witness not to answer because I think we
16   actually answered 19, 20 and 21 while
17   stating objections to some -- to some of
18   the parameters of the notice.
19        MR. BAUERMEISTER:   Okay.
20   Well, perhaps I will go through them and
21   get this witness' knowledge, and if you
22   have objections, please state them.
23        MR. CARROLL:   Okay.
24   The -- the only thing I would ask is with
25   respect to 19, 20 and 21, I am holding
```

**Page 233**

```
 1              RUSH
 2   the -- the objections, and it might make
 3   it easier -- well, no. Go ahead. That is
 4   fine. If I -- if I have got a problem
 5   with it, I will wait until it comes up.
 6        MR. BAUERMEISTER:   Okay.
 7        Q.   Mr. Rush, what knowledge do you
 8   have about any prior claims for punitive
 9   damages against the WCMA or any of its
10   members?
11        A.   I know of no punitive damages
12   against WCMA and know some member
13   companies have been sued, but I do not
14   know any of the terms or facts of how that
15   litigation played out.
16        Q.   Does the WCMA do any information
17   collecting to stay abreast of what
18   punitive damages any of its members have
19   paid for deaths relating to window
20   covering products?
21        A.   No, it does not.
22        Q.   Does the WCMA consider that
23   information unimportant to the work that
24   it does?
25        MR. CARROLL:   I object to the
```

234

```
 1        RUSH
 2   form.  You can answer.
 3        A.   I would think it -- we might
 4   feel that it would be illegal to collect.
 5        Q.   Illegal to collect it?
 6        A.   Yes.
 7        Q.   Why would that be?
 8        A.   The terms and conditions of sale
 9   under the trade association might violate
10   the antitrust rules.
11        Q.   Sir, are you familiar with any
12   punitive damages claims being made against
13   Jencraft Corporation?
14        A.   No, I am not.
15        Q.   Are you familiar with any
16   lawsuits of any type being made against
17   Jencraft Corporation for window covering
18   products?
19        A.   I am not familiar with any
20   specifics of Jencraft at this point.
21        Q.   The same two questions about
22   Wal-Mart?
23             MR. EARNHART:  Foundation.
24        A.   I am aware of Wal-Mart is
25   involved in one litigation.  I do not
```

235

```
 1        RUSH
 2   know -- I am not familiar with the
 3   specifics of it however.
 4        Q.   How about Ching Feng Blinds
 5   Industry?
 6        A.   I do not know anything about
 7   Ching Feng Blinds.
 8        Q.   Have you ever had any contact
 9   with any members or representatives or
10   employees of Ching Feng blinds?
11        A.   Not that I know of.
12        Q.   Do you know anything about the
13   products they produce?
14        A.   No, I do not.
15        Q.   All right, sir.  Question 21
16   looks like it is -- no, I guess it is
17   correctly numbered.  Question 21 here,
18   what information, if any, do you have
19   about the WCMA's net worth?
20        A.   I see their financials and file
21   --
22        Q.   What is the net worth of the
23   WCMA?
24             MR. CARROLL:  I am going to
25   object to the extent that this question
```

236

```
 1        RUSH
 2   has no bearing on the lawsuit.
 3             THE WITNESS:  Shall I answer?
 4             MR. CARROLL:  You can answer.
 5        A.   The net worth of the association
 6   is less than 50,000 dollars.
 7        Q.   Can you tell us what the annual
 8   gross income from all sources for the WCMA
 9   is?
10             MR. CARROLL:  I will make the
11   same objection but will allow the witness
12   to answer.
13        A.   About a 135,000 dollars.
14        Q.   And can you tell us the sources
15   of that income?
16        A.   Dues are the primary -- prime
17   source of income.  There is a small
18   secondary source of income for a product
19   innovation awards program, and it is
20   simply the entry fee.
21        Q.   Has that products innovations
22   award program ever made an award for
23   safety features added to window covering
24   blinds to protect small children?
25        A.   It has -- the product innovation
```

237

```
 1        RUSH
 2   awards program has added a category in
 3   safety, and awards have been made in that
 4   product category.
 5        Q.   Have any of them related to
 6   window covering blinds?
 7        A.   Window coverings in general and
 8   safety cords is -- was one -- one of the
 9   areas that I believe award have been given
10   in.
11        Q.   When did the program making
12   awards in safety begin?
