174 P.3d 757
174 P.3d 757
(Cite as: 174 P.3d 757)

Page 9

total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection"); cf. W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 53, at 356 (5th ed. 1984) ("It is better to reserve 'duty' for the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other, and to deal with particular conduct in terms of a legal standard of what is required to meet the obliga- tion.").

Here Peak has argued that section 321 should be construed to mean that the danger posed by the moose carcass's presence on the highway could have been "created" only by the driver whose vehicle actually killed or disabled the moose. In our view, Peak's attempt to equate the creation of a hazard with what amounts to the requirement of but-for causation unduly restricts the scope of the duty contemplated by section 321 and undermines that provision's basic purpose.

As the facts of this case illustrate, hazardous conditions can often reflect the actions of multiple actors. In such cases, however, the immediate circumstances surrounding the hazard's creation will frequently make it difficult to tell exactly which actor and actions primarily caused the new danger; and in many such cases, definitive proof of actual or primary causation might never be found.

In these situations, a rule that hinges the hazard-creating actors' duty of due care on proof of but-for causation would invite all involved actors to disclaim any duty until the question of causation could be resolved. The purpose of the duty established in section 321 is to encourage immediate efforts to avoid future harm. It would make little sense, and would frustrate the duty's purpose, to interpret section 321 as hinging the imposition of the duty on causational determinations that commonly require careful investigation and often prompt considerable debate.

Nor does the plain language of section 321 compel such a narrow definition of its phrase referring to an act that creates a hazard. The section describes two key ingredients required to establish creation. The first is affirmative action on the part of the actor: the duty can attach only when the "actor does an act." [FN7] The second is the actor's awareness (objectively measured) of a substantial potential for resulting danger: the duty can attach only when the actor "realizes or should realize" that "an unreasonable risk of causing physical harm to another" has resulted from the act.[FN8] As section 321's own text describes its creation requirement, then, a hazard can be "created" by multiple actors when each actor actively participates in the circumstances immediately surrounding the creation of a hazard and each actor realizes that these circumstances have resulted in a condition that poses a substantial risk of physical harm to others.

FN7. RESTATEMENT (SECOND) OF TORTS § 321.

FN8. Id.

[3] Peak advances no sound reason for limiting section 321's duty in cases involving multiple actors to the actor who can be proved to be the but-for cause of the hazard. Although Peak insists that Parnell's joint-creation theory would require any driver who hit a carcass to stop and remove it or warn others of its presence, Parnell actually advances, and the evidence supports, a much narrower theory. At trial it was undisputed that Dougherty and the "John Doe" driver both struck the moose, which at some point in time came to rest in the middle of the roadway, and the evidence, including eyewitness testimony, indicated that the two drivers hit the moose almost simultaneously. Indeed, the superior court itself recognized that the evidence would have allowed the *764 jury to find that "a combination of the two cars ... took out the moose."

In light of this evidence, the point at issue here is not whether a motorist who happens to see-or merely run over-an already existing roadway hazard

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

174 P.3d 757
174 P.3d 757
(Cite as: 174 P.3d 757)

Page 10

can be found to have "created" the hazard. Rather, Parnell's theory of the case presents a more limited question: who bears the duty when two motorists both take substantial actions that combine to create the hazard? In this unique situation, as we have noted, the crucial policy issue becomes whether the protective duty imposed by section 321 should fall to both drivers based on their active participation and actual awareness of resulting danger, or just to the driver who, in retrospect, might be determined to be the primary cause of the hazard's existence. In our view, the policies underlying section 321 weigh heavily in favor of imposing the duty on both drivers.

In arguing for a narrower interpretation of section 321, Peak relies on *Udy v. Custer County*,[FN9] which simply recognizes the general principle that a motorist who passes by an existing roadway hazard owes no duty.[FN10] *Udy* is unremarkable, and Peak's reliance on it is misplaced. In contrast, Parnell cites two cases that offer substantial guidance on this question: *Zylka v. Leikvoll*[FN11] and *Montgomery v. National Convoy & Trucking Co.*[FN12] Like Parnell's case, both *Zylka* and *Montgomery* addressed situations involving traffic hazards arising from the combined actions of two motorists; in each case, the court recognized that the defendant's substantial participation in creating the hazard sufficed to trigger a duty of due care even though the same hazard arguably might have existed without the defendant's participation.[FN13]

   FN9. *Udy v. Custer County*, 136 Idaho 386, 34 P.3d 1069 (2001).

