

**DORRIS AND ASSOCIATES INC.**

75 Fifth Street, NW   Suite 650   Atlanta, GA 30308   P 770.487.2138   F 770.487.0106   W www.dorrisassociates.com

February 17, 2006

Mr. Jameson B. Carroll
King & Spalding
191 Peachtree Street
Atlanta, GA  30303-1763

Re:  Rountree v. WCMA, et al.

Dear Mr. Carroll:

As requested, the following is a report of our opinions regarding the warnings and safety communications aspects associated with the above referenced litigation.

## QUALIFICATIONS

Please find enclosed copies of our most recent curricula vitae, which outline our respective experience and qualifications, including relevant publications, professional certifications and affiliations. We have given numerous presentations and authored various manuscripts, articles, and technical reports on the design of warnings and behavioral responses to safety messages.

Briefly, we both hold an M.S. and Ph.D. in Industrial and Systems Engineering and have specialized in Human Factors Engineering (HFE). During our professional work experience, we have both routinely performed evaluations of the design and development of warnings and similar precautionary information.

Dorris and Associates, Inc. provides product safety services to a wide variety of entities. Clients include corporations, non-profit organizations, trade associations, state and federal governmental agencies, as well as defense and plaintiff's attorneys. Client services have been performed in the U.S., Canada, U.K., France, Germany, Spain, Belgium, Australia and Japan.

Dorris and Associates is a member of the American National Standards Institute (ANSI) Z535 Committee that promulgates voluntary, consensus warning standards. Currently, Nathan serves as the chairman of ANSI Z535.5 subcommittee.

The charge for our services in this litigation is $575 per hour for Alan Dorris and $225.00 per hour for Nathan Dorris. Attached are the respective lists of trial and deposition testimony we have given over the past four years.

1

**EXHIBIT  49**

## MATERIALS REVIEWED

In analysis of this matter, we have reviewed the following materials specific to this case:

- Demand for Trial By Jury
- Complaint
- Epidemiologic Investigation Report
- Anchorage Police Department Death Investigation Report
- Anchorage Police Department Police Report and Narrative
- Municipality of Anchorage, Anchorage Police Department Property & Evidence Report
- Office of the State Medical Examiner Death Investigation Report
- State of Alaska, Department of Health & Social Services Autopsy Report
- Materials regarding the development of ANSI/WCMA A100.1
- Journal of the American Medical Association article, entitled "Pediatric Window-Cord Strangulations in the United States, 1981-1995"

- A Study of Design Factors and Other Influences Impacting Window Product Safety Commission Between 1996-2002
- Photo Copy of Subject Warning
- Reports of Window Covering Safety Council to Consumer Product Safety Commission (1995, 1996, 1997, 2001, 2002, 2003, 2004)
- Materials Relating to the Nov. 2000 WCSC Recall and Safety Campaign
- Deposition of Paul Rountree, 07/27/05
- Deposition of Ilene Rountree, 07/27/05
- Deposition of Peter Rush, 02/16/06
- Deposition of Valerie Rountree Cox, 04/27/06
- Deposition of Christopher Cox, 04/28/06

In addition to the above materials, the opinions expressed in this report are based upon our respective education and training in the fields of Human Factors Engineering (HFE) and product safety as well as our familiarity with the safety aspects of the published literature and standards in these fields.

## WARNINGS RESEARCH

Over the past quarter of a century there has developed a sizable literature on behavioral responses to warnings. Since the design of safety communications and the systematic analysis of responses to those communications is an aspect of HFE, many of the studies are reported in the HFE literature. The fact that warning analysis has developed into an empirical, scientific field of behavioral study is evidenced by:

- the existence of a substantial amount of literature, much of it refereed, evidencing a range of research methodologies; and

- empirical evidence that lay persons are not able to predict with statistical reliability the effectiveness of safety signs or labels.

Significant reviews of this literature can be found in McCarthy et al. (1984), DeJoy (1989), Ayres et al. (1998), Rogers et al. (2000).

## USE OF WARNINGS

A commonly cited definition of a warning is "...a message intended to reduce the risk of personal or property damage by inducing certain patterns of behavior and discouraging or prohibiting certain other patterns of behavior" (Dorris and Purswell, 1978). There is general agreement that warnings should endeavor to communicate:

1. the nature of the hazard;

2. the means of avoiding the hazard; and

3. the consequences of failing to avoid the hazard.

