STUART M. STATLER

*esms@comcast.net*

2369 NORTH NELSON STREET
ARLINGTON, VIRGINIA 22207
703.524.8990 [ofc]   703.524.8418 [fax]
703.304.5090 [cell]

Charles W. Ray, Jr.
711 H Street, Suite 310
Anchorage, AK  99501

October 31, 2007

re: ***Rountree v Ching Feng Blinds Industry Co., LTD.,
Window Covering Manufacturers Association, et al.***

Dear Mr. Ray:

At your request, I am submitting my report in this matter.  I do so based on the materials I reviewed, and the specialized knowledge and experience I have, addressed within, in the areas of consumer product safety generally, manufacturer and seller responsibility, and the consideration of dangerous products by the U.S. Consumer Product Safety Commission [CPSC].  As you know, I served as CPSC commissioner for seven years, from 1979-86, and have consulted with respect to all these areas with consumer product manufacturers and retailers and in products litigation ever since.  Accordingly, this report is also based on my own direct, past involvement with the serious risks to safety posed by faulty household products, including corded window blinds.

## MATERIALS  REVIEWED

I have reviewed the materials which you sent me.  These include -

➢  plaintiff's original complaint;

EXHIBIT  51–A

- responses by the Window Covering Manufacturers Association [WCMA] to plaintiff requests for admission and production, and interrogatory requests;
- photographs of the Cox home, the infant crib; the adjacent window blinds and middle cord, and the room setting of the subject incident;
- > response of the WCMA to plaintiff's First Discovery Requests;
- medical records relating to the death of April Cox;
- death investigation report of 05.27.02 from the Anchorage Police Department;
- depositions of Paul Rountree and of Ilene Rountree;
- deposition of Peter Rush, former Executive Director of the Window Covering Manufacturers Association and of the Window Covering Safety Council, and WCMA's designated 30(b)(6) witness, together with the extensive set of deposition exhibits;
- pleadings re: WCMA's motion seeking dismissal for lack of jurisdiction;
- pleadings re: WCMA's summary judgment motion, and Order of the Court;
- incident reports from the CPSC concerning strangulation risks from window covering cords;
- a series of CPSC Safety Alerts and agency press releases on strangulation hazard associated with window covering cords;
- CPSC's response to plaintiff's Freedom of Information request, including 11 in-depth investigations [IDIs] of strangulation deaths to very young children from window blind cords, and 9 Medical Examiner and Coroner Alert Project [MECAP] reports;
- article from the *Journal of the American Medical Association* [JAMA, June 4, 1997], entitled "Pediatric Window Cord Strangulations in the United States, 1981-1995";
- material from Parents for Window Blind Safety;
- material from National Safe Kids Campaign on window covering cord hazard;
- material concerning both the Window Covering Manufacturers Association and the Window Covering Safety Council, from their websites; and
- related materials.

I anticipate receiving additional materials, including discovery documents, depositions and the like, as they become available, as well as defendant expert reports, and therefore reserve the right to amend or supplement this report, as appropriate, to reflect such new information.

## FACTUAL CONTEXT

I understand that, on May 27, 2002, 14-month old April Lynne Cox, in a crib in her grandparents' home in Anchorage, Alaska, was found unconscious and unresponsive by her mother with the center cord from nearby window blinds entangled around her neck. The blinds were in a down position when EMT

personnel arrived, with the crib up against the window.  April Cox died from strangulation by the center cord.

From the testimony in the case, the window blinds were apparently purchased by the grandparents at a nearby Wal-Mart store in 1994.

## PERSONAL BACKGROUND and EXPERIENCE

As previously noted, I served for seven years as Commissioner of the U.S. Consumer Product Safety Commission, the federal regulatory panel having exclusive jurisdiction over thousands of consumer products used in and around the home and in recreation.  Window blinds constitute one of those products.  The CPSC is the *only* federal agency having authority to ensure against unreasonable risks related to all kinds of infant products.  I was appointed by the President and unanimously confirmed by the United States Senate, and served as Commissioner from August 1979 through the end of May 1986.  I also was acting-Chairman and Vice-Chair of the agency for extended periods.

During that tenure in office, my responsibilities centered on protecting American citizens from unreasonable risks of injury and other product risks.  On a daily basis over a period of those seven years, my attention was wholly focused on issues of product safety, which included the risks associated with window blinds.

