admitting to knowing only about the one 1995 incident, the WCMA is effectively conceding that it failed to exercise reasonable care in assessing the causal or precipitating circumstances for each of the 170+ reported child strangulations which, by then, the CPSC had documented. That should have been the first step, on the Association's part, in any reasonable and prudent standards undertaking for such a prominent and troubling risk as this was.

But equally important, and directly relevant to this litigation, by failing to acknowledge the inner cord risk, the Association also, as a consequence, failed -in its standards role- to adequately *warn* about that risk. It owed that duty to parents and caregivers; it owed it to the parents and grandparents of April Cox. Instead, the literature the Association disseminated, and the warning it promoted as part and parcel of the 1996 version of WCMA A100.1, Standard of Safety for Corded Window Covering Products (*see* para.5.1.1), is deafeningly silent as to any inner cord risk which parents need to know about. The warning reads: "Young children can become entangled and strangle in cord or bead loops. Use safety devices to reduce access to eliminate loops." Accompanying that warning is a pictograph of a child reaching *for a pull cord* with the international 'Don't Do This' symbol stamped over his hand. Even caregivers aware of the much-publicized problem of child strangulations from pull cords on window blinds would not in any way be cautioned or sensitized by this language to believe that there was any problem or risk at all from an inner, support cord which could not even be seen.

Moreover, as a practical matter, what purpose is accomplished by placing a critical safety warning –one addressed to the most tragic of risks involving the strangulation of a young child- in a place and a manner where it is *least likely* to be seen? That was the situation here. And that was what the WCMA-developed, ANSI-approved, industry standard for window coverings allowed. The officially-sanctioned warning, *sans* any mention of inner cord risk, was only to be found, inconspicuously, underneath the bottom rail of the window covering, hidden from plain sight. It could only be seen if the blinds were open, and not otherwise. Why hide such important safety information? What went wrong in the WCMA-led, industry-dominated process, which failed to adequately take into account the needs of the pubic?

Parents and caregivers need to have ready access to conspicuous and succinct language, warning about any material hazard about which the Association and the window covering industry knew or should have known. Certainly by the time, in 1996, that this WCMA standard was approved, the inner cord strangulation hazard fit that description. But just as certainly, such a warning was nowhere to be found. And what warning was present, *on the bottom of the bottom rail*, might just as well not have been there at all in view of its hidden placement. Whatever

EXHIBIT 51-B

15

reasons the Association may have had for approving or acquiescing to these failures to communicate a known hazard and risk, such actions, at the very least, reflect an absence of reasonable or due care.

Under the circumstances in this litigation, the WCMA's collective failures involved promoting a substantive product standard *and* a product warning which *both* pointedly failed to address a critical risk. Those failures necessarily increased the risk of harm to unsuspecting young children from inner cord strangulation. As such, WCMA's actions reflect reckless disregard for the safety interests and rights of persons affected.

## CONCLUSION

The prolonged inaction of WCMA in the face of child strangulations from the inner cords of window coverings is indicative of a safety effort gone awry. In the aggregate, such conduct -in the context of a product known almost from the outset to be fraught with the foreseeable risk of death to children- contravenes all known principles of responsible practice within the manufacturing community or by the association which purports to represent it. As a result, safety was seriously compromised -both in theory and in fact. An unsuspecting youngster, 14 months of age, needlessly allowed to strangle from the inner cord of a window blind, due to the wholly foreseeable chain of events set in motion by the Association's systemic disregard for safety, at all levels and over such a long period of time.

WCMA unquestionably knew, from very early on, about the specific hazard to infants from the support or inner cords of window coverings. Yet the Association chose steadfastly to ignore the hazard, throughout the decade of the 80's, and throughout the decade of the 90's. It undertook to develop and oversee the process for setting an industry safety standard, officially sanctioned by ANSI, for corded window coverings, in effect standing in for its own individual companies who otherwise were duty-bound to ensure the safety of their product; to make sure that it was fit for the purpose for which it was intended and not a lethal risk to the most vulnerable of populations of infants and toddlers. How many youngsters must suffer entanglement deaths before an industry association, which undertakes a critical safety function on behalf of its members, acts forcefully and fully to address or eliminate such an insidious hazard? The inner cord strangulation risk was known to the Association and its members, but hidden from view of the parents of young children at risk, and from the children themselves.

