# DEPOSITION OF STUART M. STATLER
## CONDUCTED ON THURSDAY, JANUARY 24, 2008

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

VALERIE ROUNTREE, individually )
and as Personal Representative )
of THE ESTATE OF APRIL LYNNE )   Case Number:
COX; MORGAN SCHEDIWY, a minor, )
through her natural mother and )   A04-0112 CV (JWS)
guardian VALERIE ROUNTREE; and )
CHRISTOPHER COX, )

    Plaintiffs,

vs.

WINDOW COVERING MANUFACTURERS
ASSOCIATION,

    Defendant.

DEPOSITION OF
STUART M. STATLER
Washington, D.C.
Thursday, January 24, 2008
9:58 a.m.

Job No.: 1-121137
Pages 1 through 263
Reported by: John L. Harmonson, RPR

---

**Page 2**

Deposition of
STUART M. STATLER

Held at the offices of:

    KING & SPALDING, LLP
    1700 Pennsylvania Avenue, Northwest
    Washington, D.C. 20006
    (202) 737-0500

Taken pursuant to the Federal Rules of Civil Procedure, by notice, before John L. Harmonson, Registered Professional Reporter, Notary Public in and for the District of Columbia, who officiated in administering the oath to the witness.

---

**Page 3**

APPEARANCES

ON BEHALF OF PLAINTIFFS:
    DON C. BAUERMEISTER, ESQUIRE
    (Participating via telephone)
    Burke & Bauermeister, PLLC
    921 West 6th Avenue
    Suite 200
    Anchorage, Alaska 99501
    (907) 277-6177

ON BEHALF OF DEFENDANT:
    MICHAEL L. WEISS, ESQUIRE
    King & Spalding, LLP
    1180 Peachtree Street, Northeast
    Atlanta, Georgia 30309-3521
    (404) 572-4600

---

**Page 4**

EXAMINATION INDEX

|  | | PAGE |
|---|---|---|
| EXAMINATION BY MR. WEISS | | 6 |

\* \* \* \* \*

EXHIBIT INDEX
(Exhibits attached to transcript.)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition | 7 |
| 2 | Expert Report of Stuart M. Statler | 12 |
| 3 | Billing records | 27 |
| 4 | Curriculum Vitae of Stuart M. Statler | 28 |
| 5 | Memo from S. Halupka to E. Besson | 38 |
| 6 | Expert Report of Erick Knox | 63 |
| 7 | Memo of telephone conversation between S. Morrow and P. Rush; July 3, 1985 | 64 |
| 8 | Letter from S. Morrow to P. Rush; July 26, 1985 | 69 |
| 9 | Meeting minutes; December 14, 1999 | 104 |
| 10 | "Pediatric Window Cord Strangulations in the United States, 1981-1995" | 136 |

---

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 5

EXHIBIT INDEX (Cont.'d)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 11 | Letter from T. Griesbach to P. Rush; September 5, 1990 | 139 |
| 12 | Portion of WCMA's responses to discovery requests | 143 |
| 13 | Letter from T. Griesbach to S. Morrow; September 5, 1990 | 147 |
| 14 | Letter from R. Rauchschwalbe to Mr. and Mrs. Beller; October 11, 2000 | 162 |
| 15 | Warning label | 173 |
| 16 | American National Standard for Safety of Corded Window Covering Products | 194 |
| 17 | Letter from R. Rauchschwalbe to P. Rush; September 3, 1999 | 202 |
| 18 | Reporting Guidelines Under Section 15 of the Consumer Product Safety Act | 255 |

Page 6

PROCEEDINGS

STUART M. STATLER,
after having been first duly sworn, was examined
and did testify under oath as follows:

EXAMINATION

BY MR. WEISS:
  Q. Mr. Statler, my name is Mike Weiss. We met a few moments ago. I'm representing the Window Covering Manufacturers Association in the case of Rountree v. Window Covering Manufacturers Association. We usually refer to it as the WCMA. Is that okay with you?
  A. That's fine. That's what I understand it as.
  Q. It's not much of an abbreviation, but certainly better than the whole thing.
     And I understand you've probably -- well, I know you've been deposed a number of times.
  A. I have.
  Q. So you know about the process. I'll be asking questions. You're answering. The court

