DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 41

1  you would, in the course of your activities as a
2  commissioner, have read this memorandum, or received
3  this memorandum?
4      A.  Yes, I would.
5      Q.  Do you know if this June 2nd, 1981, would
6  have predated or postdated, if you know, the decision
7  by the commission to task the staff with contacting
8  members of the window covering industry?
9      A.  I couldn't be that specific for you.
10 Again, the May report may well not have been seen by
11 us until several months later. I suspect this
12 probably predated that tasking.
13     Q.  Okay. If you'll turn to the last page,
14 you'll see a header of "Products Not Addressable by
15 Commission Action." Do you see that?
16     A.  Yes, I do.
17     Q.  And the first paragraph under that says:
18 "We believe the following items are not addressable by
19 Commission action since they either are not intended
20 for children or cannot be changed to reduce the hazard
21 without drastically diminishing their utility."
22     Is that right?

Page 42

1      A.  I see that.
2      Q.  And one of the products is window cords?
3      A.  That's correct.
4      Q.  Do you remember a recommendation from the
5  staff that window cords were not addressable by the
6  commission?
7      A.  I know that -- As I say, I've seen this
8  document before. I know that this exists. The fact
9  that a staff member says that, that's why you have a
10 commission.
11     Q.  I understand. I'm not trying to impart
12 this to commission action, I'm --
13     A.  Indeed, we would have -- The way the
14 commission worked, just so you know, this is a hazard
15 identification group. They identify hazards. Really
16 what Ms. Halupka, with all due respect to her, is
17 saying here is it's not within her realm of expertise.
18 As a commission, we would have tasked this across the
19 board because we work in product teams, or hazard
20 teams.
21     And that's why I refer to a voluntary
22 standards team which ultimately dealt with this issue,

Page 43

1  at least early on. And that team would consist of
2  somebody or some people from epidemiology, hazard
3  identification, some from engineering, some from the
4  enforcement and compliance staff, and some from the
5  general counsel's office, one or more. And who am I
6  leaving out? The economics group, which was separate,
7  would have been part of that team.
8      To say that something, as it is indicated
9  here, is not addressable by commission action because
10 the product is not intended for children or that it's
11 otherwise more conducive to an educational campaign is
12 way out of the realm of expertise of this person.
13 This person, as I say, with all due respect, is in the
14 area of identifying and analyzing the statistics
15 having to do with hazards as opposed to the remedies
16 or the possible means for eliminating or otherwise
17 attenuating that risk.
18     Q.  Do you see that she also suggests -- this
19 is -- Shelley Halupka is a woman; is that correct?
20     A.  That's correct.
21     Q.  She also suggests that it may be, and it's
22 unclear from here, that it may be because it cannot be

Page 44

1  changed to reduce the hazard without drastically
2  diminishing the utility.
3      A.  Again, way beyond her area of competence.
4      Q.  So the hazard identification people are not
5  able to make that --
6      A.  Not for that. I mean, you would want your
7  engineering people to be rendering those kinds of --
8  or at least addressing those kinds of issues.
9      Q.  Do you --
10     A.  And your economics. Actually, the
11 economics staff as well had a role in that, as to the
12 function -- functionality, impact on functionality.
13 That's where economics came in.
14     Q.  Do you remember, though, overriding or in
15 any way discussing this recommendation when you
16 discussed the issue of whether and how to address --
17     A.  To be honest with you, I don't explicitly
18 remember discussing this issue per se. But I do
19 remember that we -- and it would have been
20 subsequent -- we tasked the more inclusive voluntary
21 standards team, which may well have included
22 Ms. Halupka as the hazard identification component, as

11 (Pages 41 to 44)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

EXHIBIT 52-B

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 45

1 the epidemiology component. But we tasked the team to
2 approach the industry, which meant both the
3 association and the individual manufacturers, to get a
4 better sense and report back to us what might be done.
5     When I talked about the discussions that
6 took place in '85, '86, by that time I can tell you we
7 knew, based upon what the team told us, that what's in
8 this memo is totally out of whack. That is to say,
9 the problems were addressable. They were addressable
10 in part by a public safety campaign, but they were
11 also addressable by consideration -- or at least the
12 thought was there that they could be addressed by a
13 consideration of design modifications.
14     Q.  But you don't recall that any time prior to
15 1985 or 1986?
16     A.  I recall that once they had done their
17 work, they had gone back and forth with the industry
18 and probably met several times, both with individual
19 manufacturers and the association.
20     I recall that there was a discussion that
21 culminated in -- or at least by the time I left --
22 that culminated in an understanding that there are

