DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 81

1  they made contact as we've seen here. And I
2  understand there may have been earlier ones, but
3  talking about --
4      A.  I would use the term throughout their
5  tenure.
6      Q.  That's fine. Let's talk about this time
7  here.
8      A.  Fair enough.
9      Q.  If the trade association is determined by
10 the staff to be ineffective and lacking in leadership,
11 and given that it's the responsibility, at least among
12 other people perhaps, it's the manufacturer's
13 responsibility to address product hazards,
14 unreasonable hazards, would the CPSC staff continue to
15 press what they described an ineffectual association
16 to do this rather than the companies themselves?
17     A.  From my recollection of what was going on
18 in that period, at least while I was still there, the
19 staff was reporting to us that the leadership was
20 ineffectual or lacking, both at the association level
21 and at the manufacturers' level.
22         And one of the things we tell the staff is,

Page 82

1  "Well, find means of assistance here. You're going to
2  have to work with both, and maybe one can encourage
3  the other."
4          One of the things I didn't know, and I'm
5  sure none of the other commissioners knew at that
6  time, is that this was a sham organization. It really
7  didn't even have a staff. I've never -- to be honest,
8  I've never heard of -- in the safety arena, in the
9  arena of volunteering to undertake a voluntary
10 standards process to set safety standards, I've never
11 heard of an organization which is basically a PR
12 management group that would undertake to assume that
13 kind of a task.
14         All my experience has been with
15 organizations like the American Gas Association, the
16 American Home Appliance Manufacturers, Underwriters
17 Laboratories, the Chainsaw Industry Group, the Outdoor
18 Power Equipment Institute, the Kerosene Heaters
19 Association, the All-Terrain Vehicles Association, the
20 Ladder Institute.
21         These are all organizations with technical
22 know-how, with staff as opposed to zero staff, with

Page 83

1  access to human factors analysis which actually help
2  to lead and guide the members towards the promulgation
3  of safety standards. The result isn't always
4  exemplary, but at least you've got the beginnings of a
5  semblance of an organization that is not otherwise a
6  paper organization.
7      Q.  You recall we're talking about 1985 here?
8      A.  I understand that. All I'm saying is I
9  didn't know, and I don't think the staff knew or my
10 fellow commissioners knew that when we talked about
11 the lack of leadership within the Window Covering
12 Manufacturers Association that there really wasn't an
13 association.
14     Q.  Would you consider the Window Covering
15 Manufacturers Association in 1985 a group that is
16 concerned with -- well, I guess that's the wrong way
17 to say it.
18         Is it a safety group?
19     A.  Well, we know that at some -- at some point
20 they, as witnessed by the fact that they participated
21 in that release at the end of 1985. They participated
22 and were working with the staff on the issues of child

Page 84

1  strangulation, at least according to our staff, as of
2  1986 and forward, even if it was in name only. But
3  they purported to be an organization concerned about
4  safety if not a safety organization.
5          And then ultimately, in the 1994 period,
6  '95, they took it upon themselves to be a sponsor of a
7  safety standard.
8      Q.  Let's talk about -- We're talking about
9  1985 now.
10     A.  Sure.
11     Q.  I guess what I'm trying to understand is,
12 and maybe this goes to something we should talk about
13 later when we're talking about the sham organization
14 opinion. But prior to them being informed of the
15 hazard -- I'm going to hold off because I think it's
16 going to go into another area.
17         Let's go back to your report. On page 9
18 you mention -- I have a copy which I think will guide
19 me through this a little easier.
20         On page 9 you mention at the beginning of
21 the third paragraph, or the second full paragraph on
22 that page that the CPSC -- "In 1994 the CPSC was

21 (Pages 81 to 84)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

EXHIBIT 52-C

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 85

1  confronting increasing media and public concern about
2  these strangulations."
3       Again, I'm going from what I have, I have
4  seen. Where was the media and public concern about
5  child strangulations in 1994?
6  A. There was increasing media reports about
7  child strangulation. And my recollection, there
8  was -- I don't recall who it was, but somebody in
9  Congress was making waves about this issue, and in the
10 Congressional record there was reflecting floor
11 discussion. There was concern about the issue.
12      And there was some outside pressures as
13 well as the -- there was an incoming new chairman, Ann
14 Brown, as of 1993 who partly in response to the
15 pressures and partly, as I understand it, on her own
16 raised this issue back to -- or took it from the back
17 burner to a front burner, and as a result led to much
18 increased activity, first within the commission and
19 then within the industry.
20 Q. Okay. You were not a commissioner at that
21 time?
22 A. I was not, no.

