DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 121

1  Q.  And I understand there's maybe some
2  negotiation. But in 1993, did the window covering
3  industry fight the CPSC in the way you described the
4  ATV industry doing it?
5  A.  No, there is no indication they fought.
6  But -- Yeah, there is no indication that had the
7  corrective action plan been more inclusive to cover
8  the inner cords, whether that would have been
9  acceptable.
10  Q.  Is it possible that at the time the
11  enforcement folks came to the window covering industry
12  in 1993, those people at CPSC were not aware of the
13  inner cord hazard?
14  A.  No, I don't think that's possible. Because
15  there would have been -- in going that route, they
16  would have studied -- I mean, there wasn't a whole lot
17  of literature here. They would have studied whatever
18  CPSC had done previous to that point, and basically we
19  are starting from 1981 and we covered that in the
20  previous. So no, they wouldn't have not been aware,
21  but they may have felt that from a legal standpoint
22  they were more comfortable sticking to the most

Page 122

1  flagrant and blatant hazard.
2  Q.  So assuming the CPSC -- and I'm not even
3  going to talk about them as an agency, but the people
4  involved in this portion, making this decision to go
5  to WCMA and request a corrective action plan, assuming
6  they knew about the inner cord hazard and knew that it
7  was, as you said, 10 percent of all incidents, they
8  made a conscious decision not to request that the
9  industry take any action?
10  A.  I don't know that they didn't request.
11  That's what we discussed earlier.
12  Q.  Sure. But you have not seen any evidence
13  that shows they did request it?
14  A.  No, I don't know one way or the other.
15  Q.  And didn't do so for the subsequent six
16  years, that you know about?
17  A.  That's correct.
18  Q.  You wrote -- Let's go back to your report a
19  little bit. On page 12 you wrote that "During the
20  1980s the Association needed only to study the
21  in-depth investigations of these incidents conducted
22  by the staff to realize that while the bulk of such

Page 123

1  incidents involved outer pull cords" -- I'm reading
2  from my outline; I should look at the document --
3  "while the bulk of such incidents involved outer pull
4  cords, not all of them did."
5  A.  Let me find that.
6  Q.  That's at the very bottom of the page.
7  A.  Page 12?
8  Q.  Yes.
9  A.  Okay, I've got it.
10  Q.  Have you reviewed any IDIs from the 1980s?
11  A.  No, I have not.
12  Q.  Are you aware of any -- and I'm not talking
13  about incidents. Are you aware of any IDIs from that
14  period, specific IDIs that indicate that the cause of
15  strangulation is inner cord?
16  A.  There were incident reports. I don't
17  recall whether -- I don't have specific knowledge
18  whether there were IDIs done on those issues, but
19  there were incident reports that the inner cord was
20  involved.
21  Q.  Do you have any?
22  A.  I don't.

Page 124

1  Q.  Is this your recollection from when you
2  were a commissioner?
3  A.  That's right. No, it's my recollection of
4  some -- there's some reference in the material, I
5  can't cite you where, that during the period of the
6  '80s that of the incidents uncovered, while most of
7  them fit the category of pull cord-associated, that
8  some of those incidents were in fact -- some of the
9  other incidents were inner cord problems.
10  Q.  Is that a document from the 1980s?
11  A.  It's not a doc -- I've seen it referred to,
12  but I don't remember what the document is.
13  Q.  Have you seen a document or just seen
14  references to it?
15  A.  I don't know whether I've seen a document
16  or not. At this point it kind of all blurs as to what
17  you've seen and what you've not.
18  Q.  And that's fair.
19  Okay. Have you seen any documents prior to
20  19 -- Well, we'll get to that part later.
21  Forgetting the Toni Griesbach letter, we're
22  talking about CPSC documents, are you aware of any

31 (Pages 121 to 124)

EXHIBIT 52-D

f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 125

1  documents from the 1990s, or I guess I'll say from
2  1990 to 1999 in which any CPSC documents discuss the
3  hazard of inner cord strangulation? In your review of
4  the evidence in this case or elsewhere.
5      A.   I don't recall any specifically.
6      Q.   Okay.
7      A.   Well, except to say that -- except to say
8  that a segment of the incident reports, in other
9  words, by 1995, for example, on incidents that had
10 occurred from 1981 to 1995, there was a reporting of,
11 as I recall the figure was about 175 incidents of
12 which -- about 20 of which had to do with -- or maybe
13 at that time it was 16. But somewhere in that
14 vicinity, about 10 percent had to do with the inner
15 cord problem.
16     Q.   What was the year of that document?
17     A.   My recollection is that it would be in the
18 period around 1994-95.
19     Q.   Do you have that with you?
20     A.   I would have to -- what I'm thinking of
21 is -- maybe at the break I can look through my
22 documents. I may have that with me.

