DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 161

1   Q. And then the paragraph after that she
2 discusses the possibility there was a
3 misclassification of it on a report; is that correct?
4   A. Correct.
5   Q. Are you aware of anywhere else in this
6 three-page article where she discusses underreporting?
7   A. No.
8   Q. Would it be fair to say, then, that the
9 focus of this article is on -- if it's on
10 underreporting, it's certainly on other things as
11 well? Other elements of the issue as well?
12   A. Yeah. It's a more -- It's a general
13 discussion of the epidemiology of pediatric window
14 cord strangulations.
15   Q. And there are different ways in which it
16 can occur?
17   A. Not really. It doesn't really go into
18 different ways, as I recall.
19   Q. Okay. Is it possible that Renae
20 Rauchschwalbe did not know about inner cord
21 strangulation when she did this study of all these
22 injuries?

Page 162

1   A. I don't see how it's possible. Not if
2 she's -- I mean, she would have had to be privy to all
3 the information in the commission files.
4   Q. Do you know what her title was at the time?
5   A. Yeah, I think I do.
6   Q. You can look it up if you have it handy.
7   A. She's a compliance officer at CPSC.
8   Q. Okay.
9   A. Which means she's in the enforcement and
10 compliance. And if she didn't have -- if she wasn't
11 aware, she should have been.
12   Q. Okay.
13   A. But I can't really comment that she did or
14 didn't know that.
15   Q. Certainly I don't expect you to tell me
16 what she knew.
17     I'm going to show you another letter. And
18 again, I'll sort of describe it while you look at it.
19 This is a letter -- purports to be a letter of
20 October 11, 2000. Exhibit 14.
21   (Exhibit 14 marked for identification and
22 attached hereto.)

Page 163

1   MR. WEISS: Don, this is Bates number
2 0024149 to 24150. And this is a letter from Renae
3 Rauchschwalbe to Eric and Elizabeth Beller in Ashburn,
4 Virginia. Mr. Statler is reading the letter now.
5   THE WITNESS: Okay.
6 BY MR. WEISS:
7   Q. Is this from the same person who wrote the
8 JAMA article?
9   A. Yes, it is.
10   Q. And perhaps her title changed. She's now a
11 senior compliance officer?
12   A. That's right.
13   Q. I don't want to sell her short.
14     And can you read -- well, you have read the
15 letter now; is that correct?
16   A. Yes.
17   Q. You recognize this as a letter to the
18 parents of a child who had strangled in a window
19 covering?
20   A. That's correct.
21   Q. On August 18, 1998?
22   A. Right.

Page 164

1   Q. And this is an inner cord strangulation?
2   A. That's right.
3   Q. Can you read, please, if you look in the
4 middle of the first paragraph, starting with "First."
5 It's four lines down.
6   A. Starting with what? Oh, "First."
7     "First, let me say how sorry I am that the
8 incident occurred. Also, I want you to know how much
9 I appreciate your efforts to get the word out to other
10 parents about this horrible hidden hazard. It was
11 Hanna's death that brought my attention to this hazard
12 that resulted in my thorough investigation of all
13 window cord deaths. I discovered that since 1991 CPSC
14 has received 16 reports of child strangulations in
15 inner cords. Three of the five deaths in window
16 coverings were in inner cords in 1991."
17   Q. I'm sorry, is that 1999?
18   A. I'm sorry, "in 1999."
19   Q. Does it appear from this letter -- and
20 again, I'm not trying to get you into
21 Ms. Rauchschwalbe's mind, that she was not aware of
22 the hazards of inner cord strangulation until she read

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 165

1  the report of the death of Hanna Beller in 1998?
2     A.  Yeah, that's definitely how I read the
3  letter.
4     Q.  Okay. And this letter is written well
5  after the JAMA article; is that correct?
6     A.  Yes, it is.
7     Q.  And in fact, the incident was after the
8  JAMA article?
9     A.  That's correct.
10    Q.  And presumably the report also?
11    A.  That's correct.
12    Q.  Do you know when Renae Rauchschwalbe first
13 became involved in the window cord issue?
14    A.  I don't.
15    Q.  Do you remember seeing her name on
16 documents that you reviewed prior to this, prior to
17 the JAMA article?
18    A.  The first time I saw her name was in
19 conjunction with the JAMA article. I don't remember
20 her being a staff person back in the '80s.
21        And again, I should add, as a compliance
22 officer, while I think she should have had access to

