DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 201

1  Q. I'm not asking that question. I'm asking
2  about the language of this warning.
3  A. I understand what you're asking about.
4  When your own representatives and experts say that
5  there -- that this does not talk about inner cords, I
6  don't see why you're pressing me to say that this
7  could only be inner cords.
8  Q. I guess I'm just trying to understand --
9  actually, I'm looking for a document here. It's
10 already been marked. Excuse me a second.
11     MR. BAUERMEISTER: Mike, would it be okay
12 if we take a three-minute break here?
13     MR. WEISS: We can. Can we go just for
14 another couple minutes here? I have one more
15 question. Is that okay, Don, or do you have like an
16 incoming call?
17     MR. BAUERMEISTER: No. I just need three
18 minutes or four.
19     MR. WEISS: This will just take a second.
20 BY MR. WEISS:
21 Q. You said you read the discovery responses
22 too; is that correct?

Page 202

1  A. Yes.
2  Q. Did you rely on those in forming your
3  opinion?
4  A. The discovery responses? In part.
5     MR. WEISS: Don, let's take the break now.
6  We'll call you back in just a minute.
7     MR. BAUERMEISTER: All right. Thank you.
8     (A recess was then taken.)
9  BY MR. WEISS:
10 Q. Mr. Statler, have you read the generic hang
11 tag warning that we were talking about before?
12 A. Yes, I have.
13 Q. Had you read it prior to this deposition?
14 A. Yes. Several times.
15 Q. I'm going to mark this letter as
16 Exhibit 17. It's a letter from Renae Rauchschwalbe to
17 Peter Rush talking about inner cord strangulation.
18    (Exhibit 17 marked for identification and
19 attached hereto.)
20 BY MR. WEISS:
21 Q. Do you see in the first sentence there
22 she's discussing inner cords; is that correct?

Page 203

1  A. Yes.
2  Q. She uses the term "lift cord"?
3  A. Right.
4  Q. Earlier in the article she had used "slat
5  cord"?
6  A. Right.
7  Q. Is it fair to say there's a lot of words
8  for this, for this cord?
9  A. Yeah. But I think the one that -- again,
10 if you were a communications person -- and she's
11 not -- if you're concerned about warnings, a human
12 factors type person, you would use a term that would
13 be most likely to clearly communicate the message, and
14 that would be inner cord.
15 Q. Okay. You see, though, she refers to them
16 as a loop for the lift cord that runs through the
17 window covering; is that right?
18 A. Right.
19 Q. Okay. Do you have any opinions about a
20 failure by WCMA to warn the public generally of the
21 hazard as opposed to a product --
22 A. Just before we leave the hang tag issue, it

Page 204

1  occurs to me you didn't raise but I should comment on
2  the record if it's all right with you.
3  Q. I'm not sure what you're going to say. I
4  would kind of like to ask the questions. But you're
5  welcome to.
6  A. To the credit of WCMA, when they show this
7  generic hang tag, they provide a pictograph, as they
8  do with the warning at the bottom of the rail that
9  nobody sees. In both cases it's the same pictograph,
10 and in both cases it's a child reaching for what
11 appears to be a pull cord.
12     So if the purpose of this generic warning
13 was to somehow alert people to a problem with the
14 inner cord, the pictograph doesn't do it, nor does the
15 explicit language that they use.
16 Q. You would agree this standard is supposed
17 to address pull cord strangulation, correct?
18 A. That's my understanding of the standard,
19 yes.
20 Q. And I think you testified that the vast
21 majority of window blind strangulations are due to
22 pull cords?

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 205

1  A. That's correct.
2  Q. And in fact the CPSC itself may have been
3  hesitant to raise the issue of inner cords because
4  they wanted to focus on pull cords?
5  A. May well have been.
6  Q. Because that was the dominant hazard?
7  A. That's correct.
8  Q. Is it fair this pictogram depicts the most
9  common hazard of window cord strangulation?
10 A. It may be doing that, but if its purpose is
11 to communicate anything about inner cords, it's not
12 doing it.
13     The only reason I raise that is because you
14 are -- your questions implied, at least for me, that
15 this was a means of alerting people to an inner cord
16 problem, and I'm saying that neither the language nor
17 the pictograph does that.
18 Q. Would you agree the pictograph doesn't also
19 show someone moving cribs and furniture away from
20 window covering cords?
21 A. That's correct.
22 Q. It doesn't show a wraparound as described

