DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 241

1  that. You say, "Look, there are this many
2  manufacturers and many of them are not coming to join
3  us, they are not helping out, we need your help to get
4  them involved."
5     A.   I haven't seen that correspondence, but
6  it's not the type of thing that CPSC would help them
7  on. The purpose of the CPSC is manyfold, but it's not
8  to get additional members for a trade association.
9     Q.   Is one of the purposes of CPSC to get as
10 many members of the industry as possible to buy into a
11 corrective action plan?
12    A.   Yes. But you can do that without being a
13 member of a trade association.
14    Q.   I'm sorry. I don't mean to suggest they
15 were asking for membership.
16         Are you aware of documents or
17 correspondence in which WCMA or WCSC told the CPSC
18 that -- of large segments of the industry that were
19 not participating?
20    A.   I'm not. I don't think that has any --
21 whether that's true or not, I don't think that has any
22 bearing on my statement here.

Page 242

1     Q.   On page 17 you wrote -- first bottom full
2  paragraph, "It had undertaken for more than a decade
3  to lead the industry in collected use from all matters
4  pertaining to window blind safety, including the
5  adequacy of product blinds."
6         We're talking about a decade going back to
7  the mid-'80s; is that correct?
8     A.   That's right.
9     Q.   That was a time when the CPSC staff had
10 determined that WCMA was ineffectual in backing the
11 leadership?
12    A.   Keep in mind what I said, it's not only the
13 WCMA but it was the manufacturers themselves. There
14 wasn't a leader in the group willing to come forward.
15 So it was -- you know, it was a shared indictment.
16    Q.   What happened in the mid-'80s where WCMA
17 had undertaken to lead the industry in all matters
18 pertaining to window blind safety?
19    A.   What happened?
20    Q.   Yeah.
21    A.   They led with a leaden foot. They were
22 dragging their feet throughout the '80s and into the

Page 243

1  '90s until the CPSC says to them, at least in the
2  context of pull cords, "Either you do it or we do it."
3     Q.   I think what you're saying is they didn't
4  do anything?
5     A.   Largely they did nothing, yes.
6     Q.   And if they are not doing anything, where
7  is the undertaking to lead the industry in all matters
8  pertaining to window covering safety?
9     A.   They did that from the outset in the 1985
10 period. As you recall, at the end of that year, and
11 1989 and 1993, it participated in wide scale,
12 widespread announcements and safety campaigns with the
13 CPSC representing the industry as the leader of that
14 industry. And I think that's consistent with the
15 statement I make here.
16    Q.   When we discussed before, or my read of it
17 is, I guess, that Stan Morrow called Peter Rush and
18 said, "We would like to issue the safety alert." Or
19 wrote to Peter Rush. They agreed to do it.
20         And I guess it's your testimony or your
21 opinion that by agreeing to issue the safety alert
22 along with CPSC, or agreeing to cosponsor it, that is

Page 244

1  undertaking to lead the industry in all matters
2  pertaining to window covering safety?
3     A.   I think in the absence of any other known
4  activity on the part of anyone else, by default they
5  were the leader.
6     Q.   I guess I'm not trying to ask whether they
7  were first among others.
8     A.   This is not anything that either WCMA or
9  the individual members ought to be especially proud
10 of, but it's kind of like, you know, Kemo Sabe, you do
11 it and you do it and you do it. And nobody is willing
12 to take the lead, and so to some extent WCMA did that
13 by at least participating in the every-four-year
14 announcement.
15    Q.   But it seems like here that what you're
16 saying is by agreeing to issue that product safety
17 alert, they're undertaking to do everything.
18    A.   Well, that and knowing that in 1993 they
19 became the designee of the industry.
20    Q.   But we're not talking about that in this
21 paragraph. We're going backwards now to prior to
22 that.

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

EXHIBIT 52-G

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 245

1   A.  I understand that.
2   Q.  So I guess I'm asking you, is it your
3   opinion that -- if I understand you, by agreeing to
4   issue that product safety standard, they now have
5   taken on the obligation to deal with and address all
6   matters pertaining to window blind safety?
7   A.  As of what date?
8   Q.  As of -- I guess -- well, you said they
9   issued a product safety alert.  So by the time they
10  issued the first product safety alert.  Was that an
11  undertaking by the WCMA to lead the industry in all
12  matters pertaining to --
13  A.  I think yeah.  I would answer that yes.
14  Q.  Okay.  You also said, "It came forward and
15  represented itself to the CPSC as the responsible
16  party to lead an industry-sponsored effort to
17  establish effective safety standards."  We talked
18  about that already.
19  A.  I'm sorry, you're at the top of page 17?
20  Q.  I'm at the bottom of page 17, but actually
21  we've already talked about that, so I'll strike that
22  question.

