IN THE UNITED STATES COURT
FOR THE DISTRICT OF ALASKA


VALERIE ROUNTREE, individually and )
as Personal Representative of THE )
ESTATE OF APRIL LYNNE COX; MORGAN )
SCHEDIWY, a minor, through her )
natural mother and guardian VALERIE)
ROUNTREE; and CHRISTOPHER COX, )
                                   )
                                   )
              Plaintiffs,          )
     vs.                           )    NO. A04-0112 CV (JWS)
                                   )
WINDOW COVERING MANUFACTURERS      )
ASSOCIATION,                       )
                                   )
              Defendant.           )
_____    )


DEPOSITION OF

JON O. JACOBSON, Ph.D.

SEATTLE, WASHINGTON

FEBRUARY 1, 2008


ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com


REPORTED BY: JUDY BONICELLI, CSR NO. 9091

FILE NO: A20080F

EXHIBIT 55-A

A20080F

JON O. JACOBSON, Ph.D.    FEBRUARY 1, 2008

---

IN THE UNITED STATES COURT
FOR THE DISTRICT OF ALASKA

VALERIE ROUNTREE, individually and )
as Personal Representative of THE )
ESTATE OF APRIL LYNNE COX; MORGAN )
SCHEDIWY, a minor, through her )
natural mother and guardian VALERIE )
ROUNTREE; and CHRISTOPHER COX, )
)
)
)
Plaintiffs, )
vs. ) NO. A04-0112 CV (JWS)
)
WINDOW COVERING MANUFACTURERS )
ASSOCIATION, )
)
Defendant. )
_____ )

Deposition of JON O. JACOBSON, Ph.D., taken on behalf
of the Defendant, at Premier Business Center, 1700 Seventh
Avenue, Suite 2100, Seattle, Washington, commencing at
10:16 a.m., Friday, February 1, 2008, before Judy Bonicelli, CSR
9091.

Page 2

---

I N D E X

WITNESS:  Jon O. Jacobson, Ph.D.
EXAMINATION:                                      PAGE
   By Mr. Weiss                                  5,89
   By Mr. Bauermeister                            89
EXHIBITS:

NUMBER                DESCRIPTION               PAGE
   1    4-Page Notice of Deposition of Jon Jacobson    6
   2    8-Page Invoices, Retainer and copies of checks  11
   3    2-Page CV of Jon O. Jacobson, Ph.D.           14
   4    3-Page Report of Jon Jacobson, Dated 10-31-07  24
   5    22-Page Study of Design Factors, Dated 12-03   43
   6    12-Page Reported Window-Cord Deaths 1981-1997  44
   7    6-Page Reported Window Covering Strangulations
        of Children in U.S. CPSC since 1/1/81         44

   8    26-Page US Consumer Product Safety Commission
        Product Safety Assessment Report Draft        45
   9    18-Page Reporting Guildelines Under Section 1
        of the Consumer Product Safety Act            50

  10    16-Page American National Standard for safety
        of corded window covering products           61
  11    1-Page WCMA Letter Ballot on Proposed Standard
        WCMA 100.1                                    73

  12    3-Page Letter to Peter Rush from Jacqueline
        Elder Dated 2-6-02                            74

INFORMATION TO BE SUPPLIED:
   (None.)

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
   (None.)

Page 4

---

A P P E A R A N C E S

FOR THE PLAINTIFF:    BY: DON C. BAUERMEISTER

BURKE & BAUERMEISTER
921 West 6th Avenue
Suite 200
Anchorage, Alaska 99501
(404) 572-4600
(404) 572-5144 Fax
docblaw@alaska.com
(Appearing telephonically)


FOR THE DEFENDANT:    BY: MICHAEL WEISS

KING & SPALDING
1180 Peachtree Street
Atlanta, Georgia 30309
(404) 572-2804
(404) 572-5136 Fax
mweiss@kslaw.com

Page 3

---

JON O. JACOBSON, Ph.D.,

having been first duly sworn, was

examined and testified as follows:


EXAMINATION

BY MR. WEISS:

   Q.  Mr. Jacobson -- or sorry, Dr. Jacobson, we met
obviously a little before this morning.  My name is Mike Weiss,
and I represent the Window Covering Manufacturers Association in
the Rountree case, and I understand you've been deposed before.