13        A.   I would have to consult notes,
14   but I would say probably in '96 or '97.
15        Q.   What analysis of safety does the
16   WCMA make to make those awards concerning
17   window covering products?
18        A.   The window covering
19   manufacturers do not make any analysis.
20   The awards are judged by third parties who
21   are not affiliated with Window Covering
22   Manufacturers Association.
23        Q.   Who are those third parties?
24        A.   Retailers, a professor from the
25   Fashion Institute of Technology, and
```

**Page 238**

1       RUSH
2  generally a consumer magazine editor.
3       Q.  Have you identified in your
4  interrogatory answers all of the companies
5  who were members of the WCMA at the time
6  of the November '96 standard issuance?
7       A.  Yes.
8       Q.  Have you identified in your
9  interrogatory answers all of the companies
10 who were members of the organization
11 during the September 2 standard issuance?
12      A.  Yes.
13      Q.  And have you identified in your
14 interrogatory answers the names of all the
15 companies who were members of the window
16 coverings association to date?
17          MR. CARROLL:  If you would,
18 counsel, point him to the interrogatory
19 answer, and he can tell you.  I believe it
20 is number 4, Peter.  Number 5 --
21      A.  What --
22          MR. CARROLL:  I apologize.  It
23 is tab one beginning at page 091.  I don't
24 believe the interrogatories request any
25 information about the -- who was a member

**Page 239**

1       RUSH
2  at the time of the 2002 standard, so to
3  the extent that was one of your questions
4  I will object.
5           I apologize.  It is in number
6  four.  I withdraw the objection.
7          (Pause.)
8       A.  So we are at interrogatory 4?
9           MR. CARROLL:  Um hum.  If
10 you'll just read the answers to four and
11 five, so you could be fully informed when
12 you respond to those two questions and the
13 answer if necessary.
14      A.  Yes, those are correct.
15      Q.  All right, sir.  It is just
16 about on the hour again.  Do you want to
17 take a break or do you want me to
18 continue?
19      A.  No, let's continue.
20      Q.  I would say I have less than an
21 hour's worth of questions left here.
22      A.  Let's continue.
23      Q.  All right.
24          I want to go, sir, to your
25 admissions answers.  Please look at 068.

**Page 240**

1       RUSH
2  Do you have that page, sir?
3       A.  Yes, I do.
4       Q.  Now, admission answer 62 states
5  that WCMA admits that at the time of April
6  Cox's death Peter Rush was executive
7  director of both WCMA and WCSC, and that
8  is true, isn't it?
9       A.  Let me double-check.
10      Q.  Is that true, sir?
11          MR. CARROLL:  May 27, 2002
12 would be the date of death.
13      A.  2002.  I believe that to be
14 true.
15      Q.  Sir, for how many years were you
16 the executive director of both the WCMA
17 and the WCSC?
18      A.  I have been the executive
19 director of WCSC from 1994 to the present.
20 I was the executive director, and I do not
21 have the specific date when I was
22 appointed executive director of WCMA, but
23 I would -- my recollection would be
24 somewhere about 1989.
25      Q.  Until what date?

**Page 241**

1       RUSH
2       A.  Until sometime in 2002.
3       Q.  And that is when Caroline
4  Jennings became executive director?
5       A.  That's correct.
6       Q.  Now, during the entire time that
7  you were the executive director for both
8  organizations, they had the same office
9  address, the same mailing address, and the
10 same facsimile number; is that correct?
11      A.  That is correct.
12      Q.  Tell me what steps the WCMA
13 participated in to start the WCSC.
14      A.  The WCMA -- I represent -- I
15 participated in meeting with the U.S.
16 Consumer Products Safety Commission I
17 believe it was March 30, 1994 as a -- as
18 the executive director of the Window
19 Covering Manufacturers Association in
20 addition to a -- a number of other
21 companies, both members of WCMA and
22 members -- companies who were not members
23 of WCMA.
24          At that meeting, the issue of
25 a -- some type of corrective action

**242**

RUSH

program was discussed with CPSC, and at that point it became readily apparent that the Window Covering Manufacturers Association because of the narrow focus of the eligibility for membership could not include all the other companies that were currently involved in the business. Upon advice of counsel, we established a new 501 C 6 called the Window Covering Safety Council, which was incorporated in I believe June of 2000 -- of 1994 whose membership requirements were extremely broad that said any company that was involved in the window covering industry was eligible to join.