   FN10. *Id.*

   FN11. *Zylka v. Leikvoll*, 274 Minn. 435, 144 N.W.2d 358 (1966).

   FN12. *Montgomery v. Nat'l Convoy & Trucking Co.*, 186 S.C. 167, 195 S.E. 247 (S.C.1938).

   FN13. *See Zylka*, 144 N.W.2d at 367;

*Montgomery*, 195 S.E. at 253.

On balance, considering the record, the parties' arguments, and these authorities, we conclude that when the combined actions of two actors result in a hazardous condition, section 321 allows each to be treated as having "created" the hazard so long as each actor's conduct substantially contributed to the resulting hazard and each actor realizes the resulting danger of serious harm to others.

[4] We also conclude that Parnell was entitled to an instruction to clarify the scope of the disputed duty. We have previously recognized that a plaintiff is generally entitled to a jury instruction "consonant with the theory of her case" if the evidence supports the plaintiff's theory.[FN14] We have further recognized that, when a jury expresses confusion and seeks clarification as to the applicable law, it is the trial court's duty to guide the jury with a "lucid statement of the relevant legal criteria."[FN15]

   FN14. *Clary Ins. Agency v. Doyle*, 620 P.2d 194, 201 (Alaska 1980) (quoting *Putensen v. Clay Adams, Inc.*, 12 Cal.App.3d 1062, 91 Cal.Rptr. 319, 334 (1970)).

   FN15. *Chenega Corp. v. Exxon Corp.*, 991 P.2d 769, 776 (Alaska 1999); *Des Jardins v. State*, 551 P.2d 181, 189-90 (Alaska 1976) (quoting *Bollenbach v. United States*, 326 U.S. 607, 612-13, 66 S.Ct. 402, 90 L.Ed. 350 (1946)).

Here, Parnell's primary theory of liability against Peak was her theory of joint creation: she claimed that John Doe and Dougherty both struck the moose within moments of each other and left its carcass on the highway, that Dougherty realized that the carcass exposed other motorists to a substantial risk of harm, and that these circumstances justified assigning a duty of due care to Dougherty because he had participated in creating the hazard. In keeping with this theory, Parnell proposed an instruction describing her claim as being that "Marvin Dougherty

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

174 P.3d 757
174 P.3d 757
(Cite as: 174 P.3d 757)

Page 11

struck a moose, thereby creating or participating in the creation of a hazardous situation." Her instruction also proposed to inform the jury that under the law applicable to the case, a duty of due care arises "if a driver, by his actions, or in combination *765 with others, creates or participates in the creation of a hazard in a roadway."

In our view, by emphasizing that a duty of due care can be owed by a driver who either "creates" a hazard individually or "participates in the creation" with another driver, Parnell's proposed instruction effectively made the point that both Dougherty and John Doe could be found to have created the hazardous condition, even though the same hazard might have existed if only one or the other had struck down the moose.

The trial court's instructions did not otherwise make this point. In keeping with Peak's narrow view of section 321's creation requirement, the instructions actually given by the trial court appeared to offer the jury an either-or choice: on the one hand, Instruction 23 informed the jury of Parnell's claim that Dougherty had created the hazardous condition and stated that she could prevail against Peak only if she proved that Dougherty created the hazardous roadway condition; on the other hand, Instruction 24 told the jury of Peak's claim that "John Doe" had created the hazard, directing the jury to find John Doe negligent if Peak proved this theory.

The jury may have understood these instructions to imply that only one actor could have legally created the hazard. The instructions effectively validated Peak's position that section 321's creation requirement hinged on a finding that Dougherty was the but-for cause of the moose carcass's presence on the highway. Peak maintained in its closing argument that the jury could find that Dougherty created the hazard only if Parnell proved that John Doe's vehicle had neither killed nor mortally wounded the moose. By contrast, although the instructions did not completely prevent Parnell from arguing joint creation, her attorney was constrained to confine this argument to the narrow theory that both drivers might have hit and killed the moose simultaneously-a theory that would have required the jury to find that both drivers were the actual cause of the hazard because they killed the moose at the same moment.