However, not all of these elements will be necessary in all circumstances and need not be explicitly included in the warning.

With respect to on-product warnings, it is important to note that, in general, more is not always better.   For instance, the National Highway Traffic Safety Administration has recognized the need to avoid what it refers to as "information overload" in developing automotive warning regulations (Dorris & Dorris, 2001a, 2001b). This concern is supported by the warnings literature (Dorris, 1991; Frantz, Rhoades, Young & Schiller, 1999; and Frantz, Rhoades & Lehto, 1999).

## ACCIDENT INFORMATION

According to the Anchorage Police Department report (report no. 02-25880), on May 27, 2002, April Lynne Cox was found by her mother, Valerie Rountree Cox, in her crib with a portion of the inner-cord of the subject window blinds wrapped around her neck.   Police and emergency medical services responded, however, the 14-month-old died from her injuries.

According to the police report, the child's crib was placed "against the south wall (lengthwise) with the rail of the crib above level with the bottom of the window."

## FACTS AND OPINIONS

On the basis of our respective education and experience as outlined on the attached curricula vitae, the literature on warnings including but not limited to those referenced in this report, and the materials reviewed for this case as listed above, we have reached the following opinions that are held to a reasonable degree of scientific certainty:

1. *Warning on Subject Window Covering*

It is my understanding that the manufacturer of the subject window covering has not been identified. As such, it is impossible to determine if that manufacturer complied with all the provisions of the American National Standard for Safety of Corded Window Covering Products, ANSI/WCMA A100.1.

The warning affixed to the bottom rail of the subject window blinds (see figure 1) generally conforms to the provisions set forth in section 5.1.1 of ANSI/WCMA A100.1-1996 (see figure 2). It should be noted that safety messages in French are not a requirement the American standard. This label explicitly warns users about the potential for strangulation from blind cords.



Figure 1. *On-product label affixed to subject window covering*

2. *Development of ANSI/WCMA A100.1-1996*

The voluntary consensus standard ANSI/WCMA A100.1-1996 was developed through a reasonable and appropriate process that directly involved the U.S. Consumer Product Safety Commission (CPSC). From the evidence reviewed in this matter, one can reasonably conclude that the warnings outlined in this standard resulted from an appropriate human factors analysis, including iterations of design-and-evaluation by WCMA members and CPSC staff. The significant level of involvement by CPSC staff in the development of this standard is reflected in the evidence as well as a letter of support from the CPSC opposing the withdrawal of this standard. In that letter, the CPSC stated:

4

"The staff [of the CPSC] advocated the development of a national consensus standard on blind cords in order to reduce deaths and serious injuries associated with blind cords. Further, the staff provided technical support to the development of the safety standard referenced above."

Additionally, it is significant that the WCMA obtained ANSI-accreditation as a standards developer in order to sponsor the development of this standard, rather than author and publish proprietary guidelines. Standards developed by committees accredited by the American National Standards Institute (ANSI) must meet requirements for openness, balance, consensus and due process. ANSI-accredited standard developers are required to follow a structured method for eliciting and considering comments during the standard-making process. This due process requirement is designed to ensure that consensus has been reached and that a concerted effort has been made to resolve any objections or negative opinions that have been expressed to the standard committee. According to ANSI:

"Due process is the key to ensuring that [American National Standards] ANSs are developed in an environment that is equitable, accessible and responsive to the requirements of various stakeholders. The open and fair ANS process ensures that all interested and affected parties have an opportunity to participate in a standard's development. It also serves and protects the public interest since standards developers accredited by ANSI must meet the Institute's essential requirements and other due process safeguards" (see ANSI website).

The WCMA acted reasonably and properly by working with the CPSC to develop warning provisions that would be uniformly applied to all window coverings complying with the voluntary standard. Consistency in warnings and safety communications is desirable and appropriate when potential hazards are similar across products within an industry, regardless of the specific design or manufacturer. For example, uniform warnings have been mandated by regulatory agencies, such as the CPSC (Deppa, 2006) for choking hazards associated with children's toys as well as for airbags in automobiles by NHTSA (Dorris & Dorris, 2001a, 2001b).