While serving at the helm of the CPSC, in public meetings, private sessions with affected companies and industries, and in various articles, I explicitly addressed the critical responsibilities of manufacturers and distributors of consumer products.  Both then, and as a consultant and expert witness during all the years since, I have consistently stressed the prime importance of companies actively investigating instances of serious injury or death occurring from their products.  I have repeatedly emphasized the pressing need on their part to focus upon improving a product's safety through changes to its design as a first principle.  I also have urged firms to fully comprehend and assess a product's risk *before* ever bringing it onto market, to maintain adequate records and files of hazard investigations and assessments, and to timely report safety risks to the CPSC, pursuant to the reporting requirements of the Consumer Product Safety Act [CPSA], 15 U.S.C. 2051 *et seq.*, and the Federal Hazardous Substances Act [FHSA], 15 U.S.C.1261 *et seq.*

At a previous point in time, almost a decade before being appointed as CPSC Commissioner, I served as Special Assistant to the Chairman of the precursor

panel to the CPSC, the National Commission on Product Safety [NCPS]. The panel conducted a comprehensive, two-year study [1968-70], at the direction of the U.S. Congress. It recommended to the Congress and the President a broad-based statutory scheme to provide for better protection of Americans against unreasonable risk of injury from products found in and around the home, and in recreation. Among my responsibilities, I supervised several staff investigations into unreasonable hazards needing to be addressed. The panel identified a series of risk concerns which warranted action by manufacturers, importers and retailers, by industry at large, and, as might be necessary, by regulatory or enforcement action on the part of the federal government whenever voluntary, industry remedial efforts proved unsatisfactory or inadequate.

In addition, I wrote and edited the NCPS *Interim Report: Recommending Enactment of the Child Protection Act,* which, as approved by the Congress, extended the scope of the Federal Hazardous Substance Act to cover electrical, mechanical and thermal risks to children. I also served as editor–in-chief of the NCPS *Final Report,* and helped to draft the basic outline for the later-enacted Consumer Product Safety Act. Subsequently, I was privileged to serve as a principal staff member of one of two U.S. Senate committees responsible for recommending enactment of this landmark product safety legislation to the full Senate, which overwhelmingly approved it. The measure was then signed into law by President Richard Nixon.

By way of further background, upon completing my term as CPSC Commissioner, I served as vice-president and partner with the international management consulting firm of A.T. Kearney [1986-89], in charge of product liability and product risk assessment. Much of my work there consisted of advising Fortune 500 and other firms about product risks to help them avoid downstream liability. Also, I assisted companies and their legal counsel when confronted with a product already sold and in consumer hands which constituted an undue risk or hazard. I counseled them on ways to best recall the product or otherwise mitigate the risks attendant to it. And I would advise companies, often through their outside counsel, as to how -both logistically and strategically- to deal with product risks, particularly in the context of products subject to recall by the CPSC; and then, how best to accomplish such a recall once a company or its counsel determined that was the direction in which they wanted to proceed.

A current copy of my CV is attached, along with a fee schedule and a listing of recent prior testimony I have given at trial or in deposition.

## DETERMINING WHETHER A RISK IS REASONABLE or UNREASONABLE

In weighing product risks, it is never enough to cite injury statistics -whether the figure is large or small- and attempt to determine, on that basis alone, that the risk is either reasonable or unreasonable. The fact that tens of thousands, or even hundreds of thousands of injuries each year are reported from falls on stairs, or from various recreational sports (e.g., football, baseball, rollerblading), do not make those activities or the products associated with them unreasonably dangerous. Neither under traditional common law principles, nor under the Consumer Product Safety Act, do sheer numbers of injuries ever, by themselves, render a product an unreasonable risk.

By the same token, the *absence* of sizeable injury figures does not mean that a product is safe or that it does not constitute an unreasonable risk. For example, many thousands of dangerous products have been recalled over the years, either voluntarily by the manufacturer or compelled by government officials, because of the presence of one or more design or production flaws, or the absence of needed safeguards or warnings, which render a product unreasonably dangerous. Such products may have very few or no actual incidences of serious injury or death yet reported from their use, but their flawed design causes them to have the recognized potential for leading precisely to those results.

Consider, for the moment, the instance of a design flaw affecting an entire line of products. During my tenure as CPSC Commissioner, in the early-1980's vertical convection heaters first made their way onto the American market. They were instantly popular. But before the first death was reported, and with very few reported injuries associated with the product, CPSC engineering and human factors staff identified a series of design flaws which were *capable of causing* severe burns from improper guarding and fires from overturning. As a result, the entire line of units, from a dozen or more producers, was voluntarily recalled and replaced with units incorporating safer designs which largely eliminated the acknowledged dangers.