There is no tragedy more jarring than the sudden and needless death of a child. WCMA knew that a *highly-vulnerable population* -namely, infants and toddlers-

were almost always the victims of these incidents. This industry association and its member companies had access to the persistent injury reports compiled by the CPSC, annually, over each of the 20+ years preceding this incident which identified these youngest of children as the most likely victims of incidents involving corded window blinds.

WCMA also knew the nature of the hazard was hidden or *latent*, not open and obvious. In the injury reports it received from the CPSC, repeatedly, parents, grandparents and parent surrogates related that the incidents occurred "suddenly," "unexpectedly," and "without warning." They occurred at a time and in a place where the parent believed their child to be safe and did not even have an inkling of any danger. From previous injury reports (if not from their own safety analysis), the industry association and its members knew that corded window coverings strangle infants in adjacent cribs and playpens. Parents and others entrusted with the care of infants don't necessarily know that. Here –just like the situation described to WCMA by Toni Griesbach- the grandparents knew about the hazard associated with window blind pull cords and took appropriate preventive measures. But they had no idea –as the supplier and sellers did, and the WCMA even more acutely – that the *inner* cords on the backings of window blinds, which were hidden from view to the grandparents, also present a strangulation hazard and could lead to death. And did lead to the death by strangulation of April Cox.

WCMA knew that the *design* of window blinds was directly tied to the prominence of these incidents. Yet, in representing itself as the agent of the industry producing these blinds, and sponsor and developer of the very standard for safety which would bind its members, the Association failed in its primary responsibility. That responsibility was -having accepted the obligation to develop and sponsor an adequate safety standard- to carefully scrutinize the facts and circumstances associated with the repeated reports of serious injury, and respond, in an affirmative way, so as to materially improve the design safety of the product. It was a responsibility and obligation to ensure and help promote effective and meaningful safety standards. Having undertaken the task of spearheading a standards effort on the part of the corded blind industry, WCMA dropped the ball. It permitted a demonstrably unsafe looped design for inner cords to persist, even after it had finally -after many long years of unconscionable foot-dragging and delay- eliminated that same looped cord hazard from the design of outer, pull cords on the industry's window coverings.

Directly and foreseeably, a flawed standards process, supervised and heralded by the WCMA, compromised safety. As a result, April Cox became one more victim of the negligent actions and omissions of the WCMA – which at all times represented itself to the federal government, in the form of the CPSC, as the

responsible industry leader on all matters affecting window blind safety. The WCMA failed to redress a known danger. It failed to act responsibly to successfully identify, warn against, promote an industry-wide recall of, and help to come up with, prospectively, a viable standard against a known danger. By allowing this unsafe, looped, inner cord design to persist on the market in the face of repeated reports of the grievous danger and risk to young children *specifically from this cause*, the Association acted in complete disregard of the safety risks to the most vulnerable of populations.

From the standpoint of promoting effective standards for window blind safety, WCMA was, in essence, a sham organization. A façade. With no safety engineers, no human factors or safety professionals, no epidemiologists or statisticians to assess and quantify the risk, the WCMA was wholly lacking in the kind of expertise it needed, as a certified developer of safety standards, to even approach the level of professionalism and sophistication that responsibility required. The Association was, by the testimony of its own Executive Director, a shell organization. It did not "maintain statistics on accidents, deaths, injuries [or] causes of accidents, deaths and injuries relating to window coverings." [*see* Rush/WCMA Deposition, p.48]. It turns out that there was no WCMA staff - nobody on the payroll! Mr. Rush himself was an employee of an association management and public relations company. Even more remarkable, while serving as the Association's sole executive, he was at the same time responsible for the management and public relations functions of several other trade association entities. He was running the WCMA out of his side pocket, which otherwise would be perfectly okay - had the Association not affirmatively taken on the formidable responsibility to ensure the safety of unsuspecting infants and toddlers from the known and foreseeable risk of window cord strangulation, and the legal obligations attendant to that role.

Having undertaken, for more than a decade, to lead the industry it collected dues from, in all matters pertaining to window blind safety, including the adequacy of product warnings, the WCMA ignored the identified risk of inner cord infant strangulations and engaged in a protracted stall. Having come forward and represented itself to the CPSC as the responsible party to lead an industry-sponsored effort to establish effective safety standards and product warnings, this shell Association demonstrably fell down on the job. It failed to summon the necessary resources, and the conviction of its members, to fulfill the obligation it willingly volunteered for on behalf of its more reluctant individual manufacturers. And that was, to promote and develop a viable safety standard for the industry; and, through appropriate safety warnings and otherwise, to timely act to reduce infant exposure to a known hazard.