Page 7

reporter is taking it all down.
  A. Correct.
  Q. So you know that we should avoid speaking over each other. I'll certainly do my best to do that, and probably you'll do as well.
     Mr. Bauermeister is here on the phone, so you may want to just be cognizant of the fact that he may not be able to tell from our visual cues whether one of is finished asking or answering.
     And of course if you want to take a break at any time, please just say so.
  A. Okay, thank you.
  Q. I guess I'll start with the deposition notice. You're here pursuant to a deposition notice?
  A. Yes, I am.
  Q. And that's marked here as Exhibit 1.
     (Exhibit 1 marked for identification and attached hereto.)
BY MR. WEISS:
  Q. I have a copy for you. And you'll notice at the last page of that notice there is a Schedule A that requests you to bring certain materials. And I

Page 8

see you seem to have brought a fair amount here with you.
  A. Yes, I have.
  Q. Do you mind if we go through the list on that notice and see what you have here?
  A. By all means.
  Q. Okay. The first item on the notice is your file in this matter, the matter of Rountree, et al. v. WCMA.
  A. I brought my complete file.
  Q. Okay. Are all the documents --
     MR. WEISS: And Don, I'll just explain since you can't see it. Mr. Statler has it looks like four piles of materials here.
     THE WITNESS: Yeah. It could be eight piles. It's not organized in any particular way.
BY MR. WEISS:
  Q. Are all the materials here what you would consider your file in the case?
  A. Yes, they are.
  Q. So everything here would fall under Item No. 1?

2 (Pages 5 to 8)

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 9

1  A.  That's correct.
2  Q.  Okay. And I know you haven't organized it,
3  and that's fine. But can you tell me, I guess sort of
4  in general terms, what sort of things are contained
5  here?
6  A.  Well, this whole pile is exhibits to the
7  deposition of Peter Rush.
8  Q.  Okay.
9  A.  This file or this part of the file is a
10 scattering of materials. The bulk of it, I guess in
11 this black part, is all materials received by
12 Mr. Bauermeister and Mr. Ray's office in response to
13 an FOIA request to the CPSC.
14     And then there's a scattering over here.
15 They're some of the documents I tend to rely more
16 upon, which are either referenced in my report or
17 otherwise that I have turned to more than once.
18 Q.  Sort of highlights?
19 A.  By and large. Except that towards the end
20 of it it may get into some of the more detailed
21 materials that you specifically asked for.
22 Q.  Okay. Are there any items here that are

Page 10

1  not listed in your expert report that you wrote to
2  Mr. Ray listing the materials you reviewed?
3  A.  The only thing I can think of is since the
4  time of the writing of that report and in response to
5  my own expert report, I received three expert reports
6  from the defendant's side, and those are now included
7  in my materials.
8      I don't think there's anything else, except
9  as I'm looking at it, it couldn't have been included
10 in my report. The materials that are involved in the
11 summary judgment proceeding before Judge Sedwick, the
12 briefs as well as the two court orders associated with
13 that summary judgment proceeding.
14 Q.  And why were those not included in the
15 report, or not --
16 A.  It came after the fact.
17 Q.  Okay. I'm a little confused, then. Maybe
18 I'm thinking of something else. What is the date on
19 the summary judgment pleadings that you have there?
20 A.  November 2006. I guess -- I guess I didn't
21 get these materials until after I submitted my report.
22 Q.  Okay. So those were not -- you didn't rely

Page 11

1  on those in any way or use them in reference to your
2  report?
3  A.  No, I did not.
4  Q.  Okay. Is there any correspondence here
5  with Mr. Ray or Mr. Bauermeister or anybody else?
6  A.  All the correspondence I've had is in the
7  file here.
8  Q.  And is that broken out somehow?
9  A.  I think all or almost all of the
10 correspondence is in this green file to my right.
11 There may be a scattering in this material, but it's
12 basically all in the green file.
13 Q.  Okay. And I guess the next question will
14 be: Is there any correspondence in this case that is
15 not with either Mr. Bauermeister or Mr. Ray?
16 A.  You mean with somebody else?
17 Q.  Yes. For example, did you write to -- is
18 there any correspondence with the plaintiffs
19 themselves?
20 A.  No. There is no correspondence other than
21 correspondence with Mr. Bauermeister and Mr. Ray.
22 Q.  Okay. Does this include any drafts or