Page 46

1 basically two problems here. There were design
2 considerations that ought to be taking place, design
3 formulations with respect to corded blinds that could
4 reduce the risk to infants and toddlers.
5     And there were public education -- there
6 was a public education warnings component as well.
7 But at least as to the design considerations, there
8 was a real reluctance on the part of this industry --
9 and there I can't break it down to whether it was the
10 individual manufacturers or the American Window
11 Covering Manufacturers Association where this was
12 coming from. It could well have been both. But there
13 was a real reluctance to address the design end of
14 things because of liability concerns.
15     Q.  What date did you leave the commission?
16     A.  At the end of May of 1986.
17     Q.  Do you recall whether this was resolved in
18 any way by May 1986?
19     A.  I do remember as part of our discussion we
20 told -- we reminded the voluntary standards staff that
21 what we were hearing was not unusual. We had heard
22 that kind of thing from the chainsaw industry, from

Page 47

1 the lawn mower industry, from the all-terrain vehicle
2 industry. And just about -- well, not every industry.
3 Some worked more cooperatively with us from the start.
4     But it was not a novel response, but it was
5 one that shouldn't stand in the way of the staff
6 coming up with whatever suggestions they could or
7 otherwise encouraging the manufacturers in light of
8 the seriousness of the risk; namely, infant children
9 dying from strangulation under circumstances where the
10 parents had every reason to believe that they were
11 safe, that this needn't be occurring, and that
12 anything in the way of improvement ought to be
13 seriously looked at, even if it meant starting with a
14 public education campaign. But ultimately, to be
15 effective, you were going to have to look at the
16 design itself.
17     Q.  Okay. And so you reminded the staff of
18 that?
19     A.  That's correct.
20     Q.  But at the time you left there was no --
21     A.  At the time I left, all I know is the staff
22 was trying to get the industry to -- and I know they

Page 48

1 had shared all the information they had, which was
2 being -- which was being collected on an ongoing
3 basis, because I had seen some changing figures on
4 infant strangulation since 1981.
5     And as my report indicates, by 1985, as I
6 recall, the commission at that time knew that these
7 incidents of strangulation were occurring on the
8 average of about one a month. And that was even more
9 of a problem than when they were occurring -- what was
10 signaled by the 1981 report.
11     And so given the combination of frequency,
12 the seriousness of the injuries, and the fact that
13 there was such a vulnerable population involved, kids
14 who couldn't do anything about it, and the fact that
15 by 1985 the staff had come back to us and said we
16 think there are some design considerations that can be
17 taken into account here, and design came into play,
18 all those factors, as my report spells out in the
19 early pages, are important in trying to deal with
20 what -- and make reasonable what might otherwise be an
21 unreasonable risk.
22     Q.  Mr. Statler, I appreciate your answer. And

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 49

1  I want you to feel like you can answer as wholesomely
2  as possible. But there is a lot of stuff to get
3  through and I do want to --
4      I believe the question was whether this was
5  resolved at the time you left the commission.
6   A.  It was not resolved at the time I left the
7  commission.
8   Q.  And I appreciate -- And I want you to feel
9  like you can explain everything.
10  A.  Fair enough.
11  Q.  Thank you. You talked about your report a
12 couple of times, so let's start going through that, if
13 that's okay.
14  A.  Sure.
15      MR. BAUERMEISTER: Mr. Weiss, this is Don
16 Bauermeister again.
17      MR. WEISS: Yes, Don.
18      MR. BAUERMEISTER: We've been going about
19 an hour. I don't need a break right now, but I would
20 like to remind the two of you that at any point a
21 break is necessary, we should go ahead and take those
22 periodically.

Page 50

1  I would like to ask for the phone number in
2  case I get disconnected. As you know, I'm attending
3  telephonically. Do you have that number?
4      MR. WEISS: I do. I do.
5  (Off-the-record discussion.)
6  BY MR. WEISS:
7   Q.  I have a copy of your report here, which I
8  imagine you have also.
9   A.  Yes, sir.
10  Q.  In fact, I believe I already marked that as
11 an exhibit; is that correct?
12  A.  Yes.
13  Q.  Okay. I went through it and I tried to
14 summarize, or at least determine in broad scopes what
15 your opinions are in this case. And I've made a list,
16 and if it's okay with you, I'd like to go through what
17 I've come up with, and then you can tell me if, A,
18 I've misstated any of them; or B, missed any.
19  A.  Okay.
20  Q.  And recognizing this, we can narrow down a
21 little more later. I'm just trying to get the broad
22 focus.