Page 86

1  Q. Were you aware of media pressure on the
2  CPSC?
3  A. I was aware from some of the publications
4  that cover the CPSC that this was an issue that had
5  come back into the forefront.
6  Q. And I understand it came to the forefront
7  with the CPSC. Were you aware at the time as a
8  private citizen of media pressure and public pressure?
9  A. Yes, I was.
10 Q. Do you have any news articles,
11 publications, anything like that?
12 A. I do recall that this was also an issue
13 that had been raised by the American Trial Lawyers
14 Association with the CPSC as part of what was called
15 ATLA Alert Program. And that would have been in the
16 1991-92 period. And that in and of itself would have
17 gotten public attention, but they also raised it with
18 CPSC.
19 Q. Okay. And as you talk about in your
20 report, CPSC, I think you just said, reactivated, put
21 it back on the front burner?
22 A. That's correct.

Page 87

1  Q. Went back to the WCMA to talk about taking
2  additional steps; is that correct?
3  A. Well, more than just to talk about it. By
4  the 1994 period, the pressure was so great that CPSC
5  was preparing a corrective action plan to require
6  product redesign whether or not the industry was going
7  to agree to it.
8  Q. And they informed the industry of this?
9  A. That's correct.
10 Q. Or they informed the WCMA of this effort.
11 And did the WCMA respond?
12 A. Yes.
13 Q. What did they do?
14 A. WCMA and the individual manufacturers
15 agreed to a corrective action plan.
16 Q. Okay. When you talk about that, I think it
17 says here in your report on page 9 that "The WCMA
18 volunteered to work with the commission through its
19 offshoot body, the Window Covering Safety Council."
20      I guess where is your understanding that
21 WCMA was operating the Window Covering Safety Council?
22 A. Where is my understanding that WCMA was

Page 88

1  operating --
2  Q. Or am I misunderstanding what you're
3  writing?
4  A. I don't know that I would say that they
5  were operating it, but the Window Covering Safety
6  Council was an offshoot or an adjunct of the Window
7  Covering Manufacturers Association. My understanding,
8  it was explicitly set up to carry out the corrective
9  action plan.
10 Q. And what do you know about the differences
11 between the two organizations?
12 A. Well, certainly from Peter Rush's
13 testimony, I understand the differences that even
14 though they were in the same location, shared the same
15 telephone and fax, had the same executive director,
16 that WCMA represented solely the manufacturers and
17 apparently later on -- that is originally only the
18 manufacturers, and later on some importers as well,
19 but that the industry said they wanted a broader -- a
20 broader-based task force dealing with the issues
21 arising from the corrective action plan and therefore
22 wanted to include retailers, distributors and perhaps

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 89

1  others who for one reason or the other were not
2  members of the WCMA.
3      Q.  What came first, the WCSC or the agreed
4  corrective action plan?
5      A.  Well, the agreed corrective action plan. I
6  suspect -- I'm guessing on the basis of logic -- but I
7  think once the initial outlines of a corrective action
8  plan were presented to the WCMA, for whatever reasons
9  the WCMA in its judgment felt that it would be better
10 to carry out the corrective action plan through a --
11 through a broader-based body that was explicitly
12 devoted to that purpose.
13     Q.  I guess the question, then, is which
14 organization agreed to the corrective action plan, was
15 it WCMA or WCSC?
16     A.  In the end, the responsible organization
17 for carrying out the plan was the Window Covering
18 Safety Council.  But I think piercing the corporate
19 veil here, so to speak, I'm not sure there was a major
20 difference between the two.
21         And I think clearly WCMA had to have had a
22 major role in determining that it would be best to

Page 90

1  have the W -- the safety council be the responsible
2  and identifiable group for carrying out that plan.
3      Q.  Okay, let's talk about the next opinion.
4      MR. BAUERMEISTER:  One second.
5      MR. WEISS:  Yes.  Don, do you want to take
6  a break?  It has been a long time.
7      MR. BAUERMEISTER:  Well, that's what I was
8  wondering.  We're two hours into this.  I'm directly
9  available for the next period of time on my calendar
10 because it's just 8:00 a.m. here in Alaska.  What is
11 the plan of yourself or Mr. Statler for how you're
12 going to proceed?
13     (Off-the-record discussion.)
14     (A recess was then taken.)
15 BY MR. WEISS:
16     Q.  We will start again with where we left off,
17 which was talking about Opinion 4, which is "The WCMA
18 knew or should have known of the risk of inner cord
19 strangulation at some point in time."
20         I guess I'll start with, the broad question
21 is:  Do you have a more specific opinion, Mr. Statler,
22 of when it should have become aware of the risk?