Page 126

1      Q.   Okay. Have you seen -- Did you ever review
2  IDIs? Did I already ask you if you reviewed IDIs?
3      A.   You did.
4      Q.   Do you know if any of those IDIs list inner
5  cord strangulation as the cause?
6      A.   I think you asked that question, too.
7      Q.   Did I?
8      A.   I can't distinguish in my mind at this
9  point whether the IDIs list that or whether other
10 incident reports that weren't subject to that kind of
11 full across-the-board treatment as an IDI is. But
12 there were clearly incidents that were noted by the
13 staff and identified as inner cord strangulations.
14          And again, whether an IDI was done by the
15 commission or not, certainly follow-up could have been
16 done by WCMA in its -- and by the individual
17 manufacturers, but WCMA in its role as the
18 representative of this industry.
19     Q.   I understand what you're saying. I guess
20 I'm focusing on the sentence in your report which
21 says, "During the 1980s the Association needed only to
22 study the IDIs conducted by CPSC staff to realize that

Page 127

1  the bulk" -- and I understand what you're saying here
2  to be that some involved inner cords.
3          What I'm trying to find out is: What is
4  the basis for your statement that a review of the IDIs
5  would have revealed --
6      A.   I see. Now I understand the question.
7      Q.   Do you see what I'm saying?
8      A.   It really should say if they had studied
9  the IDIs and all the other information that the
10 commission had on hand.
11     Q.   What information did the commission have on
12 hand in the 1980s separate from the IDIs?
13     A.   They had other reports of incidents that
14 could have been more fully studied. It could have
15 been by the commission; it could have been by the
16 industry.
17     Q.   And what is your basis for saying that
18 studying those additional reports would have revealed
19 it?
20     A.   Because those reports identified something
21 other than the pull cord, namely, the inner cord as a
22 source of the problem.

Page 128

1      Q.   And where can we find those reports?
2      A.   It would be in the commission files.
3      Q.   And do you have any specific recollection
4  of those -- Do you have any specific recollection of
5  one of those reports saying --
6      A.   No. What I'm referring to is the
7  cumulative enunciation by the commission that over the
8  period of 1981, for example, to 1985, there were some
9  175 incidents or thereabouts, of which about
10 10 percent were inner cord problems, and then that was
11 amended in 1987 by the JAMA study which was
12 participated in by --
13     Q.   Do you mean 1997?
14     A.   It's the Journal of the American Medical
15 Association study that was participated in by a
16 commission staffer which indicated that that figure,
17 about 175, really needs to be doubled because some
18 49 percent of the incidents were underreported.
19     Q.   I guess what I'm asking is -- Let me sort
20 of explain where I'm trying to go and maybe that will
21 help.
22          You say here that "If the WCMA had

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 129

1  investigated the files that CPSC has," and I
2  understand you have expanded it beyond IDIs, "they
3  would have known about the hazard of inner cord
4  strangulation."
5    A.  Yes.
6    Q.  What I'm trying to find out is: What are
7  the documents from the 1980s that would have shown
8  that to the WCMA, and where are they?
9    A.  Well, what I'm saying is if the commission
10 is reporting in 1995 that it knows of approximately 16
11 to 20, I forget the exact number, incidents that are
12 attributable to inner cord safety concerns, then the
13 first step would be to go to the commission and say --
14 you know, as you're asking me, to go to the commission
15 and say, "Where do we find this information that we
16 can understand it better?"
17   Q.  Where did they report that in 1985?
18   A.  They didn't report in 1985. They reported
19 in 1995.
20   Q.  Okay. But I'm -- I understand your report
21 to be saying that the WCMA should have looked at these
22 reports in 1985 to determine that information.

Page 130

1    A.  I'm saying that I know of at least -- not
2  1985. 1986, I can speak from personal knowledge that
3  based upon what the staff told me and other
4  commissioners that they had shared with the industry
5  the fact that there was a twofold problem here,
6  namely, the pull cords and the inner cord, although
7  they recognized, the staff did, and we as
8  commissioners did, that the pull cord problem was by
9  and far the -- in terms of the sheer numbers,
10 constitute more than 90 percent of the incidents
11 involved.
12   Q.  That's exactly what I'm trying to get at.
13 So your information that that -- your opinion or
14 statement that that information is available is based
15 on your recollection of what you were told when you
16 were a commissioner?
17   A.  Not the 90 percent figure, but the fact
18 that by and far the bulk of the problem. But yeah,
19 what I am saying is while I was commissioner, the
20 staff had identified that there was an inner cord
21 problem.
22   Q.  But I'm saying you have not seen any