Page 166

1  the entire file on these strangulations, it would
2  appear that either she didn't have the access or she
3  didn't undertake to have the access.
4     Q.  Or is it possible she had the access and
5  did not recognize the hazard of inner cord
6  strangulation?
7     A.  If she had the access to the files, she
8  would have had to know that there was inner cord
9  strangulations way before -- I mean, she even says in
10 here in this letter, she says from 1991 -- "Since 1991
11 CPSC has received 16 reports of child strangulations
12 in inner cords." But she doesn't know until 1998.
13 That leads me to believe that she apparently didn't do
14 her homework. I don't think all the incidents would
15 have occurred between 1998 and 1999.
16    Q.  Okay. If you could pull the JAMA article
17 back real quick.
18    A.  Yes.
19    Q.  If you look under "Methods," it describes
20 the documents that she and Dr. Mann reviewed in
21 preparing this article.
22    A.  Okay.

Page 167

1     Q.  Do you see that in the first paragraph
2  under "Methods"?
3     A.  Yes.
4     Q.  There were four CPSC data banks; is that
5  correct?
6     A.  Yes.
7     Q.  The death certificate file, the injury and
8  potential injury incident file, the IDIs, and the
9  national electronic injury surveillance system.
10    A.  Right.
11    Q.  Does that appear that she reviewed the CPSC
12 reports on incidents of window blind strangulation?
13    A.  Let me give some thought to that for a
14 moment.
15    Q.  Okay.
16    A.  My concern is she doesn't appear to
17 reference the files within the program management
18 team, which may be duplicative of some of these files.
19 But they would have indicated any work that had been
20 done with respect to both the pull cord and the inner
21 cord problem.
22    Q.  But she read the IDIs, right? Is that what

Page 168

1  it says?
2     A.  According to this, she read the IDIs. But
3  it's not clear -- She makes a general reference to the
4  National Electronic Injury Surveillance System, NEISS
5  I'm not sure what she would have gotten from that,
6  because NEISS reports typically on injuries and not
7  deaths.
8         What I don't see here -- death certificate
9  file. I don't see a reference to the MECAP file,
10 which is the medical examiner and coroner's
11 information, which is I believe probably the most --
12 the most complete and thorough information the CPSC
13 gets on accident-related deaths as opposed to
14 injuries.
15    Q.  Are those typically attached to the IDI,
16 the medical examiner's file?
17    A.  There would be to the individual IDI files.
18 But the MECAP reports cover a much, much broader area.
19 And I'm very surprised that that's not referenced
20 here, because that would be a key source of
21 information.
22    Q.  Are you also surprised that she apparently

Page 169

1  was able to read the IDIs enough to -- in fact, if you
2  look, for example, on page 4922, she's talking about
3  what sort of blinds they were, how it occurred, which
4  cord. In fact, let's take a look right there. At the
5  top paragraph in the center column on page 4922, she
6  discusses some details about window covering
7  strangulation.
8      A.  She does.
9      Q.  Let's scratch that.
10         Anyway --
11     A.  Let's not just pass over that, because she
12  does discuss -- she calls it something else, but as
13  I'm reading it, she says "The window covering
14  component implicated with the injury was the pull cord
15  88 percent, the slat string 7 percent." Now, we
16  haven't been calling it that, but the slat string --
17     Q.  Do you think that's the inner cord?
18     A.  Do you not think it is?
19     Q.  I don't know. I'm asking you.
20     A.  I think it is.
21     Q.  So if she --
22     A.  I don't see what else it could be. Is

Page 170

1  there any other slat string that I don't know about
2  that you do?
3      Q.  I don't know.
4      A.  Yeah, I think it is. Otherwise, it's the
5  bottom horizontal cord 3 percent or torn curtain
6  fabric. Obviously that's not. So the slat string is
7  exactly -- and she determined that 7 percent of the
8  incidents had to do with the inner cord.
9      Q.  After saying that, though, why do you think
10  she would write to the Beller family and say she had
11  just discovered that?
12     A.  Let's see what she's saying here.
13     Q.  Do you have the letter?
14     A.  Yeah, I have it in front of me.
15         What she says here, and I'll read it, it
16  says, "It was Hanna's death that brought my attention
17  to this hazard that resulted in my thorough
18  investigation of all window cord deaths."
19         I think what she -- a way of interpreting
20  that that would make some sense is that, you know, we
21  often deal in percentages and in figures. But when
22  you have a real-life heartfelt example in front of