Page 206

1  earlier?
2  A. Show a what?
3  Q. It doesn't describe -- There's a sentence
4  here, "It can also wrap cords around their neck."
5  A. That's correct.
6  Q. It doesn't describe that.
7     It doesn't show someone installing safety
8  devices?
9  A. That's correct. But it is showing a child
10 what appears to be pulling on a pull cord.
11 Q. Sure.
12 A. I would note that, again, if the intent was
13 to -- to communicate anything about inner cords, I
14 think you probably ought to communicate that to your
15 experts because --
16 Q. Mr. Statler, I really want to move on.
17 There's not a question on the floor.
18 A. That's fine, but at least two of your
19 experts would indicate -- at least on my reading of
20 their reports -- indicate that there is in the case of
21 one, nothing about inner cords in the standard, and
22 the other is indicating that if the language happens

Page 207

1  to cover inner cords, then all the more fortunate,
2  which would indicate that it clearly wasn't intended
3  to.
4  Q. I would like to focus on the questions we
5  have.
6  A. By all means.
7  Q. I apologize.
8     The question I think we started with was
9  whether you had any opinion about efforts to warn the
10 public in general, not via product. For example, the
11 public education campaign.
12 A. You mean the overall public education?
13 Q. Correct.
14 A. Do I think it was adequate?
15 Q. No. I'm asking if you intend to offer an
16 opinion about it?
17 A. Only if asked.
18 Q. Have you been asked to offer an opinion
19 about that?
20 A. Not as of this date.
21 Q. When you were discussing your report with
22 Mr. Ray and Mr. Bauermeister, did they ask you about

Page 208

1  that?
2  A. No. It's probably something that may or
3  may not come up. I don't know.
4  Q. Okay. And this is -- It's not the last but
5  one of the last areas is that WCMA undertook a duty.
6  And that's a large portion of your report as well; is
7  that correct?
8  A. Right.
9  Q. What I'm trying to -- What I would like to
10 understand here is when it assumed that duty.
11 A. Okay.
12 Q. At what point -- I'll just ask. At what
13 point in time did WCMA assume a duty -- Well, let's go
14 back a little bit.
15     What duty did they assume?
16 A. I think they assumed a duty of leading an
17 entire industry in a standards -- or in an effort to
18 appropriately deal with the hazard of child
19 strangulation from window covering cords. I guess I
20 would leave my answer at that.
21 Q. And when did it assume that duty?
22 A. I would say it certainly assumed that duty

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 209

1  when it offered itself as a -- as a promoter and
2  supporter and sponsor of a national safety standard
3  for window blind safety.
4      Q.   Okay.  Did it assume that duty before that
5  time?
6      A.   I think that becomes more of a matter of --
7  it assumes responsibility, but how much of a duty,
8  probably not to the same degree as it does as a
9  national -- as an association representing an entire
10 industry in conjunction with ensuring the safety of a
11 product of that industry.
12     Q.   Okay.  You had testified earlier today that
13 the CPSC -- I'm sorry, the WCMA -- I think you may
14 have said, although I may be misquoting you.  I think
15 you used the phrase obligation, that in 1985 or sooner
16 when it was informed of the hazard of window blind
17 strangulation, it had an obligation to search the
18 files, go through the files at CPSC and find out more
19 about that hazard.
20     A.   I think that's right.  That's why I was
21 hesitant in my prior response.  Because there are
22 certain obligations and there's certain additional

Page 210

1  obligations or duties that go with being a sponsor of
2  a national standard.
3      Q.   You're an attorney, I assume?
4      A.   I am.
5      Q.   And presumably a much better attorney than
6  I am.  You understand that duty is a legal term as
7  well as a general term that the jury might understand?
8      A.   I do.
9      Q.   And that one of the -- and I don't want to
10 get too into legal issues, but one of the elements of
11 a tort claim is a duty to the plaintiff?  Do you
12 understand?
13     A.   That's right.
14     Q.   And that in the field of tort law, certain
15 entities have duties to certain people and certain
16 ones don't, correct?
17     A.   Right.
18     Q.   And for the sake of clarity here, can we
19 agree that when I use the word "duty," I'm referring
20 to a legal duty, and we can use another term,
21 obligation --
22     A.   You're referring to a legal duty to the