Page 246

1   A.  As long as you're at the bottom of 17, I
2   would make a modification in my report.
3   Q.  Sure.
4   A.  The very last sentence there reads "And
5   that was to promote and develop a viable safety
6   standard for industry and through appropriate" -- I
7   would add the words "design modifications, safety
8   warnings and otherwise, to timely reduce infant
9   exposure to a known hazard."
10       The implication here without that change is
11  that it was only through safety warnings.  Otherwise
12  is a very vague term.  It really is design
13  modification, safety warnings and any other way.
14  Q.  Okay.  On page 18, the top of page 18, you
15  say: "The WCMA had agreed to undertake a successful
16  correction of corded window blinds previously sold in
17  people's homes."
18       Is that true?
19  A.  Yes.
20  Q.  How so?
21  A.  Through the corrective action plan of --
22  the first corrective action plan.  I'm referring here

Page 247

1   to the first corrective action plan.
2   Q.  Is it your understanding that it was the
3   WCMA and not the WCSC that agreed to that plan?
4   A.  Well, I think you're splitting hairs there.
5   This is all under the rubric -- I mean, it's WCMA who
6   is the sponsor of the safety standard, so -- and WCSC
7   that is a means for accomplishing that.  So I think
8   the statement is correct.
9   Q.  So is WCMA responsible for the actions or
10  inaction of the WCSC?
11  A.  I think you can't -- I don't think you can
12  so separate the groups that they're entirely
13  distinguishable.  I think the WCMA had overall
14  responsibility for ensuring the safety of corded
15  window coverings and WCSC, the safety council, was a
16  means for accomplishing that result.  It was one of
17  several means of accomplishing that result.
18  Q.  Do you know if the WCMA was involved in the
19  retrofit campaign at all?
20  A.  Again, I think that's splitting hairs.  The
21  safety council was the designated agent for that
22  campaign, but I don't believe from what I see of the

Page 248

1   structure and how integrated that there is a whole lot
2   of difference between the two, notwithstanding some
3   differences in membership.
4   Q.  I mean, who made the agreement with the
5   CPSC to do the corrective action plan?
6   A.  You have two bodies here that are both
7   involved.  Who made the agreement, the safety council
8   did, because WCMA said that we're not widespread
9   enough to be able to do this.  On the other hand, it's
10  WCMA that is the party that is designated as the
11  responsible sponsor of the safety standard.
12       And that being the case, you can't have a
13  safety standard, I don't believe, without having the
14  involvement of all parties, including the safety
15  council.
16       I really think it's nit-picking to try and
17  single out the responsibilities of one versus the
18  other when WCMA clearly is the -- not the parent
19  group -- the group that is identified as having the
20  broad-based responsibility.
21  Q.  And why do you believe the WCMA is the one
22  identified as having the broad-based responsibility?

62 (Pages 245 to 248)

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 249

1  A.  Because they took on the role as the -- as
2  the sponsor and promoter of the national standard.
3  MR. BAUERMEISTER: Mr. Weiss, this is Don
4  Bauermeister. I apologize for interrupting. I notice
5  it's six and a half hours since we started. Are we
6  nearing the end?
7  MR. WEISS: I would love to be, Don. I'm
8  trying to get an answer here. If I have to move on, I
9  have to move on.
10  All right, let's go forward.
11  MR. BAUERMEISTER: Mr. Statler, do you need
12  a break?
13  THE WITNESS: No, I'm fine. Thank you for
14  inquiring.
15  BY MR. WEISS:
16  Q.  Does the WCMA inspect products?
17  A.  Does the WCMA inspect products? So far as
18  I know, they do not.
19  Q.  Do they certify compliance with the
20  standard?
21  A.  So far as I know, they do not.
22  Q.  Do they mandate compliance with the

Page 250

1  standard?
2  A.  No, they do not.
3  Q.  Do they punish anybody for noncompliance?
4  A.  No, they do not. And if they did, they
5  would be in violation of the law, as with any other
6  voluntary standards group.
7  Q.  Do you have an opinion about the adequacy
8  of the retrofit campaign?
9  A.  No, I don't.
10  Q.  You said on page 13 of your report again
11  that the association's primary loyalties are to its
12  members' profits?
13  A.  Correct.
14  Q.  And you wrote "That's reflected in the
15  testimony of Mr. Rush"?
16  A.  Yes.
17  Q.  Where does it say that in the testimony of
18  Mr. Rush?
19  A.  He doesn't use the term profit, but he used
20  the term the purpose of the organization is to ensure
21  the -- ensure the interest of its members. And one of
22  the -- surely whatever the other interests of its