   A.  Yes.

   Q.  So you know all the rules to make sure that we don't
speak over each other so the court reporter can take everything
down?

   A.  Well, I don't know if I know all the rules, but I have
been deposed before.

   Q.  Okay.  Well, certainly I'm going to be asking
questions, and you'll be answering them presumably.  If you
don't understand my question, please ask me, and I'll try to
clear it up.  I want to make sure that we understand each other
before we get anything on the record, and if you would like to
take a break at any time, as we talked about before, just say
so, and I'll be happy to stop.

   Let's get started.  You're here pursuant to a
deposition notice; is that correct?

Page 5

---

JON O. JACOBSON, Ph.D.    FEBRUARY 1, 2008

**Page 6**

1  A. Yes.

2  **Q. And I don't know if you have a copy of it here.**

3  MR. BAUERMEISTER: Sorry for interrupting. This is

4  Don one more time. If we could get the phone number for me in

5  case I get disconnected, because you won't know right away that

6  I've been disconnected.

7  MR. WEISS: That's very true. I don't know if we know

8  what the phone number is here. Don, I've got my cell phone

9  sitting up here. Why don't I give you that number?

10  MR. BAUERMEISTER: Okay.

11  MR. WEISS: And just buzz me if you drop off. It's

12  (404) 668-4063.

13  MR. BAUERMEISTER: (404) 668-4063?

14  MR. WEISS: Yes, sir.

15  MR. BAUERMEISTER: Pardon me for the interruption, go

16  ahead.

17  MR. WEISS: Oh, no problem.

18  (Discussion held off the record.)

19  (Exhibit No. 1 marked for identification.)

20  **Q. (By Mr. Weiss) The deposition notice is Exhibit 1, and**

21  **this is the notice you received or a copy of the notice you**

22  **received?**

23  A. Appears to be the case, yes.

24  **Q. Okay. You'll notice, if you turn to Page 4, that**

25  **there is a list of items that we requested that you would bring**

**Page 7**

1  to the deposition.

2  A. Yes.

3  **Q. Did you bring anything with you?**

4  A. Yes.

5  **Q. Do you have that with you?**

6  A. Yes.

7  **Q. Could you get it, please?**

8  A. (Deponent complied.)

9  **Q. Okay. Now, the first item on the list is your entire**

10  **file in the Rountree matter which you've put on the table here,**

11  **it looks like a red well labeled "Rountree." I guess this is**

12  **your file.**

13  A. Yes.

14  **Q. Do you mind if we go through it and see what is in**

15  **there?**

16  A. Fine, if you like.

17  **Q. Thanks.**

18  Okay, now, I see -- I believe that there is a manila

19  folder in here. I'm describing this for you. There is an

20  outgoing correspondence and incoming -- or there is no incoming

21  correspondence, but there is the file for it. Legal notices,

22  which appears to be expert reports filed by the Defendant, your

23  deposition notice, and what looks like an invoice.

24  There are exhibits, which is empty; notes, which is

25  empty; and it looks like some sort of loose items here. I'll

**Page 8**

1  start with the loose items, if that is okay. Something dropped

2  out. Okay. There is also a CD in here that is labeled "Peter

3  Rush deposition," I assume, that there is -- is this a video of

4  the deposition of Mr. Rush?