Q. All right, sir.
Do you know Elise Gatto?
A. The name is not familiar to me.
Q. Let's look at notebook number 2 and tab 12 and page 118.
MR. CARROLL: 5024.
A. Okay.
(Pause.)
A. Yes, I am there.

**243**

RUSH

Q. Do you have that, sir?
A. Yes, I do.
Q. Okay. Now, this is a WCMA document?
A. Yes, it is.
Q. And it indicates that at the meeting of the Window Covering Manufacturers Association held at Hyatt O'Hare Hotel in Chicago on Wednesday, June 29, 1994 pursuant to call and notice of association members and invited importers of window products, the following members and guests were in attendance; is that correct?
A. That's correct.
Q. And the WCMA members are listed in the first column with both an individual representative and his corporate connection, correct?
A. That's correct.
Q. And the same thing happens with importers, but they are not WCMA members in the second column, right?
A. Well, yes. Below them are the

**244**

RUSH

nonmembers, the importers.
Q. Now, in the importers list, we have Jencraft represented by Sharon -- do you -- I don't have a -- it doesn't look like a complete copy here of that.
Do you know Sharon's last name?
A. I think it is Defeo, D-E-F-E-O.
Q. Defeo?
A. I believe so.
Q. Have you ever met Sharon Defeo?
A. I believe I met her at this meeting.
Q. Okay. And Jencraft showed an interest in the substance of this meeting?
A. They attended the meeting, yes.
Q. And what was the substance of the meeting?
A. The substance of the meeting was -- of the meeting was to form a -- well, it was basically to involve -- talk about the corrective action plan, the proposed retrofit program, and at the same time we spoke about starting a new organization.

**245**

RUSH

Q. Okay. So the WCMA had already taken the baton on the corrective action plan and was now discussing a new organization at this meeting?
A. Well, actually the Consumer Products Safety Commission had presented to us what they expected in a corrective action plan.
Q. Okay.
A. And we presented it to the broader industry.
Q. Okay. Now, another importer there was Wal-Mart represented by Elise Gatto, G-A-T-T-O, right?
A. Yes.
Q. You are shown as present, Peter Rush for WCMA, correct?
A. That's correct.
Q. Now, the pages that follow, have you read this document before?
A. Yes.
Q. And can you summarize it for us, what -- what happened?
MR. CARROLL: I am going to

**Page 246**

RUSH

object to a request for a summary. It says what happened. If you've got any questions for him, he can answer.
    (Pause.)
Q. Okay, sir. Can you tell me are the meeting notes all this -- this appears to me to be the notes of two meetings.
    Is the first meeting shown at 118 through 120 and then a second meeting at Hyatt O'Hare on Tuesday May 3, '94, which is shown at 121 through 122?
    MR. CARROLL: 5012-5013 is the second meeting, gentlemen.
    MR. BAUERMEISTER: Yes, sir.
A. Yes, they appear to be the notes of two separate meetings
Q. Now, you made a presentation at this meeting; is that right?
A. Which meeting are we discussing?
Q. The one shown at 118, 119, and 120?
A. Yes, I did.
Q. What was the substance of your presentation?

**Page 247**

RUSH

A. The substance of my presentation was the information provided to us by the Consumer Products Safety Commission regarding deaths in window covering cords and the substance of the corrective action plan that CPSC had proposed that the industry implement.
Q. Okay. Now, looking at page 119, there is a heading there called the corrective action retrofit program, correct?
A. Yes, there is.
Q. Why don't you read that first paragraph to us, please.
A. "Mr. Rush explained that in a meeting at CPSC in Washington on March 30 CPSC urged that a voluntary program funded by the industry begin immediately. CPSC specifically requested that the program called a corrective action addressed window coverings in households nationwide. CPSC's guidelines for the corrective action include a public information program and a distribution program of

**Page 248**

RUSH

safety devices approved by CPSC. The two CPSC approved products for distribution are tassels and a break through tassel both of which would be installed to the hang cord after the loop was cut."
Q. And the next paragraph, sir, would you read that, please?
A. "The education program sumbimtted by WCMA and approved by CPSC includes the following, a media kit, press conferences, distribution of new safety alert, ongoing media relations, video news releases, public service announcements, satellite, and market -- major market and radio tours, a consumer brochure, and posters in both English and Spanish."