Even when the jury later requested clarification of Instruction 23's final paragraph, which barred the jury from finding Peak negligent unless it found that Dougherty had himself created the hazard, the trial court declined Parnell's request to inform the jury that Dougherty could have created a hazard "either directly or in combination with another vehicle." Accordingly, the jury was never adequately informed that Dougherty could be found to have "created" the hazard even if his own actions might not actually have killed or incapacitated the moose.

[5][6][7] In determining whether the jury was properly instructed on the applicable law, we review the trial court's rulings de novo.[FN16] An instruction that sets out an incorrect or incomplete statement of the applicable law amounts to reversible error only if it causes substantial prejudice to a party-that is, only "if it can be said that the verdict may have been different had the erroneous instruction not been given." [FN17] When "evaluating whether there has been prejudicial error with regard to jury instructions, the reviewing court must put itself in the position of the jurors and determine whether the error probably affected their judgment." [FN18]

> FN16. *Reich v. Cominco Alaska, Inc.,* 56 P.3d 18, 25 (Alaska 2002).
>
> FN17. *Id.* (quoting *Barrett v. Era Aviation, Inc.,* 996 P.2d 101, 103 (Alaska 2000)).
>
> FN18. *Id.* (quoting *Cable v. Shefchik,* 985 P.2d 474, 479 (Alaska 1999) (internal quotations omitted)).

Applying these principles, we conclude that if the jury instructions had made it clear that but-for causation is not a strict prerequisite to imposing a duty

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

174 P.3d 757
174 P.3d 757
(Cite as: 174 P.3d 757)

Page 12

under section 321, the jury may have returned a different verdict. Accordingly, we hold that the failure to instruct the jury on Parnell's theory of the case amounted to reversible error; at a minimum, Parnell's proposed supplemental instruction should have been given in response to the jury's specific request to clarify the meaning of Instruction 23.

**2. Parnell's Motions for Judgment as a Matter of Law**

Before trial Parnell unsuccessfully moved for summary judgment against Peak on the *766 issue of liability, asserting that she was entitled to judgment as a matter of law on a theory of negligence per se. After the evidence closed at trial, Parnell unsuccessfully moved for a directed verdict and judgment notwithstanding the verdict on the same grounds or, alternatively, on the basis of the common law factors set out in *D.S.W. v. Fairbanks North Star Borough School District*.[FN19] Parnell now renews these arguments on appeal.[FN20]

> FN19. *D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554, 555 (Alaska 1981).

> FN20. Because the superior court's post-trial rulings effectively superseded its original pre-trial rulings on Parnell's summary judgment motions, we review the court's post-trial rulings rather than its rulings on summary judgment. We review these rulings de novo using a standard similar to the one that applies in reviewing summary judgment rulings, asking "whether the evidence, when viewed in the light most favorable to the non-moving party is such that reasonable persons could not differ in their judgment as to the facts." *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 722 (Alaska 2003) (quoting *Ben Lomond, Inc. v. Schwartz*, 915 P.2d 632, 635 (Alaska 1996)); cf. *Nielson v. Benton*, 903 P.2d 1049, 1052 (Alaska 1995); *Bishop v. Municipality of Anchorage*, 899 P.2d 149, 153 (Alaska 1995) (describing standard of review for summary judgment). Parnell also appeals denial of her motion for directed verdict on the ground that under the *Restatement (Second) of Torts*, section 321, Peak had a duty to either remove the moose from the roadway or warn others of the hazard and his failure to do so entitled Parnell to a directed verdict. But while we have addressed the legal questions of the existence and extent of the duty in this case, the remaining questions of breach and causation are factual issues reserved for the jury at the new trial after remand.