3.  *The Warning System Outlined by ANSI/WCMA A100.1-1996*

From a human factors engineering perspective, the warning system put forth in ANSI/WCMA A100.1-1996 is reasonable, appropriate and adequate to alert expected users of potential strangulation hazards associated with cords in window coverings as well as the means to avoid these hazards or reduce the risk of serious injuries. This warning system consisted of various on-product warning labels and hang tags. The primary warnings, which would be common to all window coverings complying with this standard, consisted of the bottom rail label (see figure 2) and a hang tag (see figure 3).

5

  

*Figure 2. Bottom rail label identified in ANSI/WCMA A100.1-1996*

The hang tag required by ANSI/WCMA A100.1-1996 explicitly warns about potential strangulation from inner cords by identifying "cords that run through window coverings." Additionally, this warning instructs readers to move cribs and furniture away from window covering cords (see figure 3).

 

*Figure 3. Hang tag identified in ANSI/WCMA A100.1-1996*

The standard requires that these warnings adhere to the provisions of the ANSI Z535 series of standards, which address formatting of safety signs and labels.

Hang tags and other temporary warnings are an appropriate component of a warning system. As an example, the National Highway Traffic Safety Administration (NHTSA) requires a temporary warning regarding airbags on the dashboard of new vehicles, in addition to the permanent sun visor warnings (Dorris and Dorris, 2001a). Because hang tags and other temporary warnings are not limited by the space available for on-product labeling, these warnings often will communicate more information than appears in corresponding permanent warnings. Appropriate permanent labels will communicate the necessary precautionary information, in addition to serving as a reminder for users after hang tags have been removed.

4.  *The WCSC Safety Education Campaign*

The Window Covering Safety Council (WCSC) was formed in 1994. This group included members of the WCMA as well as importers and retailers of window coverings. It is my understanding that the WCSC worked directly with CPSC staff in October 1994 to develop a safety program focusing on strangulation hazards associated with window coverings. Many of the issues identified and addressed by this program were incorporated into the subsequent voluntary standard, ANSI/WCMA A100.1-1996.

In November 2000, approximately 1½ years before this accident, the WCSC and CPSC announced a "recall to repair" and safety education campaign to address the strangulation hazard associated specifically with inner cords of window coverings. This campaign encouraged consumers to install a newly developed safety device the, inner cord stop, which would reduce the potential for inner cords to be pulled out from the window covering forming a loop. Design changes, including requirements for the installation of inner cord stops for new products, were incorporated into the next revision of the voluntary standard, ANSI/WCMA A100.1-2002.

The WCMA members acted properly in working with the CPSC to form the WCSC, which conducted the November 2000 safety campaign. This campaign was reasonable and appropriate for the purpose of educating consumers about the potential strangulation hazards associated with cords and encouraging past purchasers of window coverings to install the inner cord stops, which were made available free of charge. The WCSC and CPSC worked together to publicize the new safety device and warn consumers about the risks of children and window covering cords using methods such as: (a) public announcements and news releases, (b) CPSC Safety Alerts, (c) information on websites, (d) posters and information sent to pediatricians and other medical practitioners, as well as (e) eliciting substantial media coverage in major and local newspapers, magazines, and television outlets. All of these methods are accepted practices for promoting public outreach and safety education campaigns. The safety campaign was monitored by the WCSC and reports were made directly to the CPSC as a part of the voluntary action plan.

5.  *Different or Additional Warnings*

From the materials reviewed to date, there is no evidence to suggest that any different or additional warnings would have changed the behavior of anyone in the Rountree family in such a fashion as to prevent this accident. Mr. Paul Rountree

testified that, prior to this accident, he never noticed or read any warnings associated with the subject blinds (see deposition of P. Rountree, pg. 11-12, 25-26, 64). He also testified that he doesn't recall if any written instructions accompanied the subject blinds (see deposition of P. Rountree, pg. 15-16, 42). Mr. Cox, April's father, stated that he doesn't know if he noticed the warning on the subject blinds prior to the accident (see deposition of C. Cox, pg. 114). Valerie Rountree Cox, April's mother, stated that she did not see any warnings on the subject blinds prior to this accident (see deposition of V. Rountree Cox, pg. 43-44). Given this testimony, it is unlikely that different safety messages would have been noticed or heeded.

The WCMA has no authority or control over manufacturers of window coverings. The national consensus standard sponsored by the WCMA is voluntary and the association cannot require conformance with the standard. In fact, the CPSC recommends, but does not require, that individual manufactures conform to this standard. Manufacturers of window coverings are not precluded from applying additional warnings or safety messages on or with their products.