Over many years, product liability cases in both state and federal courts have attested to both those truisms –that mere injury statistics (i.e., frequency of injury) do not mean that a product is an unreasonable risk, and that their absence does not render a product reasonably safe. The legislative history of the Consumer Product Safety Act reflects the notion that frequency of injury alone, without any other consideration, may be an excellent early-alert to an emerging problem; but it does *not* provide the basis for any conclusion about the reasonableness of the risk from any consumer product.

In fact, the driving theme of the National Commission on Product Safety's seminal 1970 *Final Report* – which established the basis and need for both the Consumer Product Safety Act and an independent, regulatory panel to administer it – is that, as a nation, we should not need to await a body count of injuries and deaths from any particular consumer product before corrective action is warranted. As that *Report* forcefully points out-

> "Manufacturers have it within their power to design, build, and market products in ways which will reduce if not eliminate most unreasonable and unnecessary hazards. Manufacturers are best able to take the longest strides to safety in the least time. The capacity of individual manufacturers to devise safety programs, without undue extra cost, has been demonstrated repeatedly in the course of our short history...." [*at* 3]

Forthright action is expected on the part of the manufacturer in the first instance, and by the government as a last resort, to avert what may otherwise be a foreseeable and preventable risk to safety.

Apart from the presence or absence of figures pointing to the frequency of injury, and regardless of how large or small those figures may be, several other factors must be taken into account in determining whether a particular product constitutes a reasonable or unreasonable risk. Many of those factors have been suggested or identified over the years both in judicial proceedings and learned treatises, as well as by the provisions of the Consumer Product Safety Act and its underlying legislative history.

Any listing of those critical considerations would include –

➤ As a first principle –as indicated earlier- **whether the design of the product can reasonably be made safer**. *Whether the product incorporates a design, or a          production error, which either directly causes it to be capable of producing needless risks to safety, or otherwise fails to incorporate design features which might avert or significantly reduce known risks when the product is used in an anticipated or foreseeable manner.* To the extent that certain ways in which the product is routinely or even occasionally used -even if unintended- create dangers, what redesign efforts are undertaken to design or guard against just that? It is never sufficient for the supplier simply to accompany the product, or its sale, with educational literature or even on-product cautions or warnings, when reasonable design alternatives are apparent. They are reasonable if they are technically practical and cost-effective in anticipating user behaviors and thereby significantly lessening the risk.

➤ the **severity of the risk(s)** brought about by the product's usage. For example, are the consequences of using the product likely to result in deaths, disfigurations, brain or spinal injury, paralysis, blindness, loss of

limb, or other permanent or severe damage?  Or, as in the case of the often-cited skateboard or hula hoop statistics for which the frequency figures are large, are the great bulk of reported incidents likely to be minor abrasions, bruises or cuts?

➢ the *vulnerability* of the population affected.  Are an appreciable number of the injury incidents occurring to infants, toddlers, or to children generally, who don't have, or are not likely to have either the mental development to understand or appreciate the risk, or the physical ability to deal with it?  Or, are they occurring to a largely elder population, or impaired or physically-handicapped population, which for similar reasons is either unaware of the risk or otherwise incapable of dealing with it?

➢ the *functionality* or utility of the product. How much is the product needed? Is it used exclusively or primarily for essential or functional purposes, or for recreational purposes?

➢ the *availability of substitute, similar-use products*.  Can, or do other like-products on the market serve the same purposes?

➢ the *availability of alternative designs* for the same product.  What design options are available or technologically feasible, and at what added cost, if any, to redress known or anticipated product risks?

➢ the *transparency or latency* of the risk.  How well does the consuming public understand or appreciate dangers from the hazard or risk (the likelihood of it occurring); how open or obvious is it, or how hidden?  Are users likely to grasp the dangers from ordinary or anticipated usage, and how likely are they to take actions to assuage or mitigate the perceived risk?

➢ *comparative safety* considerations, where available.  How does the product's safety record compare with other like-products? with other types of products capable of performing similar functions?  with other models of the same product, or competitive brands, incorporating alternative, safer designs aimed at redressing known or foreseeable risks?

➢ *cost/benefit considerations* of adapting design modifications to redress known or foreseeable hazards. How cost-effective would it be to adopt or implement practical and technologically-available design solutions to the problem at hand?