The WCMA had agreed to undertake a successful correction of corded window blinds previously sold and in people's homes, or – at least minimally – to effectively warn the public about the problem from the time it first knew about the hazard. And most critically, the WCMA stepped forward to undertake to oversee and promote a safety standard which all new corded blinds would need to meet. Yet, in accepting that role, for six years –up until November 2002 when its revised standard [WCMA A100.1-2002] took effect- the Association conspicuously ignored the same looped cord hazard it had years earlier identified with respect to pull cords. All that time, from 1996 through most of 2002, the WCMA standard allowed looped, inner, support cords to continue to be produced as a result of its flawed, earlier standard.

WCMA's Peter Rush testifies in his deposition [at pp. 67-69] that, once pressed by the CPSC in 2000 to conduct a second Corrective Action to deal with this inner cord risk, the manufacturers "immediately" agreed to include some sort of mechanism on the inner cord to reduce the possibility of it being pulled through the head rail. But even accepting his testimony at face value, and assuming 100% compliance on the part of manufacturers, which is unlikely, for the five years covering 1995-2000 -with some 85 million such units produced each year just during that time frame- the WCMA's inexplicable, earlier inaction allowed at least another 400+ million defective units onto the market and into people's homes! And at no point did the WCMA suggest that those faulty units –now known and identified as being capable of child strangulations- be recalled.

The WCMA actions -and its corresponding inaction for so long in failing to respond to the unreasonable risk of inner cord strangulations- reflect a reckless indifference to the problem at hand. Those actions mark an indifference to the safety interests of young children and their concerned parents. The Association knew that the very conduct it was engaged in put others -infants and toddlers- at risk. It accepted an undertaking -a risk, if you will- that a reasonable and responsible organization, in like circumstances, would not take on. It pretended to have a process in place for developing a viable standard, when it had neither the staffing background or the wherewithal or the commitment of the large segments of the industry to see it through to successful fruition. It pretended to come up with an effective warning for the risks associated with one type of window blind cord when, in reality, the warning needed to extend to another cord –the inner, support cord- as well.

The WCMA had to know that a responsible association with such limited funding and with no safety engineers or professionals on its staff wouldn't dare to assume the awesome responsibility of developing safety standards to protect young children. Yet it chose to do so anyway. A responsible Association would not misrepresent itself and its capabilities in these ways.

19

In the final analysis, had the WMCA - from the start - conducted itself in a manner more consistent with reasonable norms for an association purporting to represent an entire industry in all matters affecting the safety of corded window blinds, it is decidedly more likely than not that 14-month-old April Lynne Cox would *not* have died..

If the association and the companies it represented had simply engaged in what each knew to be responsible conduct from the standpoint of safe product design, and effective warnings and standards setting, this consequence could have been altogether avoided. The incident was clearly foreseeable and preventable, had the WMCA only taken the time and interest, and shown the requisite concern and due care, to address this known hazard.

*   *   *   *

Kindly let me know if there is any other assistance I can provide in this matter by virtue of the specialized knowledge and experience I bring to bear.

                                          Sincerely,

                                          Stuart M. Statler

<u>Enclosures</u>:
  CV
  Recent Testimony
  Fee Schedule

# STUART M. STATLER

*esms@comcast.net*

2369 NORTH NELSON STREET
ARLINGTON, VIRGINIA 22207
703/ 524-8990 [ph.]
703/ 524-8418 [fax]

My fee schedule, which has remained the same over the past decade or more, is as follows: hourly rate of $300, billed against an initial retainer of $2,000, for all work performed on a matter in litigation, other than deposition or trial testimony which is billed at $3,300 per day or any part thereof.