Page 12

1  outlines or other versions of the expert report that
2  you submitted on October 31st of last year?
3  A.  No, it doesn't. I do my work on a
4  computer, and as I make changes, it automatically
5  deletes any prior materials.
6  Q.  Okay. I do have one question about that.
7  And maybe I'll do this right now. I have a copy of
8  your expert report here. Let me mark that as
9  Exhibit 2. This is just something I'm a little
10 curious about.
11     (Exhibit 2 marked for identification and attached
12 hereto.)
13 BY MR. WEISS:
14 Q.  Is this a copy of the report you submitted
15 to -- I think it's addressed to Mr. Ray -- on
16 October 31st.
17 A.  That's correct.
18 Q.  On the copy I received, and it may be
19 different from the one you have there, if you turn to
20 the last page, which is page 19 -- And again, this is
21 the copy that I received. Yours may be different. It
22 looks like there is a substitute page 19 sent, or this

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 13

1  looks like a faxed copy, and it's page 2 of 2.
2        Do you have any idea -- was there a reason
3  why -- Well, I guess do you know what happened?
4     A.  Yeah, I agree with you it looks like it's a
5  different type.  It's actually the same type but in a
6  smaller faxed form.
7     Q.  Uh-huh.
8     A.  And if you'll notice, that's the only page
9  at the top that indicates a fax designation.  And the
10 reason for that, I believe, would be the fact that I
11 e-mailed the report to Mr. Ray and to Mr. Bauermeister
12 and then faxed them a signature page, since my
13 competence with the computer is limited and I haven't
14 yet figured out how to sign on my documents.  And so
15 this is a fax page, but it is identical to the final
16 page of my report as it was originally done.
17    Q.  That was my suspicion, but I just wanted to
18 check.
19    A.  You're very observant.
20    Q.  That's probably not true, but thank you for
21 saying.
22       And are there any notes that you've taken

Page 14

1  when you went through all of these materials prior to
2  preparing your report?
3     A.  The only notes I would have taken are on
4  the documents themselves.  There are some notes
5  scattered.
6     Q.  So you would handwrite on documents?
7     A.  Yes, I would.
8     Q.  But you didn't have a notepad in front of
9  you where you would write down key parts or questions?
10    A.  No.
11    Q.  We've already gone over No. 2 on Exhibit A.
12       Now, were there any documents related to
13 the -- Well, let me back up for a second.
14       You've already said that you received
15 materials from plaintiffs in response to their FOIA
16 request to the CPSC?
17    A.  That's right.
18    Q.  And you also have the exhibits to the
19 deposition of Mr. Rush.
20       Aside from those two, are there any
21 documents related to the hazards of window covering
22 cords that were created during the time you were on

Page 15

1  the -- you were a member of the -- Should I say you
2  were a member of the Consumer Product Safety
3  Commission?
4     A.  That's correct.
5     Q.  An employee?  I guess what's the right
6  term?
7     A.  I was a member of the commission.
8     Q.  Backing up then again, are there any
9  documents aside from those two sets that relate to the
10 hazards of window covering cords that were created or
11 generated during your time as a member of the CPSC?
12    A.  There may be a press release or two that
13 are contained in this file, but that would be the only
14 thing.
15    Q.  Are those something that you had in your
16 personal file from your time -- I guess do you have a
17 file of materials from your time at the CPSC?
18    A.  I do.  Not related to window cord safety.
19 And so the answer to your question is as I was -- as I
20 entered into a relationship with this case as a
21 consultant and expert witness, I did not have an
22 incipient file to begin with.