Page 51

1  The first opinion that I pulled out I think
2  is at the beginning, which -- and certainly this is
3  summarizing a broad thought, but that it's not the
4  number of deaths or instances that make the severity
5  of the hazard or the importance of addressing the
6  hazard?
7   A.  That's correct.
8   Q.  The second one I came up with, which is
9  something we have already begun discussing, which is
10 that CPSC knew the risk of strangulation in 1981 and
11 informed the WCMA of that risk in 1981.
12  A.  Right.
13  Q.  And as we've talked a little bit, we've
14 already addressed some of that, but we'll go back to
15 that in a moment.
16      The third is that WCMA knew or should have
17 known of the risk of inner cord strangulation and I --
18 at some point in time, and I guess we'll figure out
19 what that time was. Is that fair?
20  A.  Yes.
21  Q.  The next is that the WCMA did not
22 adequately warn the public of the risk.

Page 52

1   A.  That's correct.
2   Q.  The fifth is that WCMA undertook a duty to
3  adequately design and warn of the hazard.
4   A.  Can you just hold on for a minute?
5   Q.  Of course.
6   A.  I want to get these down myself.
7   Q.  No, I'm sorry. Please continue.
8   A.  The fourth was that they did not adequately
9  inform the public?
10  Q.  Yes. And by "the public," I'll include
11 purchasers of the blinds.
12  A.  Okay.
13  Q.  The fifth is that WCMA undertook a duty to
14 adequately design and warn of the hazard. Is that
15 fair, Mr. Statler?
16  A.  To adequately warn and what?
17  Q.  And adequately design -- I guess I cut that
18 short a little. Design the product and warn of the
19 hazard.
20  A.  I wouldn't put it in quite those terms. I
21 would say they undertook a duty not to adequately
22 design the product but to adequately come up with an

13 (Pages 49 to 52)

Page 53

1  adequate standard for the product that would otherwise
2  render it reasonably safe.
3      In other words, I think -- I'm not saying
4  that -- at least not directly that -- and I think in
5  Peter Rush's testimony, he's not saying that they --
6  that WCMA was to design or redesign the product, but
7  that as part of an effective voluntary standards
8  process which they undertook to oversee and steer on
9  behalf of the industry, that whatever it took in the
10 way of eliminating or alleviating the relevant risks,
11 which may include design factors, that that's what the
12 WCMA undertook.
13    Q.  So their undertaking was --
14    A.  For example, I'm not saying that they
15 undertook to design. They didn't have an engineer on
16 board. So they couldn't design. But through a
17 process which they agreed to undertake, which as I
18 understand it included the engineering expertise from
19 the individual companies, that if it were necessary to
20 have an adequate standard, that such design
21 reformulation would be a part of that.
22    Q.  Okay. So is there -- Is their undertaking

Page 54

1  to produce a standard that adequately addresses the
2  hazard?
3    A.  That's correct.
4    Q.  And that may include design factors?
5    A.  At the time they undertook it, it may have
6  included it. We now know in retrospect that it would
7  have had to include it because there was an identified
8  design defect that came to be in the course of their
9  participation in that process, their leadership in
10 that process.
11    Q.  And that may also include warnings, product
12 warnings? Is that part of that?
13    A.  It would have included any reasonable means
14 to attenuate or eliminate the hazard, which would
15 include product redesign as well as warnings as well
16 as any other guarding or fail-safe means aimed at
17 accomplishing that result.
18    Q.  And the last one I came up with, the last
19 opinion, and I'll use your words because I think
20 they're good, "WCMA was a sham organization."
21       Is that fair?
22    A.  Yes.

Page 55

1    Q.  Are there any opinions -- again, knowing
2  there might be subsets of these, are there any more
3  broad opinions that you intend to offer at trial in
4  this case?
5    A.  Well, you know, I think you've made an
6  effort to try and -- try and capture what I've said in
7  the report. I think sometimes in doing that things
8  can get lost. It may well be, or at least my concerns
9  in limiting my opinions to these areas may be that --
10 that may be assuaged by your reference to there are
11 subsets of these opinions.
12       But I would have to say that one of the
13 most important things that I would add that is
14 certainly deserving of an opinion category in and of
15 itself as opposed to a subset is that there is a clear
16 identification in this case -- in the case of
17 strangulations -- in the instance of strangulations of
18 children from window coverings, there is a clear
19 identification of a design problem, and indeed a
20 design defect associated with looped cords, be they
21 pull cords or middle or inner cords, in that while the
22 WCMA undertook with some degree of success to deal