Page 91

1          Oh, actually back up.  Do you have an
2  opinion as to when it did become aware of the risk?
3      A.  Inner cord?
4      Q.  Inner cord strangulation.
5      A.  Well, we know it certainly became aware of
6  the risk as of the letter from Toni Griesbach in 1990
7  which I refer to in my report.  There couldn't have
8  been a more clear and definitive enunciation of what
9  the problem was and what the consequences of that
10 problem were and inviting the association and its
11 members to address that problem.  And certainly to
12 address it, if nothing else, in terms of the
13 appropriate warnings about the inner cord problem and
14 not limit those warnings to the pull cord problem.
15         So without question, to identify some date
16 as to which they knew about the problem would have to
17 be no later than the Griesbach letter in 1990 which
18 reflected, by the way, an incident occurring back in
19 October of 1986.  The Griesbach letter is September 5,
20 1990.
21         I would argue, however, that -- your
22 question is when did they know about the problem.

Page 92

1      Q.  And I'm going to ask when they should have.
2      A.  I'm going to say leaving aside the issue of
3  when they should have known about the problem -- Well,
4  I can't say definitively when they knew.  They must
5  have known as of the 1990 September 5th date.
6      Q.  Then the next question is:  When should
7  they have known?  Or do you have a date when they
8  should have known?
9      A.  I have a sense of a range when they should
10 have known, and it should have been earlier than that
11 point.
12     Q.  Hold on one moment.  Let me just clarify
13 the question.  I used the pronoun "they."  I mean the
14 WCMA.
15     A.  That's the way I understood your question.
16     Q.  Not "they" meaning the industry.
17     A.  The WCMA, as the industry group that by its
18 mission was responsible for advancing the interests of
19 its members according to the Rush deposition and
20 according to their website, should have undertaken by
21 their own -- on its own part or in conjunction with
22 the individual members some assessment and study of

23 (Pages 89 to 92)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 93

1  the child strangulation problem associated with window
2  coverings back in the mid-1980s. From the time it
3  first learned about the problem.
4         From the documents you produced, we know if
5  not earlier, it certainly learned about the problem.
6  Again, when it should have learned about the problem
7  is another issue. But we know it certainly learned
8  about the problem as of 1985. I believe that it
9  learned about the problem earlier than that.
10        But as soon as it learned about the
11 problem, given the fact that the mission of the
12 association was to advance the interest of its
13 members, it seems to me that nothing could be more
14 appropriate and conducive to advancing that mission
15 than to protect -- or help to protect its members from
16 any downstream concerns associated with the child
17 strangulation problem for which this industry, the
18 window covering industry, was now being identified as
19 one of the single most important sources and causes of
20 child strangulation, infant strangulation as a result
21 of corded window blind coverings.
22        So once alerted to that problem, it should

Page 94

1  have undertaken a study, an analysis of the
2  information available to it, which would include
3  everything from the 1981 study, the 1985 additional
4  material that was shared with WCMA in the Stan Morrow
5  letter, as well as subsequent issuances of updated
6  information which we certainly know came about in 1989
7  and again in 1993, although that postdates the 1990
8  date.
9         But throughout the 1980s the commission was
10 collecting and studying and having available to any
11 responsible interested party, of which the WCMA should
12 have been one of those, and had it done an assessment
13 of those incident reports, those in-depth
14 investigations, it would have known that the inner
15 cord problem for window coverings was a substantial
16 risk factor and was really a, I believe, as Griesbach
17 explains, is really the other end of the pull cord
18 problem.
19        And if you've got loops that are a problem
20 with pull cords, you also have loops that are a
21 problem with the inner cord, and the two are
22 connected. And how you can deal with the one and not

Page 95

1  the other when it's two aspects of the same problem is
2  really the issue that's before us today.
3         But again, in specific response to your
4  question, it should have been in the period of no
5  later than the mid-1980s as additional information was
6  being shared with it by the CPSC.
7     Q.  Do you know when the CPSC became aware of
8  the hazard of inner cord strangulation?
9     A.  Well, I know it became aware of the hazard
10 with the analysis of the material in the 1980s period.
11 The extent of the problem was clearly less, and less
12 by far, than the pull cord problem just in terms of
13 sheer numbers. But all the other elements of the
14 unreasonable risk were one and the same. That is to
15 say, it was a hidden hazard, perhaps even more hidden
16 than the pull cord problem because this was a cord in
17 many cases you couldn't even see.
18        It was the same vulnerable population that
19 was exposed to that problem, namely kids, mostly under
20 three years of age.
21        And it was a problem that clearly was
22 associated with the design of the cord itself, because