Page 131

1  document since then, certainly not in your review of
2  this case, that indicates that that happened in 1985
3  or 1986 or the 1980s?
4    A.  That what happened?
5    Q.  That the CPSC had identified the inner cord
6  hazard.
7    A.  I know that.
8    Q.  I understand, but your basis for that is
9  your knowledge as a commissioner, not based on a
10 document that you reviewed for this case? Is that
11 fair?
12   A.  As of 1985 or '86, yes.
13   Q.  Okay.
14   A.  But we do know that there is a document, at
15 least as of 1994-95 period, that traces the number of
16 incidents and identifies that some percentage of that,
17 approximately 10 percent, had to do with inner cord
18 problems through the period of 1981 through 1995.
19   Q.  And I guess what I'm saying is: Where is
20 that document?
21   A.  Where is the reference to that?
22   Q.  Yes.

Page 132

1    A.  I think I have that here. I'll look for
2  it.
3    Q.  Okay. I would like to try to find that,
4  because to be honest, I am not sure what you mean.
5    A.  Okay.
6    Q.  I'm not trying to trap you into something.
7    A.  I understand.
8    Q.  I'm just trying to find out.
9    A.  Okay.
10   Q.  Let's talk about the Toni Griesbach letter
11 you mentioned earlier. Actually, let's go back.
12 Let's talk about the 1990s.
13       Are you aware of any document prior to this
14 meeting in 1999, the December 14th meeting we talked
15 about earlier, in which the CPSC shared or informed
16 the WCMA of the risk of inner cord strangulation? So
17 we'll start from 1990 until December 1999.
18   A.  Any document in which they shared with WCMA
19 which informed them of the inner cord?
20   Q.  And I recognize that you believe they were
21 informed before, but in which they passed that
22 information on.

33 (Pages 129 to 132)

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 133

1  A.  Well, I'm not sure that, you know,
2  logically -- I guess you're asking is there any
3  additional information. Because if they had shared it
4  as of 1985-86 period, you don't have to share it
5  again. So is there anything additional?
6      You know, I think it --
7  Q.  I can be more broad if you would rather.
8  A.  I think what has to be kept in mind here is
9  that this is a very small agency that's working on a
10 huge host of problems. And as important as the window
11 cord problem is, it behooves any industry when
12 confronted with a problem to deal with it.
13     And that's what the expectation is, that
14 part of CPSC's role is a bearer of information. And
15 throughout the period of the '80s, the commission was
16 collecting additional information, all of which could
17 have been reviewed and analyzed by the Window Cord
18 Manufacturing Association. From all indications, it
19 wasn't. From Peter Rush's testimony, it wasn't.
20     So, you know, whether there is additional
21 communications, I'm not sure. There is nothing I can
22 cite other than the fact that CPSC certainly as of

Page 134

1  1994-95 period is telling the public at large, which
2  includes the Window Cord Manufacturers Association --
3  Window Covering Manufacturers Association, that inner
4  cords are causing a percentage of the deaths to
5  infants from strangulation, albeit a significantly
6  lesser problem in terms of numbers than the pull cord,
7  that it still constitutes a problem.
8      And it really behooves the industry to use
9  that information and to confront on their own accord,
10 on their own initiative how they're going to deal with
11 the single most important safety concern in that
12 industry.
13 Q.  Well, is inner cord strangulation the
14 single most important safety concern?
15 A.  The single most important concern is cord
16 strangulation, of which inner cord strangulation is a
17 segment of that.
18 Q.  But I believe my question was, and maybe we
19 could read it back, are you aware of any communication
20 to the window covering industry from 1990 to 1999 that
21 mentions inner cord strangulation?
22 A.  Are you saying communication to the

Page 135

1  industry? Or does that include communication to the
2  public at large?
3  Q.  I'm talking about to the industry.
4  A.  To the industry. With that caveat, I would
5  say no.
6  Q.  Okay. And how about to the public at
7  large?
8  A.  To the public at large, there was an
9  announcement to the effect that -- that in the study
10 of this problem of cord strangulation associated with
11 window coverings, during the period of 1981 to 1995, I
12 believe the figure was, there was -- as of 1995 there
13 were some 175 such incidents, of which inner cords
14 constituted about 16, 17, 20 of those incidents.
15     And in 1997 there was another such
16 announcement saying that it was about double that, the
17 problem across the board was about double what they
18 thought it was both for pull cords and for inner
19 cords.
20 Q.  And the 1997 thing -- Let's back up first.
21     The 1995, 1996 thing you're talking about,
22 that's the one you're going to find for us at a break;