Page 171

1  you, it causes the figures to become a lot more
2  meaningful.
3         And I think seeing her article written two
4  years earlier, which identifies the inner cord in not
5  so many words, and then seeing this letter here, I
6  read that the only way you can find consistency is
7  that Hanna's death brought home to her -- it wasn't
8  the first time she was aware of it, but it brought
9  home to her how serious and tragic these kinds of
10 incidents are, and that caused her to then conduct a
11 much more broader search. I think that's the only
12 rational interpretation you can give to that.
13     Q.  Let's go to the next opinion, which is that
14 "WCMA did not adequately warn the public of the risk."
15 Is that correct?
16     A.  Yes.
17     Q.  And go to your report where it talks about
18 that. You write here --
19     A.  If I can just borrow one of these.
20     Q.  Yes. Is that yours?
21     A.  This is my copy. It's an exhibit, but it's
22 my copy.

Page 172

1      Q.  I see.
2      A.  I'll put it back in that pile.
3      Q.  No, that's okay. I just wanted to make
4  sure I was talking about the same thing.
5      A.  Actually -- we can deal with that later.
6  If you have a copy of this exhibit, maybe we could
7  exhibit your copy and then mine wouldn't have to go in
8  there. Unless you want my interlineations.
9      Q.  I don't think that's your report. I think
10 that's Dr. Knox's report.
11     A.  No, it's not my report. It's Dr. Knox's
12 report, but it's my copy of his report.
13         Do you want my copy in there or do you want
14 yours?
15     Q.  I'd like your copy.
16     A.  I'll put it back there at the end.
17     Q.  That's fine. I was afraid you were taking
18 your report.
19     A.  No.
20     Q.  On page 14 is where I believe you, I guess,
21 begin in earnest talking about the warnings issue.
22 See the first full paragraph on page 14?

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 173

1  A. Okay.
2  Q. You wrote that CPSC, by assuming to --
3  assuming the duty to -- or by assuming the role as a
4  standards developer assumed a responsibility to
5  adequately warn about the risk of inner cord
6  strangulation.
7  A. That's correct.
8  Q. And that the standard is definitely silent
9  as to any inner cord risk; is that correct?
10 A. That's correct.
11 Q. Okay. Was there a warning on the blinds?
12 A. There was.
13 Q. And you may have one with you, but I have a
14 copy of it if that would be helpful. We can make this
15 Exhibit 15.
16    (Exhibit 15 marked for identification and
17 attached hereto.)
18 BY MR. WEISS:
19 Q. Is that the warning label that appeared on
20 the blinds in this issue?
21 A. That's correct.
22 Q. And you contend that warning is not

Page 174

1  adequate?
2  A. Absolutely not.
3  Q. And if I read your report correctly, you
4  contend it's inadequate for two reasons. One is
5  content, and the other is its placement. Is that
6  fair?
7  A. That's correct.
8  Q. Let's talk first about --
9  A. I should say --
10 Q. Is there a third?
11 A. Yes, there is a third reason I didn't
12 mention in the report, but seeing it in bold in here
13 reminds me that it's also inadequate in that it fails
14 to conform to ANSI standards as to what an appropriate
15 warning should be for a product that is likely to
16 cause serious injury or death in terms of the use of a
17 proper signal word.
18    A signal word here which says, "Warning is
19 an inappropriate word in this context." It should be
20 danger, by ANSI's own standard.
21 Q. Was that the standard in 1996?
22 A. I believe it was.

Page 175

1  Q. Are you aware this is an ANSI standard?
2  A. I'm aware it's an ANSI standard.
3  Q. Let's talk about placement first, if that's
4  okay. You testified --
5  A. That's a much more secondary point to the
6  points I make in the report. But seeing it at this
7  point, the word "warning" is the wrong word.
8  Q. Danger is the word?
9  A. The appropriate word where the risk is one
10 of serious injury or death.
11 Q. You testified -- You wrote in your report
12 that the warning label was in a place where it was
13 least likely to be seen?
14 A. Yeah. I guess there -- least likely, maybe
15 it was more least likely to be seen if it was in the
16 upper corner of the part that's -- of the part of the
17 blind -- I don't know what you call that, the window
18 covering, which is up against the wall. Then it
19 wouldn't be seen there either and may be less likely
20 to be seen still. But certainly at the bottom of a
21 window covering, particularly when the window covering
22 is closed, it ain't likely to be seen.