Page 211

1  plaintiff?
2      Q.   I'm just talking about a legal duty as
3  opposed to a moral duty or what should be done, to the
4  extent there is a difference between them.
5      A.   Okay.
6      Q.   You understand if there is a car accident
7  out there, all of us may have a moral duty or
8  obligation to go help.
9      A.   Yeah.  I guess I was thinking of it more in
10 terms of there were certain duties or obligations or
11 responsibilities that an association has to its
12 members.  If the mission of the organization is to
13 promote the organization, to promote the interest of
14 its members, there are certain duties you have.  I
15 take it that's not what you're referring to.
16     Q.   We can talk about all of those things.  I
17 just want to make sure that when we're talking about
18 them, we understand each other as to what we're
19 saying.
20     A.   I think in terms of legal duty in the
21 context of the facts of this case, that legal duty
22 arises in the context of it taking on the role of the

Page 212

1  manufacturers in being a sponsor of the national
2  safety standard which was meant to ensure the safety
3  and adequacy of the product in terms of it being fit
4  for the purpose intended, and it did not do that.
5      Q.   Okay.  And so there are a number of places
6  in your report where you talk about duty and
7  obligation.  Do you know -- Shall we go through those
8  and try to figure out what you mean?  Is that all
9  right?
10     A.   By all means.  I think in large part it's
11 going to relate to what we just discussed.
12     Q.   The duty to the Rountree --
13     A.   Duties to the public at large once you --
14 once you take on the role of the manufacturers in
15 sponsoring and ensuring the adequacy of a safety
16 standard.
17     Q.   Because the manufacturers in the United
18 States jurisprudence, they have a duty to make a
19 product that is free of unreasonable dangers and
20 hazards?
21     A.   Correct.
22     Q.   And a distributor and a retailer may also

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 213

1  have that duty.
2  A.  Correct.
3  Q.  And I think what you said a moment ago was
4  that when it chose to sponsor the standard, it assumed
5  some of that duty from the manufacturers.
6  A.  Yes.
7  Q.  Is that correct?
8  A.  Yes.
9  Q.  Prior to that date, did it assume any duty
10 that would normally be held by the manufacturers in a
11 legal sense?
12 A.  Again, from a legal context, we're talking
13 about I think no.  I think it did have an obligation
14 to its members to -- I've been associated with several
15 trade associations, professional ones.  But you have a
16 duty as an association to serve your members.  And so
17 some of the things it should have been doing in the
18 context of the single most important issue before its
19 members, other than profits, namely safety of the
20 product, it should have undertaken on behalf of its
21 members, and it appears not to have done that.
22 Q.  I think you said earlier that it was

Page 214

1  responsible for advancing the interest of its members;
2  is that correct?
3  A.  That's correct.
4  Q.  Who decides what are in the interests of
5  its members, the WCMA or the members?
6  A.  I think in the end it's the members.
7  Q.  And --
8  A.  I don't see how WCMA could decide that,
9  because there's nothing there.  There is no staff.
10 There is no -- there's an office with a consultant.
11 Q.  It doesn't -- does that mean that it has an
12 obligation -- and again, we're talking in the general
13 sense, not the legal sense -- an obligation to do
14 everything that can be done on behalf of its members?
15 A.  I think a test of reasonability, you
16 reasonably work towards the issues that are important
17 to your members, and the members help determine what
18 that should be.
19 Q.  I guess what I'm saying is, there may be a
20 dozen things that the organization can do, even
21 reasonably, that would be in the interest of its
22 members.

Page 215

1  A.  That's right.
2  Q.  Does it have an obligation to do all 12?
3  A.  I think in the end, since the obligation is
4  to the members, the members determine that.
5  Q.  And certainly --
6  A.  In this case, the members, if they felt the
7  organization wasn't serving their interest, I assume
8  they would get rid of the association management
9  outfit that was headed by Peter Rush and put in
10 another one.
11 Q.  I wasn't suggesting a dissatisfaction.  I
12 was suggesting -- Well, I'm asking, are there things
13 that the members may wish to do themselves?
14 A.  That's possible.
15 Q.  Certainly doing something that would help a
16 member out does not mean doing everything a member
17 should do itself?
18 A.  That's right.
19 Q.  It would help the members out if the WCMA
20 built a giant factory and built blinds for them for
21 free?
22 A.  If they what?