Page 251

1  members are, maximizing their profits is certainly a
2  role of any trade association.
3  Q.  Okay. So because he said the purpose of
4  the organization is to serve the interest of its
5  members, you have determined that the primary loyalty
6  is to the profits of the --
7  A.  Yeah, it's partly. If you look at the
8  mission statement of the WCMA on its website, it's
9  along the same lines. And interestingly, it doesn't
10  identify anything in the way of safety, which I
11  believe it should.
12  Q.  Is it possible it doesn't say anything
13  about safety because it's not a safety organization?
14  A.  Well, if it's not a safety organization,
15  it's a sham, because it's representing itself to the
16  federal government as a sponsor of safety standards.
17  Q.  I think you also wrote in the same
18  paragraph that "The formulation of a truly effective
19  safety standard may imperil members' profits"?
20  A.  It may.
21  Q.  Did Peter Rush say that at all?
22  A.  I'm not saying that it would. I mean, in

Page 252

1  this particular case, there's very little that would
2  indicate that the solutions, plural, that are arrived
3  at for both the pull cord and the inner loop are going
4  to cost a whole lot more, if any more, than without
5  such solutions.
6  Q.  And along those lines -- I'm sorry.
7  A.  That being the case, it doesn't
8  necessarily, but often -- I guess I was using the
9  example here, often safety considerations can be
10  against -- can be contrary to or adverse to the profit
11  interest of an association's members.
12  Q.  Is there anything in this record that shows
13  that there was a fear they would imperil their
14  profits?
15  A.  No.
16  Q.  A moment ago --
17  A.  This is meant to be more of a theoretical
18  statement.
19  Q.  Okay. You said just a moment ago that WCMA
20  was a sham organization?
21  A.  Yeah.
22  Q.  A facade. And one of the things you

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 253

1  pointed to was it didn't have actual employees, it had
2  a contract with an association management service.
3      A.  Right.
4      Q.  Are consultants not able to do the same job
5  as employees?
6      A.  That's not anything I said.
7      Q.  I'm asking you.
8      A.  Oh, it can.
9      Q.  You're a consultant?
10     A.  I'm a consultant, yes.
11     Q.  And you're dedicated to the work you do, I
12 imagine?
13     A.  I am.
14     Q.  You wrote that "Peter Rush was running the
15 organization out of his side pocket"?
16     A.  Yes.
17     Q.  Because he had other obligations; is that
18 correct?
19     A.  He had many other obligations and
20 organizations for which he headed.
21     Q.  You've been the head of organizations?
22     A.  I have.

Page 254

1      Q.  And I'm not sure of the title, but a deputy
2  head or a higher-up in a second organization?
3      A.  Deputy head of one and executive director
4  of another, head of two Congressional committees.
5      Q.  And during that time, at least the latter,
6  you were also a consultant?
7      A.  I was.
8      Q.  You were doing both things at once?
9      A.  I was.  But my consulting work constituted,
10 oh, probably less than 5 percent of my time.
11     Q.  But when you were consulting a company on
12 safety issues, you certainly gave it the dedication it
13 required, didn't you?
14     A.  I did.  But I can tell you that I don't
15 know of any organization --
16     Q.  You're welcome to answer, but we're trying
17 to rush.
18     A.  Sure.
19     Q.  The CPSC lends its expertise to
20 organizations that are developing safety standards or
21 otherwise going through a voluntary corrective action
22 plan; is that correct?

Page 255

1      A.  Correct.
2      Q.  I have an article you wrote, and I'm happy
3  to show it to you, but we can just talk about it if
4  that would be easier.  I believe you wrote that CPSC
5  becomes a partner with the industry to determine the
6  nature and scope of the hazard and what needs to be
7  done to correct it.  Does that sound familiar to you?
8          And I have it for you now if that will be
9  easier.  I'll mark it as Exhibit 18.
10         (Exhibit 18 marked for identification and
11 attached hereto.)
12 BY MR. WEISS:
13     Q.  There you go.
14     A.  Yes.
15     Q.  That's your article?
16     A.  Yes, it is.
17     Q.  Does the CPSC become partner with an
18 industry or a manufacturer in an equally beneficial --
19     A.  It's a partner in the sense of both trying
20 to solve similar problems of risk.  And the actions of
21 the one can complement the other.
22     Q.  If you look on page 96 of that, and I'll

Page 256

1  read it out loud again to save time, you wrote that "A
2  firm immediately taps the Commission's wealth of
3  expertise with risk assessment and corrective actions
4  as well as its technical engineering and public
5  affairs expertise."
6      A.  That's right.
7      Q.  Is that correct?
8      A.  That's right.
9      Q.  In fact, that expertise is preeminent in
10 the United States, I would imagine.
11     A.  It's preeminent where?
12     Q.  In the United States.
13     A.  Okay.
14     Q.  Is there nobody else with greater expertise
15 in product safety?
16     A.  I don't know that I would say that, but
17 it's certainly at a high level.
18     Q.  CPSC provided that expertise in this case,
19 correct?
20     A.  They did.
21     Q.  Is it fair for an organization to rely on
22 that expertise?