5  A. No.

6  **Q. It's a transcript on CD?**

7  A. Yes.

8  **Q. And does that include the exhibits as well?**

9  A. No.

10  **Q. Did you read Mr. Rush's deposition?**

11  A. Yes.

12  **Q. The first -- there is -- again, I'm going through the**

13  **loose folder in the file here. I see this seems to be a letter**

14  **to Mr. Bauermeister, a copy of a letter to Mr. Bauermeister,**

15  **asking for a signed contract and stating that you received the**

16  **WCMA's expert reports, and then behind it is the expert reports;**

17  **is that correct?**

18  A. Yes.

19  **Q. There is a -- what looks to be an e-mail from Chuck**

20  **Ray, an attorney in this case, to you, dated October 10th, 2007,**

21  **asking -- telling you you need to produce expert reports by the**

22  **end of the month.**

23  A. That's apparently what it says, yes.

24  **Q. Okay. This appears to be a bunch of documents --**

25  **substantive documents related to the case; is that true?**

**Page 9**

1  A. Yes.

2  **Q. There are some court documents -- let's put these**

3  aside, as well.

4  Actually, Dr. Jacobson, is this the sum of your

5  reliance material in this case?

6  A. Yes.

7  **Q. So I know that on your expert disclosure you listed**

8  all the documents you relied on. Is that coextensive with this

9  or should be?

10  A. I hope that is correct, yes. I had those digitally.

11  And except for the deposition, I printed everything out so you

12  can put your hands on it.

13  **Q. Thank you.**

14  A. And I didn't bring a computer so we could --

15  **Q. That's perfectly fine.**

16  A. The deposition was only done digitally over the

17  Internet.

18  **Q. And we'll look at those later if that is okay.**

19  I'm looking at the file called "Outgoing

20  Correspondence." This is a fax from you, Dr. Jacobson, to Chuck

21  Ray, and it's a PDF of your report. That's the report that was

22  filed in this case?

23  A. Yes.

24  **Q. Okay. And legal notices is the only other file that**

25  has material in it.

ATKINSON-BAKER, INC. COURT REPORTERS

(800) 288-3376

JON O. JACOBSON, Ph.D.    FEBRUARY 1, 2008

1    I presume when you open up a new matter that you
2  create a bunch of files that might normally include a
3  standard --
4        A. There is a standard set of folders that go into that,
5  yes.
6        Q. So you do that before you actually have materials, and
7  as things come in, you put them in the proper file, hopefully?
8        A. Well, sometimes I get things before I have a signed
9  contract.
10        Q. Okay.
11        A. So I have to wait for the contract to arrive and
12  things, so I can't necessarily say I followed that exact process
13  that you had before.
14        Q. Okay.
15        A. So I don't create a file until I have a signed
16  contract.
17        Q. Okay. Is it fair to say that the fact there are file
18  folders that don't have any material in them doesn't reflect
19  that there was something like that? That's just the --
20        A. No, just my standard. My secretary just makes a
21  folder, puts those folders in. Through the course of the case,
22  I put them back in the right place. They just go into the
23  overall folder.
24        Q. And I see there are paper-clipped together a single
25  invoice or a set of invoices in this case. Let's look at those

Page 10

1  real quick. I'll try to keep your filing together. I don't
2  want your secretary to get mad at me.
3        There is an invoice from -- well, gosh, two days ago
4  here to Mr. Bauermeister which says, "From December 1st, 2007:
5  Transfer remaining invoices due from Ray Rountree case."
6        That is $3,100. And then look here. I see that your
7  total -- is the 4,050 that is referenced here the total amount
8  you've been paid in this case or have invoiced in this case?
9        A. Probably.
10        Q. I see $1,000 subtracted. That reflects a prior
11  payment?
12        A. That may be a retainer that I had against
13  Mr. Bauermeister.
14        Q. Let's mark this, please, as Exhibit 2.
15        (Exhibit No. 2 marked for identification.)
16        Q. (By Mr. Weiss) I see, here is a signed contract that
17  is dated 12-31-07.
18        A. Sure.
19        Q. That is subsequent to the time you issued your expert
20  report; is that correct?
21        A. Yes.
22        Q. So you actually issued the report before you had a
23  contract?
24        A. No. Charles Ray was the original attorney that I
25  dealt with on the case, and because of health reasons he