Q. Now, why was the WCMA preparing an education program and submitting it here to the CPSC for approval?
A. In order to be responsive to the Consumer Products Safety Commission.
Q. Okay. Did the WCMA follow up on the media press conferences, news safety alerts and all the things listed in this

**Page 249**

RUSH

paragraph?
A. No, all of those activities were taken over by the Window Covering Safety Council once it was established.
Q. Okay. But they were first submitted by WCMA and approved by the CPSC in the form of various it looks like public relations information steps here in this paragraph; is that right?
A. They were basically proposed to the industry by the Consumer Products Safety Commission, which we then submitted back to them to see if we made certain of all the things they would require on this public information and education program.
Q. All right, sir.
    If you would look at notebook number one under tab 1, we are looking for admissions answers again, and I would like you to look at page 074. Do you have that, sir?
A. Yes, I do.
Q. Okay. The answer to admission number 72 was: "WCMA, which is a

**Page 250**

RUSH

voluntary organization admits it has no procedure for tracking injuries or deaths caused by corded window covering products."

Is that true?

A. That is true.

Q. And why do you have no procedure for tracking injuries or deaths caused by corded window covering products?

A. Because the Consumer Products Safety Commission has the statutory ability and the mechanisms to comply with gathering that kind of information.

Q. All right, sir. I would like you to look at request for production number 31, which is at page 087. Do you have that there, sir?

A. Yes, I do.

Q. Question 31 was: "Please produce at all documents sent to you or received by you from the CPSC which discuss death or injury by strangulation of corded window covering products," and your answer was: "WCMA has searched its

**Page 251**

RUSH

records in the ordinary course of business and has not located documents responsive to that request."

Is that an accurate answer?

A. All the documents that we have responsive to that answer were contained in the documents that were made available to you.

Q. Well, do you have documents responsive to that or not? This says you don't. Is that true or not is what I am asking you.

A. Any documents that would be or could have been produced are -- were in the files that you had access to.

Q. Okay. All right, sir. What I would like to do now is take a short break. I am very near the end of my questioning. I thank you for your patience, and I would like to go off record with counsel's permission for about five minutes and then come back and finish my examination.

MR. CARROLL: That is

**Page 252**

RUSH

perfectly all right. Thanks.

THE VIDEOGRAPHER: The time is 4:14 p.m. We are off the record.

(Recess taken.)

THE VIDEOGRAPHER: We are back on record. The time is 4:25 p.m.

MR. CARROLL: Okay. He is ready.

Q. All right. We want to look at volume one of the exhibit notebooks. We are looking under tab one at the admissions answers.

Are you ready, sir?

A. Yes.

Q. Look at page 055 of the admissions answers, looking at request for admission number 34. The question -- have you found it, sir?

A. Yes.

Q. The question is: "Please admit that you undertook to develop the 1996 standard on behalf of your members," and what was the WCMA answer?

A. "WCMA admits it and its members

**Page 253**

RUSH

developed the voluntary standard codified as WCMA A 100.1-1996 in conjunction with the consumer products -- CPSC and in accordance with the standards and practices of ANSI. WCMA further states it did not participate in any design, manufacture, inspection, testing, distribution, or sale of any window covering product, and it denies that by developing the voluntary standard codified as WCMA A 100.1-1996 it assumes any duties or responsibilities of any other entity or acted on any other entity's behalf."

Q. All right, sir.

Have you participated or reviewed the answer draft to that admission?

A. Yes, I did.

Q. Okay. I take it you are not an attorney?

A. That's correct.

Q. Okay. I am not interested in any legal opinion. I am interested in your understanding of the statement that

## Page 254

```
 1    RUSH
 2    it denies that by developing the voluntary
 3    standard the WCMA assumed any duty or
 4    responsibility of any other entity or
 5    acted on any other entities behalf. What
 6    does that mean to you as the former
 7    executive director of the WCMA?
 8         MR. CARROLL:   I will still
 9    interpose an objection. Since it was
10    crafted by lawyers, it is going to seek an
11    understanding of -- of language that was
12    put in there by lawyers, but to the extent
13    he can answer, he is allowed to.
14    A.   The WCMA standard is a voluntary
15    ANSI based standard.
16    Q.   Is that your total answer, sir?
17    A.   Yes, it is.
18    Q.   Does the WCMA intend for product
19    purchasers to rely on the standards when
20    they are shown on products that are
21    purchased?