**a. Negligence per se for violating AS 28.35.080**

[8][9] Parnell builds her theory of negligence per se around AS 28.35.080(a), a hit-and-run provision that requires any driver involved in an accident that results in death, personal injury, or "total property damage to an apparent extent of $2000 or more" to notify the police or the Department of Public Safety "immediately by the quickest means of communication." In *Ferrell v. Baxter*, we ruled that general traffic laws can "set the standard of a reasonable man and thereby require a finding of negligence in a tort action if the plaintiff can prove that the defendant committed an unexcused violation."[FN21] But we have also recognized that negligence per se cannot apply in a particular case unless the trial court first determines that "the conduct at issue lies within the ambit of the statute or regulation in question."[FN22]

> FN21. *Ferrell v. Baxter*, 484 P.2d 250, 259 (Alaska 1971).

> FN22. *Osborne v. Russell*, 669 P.2d 550, 554 (Alaska 1983).

[10] Here, the superior court ruled that Parnell's negligence per se claim failed to meet this standard, concluding that the requirements of AS 28.35.080 were not "applicable to the fact situation in this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

174 P.3d 757
174 P.3d 757                                                                                                                Page 13
(Cite as: 174 P.3d 757)

case." The court cited two cases for this conclusion, *Wylie v. State* and *Drahosh v. State,* both of which describe the Alaska Motor Vehicle Code's hit-and-run provisions as having two basic purposes: to prohibit hit-and-run driving in order to prevent drivers from escaping liability and to ensure the availability of prompt assistance to motorists in distress.[FN23]

> FN23. *See Wylie v. State,* 797 P.2d 651, 657 (Alaska App.1990); *Drahosh v. State,* 442 P.2d 44, 48 (Alaska 1968).

Parnell contends that AS 28.35.080 was intended to "protect the motoring public [from] any hazards associated with the accident." But we agree with the superior court's decision rejecting this view and conclude that the court correctly relied on *Wylie* and *Drahosh.* Although AS 28.35.080 may well enable the police to protect the public against roadway hazards in many cases, this appears to be a secondary benefit of the hit-and-run statute. If the legislature had viewed roadway hazards as a matter of primary concern, there would have been no obvious reason for it to use the apparent value of property damage as the exclusive measure triggering the duty to report a hazard-an imprecise measure that is bound to result in underreporting when low-damage accidents create obvious hazards and overreporting when high-damage accidents create no hazard.

*767 [11] In any event, even assuming that protecting the public from traffic hazards fell within the core purpose of AS 28.35.080, the evidence in this case still would not have supported Parnell's claim of negligence per se. Subsection .080(a) requires an accident involving property damage to be reported only when there is "total property damage to an apparent extent of $2000 or more." Here, several invoices and other discovery evidence included with the parties' pre-trial pleadings suggested that Peak made various repairs to Dougherty's pickup and that the total value of the work exceeded section .080's $2,000 threshold.[FN24] But these documents were largely unexplained, and at least some of the items they listed seem unrelated to Dougherty's collision with the moose. None of the documents were introduced at trial to establish total property damage; indeed Parnell appears to have made no effort to pursue the issue at trial. And undisputed evidence established that virtually all of the damage from the collision occurred on the underside of Dougherty's truck-an area where the damage was hardly "apparent."

> FN24. Parnell bases her argument that the statute's $2,000 threshold was met on the following evidence: Dougherty's deposition testimony that the truck was "pulling real hard to the right or to the left" after the accident and that this forced him to reduce his speed; an undated Peak supervisor's incident report estimating the "direct cost" of equipment damage as $3,800; an April 24, 2004, Peak purchase order for truck parts, including ball joints, serpentine belts, brake pads, and a speed sensor; and deposition testimony by Peak employee Duke Minium that, shortly after the moose collision, the truck's exhaust sounded noisy. Parnell also argues that the value of the dead moose should be included in the property damage total. We find this argument meritless because, even though a moose arguably might be characterized as property having value, nothing in the record suggests that the value of a moose killed on the highway could ever be "apparent" to a motorist, as required under section .080.

[12] Because AS 28.35.080 imposes a duty on drivers to take immediate action after an accident, the provision's requirement that the value of the damage be "apparent" can best be understood as referring to property damage that can be readily detected and evaluated by motorists at an accident scene. Here, even viewing the record in the light most favorable to Parnell, we see no reasonable basis for finding that damages to Peak's truck totaling $2,000 or more should have been "apparent" to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

174 P.3d 757
174 P.3d 757
(Cite as: 174 P.3d 757)

Page 14

Dougherty at the accident scene. Thus, the court correctly ruled that liability on a theory of negligence per se cannot stand.