With respect to the allegations in this matter, the warning hang tag prescribed by ANSI/WCMA A100.1-1996 identifies all cords, including "cords that run through window coverings," as potential strangulation hazards. This warning also clearly instructs users to move cribs away from window covering cords (see figure 3). If the manufacturer of the subject blinds complied with the ANSI standard, then this important warning would have been available to the Rountree family. In fact, someone in the Rountree family would have had to interact with this hangtag warning in order to remove it. Interaction with warnings increases the likelihood they will be noticed and read by product users.

6. *Disagreement with Mr. Jacobson and Mr. Statler*

We have reviewed the reports of Mr. Jacobson (10/31/07) and Mr. Statler (10/31/07) and generally disagree with their respective conclusions regarding alleged deficiencies in the warning system outlined by ANSI/WCMA A100.1-1996. Some specific points of disagreement include:

- that the WCMA was solely responsible for the content of the ANSI standard it sponsored;

- that the WCMA developed the standard without the benefit of input and advice from product safety professionals and specialists;

- that in developing the ANSI standard the WCMA had a conflict of interest or "...an incentive to set the bar unrealistically low, oblivious to the safety concerns it is purporting to address" (see Statler report);

- that the warning system outlined by ANSI/WCMA A100.1-1996 was defective or that a window covering complying with these provisions would necessarily be unreasonably dangerous for consumers;

- that the 1996 edition of the ANSI standard failed to "acknowledge" or "adequately warn" about the risk of strangulation associated with inner cords (see Statler report); and

- that the placement of an on-product warning on the bottom rail was inappropriate or unlikely to be noticed.

In the event that additional information is made available, I reserve the right to supplement or amend these opinions.

Sincerely,

Alan L. Dorris, Ph.D.
President

Nathan T. Dorris, Ph.D.
Principal Consultant

Attachments

### *References*

Ayres, T., Wood, C., Schmidt, R., Young, D. & Murray, J. (1998). Effectiveness of warning labels and signs: An update on compliance research. Proceedings of the Silicon Valley Ergonomics Conference and Exposition, pp. 199-205.

DeJoy, D.M. (1989). Consumer product warnings: Review and analysis of effectiveness research. Proceedings of the Human Factors Society 33rd Annual Meeting, pp. 936-940.

Deppa, S.W. (2006). Consumer Product Safety Commission: Development of Product Warnings. In Handbook of Warnings, Ed. M.S. Wogalter. Lawrence Earlbaum Associates: Mahwah, NJ.

Dorris, A.L. (1999). Product warnings in theory and practice: Some questions answered and some answers questioned. Proceedings of the Human Factors Society 35th Annual Meeting, pp. 1073-1077.

Dorris, A.L. & Dorris, N.T. (2001a). Mandatory air bag warnings: A human factors analysis of their development. Society of Automotive Engineering Technical Paper 2001-010046.

Dorris, A.L. & Dorris, N.T. (2001b). Supporting the warning designer: An automotive case study. Proceedings of the Human Factors and Ergonomics Society 45th Annual Meeting, pp. 865-869.

Dorris, A.L. & Purswell, J.L. (1978). Human factors in the design of effective product warnings. Proceedings of the Human Factors Society 22nd Annual Meeting, pp. 343-346.

Frantz, J.P., Rhoades, T.P., & Lehto, M.R. (1999). Practical considerations regarding the design and evaluation of product warnings. In Warnings and Risk Communication; eds. Wogalter, DeJoy & Laughery, Taylor and Francis: Philadelphia, PA; pp. 291-311.

Frantz, J.P., Rhoades, T.P., Young, S.L. & Schiller, J.A. (1999). Potential problems associated with overusing warnings. Proceedings of the 7th International Conference on Product Safety Research, pp. 274-279.

McCarthy, R.L., Finnegan, J.P., Krumm-Scott, S. & McCarthy, G.E. (1984). Product information presentation, user behavior and safety. Proceedings of the Human Factors Society 28th Annual Meeting, pp 81-85.

Rauchschwalbe, R., Mann, N.C. (1997). Pediatric window-cord strangulations in the United States, 1981-1995. Journal of the American Medical Association, Vol. 277(21), pp. 1696-1698.

Rogers, W.A., Lamson, N & Rousseau, G.K. (2000). Warning research: An integrative perspective. Human Factors, 42, pp. 102-139.