➢ *economic considerations*, such as the approximate number of such products in use, profit factors, market share, product functionality, etc.

➤ *alternative means of achieving the safety objective*, while minimizing adverse effects on competition or disruption of the product's production.

➤ *responsible practices,* demonstrated in assessing known or foreseeable risks, having a viable product safety program in place for dealing with them, and incorporating policies and/or standards to mitigate or eliminate preventable risk.

These factors are not meant to be exhaustive. The listing is simply intended to show that the determination of whether the risk from a consumer product is reasonable or unreasonable must necessarily take into account an array of complex factors. The remainder of this report addresses many of these considerations in the context of what comprises responsible practices on the part of the WCMA concerning the known, foreseeable, and wide-scale risk of serious injury and death from strangulation of infants, at rest in their cribs, caused by nearby, corded window blinds.

## APPLICATION OF EXPERIENCE TO MATTER AT HAND

### What Was Known About the Risk?

At least as far back as 1981, while I was serving as CPSC Commissioner, staff of the agency's Epidemiology Directorate reported about accidental strangulation of children under 5 years of age. Staff specifically identified window covering cords as one of the products most frequently associated with child strangulations of any kind. As was routine for other hazard information accumulated by the staff, the Commission, concerned about an especially vulnerable population of very young children, directed that these strangulation results be shared with window covering manufacturers, and their industry trade group. At the time, that industry association was the American Window Covering Manufacturers Association [AWCMA], since re-named the Window Covering Manufacturers Association [WCMA], defendant in this litigation. The Commission's purpose in doing that was to alert the window covering industry to the dimensions of this risk which it may not have previously known, and to enlist the support of manufacturers and suppliers, and their designated trade association, in addressing this critical safety concern.

Characteristically, according to Commission staff study, these strangulation deaths from window cords occur when young children – usually under 3 years of age – are in areas or places their parents deem safe, as in their bedroom or in a crib. The youngsters often climb or reach up and get looped cords down from the

cleats or hooks, which hold them in place, or by reaching for the looped inner cord of the window covering. Staff also noted that the deaths tend to be silent, in that the youngsters, when strangled and their air supply cut off, are unable to call out for help.  Further study by the CPSC identified that in some 85% of cases documented by staff, parents were actually at home when the incident occurred. Parents or caregivers often are assisting another child or doing household chores, believing their child to be at rest and safe.

Having called upon the window covering industry to address the problem soon after it was identified, the CPSC continued to document the problem over the decade of the 80's, without any ostensible action forthcoming on the part of individual manufacturers or suppliers, or their trade association.  By 1985, reported child strangulations from corded window coverings were averaging about 10 per year. In conjunction with the AWCMA – WCMA's predecessor in name – the Commission and the trade association issued an end of the year warning to the public expressing their joint concern about accidental death and injury to young children who became entangled in cords for window coverings. and urging that parents be on the alert to this emerging hazard.  By 1991, the annual toll had doubled, to more than 20 such deaths.  Yet, corrective action, even in the face of a known hazard, was not forthcoming.  The manufacturers were ignoring their responsibility to eliminate a known hazard, and more and more unsuspecting infants and families were enduring the consequences.

By 1994, the CPSC was confronting increasing media and public concern about these foreseeable child strangulations.  Because it believed that the hazard was entirely preventable but that window covering producers were not facing up to their responsibility to prevent further tragedy, the CPSC signaled its intention to force action if the industry did not do so on its own.  In the absence of individual company leadership, the re-named Window Covering Manufacturers Association undertook to undertake a corrective action to make window coverings already in American homes safer, and to lead a standards-setting effort to make future production of corded window coverings safer so as to eliminate the principal flaws of their design which tended to exacerbate the hazard.

As to the first, the corrective action component, WCMA volunteered to work with the Commission, through its offshoot body –the Window Covering Safety Council- which was explicitly established, as a result of WCMA efforts, to carry out the agreed upon Voluntary Corrective Action Plan of September, 1994 [see Rush/WCMA Deposition, Exhibit 4].  The Association's commitment under the Plan was to lessen the likelihood of pull-cord strangulations by advising parents and consumers generally to eliminate the loop in two-corded horizontal blinds by (i) cutting the cord above the tassel; (ii) removing the equalizer buckle; and (iii) adding a safety tassel at the end of each cord which was being made available,

without charge, from the industry association. But nothing was said or done under the Plan –no advice to parents or the public– about the safety risks attendant to inner cord strangulations.