May 2005

# DEPOSITION/ TRIAL TESTIMONY
## of STUART M. STATLER (2002-Present)

*To the best of my information and belief, the following represents a full and accurate listing of testimony I have given, at trial or by deposition, in product safety litigation during this period:*

| Case Name | Year | Venue | Type |
|---|---|---|---|
| Pounds v. Honda | 2002 | Mobile, AL | Deposition |
| Arzie v. Zenith | 2002 | Anchorage, AK | Deposition |
| Ellis v. Brinkmann | 2002 | Western MO | Deposition |
| Ghorbieh v. State Industries | 2002 | Fairfax Co., VA | Deposition |
| Castillo v. Gladstrong USA | 2002 | Edinburgh, TX | Deposition |
| Crosby v Whirlpool | 2003 | Mobile, AL | Deposition |
| Gray v Schottenstein | 2003 | Prince Georges Co., MD | Deposition |
| Caglioti v. Graham-Field & Apria | 2003 | Washington, DC | Deposition |
| Gray v Schottenstein & Camas Y Muebles | 2003 | Prince Georges Co., MD | Deposition |
| Eberts v. Kawasaki | 2003 | Bismarck, ND | Deposition |
| Robinson v. Electrolux & Sears | 2004 | Laurel Co., KY | Deposition |
| Morris v. Honda | 2004 | Monroe Co., AL | Deposition |
| Andrews v. Bush | 2005 | Alamance Co., NC | Deposition |
| Koster v. Honda | 2005 | Pickens Co., AL | Deposition |
| Canales v. Black & Decker | 2005 | Prince Georges Co., MD | Deposition |
| Horst v. John Deere | 2006 | Washington Co., WI | Deposition |
| Bowler v. Honda of Lake Charles, Interco & Denman | 2006 | Calcasieu Parrish, LA | Deposition |
| Whitaker v. Westfall | 2006 | Hillsdale Co., MI | Deposition |
| Horst v. John Deere | 2006 | Washington Co., WI | Trial |
| Koth v. Metalcraft of Mayville | 2006 | Sioux City, IA | Deposition |
| Sanchez v. DesignPac & Target | 2007 | Hillsborough Co., FL | Deposition |
| Franklin v. Home Depot | 2007 | Harrisonburg, VA | Deposition |
| Schlag v. Deere & Co. | 2007 | Eau Claire Co., WI | Deposition |
| Graham v. Deere & Co. | 2007 | Kent Co., DE | Deposition |

**STUART M. STATLER**
2369 N. Nelson Street
Arlington, Virginia 22207
esms@comcast.net

703.524.8990

703.524.8418 [fax]

## PRODUCT SAFETY and REGULATORY CONSULTANT  [1987–current]

Perform strategic consulting services with respect to risks from consumer products, how they are dealt with, and the impact of federal regulation. The products typically are those subject to the jurisdiction of the **U.S. Consumer Product Safety Commission**, on which I served a seven-year term as **Commissioner** (and **acting-Chairman** for eight months). Consulting assignments commonly involve assessment of the risk involved, product recall analysis, regulatory options, or litigation support. I have presented expert testimony in deposition and at trial on more than 100 occasions in both federal and state court actions. Areas covered include product marketing, labeling, design flaws and safer design considerations, manufacturer and supplier responsibilities, product testing and warnings. I have counseled major manufacturers on product recalls and have regularly assessed risks from foreseeable, even if unintended, uses of consumer products. Also advise as to —

> > conformance with responsible manufacturing practice, and with statutory hazard reporting obligations under the Consumer Product Safety Act;
> > management and efficacy of product recalls;
> > impact of federal safety regulation;
> > product defect and liability considerations;
> > adequacy of industry safety standards and fairness of standards procedures;
> > compliance with applicable regulations and policies.

The CPSC, on which I served from 1979-86, is an independent federal regulatory agency empowered to address unreasonable product risks by encouraging industry to correct hazards and develop voluntary safety standards; mandating federal standards; disclosing risk information; or ordering a ban, seizure, or recall, to remove unsafe products from the market. Appointed by President Carter and unanimously confirmed by the U.S. Senate, I actively oversaw inquiries into a host of product dangers including -*gas valves, electric heaters, wood stoves, kerosene heaters, appliances, extension cords, flammable sprays & adhesives, chain saws, riding and walk-behind power mowers, power tools, ATVs, fireworks, tap water scalds ,lead paint, infant gates, cribs & walkers, toys & small parts, automatic garage doors, ladders, bunk beds, hot water heaters, amusement rides, furniture fires, window blind cords, tv carts, televisions, swimming pools & spas*, and more. Also helped to formulate indoor air pollution policies, and dealt with such longer-term risks as methylene chloride in paint removers, toxic emissions from kerosene heaters, and formaldehyde in manufactured housing, furnishings and insulation.