Page 16

1     Q.  Okay.  And aside from your work in this
2  case and -- well, aside from your work in this case
3  and any other litigation, we'll talk about that in a
4  minute, have you done any work in terms of studying or
5  research or investigation or advocacy related to
6  window blind cords?
7     A.  There's a lot of parts to that question,
8  but I think I can answer them all in the negative.
9  No, I have not.
10    Q.  Okay.  And do you have any invoices or
11 billing statements or anything reflecting the time
12 you've put in this case?
13    A.  Yes, I do.
14    Q.  Can you grab those?
15    A.  Yeah.  They're in the back of this file.
16    Q.  I see there is a retainer, your initial
17 retention as an expert consultant in this case.
18       Now, I see that there is an invoice you
19 submitted on October 21, 2006.
20    A.  Correct.
21    Q.  And payment of a little more than $5900.
22 How many hours, do you know, did you work at that

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 17

1  time?
2     A.  It's listed there.
3     Q.  Oh, okay. I'm sorry. I didn't flip all
4  the way through.
5         And this would describe the work you did?
6     A.  That's correct. There's a detailed list.
7     Q.  So before August 29, 2006, you had already
8  begun preparation of an expert report?
9     A.  I had, that's correct.
10    Q.  Do you have an understanding as to -- I
11 understand you submitted the report more than a year
12 later, in 2007.
13    A.  That's correct.
14    Q.  Did you have an understanding there was an
15 earlier deadline that was eventually abandoned?
16    A.  That was my understanding.
17    Q.  Do you recall what you thought that
18 deadline was?
19    A.  I don't.
20    Q.  In your list of materials here that you
21 reviewed, it looks very familiar to me. Did you take
22 that list and use that when drafting your expert

Page 18

1  report of materials?
2     A.  I believe when I drafted the expert report,
3  I started ab initio from the beginning and went
4  through all the documents that I had in my file.
5     Q.  I see here that in -- well, I guess
6  sometime since August 2006, but between that and the
7  filing of the expert report you did some document
8  searches from CPSC, the website for Parents for Window
9  Blind Safety, and the Internet generally.
10    A.  That's correct.
11    Q.  Can you tell me what sort of things you --
12 well, tell me what you looked for first.
13    A.  Well, basically to update myself on
14 anything that had taken place within the CPSC with
15 respect to window covering safety issues, as well as
16 the websites of WCMA and WSSC with respect to the same
17 issues. And my searches, or at least anything that I
18 thought at all useful, I made copies of and are
19 included in my file today.
20    Q.  Can you recall anything specifically that
21 you learned from that site that you didn't know prior?
22    A.  Well, I think -- It's hard to say

Page 19

1  specifically. I would say it increased my
2  understanding of the frequency of incidents involved
3  in child strangulations associated with reported
4  window coverings. It reminded me or helped me to
5  recall some of the origins of this issue coming to the
6  fore actually during my tenure as a commissioner as
7  far back as 1981 when the first survey was done about
8  child strangulations, which as early as that date
9  showed that strangulations from window cords was one
10 of the most frequent and serious sources of child
11 strangulations of any kind.
12        And it gave me some sense of
13 relationship -- the searches gave me some sense of the
14 relationship of the Window Cord Safety Council in the
15 context of the Window Cord Manufacturers Association.
16 It gave me some additional sense of the two corrective
17 action plans that were ultimately agreed to by the
18 Window Cord Manufacturers Association.
19        And I would say most important of all, it
20 called to mind how -- however the risk and the hazard
21 may have been viewed at the outset in terms of its
22 seriousness and the prospects for dealing with it, in

Page 20

1  the end it became transparently clear that this was
2  from the outset a problem of design and that there was
3  and now acknowledged by the Window Cord Manufacturers
4  Association, there was and is a defect in the design
5  of window cords, window coverings involving the cords,
6  both with respect to the outer pull cord and the
7  so-called inner cord or middle cord which was the
8  source of the strangulation death of April Lynne Cox
9  in this case.
10    Q.  Okay. I might have been a little confused
11 about something.
12        Is this your first time searching the
13 Internet for these issues?
14    A.  When I first was contacted in connection
15 with this case, that would have been the first time
16 that I conducted such a search.
17    Q.  And you did it subsequent to August of 2006
18 at some time when you were preparing your expert
19 report?
20    A.  That's correct.
21    Q.  When were you first contacted in this case?
22 I imagine it's in this material here.