Page 56

1  with the pull cord problem, both retrospectively and
2  prospectively, in terms of the inner cord problem, it
3  only dealt with that design flaw prospectively.
4       And as a result, there are -- there
5  continue to be something on the order of some
6  850 million ticking time bombs out there because those
7  units have not been corrected.
8       And as a subset of that opinion but
9  particularly important to mention, that had the WCMA,
10 based upon all the information it had or could have
11 had in the 1994-95 period, factored that information
12 into account in terms of the standard that it
13 ultimately produced in 1996, then an additional
14 approximately 400 million units of that 850 million
15 figure that I just referenced would have been
16 corrected.
17      That is, as a result of the prolonged delay
18 and the warnings issues that I otherwise deal with in
19 the report, I don't think I satisfactorily point out
20 here, and I'd make it clear in these remarks, is that
21 from a design perspective, had the problem been
22 properly dealt with as of 1996 or even 1994 when first

Page 57

1  brought to their attention -- I'm sorry, or as of 1994
2  when they agreed to the first corrective action plan,
3  since the inner cord problem had been brought to
4  WCMA's attention way earlier, but at least as of 1994,
5  some 400 to 500 million units that embody a defective
6  design in terms of the inner cord would not currently
7  still be on the market and pose a problem to all the
8  rest of the American public along the same lines that
9  it presented to the Rountree family in this case.
10     Q.  Okay. Are there any other -- Are there any
11 other sort of broad-structured opinions? And
12 certainly if you think of some as we're going, that's
13 fine. At the end we can go through this again if you
14 would like. I'm not trying to --
15     A.  Why don't we put an asterisk at this point,
16 kind of an imaginary asterisk, and if you would ask
17 that question at the end of our deposition today, if I
18 have anything that I feel needs to be supplemented, I
19 will do that.
20     Q.  That would be great. I'm really just
21 trying to make sure I ask you everything I need to ask
22 you today.

Page 58

1         Okay. Let's go through the list. I'll
2  make that one No. 7 on my list, which is actually
3  letter G.
4         Let's start with the first one that you
5  listed, which is essentially it's not the number of
6  deaths that make the hazard something that should be
7  addressed.
8     A.  To put it more correctly, it's not only the
9  number of deaths but it's the context, the entire
10 context.
11    Q.  Why did you include that in your report?
12    A.  I would include it in any discussion of
13 what -- excuse me, I have something in my throat.
14        I would include it in any discussion of
15 what constitutes a reasonable -- or unreasonable risk,
16 I should say -- because sheer numbers are only part of
17 the story.
18        Certainly to say that there are 41
19 strangulations as of 19 -- as of 1981 or 176 as of --
20 175 as of 1994 period or 200 between 1991 and 2004,
21 these are all significant figures. These are -- These
22 are unlike what is contained in the expert report of

Page 59

1  your so-called engineer commenting upon this. This is
2  not an isolated type of occurrence. Or to be fair to
3  the engineer, let me quote more directly.
4         On page 4 of his report, 4 of 7 --
5     Q.  Can you identify which report that is,
6  please?
7     A.  The report of Erick Knox dated 12/3/07, he
8  says, "Considering other information where the
9  Consumer Product Safety Commission reported
10 approximately 170 deaths associated with window cord
11 strangulations from 1981 to 1995, a simple
12 quantitative risk analysis would show that the
13 quantitative risk for this hazard is extremely low."
14        Technically, that may be accurate; that is,
15 if there were 170 deaths and there were 850 million
16 units out there, quantitatively that may -- but it's
17 irrelevant. That's the point of your question to me.
18    Q.  Sure.
19    A.  Interestingly, he doesn't talk about
20 qualitative risk, he doesn't talk about reasonable
21 risk or unreasonable risk, which I find strange for an
22 engineer to be talking only about quantitative risk,

Page 60

1  which is more in the rubric of a hazard identification
2  type of person.
3         But for an engineer, he should be concerned
4  about any risk that is preventable. And even to raise
5  the issue of quantitative risk and then to say that it
6  is extremely low is dismissive of the problem.
7         My point is that whatever that figure is --
8  and we'll take 170 deaths -- we'll take the 41 from
9  the first couple of years, 170 in the period of '81 to
10 '95, and we subsequently know there are some 200
11 additional in the period 1991 to 2004. But add to
12 that the notion that every one of these deaths is to a
13 kid, is to an infant, is to a toddler. Every one, or
14 almost -- or 93 percent are to kids under three years
15 of age when they're in their cribs or just outside
16 their cribs.
17        It involves a vulnerable population. These
18 kids can't do anything about it. They're not in a --
19 They don't appreciate the hazard. They don't know
20 about the hazard. It's a latent hazard. All those
21 are elements in determining whether the sheer number
22 is a number that needs to be addressed.