Page 96

1  the cord had loops, and loops were the problem.
2     Q.  I guess my question was: At what time did
3  the CPSC become aware of that aspect of the hazard,
4  that inner cords could cause strangulation?
5     A.  They were aware of the problem as early as
6  the mid-'80s when they issued information about the
7  in-depth reports and the other investigation and study
8  that they had done that basically pointed to one out
9  of every ten strangulations, as I recall the figure,
10 about one out of every ten had to do with the inner
11 cord as opposed to the pull cord.
12    Q.  Did you have that study?
13    A.  No, I don't. But the information is
14 reflected -- As best as I could review the documents,
15 that information isn't kind of publicly announced
16 until the 1990s period. But if anyone took the time,
17 which CPSC did, and the window covering manufacturers
18 did not, according to its testimony, took the time to
19 analyze the individual reported instances, some of
20 those instances were inner cord strangulations.
21    Q.  But there is a report from 1985 that says
22 that one out of ten --

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 97

1   A.  No. I did not say that.
2   Q.  I'm confused about that. I'm sorry.
3   A.  No, what I said is that a study, an
4 independent study of the material that CPSC generated
5 would have told you that approximately one out of
6 every ten were inner cord strangulations.
7   Q.  Did you know that when you were at CPSC?
8   A.  I did not, no.
9   Q.  Are you aware of any CPSC study --
10  A.  Let me take that back. I did know -- And
11 this was probably in 1986 when the commission staff
12 talked to us about that this isn't just a problem that
13 could be solved by an education campaign, that there
14 were design considerations, the staff did discuss with
15 us that there were two aspects of the problem,
16 primarily the pull cord, and that constituted the bulk
17 of the incidents, but there was a residue of incidents
18 that involved the inner cord, and they did share that
19 with us. And that was something they said they shared
20 with the industry as well.
21  Q.  Do you have any paper that shows that you
22 reviewed for your --

Page 98

1   A.  No. No.
2   Q.  In 1985, the CPSC, in conjunction with the
3 WCMA, issued a public safety alert?
4   A.  That's right.
5   Q.  Did that alert mention the hazard of inner
6 cords?
7   A.  No. It referred only to the pull cords.
8   Q.  You were on the commission at that time?
9   A.  I was.
10  Q.  Why didn't it mention inner cord hazards?
11  A.  There are a couple of explanations for
12 that, and I'm not sure what the correct one is. The
13 most logical explanation is that since by far the bulk
14 of the incidents had to do with the pull cords, the
15 purpose of this release was to identify that problem,
16 to identify where the maximum risk was and perhaps not
17 to confuse the issue.
18      But an explanation might also be contained
19 in the fact that all those product safety alerts --
20 every product safety alert the commission has ever
21 issued, not only in this area but with respect to any
22 consumer product covering just about all

Page 99

1 the probably -- product safety alerts have been issued
2 for probably every one of the products that are listed
3 on page 1 of my C.V., and in some cases more than a
4 dozen such alerts. For example, for ATVs.
5      But in every single case, those are
6 negotiated -- the language is negotiated with the
7 industry affected so that the Window Covering
8 Manufacturers Association would have had a say in what
9 language was used. I don't at this point in time know
10 whether the original draft said both pull cords and
11 inner cords and WCMA said "No, let's talk about only
12 the pull cords because the inner cords isn't that much
13 of a problem." Or it may well have been the original
14 draft had no reference to inner cords. I don't know
15 the answer to that.
16     But that could be an explanation for if the
17 CPSC had wanted to mention -- and I'm not sure it did
18 or did not -- had wanted to mention the inner cord
19 problem, since this was a cooperative effort in terms
20 of issuing a product safety alert, the WCMA and the
21 industry that it represented would have had a role in
22 what the final language was.

Page 100

1   Q.  Okay. But you don't have any knowledge
2 that the WCMA or anybody tried to get that removed
3 from any sort of publication?
4   A.  No, I do not.
5   Q.  Why would they?
6   A.  Why would they what?
7   Q.  Why would they not want that information?
8 Why would they issue a safety alert that warns of this
9 hazard but not the other?
10  A.  And "they" being the WCMA in your question?
11  Q.  I guess we could go to both. Let's back up
12 because you actually gave two possible explanations.
13 One was the CPSC didn't want to confuse the issue by
14 addressing it because the most common danger was the
15 pull cord.
16     Given everything else in your report,
17 what -- and maybe I'm just missing it. What possible
18 reason would the CPSC have for issuing a product
19 safety alert about a product that does not mention a
20 related hazard of which it's aware?
21  A.  I would argue for mentioning it. But, you
22 know, I think the answer is what I already told you,