Page 136

1  is that correct?
2  A.  I'll try to find it.
3  Q.  The 1997 announcement, are you referring to
4  the article in the Journal of American Medical
5  Association?
6  A.  I am, and the CPSC's announcement with
7  respect to it.
8  Q.  Did that article mention inner cord
9  strangulation?
10 A.  I would have to go back and see. I don't
11 recall.
12 Q.  Do you want me to show it to you?
13 A.  Sure.
14 Q.  We'll mark this as Exhibit 10.
15     (Exhibit 10 marked for identification and
16 attached hereto.)
17     (Off-the-record discussion.)
18 BY MR. WEISS:
19 Q.  Is that the article?
20     MR. BAUERMEISTER: Mike, would this be a
21 good time to go off the record?
22     MR. WEISS: That's fine, Don.

34 (Pages 133 to 136)

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 137

1  (A recess was then taken.)
2  BY MR. WEISS:
3    Q.  Let's start with the question I think we
4  had left at, which was: You've read the JAMA
5  article --
6    A.  Yes.
7    Q.  -- that you mention in your expert report.
8  Does it contain any reference to inner cord
9  strangulation?
10   A.  I did not see any reference.
11   Q.  And I know you mentioned an announcement
12 CPSC made in connection with that report.  I
13 apologize.  I don't have that with me.  I don't know
14 if you do.
15   A.  Yes, I do.  I didn't see it in the
16 announcement either.
17   Q.  I believe earlier we had talked about you
18 trying to find a document from the '95-96 time frame
19 in which the CPSC discussed incidents of inner cord
20 strangulations.
21   A.  I'm not finding it.  For the record, I'll
22 make an effort when I get back to see if I can find

Page 138

1  it, and I guess I'll mail it to Don to send to you.
2    MR. WEISS:  That will be perfect.
3    Don, is that okay with you?
4    MR. BAUERMEISTER:  Sure, go ahead.
5  BY MR. WEISS:
6    Q.  Then, Mr. Statler, is it fair to say that
7  that document is the only one that you're aware of,
8  again we're talking about 1990 to 1999, in which CPSC
9  informed the public about the hazards of inner cord
10 strangulation?
11   A.  That's --
12   Q.  Or that you know about.  I don't want to
13 limit you.
14   A.  Well, I'm remembering something on the
15 order of probably a press release or something of that
16 nature which identified -- it was not a safety alert
17 as such, but it identified the inner cord
18 strangulations as being a problem.
19   Q.  Did it announce the retrofit campaign at
20 that time, in that same release?
21   A.  No, no.  The retrofit, as you well know,
22 didn't come until years later.

Page 139

1    Q.  I'm just trying to find out which one it
2  is.  Let's move on, then.
3        I think we were about to go into the Toni
4  Griesbach letter.  And I'll pull that out, too.  I
5  think we might have made that an exhibit already.
6    A.  I don't think so.
7    Q.  I know you looked at it.  I've got it here
8  so we can do it now.  I'll mark this as Exhibit 11.
9        (Exhibit 11 marked for identification and
10 attached hereto.)
11 BY MR. WEISS:
12   Q.  Mr. Statler, is that the letter you were
13 speaking of?
14   A.  Yes, it is.
15   Q.  Okay.  You can keep it in front of you if
16 you like.  I guess you probably already have one.
17       Do you know Toni Griesbach?
18   A.  I do not.  In fact, let me correct my
19 report.  On several instances in my report referring
20 to this, I refer to Mr. Griesbach, and it turns out,
21 as I now understand, Toni is a woman.
22   Q.  Okay.  I guess that makes sense with the

Page 140

1  "i."
2        Now, this letter concerns an incident
3  involving a child who was strangled on a cord in the
4  back of a woven wood shade.  That's what it says in
5  the beginning.
6    A.  Right.
7    Q.  What is a woven wood shade?
8    A.  My recollection -- It's been a while, but
9  my recollection of woven wood shades is that they are
10 a window covering that roll up and down, and there are
11 both pull cords and internal cords associated with
12 them.
13   Q.  Would you agree that's a description of any
14 horizontal blinds?
15   A.  It probably is, but I couldn't say with
16 authority.
17   Q.  Well, I guess what are the blinds at issue
18 in this case, in the Rountree case?  Were they woven
19 wood shades?
20   A.  No.  I understand them to be horizontal
21 blinds.
22   Q.  Do you know the difference between the