Page 176

1  Q. What about when the window covering is
2  open?
3  A. When the window covering is open, it's
4  still not likely to be seen, but it's a little bit
5  more exposed. But if the purpose of a warning is to
6  clearly -- and WCMA has stated this -- is to clearly
7  communicate a message, putting it at the bottom of
8  your window covering doesn't clearly communicate that
9  message.
10 Q. Okay. Do you have any consumer studies,
11 reports, evidence, anything that would tell you that
12 consumers are not likely to see a warning on the
13 bottom rail of the blind?
14 A. I'm in agreement here, I would just take
15 the view of Judge Sedwick. He says it's not likely to
16 be seen there.
17 Q. I'm asking you.
18 A. Do I have any?
19 Q. Yes.
20 A. Yeah. I've spent almost 30 years in the
21 area of consumer product safety, and I was the
22 commissioner who was the designated person in charge

Page 177

1  of working with the staff on warnings. I've advised
2  companies on warnings. And I would be laughed at if I
3  ever advised a company or in the context of my
4  responsibilities at the CPSC advised a company that to
5  be efficacious, you put your warning label in a place
6  that's not likely to be seen.
7      Q.  I'm not asking you about whether you should
8  put them in a place that's not likely to be seen. I'm
9  asking you if you have any evidence, any experience,
10 anything that tells you whether the bottom rail is
11 likely to be seen.
12     A.  Whether the bottom rail is --
13     Q.  Sure.
14     A.  No, I have not done any independent
15 research. But it belies logic, knowing that the
16 bottom rail probably in 50 percent or more of the
17 instances is banging up against the bottom of the sill
18 or so far below the sight line that it can't be seen,
19 that that would be an appropriate or optimal place to
20 communicate a message about the possibility of a
21 strangulation death to young children.
22     Q.  Are you saying that 50 percent of the

Page 178

1  incidents, the blinds are never opened? I'm confused.
2      A.  No, I'm saying just judging from my own
3  observations over the years, 50 percent of the time or
4  more probably the blinds are in a down position.
5      Q.  And are never opened?
6      A.  No. Well, many times they are. You might
7  simply open or close or change the angle of the slats,
8  but the blinds may well be in a down position the
9  entire time.
10     Q.  Where should the warning be on the blinds?
11     A.  I would put it in as prominent a place as
12 possible. I think given the seriousness of the risk,
13 I probably would put it in more than one place.
14     Q.  You would have more than one warning?
15     A.  More than one place.
16     Q.  Where would you put it? Well, okay, where
17 would you put it if there was a second warning?
18         Let me ask you this: If there was another
19 warning in a more prominent location, is the bottom
20 rail a bad location for the warning then?
21     A.  I think -- there would need to be some
22 research done, but I think research would probably

Page 179

1  tend to reveal that a place perhaps on the side of the
2  top part of the window covering and possibly on the
3  outer side of the bottom window covering; and, if not
4  that, possibly on the outer front edge of the bottom
5  window covering would be the two places that would be
6  most ideal.
7          But I think some research probably ought to
8  go into that.
9      Q.  When you say "the side of the top," what do
10 you mean?
11     A.  Up at the top end on the side portion.
12     Q.  On the head rail on the side?
13     A.  I'm sorry, on the front side.
14     Q.  The side that faces out?
15     A.  The side that faces out, yes.
16     Q.  Or the side that faces out on the bottom
17 rail?
18     A.  That's correct.
19     Q.  What about on the cord?
20     A.  Possibly on the tassel.
21         Again, I don't want to give you a
22 seat-of-the-pants expertise. But those, to me, would

Page 180

1  seem much more likely areas to garner consumer
2  attention. And that, after all, is the purpose of a
3  warning.
4          I understand that manufacturers don't like
5  what they would call marring their product with
6  warnings. But given the magnitude and the grievous
7  nature of this risk, I think that concern on the part
8  of manufacturers would have to take a back seat.
9      Q.  Are consumers also -- do they also dislike
10 having their products marred by warnings?
11     A.  Many of them do.
12     Q.  And what do they do with warnings that mar
13 their products?
14     A.  They're often removed.
15     Q.  Is it important in the case of window blind
16 strangulation to have a warning that stays with the
17 product, that is not removed?
18     A.  I think definitely. That's why I'm saying
19 that these are ad hoc responses on my part to where.
20 I really think a much more -- a much more enduring
21 consideration, much more considered attention ought to
22 be given to placement. But placement at the bottom of