Page 216

1  Q.  Built a factory and made blinds for them,
2  the manufacturers made the blinds.
3  A.  I don't know that that would help the
4  members.  It would be seen as a competitor.
5  Q.  Okay.  Let's go through -- Actually, at the
6  time when you say the WCMA assumed a legal duty by
7  choosing to sponsor the standard, did the manufacturer
8  still have the duty to make a -- to manufacture a
9  product free of --
10 A.  Absolutely.  They can't delegate that
11 responsibility.
12 Q.  And the importer or distributor also had
13 whatever legal obligations it had before?
14 A.  Yes.
15 Q.  And the retailer as well?
16 A.  Yes.
17 Q.  So WCMA did not take this responsibility or
18 duty from the manufacturers and other people, other
19 parties; it added on to the number of entities that
20 had this duty?
21 A.  I'm not quite sure of the semantics here.
22 But the fact of the matter is they assumed a

54 (Pages 213 to 216)

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 217

1 responsibility. They assumed a duty.
2  Q. But someone made these blinds?
3  A. Yes.
4  Q. Not the WCMA?
5  A. Right.
6  Q. And if that entity was still in this case,
7 in your opinion, if that entity said, "Hey, not our
8 fault, WCMA standard," would they no longer have that
9 responsibility? Would that get them off the hook?
10  A. I think there would be joint
11 responsibility.
12  Q. But that would not remove their
13 responsibility?
14  A. No.
15  Q. Let me go through some of these phrases. I
16 do want to make sure I got them. Helpfully we can do
17 this quickly.
18    Do you have your report?
19  A. I do.
20  Q. On page 13 you wrote that "The WCMA in
21 effect positioned itself in the lead safety role
22 routinely assumed by manufacturers and sellers of a

Page 218

1 product."
2  A. Let me just make sure I know where you are.
3  Q. I'm sorry. It's the first full paragraph
4 on page 13, two lines down.
5  A. Two lines?
6  Q. Yes.
7  A. Okay, I've got you.
8  Q. That's correct?
9  A. Yes.
10  Q. How did it position itself in the lead
11 safety role?
12  A. By undertaking to be a sponsor of an
13 American national standard.
14  Q. And so this sentence refers to that aspect,
15 not any other?
16  A. That's correct.
17  Q. You've talked a bunch about other trade
18 associations. Is this lead safety role -- Are safety
19 standards normally developed by manufacturers or
20 sellers, or by outside groups?
21  A. It can be by -- the lead can be by a
22 technical committee consisting of manufacturers,

Page 219

1 sellers, distributors. It can be under the auspices
2 of a trade association. It can be under the auspices
3 of an outside organization like Underwriters
4 Laboratories that is neither a trade association nor a
5 manufacturer or seller.
6  Q. Is the duty that WCMA took on actually more
7 similar to a trade association than it is the duty of
8 a manufacturer or seller? Does that make any sense?
9   You wrote that it put itself in the role
10 routinely assumed by manufacturers and sellers of the
11 product. I guess it's my understanding that the role
12 the WCMA had here was actually the role organizations
13 like itself or Underwriters Laboratory or an ad hoc
14 committee would have, not the role that a manufacturer
15 or seller would have.
16  A. I think you're splitting hairs a little bit
17 too much. The role of a manufacturer or seller is
18 really to ensure the safety of a product. It's to
19 make sure that the products that they manufacture and
20 sell are reasonably fit for the purpose for which
21 they're intended.
22    By taking on the role of -- that it did in

Page 220

1 this case as sponsor of a national standard to ensure
2 the safety of a product, that product being window
3 coverings, the organization was assuming a role not
4 unlike that of manufacturers and sellers and not
5 unlike that of other -- some of the major associations
6 that I referred to earlier like the GAMA, Gas
7 Appliance Manufacturers Association, the Outdoor Power
8 Equipment Institute, the AHAM, the Association of Home
9 Appliance Manufacturers, all of which are involved as
10 sponsors of national safety standards.
11  Q. Is a manufacturer -- A manufacturer is
12 obligated to ensure the safety of a product?
13  A. The manufacturer is, yes.
14  Q. Did WCMA ever explicitly undertake to
15 ensure the safety of the products?
16  A. Did they ever undertake to do that?
17  Q. To ensure the safety of window covering
18 products.
19  A. Yes, I think they did by offering
20 themselves as a sponsor of a standard that would have
21 that effect.
22  Q. Okay. Do you have the standard still in

55 (Pages 217 to 220)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

Page 221

1  front of you?
2      A.  Yes, I do.
3      Q.  If you'll turn to page 4.  On Item 2, you
4  list the objective of the standard.
5      A.  Page 4, Item 2?
6      Q.  Yeah.
7      A.  Okay.
8      Q.  That's on that 0028186.  Can you read the
9  objective, please?
10     A.  "The objective of the standard is to
11 provide requirements for covered products in 1.3 that
12 reduce the possibility of injury, including
13 strangulation to young children from the bead, chain,
14 cord, or any type of flexible loop device used to
15 operate the product."
16     Q.  I'm understanding your testimony to be that
17 WCMA did not have a legal duty to the plaintiffs until
18 they undertook to create the safety standard; is that
19 correct?
20     A.  Yes.
21     Q.  So what I'm asking here, I think, is what
22 are the limitations in the scope of that duty?  It's