64 (Pages 253 to 256)

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 257

1  A.  I think it's fair to -- to take advantage
2  of that expertise in a positive way, to use the
3  expertise, but when you say rely, if you mean rely in
4  the sense -- it's a very vague term. If you mean rely
5  in the sense of to use it and to make benefit from it,
6  by all means. If you mean it to the exclusion of
7  anything else, then I would say no.
8      I mean, you can't ever substitute your own
9  good judgment and your own responsibilities under the
10 law. Not only the Consumer Product Safety Act law,
11 but your common law responsibilities and your
12 manufacturing and your -- your manufacturing
13 responsibilities on the part of the members, your
14 association responsibilities to your members.
15 Q.  Do you believe that the WCMA overrelied on
16 the CPSC in this case?
17 A.  You know, I don't know -- I can't say they
18 overrelied when I don't know how much they relied upon
19 them. So I don't have an opinion.
20 Q.  We're closing up now, I think.
21     You're aware that the industry, largely the
22 WCSC, took action in 2000 after being asked by the

Page 258

1  CPSC to address the inner cord risk, correct?
2  A.  I am.
3  Q.  And that they began a public relations
4  campaign?
5  A.  Yes.
6  Q.  And a retrofit campaign?
7  A.  Yes.
8  Q.  And retrofitted products that were still on
9  the shelf by putting safety kits with those products?
10 A.  Correct.
11 Q.  And at some point stopped production and
12 began producing blinds with cord stops?
13 A.  Correct.
14 Q.  And all of this was prior to the going into
15 effect of the 2002 standard?
16 A.  Yeah, by about two years.
17     MR. WEISS: Don, if you'll give me just a
18 second -- We can go off the record. I'm sorry.
19     (Off-the-record discussion.)
20     MR. WEISS: I don't have any more
21 questions. I don't know if Mr. Bauermeister does.
22     MR. BAUERMEISTER: Thank you. I do not.

Page 259

1     Thank you, Mr. Statler.
2     MR. WEISS: Mr. Statler, thank you very
3  much. I really appreciate your copious amounts of
4  time you've dedicated to this.
5     THE WITNESS: Thank you.
6     MR. WEISS: Thanks, Don. We'll talk again
7  soon.
8     (Whereupon, the deposition was concluded at
9  4:42 p.m.)

Page 260

1     WITNESS CERTIFICATE
2
3     I, STUART M. STATLER, have read or have had the
4  foregoing testimony read to me and hereby certify that
5  it is a true and correct transcription of my testimony
6  with the exception of any attached corrections or
7  changes.
8
9  _____
10    STUART M. STATLER
11 [ ] No corrections
12 [ ] Correction sheet(s) enclosed
13
14 SUBSCRIBED AND SWORN TO BEFORE ME, the
15 undersigned authority, by the witness, STUART M.
16 STATLER, on this the _____ day of _____,
17 _____.
18
19 _____
20    NOTARY PUBLIC IN AND FOR
21    THE STATE OF _____
22 My Commission Expires: _____

65 (Pages 257 to 260)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

f7cdbd99-e668-4efd-a6b8-1be95a488f45

DEPOSITION OF STUART M. STATLER
CONDUCTED ON THURSDAY, JANUARY 24, 2008

Page 261

REPORTER'S CERTIFICATE

I, the undersigned Registered Professional Reporter and Notary Public, do hereby certify that STUART M. STATLER, after having been first duly sworn by me to testify to the truth, did testify as set forth in the foregoing pages, that the testimony was reported by me in stenotype and transcribed under my personal direction and supervision, and is a true and correct transcript.

I further certify that I am not of counsel, not related to counsel or the parties hereto, and not in any way interested in the outcome of this matter.

SUBSCRIBED AND SWORN TO under my hand and seal this 3rd day of February, 2008.

_____
JOHN L. HARMONSON, RPR
Notary Public in and for
the District of Columbia
My Commission Expires: 10/14/2010

Page 262

CHANGES AND SIGNATURE
PAGE LINE    CHANGE    REASON

DATE    SIGNATURE

Page 263

CHANGES AND SIGNATURE
PAGE LINE    CHANGE    REASON

DATE    SIGNATURE