Page 11

1  turned -- apparently turned over the major effort to Don
2  Bauermeister, as I understand.
3        Q. Okay. So that is a contract that essentially is with
4  Mr. Bauermeister replacing Mr. Ray?
5        A. As I understand it, from my end of it.
6        Q. Okay.
7        A. Here in Seattle.
8        Q. Okay.
9        MR. BAUERMEISTER: Gentlemen, this is Don Bauermeister
10  again.
11        I believe you know that Ray has suffered a probably
12  permanent and almost complete loss of hearing, and that is
13  what -- he's still involved in the case, as obviously am I, but
14  that's what necessitated, really, my office becoming the full
15  coordinator for this case instead of Mr. Ray's combination
16  involvement. He cannot hear anymore. It's difficult for him to
17  take phone calls. That's what happened.
18        MR. WEISS: Thank you, Don.
19        Q. (By Mr. Weiss) Let's look again real quick at the
20  deposition notice. I'm looking at some of the things we asked
21  for. That reflects all the correspondence you've had with
22  Mr. Ray or Mr. Bauermeister?
23        A. I think so, yes.
24        Q. It also asks for all materials provided you by
25  Plaintiffs' counsel. Is that the reliance materials you have

Page 12

1  listed here?
2        A. As far as I know, yes. When I had the file, I asked
3  my secretary to print those out last week.
4        Q. So the stack that's in front of me here, this is not a
5  subset of what was provided to me. This is the material that
6  was provided to you?
7        A. As far as I know, yes. I did my best to do that.
8        Q. Okay. We also asked for all drafts and outlines of
9  your expert disclosure. There is none of those that exist?
10        A. The draft gets overwritten while I'm doing the report,
11  so I don't know how to -- it's erased and gone.
12        Q. There are no notes that you used in preparation of the
13  report?
14        A. No.
15        Q. We talked about No. 2, all materials referenced in
16  your expert disclosure, all documents created by you or your
17  behalf related to the hazards of cords on window-covering
18  products. None of those?
19        No documents that indicate any advocacy or
20  investigation or research into the hazards report?
21        A. No.
22        Q. And we've already gone through the invoices. The last
23  item is your most recent CV. You've attached a CV to your
24  current disclosure. Is that current?
25        A. Yes.

Page 13

4 (Pages 10 to 13)

A20080F

**JON O. JACOBSON, Ph.D.    FEBRUARY 1, 2008**

1  Q.  Can we use that today?
2  A.  That's fine.
3  Q.  Let's look at that real quick.  I have a copy of it
4  here.
5      (Exhibit No. 3 marked for identification.)
6  Q.  (By Mr. Weiss) Dr. Jacobson, this is your most recent
7  CV?
8  A.  That's since last time I updated it.
9  Q.  Is there anything on it that has changed or we should
10 notice?
11 A.  There probably could be, but I haven't gone over it.
12 Q.  Okay.  I take it there is nothing.
13 A.  I should update it with some things, but it's fine.
14 It covers my background.
15 Q.  There is nothing that you would add on to it that you
16 think would be relevant --
17 A.  It's fine.
18 Q.  -- to this case?  Okay.
19     Now, I guess I would like to focus on the bottom of
20 the first page.  It says, "Professional experience."
21 A.  Yes.
22 Q.  And, again, I understand there may be some new items,
23 but this is a list of the experience you have professionally?
24 A.  Yes.
25 Q.  And I counted it last night, and I came up with

Page 14

1  24 items.  I know you may not know that, but does that sound
2  fair?
3  A.  I've done a lot more things than that.  Some are
4  summary, some are specific.
5  Q.  I'm not saying you've only done 24 jobs.  I'm saying
6  there are 24 items listed.
7  A.  That's fine, sure.
8  Q.  Have you ever had any experience with window blinds,
9  professional experience with window blinds?
10 A.  No.
11 Q.  Any experience with a product that is linked to
12 strangulation?
13 A.  I have had experience with litigation with
14 strangulation cases but not specifically a product, per se.  I
15 have had one product, yes.  Others have been strangulations due
16 to other entanglements with cord-like devices.
17 Q.  Well, let's talk about the first one when you said
18 there was experience with a product that was linked to
19 strangulation or strangulation hazard.
20 A.  Yes.
21 Q.  What was that?
22 A.  Seatbelts in automobiles.
23 Q.  And are you saying that you had experience in a matter
24 that dealt with strangulation by seatbelts, or are you saying
25 that seatbelts in theory could cause --