22         MR. CARROLL:   I object to the
23    form. You can answer.
24    A.   The voluntary standard is a
25    standard which the U.S. Consumer Products
```

## Page 255

```
 1    RUSH
 2    Safety Commission relies on to be -- that
 3    window covering products must comply with.
 4    As far as I know, it is the only standard
 5    that a window covering product must comply
 6    with, but that is a -- that is based upon
 7    the U.S. government's Consumer Products
 8    Safety Commission's enforcement of that
 9    standard. The WCMA has no enforcement
10    power at all.
11    Q.   I understand that. What I am
12    trying to determine is if the WCMA expects
13    that when consumers buy products
14    manufactured under the WCMA standard and
15    carrying the WCMA warning as promulgated
16    that those consumers can rely on that
17    warning as something that will help make
18    the product that they use safe?
19         MR. CARROLL:   To the extent
20    the question calls for a legal conclusion
21    about reliance or consumer expectations, I
22    object. Mr. Rush can answer based on his
23    knowledge and experience.
24    A.   The WCMA has no particular
25    program to consumers regarding the
```

## Page 256

```
 1    RUSH
 2    standard or what is in the standard. That
 3    requirement falls to the individual
 4    manufacturers who manufacture products and
 5    make product claims about their products.
 6    Q.   Okay. So if I am an ordinary
 7    purchaser, not a lawyer, just trying to
 8    buy a safe window covering for my child's
 9    room and see the WCMA warning placed on
10    that window covering, should I rely on
11    that warning to suggest to me how safe the
12    window covering is?
13    A.   You --
14         MR. CARROLL:   Let me object
15    that -- that the timing is not made clear.
16    You mean today for the purpose of the
17    question.
18         MR. BAUERMEISTER:   Any time.
19         MR. CARROLL:   Okay. I object
20    in that it is not limited to any time.
21    You can answer.
22    A.   WCMA cannot attest that any
23    particular manufacturer is actually
24    manufacturing to that standard.
25    The -- the standard and the warning labels
```

## Page 257

```
 1    RUSH
 2    of that standard are readily available and
 3    commercially available from ANSI as well
 4    as WCMA, but we have no -- we have no
 5    ability to judge whether any individual
 6    product is manufactured to comply with
 7    that standard.
 8    Q.   Well, do the manufacturers tell
 9    consumers that it is manufactured in
10    accordance with WCMA ANSI standards?
11    A.   You would have to consult the
12    individual manufacturers on that.
13    Q.   You've never seen a
14    manufacturers box that said this is
15    manufactured to that standard?
16    A.   I do not recall anyone putting
17    that on their box.
18    Q.   So the public would have no way
19    of knowing that you produce a standard?
20    A.   The public?
21    Q.   Yes, sir.
22    A.   I do not know whether they would
23    or they would not. The standard is a
24    performance standard that is used as a
25    production standard and is enforced by the
```

258

1  RUSH
2  Consumer Products Safety Commission to a
3  level that they feel is acceptable in
4  terms of the product performance.
5      Q.  So people who go to the store
6  and buy window coverings that bear the
7  exact warning that the WCMA standards say
8  should be on these blinds shouldn't assume
9  that that warning tells them accurately
10 how safe this blind is?
11     MR. CARROLL:  I will object,
12 and -- to the extent it asks for a comment
13 beyond what the WCMA itself can say, but
14 with that objection Mr. Rush can answer.
15     A.  Again, WCMA has no way of
16 knowing or policing how a product is
17 manufactured.
18     Q.  Well, as a general matter,
19 manufacturers of these products owe
20 consumers a duty to make reasonably safe
21 products.  Isn't that true?
22     MR. CARROLL:  To the extent
23 you are not asking Law Professor Rush, he
24 can answer.
25     A.  Manufacturers of window covering

259

1  RUSH
2  products should be complying with the
3  current ANSI standard on any product that
4  they are -- that they are offering to the
5  public for sale.  If not, they are subject
6  to enforcement actions by the U.S.
7  Consumer Products Safety Commission.
8      Q.  And why is that?
9      MR. CARROLL:  Asked and
10 answered.  You can answer again.