### b. Liability based on *D.S.W.* factors

[13] Parnell alternatively contends that the superior court erred in declining to find liability as a matter of law based on the policy factors listed in *D.S.W. v. Fairbanks North Star Borough School District*.FN25 But this alternative theory is unavailing. The *D.S.W.* analysis serves to determine whether a common law duty should be recognized where none otherwise exists. For this reason, we have observed in other cases that an analysis under *D.S.W.* becomes appropriate only "[i]n the absence of any other source of a duty of care (imposed, for example, by statute, contract, or doctrine of law)." FN26 Here, as we have already seen, the superior court properly determined that the issue of duty in this case was governed by the legal rule set out in section 321 of the Restatement (Second) of Torts. Accordingly, this case provides no occasion to undertake an analysis under *D.S.W.* in search of a new duty.

FN25. *D.S.W.*, 628 P.2d at 555.

FN26. *Bolieu*, 953 P.2d at 1235; *see also Kallstrom v. United States*, 43 P.3d 162, 167 (Alaska 2002) ("We apply the [*D.S.W.*] factors ... to determine whether an actionable duty of care exists when the facts under consideration are not covered by statute, regulation, contract, or case law.").

### B. Peak's Cross-Appeal

Peak raises a contingent cross-appeal, arguing two points of error to be considered only if Parnell's appeal is not affirmed.

### 1. Vicarious liability

First, Peak challenges the superior court's order granting summary judgment to Parnell on the issue of Peak's vicarious liability for Dougherty's actions. Peak contends that this ruling "ignore[d] the overwhelming factual evidence" showing that Dougherty was *768 not acting in the course and scope of his employment with Peak, as well as established case law requiring that an employee's activities be designed to serve the employer's interests before liability can be imposed. Peak emphasizes that Dougherty was not employed as a crew driver; the accident occurred before Dougherty's normal shift began and at a distance of several miles from the worksite; and Dougherty was not paid for this travel time to and from the jobsite. Citing several cases holding that driving a company-owned vehicle does not necessarily bring an employee's conduct within the course of employment,FN27 Peak insists that the facts clearly show that Dougherty was using Peak's truck to further his own interests, not Peak's.

FN27. *See, e.g., Salmon v. Hinojosa*, 538 S.W.2d 22, 23-24 (Tex.Civ.App.1976); *see also* RESTATEMENT (SECOND) OF AGENCY § 229 cmt. d (1958).

Parnell responds that the superior court properly held that Peak would be vicariously liable if Dougherty were found negligent, because the undisputed facts show that Dougherty was essentially acting as a "bus driver" in furtherance of Peak's interests.

[14] Under the doctrine of respondeat superior, an employer is liable for the negligent acts or omissions of an employee only if the acts or omissions occur within the course and scope of employment.FN28 For purposes of determining whether a particular act occurred in the course and scope of employment we have customarily looked to the standards set out in sections 228 and 229 of the Restatement (Second) of Agency.FN29

FN28. *Powell v. Tanner*, 59 P.3d 246, 248 (Alaska 2002); *see also* PROSSER AND

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

174 P.3d 757
174 P.3d 757
(Cite as: 174 P.3d 757)

Page 15

> KEETON ON THE LAW OF TORTS § 70, at 501-03 (W. Page Keeton et al. eds., 5th ed.1984).

FN29. *Luth v. Rogers & Babler Constr. Co.*, 507 P.2d 761, 764-65 n. 14 (Alaska 1973).

Section 228 describes the circumstances required to bring conduct within the scope of employment as well those establishing conduct fully outside that scope:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
> (a) it is of the kind he is employed to perform;
>
> (b) it occurs substantially within the authorized time and space limits;
>
> (c) it is actuated, at least in part, by a purpose to serve the master, and
>
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.[FN30]

FN30. RESTATEMENT (SECOND) OF AGENCY § 228.