As to the second commitment -initiating a standards effort- the WCMA undertook to establish itself as a certified standards-setting organization pursuant to procedures established by the American National Standards Institute [ANSI]. In the interim, pursuant to the Corrective Action Plan, the association agreed to encourage manufacturers to take steps –again, limited to pull-cord infant strangulations and not addressing inner cord strangulations- to prevent future incidents. The association agreed to encourage elimination of the loop altogether on two-corded horizontal blinds manufactured after January 1, 1995. And, upon being certified by ANSI, the association, again through the Council it set up, undertook to develop a voluntary, industry standard, for ultimate approval within the ANSI process, covering all window covering pull-cords. Strangely, the looped, inner cord strangulation hazard was not addressed in that standards process, and was left uncorrected for future production of window coverings, in the final 1996 version of the ANSI-approved standard. [*see* WCMA A100.1-1996, Standard for Corded Window Covering Products]. Also conspicuous in its omission from the Warnings section of that standard is any warning, or any reference at all, concerning the documented strangulation risk associated with the looped, inner cord.

At the time WCMA undertook to lead that standards process "to develop American National Standards for window covering products," the CPSC was aware of some 170 strangulations from both pull-cords and inner cords occurring between 1981 and 1995. The agency had directly communicated that information to WCMA. That amounted to about one death each month. Within two years, in a seminal 1997 article appearing in the prestigious *Journal of the American Medical Association* [JAMA], researchers reported that the number of children who strangle in window cord had been materially under-reported. The study found that "about half" (49%) of such deaths went unreported to the CPSC. It estimated that the total number of such child strangulation deaths from 1981 through 1995 actually stood at 359. "These figures mean that nearly one child is strangling in window cords every two weeks." Almost all of these deaths (93%), the research found, involved children 3 years old and younger.

As the CPSC itself reported in publicly announcing the study's results, "According to the study, there are two common ways children strangle in these cords. Infants in cribs near windows get tangled in the looped cords while sleeping or playing; and toddlers, trying to look out a window, climb on furniture, lose their footing, and get caught in the window cords." While the research reported significantly more deaths due to pull-cords than inner cords, tellingly, the

two typical scenarios which it identified above applied equally regardless whether a pull cord or inner cord was the precipitating cause of the child strangulation.

The study went on to note: "The mortality rate from window cords makes them among the greatest threats to children three years old and younger. Other products that present a strangulation hazard to children in the home and have been redesigned include strings on pacifiers, recliner chairs, accordion-style baby gates, and electric garage doors." The report further identified that 86% of the window coverings involved in the incidents were venetian blinds or mini-blinds; and that 9% were venetian-type vertical blinds.

With an estimated 85 million units or corded window coverings sold each year by this industry, and an estimated 850 million units all told in homes in America, the known and foreseeable hazard of so many previously sold, uncorrected units went unaddressed by WCMA and individual producers. So too, the known child strangulations from entanglement with inner cords went unaddressed by WCMA for another five years. In the interim, the CPSC was conducting in-depth investigation [IDIs] and reporting on an ongoing toll of child strangulations. In 1999, the Commission commenced a new investigation of window blind deaths, this time focusing on inner cord loop entanglements.

Only then, again under pressure from the CPSC, did the WCMA begin to undertake, in 2000, a second Corrective Action Plan to broadly warn the public about inner cord strangulations, and to immediately include a stop cord to reduce the possibility of that inner cord being pulled upon and entangling a young child. Also, the WCMA, in its standards-setting role, began a review of the existing WCMA-initiated ANSI-sanctioned industry standard. But a comparable change in the standard itself did not become effective until November 2002 – a two–year delay which the Association, in testimony by Peter Rush [at pp.68-69] attributed to the cumbersome nature of the ANSI standards process.

During that interim, the Commission reported anew that, since 1991, it had received reports of another 160 child strangulations associated with cords on window blinds, of which 140 strangulations involved outer pull cords and 20 involved the inner cords which run through the blind slats. The WCMA's review of its existing (1996) standard, with the CPSC's urging, finally led the Association, as the standard's sponsor and developer, to include coverage of inner cord loops.

On May 27, 2002, April Cox -just 14 months old- was found dead in her crib, her neck entangled by the inner cord of a venetian blind.