Previously, I served as **Special Assistant to the Chairman** of the **National Commission on Product Safety** [1968-70], precursor agency to the CPSC, which examined the adequacy of measures to protect the American public against unreasonable risks from consumer products used about the home and in recreation. The panel's final report led Congress to enact the Consumer Product Safety Act. I advised the NCPS Chairman on all substantive matters, prepared testimony to Congress, organized hearings around specific product risks, coordinated analysis of the adequacy of the common law in addressing product hazards, and drafted proposed legislation which later became the Child Protection and Toy Safety Act of 1969. Also served as Editor-in-Chief of the Commission's *Final Report to Congress and the President*, which set forth the basic outline of the later-enacted Consumer Product Safety Act.

*STUART M. STATLER*
*Page Two*

By way of further background, I also served as **Vice President and Partner** with the international management consulting firm of **A.T. Kearney** [1986-89], heading up their risk management and product liability practice. I advised companies, and their law firms, how best to anticipate and avoid health, safety, and environmental risks, or to manage them so as to limit possible damage and costs. I also assisted land developers and property management firms to forge regulatory strategies for dealing with risk concerns on sites they planned to acquire, develop, or finance. In the consumer product area, I counseled firms as to their potential liability and how best to avert costly litigation, and provided litigation support, expert witness testimony, and assistance with regulatory concerns. Also worked with product manufacturers and distributors to develop practical measures to:

> Evaluate design, production, and sales efforts so as to promote higher standards of quality assurance.
> Promote market entry of new products by anticipating safety concerns.
> Implement risk management plans for firms facing significant liability exposure.
> Devise advertising, packaging, and warnings to reduce likelihood of legal claims & adverse judgments.
> Gauge the advisability of a recall or other corrective action, and formulate planning for crisis control.

## OTHER PROFESSIONAL EXPERIENCE

**NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS**, Executive Director   [1995-2000]
*(NACDL is the preeminent organization in America helping to ensure justice and due process for persons accused of crime or wrongdoing, to foster the integrity, independence, and expertise of the criminal defense profession, and to promote the proper and fair administration of criminal justice.)*

As chief executive officer, have guided all operations and strategic direction of this specialized bar association, comprised of 10,000 direct members and 80+ state and local affiliates with 28,000 additional criminal defense lawyers, public defenders, law professors, active-U.S. military defense counsel, & judges. Supervised staff of 20, budget of $3 million, and long-term investments. Implemented policies of governing Executive Committee and 45-member Board. Steered activities involving Congress, state legislative and regulatory bodies, law enforcement agencies and judicial conferences. Oversaw accredited seminars offering continuing legal education on criminal justice issues, advocacy trial skills and legal ethics. Published *The Champion*, NACDL's renowned monthly legal journal, and guided operation of its highly-acclaimed Internet website *(www.criminaljustice.org)*. Supervised membership recruitment and retention efforts, creation of value-laden member benefits, and development of programs to serve members' practice needs. Helped direct indigent defense and *amicus curiae* efforts. Also, organized a new, non-profit arm, the Foundation for Criminal Justice.

**ASSOCIATION OF TRIAL LAWYERS OF AMERICA**, Deputy Executive Director   [1989-93]

For this 60,000 member organization, managed all Association activities involving **publications** (*TRIAL* magazine, the *Law Reporter*, three specialty law reporters, and the *ATLA Advocate*); **continuing legal education** through the *National College of Advocacy*; **member services**, including *The Exchange* — a fully-computerized research network; *ATLA Press* — which published books, audio & video tapes, and *ATLASearch* — a research service; **marketing** (including copy design, convention exhibits, and list sales); and **production**. Supervised 100+ staff and budgeted activities of $10 million, emphasizing value-added quality member services and top-down commitment to excellence.

> Guided cultural shift within ATLA, and more positive public image, by highlighting concern
  of trial lawyers for securing safer products and for preserving fundamental human rights.
> Developed *ATLA Alert* program to inform regulatory agencies, the media, & the public about
  emerging hazards affecting consumer health and safety, or the environment.