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 21

1    A.  It is. I believe it was February of 2004.
2    Q.  I have a letter of January 28th. Does that
3  sound fair, that sometime before that is when --
4    A.  I think the actual materials that I
5  received began coming in February, but the original
6  contact was probably in late January.
7    Q.  What new -- what new -- Let me back up
8  again.
9        I think you mentioned four websites that
10 you visited. There may be more, but I believe you
11 mentioned the CPSC website, the website for Parents
12 for Window Blind Safety. Those are both listed here.
13 And then a moment ago you said you went to the WCSC
14 and WCMA websites.
15   A.  That's correct.
16   Q.  Was there new material from the time you
17 first looked in early 2004 and the time you looked the
18 second time that had all that material you discussed?
19   A.  There was new material in the CPSC website
20 by all means. There may have been in the Parents for
21 Window Blind Safety website. And I also in the
22 interim had contacted CPSC for some updated material

Page 22

1  in connection with incidents occurring. I can't
2  recall when that contact was made, but the response is
3  in my file here, whether it was made before or after
4  that particular billing.
5    Q.  But I guess what I'm asking is: Was there
6  new material that further informed you about issues
7  prior to, say, 2000? You talked about at the outset
8  of this. You mentioned a 1981 survey in your answer.
9  Was there new material that shed light on those, on
10 historical issues involved in the --
11   A.  I'm a little confused by your question. At
12 what point in time are you asking was there new
13 material?
14   Q.  I understand. Probably because I myself am
15 confused.
16       You went and did these Internet searches
17 sometime in 2004, early 2004 when you were brought
18 into the case. Sometime after August 2006, you went
19 back and looked at many of these websites again.
20       When I asked you what you had learned,
21 among the things you discussed were a 1981 survey that
22 identified window blind strangulation, corrective

Page 23

1  action plans that began in 1994 and 2000, the
2  initial -- some design issues, many things that, I
3  guess, to my understanding occurred well before your
4  first Internet search.
5        I guess what I'm asking is: Was there new
6  material that you identified between these searches
7  that shed light on these historical issues? And I
8  guess by "historical issues," I'll just say prior to
9  your first search.
10   A.  Yeah, I think I understand your question
11 better now. I don't believe so. I mean, there was
12 some additional, more recent material, but I don't
13 think that shed any particular new light. I think
14 with the first search and with the material received
15 from Chuck Ray and with some of the material that was
16 in the -- for example, in the exhibits to the Peter
17 Rush deposition, that's what I was referring to, is
18 all of that material is what caused me to think anew
19 about the issues before us.
20   Q.  Would you say that those web searches were
21 something you relied upon in forming your opinions in
22 this case?

Page 24

1    A.  To some extent, any material that I've
2  referred to, to the extent that those web searches
3  contained information that helped to explain the
4  history and the chronology of both the activities that
5  took place to enhance infant safety against
6  strangulations, as well as reading between the
7  materials the prolonged inaction of the Window Cord
8  Manufacturers Association that comes to the fore as a
9  result of reading those materials is what hit me as I
10 reviewed those materials.
11   Q.  And again, you're talking about all the
12 materials, not just your Internet search?
13   A.  That's correct.
14   Q.  I'm trying to narrow it a little bit
15 because I'm just trying to find out what --
16   A.  I just have a hard time distinguishing
17 between the searches and the rest of the materials.
18 They all are factored into my expert report and the
19 opinions I will further express today.
20   Q.  And that's completely fair. Maybe it would
21 be helpful if I explained a little bit what I'm trying
22 to find out. I believe I have the materials that you

6 (Pages 21 to 24)

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 25

1  have in front of you. The deposition exhibits, of
2  course. The plaintiffs have produced their FOIA
3  requests. There are documents that we have produced
4  in this case.
5      What I'm trying to find out is: Are there
6  sources on the Internet for historical information,
7  again, prior to, say, the incident in this case that
8  provided that information to you, or provided the
9  basis for your opinions? Is there a source online for
10 documents from the '90s, for instance, that revealed
11 what you said was a prolonged inaction?
12     A.  No. I think you really need to -- I mean,
13 most of what I'm referring to is a series of materials
14 really coming from the CPSC website which probably
15 were not otherwise part of the file but may have been.
16 I mean, I've got duplicate materials of some of the
17 CPSC materials. But by and large, when you -- having
18 gathered those materials, and then you study them and
19 you understand them in the context of an issue that I
20 had been involved in at the outset, it caused me to
21 realize that what may have originally been seen as a
22 matter that could perhaps have dealt -- has been dealt