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 61

1    But these are not -- I don't mean to
2 dismiss the number, because these are not hula hoop
3 type of injuries. It's not a bruised knee, but these
4 are deaths, deaths to young kids.
5    So the number is significant. It is
6 qualitatively very significant when you understand who
7 it's occurring to. It's significant in the context of
8 an analysis of what constitutes a reasonable product
9 or an unreasonable product when you factor in the fact
10 that both the kids themselves and the parents do not
11 have a basis for knowing, particularly with respect to
12 inner cord -- with the parents I'm now talking. The
13 kids don't have any basis for knowing or appreciation
14 under any circumstance.
15    The parents, at least at this point in time
16 when this incident occurred in 2002, did have a basis
17 for knowing of an inner cord problem -- I'm sorry, of
18 a pull cord problem but had no basis for knowing that
19 there was any inner cord problem.
20    So that all goes -- that is, the severity
21 of the risk as well as frequency, the latency of the
22 risk -- and these are all factors that I deal with in

Page 62

1 the opening pages of my report.
2    And most importantly of all, which is
3 identified on page 6 of my report, is whether the
4 design of the product can reasonably be made safer.
5    And going to that, I say: To the extent
6 that certain ways in which a product is routinely or
7 even occasionally used, even if unintended, create
8 dangers, what redesign efforts are undertaken to
9 design or guard against just that?
10    It is never sufficient for the supplier
11 simply to accompany the product or its sale with
12 educational literature or even on-product cautions or
13 warnings, which are involved in this case, when
14 reasonable design alternatives are apparent.
15    They were apparent as early as the early
16 '80s. They were apparent to our staff because our
17 staff talked to us about it. But they were never
18 considered right up until 19 -- or at least never
19 identified in any document that I've seen from the
20 WCMA right up through 1994 when, as a result of the
21 pressure on the part of CPSC to either correct this
22 problem or we're going to do something about it, they

Page 63

1 agreed voluntarily -- and I put that term in quotes --
2 they agreed voluntarily to a corrective action plan.
3 And that corrective action plan involved design
4 modification.
5    Q.  Can I see the report you refer to, not
6 yours but --
7    A.  The engineering?
8    Q.  Yes, please. Since we're talking about it,
9 I'm going to mark this as well as Exhibit 6.
10    (Exhibit 6 marked for identification and attached
11 hereto.)
12 BY MR. WEISS:
13    Q.  I think that leads us into the next area,
14 which is -- the next opinion, I'm sorry, which is that
15 the CPSC knew of the risk of strangulation in 1981 and
16 informed the WCMA of that risk. Again, we started
17 talking about that earlier.
18    And if I recall your testimony correctly,
19 you tasked the staff, a special team, to notify some
20 members of the industry about this issue, and they
21 apparently went back and forth with them, and in 1985
22 or 1986 reported to you the issues they were having

Page 64

1 with members in the industry.
2    A.  That's correct.
3    Q.  Okay. And I think you testified earlier
4 that you don't have any specific recollection or
5 knowledge, or, frankly, any documents that show any
6 contact between the CPSC and what's now the WCMA prior
7 to the '85-86 time frame; is that correct?
8    A.  That's correct.
9    Q.  I have a document here we'll mark as
10 Exhibit 7. I'll ask you what it is.
11    (Exhibit 7 marked for identification and attached
12 hereto.)
13 BY MR. WEISS:
14    Q.  And you can read the whole thing if you
15 would like.
16    A.  If I can just take a minute.
17    Q.  Sure.
18    A.  Okay.
19    Q.  Have you seen this before?
20    A.  Probably not.
21    Q.  And this --
22    A.  This would be an internal staff memorandum

16 (Pages 61 to 64)

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 65

1  that may have been part of a briefing package, but I
2  don't know. I wouldn't have paid much attention to it
3  if it was.
4      Q.   And it says at the top it's a memorandum of
5  a telephone conversation between Stan Morrow and Peter
6  Rush?
7      A.   Correct.
8      Q.   Do you know Stan Morrow?
9      A.   I know the name. I don't know him
10 personally.
11     Q.   I'll represent to you that this is the
12 earliest contact that I can find in any document
13 between a CPSC staff or anybody with the CPSC and the
14 WCMA, or what was then the AWCMA.
15          Do you have any reason to believe that this
16 is not the initial contact?
17     A.   In terms of the association, I couldn't say
18 one way or the other. I am quite certain based upon
19 my recollection of events that there were individual
20 contacts -- contacts with individual manufacturers
21 prior to this point in time.
22     Q.   In reading this as you did earlier, does