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 101

1   that is, if you really -- It's very hard, it's very
2   difficult to get the public to seize upon and
3   appreciate safety information coming from any source,
4   including the United States government, including the
5   Consumer Product Safety Commission.
6         And it is always good practice to try and
7   target as much as possible the message that you want
8   to get across. And while there might be another
9   message that is important, there is good reason to
10  target the first message, to target the one that
11  applies in its broadest scope and covers 90 percent or
12  more of the strangulation problems.
13        And therefore I can see either in the
14  initial draft or agreement to a proposed revised draft
15  that CPSC could well have made a reasonable decision
16  at that time to focus on the most -- the most
17  broad-based and widespread cause of child
18  strangulations and try not to confuse the issue.
19      Q.  If CPSC did make that decision, would you
20  agree with that decision?
21      A.  You know, I think it's a close call. I can
22  see the reasons for doing it. This is not an alert

Page 102

1   that the commissioners needed to pass off on, so I
2   didn't have a role one way or the other. But I can
3   see both.
4         I guess in retrospect, you can always see
5   things differently after the fact. Knowing everything
6   that I know now, I think that probably is a mistake.
7   But given the information available at the time, it
8   was a reasonable conclusion to reach.
9       Q.  And you testified earlier, and we have seen
10  that the CPSC issued additional product safety alerts?
11      A.  It did.
12      Q.  Over the next eight years --
13      A.  Correct.
14      Q.  -- is that correct?
15        Did any of those safety alerts mention the
16  inner cord hazard?
17      A.  My recollection is the alerts in '89 and
18  '93 also singled out only the pull cord problem.
19      Q.  It didn't just single out. It did not
20  mention at all the risk of inner cord strangulations?
21      A.  It didn't mention at all the inner cord
22  problem.

Page 103

1       Q.  Are you aware of any additional releases or
2   public information or anything put out by the CPSC in
3   those intervening years to warn the public of inner
4   cord strangulation?
5       A.  No, I'm not.
6       Q.  Are you aware of any correspondence between
7   CPSC and -- heck, anybody, the public, the industry,
8   amongst themselves, that discussed specifically the
9   danger of inner cord strangulation prior to 1993?
10      A.  That correspondence CPSC had with others?
11      Q.  With anybody else. Well, let's break it
12  down. Any correspondence between the CPSC and WCMA
13  about inner cord strangulation prior to 1993? Or
14  prior to and including 1993?
15      A.  No, I'm not aware of any correspondence. I
16  know from going back to the 1985 period, based upon
17  the dialogue we had with staff, that some staff had
18  identified as of that period, 1985-1986, some staff
19  had identified certainly by early 1986 that they would
20  have shared, and they did share that information with
21  WCMA and the industry because they were coming back to
22  us and saying the industry was not open to the idea of

Page 104

1   design modifications associated with either of the two
2   problems.
3       Q.  That's what they said?
4       A.  That's right.
5       Q.  Okay. Like I did before, you will
6   obviously take the time to read whatever you like.
7   I'm just going to introduce it while you're doing
8   that. This is Exhibit 9.
9         (Exhibit 9 marked for identification and attached
10  hereto.)
11  BY MR. WEISS:
12      Q.  These are meeting minutes, or they purport
13  to be meeting minutes between the WCSC and the CPSC on
14  December 14, 1999, in CPSC headquarters in Bethesda.
15  Is that correct? That's what it says?
16      A.  Yes.
17      Q.  If you could -- actually, why don't you
18  read the first two paragraphs, please.
19      A.  Read aloud?
20      Q.  Sure.
21      A.  "The CPSC called this official meeting to
22  discuss strangulation incidents since 1991 involving

Page 105

1 window covering lift cords. A list of attendees is
2 attached. Alan Schoem, Director of the CPSC
3 Compliance Office, opened the meeting by recounting
4 the successful cooperation of WCSC and CPSC in
5 eliminating loop cord hazards and how this has led to
6 a significant drop in strangulation deaths."
7   Q.  And let me interrupt you for just one
8 second. We've been using a different term. Do you
9 know what lift cords are that Mr. Schoem is --
10  A.  Yeah. I understand that to be pull cords.
11  Q.  Oh, okay. Is it your understanding --
12  A.  Oh, I'm sorry. No. I'm sorry. No, the
13 lift cords are what I've been referring to as the
14 interior inner cord.
15  Q.  I just want to make sure we're on the same
16 page.
17  A.  That's correct.
18  Q.  Please continue.
19  A.  I'm distracted because there is a statement
20 here that I disagreed with.
21  Q.  I thought you might.
22  A.  The part about they were successful in