35 (Pages 137 to 140)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 141

1  blinds in this case and a woven wood shade?
2     A.  They appear different. You know, a wood
3  shade is a wood shade, and it totally covers up the
4  area. They're not individual slats.
5     Q.  Okay. Do you know if any members of the
6  WCMA make woven wood shades?
7     A.  I don't.
8     Q.  Do you know if any WCMA members, or any
9  members who used to be in the WCMA ever made woven
10 wood shades?
11    A.  No, I don't.
12    Q.  In your report when you're discussing this
13 letter, which is on page 13 I believe -- you start
14 talking about it on page 12, but if we could turn to
15 page 13 -- give me a second.
16        You wrote that "In his deposition on behalf
17 of the WCMA" -- and I'm looking at the first paragraph
18 on the top of page 13 of your expert --
19    A.  Is that the first full paragraph?
20    Q.  No, starting at the top of the page. It's
21 one, two, three, four, five lines.
22    A.  I see.

Page 142

1     Q.  "Former Executive Director Peter Rush, to
2  whom the letter was addressed, was largely unaware of
3  its content and clearly had never shared the letter or
4  its import with Association members even though child
5  strangulations understandably were the singular most
6  important issue confronting the industry."
7        Is that correct?
8     A.  That's what it reads. I would correct that
9  to say not that he never shared the letter, but he
10 never discussed the letter.
11    Q.  Okay. But you would agree that he
12 testified that he did send it out to members of the
13 association?
14    A.  That's correct.
15    Q.  So should we change that in your report?
16    A.  Yeah, I would say he never discussed the
17 letter.
18    Q.  Okay. Does that change anything in your
19 opinions?
20    A.  No.
21    Q.  Now, also when you're discussing the Toni
22 Griesbach letter in your report, and I'm looking lower

Page 143

1  on page 13, you refer to Plaintiffs' Request for
2  Admission No. 22, or the response to Request for
3  Admission No. 22.
4     A.  Right.
5     Q.  And I believe you said you used WCMA's
6  discovery responses as a basis for your opinions in
7  this case?
8     A.  That's correct.
9     Q.  I have a copy of this. This is a -- rather
10 than copying the full thing, I have a sentence that
11 includes the Request for Admission No. 22 and then the
12 response.
13       (Exhibit 12 marked for identification and
14 attached hereto.)
15 BY MR. WEISS:
16    Q.  This is Exhibit 12. I'll be completely
17 candid with you. I'm just confused by your statement
18 here, because I read the request and the answer, and
19 I'm not sure that's what it says. And I was wondering
20 if you could please read the request that starts on
21 the bottom of page 9, and the answer again, and maybe
22 we can clean it up.

Page 144

1     A.  The request is: "Please admit that in 1995
2  WCMA knew that accessible inner cords presented a risk
3  of injury or death to children and/or infants."
4        Response: "WCMA admits it was aware of at
5  least one report, a child had strangled in the inner
6  cords of a corded window covering product in 1995.
7  WCMA --"
8     Q.  You may if you wish, but you don't have to
9  read the objection.
10       Do you read that to say that WCMA was aware
11 of a 1995 incident?
12    A.  That's how I read it, yeah.
13    Q.  If you'll read the question again, do you
14 read the request to be that WCMA is asked what it knew
15 in 1995?
16    A.  Yes, I agree with that.
17    Q.  Is it possible that this response, however
18 inartfully worded, is WCMA attempting to say the
19 number of reports it was aware of in 1995 rather than
20 it's aware of a 1995 incident?
21    A.  Did you write this inartfully worded
22 response? Yeah, that's how I interpreted it.

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 145

1  Q.  Does that change the interpretation? I'm
2  trying to understand exactly. When you read the
3  response in light of that question, is it a fair
4  reading that what WCMA is attempting to say here is
5  that it was aware in 1995 of at least one report as
6  opposed to --
7  A.  I understand that. If that's what you're
8  saying, I understand that now. But that's not how I
9  read it.
10  Q.  And that's perfectly fair.
11     Would you agree, if that reading is
12  correct, that WCMA is not admitting here that it was
13  not aware of the incident in the Toni Griesbach
14  letter?
15  A.  I'm sorry, repeat that.
16  Q.  Would you agree that if the second reading
17  is correct, that WCMA is not admitting that it was not
18  aware of the Toni Griesbach incident, that it's
19  admitting that in 1995 it was aware of one incident,
20  which may or may not be the incident referred to in
21  the letter?
22     I can explain better if that will help.