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 181

1  the unit, to me, is counterproductive.
2    Q.  You said you would recommend having more
3  than one.
4    A.  I would.
5    Q.  Would it be -- Hypothetically, if there was
6  a warning that was more visible, in fact much more
7  visible, would the bottom rail be a good location for
8  the second warning given that it's less likely to be
9  removed by somebody after the blinds are installed?
10   A.  I don't think so. I don't think having it
11 on the bottom rail, inasmuch as it's not likely to be
12 seen there, and in fact wasn't seen by the parents or
13 grandparents in this case, is indicative of the fact
14 that that's not a very useful place.
15   Q.  Well, I guess I'm hung up a little bit on
16 your "most likely to be seen." Do you have any
17 research that shows that more likely than not that
18 someone who has blinds in their house doesn't see the
19 bottom rail, doesn't see the bottom of the bottom
20 rail? I'm not clear where that's coming from.
21   A.  I don't have research. I'm suggesting that
22 this is something that ought to be subject to

Page 182

1  considered attention. But it is not -- given my years
2  in advising companies, that's not an area I would even
3  think of placing such an important warning as this.
4    Q.  You asked in here, page 14, second full
5  paragraph down, "Why hide such important safety
6  information?"
7    A.  Right.
8    Q.  Why hide such important safety information?
9    A.  You're asking me that question?
10   Q.  I'm asking you.
11   A.  I don't know the answer to that.
12   Q.  What would a manufacturer have to gain by
13 doing that? Do they save money?
14   A.  No. I mean, the only thing I can think of,
15 and I've seen this happen in industry after industry,
16 you've got people who are constantly arguing on behalf
17 of, you know, what consumers want as opposed to what's
18 in the overall safety interest of the product to deal
19 with potential unreasonable risks. In this case a
20 strangulation risk to infants.
21        And that being the case, I suspect that
22 those folks who are more concerned about appearance

Page 183

1  won out in this area.
2    Q.  CPSC has human factors experts, right?
3    A.  They do.
4    Q.  Are you aware that there are CPSC human
5  factors experts that were on the technical committee
6  that came up with the standard?
7    A.  I am.
8    Q.  Would you expect them to raise an issue
9  about the placement of those?
10   A.  I would expect that there were probably a
11 number of issues that were raised in conjunction with
12 the voluntary -- so-called voluntary corrective action
13 plan and that the end language and the end
14 requirements came about through a compromise of all
15 the interests involved.
16   Q.  And why do you expect that was --
17   A.  Because that's always -- I was involved in
18 several hundred voluntary action plan discussions and
19 considerations, and I can't think of one of them that
20 wasn't a negotiated settlement.
21   Q.  So is your guess as to what happened here
22 is that the CPSC wanted the warning somewhere else,

Page 184

1  the industry wanted the warning there, and the CPSC
2  said "We'll compromise"?
3    A.  I hesitate to guess, because it's a guess.
4  I would -- whatever CPSC wanted under the
5  circumstances, whatever the industry wanted, the end
6  result of this warning being where it is is not, in
7  the words of WCMA, a means that clearly indicates the
8  scope of the risk or danger posed by the product.
9        It doesn't reasonably communicate the
10 extent or seriousness of the harm that could result
11 from the danger, and it doesn't convey the -- the
12 substance doesn't convey the extent and seriousness of
13 the risk in such a manner as to alert a reasonably
14 prudent person.
15   Q.  And what are you reading from there?
16   A.  Apparently this is from WCMA's brief
17 submitted to -- submitted to the court in this case in
18 conjunction with the summary judgment action.
19   Q.  That's WCMA's summary judgment brief?
20   A.  I'm reading from the opinion of the judge,
21 but he's quoting the WCMA position, which he agrees
22 with, that such a warning should accomplish those

46 (Pages 181 to 184)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 185

1 three things.
2    Q.  Okay.  Do you know if the blinds involved
3 in this case contain any other warnings aside from the
4 bottom rail?
5    A.  I'm sorry, contain --
6    Q.  Any warning labels other than the one on
7 the bottom rail that are an exhibit --
8    A.  Not as they appeared at the time of the
9 incident.
10   Q.  Have you seen the blinds?
11   A.  I have not.
12   Q.  So you were told they didn't contain any
13 other warning labels?
14   A.  I'm not sure what other warning labels
15 you're talking about.  I'm aware of only one warning
16 label.
17   Q.  Are you aware if at any time there was
18 another warning label on the blinds?
19   A.  You're talking about a permanently affixed
20 warning label?
21   Q.  I'm talking about any sort of warning that
22 can attached to the blinds.