Page 222

1  not like a manufacturer who has an inherent duty by
2  making a product.
3      A.  Right.
4      Q.  Can the scope of their duty go beyond what
5  they're undertaking to do?  When I say "they," I mean
6  the scope of WCMA's duty.
7      A.  Repeat the question.
8      Q.  Sure.  Can the scope of WCMA's undertaking
9  go beyond -- I'm sorry, can the scope of WCMA's duty
10 go beyond its undertaking?
11     A.  Go beyond its undertaking?  In other words,
12 the objective of what they're doing?
13     Q.  Well, we can talk about this paragraph, but
14 I mean in general.  Well, let's talk about this
15 paragraph.
16     A.  All right.
17     Q.  Can the scope of WCMA's duty extend
18 beyond -- and we'll assume that this is representative
19 of what they're undertaking to do.
20     A.  If I understand your question, the answer
21 is yes.  If the role they're undertaking, largely to
22 ward off federal intervention that would otherwise

Page 223

1  ensure the safety of a product, window coverings, from
2  strangulations to infants and toddlers, then by in
3  effect warding that off they are undertaking to ensure
4  the adequacy of a standard that -- a voluntary
5  standard that would accomplish the same thing.
6          In other words, it's got to be a safety
7  standard that is adequate to the purpose or reasonably
8  adequate to the purpose of significantly reducing the
9  likelihood of injury.
10     Q.  Okay.
11     A.  And the reason I make that point is just
12 seeing the language here, the objective, it seems to
13 be a little wishy-washy.  Maybe that's how they wanted
14 it, or thought that's how they could escape
15 responsibility if they were thinking in those terms,
16 which they may well have.  But here it says that
17 reduce the possibility of injury.  Well, it's more
18 than that.  It's significantly reduce the possibility
19 of injury in a manner that is adequate to the risk
20 that is identified.
21     Q.  You said a moment ago that their purpose
22 was to ward off federal regulation that would have

Page 224

1  ensured the safety of these products.
2      A.  I say that in the context of what we know
3  happened.  The CPSC came to them and said "You better
4  do this or we're going to do it."  So yes, there would
5  have been safety regulation in the broadest sense that
6  would have required a result, perhaps more rigid than
7  the result that came about.
8      Q.  Okay.  Because then I'm very confused.
9  Because we had, maybe not established, but we
10 certainly discussed earlier that we couldn't find any
11 record of when the CPSC approached them of mentioning
12 inner cord strangulation at all, correct?
13     A.  That's correct.
14     Q.  We found no document here that indicated
15 that CPSC brought it up.
16     A.  That's right.  But keep in mind the
17 discussion we had.  CPSC had brought it up at an
18 earlier point in time.  So it's not anything they
19 weren't aware of.
20     Q.  I understand.  So essentially by their
21 assumption of duty actually becomes not to the scope
22 of what they're saying here, but to what the CPSC

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 225

1  might have done?
2      A.  No, I wouldn't put it in those terms.  I
3  would say their responsibility goes to whatever is
4  necessary to come up with a standard that reasonably
5  and adequately reduces the likelihood of injury from
6  window cord strangulation.
7      Q.  Did the standard reasonably reduce the
8  chance of injury from window cord strangulation?
9      A.  I believe from one aspect of window cord --
10 not to minimize it, one and one very important aspect,
11 yes.  From another, lesser -- less serious but equally
12 grievous kind of injury, no, it did not at all.
13     Q.  I'm just still a little hung up about your
14 comment about the warding off regulation from the
15 CPSC.  I guess I heard it to say that they did this in
16 lieu of what the CPSC could have done.  And yet during
17 this time frame -- and actually we don't have any
18 documents, but to show any request or suggestion or
19 anything in the CPSC that in 1993 WCMA addressed the
20 issue of inner cord strangulation.
21     A.  I guess what I'm saying is an industry
22 faced with a serious safety risk such as child