Page 15

1  A.  No.  I have had vehicular collision cases where the
2  seatbelt resulted in a strangulation death.
3  Q.  And did you offer an opinion in that case?
4  A.  As of today, I have not been asked to comment on that,
5  although that was the method -- that was how the fatality
6  occurred in the accident.
7  Q.  Is that matter still ongoing?
8  A.  I think so.
9  Q.  What about -- you said there were some that were not
10 product-related?
11 A.  Well, they were -- yeah.  There was some -- I'm
12 recalling right now a strangulation having to do with some
13 playground equipment that had some ropes on it that resulted in
14 strangulation.
15 Q.  Was that also in litigation?
16 A.  Yes.
17 Q.  Did you offer an opinion in that case?
18 A.  Yes.  But I haven't been deposed or it hasn't gone to
19 trial as far as I know.
20 Q.  Has your opinion been disclosed in the expert report
21 or some analogous format?
22 A.  Possibly.  Except that the attorney I was working for
23 has been appointed as a judge, and he gave the case to someone
24 else.  So I'm waiting for that to take place.
25 Q.  Okay.  Can you tell me roughly what you were asked to

Page 16

1  offer in that report or what you decided to offer in that
2  report, depending on what stage it is in?
3  A.  I was offering the mechanism as to how the loop
4  occurred that ensnared the head and neck of a young boy.
5  Q.  And what was your opinion?
6  A.  That it was very likely that this rope on a flagpole
7  attached to playground equipment would produce a large enough
8  loop that could readily capture somebody's chin, neck and head
9  and result in strangulation.
10 Q.  This is a rope on a flagpole, and the rope was
11 attached to flagpole equipment?
12 A.  Correct.  And it was an old rope that became very
13 stiff so it formed a hanging loop that was large enough to catch
14 something.
15 Q.  Is part of your opinion in that case that that danger
16 should have been known to the owner of the equipment or the
17 manufacturer of the equipment or whoever the defendant may be?
18 A.  Should have been known to somebody.
19 Q.  Okay.  Do you have any experience with strangulation
20 hazards outside of litigation?
21 A.  No.
22 Q.  Let me back up, then, a little bit.  Is litigation
23 consulting your only business?
24 A.  No.
25 Q.  What is your other business?

Page 17

A20080F

**JON O. JACOBSON, Ph.D.    FEBRUARY 1, 2008**

1    A.   Well, not on my résumé was a major job I had over the
2   last two years rebuilding the monorail in Seattle for a couple
3   events that occurred.
4    Q.   I guess sometimes you work as a nonforensic engineer;
5   is that fair to say?
6    A.   I have done a lot of nonforensic work, yes.
7    Q.   How would you describe the split in your job?  What
8   percentage is forensic-related and what, for lack of a better
9   word, is straight engineering?
10    A.   As of this year, it was 100 percent forensic, because
11   I had a major job that took up virtually all of January.  And
12   prior to the problems with the Seattle monorail, my forensic
13   work was becoming virtually my entire professional income.  And
14   then that went to virtually nothing for a year and then last
15   year it was the process of reestablishing contacts with people.
16    Q.   Excluding the monorail job, looking back, how long ago
17   would you say the forensic engineering became a predominant part
18   of your work?
19    A.   Well, I kind of tried to see what the percentage was.
20   When I started 30 years ago, it was not at all except for one
21   case that I carried over from my last employer.  And it sort of
22   grew a few percent a year to the point, by the time I had been
23   in business 30 years, it was probably 90 -- over 90 percent of
24   my business until a few years ago.
25    Q.   So, say, ten years ago in 1988 -- sorry, I wish --