11     A.  Because the U.S. Consumer
12 Products Safety Commission has the
13 statutory authority to determine products
14 which are safe to sell in the United
15 States.
16     Q.  And the way we tell whether a
17 product is safe to sell is whether it
18 meets the ANSI WCMA standard, correct?
19     MR. CARROLL:  I object.
20 Mischaracterizes the witness' testimony.
21 You can answer again.
22     A.  The U.S. Consumer Products
23 Safety Commission enforces voluntary
24 industry standards that -- accepted
25 standards that it feels are sufficient to

260

1  RUSH
2  meet its goal of providing a safer
3  environment for U.S. citizens.
4      Q.  So the WCMA goal is to provide a
5  safer involvement for U.S. citizens?
6      MR. CARROLL:  Mischaracterizes
7  the witness' testimony.  You can answer
8  again.
9      A.  I believe I said that is the
10 duty of U.S. Consumer Products Safety
11 Commission.
12     Q.  Okay.  My question to you is is
13 that the mission of the WCMA?
14     A.  No, the mission of the WCMA
15 is -- is to represent the wishes of its
16 members as an organization.
17     Q.  And it is not concerned with
18 whether products are safe or not for
19 consumers?
20     MR. CARROLL:  Mischaracterizes
21 the witness' testimony.  Nice try, but he
22 can answer again.
23     A.  No.  The WCMA has developed a
24 voluntary standard, ANSI standard that the
25 U.S. Consumer Products Safety Commission

261

1  RUSH
2  is enforcing regarding the safety of
3  window covering products.
4      Q.  Well, I apologize.  I am having
5  trouble understanding.
6      MR. CARROLL:  Do we need to
7  turn the volume up?
8      MR. BAUERMEISTER:  I don't
9  think that would help.
10     MR. CARROLL:  Okay.
11     MR. BAUERMEISTER:  What would
12 be useful is if the witness could say what
13 reliance consumers should place on
14 corporations that adopt ANSI standards
15 promulgated by WCMA.
16     MR. CARROLL:  To the extent it
17 does not call for a legal conclusion about
18 reliance and consumer expectations, the
19 witness can answer the question again.
20     A.  With -- WCMA has no control over
21 whether any corporation adopts or does not
22 adopt, manufactures or does not
23 manufacture to the WCMA standard.  That is
24 totally within the perview of the U.S.
25 Consumer Products Safety Commission, not

262
```
 1              RUSH
 2  the association.
 3     Q.  Now, does the organization have
 4  a regulation that requires members to
 5  report companies who are producing
 6  products that don't meet the WCMA standard
 7  for window covering products?
 8         MR. CARROLL:  Asked and
 9  answered.  You can answer again.
10     A.  No, it does not.
11     Q.  So there is no duty to identify
12  manufacturers of products that are unsafe
13  for the public?
14     A.  No --
15         MR. CARROLL:  I object to the
16  form.  You can answer.
17     A.  There is -- the WCMA has a
18  requirement within the organization
19  standards writing.  If the standard is
20  unacceptable or if there are problems with
21  the standard, but in terms of reporting to
22  WCMA, no.  The issue again relies on the
23  U.S. Consumer Products Safety Commission,
24  and any product defects should be reported
25  to the Consumer Products Safety Commission
```

263
```
 1              RUSH
 2  under their statute.
 3         MR. BAUERMEISTER:  I have no
 4  further questions.
 5         MR. EARNHART:  This is Will
 6  Earnhart, I have got a few follow-ups.
 7  EXAMINATION BY MR. EARNHART:
 8     Q.  Mr. Rush --
 9         MR. EARNHART:  Let me Mike up
10  just a second, gentleman.
11         MR. CARROLL:  I think he wants
12  this one.  Just a second fellas.  We are
13  having technical difficulties.
14     Q.  This is Will Earnhart.  I've got
15  a few follow-up questions.
16         First of all, Mr. Rush, what
17  entities share the same fax numbers and
18  address as the WCMA?
19     A.  Over what time period?
20  Currently?
21     Q.  Why don't we start with
22  currently, and then we can go back to how
23  about 2000 and back to 1995.
24     A.  Okay.  Currently, the Builders
25  Hardware Manufacturers Association, the
```

264
```
 1              RUSH
 2  New York Women in Communication, the Comic
 3  Magazine Association of America, the
 4  Healthcare Food Services Managers
 5  Association, the New York Women in
 6  Communications Foundation, the New York
 7  Chapter of the International Design
 8  Association.
 9     Q.  Do any of those entities have
10  anything to do with window coverings?