Section 229 elaborates on the circumstances required under section 228 and lists several factors relevant to determining their presence. This section provides that, "[t]o be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized." It then explains that considerations relevant in determining whether an act meets these standards include whether the act is one commonly done by such servants; whether the master has reason to expect that such an act will be done; whether the instrumentality by which the harm is done has been furnished by the master to the servant; and the extent of departure from the normal method of accomplishing an authorized result.[FN31]

FN31. RESTATEMENT (SECOND) OF AGENCY § 229.

Comment d of section 229 specifically addresses driving that occurs while an employee is going to and from work:

> If the master supplies the servant with a vehicle in order that the servant may go to or from work, it is important to ascertain whether the vehicle is supplied primarily for the purpose of assisting the master's work or for the purpose of assisting the employee to perform what is essentially his own job of getting to or from work. The mere fact that the employer supplies a vehicle does not establish that those who avail themselves of it are within the scope *769 of employment while upon it, especially if the use is merely casual.[FN32]

FN32. *Id.* cmt. d.

Illustration 13 of section 229 addresses this comment and is squarely on point with this case:

> P employs men to do logging five miles from the nearest habitation. In order to be certain that they arrive on time, P habitually supplies and keeps in repair a truck which his workmen, who live in the nearest town, use in going to and from work. It is driven usually, but not invariably, by the one acknowledged to be the best driver. These facts will support a verdict that in driving to and from work, the driver is within the scope of employment.[FN33]

FN33. *Id.* cmt. d, illus. 13.

[15] While Peak did not pay Dougherty for driving other employees to the Swanson River worksite, it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

174 P.3d 757
174 P.3d 757
(Cite as: 174 P.3d 757)

Page 16

is undisputed that the company allowed Dougherty to have the truck with the understanding that he would use it to commute to the jobsite with his co-employees; it is further undisputed that Dougherty was en route to pick up other workers and drive them to the jobsite when he hit the moose, and that Peak authorized Dougherty to perform this task on a regular basis and derived a significant benefit from Dougherty's willingness to do so. By driving other employees to work each day, Dougherty helped to ensure that they would reach Peak's remote jobsite on time, at the same time reducing traffic and related impacts on the gravel road leading to the jobsite.

As the superior court correctly recognized in applying the Restatement's analysis, these undisputed circumstances establish that, at the time of the accident, Dougherty was acting in the course of his employment with Peak. Although Peak correctly points out that driving an employer-owned vehicle to work is not itself dispositive of the issue, the additional facts here clearly support a finding that Dougherty was acting within the scope of employment. We thus affirm the superior court's order granting summary judgment to Parnell on the issue of Peak's vicarious liability as Dougherty's employer.

**2. Peak's expert witness**

At trial Peak moved for an order allowing its accident reconstruction expert, Michael DiTallo, to supplement his pre-trial report with-and then to testify about-new information DiTallo had just gained from a recently identified witness. The trial court denied Peak's motion. Peak now challenges this ruling, arguing that Peak acted diligently in acquiring the new information; that the evidence had significant value; and that its exclusion resulted in unwarranted prejudice to Peak. In response, Parnell argues that the court properly excluded DiTallo's supplemental report and testimony because the evidence was untimely and would have left her with insufficient opportunity to respond, since her own experts had already testified and left town.

We find it unnecessary to resolve this point on its merits. Parnell's objections to this evidence and the superior court's order declining to allow its admission both appear to have been based on concerns over potential prejudice that might arise if the new information were admitted at the last minute. Because the disputed evidence will not be cause for surprise in future proceedings, we see no reason to expect that the same concerns would prompt the superior court to exclude the evidence on remand. As matters now stand, then, the controversy over the evidence's last-minute admission appears to be moot. [FN34]

> FN34. Because parties and the superior court have had no occasion to raise or consider any issue concerning the admissibility of the new evidence besides the fact of its last-minute production, our disposition finding this point moot implies no view as to the ultimate admissibility of this evidence.

**IV. CONCLUSION**

We REVERSE the judgment against Parnell and REMAND for a new trial in accord with this opinion; we AFFIRM the order granting partial summary judgment to Parnell*770 on the issue of Peak's vicarious liability for Dougherty's conduct.

MATTHEWS, Justice, not participating.
Alaska,2007.
Parnell v. Peak Oilfield Service Co.
174 P.3d 757

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.