## WCMA's Obligations

At least one additional, significant fact is omitted from the chronology of window cord strangulations just discussed. Back in 1990, the then-American Window Covering Manufacturers Association –WCMA's predecessor- received a letter dated September 5, 1990, from Toni Griesbach [see Rush/WCMA Deposition, Exhibit 6]. He was an attorney from St. Louis, Mo., who had recently represented a family whose 18-month old son was killed –back in October, 1986- when he was entangled in a cord on the back of a woven-wood shade. Mr. Griesbach stated that he was writing to the Association to expand its efforts to warn the public about the dangers posed by cords on window coverings. But he explicitly pointed out that "limiting the warnings to 'pull cords' may be misleading." For the family he was representing, they were very much aware of the danger of pull cords and had "in fact, placed the crib at the opposite end of the window from where the pull cord was located." Their child became entangled, instead, in the support or inner cord on the back of the woven shade, well out of view of the parents or anyone else.

The letter points out, "This 'support cord' was an even more insidious danger than the 'pull cords' because the support cord was hidden from view. The cord did not even show from the front, when the shade was rolled up, because the shade flapped up in such a way that the cords were invisible." Mr. Griesbach then suggests,

[L]imiting warnings to simply the 'pull cord' is insufficient because parents will be misled into thinking that the pull cord is the only danger on a window covering when, in fact, all cords on window coverings are potential strangulation hazards to young children. During our investigation of this particular case, we learned that the cording on many models of venetian blinds and mini-blinds can be pulled out away from the blinds to form a noose-like strangulation hazard, even though the cording is threaded to each individual slat. This can occur when the blinds are in the completely lowered position because, in some models, there is no tension on the cording when it is in that position.

Finally, the letter urges the Association to share and "discuss these issues with its members and recommend that they take action immediately."

At any time during the decade of the '80s, as child deaths from window cord strangulation were mounting, the Association needed only to study the in-depth investigations of these incidents conducted by CPSC staff to realize that, while the bulk of such incidents involved outer pull cords, not all of them did. Some

were identified as arising from the inner, support cord at the rear of the window covering. If, for whatever reason, the Association had *not* undertaken that kind of rudimentary assessment of the available risk information available to it, then, conceivably, it may not have been aware of this additional facet of the strangulation hazard associated with window coverings. But once apprised by the specifics of the Griesbach letter of this additional lethal risk from child strangulation associated with the inner support cord which was hidden from view to parents, it behooved the WCMA to conscientiously share and discuss that danger with and amongst its members, and in consultation with the CPSC. It did not do that. In his deposition on behalf of the WCMA, former executive director Peter Rush, to whom the letter was addressed, was largely unaware of its content, and clearly had never shared the letter, or its import, with Association members even though child strangulations, understandably,  was the singular, most important issue confronting the industry.


In initially assuming leadership of the window covering industry's safety effort -and later, its standards-setting effort- to prevent cord strangulations of children, the WCMA in effect positioned itself in the lead safety role routinely assumed by manufacturers and sellers of the product. It was a voluntary undertaking on WCMA's part to develop and recommend window covering design and warnings standards for safety to its members and to the industry at large. By arrogating such responsibility to itself, and having unfettered discretion to set product safety standards, the WCMA, like any such industry trade association, runs the risk of a conflict of interest. After all, as reflected in the deposition of Peter Rush on WCMA's behalf, the Association's primary loyalties are to its members' business success. When the formulation of a truly effective safety standard may imperil members' profits, an association in the WCMA's vaunted position may have an incentive to set the bar unrealistically low, oblivious to the safety concerns it is purporting to address. Thus, the Association took on certain duties and responsibilities to perform that standards-setting function in a conscientious manner and with reasonable care.


But by ignoring, from the outset, its responsibility to scrutinize and understand the underlying reasons for child strangulations, the WCMA failed in that. It also failed in arriving at, and promoting a 1996 standard which did not even recognize any risk at all associated with inner cord strangulations Even the most casual review of the available in-depth investigations, and literature on the subject, would have revealed that. That, of course, assumes that the Association wasn't already acutely aware of the inner cord risk, but chose – for reasons known only to itself – to shift the focus entirely to the problem of pull cords. In its November 28, 2005, Response to Plaintiff's Request for Admission No 22, "WCMA admits it was aware of at least one report a child had strangled in the inner cords of a corded window covering product in 1995." What about the incident back in 1986 which Mr. Griesbach so thoroughly brought to its attention? Ironically, by