*STUART M. STATLER*
*Page Three*

## U.S. SENATE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS
*(Panel was the main investigating arm of the U.S. Senate, with personnel and budget greater than most full Committees. Inquiries focused on organized crime, racketeering, energy, health care and government contracting.)*

**Staff Director/Chief Counsel to the Minority**
**Counsel to U.S. Senator Charles Percy**

Counseled Senators and supervised staff of 25, directed investigations; prepared hearings; questioned witnesses; and briefed the press. Led major investigations into:

| | | |
|---|---|---|
| securities frauds | labor/management racketeering | pension fund abuses |
| energy oversight | high tech exports to Soviets | drug trafficking |
| Russian grain sales | abuses in pre-paid health plans | military club frauds |
| organized crime | auto theft "chop shops" | arson-for-profit |

Advised Senator Percy (R-IL) on legal and political matters, business/regulatory concerns, law enforcement and environmental issues. Heavily involved in Committee markups, Senate Floor debates, House-Senate Conferences.

## U.S. SENATE SUBCOMMITTEE ON EXECUTIVE REORGANIZATION

**Minority Chief Counsel**

Advised senators on subcommittee inquiries into food additives, auto safety, environmental and health issues. Promoted bipartisan consensus in: devising strategy for numerous reorganization plans of the President, including merger of the Peace Corps and Vista into ACTION; guiding landmark legislation through Committee approval and Senate passage to coordinate federal drug treatment and rehabilitation programs; and revamping legislation on representing consumer interests before federal agencies and courts.

## PRESIDENT'S ADVISORY COUNCIL ON EXECUTIVE ORGANIZATION
*(Blue-ribbon White House Council appointed by President Nixon to help reorganize the Executive branch. Prepared private memoranda for President on social programs, natural resources, trade, drug abuse, and regulation)*

**Senior Staff Associate**

Member of Task Force on Independent Regulatory Commissions which assessed deficiencies in such agencies as the ICC, CAB, FTC, SEC, and FCC. Principal Editor of the Council's final report, *"A New Regulatory Framework,"* which proposed restructured agencies, substituting single administrators for commissions and revamping their functions & appeals process.

## EDUCATION

J.D., honors, **Harvard Law School**, Cambridge, MA.
*John Woodruff Simpson Fellow*
B.A., Magna Cum Laude, Phi Beta Kappa, **Amherst College**, Amherst, MA.

Have been admitted to practice in New York, the District of Columbia, and Virginia, as well as before both the Federal District Court and the U.S. Court of Appeals for the District of Columbia; the Court of Customs and Patent Appeals; and the U.S. Supreme Court.

*STUART M. STATLER*
*Page Four*

## PUBLICATIONS

*Partial listing includes:*

"Preventing 'Accidental' Injury: Accountability for Safer Products by Anticipating Product Risks and User Behaviors," in *Handbook of Human Factors Litigation* (CRC Press, December 2004)
"Nobody Does It Better," *Association Management* (March 1987).
"A Safety Agenda for the States," *Newsletter* of the National Association of Attorneys General (July 1986).
"The Butt Stops Here," *TRIAL* (January 1985).
"Toys Can Be Dangerous," *San Diego Union* (December 1984).
"Thrills, Injuries and Death -- Federal Role in Amusement Ride Safety," *St. Louis Post-Dispatch* (August 1984); related article syndicated nationally by *UPI* (June 1984).
"Reporting Guidelines Under Section 15, Consumer Product Safety Act," *Journal of Products Liability* (June 1984).
"Some Advice to Manufacturers: Build a Better Microchip," *Sacramento Bee* (May 1984).
"After The Legislative Veto," *Wall Street Journal* (April 1984).
"Consumer Products' New Technology Tends To Let Chips Fall Where They May," *Houston Post* (April 1984).
"Doing a Slow Burn Over Cigarette-Fire Deaths," *Los Angeles Times* (December 1982) (syndicated nationally).
"Gagging the Product Whistle-Blowers," *Los Angeles Times* (April 1982) (syndicated nationally).
"How Not to Rein in the Regulators," *Washington Post* (January 1982).
"Regulatory Reform: Structure of Regulatory Commissions," *Legal Times* (May 1981).
"One Regulator Can Do the Job Better," *Business Week* (May 1981).
"Let the Sunshine In?" *American Bar Association Journal* (May 1981). Excerpt in "Too Much Sunshine in Government Can Hurt," *Washington Post* (May 1981).
"The Case for Continuing Watch on Health-Endangering Products," *Seattle Times* (April 1981).
"Consumers, Please Squawk," *Parade* (nationally-syndicated Sunday newspaper supplement) (April 1980).

# # #