Page 26

1  with, say, almost exclusively through public education
2  and warnings, really in the end came down to an issue
3  that, from the outset, was a design defect issue that
4  affected generically the entire production of an
5  industry which, as some of the papers would indicate
6  here, some of the materials, is something in excess of
7  850 million units of window coverings, that they all
8  are subject to the same, as identified by both
9  Caroline Jennings of WCMA and ultimately by Peter
10 Rush, an inherent defective design that needed to be
11 dealt with and corrected.
12     Q.  Let me try to narrow it down just one more
13 time. I understand your answer. I think it may be a
14 problem with the question.
15     In your Internet searches in the context of
16 this case, did you discover any documents or records
17 prior to, say, 2001 that you're aware of that you did
18 not find in the materials provided to you by the
19 plaintiffs' counsel? I'm trying to be able to make
20 sure I can get my hands on the things that you've seen
21 also.
22     A.  You know, I think the bulk of my opinions

Page 27

1  in this case are based upon the materials that you
2  have and that -- and you probably have all the other
3  materials as well. But if you don't, they're here.
4      But the bulk of my opinions are based upon
5  the materials that have already been the source of
6  questioning in this case. Particularly, I would refer
7  to the deposition and exhibits of Peter Rush.
8      Q.  Excellent. Thank you very much.
9      Before we move on, I'm just going to move
10 to mark these three -- there are three letters that
11 you said contained your billing and hourly
12 information. I'm going to mark them collectively as
13 Exhibit 3.
14     (Exhibit 3 marked for identification and attached
15 hereto.)
16 BY MR. WEISS:
17     Q.  And the last thing on the Exhibit A to your
18 notice is your most recent C.V.
19     A.  I did bring a copy of that.
20     Q.  Is that any different from the one that you
21 submitted on October 31st, do you know?
22     A.  Stylistically, yes; substantively, no. And

Page 28

1  I did also -- I wasn't asked for it, but I did also
2  bring an update of the testimony and trial --
3  deposition and trial testimony which updates the
4  attachment to my expert report, because there were
5  some depositions I was involved in subsequent to that
6  date.
7      Q.  May I see those?
8      A.  So there's two documents (tendering
9  documents).
10     Q.  Thanks very much. And thanks for bringing
11 that.
12     I see the design change on the C.V. Let me
13 ask you a couple of questions about that next.
14     And I'll mark the C.V. that you brought to
15 this deposition as Exhibit 4.
16     (Exhibit 4 marked for identification and attached
17 hereto.)
18 BY MR. WEISS:
19     Q.  Now, you were appointed a commissioner in
20 1979?
21     A.  That's correct.
22     Q.  And you served until 1986?

7 (Pages 25 to 28)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 29

1  A.  That's correct.
2  Q.  I see on page 1 of your C.V. there is a
3  list of the products that you worked on. Do you need
4  the copy back?
5  A.  It's a list of products that I've been
6  involved with since my time with the CPSC as a
7  consultant or expert witness.
8  Q.  If you look on the second block, there's a
9  series of about five lines, five and a half lines in
10 italics.
11 A.  Right.
12 Q.  Does that reflect the list -- and again I'm
13 not holding you to your complete list -- of what you
14 worked on as commissioner?
15 A.  Yeah, these are all the issues that I did
16 work on as commissioner and with the CPSC and I should
17 add and subsequently have worked on in conjunction
18 with expert involvement or otherwise consulting.
19 Q.  And I see on that list it says "window
20 blind cords."
21 A.  That's correct.
22 Q.  Can you tell me what sort of activities or

Page 30

1  tasks you did as a CPSC commissioner involving window
2  blind cords?
3  A.  Yes. As my report notes, back in -- first
4  of all, as the C.V. notes, I started as a commissioner
5  in 1979. In 1981, sometime during that period, a
6  report did come to my attention involving child
7  strangulations, and window cord safety was clearly
8  identified, as I've already testified, as one of the
9  most frequent causes of infant and toddler
10 strangulation.
11      During that period -- and I'm thinking now
12 particularly towards the latter part of 1985 and early
13 part of 1986 -- well, let me go back a few years.
14      When the initial report came in, we tasked,
15 that is we as a commission and I as one of five
16 members, tasked the -- what was called the voluntary
17 standards team within the Office of Program Management
18 at the commission to try to work with the corded blind
19 industry and to see if there weren't ways consistent
20 with the statute that we were working with, the
21 Consumer Product Safety Act, if there weren't ways to
22 induce and encourage this industry to take a lead in