Page 66

1  this appear to you to be an initial contact, a record
2  of an initial contact? Or I guess maybe the flip
3  question is better. Do you see anything that
4  indicates otherwise?
5      A.   It's hard to say. And I say that because
6  this is a telephone -- memorandum of a telephone
7  conversation between Stan Morrow and Peter Rush. I
8  don't know -- there are several other names mentioned
9  at the bottom as cc'd, Carl Blechschmidt, Elaine
10 Tyrrell, Nick Marchica, Doug Noble and Harry Cohen.
11 They were all members of the program management team
12 that I mentioned earlier and whose name is left off
13 here, Bill King, who would have been the engineer
14 associated with that team who dealt with voluntary
15 industry standards.
16          So I don't know whether, for example, Bill
17 may have had contact on his own or any of these people
18 or still somebody else from one of the other either --
19 for example, it could have been somebody from the
20 emerging hazards task force.
21          But I know ultimately we in the commission
22 looked to the voluntary standards team, and Carl

Page 67

1  Blechschmidt was certainly a key member of that team,
2  one of the people mentioned here. But this is a
3  notation of a conversation between Stan Morrow and the
4  association, but there may well have been some contact
5  other than that.
6           And I should say that leads me further to
7  believe that this wasn't the first contact in that the
8  commission had a practice which I believe was followed
9  to the tee that whenever we dealt -- we as a
10 commission dealt with a hazard category, whenever
11 there was any either briefing package or other
12 memorandum or paper produced by the staff that cast
13 any kind of negative light on an industry's product,
14 the staff was under ongoing instructions to make sure
15 the industry had that information that the staff was
16 sharing with the commission.
17          There was what was then known as a fish
18 bowl mentality that pervaded the commission, and the
19 idea was there were no secrets when it came to hazard
20 issues. And if the staff was telling the commission
21 about something, the staff ought to also be telling
22 the affected industry or members of the industry.

Page 68

1           So while I can't say for sure that there
2  was a contact with AWCMA, I know there were contacts
3  and the sharing of that previous information with the
4  individual manufacturers. And there probably -- they
5  probably would have identified an industry group, and
6  the only one relevant would have been AWCMA.
7           And so I suspect that even though that may
8  have been the first telephone conversation, there was
9  undoubtedly a sharing ahead of time of the information
10 that had been shared with the commission.
11     Q.   But you're not aware of any specific
12 communication with the WCMA about that?
13     A.   No. I can only share with you the ongoing
14 protocol that was established for all product risk
15 areas.
16     Q.   Would there have been a record of any of
17 those prior contacts in the CPSC files?
18     A.   There would be a record of anything sent to
19 WCMA or individual manufacturers in the way of
20 letters. But where you would find them at this point
21 in time, they're probably, you know, somewhere in the
22 archives and who knows what tomes you would have to go

17 (Pages 65 to 68)

Page 69

1  through.
2  Q. That brings me to a letter here. I'll let
3  you look at it also. This is marked as Exhibit 8.
4  (Exhibit 8 marked for identification and attached
5  hereto.)
6  THE WITNESS: What was the date of the
7  other letter?
8  BY MR. WEISS:
9  Q. The phone conversation was July 3, 1985.
10 This is a little longer. You're welcome to
11 read it. I was just going to introduce the document
12 while you were reading, if that's all right. You can
13 correct me if I misstate it.
14 A. Sure.
15 Q. This appears to be a letter from the same
16 Stan Morrow at the CPSC dated July 26, 1985, to Peter
17 Rush. Is that correct?
18 A. That's correct.
19 Q. And if you read the first paragraph --
20 Again, you're welcome to read the whole thing. The
21 first paragraph is where I wanted to focus.
22 Can you read the second sentence -- well, I

Page 70

1  guess the first sentence I'll say follows up the phone
2  conversation we talked about before. And if you could
3  read the second sentence, please.
4  A. "The commission staff wishes to advise your
5  association about the accident data which we have in
6  our files and to encourage any voluntary or
7  cooperative actions which may help to reduce the
8  number of deaths to young children from such
9  strangulation and accidents."
10 Q. Does that suggest to you at all that at
11 least as far as Mr. Morrow is concerned, he at least
12 believes he's advising the association of the issue?
13 A. That what?
14 Q. He is the one that is advising the
15 association of the issue. Does that make sense?
16 A. No. Because again, you have to read the
17 letter in context. No. 1, he's talking about the
18 commission's new project identification team. As I
19 indicated to you earlier, ultimately this went to the
20 voluntary standards team, which is a different team
21 from Mr. Morrow's team.
22 But if you look at the second paragraph,