Page 106

1 eliminating loop cord hazards. Well, they hadn't
2 eliminated loop cord hazards. But that's okay.
3       "However, Schoem noted that the Commission
4 had uncovered a new safety problem, the ability of
5 some lift cords to be pulled out to loose length when
6 a window covering is in the down position and the cord
7 lock is not engaged. Renae Rauchschwalbe of the CPSC
8 Compliance Staff went on to demonstrate this potential
9 hazard, noting 15 infant deaths since 1991
10 attributable to inner cord strangulations. Schoem
11 said the Commission was now seeking a fix of this
12 problem from industry, both in terms of retrofit of
13 existing products and a design solution for future
14 products."
15  Q.  You're welcome to continue reading. You
16 don't need to read any more, but you're welcome to if
17 you like.
18  A.  Why don't you give me a minute to read
19 this.
20  Q.  Of course.
21      MR. BAUERMEISTER: Mr. Weiss, this is Don
22 Bauermeister. The date of this document is what?

Page 107

1      MR. WEISS: The date of this document is
2 December 14, 1999. I have the Bates number if that
3 will help you.
4      MR. BAUERMEISTER: No, that's fine. I
5 don't have the document here. Why don't you put the
6 Bates number on the record. That way we'll be able to
7 find it.
8      MR. WEISS: Sure. In fact, if you would
9 like, whenever I do a document that has one, which I
10 guess will be most of them, I'll just read that into
11 the record so you can find it when you get the
12 transcript.
13      MR. BAUERMEISTER: Sure.
14      MR. WEISS: This is document 0018244.
15      MR. BAUERMEISTER: All right.
16      (Telephone interruption.)
17      (Off-the-record discussion.)
18 BY MR. WEISS:
19  Q.  You had read the document we talked about
20 before?
21  A.  Yes.
22  Q.  Do you know Alan Schoem?

Page 108

1  A.  I do.
2  Q.  Is he -- I guess he's no longer with the
3 CPSC; is that correct?
4  A.  That's correct.
5  Q.  Was he a good staffer?
6  A.  Excellent.
7  Q.  Do you have any idea why he would describe
8 the inner cord hazard as a new safety problem?
9  A.  Yes, I do.
10  Q.  What is that?
11  A.  Alan Schoem was with the enforcement and
12 compliance staff of the CPSC. He was a lawyer. He
13 was not probably in any way involved in what was going
14 on in the period of the 1980s that I discussed,
15 because that was the program management team. But the
16 lawyers in compliance at this time, probably headed by
17 Alan Schoem, got involved in safety issues kind of as
18 a -- how do I describe it? Well, they're an
19 enforcement team. They get involved because they're
20 enforcing largely Section 15 of the Consumer Product
21 Safety Act, which is the part of the act that talks
22 about substantial product hazard and substantial

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 109

1  product hazard reporting. And sometimes Section 12 of
2  the act, which is imminent hazard reporting and
3  imminent hazards would also have to be reported under
4  Section 15.
5      So the compliance and enforcement branch
6  only gets involved, or directorate only gets involved
7  in the most dire of circumstances when there is a
8  substantial product hazard or an imminent hazard
9  that's involved.
10      They were involved in the 1994 period in
11  terms of the corrective action plan because had a plan
12  not been agreed to, then the CPSC, according to the
13  corrective action procedures, would have been prepared
14  to issue a preliminary finding that window coverings
15  were a substantial product hazard and subject to
16  recall. And window coverings at that time with pull
17  cords that -- that -- that constituted an unreasonable
18  risk, which basically were all window blind coverings.
19      So really beginning in the 1994 period when
20  there was this renewal of activity within the
21  commission, the issue kind of got transferred over --
22  not kind of, did get transferred over to the

Page 110

1  enforcement folks who had the ability to threaten that
2  there would be a formal finding of unreasonable risk
3  or substantial product hazard or both, or possibly
4  even an imminent hazard under Section 12 if the
5  affected party, in this case the window covering
6  industry, didn't take the kind of corrective action
7  that they were suggesting that they take.
8      Having focused on the pull cord problem in
9  1994, in 1999 when this is written for the enforcement
10 branch, the inner cord problem was a new problem and
11 really became a new problem by virtue of the
12 additional statistics that were indicating that the
13 number of strangulations from inner cords was not
14 diminishing in any way as a result of the 1994 action.
15 And as a result of the staff activity in the 1998-99
16 period to expand upon their understanding of what
17 other problems still remained with respect to corded
18 blinds and to deal with those problems.
19      So the issue from 1994 really -- or I
20 should say in 1994-95 period, and again in 1999, was
21 the enforcement branch really getting the issue as
22 opposed to the voluntary standards folks who