Page 146

1  A.  No, I think I understand.
2     Okay, what is the question again?
3  Q.  The question is: If in fact WCMA is saying
4  here that it was -- that in 1995 it was aware of one
5  incident, that is not an admission that it was not
6  aware of a letter reference by Ms. Griesbach in her
7  letter?
8  A.  I think if that's what you're trying to
9  say, you're being a little too cute here, in all
10  fairness. The question is not that you were aware of
11  the Toni Griesbach letter or not, but to say what WCMA
12  knew about the risk of injury or death from accessible
13  inner cords.
14     Reading this now according to what you've
15  advised me, you're telling me, well, we were aware of
16  at least one incident as of 1995, but it doesn't say
17  what you are aware of.
18  Q.  That's true.
19  A.  In other words, you're not really
20  responding to the question in its full and complete
21  way.
22     As I now understand it, you're saying this

Page 147

1  wasn't -- it could have been but it wasn't necessarily
2  a 1995 incident, but by 1995 we were aware of at least
3  one such incident. But it doesn't say what else we
4  were aware of.
5  Q.  That's fair. I'll do better next time.
6  A.  I suspect you did what you wanted to do
7  here. But it's not a complete and full response to
8  the question.
9  Q.  Was the CPSC aware of Toni Griesbach's
10  letter?
11  A.  My understanding is that it was shared with
12  CPSC.
13  Q.  Did Ms. Griesbach send that letter to CPSC,
14  do you know?
15  A.  Did she send it to the CPSC? You know, I
16  couldn't say for sure. Somewhere I remember seeing
17  language to the effect -- I guess it might have been
18  in Peter Rush's deposition -- that she had shared
19  it -- or it had been shared with the CPSC.
20     (Exhibit 13 marked for identification and
21  attached hereto.)
22  BY MR. WEISS:

Page 148

1  Q.  This is Exhibit 13, which you can look at
2  that also. It appears to be the identical body of the
3  letter, the Toni Griesbach letter referred to before
4  at Exhibit 11 but sent to Stan Morrow of the CPSC.
5  A.  Fair enough. Yeah, I haven't seen this
6  one.
7  Q.  I've already asked you if you knew Stan
8  Morrow. I believe you said you knew his name.
9  A.  Yeah, I probably knew him at the time I was
10  commissioner. I just can't picture him.
11  Q.  Do you know why Ms. Griesbach would have
12  received Stan Morrow's name as the person to whom this
13  should be addressed?
14  A.  I have no idea.
15  Q.  What, if anything, did the CPSC do in
16  response to receiving this letter?
17  A.  I don't have those facts.
18  Q.  Are you aware of anything they did in
19  response to receiving this letter?
20  A.  No, I'm not.
21  Q.  Hypothetical here, if you were a
22  commissioner at the time and received this letter

37 (Pages 145 to 148)

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 149

1  addressed to you, what would you have done?
2      A.  I would have been quite concerned.
3      Q.  And what --
4      A.  I would have alerted some of the top staff,
5  fellow commissioners that this was another facet of
6  the problem of child strangulations that we ought to
7  be looking into in much greater detail than we have to
8  this point, because here's -- even though our staff
9  has told us earlier that it's a problem, here we have
10 a concrete example where -- where an attorney has told
11 us the ramifications, the dire ramifications of an
12 inner cord strangulation, has shared that with the
13 industry and is sharing it with us so that we're not
14 in a situation that -- so that we can respond as the
15 industry, or if the industry doesn't, to the
16 situation.
17     Q.  Would this have -- Would you have
18 encouraged them to go to the industry and push for a
19 corrective action plan that would address this issue?
20     A.  "Them" being the staff?
21     Q.  "Them" being the staff.  Maybe push is the
22 wrong word.

Page 150

1      A.  You're talking 1990 here, you know --
2  you're talking -- practical considerations in 1990
3  that didn't exist -- excuse me -- in the period that I
4  was there.
5          But in similar circumstances, yeah, I would
6  have brought to the attention of the other
7  commissioners, brought it to the attention of top
8  level staff in program management and to the executive
9  director and to the -- well, at this point it probably
10 was not yet in the enforcement area, but I certainly
11 would have wanted a whole lot more information.
12     Q.  Let me go back briefly to the article in
13 the Journal of American Medical Association, which is
14 Exhibit 10.  I'll give it back to you to look at.
15         We already discussed that a bit.  I notice
16 in your disclosure, which is the expert report, you
17 discuss that on page -- excuse me a moment -- on
18 page 10.
19         At the very bottom of that page you write:
20 "While the research reported significantly more deaths
21 due to pull cords than inner cords" -- well, let's
22 take this one step at a time.