Page 186

1    A.  I don't know whether there was any other
2 warning attached to the blinds, possibly in the form
3 of a hang tag.  But there is nothing to indicate that
4 the hang tag was in fact there, or if it was there, it
5 certainly would not be, in my mind, a warning in the
6 traditional sense.
7    Q.  When you say "there's no indication the
8 hang tag was there," what are you talking about?
9    A.  It certainly wasn't there at the time of
10 the incident.  And whether it was ever present from
11 the time of purchase is problematic.
12   Q.  What do you mean, "problematic"?
13   A.  It may or may not have been there.  It
14 should have been there to conform with the standard,
15 but there is nothing to indicate that a -- whoever the
16 manufacturer was in China who made this felt obliged
17 or otherwise to conform with a voluntary standard in
18 the U.S.
19   Q.  Do you know who made these blinds?
20   A.  My best understanding is that it may have
21 been Ching Feng.
22   Q.  What is that based on?

Page 187

1    A.  From the original titling of the case.
2    Q.  And Ching Feng is in China?
3    A.  I believe they are.
4    Q.  Are you aware of any evidence in the case
5 that indicates whether there was a hang tag on the
6 blinds?
7    A.  No, I'm not.
8    Q.  Are you aware of any witness who has
9 testified that he or she saw or didn't see it?
10   A.  No, I'm not.
11   Q.  You mentioned that the blinds would have to
12 have --
13   A.  I take that back.  You said saw or didn't
14 see it?  Yeah, there is some testimony in the case
15 that no one saw the -- no one testifies that they did
16 see it.
17   Q.  Okay.  You said a moment ago that the
18 blinds would have to have a hang tag to comply with
19 the safety standard?
20   A.  That's correct.
21   Q.  But we don't know if they did?
22   A.  That's correct.

Page 188

1    Q.  Have you read the 1996 standard?
2    A.  Yes, I have.
3    Q.  Okay.  And I ask, and this is no way -- I
4 notice it's not listed as something you reviewed on
5 your expert disclosure.  Is that something that should
6 be on that list?
7    A.  Let me just think for a moment.
8        My recollection is that that hang tag -- or
9 that standard was communicated to me in the exhibits
10 to the Peter Rush deposition, which exhibits -- some
11 of which exhibits I received after the expert
12 disclosure.
13   Q.  You received the exhibits to --
14   A.  Some of the exhibits.
15   Q.  Okay.  So let me -- So is it possible you
16 wrote this expert disclosure without reading the
17 safety standard?
18   A.  See, that I don't recall.  My recollection
19 is I probably saw it beforehand.  If I didn't see it
20 beforehand, I saw a discussion of it beforehand.
21   Q.  But this disclosure was filed on Halloween
22 of last year, less than three months ago.

47 (Pages 185 to 188)

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 189

1  A. Right.
2  Q. Do you know if you read the safety standard
3  before --
4  A. My recollection is I did.
5  Q. Okay. And that's the basis for your
6  opinion that the safety standard was not adequate?
7  A. That what?
8  Q. That the safety standard -- the WCMA 100.1
9  1996 standard was inadequate. That's based in part on
10 your reading of the standard; is that correct?
11 A. Yes.
12 Q. Would you agree that it would be difficult
13 for you to say that the standard was inadequate if you
14 hadn't read it?
15 A. Not necessarily, if I knew the thrust of
16 what was in it. You don't necessarily need to read
17 the standard. For example, there are some ANSI
18 standards that go on for 700, 800, 900 pages. You
19 don't have to read the entire standard to get the
20 thrust of what the standard is about.
21      The same would be true for Federal Register
22 notices that the CPSC puts out. It might go on for

Page 190

1  hundreds of pages, but you don't have to read the
2  entire Federal Register notice to know what the thrust
3  of what it is that the CPSC is doing.
4  Q. Would you have to read some of it to get
5  that thrust?
6  A. You would have to either read some of it or
7  to know what the -- you know, what the fundamental
8  elements of it were.
9  Q. How would you find out what the fundamental
10 elements were?
11 A. I guess what I'm saying is the actual
12 language is not so much important as what the
13 requirements are.
14 Q. Okay. So you would have to know what the
15 requirements are?
16 A. That's right.
17 Q. Okay. You testified a moment ago that to
18 meet the safety standard, there would have had to have
19 been a hang tag attached?
20 A. That's right.
21 Q. Okay. In your report on page 14 you wrote
22 that "The officially sanctioned warning sans any