Page 226

1  strangulations has a more direct and higher
2  responsibility than the government does.  The
3  government is an ensurer of safety of last resort.
4      But the whole thrust of the Consumer
5  Product Safety Act is to get industry to do what it
6  should otherwise do, companies, manufacturers,
7  producers, distributors, retailers, and even
8  associations to do what they should do to adequately
9  reduce the risk of injury where that risk is
10 unreasonable.
11     The CPSC has identified an unreasonable
12 risk early on.  They made it clear to them that they
13 thought that this was a risk and discussed all aspects
14 of it with them.  In 1993, while the focus of CPSC may
15 have been on pull cords, the focus of the industry
16 should have been on window cord safety across the
17 board.  And they knew enough about the relationship
18 between pull cords, which are one end of the problem,
19 and inner cords, which are the other end of the
20 problem, that they could have and should have
21 addressed the entire issue at that time.
22     Q.  Are you using the term "industry" to be the

Page 227

1  same as WCMA?
2      A.  I'm using industry in the context of
3  manufacturers, who have a responsibility, and WCMA,
4  who in the context of the standard, having said that
5  we're going to lead the standards effort, they have
6  that responsibility.
7      Q.  Did the manufacturer of the window blinds
8  at issue here, could they have put -- Well, let me
9  back up.
10         How does inner cord strangulation occur?
11     A.  How does it occur?
12     Q.  Uh-huh.
13     A.  A child typically pulls on the inner cord,
14 creates a noose, and gets the noose entangled around
15 its neck.
16     Q.  And what is the fix in the 2002 safety
17 standard to address that?
18     A.  In terms of the 2002?  It's basically cord
19 stops.
20     Q.  Do you think those are effective in
21 preventing inner cord strangulation?
22     A.  I don't know of anything that would

Page 228

1  indicate otherwise.
2      Q.  Is there anything that prevented the
3  manufacturer of these blinds from putting cord stops
4  in the blinds?
5      A.  On their own?
6      Q.  Yes.
7      A.  No.
8      Q.  Does this standard stop them from doing
9  that?
10     A.  No, it doesn't stop them from doing it.  It
11 doesn't tell them anything about it.
12     Q.  But it doesn't prevent the manufacturer
13 from taking a step to --
14     A.  No.  And I'm not saying that the fact
15 that -- and I think we already discussed this.  The
16 fact that WCMA, by virtue of its sponsoring this
17 standard and putting itself in the lead role to ensure
18 the adequacy of a safety standard for window blind
19 safety, the fact that they did that does not excuse or
20 in any way immunize individual manufacturers in suits
21 of common law, whether it be a pull cord or an inner
22 cord problem.  Irrespective of anything done in

57 (Pages 225 to 228)

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 229

1 conjunction with the standard, the manufacturers have
2 a responsibility to make sure that the product is fit
3 from a safety standpoint for the purpose for which it
4 was intended.
5     Q.  Okay.  Back on your report on page 13 you
6 wrote that -- I think we're in the same paragraph
7 there, the middle paragraph -- that "WCMA had
8 unfettered discretion to set public safety standards."
9     A.  Right.
10    Q.  What does that mean?
11    A.  I think basically within the standards
12 process that they set up, there was nobody telling
13 them that they couldn't do whatever they wanted to do
14 in the context of that standard.
15    Q.  Were there CPSC staffers on that committee?
16    A.  There was CPSC involvement or staff that
17 were involved in the committee, but at no point did
18 any member of the CPSC staff have a vote.
19    Q.  The CPSC staff, were they able to make
20 suggestions?
21    A.  They were able to make suggestions, but the
22 suggestions could be, in the case of all standards

Page 230

1 proceedings, the CPSC staff never has a vote and the
2 staff is instructed never to signal approval or
3 otherwise.
4       In this context as well, they can make
5 suggestions, but they cannot participate in the
6 approval proceedings.
7     Q.  If the standard -- If the CPSC determined
8 that the standard was not likely to be substantially
9 followed or was not adequate to reasonably reduce the
10 hazard, what could they do?
11    A.  They could issue a proposed notice of
12 rulemaking with a finding in that notice of proposed
13 rulemaking that they had found -- identified, found
14 the voluntary standard to be inadequate.
15    Q.  Did they do that?
16    A.  No, they did not.  In terms of the pull
17 cord problem, they found the standard to be adequate.
18    Q.  You keep qualifying that, and I guess -- Is
19 this standard adequate in terms of pull cords but not
20 adequate in terms of inner cords?
21    A.  Absolutely.  I mean, that goes without
22 saying.