Page 18

1   1998, were you predominantly a litigation --
2    A.   It would have been more than that.
3    Q.   Okay.  And so when I look at the list of items on your
4   professional experience -- and I'll just read some as an
5   example:  "Testing of automobile brake performance, microwave
6   oven malfunction," is there a way to distinguish -- I guess I
7   should ask:  Are any of these litigation-related?
8    A.   A good share of them are.
9    Q.   I'm not going through them all, but some of these are
10   in the context of litigation and some might be in the context of
11   just being in engineering?
12    A.   Yes, some are engineering.  Some are failure analysis
13   engineering that are not related to litigation.
14    Q.   Okay.
15    A.   So I have rebuilt plants; I have helped companies
16   remanufacture, rebuild, redesign things.
17    Q.   So is some of your nonlitigation work in designing
18   products as opposed to projects like the monorail or a plant?
19    A.   I have not designed commercial products, per se, but I
20   have worked with large firms redesigning -- or repairing and
21   upgrading their equipment under various conditions would be a
22   better statement.
23    Q.   Okay.  When you say "equipment," does that mean the
24   equipment they use in their business as opposed to equipment
25   they put out for sale or make for sale to the public?

Page 19

1    A.   Yes.  Well, it could be production equipment.  Part of
2   their process -- it could be machinery used in their business;
3   such as in a marine environment, there is shipboard equipment.
4   There are materials-handling equipment.  And so therefore it's
5   not something that they're selling commercially but something
6   they use themselves.
7    Q.   And in the list of experience, again -- or, actually,
8   let's go broader, whatever might be your experience.  Please
9   don't limit it to the list on your CV.
10       Have you ever dealt with, designed, wrote, created
11   warnings or warning labels?
12    A.   I have.
13    Q.   Tell me about that, please.
14    A.   Well, I've done that in the context of litigation
15   before.
16    Q.   Okay.
17    A.   But not for a firm, for their products.
18    Q.   Thanks for clarifying that.  You've never
19   prospectively designed or written or otherwise created a warning
20   for a client?
21    A.   Yes.
22    Q.   And that means you never have done that?  I know there
23   was a double negative in my question.
24    A.   Yes.
25    Q.   But you have done it in the context of litigation?

Page 20

1    A.   Yes.
2    Q.   Have you ever assisted or consulted or in any way
3   helped develop a safety standard?
4    A.   I have been on the NFPA committee for recreational
5   vehicles for a number of years.  And I'm not sure if that is a
6   safety standard, but it was the fire and life safety standard
7   that I was writing, so I guess that would be called a standard.
8    Q.   What is the NFPA?
9    A.   National Fire Protection Agency.
10    Q.   That was a standard that was -- was that meant to
11   guide behavior or some sort of manufacturing?
12    A.   That was to guide the manufacturing of recreational
13   vehicles.
14    Q.   What do you mean when you say "recreational vehicles"?
15    A.   Those are vehicles that are driven on the roadway that
16   can be driven to a campsite and you can live in them.
17    Q.   So we're talking Winnebagos, Air Streams, campers?
18   I'm not trying to limit your work, but am I thinking of the
19   right type of...?
20    A.   That's the kind of -- I'm not sure if Winnebagos are
21   drivable.  No, Winnebagos are drivable.  Air Streams are --
22    Q.   I am sorry.  I guess I need to hit the road.
23    A.   So I didn't do trailers.  I did propulsion.
24    Q.   Are these -- is this a standard that is mandatory for
25   manufacturers to follow?

Page 21

A20080F

JON O. JACOBSON, Ph.D.    FEBRUARY 1, 2008

1    A. Yes.

2    Q. Who makes it mandatory? Who is the agency that

3 enforces it?

4    A. Well, it was done through NFPA, and it's probably

5 adopted by ANSI.