11     A.  No.
12     Q.  Okay.  Back in 1995, was it a
13  similar group?
14     A.  Other groups that may have been
15  in that time frame, let's say from '90
16  through current would be entities such as
17  the Plastic Bag Association, the Certified
18  Plastic Manufacturers Association, the
19  National Tabletop Association that come to
20  mind.
21     Q.  Now, these are all entities that
22  the Kellen company or its predecessor was
23  hired to manage the affairs of; is that
24  correct?
25     A.  Yes, that's correct.
```

265
```
 1              RUSH
 2     Q.  The WCMA, what is it?  What is
 3  its purpose; how long has it existed?
 4     A.  The WCMA is a 501 C 6 trade
 5  association of companies who manufacture
 6  or supply to manufacturers based in North
 7  America.
 8     Q.  What is the purpose of it?
 9     A.  The purpose of the association
10  is to I guess promote whatever activities
11  that the members choose to be involved in.
12     Q.  And how long has it existed?
13     A.  The current association actually
14  I don't have the exact beginning, but it
15  goes back to the 50s when it was the
16  United States Venetian Blind Association.
17     Q.  And how is the WCSC different
18  from the WCMA?
19     A.  The WCSC is a 501 C 6 that is
20  open to all companies or individuals for
21  that matter who are involved in the window
22  covering business including retailers,
23  importers, installers, and it has no
24  geographic boundaries in terms of their
25  involvement.  The primary purpose of the
```

266

RUSH

1
2  Window Covering Safety Council was to
3  implement a corrective action program with
4  the United States Consumer Products Safety
5  Commission and maintains an ongoing
6  program of public information and
7  education as well as distribution of free
8  retrofit kits.
9     Q.  Okay. Now, has Wal-Mart -- is
10 Wal-Mart or has Wal-Mart ever been a
11 member of the WCMA?
12    A.  No, Wal-Mart has not been a
13 member of the WCMA.
14    Q.  Given that the WCMA and WCSC are
15 different entities, does the WCMA share
16 all of its knowledge, history or documents
17 with the WCSC?
18    A.  No, we maintain separate sets of
19 documents and financials for both
20 organizations -- each organization. We
21 file individual tax returns for each
22 organization each year.
23    Q.  Okay. So information that the
24 WCMA may have may -- is likely not
25 necessarily made available to members of

267

RUSH

1
2  the WCSC?
3     A.  They do not share all
4  information. That is correct.
5     Q.  And information you may have as
6  executive director of the WCMA since 1989
7  isn't necessarily made available to
8  members of the WCSC; is that correct?
9     A.  No, not necessarily.
10    Q.  Prior to 1996, was the WCMA or
11 any of its members involved in warnings or
12 otherwise publicizing safety issues in
13 regard to blinds?
14    A.  In 1985, the American Window
15 Covering Manufacturers Association in
16 conjunction with the U.S. Consumer
17 Products Safety Commission jointly issued
18 a product alert. That product alert was
19 subsequently reissued as a
20 cooperation -- cooperative effort between
21 the Window Covering Manufacturers
22 Association and the CPSC.
23    Q.  And substantively, what was that
24 product alert?
25    A.  It substantively warned parents

268

RUSH

1
2  of potential strangulation risks with
3  window covering products and warned them
4  to keep cords away from the children.
5     Q.  Was any -- was anything said in
6  specific to cribs and their proximity to
7  corded window coverings?
8     A.  The issue of keeping cribs away
9  from windows, I cannot tell you
10 specifically when that came into the
11 literature, but it was very early in the
12 -- in the program.
13    Q.  Pre-1990?
14    A.  Yes, I believe so.
15    Q.  How does the Consumer Products
16 Safety Commission participate with the
17 WCMA in creating these regulations?
18    A.  Which regulations are you
19 speaking of?
20    Q.  ANSI or any other regulations?
21    A.  Well, the ANSI standard
22 is -- has a technical committee, which is
23 the actual body that writes the standard.
24 CPSC provides fully as -- participates
25 fully as voting members of the committee

269

RUSH

1
2  as well as providing technical information
3  and guidance on a number of the areas
4  within the standard. CPSC is also on the
5  canvass list for the ANSI standard through
6  the ANSI process.
7     Q.  How about in regard to the
8  CPSC's work, how does that involve -- not
9  CPSC but the WCSC, how does that involve
10 the -- the CPSC?