Page 31

1  helping to cut back or eliminate the instances of
2  entanglement and strangulation that were noted in that
3  report.
4       If memory serves me, that report had
5  indicated that there were some 41 instances of child
6  strangulation that the commission knew about or came
7  to know about over the period from 1973 to 1980,
8  basically a seven-year period. There was some 41
9  instances of child strangulation from window
10 coverings, the cords of window coverings, which would
11 average about six a year during that seven-year
12 period. And again, that was only instances that, as a
13 result of the report, the commission came to know
14 about.
15      It was significant enough in terms of a
16 concern and a problem to me and the other
17 commissioners that we tasked this program management
18 team, the voluntary standards group, to meet with the
19 affected industry, that being at the time the American
20 Window Cord Manufacturers Association, the predecessor
21 group in name and --
22 Q.  I'm sorry. You said a couple of times the

Page 32

1  Window Cord Manufacturers Association. Do you mean
2  window covering?
3  A.  I stand corrected, Window Covering
4  Manufacturers Association.
5  Q.  Please continue, I apologize.
6  A.  No, you're right. The American Window
7  Covering Manufacturers Association, to work with them
8  to see if there were ways that that hazard, that risk
9  could be attenuated or eliminated.
10      And so over the ensuing years, from time to
11 time that voluntary standards group met with the
12 commission and reported back as to any progress. The
13 meetings that I recall are somewhat later in time, in
14 probably late '85 and certainly early 1986.
15      Do you want me to continue?
16 Q.  It's up to you. I want you to answer the
17 way you wish to answer.
18 A.  My recollection of that involvement was
19 that the team, which as I recall was headed at that
20 time by a guy named Bill King, who was an engineer, by
21 the way, the team reported back basically two
22 problems.

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 33

One, there was, as noted by them, an absence of leadership within the window covering industry at large, and that pertained both to the manufacturers, that no one was willing to take a lead, as well as to the association, which as best I can remember they described as ineffective, not -- not a substantive organization.

And so they were trying in two ways dealing with what presented itself as an association as well as with individual manufacturers, trying to get one or more of the leaders of that industry to take the lead, to take the reigns to come up with means, be it in the way of education or standards, to address the risk or risks that had been identified. That was one aspect, the notable absence of leadership.

The other was a problem that the commission encountered time and again with respect to other industries but was especially prevalent here, at least in the response of the voluntary standards staff, and that was a real concern on the part of the industry representatives they had met with that anything in the way of product redesign, the industry was reluctant to

Page 34

follow through on because of their concerns about downstream product liability.

And to elaborate on that, basically, to the extent that any solutions of a design nature that might be feasible, this industry -- and I don't want to single out this industry, but it happened because it was -- we encountered this time and time again.

But this industry in particular, individual representatives had expressed the view that given the nature of the product and the nature of their concerns about the product, to institute a design modification scared them in terms of liability and that they were much more attuned to trying to come up with public education campaigns as well as possible warnings as appropriate to deal with any of the identified paths towards either attenuating or eliminating the risk that had been identified.

Q. Let me try to parse that a little bit and try to make sure I understand the time frame. I believe you said in 1981 you received the report about strangulations.

Was it in 1981 that the commission

Page 35

instructed the staff to contact the industry?

A. It would have been either in 1981 or early 1982.

Q. Now, you said later you recall a series of meetings in 1985?

A. It was either '85 -- definitely '85 towards the end and early 1986 I remember as well. But there were ongoing -- we would meet with the voluntary -- that is "we" the commissioners, en banc would meet with the voluntary standards group about once every three months. Sometimes they had very little to report because there was no activity within the industry.

My recollection of any kind of substantive reporting back from the voluntary standards group came about in the '85-'86 period.

Q. Are you aware of whether the staff made contact with anyone in the industry in 1981 or early 1982?

A. I am aware that contacts were made. I couldn't tell you with any specificity who those contacts were made with. I am certain, given how the

Page 36

commission functioned, the American Window Covering Manufacturers Association would have been one of the primary groups contacted.

Q. But in your review of all of these materials, do you have anything that indicates any contact with the --

A. No. My earliest recollection is what I've told you, and that was meetings by the commissioners, myself included, as part of a regular tri-monthly review of what was going on.