Page 71

1  what he's advising Peter Rush and the association of,
2  he's advising them that the staff has reports of more
3  than 35 -- and I'm reading here the second
4  paragraph -- "The staff has reports of more than 35
5  deaths to infants and young children under five years
6  of age which occurred between 1981 and 1985."
7  So he's saying in the four-year period,
8  those years, 1981 to 1984, which follow from the
9  earlier 1981 report, the commission knows of now an
10 additional 35 deaths or on average of about nine
11 deaths a year in the intervening years. So he's
12 really supplementing the information that was
13 contained in the original report, which I believe, as
14 I say, if the protocol was followed, and I have a hard
15 time believing it wasn't, the association would
16 already have known about it.
17 Q. Okay. I guess what I'm having trouble with
18 is I understand your interpretation of this letter.
19 But again, because this is the initial one we have, I
20 guess I'm having a hard time -- and maybe it's just
21 because -- let me ask it this way.
22 Is the basis for your opinion that the WCMA

Page 72

1  was -- Well, is it your opinion that the WCMA was
2  informed of the hazard in 1981?
3  A. I would say two things in that respect. If
4  not 1981, certainly -- because I forget when that
5  report came out. If it came out in December, it might
6  have been 1982. But within a few weeks or months of
7  that report, the WCMA would have been informed about
8  it. That's No. 1.
9  No. 2, and perhaps equally important, what
10 I'm saying is that if the WCMA -- in the event that
11 for some reason, whatever, the protocol wasn't
12 followed and WCMA wasn't informed about it, WCMA
13 should have informed itself about it because that
14 information was out in the public domain.
15 It was -- It was shared with the
16 manufacturers. It was -- which were members of WCMA.
17 It was reported in industry trade press,
18 which at that time would have been the Product Safety
19 Letter and the bureau of -- two publications, the
20 Bureau of National Affairs Product Safety Bulletin.
21 Two separate industry trade publications.
22 And for an organization which purports to

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 73

1  represent the interests of its members, it should have
2  known about the fact that the commission had compiled
3  information along these lines about child
4  strangulations involving its product, that its product
5  was one of the most significant causes of child
6  strangulation.
7      It behooves any trade association that
8  truly represents the interests of its members to stay
9  informed and become informed about the safety of the
10 very product that they are purporting to represent its
11 members about.
12     So to put a finality to that answer, yes, I
13 believe if the protocol was followed they would have
14 known. Absolutely they should have known, as any
15 responsible and conscientious trade association would
16 have done in terms of following the proceedings of the
17 Consumer Product Safety Commission, as was its
18 responsibility to do.
19     Q. Okay. And I want to separate that answer,
20 because as you know, we've talked about the opinions
21 that you're offering. I'm going to talk more about
22 sort of the undertaking of the WCMA later. And you're

Page 74

1  welcome to answer this, I'm not trying to limit you,
2  but I want to focus on your opinion that the CPSC
3  informed them. And what I'm hearing is that you --
4  under the normal course of events, they should have
5  been informed shortly after that.
6      A. That's right.
7      Q. But you don't have any recollection of
8  being told they were informed specifically, or we
9  don't have any documents that show they were informed
10 prior to this. Is that fair?
11     A. I don't have any documents that show that.
12 But that was the protocol.
13     Q. Okay. So is the basis of that opinion your
14 understanding of how the system -- how the process
15 should have worked?
16     A. How the process should have worked. And as
17 I say, in the event that it failed, there was still an
18 ongoing responsibility for any trade association
19 working in the area of window coverings to monitor
20 what was going on with respect to the safety of its
21 product which had been identified as one of the
22 leading causes of child strangulations in this

Page 75

1  country.
2      Q. But that's a separate question. My
3  question is whether they were informed by the CPSC
4  specifically.
5      A. I hear you.
6      Q. And your basis for that is -- again, if I'm
7  correct, your understanding that they should have been
8  informed pursuant to your recollection of telling the
9  staff to go to the industry and do this, and that
10 would have pointed to WCMA or its prior incarnation?
11     A. Sure.
12     Q. Okay. Now, what happened in -- Are you
13 aware of what happened in 1985 following this
14 correspondence we looked at?
15     A. Yeah. As I reflect in my report, towards
16 the end of 1985 a joint press release with the WCMA
17 was issued alerting consumers, the public, to the
18 problem at that time of pull cords.
19     Q. And did the WCMA or the AWCMA cooperate in
20 that effort?
21     A. Yes, they did.
22     Q. And are you aware of any other consumer