Page 111

1  previously had been working on it who could find no
2  satisfaction or relief or even interest on the part of
3  the affected industry. And as a result of the
4  prolonged inaction, it got turned over to the
5  enforcement folks.
6      Q.  In 1993?
7      A.  In the 1993-94 period originally, and then
8  again in 1999.
9      Q.  Was there a period of time when it was not
10 with the compliance department between 1993 and 1999?
11     A.  Yes and no. I would think that compliance
12 would continue to monitor, particularly what had been
13 done in conjunction with the corrective action plan.
14 But at the same time we know that the programmatic
15 staff, and by this time some of the names have
16 changed, the units within the organization, but
17 basically the hazard analysis and engineering and
18 economic folks were again studying and really
19 intensifying their study of the continuing problems.
20 In other words, that other 10 percent of the problems,
21 or thereabouts, associated with non-pull cord issues,
22 in particular the inner cord.

Page 112

1      Q.  So am I understanding that some branch of
2  the CPSC were aware of it but the compliance and
3  enforcement branch in 1993, we'll even say, was not?
4  When I say it --
5      A.  I'm not saying they weren't aware of it,
6  but their focus was to get immediate action, immediate
7  response with respect to the issue of the pull cords.
8  And my only hesitation in saying that is that I don't
9  know because the documentation is not before me what
10 may have transpired in the discussions with the
11 industry back in 1993-94.
12     There may have been, as a quid pro quo, for
13 focusing only on the pull cord issue, the industry may
14 have agreed to that, and if the CPSC at that time had
15 raised the inner cord issue, the quid pro quo may have
16 been to drop that issue at that time.
17     Q.  I have a couple of questions about that
18 that I want to ask you. One is, have you seen any
19 evidence whatsoever, any documents that show that the
20 CPSC asked the industry to address the inner cord
21 hazard and the industry said no?
22     A.  No. Those documents tend to be

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 113

1 confidential documents because they are -- they may
2 well be available to the association, but CPSC
3 typically would not make them available.
4    MR. WEISS: Let's go off the record for
5 just one moment, please, Don.
6    (Off-the-record discussion.)
7 BY MR. WEISS:
8    Q.  You've seen documents from that time frame?
9    A.  I've seen documents from that time frame.
10 I haven't seen the -- any negotiating strategies or
11 discussions or reflecting negotiating strategies and
12 discussions. I've seen the voluntary corrective
13 action plan itself.
14    Q.  You haven't seen any correspondence back
15 and forth between the WCMA and the CPSC about what
16 that plan might entail and what efforts might be
17 taken?
18    A.  Not that I can recall at this point.
19    Q.  Okay. But regardless of that, you have not
20 seen anything to suggest that happened? I understand
21 you think that you don't know that it hasn't.
22    A.  No, I'm not even suggesting that it could

Page 114

1 happen.
2    Q.  I just want to make sure that we're not --
3    A.  I'm saying that it could have happened.
4    Q.  Okay. But you don't --
5    A.  I'm not suggesting -- what I am -- I do
6 know the way the Section 15 group, the enforcement
7 group has typically operated, and particularly where
8 they're dealing with a generic industrywide hazard,
9 they try and keep that as narrow as possible because
10 they're on -- they're on slimmer legal grounds when
11 they're dealing with an industry at large than when
12 they're dealing with a specific either production or
13 design defect associated with one manufacturer's
14 product.
15    Q.  You had said that the CPSC was prepared
16 to -- and I hope I've got the phrasing right, I know
17 it's a term of art -- declare window blinds a
18 substantial product hazard and go to formal rulemaking
19 if the industry did not comply. Did I say that wrong?
20    A.  Yes.
21    Q.  Okay. Please correct me.
22    A.  There's a -- It's two different animals.

Page 115

1 Formal rulemaking has nothing to do with Section 15.
2 Formal rulemaking is prospective in its nature. They
3 could have been willing to do that, but --
4    Q.  What were they willing to do in 1983?
5    A.  Let me just clarify for the record. To the
6 extent you're dealing with the prospective, the future
7 correction of a problem, that is a problem of new
8 product being produced as of that date, you're dealing
9 with rulemaking.
10    To the extent you're dealing with product
11 already on the market or in people's homes, you're
12 dealing with product correction. Product correction
13 can only be accomplished through the Section 15
14 process.
15    Future production can only be accomplished
16 through the rulemaking process.
17    Q.  What was it that when CPSC drafted a
18 voluntary corrective action plan and approached the
19 industry, and again I hope I'm saying this right, that
20 they essentially said you take action or we're going
21 to take action --
22    A.  That's right.