Page 151

1      Did that article report significantly more
2  deaths due to pull cords than inner cords?
3      A.  By extension it did, knowing that some --
4  some percentage of the original 175 injuries, or
5  deaths I should say, were associated with -- with the
6  pull cord, and some large percentage with the pull
7  cord and a smaller percentage by far with the inner
8  cord, that by recognizing that the number of incidents
9  reported across the board was 50 percent less than
10 what was real, that probably, if the figures remained
11 consistent, that the 50 percent of underreporting
12 would include additional incidents of inner cord
13 strangulation.
14     Q.  But that doesn't go to the proportion
15 between pull cords and inner cord, does it?  If the
16 number of incidents is double what is reported, what
17 you're saying is it's probably the same for both?
18     A.  I took that liberty.  It needn't
19 necessarily be, but it's a reasonable assumption.
20     Q.  But my question is:  If someone were to
21 read this, some subscriber to JAMA, who is a physician
22 somewhere, not involved in this issue, were to read

Page 152

1  that article, would they have learned that
2  significantly more deaths are due to pull cords than
3  inner cords?
4      A.  No.
5      Q.  Would they have learned anything about
6  inner cord strangulation whatsoever?
7      A.  No.  The point I was making here is that
8  the two scenarios that are mentioned in that article
9  are both applicable to the inner cord situation as
10 they are to the pull cord.
11     Q.  But it doesn't mention inner cords?
12     A.  That's correct.
13     Q.  And this was written or was cowritten by
14 Renae Rauchschwalbe of the CPSC?
15     A.  That's right.
16     Q.  Do you know Renae?
17     A.  I do not.
18     Q.  Can you hazard a guess as to why she
19 elected not to mention the inner cord issue in this
20 article?
21     A.  I can only hazard a guess that she was
22 dealing with the underreporting of incidents.  That

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 153

1  was her subject matter, and was not breaking down
2  those incidents as to their source.
3     Q.  Well, she did discuss the two ways it
4  happens, as you mentioned earlier?
5     A.  That's right.
6     Q.  You said that was telling in your report, I
7  think in the bottom of page 12.
8     A.  Right.
9     Q.  She talks about the measures that can be
10 taken to reduce injury, correct?
11    A.  Correct.
12    Q.  She talks about what the CPSC's actions
13 were and how they urged domestic manufacturers, what
14 actions they expected them to take, correct?
15    A.  Correct.
16    Q.  And in fact she says, and you have in front
17 of you on page 1698 which --
18       MR. WEISS:  Don, I'm falling down on Bates
19 numbers.  I'm sorry.
20       THE WITNESS:  I don't have a 1698.
21 BY MR. WEISS:
22    Q.  On the bottom left of that page.  It's not

Page 154

1  the Bates number, it's the JAMA page.  But it's Bates
2  No. 0004921.
3        MR. WEISS:  Don, I'll try to be better
4  about that.
5        THE WITNESS:  Okay, go ahead.
6  BY MR. WEISS:
7     Q.  She says, the bottom paragraph on the far
8  left column:  "However, long blind pull cords still
9  pose an entanglement hazard."
10    A.  I'm afraid I don't see where you're
11 reading.
12    Q.  It's the second page of the article, the
13 first column --
14    A.  I see it.
15    Q.  Do you see it?
16       So she, Ms. Rauchschwalbe, decided to
17 mention other hazards that are not addressed; is that
18 correct, by the safety standard?
19    A.  I'm sorry, what's your question?  Repeat
20 it.
21    Q.  Let me back up.  She writes:  "Eliminating
22 the loop in window covering pull cords is an important

Page 155

1  and preventative measure.  However, long blind pull
2  cords still pose an entanglement hazard."
3     A.  Right.
4     Q.  So even though, like you said, she was
5  focusing on the underreporting --
6     A.  Right.
7     Q.  -- she also took the time to mention an
8  additional strangulation hazard that was not addressed
9  by the '96 standard; is that correct?
10    A.  And the additional hazard is what?
11    Q.  Entanglement in a long pull cord.
12    A.  I see.  Yes.
13    Q.  Any reason you can think of why she did not
14 mention inner cord there as well?
15    A.  You would have to ask her.
16    Q.  If you go to the next paragraph, or
17 actually I guess two paragraphs down,
18 Ms. Rauchschwalbe and her co-author gives advice to
19 physicians to how they can help parents avoid the
20 hazards of strangulation from pull cords.
21    A.  Correct.
22    Q.  She says to push the furniture away, move