Page 191

1  mention of inner cord risk was only to be found
2  inconspicuously under the bottom rail of the window
3  covering hidden from plain sight."
4  A. Correct.
5  Q. If there was a mandated hang tag, wouldn't
6  there be another officially sanctioned warning?
7  A. To me, a hang tag is not a warning. You
8  know, it's something -- I would call it educational
9  information that accompanies the product. That, to
10 me, is not a warning.
11 Q. Because of the way it's presented? I'm
12 confused. Why is it not a warning?
13 A. Well, No. 1, you know, a warning to be at
14 all helpful has to accompany the product or be in the
15 presence of a product. And hang tags on most products
16 are the first things that are ripped off. Certainly
17 on a window covering product, it's going to be one of
18 the first things ripped off. And the industry knows
19 that.
20 Q. But it's also very visible when the blinds
21 are installed?
22 A. I'm sure it's visible, but it's useless.

Page 192

1  No one is going to have in their living room or dining
2  room or bedrooms hang tags on their products.
3  Q. Are they going to have a sticker on the
4  front of the top rail of the product?
5  A. I think they're more likely if something is
6  affixed and preferably permanently affixed, then
7  that's not an issue.
8  Q. It's not an issue if it's not removable?
9  A. I'm saying it's not an issue if it's not
10 removable, if it's permanently affixed.
11 Q. But would you agree that a hang tag is
12 visible when the person buys a box of blinds, opens it
13 up and installs it? The hang tag is visible?
14 A. The person installing may be a repairman.
15 It's useless information to the family in whose home
16 that product is going to be.
17 Q. Who installed the blinds in this case?
18 A. My recollection is it was the grandfather.
19 Q. Would he -- If there was a hang tag on the
20 product, would he have seen it when he took the blinds
21 out of the box and installed them?
22 A. He may have seen it. But to see it does

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 193

1  not mean that you appreciate or seize the significance
2  of it.
3      Q.  Is that the case with any written warning?
4      A.  Even more so in the case of a hang tag,
5  because as I say, if I were installing a product like
6  this, that would be one of the first things that I
7  would take off without reading it.
8      Q.  You would interact with it when you took it
9  off? You have to actually take it and snip it?
10     A.  But not necessarily read it.
11     Q.  But not necessarily read it, okay.
12     A.  Keep in mind, in the hierarchy of product
13 safety, warnings are at the lowest level of addressing
14 a consumer product safety risk. Clearly, the highest
15 level is to design safety into the product. The
16 middle level is to try to guard against a problem.
17 And the third and lowest level of effectiveness are
18 warnings.
19        And then talking about a hang tag, you're
20 talking about what amounts to probably the lowest
21 level of the lowest level of communicating any means
22 of dealing with a risk. So I say that to keep things

Page 194

1  in perspective.
2      Q.  Here's the '96 standard. And I guess since
3  there was a little of that, you can look at it and
4  tell me if you've seen it or read it.
5          I'm marking that as Exhibit 16.
6      (Exhibit 16 marked for identification and
7  attached hereto.)
8          THE WITNESS: Yes, I have seen it.
9  BY MR. WEISS:
10     Q.  Let me back up to your hang tag topic
11 again. What's more likely to be read, the hang tag
12 warning or the bottom rail?
13     A.  It's hard to say. Neither one is very
14 effective.
15     Q.  Should a person -- not a professional
16 installer. Should a person who installs a blind see
17 the hang tag that says warning on it, should that
18 person read it?
19     A.  Are you talking in the abstract?
20     Q.  In the abstract.
21     A.  Not necessarily.
22     Q.  So when a --

Page 195

1      A.  A person installing has a job to do to
2  install those blinds. He or she may have no interest
3  whatsoever in anything other than what the
4  instructions are for the appropriate installation of
5  the blinds.
6      Q.  So if a grandfather were to install blinds,
7  it's actually -- I understand you're saying that he
8  may not read it. You're saying there is no reason for
9  him to read it?
10     A.  I'm not saying there is no reason. There
11 may be a reason. But the likelihood of it being read
12 is very, very tiny, minuscule.
13     Q.  How tiny?
14     A.  Minuscule. Negligible.
15     Q.  How do you know that?
16     A.  I'm thinking of when I moved into a new
17 home and all the window coverings had hang tags, it
18 was the first thing that I removed from the window
19 coverings.
20     Q.  And did it say warning on them?
21     A.  I don't know what it said on them.
22     Q.  You didn't read them?