Page 231

1     Q.  And does that make the standard adequate or
2 inadequate?
3     A.  It's adequate in terms of pull cords.  It's
4 silent as to inner cords.  But the purpose of the
5 standard's role was to ensure the safety of the
6 product through the standards procedures.  And this
7 standard's procedure, while it identified and dealt
8 with the problem of pull cord safety, did not identify
9 and deal with in any way the problem of inner cord
10 safety, which as I've stated several times today is
11 really another facet of the same problem.
12    Q.  Are there other strangulation hazards on
13 window blinds aside from being caught in the loop of a
14 pull cord and caught in the loop of an inner cord?
15    A.  Yes.  As you quoted from, among other
16 places, as you quoted from the article in the JAMA
17 publication, Ms. -- and I'm having as hard a time with
18 her name as you are -- Rauchschwalbe identified
19 several other means -- or several other types of
20 scenarios which may or may not be conducive to a
21 solution.
22        But we know that inner cords work conducive

Page 232

1 to a solution.  In fact, both inner cords and pull
2 cords would have been conducive to the same solution
3 that they ultimately came to be as early as 1981 when
4 the problem was first identified.
5     Q.  What was the solution in 1981?
6     A.  The solution would have been to eliminate
7 all loops, to provide for a cord stoppage on the inner
8 loop, on the inner cord.  Basically that.  Eliminate
9 loops and provide for cord stoppage.
10    Q.  There was a suggestion in 1981 to put a
11 cord stop on --
12    A.  No.  I'm saying that anything the industry
13 came up with -- or both aspects of a design solution
14 that the industry came up with, first in 1994,
15 beginning of 1995, and with respect to the inner cord
16 in 2000 and the standard 2002, both those solutions in
17 terms of their -- the feasibility and the practicality
18 and the cost could have been instituted as early as
19 1981.
20        There was nothing that wasn't available in
21 terms of technology and the cost was minimal, and the
22 only thing holding back such a design-based solution

58 (Pages 229 to 232)

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 233

1  was the unwillingness of the industry to approach it,
2  or even consider a design-based solution.
3      Q.  In 1994 or 1981?
4      A.  In the years immediately after 1981.
5      Q.  We're talking about 1994. There is a
6  standard here.
7      A.  Well, but I mean if we're talking 1994 --
8  if they had done it in 1981, we wouldn't be here
9  today.
10     Q.  I'm not trying to argue with you.
11         In 1994, the WCMA and the window covering
12 industry was making a design change, correct?
13     A.  When?
14     Q.  In 1994.
15     A.  In 1994 they were making a design change to
16 deal with the pull cords.
17     Q.  And as you mentioned, the cord stop, you
18 believe the technology was available in 1994?
19     A.  Are you seriously asking that question?
20     Q.  I'm seriously asking, yeah.
21     A.  As to whether they could have had cord
22 stops in 1994?

Page 234

1      Q.  Yes.
2      A.  Absolutely. In fact, I answered it before.
3  I believe they could have had it in 1981.
4      Q.  Are you familiar with the ANSI standard
5  process?
6      A.  Yes, I am.
7      Q.  And to make an ANSI standard, a standard
8  has to conform to that process; is that correct?
9      A.  That's correct.
10     Q.  And that requires ballots to be sent out to
11 interested parties?
12     A.  That's correct.
13     Q.  There's a canvass list?
14     A.  Correct.
15     Q.  And people respond and say they want to be
16 balloted and then they get balloted?
17     A.  Correct.
18     Q.  And the comments have to be considered
19 before the standard is accepted?
20     A.  Correct.
21     Q.  And some of the people who can be balloted
22 could be consumers?

Page 235

1      A.  They could be consumers. Typically they're
2  not. As a matter of fact, if you go back to the work
3  that I did and the National Commission on Product
4  Safety did back in 1969, 1970, contained in the final
5  report of the National Commission on Product Safety is
6  an indictment of the ANSI standards process as being
7  woefully industry-oriented and not at all assuring of
8  the adequacy of the end result.
9         In point of fact, it refers to the end
10 result typically as a low common denominator result,
11 and sometimes lowest common denominator because the
12 nature of the process is so industry-oriented.
13     Q.  Do you believe that today?
14     A.  I do.
15         MR. BAUERMEISTER: Can we go off the record
16 for a minute?
17         MR. WEISS: Sure, Don.
18         (Off-the-record discussion.)
19 BY MR. WEISS:
20     Q.  CPSC accepts ANSI standards? Not approve,
21 but they accept standards using the ANSI process?
22     A.  Keep in mind what I told you earlier. When