6    Q. Were you involved in the ANSI process at all?

7    A. I was only working through NFPA.

8    Q. So did you write the standard or assist in writing the

9 standard?

10    A. I assisted in several versions of it over a period of

11 15, 20 years.

12    Q. Were there several different versions?

13    A. Every few years it's updated.

14    Q. And were there -- was there a government agency that

15 was involved? Or I guess I should ask: NFPA, is that a

16 government agency?

17    A. I don't believe it's a government agency. It's

18 independent.

19    Q. Was there a government agency or staff from a

20 government agency involved in NFPA?

21    A. I don't think NFPA was involved.

22    Q. Any others that you can think of?

23    A. I don't remember. I primarily remember manufacturers

24 and manufacturers' associations.

25    Q. You said it was a mandatory standard.

Page 22

1    A. I don't know if it's mandatory, but it's what they

2 build to.

3    Q. Do you know if there is an inspection or certification

4 or anybody to make sure that it's being followed?

5    A. There were inspectors that used that, as I understand,

6 in various states to monitor the building of recreational

7 vehicles.

8    Q. Did NFPA inspect vehicles to certify that it --

9    A. No.

10    Q. Okay.

11    A. There were State inspectors that would -- as I

12 understand, that would inspect for each state.

13    Q. Would the State essentially adopt the standard as its

14 requirement, do you know?

15    A. Probably, universally so. They wouldn't write their

16 own.

17    Q. Okay.

18    A. But they could if they wanted to.

19    Q. I'm sorry, who could?

20    A. The State.

21    Q. I'm sorry.

22    A. The State could decide that they thought this other

23 organization needed some help, and they could, you know, proceed

24 to write their own if they chose to do so.

25    Q. Okay. Thank you for talking about that.

Page 23

1    Q. Let's go on now to your expert report, which I also

2 have a copy of here.

3    (Exhibit No. 4 marked for identification.)

4    Q. (By Mr. Weiss) This is your disclosure in the case.

5    A. I'm sorry.

6    Q. This is your disclosure or a copy of it?

7    A. This is a copy of my report. It was a statement by

8 you. I didn't think it was a question. If you want to phrase

9 it differently -- I want to answer a question. I thought you

10 were handing it to me and telling me what it was.

11    Q. That's perfectly fair.

12    What I'd like you to do is look at this. It's not

13 particularly long, so hopefully this should go -- but I would

14 like you to, if you could, tell me what opinions you intend to

15 offer in this case.

16    A. Well, the manner in which the Window Manufacturers

17 Association functions to guide research develop, the hazards

18 associated with the product appear to be limited in their own

19 effort unless dictated by the government agency, the Products

20 Safety Commission. There appears to be no safety studies,

21 engineering studies, engineering safety studies that were

22 developed by the Window Manufacturers Association or the safety

23 council, other than in response to the Consumer Product Safety

24 Commission.

25    I'm not sure how you would want to put the spin on

Page 24

1 encouragement, but it was at their direction whether it be a

2 mandate, a threat or a hint. But it appeared that nothing

3 happened until the Consumer Products Safety Commission was on

4 the scene with the prospect of reducing the hazard of

5 strangulation with window coverings, which had hanging cords and

6 internal cords as part of their function.

7    Q. Are there other opinions?

8    A. The design of window coverings that did not initially

9 include cord stops as part of the design was very slow in

10 coming, and the information that would have been available was

11 only done as a consequence of the data collected by the Consumer

12 Product Safety Commission.

13    The Window Manufacturers Association appeared to be

14 lacking in their accumulating of this data that would show the

15 existence of a hazard in the use of application, installation of

16 window coverings that included cords.

17    That kind of covers it.

18    Q. Certainly I'm not here to limit you to those. If you

19 come up with anything else during the course of the deposition,

20 please let me know. I'm just trying to sort of focus the

21 questions a little bit.

22    Well, let's look at the first one, and please tell me

23 if I'm misstating it. It's the matter in which the WCMA went

24 about dealing with window blind safety was limited and dictated

25 by the CPSC?