11    A.  The Window Covering Safety
12 Council works cooperatively with CPSC on
13 the whole corrective action plan, and that
14 includes regular communication with CPSC.
15 We produce an annual report to CPSC of the
16 activities of the Window Covering Safety
17 Council. CPSC has cosponsored with the
18 Window Covering Safety Council window
19 covering safety month over the past three
20 years, which included allowing the joint
21 industry program to use the CPSC logo and
22 wording. Chairman Stratton has done
23 public service announcements on behalf of
24 Window Covering Safety Council as did his
25 predecessor Ed Brandt.

270

RUSH

Q. Does the CPSC approve the voluntary actions of the Window Covering Safety Council?

A. The voluntary corrective action plans were approved by the Consumer Product Safety Commission.

Q. And if the Consumer Product Safety Commission was not satisfied I assume that they could bring to bear their full power to -- against manufacturers and retailers?

A. Yes, they could.

Q. You've used the term several times in regard to both the ANSI standards and the action plan. What do you mean by voluntary?

A. An ANSI standard unless mandated by law is by definition a voluntary standard. The -- the application of whether a standard is going to be enforced by the Consumer Products Safety Commission depends upon what CPSC determines to be the potential or the need for that standard to be enforced and according to

271

RUSH

the CPSC I guess underlying legislation that they are to look to industry standards where applicable.

Q. Is the WCMA a voluntary organization?

A. Yes, it is.

Q. And what do you mean by a voluntary organization?

A. A company can choose to join or not join.

Q. Does the WCMA have any power to enforce any actions against its members or make its members meet any standards?

A. No, it does not.

Q. How about the Window Covering Safety Council, is it a voluntary organization as well?

A. Yes, it is.

Q. And does it have any power to enforce any regulations, standard or conduct of its members?

A. No, it does not.

Q. Does either organization have any power over nonmembers of

272

RUSH

organizations?

A. No, it does not.

Q. And I take it a company can opt in or opt out of any program or even membership in these organizations at any time; is that correct?

A. Yes, we have no control over whether a company becomes a member or decides to discontinue its membership.

Q. Just a second here. Let me go through my notes.

(Pause.)

MR. EARNHART: I don't have any further questions.

MR. QUINN: No questions. This is Dan Quinn for Ching Feng.

MR. CARROLL: I don't have any questions for Mr. Rush at this time for WCMA.

MR. BAUERMEISTER: Mr. Rush, this is Don Bauermeister. I want to thank you for your patience today.

THE WITNESS: Thank you.

MR. CARROLL: The witness will

273

RUSH

read and sign.

MR. QUINN: Hey, Don, this is Dan --

MR. BAUERMEISTER: Yes, sir. Are we off the record now?

MR. CARROLL: I believe we are. You want to announce it.

THE VIDEOGRAPHER: The time is 4:50. We are off the record. This ends the deposition for today.

(Time noted: 4:49 p.m.)

_____
PETER RUSH

Subscribed and sworn to before me this     day of         , 2006

274

```
 1            RUSH
 2       CERTIFICATION
 3
 4
 5
 6    I, DEBBIE ZAROMATIDIS, a Shorthand
 7  Reporter and a Notary Public, do hereby
 8  certify that the foregoing witness, PETER
 9  RUSH, was duly sworn on the date
10  indicated, and that the foregoing is a
11  true and accurate transcription of my
12  stenographic notes.
13    I further certify that I am not
14  employed by nor related to any party to
15  this action.
16
17
18
19
20
21
22
23        DEBBIE ZAROMATIDIS
24
25
```

275

```
 1            RUSH
 2     LITIGATION SUPPORT INDEX
 3
 4
 5   DIRECTION TO WITNESS NOT TO ANSWER
 6   Page    Line     Page    Line
 7
 8          (NONE)
 9
10   REQUEST FOR PRODUCTION OF DOCUMENTS
11   Page    Line     Page    Line
12
13          (NONE)
14
15   INFORMATION TO BE FURNISHED
16   Page    Line     Page    Line
17
18          (NONE)
19
20   QUESTIONS MARKED FOR A RULING
21   Page    Line     Page    Line
22
23          (NONE)
24
25
```

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868                             516-608-2400