Keep in mind, there were about 40 different voluntary standards efforts then underway. And one of the reasons why that was so important was because also in 1981 a major change in the way the commission did business took place, namely Congress had rewritten the Consumer Product Safety Act to require the commission to defer to voluntary standards efforts before the commission could enact any mandatory product safety standard on its own. In other words, prior to 1981, the commission, if it felt compelled to do so, could, without regard for what was going on in an industry, issue a mandatory private safety standard.

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 37

1    After 1981, with the reauthorization and
2 the changes in the enabling legislation, the
3 commission could no longer do that. We had to defer
4 to any standards activity taking place within an
5 industry and could only consider a mandatory federal
6 safety standard if we made a finding, if the CPSC made
7 a finding that the industry voluntary effort was
8 deficient or not adequate. Which is a very difficult
9 thing to do because basically you have to prove a
10 negative. That continues to be a problem to this day.
11    Q.   But I want to go back to the original
12 question. From my understanding of your testimony --
13 I don't want to misstate it, so I'm trying to be
14 sure -- you don't have any documents that show any
15 contacts with the WCMA or anyone in the industry prior
16 to -- well, I guess in 1981?
17    A.   No, I -- Prior to 1981, or you mean
18 after --
19    Q.   Let's start with 1981.
20    A.   No, I don't -- whatever documents exist
21 would be in the form of -- that I can recall, would be
22 in the form of what's called voluntary standards

Page 38

1 reports, which would include activity on each of the
2 40-plus matters that were issued by the program
3 management staff about every three months.
4    Q.   And you don't have any recollection from
5 these reports or from your memory. I understand you
6 haven't seen them in a long time. But you don't have
7 any specific recollection of a contact with the AWCMA;
8 is that fair?
9    A.   I do have a recollection based upon the --
10 and I've already described this -- based upon the
11 '85-86 period discussions.
12    Q.   I'm sorry, prior to that. Prior to when
13 you --
14    A.   Prior to that, I don't have a recollection,
15 no.
16    Q.   Okay. I'll mark this as Exhibit 5.
17    (Exhibit 5 marked for identification and attached
18 hereto.)
19 BY MR. WEISS:
20    Q.   Mr. Statler, do you recognize this? And it
21 may be something we're talking about already.
22    A.   To be honest with you, I don't have a

Page 39

1 specific recollection of this document, but it would
2 have been -- I can't really tell the date of it. Is
3 this the date here, June 2, 19 -- is that '81 or '91?
4    Q.   Well, that's part of my question to you. I
5 see there is a stamp right between the words "United
6 States Government" and "Memorandum." It has a
7 "Received" stamp. Do you see that?
8    A.   Yes.
9    Q.   At the top left?
10    A.   Yes.
11    Q.   I believe that says June 2nd, 1981,
12 4:29 p.m. Is that -- but I agree the date that is
13 stamped on it --
14    A.   Let me just look at it again.
15    Q.   Sure. And I'm not trying to test you on
16 it.
17    A.   If it came in 1981, I would have seen it.
18 If it came in 1991, which I can't tell from the
19 right-hand marking -- No, I believe --
20    Q.   If you look at the first paragraph, that
21 may help you in determining what the date is.
22    A.   That's what I'm just looking at. Yeah, it

Page 40

1 looks like it would be a 1981 document, and I would
2 have received it at the time I was commissioner.
3    Q.   I guess I'm trying to get a sense as to who
4 these people are. Who is Elaine Besson?
5    A.   Elaine Besson was in the hazard
6 identification area, which is the -- the commission
7 was divided into directorates, and the hazard
8 identification or what might also be known as the
9 epidemiology area was in the -- was the area in which
10 she was employed and the head of the area at that time
11 was Dr. Robert Verhalen who is identified in this
12 document.
13    And the HIEA, that's a hazard
14 identification reference on the part of the author of
15 the document, Shelley Halupka.
16    So this appears to be a document that was
17 produced about a month after the original May 1981
18 report that I referred to in my expert report.
19    Q.   So this is different and distinct from the
20 one that you referenced?
21    A.   That's correct.
22    Q.   Would this have -- Is this something that

10 (Pages 37 to 40)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45