Page 76

1  safety alerts or product safety alerts that were
2  issued in the subsequent years by CPSC and AWCMA?
3      A. Yes. As I recall, there was one issued, I
4  believe in 1989 and another in 1993. There may have
5  been some interim reports, joint releases as well, all
6  reflecting that this was an ongoing problem. And
7  actually with each one growing more serious because
8  the commission was collecting more and more instances
9  of these strangulations taking place.
10     The industry, the Window Covering
11 Manufacturers Association, by its own testimony, was
12 not collecting these instances, was not investigating
13 them, and for some reason took a hands-off attitude,
14 hear no evil, see no evil attitude towards this
15 singular and most serious risk to safety associated
16 with its product, namely the strangulation of infants.
17     Q. Okay. And again, I want you to answer
18 wholesomely, but I did ask you whether you're aware of
19 any other subsequent product safety alerts. And if
20 you feel like you need to talk about all of that to
21 explain your answer, please do. But I am trying to
22 get Don to breakfast here.

19 (Pages 73 to 76)

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 77

1   A.   Yes, there were additional product safety
2  alerts.
3   Q.   Are you aware of the CPSC at any point
4  prior to, say, 1990 encouraging the WCMA to take any
5  steps beyond joining in a product safety notice?
6   A.   Yes.
7   Q.   What are they?
8   A.   I talked about already that certainly by
9  the period of 1985-86, while I was still at the
10 commission, from the discussion, the dialogue I was a
11 part of with the voluntary standards team, there were
12 discussions on the part of the staff with the industry
13 which by that time certainly would have included WCMA.
14 I know it included WCMA because the staff talked about
15 WCMA.
16      They identified, as I said earlier, that
17 there was a lack of leadership, both within the
18 association and within the industry, and that there
19 was an unwillingness, at least as of that time, to
20 even consider aspects of product redesign or
21 reformulation.
22   Q.   As I recall your testimony earlier, you

Page 78

1  said that there was an unwillingness among members of
2  the industry about design.
3       Are you aware of -- and given, as you said
4  before, the WCMA doesn't design any products -- I
5  guess are you aware of or do you have any documents
6  that show the WCMA being asked to take any steps
7  toward redesigning products prior to 1990?
8   A.   Yes, I do know from the conversations from
9  the feedback from the staff that the WCMA was involved
10 in those discussions with the staff in terms of how
11 best to deal with the safety problems that were being
12 uncovered, and that those problems certainly related
13 to the actual design of the product itself.
14   Q.   And so that's based on your recollection of
15 those discussions?
16   A.   That's correct.
17   Q.   Do you have any documentary evidence that
18 you've seen?
19   A.   The only thing I could refer you to is
20 there is a public record of the staff reports to --
21 For each of these briefings that I'm referring to,
22 there is a briefing package in the form of a

Page 79

1  memorandum, sometimes several memoranda. But there
2  would be memoranda from the voluntary standards group
3  discussing exactly what I'm talking about.
4       It would be memoranda written before the
5  meetings, and those memoranda would not reflect the
6  back and forth itself. Although there might be
7  available, because I believe all that was transcribed
8  back then, there might be available transcripts of the
9  discussions between the commissioners and the staff as
10 well.
11   Q.   Did you review any of that when you were
12 drafting your report?
13   A.   No, I didn't. I didn't have access to it.
14   Q.   Who does have access to it?
15   A.   Any member of the public could.
16   Q.   Did you try to get that information?
17   A.   No. Because I do remember -- Fortunately,
18 my memory serves me quite well, at least there may be
19 aspects of greater specificity that I have not
20 recalled, but I know certainly the thrust of the
21 discussions in late '85, early '86, had to do with --
22 that is between the commissioners and the staff on

Page 80

1  this issue had to do with A, the lack of leadership;
2  B, the lack of interest in approaching any design
3  reformulation of the product; and C, the willingness
4  to engage in public safety education campaigns.
5   Q.   Okay. In your report, especially the
6  initial statements, and I can point to it, but I think
7  you'll probably agree, you talk a lot about the
8  obligations of manufacturers.
9   A.   Correct.
10   Q.   It's the -- In a general sense, it's the
11 manufacturer's obligation to not produce a defectively
12 designed product?
13   A.   That's correct.
14   Q.   And a product that does not create an
15 unreasonable hazard?
16   A.   Correct.
17   Q.   When CPSC staff determines or decides that
18 a trade association like the AWCMA is -- I think you
19 described them as sort of ineffectual. Is that the
20 word you used earlier?
21   A.   That's one of the terms I would use.
22   Q.   I'm talking about the 1985 time frame when

20 (Pages 77 to 80)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45