Page 116

1    Q.  -- is that right?
2    Why would the CPSC, if it was aware of a
3 hazard of inner cord strangulation, why would it
4 accept a plan that, in your words, didn't address it?
5    A.  I think I've answered that. It's two
6 parts. One, they would have recognized that if
7 90 percent or more of the problems associated with
8 pull cords, that from a regulatory standpoint, if they
9 could accomplish that working on what are somewhat
10 questionable -- what they would view as somewhat
11 questionable legal grounds -- there are very few
12 examples of -- there are some, but there are very few
13 examples where generically affecting an entire
14 industry a product has been recalled. Typically it's
15 a manufacturer's product because of either a
16 production defect or a design defect.
17    But where you're talking industrywide, CPSC
18 is on less firm legal grounds. And so if they can get
19 cooperation of an industry more easily by targeting or
20 focusing on the most significant of the hazards
21 involved, I can see them doing that.
22    Let me give you a counterexample, for

29 (Pages 113 to 116)

Page 117

1 example.
2  Q. Yeah.
3  A. Not counter, an exemplary analogue. In the
4 1970s there were a host of problems associated with
5 lawn mowers, both riding mowers and walk-behind
6 mowers. The principal problem, 70 percent of the
7 problem, had to do with the rotating blade. But there
8 were also problems about the discharge chute sending
9 out projectiles, and there were problems with the
10 riding mowers of tipover and rollover. And there were
11 problems with the riding mower backing over little
12 kids.
13      But the CPSC focused upon the problem,
14 which was 70 percent of the issue, the problem of the
15 rotating blade. And they came up with a means for
16 requiring the industry to adopt certain procedures
17 that would deal with that problem. And in fact, it
18 was a major -- it made a major impact on serious
19 injuries to arms and hands and legs and fingers from
20 that rotating blade. But they focused on what at that
21 time constituted 70 percent of the problem that was
22 addressable.

Page 118

1      In the case of the corded blinds, if
2 90 percent or more of the problem was associated with
3 the pull cords, I can legitimately see why as a
4 regulatory agency, as an enforcement agency, CPSC was
5 willing to -- and a problem affecting an industry at
6 large as opposed to a single manufacturer, I can see
7 why the CPSC would have settled upon dealing with that
8 issue at that time.
9      That doesn't -- The same rationale does not
10 apply to the industry because it knows that it's got a
11 comparable problem in terms of design. I would have
12 thought that it could have handled both at the same
13 time and be out with it.
14  Q. And why wouldn't the CPSC ask for that? I
15 understand what you're saying about the focus and what
16 they would settle for. But you understand that it's
17 not --
18  A. I can't answer the question of why did they
19 settle for that.
20  Q. But I'm not asking why they settled for it.
21 I'm asking: Can you see a reason why -- I think you
22 described earlier this was two parts to the same

Page 119

1 hazard.
2  A. Right.
3  Q. And you quoted Ms. Griesbach.
4      Can you think of a reason why in 1993 the
5 CPSC would go to the WCMA and say, we would like you
6 to fix this hazard and not say anything about
7 fixing -- I understand what you are saying about the
8 lawn mowers, and I understand about the magnitude of
9 the hazard, but I guess I don't see why -- and I
10 understand about the difficulties in regulation. But
11 at that time CPSC was asking them to do something. Is
12 that --
13  A. You know, I can understand your frustration
14 with it, or your quizzical --
15  Q. I am.
16  A. And it doesn't make entirely logical sense
17 unless you understand that the CPSC is on somewhat
18 attenuated legal grounds when it approaches an entire
19 industry with respect to a problem that's
20 industrywide. It's much more comfortable and almost
21 100 percent -- almost 100 percent of the probably
22 close to a billion products that it's recalled over

Page 120

1 the years have been with respect to an individual
2 manufacturer. It is rare that the CPSC has approached
3 an entire industry.
4      Two examples I can think of, one is the ATV
5 industry, and it failed. And two was the juvenile
6 products furniture -- JPMA, Juvenile Products
7 Furniture Association, and Juvenile Products industry
8 to get off the market these V-shaped gates, baby gates
9 and corrals.
10      Now, in that case the commission did it
11 with the cooperation of that industry. But if it had
12 been fought like it was in the case of the ATVs, and
13 like it ultimately was -- as it was in the case of the
14 ATVs, the commission would have been on less firm
15 grounds than it would be in the case of individual
16 hazards.
17      That being the case, I can see, although I
18 don't necessarily agree with, I can see the
19 enforcement folks not wanting to press the point and
20 to focus on the issue they felt most comfortable
21 addressing because it constituted more than 90 percent
22 of the incidents.