Page 156

1  cribs away from the window.
2     A.  Correct.
3     Q.  Any reason you can think of why she
4  wouldn't mention the risk of inner cords here?
5     A.  Well, she's talking about -- I mean, I
6  can't explain why she mentions certain things and why
7  other things.  But the instruction as to the cribs
8  away from windows and draperies is a generalized
9  instruction which would apply to any hazard associated
10 with window coverings.
11    Q.  So if a parent was warned to move a crib
12 away from a window covering and followed that, that
13 would protect the child from the hazard of window cord
14 strangulation?
15    A.  It would go a long way.  It's an
16 appropriate instruction.  But as we know, not so much
17 with infants but with toddlers, that wouldn't solve
18 the problem.
19    Q.  Sure.
20    A.  Where the crib is, that's not the situation
21 in our case.  In our case, where the crib appeared
22 near the window in a relatively small room, the parent

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 157

1  or grandparent did take the added measure, knowing
2  that the pull cord was a problem, to go ahead and
3  clamp down that pull cord.
4      Q.  I'm sorry, you're aware that this
5  strangulation occurred in the crib?
6      A.  I am.
7      Q.  Would you agree that you just said this is
8  a generalized warning that applies to inner cords as
9  well as outer cords, to move the crib away from the
10 window?
11     A.  That's correct.
12     Q.  And I understand that it would not
13 eliminate all injuries because there are other ways
14 that happens with that crib?
15     A.  That's right.
16     Q.  But a warning that says "Parents should
17 move cribs or beds away from windows with drapery"
18 would apply equally to inner cords as outer cords?
19     A.  That's correct.
20     Q.  So do you believe here that by including
21 that generalized warning in this article, that
22 Ms. Rauchschwalbe and her co-author, whose name

Page 158

1  escapes me -- Clay Mann -- are addressing the issue of
2  inner cord strangulation?
3      A.  I have no idea -- I mean, if she hasn't
4  mentioned inner cord strangulation throughout, I tend
5  to doubt that a reasonable reading of this would be
6  that she thought she was addressing inner cord
7  strangulation.  But I can't say what's in her mind in
8  writing this article.
9      Q.  That's fair.  I'm asking because we've
10 talked about the reasons why CPSC might not have
11 brought it up on certain occasions to WCMA.  Again,
12 recognizing your opinion that they already knew it,
13 but still certainly didn't reiterate it.
14         And I guess I'm wondering what is a reason,
15 without these political negotiation issues, legal
16 abilities, all that, what's the reason not to mention
17 it in a JAMA article?
18     A.  What's the reason not to mention it?
19 Again, you would have to ask Renae.  I have no idea.
20     Q.  Can you think of one?
21     A.  Yeah.  I told you that it seems to me on
22 re-reading this that her emphasis is really on the

Page 159

1  issue of underreporting.
2      Q.  Okay.  This is a three-page article.
3  There's an abstract and there's a column and a half,
4  but it takes three pages up in JAMA.
5         When does she begin talking -- Well,
6  actually, let's look at this.  You read the abstract
7  of the article?
8      A.  The abstract?
9      Q.  Yeah.  Is that the term for the top, that
10 large portion at the beginning?
11     A.  Right.
12     Q.  Does that discuss underreporting at all?
13     A.  Give me a couple of minutes, because I want
14 to read the entire article in its context.
15     Q.  Okay.
16        MR. WEISS:  Don, is there anything you want
17 to take care of?  Do you want to take a little time
18 right now?
19        MR. BAUERMEISTER:  That will be fine.  I'll
20 wait for you to call me back.
21     (A recess was then taken.)
22        MR. WEISS:  Was there a question pending?

Page 160

1         THE WITNESS:  The summary that you referred
2  to does not, the article itself does.
3  BY MR. WEISS:
4      Q.  By my reading of the article --
5         MR. WEISS:  And, Don, I should tell you
6  that during the break we discovered that these pages
7  are out of order.  I can see that Mr. Statler has
8  taken apart and restapled his.  Is that correct?
9         THE WITNESS:  That's right.
10        MR. WEISS:  Which is the actual exhibit.
11 BY MR. WEISS:
12     Q.  When I read it, I certainly may have missed
13 something.  If you turn to page 4922 Bates number, the
14 bottom, last paragraph of that page begins to discuss
15 the issue of underreporting?
16     A.  That's correct.
17     Q.  And proceeds to go on and discuss the
18 capture/recapture method that they use.
19     A.  Correct.
20     Q.  And discuss that in the second paragraph,
21 the next paragraph, which is on 4921.
22     A.  Correct.

40 (Pages 157 to 160)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45