Page 196

1      A.  I didn't read them.
2      Q.  So you're a former commissioner of the
3  CPSC?
4      A.  That's correct. And that confirms my
5  position that hang tags are probably the least
6  effective means of all, other than owner's manuals
7  which may have in certain circumstances somewhat a
8  higher level of efficacy but not much in terms of
9  helping to resolve or attenuate a product risk which
10 ideally should have been and should be attenuated and
11 even eliminated by proper design, which is the real
12 issue in this case.
13     Q.  Okay. Let's turn, please, to page 6 of the
14 standard, which is 0028188.
15     A.  You said 88 at the end?
16     Q.  Yes.
17     A.  Okay, I've got it.
18     Q.  And 5 is labeling and operational tags,
19 correct?
20     A.  Right.
21     Q.  And that shall require that if a
22 manufacturer is to comply with the standard, they will

49 (Pages 193 to 196)

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 197

1  comply with the -- they will include a generic warning
2  bottom rail label, and if you will turn the page, also
3  a generic warning hang tag; is that correct?
4      A.  Correct.
5      Q.  Can you read the text of the generic
6  warning hang tag?
7      A.  The text of the generic warning hang tag?
8      Q.  Yeah.
9      A.  "Young children can strangle in the loop of
10 pull cords, chains and bead cords and cords that run
11 through window coverings. They can also wrap cords
12 around their necks."
13         Do you want me to continue?
14     Q.  Sure.
15     A.  "To avoid strangulation and entanglement,
16 keep cords out of reach of young children. Also, one,
17 install safety devices that remove the cord loop or
18 reduce access to cords; and two, move cribs and
19 furniture away from window covering cords."
20     Q.  Does this warning address inner cords?
21     A.  It does not.
22     Q.  How do you define cords that run through

Page 198

1  window coverings?
2      A.  I would define it in the same way that the
3  official representative of the WCMA defines it in his
4  testimony where he says that nothing in the standard
5  addresses inner cords.
6      Q.  I'm not asking you what he said. When you
7  read that, do you think that refers to inner cords?
8      A.  No, I don't know what it refers to, but it
9  does not conjure up for me inner cords. And if inner
10 cords was intended here, again, using WCMA's own
11 words, clearly communicate that, don't use some
12 language that is not -- is not clear in its meaning.
13     Q.  Tell me how cords that run through window
14 coverings is unclear.
15     A.  Cords that run through window coverings,
16 inasmuch as most people are aware of the pull cord
17 problem, I think they would identify that as pull
18 cords.
19     Q.  And it says "pull cords." What is unclear
20 about the phrase "cords that run through window
21 coverings"?
22     A.  What is unclear about it?

Page 199

1      Q.  Yes.
2      A.  I guess I would turn that question around.
3  What is clear about it? It's certainly not inner
4  cords in my mind because if it was, it would say inner
5  cords.
6      Q.  I guess what I'm confused about is if
7  you're a consumer that doesn't know anything about
8  blinds, why is the word inner cord clearer than the
9  cord that runs through window blinds? Certainly they
10 are window blinds with a cord that runs through them.
11 Why is inner cord more directive?
12     A.  Let me understand. It seems like your
13 question is implying that WCMA meant inner cords here.
14 Is that correct?
15     Q.  I'm not implying anything. I'm asking a
16 question.
17     A.  Well, it doesn't imply it to me. If that
18 was the intention, then I would say if you wanted to
19 clearly communicate that hazard, then you say inner
20 cords or middle cords. But you don't use cords that
21 run through window coverings.
22         And in fact, your own representative, the

Page 200

1  designated representative of WCMA, said that we never
2  identified inner cords in the standard.
3          Actually, your experts confirm that.
4      Q.  If you were to read that warning label, or
5  that hang tag, and -- if you were to read it, what
6  would you think the cords that runs through window
7  coverings means?
8      A.  To me -- Of course, I know too much about
9  the situation. But I would think the normal reading
10 would be the pull cord.
11     Q.  In what way does the pull cord run through
12 the --
13     A.  The combination of the pull cord and the
14 cords at the top of the shade. You know, I'm not sure
15 what it means, but it wouldn't communicate anything.
16 Basically, it would not have any meaning to me.
17     Q.  Okay. And I'm not going to keep asking you
18 the same question.
19     A.  You're talking about something that has no
20 meaning in the context of a hang cord that's probably
21 already thrown away and you're dealing with something
22 that is totally ineffective.