Page 236

1  you say accepts, CPSC doesn't have a whole lot of
2  choice as a result of what happened in 1981, because
3  to not accept, they would have to make a finding that
4  the ANSI standard does not adequately address the
5  problem, which is, as I say, trying to prove a
6  negative.
7      Q.  Well, let me --
8      A.  They've done it on occasion but it's rare.
9      Q.  Let me interrupt. I didn't mean
10 specifically accepts specific ANSI standards. The
11 CPSC in general uses -- Do you know who suggested
12 creating an ANSI standard in this case, to the WCMA
13 that they use the ANSI process?
14     A.  It may have been CPSC. I don't know. You
15 know, there's not a whole lot of alternatives out
16 there. If you don't have a federal safety standard,
17 there's not much else other than the ANSI standard.
18         I don't want to waste your time, but ANSI
19 only came about because of the fraudulent or
20 quasi-fraudulent activity of its predecessor which
21 purported to refer to itself as the United States of
22 America Standards Institute, and the Federal Trade

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 237

1  Commission required what is now ANSI to change its
2  name because it was -- the name was misrepresentative
3  of a federal government function.
4      So it's not exactly a glorious history that
5  ANSI has.
6      Q.  On page 16 of your report, you wrote that
7  "The WCMA" -- and it's the second full paragraph,
8  third line -- "was the sponsor and developer of the
9  very standard for safety which would bind its
10 members."
11     A.  I'm trying to find where you are here.
12 This is page 16, first full paragraph?
13     Q.  Correct.
14     A.  Okay, I've got you.
15     Q.  How does it bind its members, the standard?
16     A.  This is an area of obvious legal issues,
17 but to the extent that the members of an organization
18 that have -- where the organization has a safety
19 standard and members don't comply with it, there is
20 something of a not legal but moral binding and
21 embarrassment and potential -- and invites potential
22 enforcement on the part of the relevant federal safety

Page 238

1  agency, which in this case would be CPSC, if there's
2  not substantial compliance with an industry voluntary
3  safety standard.
4      So while technically as a legal matter they
5  can't bind its members, as a practical matter, coming
6  up with such a safety standard does in fact bind its
7  members.
8      Q.  Was the manufacturer of the blinds in this
9  case a member of the WCMA?
10     A.  Since we don't know for sure who the
11 manufacturer was, we can't say for sure whether the
12 manufacturer was a member.
13     Q.  If it was Ching Feng, was Ching Feng a
14 member?
15     A.  I don't believe they were.
16     Q.  All right.  On the bottom of page 16, going
17 to page 16, you wrote that "At all times WCMA
18 represented itself to the federal government in the
19 form of the CPSC as the responsible industry leader on
20 all matters affecting window blind safety."
21     A.  Correct.
22     Q.  How is that?

Page 239

1      A.  From everything we've discussed today, as a
2  sponsor of the standard, as the organization out of
3  which the other player, Window Cord Safety Council
4  arose out of, the WCMA, from all appearances, did
5  represent itself with respect to all matters involving
6  window blind safety.
7      And here I use WCMA in -- as including the
8  work of the WSSC which it designated to handle this
9  problem.  Yes, I think that's a correct statement.
10     Q.  But you know that legally representing
11 means essentially told; isn't that correct?
12     A.  Essentially what?
13     Q.  Are you saying the WCMA told the CPSC that
14 it was the responsible leader in all matters of window
15 blind safety?
16     A.  Not necessarily that it made a statement or
17 announced to the world we are the responsible leader,
18 but from its actions, it was the player.  It set the
19 guidelines for what would be done in the area of
20 window blind safety.  It was the responsible forum.
21 It was the shield behind which other -- behind which
22 individual manufacturers could -- could hide.  It was

Page 240

1  the single most important organization active in this
2  area.
3      Q.  Did it come forward to the CPSC and do
4  that?
5      A.  You mean did it initially present itself as
6  that?  I think as of 1993 period, yes, it did.
7      Q.  Did it tell -- Are you aware of instances
8  where the CPSC -- or WCMA might have told the CPSC
9  about some limitations that it had?
10     A.  I'm not aware of those.
11     Q.  Have you seen any documents where WCMA or
12 WCSC, I guess since you're being inclusive, told the
13 CPSC that it was not able to get large segments of the
14 industry, could not speak for all members of the
15 industry, that it was having difficulty signing people
16 up to the program and asked for CPSC's help?
17     A.  Yes, I've seen that discussion, and it's
18 referred to in the Peter Rush deposition, and that's
19 why they say they created the Window Covering Safety
20 Council, to cover more of the players.
21     Q.  I'm not talking about the limitations based
22 on the membership requirements.  I mean subsequent to

60 (Pages 237 to 240)