Page 25

JON O. JACOBSON, Ph.D.    FEBRUARY 1, 2008

**Page 26**

A. Well, they apparently had no function in that area until CPSC had taken on as a task to have the hazard addressed.

Q. Let's go with the first question, then. Should the WCMA have addressed that before the CPSC brought it to their attention?

A. If they're representing an industry that presents a product that is hazardous to the public, it should be something that they are aware of. And there was no awareness of the existence of strangulation hazards in the WCMA operation, as I believe Mr. Rush stated in his deposition.

Q. When did WCMA become aware of the risk of strangulation?

A. From Mr. Rush's deposition, I think somewhere within the mid-'90s, probably in 1994, although there was, I believe, some other information communicated to them probably earlier.

Q. What do you mean when you say "earlier"? I know what earlier meanings. What time are you talking about?

A. They may have known earlier, but there is no record of their having any information, as I understand.

Q. We've talked a bit about it before that you've had experience with NFPA?

A. Yes.

Q. That's not a trade association of manufacturers; is that correct?

A. I don't believe so.

**Page 27**

Q. Does every trade association -- and I'm not talking about individual manufacturers, I'm talking about a trade group. Does every trade group have an obligation to be aware of safety issues involving products that its members make?

A. I would certainly hope so.

Q. Does it matter what the function of the association is?

A. I would think that they should be aware of it. I would think that that would be a responsible part of the knowledge base to understand the hazards.

Q. And how would a trade group go about finding this information out?

A. The members should have that as part of their knowledge base, and the overall organization should assist -- it would seem like assist in concert to have the product as presented to the public for safe sale, merchantability. If they can't do it at home, they should be doing it in cooperative organization.

Q. I'm not sure that answered the question. How should a trade association find out about possible safety risks?

A. I think their best function is to present a safe product to the general public. And if they're part of an overarching organization, they should be aware of it and assisting the members to reduce the risk, hazard, danger to the public. So they should accumulate the information.

**Page 28**

Q. I understand that, but my question is: How should they go about finding out about it? If I'm involved in the national widget society, how would I find out if there are any risks with widgets?

A. They would take the data that comes to them or take the data from their organizations and have essentially a clearinghouse for that data and discuss that.

Q. Why would the data come to them?

A. Because it's going to be a universal problem to all the manufacturers of the product.

Q. What if this data is not brought to them?

A. That's not a proper function on the part of the organization or the members.

Q. Let's break that up. Am I correct that you're saying that the manufacturers have an obligation whenever -- any manufacturer has an obligation, when it learns about a potential safety issue with its product, to bring it to the attention of whatever trade group it might belong to?

A. Right. And the trade group has an obligation to seek that out to make sure that the product is safely marketed to the general public.

Q. And should seek that out from its members?

A. Sure.

Q. Should it call them every year and say, "Any safety issues?" How should they do it?

**Page 29**

A. If they have an organization that is meeting, those are going to be things that they should be discussing responsibly. In my involvement with NFPA, there were problems that arose in the manufacture of recreational vehicles that became common problems for all in the industry. And I'm not sure that there was something that was done, but they were all reported and the Recreational Vehicle Association was aware of those problems in general to all the members.

And I don't know that there was a procedure, per se, but when they got together, everybody had common problems in the area of the risks and hazards that were associated with the product. And to eliminate that issue from part of their operation appears to be a major lacking point.

Q. When did -- do you know who the members of the -- if I say WCMA, you understand that to be the Window Covering Manufacturers Association; is that fair? Just to make it easier.

A. Well, you've identified two things. You have the WCMA and then you asked me about the Window Covering Association, which is the WCA, if I had that acronym. So those are two different groups, the WCA and WCMA.

Q. I am sorry. I certainly didn't mean to ask you about the Window Covering Association. I'm talking about the Window Covering Manufacturers Association.

A. Well, you said Window Covering Association.

8 (Pages 26 to 29)