# E$^x$ponent®
*Failure Analysis Associates®*

December 3, 2007

Michael L. Weiss, Esq.
King & Spalding LLP
1180 Peachtree Street
Atlanta, GA 30309

Subject:  Rountree v. Window Covering Manufacturers Association, et al.
          Project No. 703376

Dear Mr. Weiss:

I am writing to summarize the work undertaken by Exponent® Failure Analysis Associates (FaAA) in connection with human factors issues in the above-referenced case and the preliminary conclusions reached on the basis of work to date.

I received a Bachelor's Degree in psychology with Distinction and Honors from Stanford University and hold a Ph.D. in experimental psychology also from Stanford University. I am a Principal Scientist and Director of the Human Factors Practice at Exponent. My work with Exponent includes the analysis, evaluation, and development of safety information for many different products. I have written extensively on the topics of safety information and warning label development. I have studied the area of human information processing, including the specific context of processing safety information associated with products. Much of my work focuses on child safety. As part of that work, I analyze the developmental abilities and limitations of children at different ages and the ways these impact how they engage in activities and use products in different environments. I investigate the accident patterns that are unique to children and the effectiveness of strategies used to reduce child injury. I have also applied risk analysis for the purpose of making decisions about the content of safety messages, measuring the effectiveness of warnings, and guiding decisions about product design. In the 1993-1994 time frame, I conducted studies to examine various issues involving child strangulation associated with window covering cords.

A copy of my resume is attached. Also included is a listing of depositions and trial testimony for the past four years. My billing rate is $365 an hour. A list of the materials I have reviewed to date is also included.

EXHIBIT 56

Michael L. Weiss, Esq.
December 3, 2007
Page 2

Based of the review of the depositions of Valerie Rountree, Christopher Cox, Ilene Rountree, and Paul Rountree, and the Anchorage Police Report, I have the following understanding of the incident:

> According to the testimony of Valerie Rountree, on the morning of May 27, 2002, Ms. Rountree and her two daughters, April Cox (DOB: 03/29/2001) and Morgan Schediwy (DOB: 06/06/1996), were at the home of Ms. Rountree's parents, Paul and Ilene Rountree, where they were living. According to the testimony of Mr. Rountree, as well as diagrams and photographs accompanying the police report of the incident, Morgan and April's bedroom contained a bed and a crib, and had a window on one wall; the crib was positioned against the wall containing the window. While Ms. Rountree, Mr. Rountree, Mrs. Ilene Rountree, and Mr. Cox indicate that the window was covered by a set of horizontal blinds, their testimony does not conclusively identify the date or location of purchase or the date of installation.

> Ms. Rountree testifies that, on the morning of May 27, 2002, April woke up around 8:30 a.m., at which time she gave April her bottle, changed her diaper, and left the room after returning April to her crib. Ms. Rountree testifies she then lay down and went to sleep in an adjoining room around 9 a.m. At approximately 10:15 a.m., Ms. Rountree awoke when she heard Morgan turn on the TV after entering the room. Ms. Rountree asked Morgan if April was still sleeping and Morgan replied that April "got herself stuck in the corner of her crib, and she passed out." Ms. Rountree testifies she went into April's room and found April unresponsive in the corner of the crib nearest the window. Emergency personnel transported April to the emergency room, but she did not survive her injuries. According to the autopsy report, available information indicated that a blind cord had encircled her neck.

In the present instance, it is alleged that the subject blinds were defective because the "inner cord" of the blinds could be pulled to create a loop, which could pose a strangulation hazard to young children. It is further alleged that this hazard was known or should have been known by the Window Covering Manufacturers Association (WCMA) and that the warnings associated with this product were insufficient to inform consumers as to this known hazard.

To evaluate the present case it is necessary to consider 1) available knowledge pertaining to hazards posed to children by window covering cords at different times; 2) scientific understanding of the development and communication of safety information; 3) human response to safety information; and 4) behaviors of the Rountrees and Mr. Cox. Human factors is the scientific study of the limitations and capabilities of people as they interact with products, systems and equipment in their environments. The application of human factors to a particular incident considers the interaction between a person, a product, and a specific environment and how this interaction is influenced by a human's abilities, limitations, perception, knowledge, and patterns of behavior.

Michael L. Weiss, Esq.
December 3, 2007
Page 3


Government agencies such as the National Highway Traffic Safety Administration, the Federal Aviation Association, the National Transportation Safety Board, the Consumer Product Safety Commission, and the Food and Drug Administration acknowledge the role of human factors in design and evaluation, and employ human factors professionals. The military, aviation, automotive, and space programs have a long history of performing and incorporating human factors research into the design of systems and standards related to such design. These agencies and administrations strive to incorporate a scientific understanding of both the capabilities and limitations of human behavior into safe use and design of products and environments, including the ability to influence safety-related behaviors based on known patterns of injuries and risk, and the communication of this information.

Based on my review of relevant case materials, and my education and experience, I have determined the following:

**Identification of Hazards Associated with Window Covering Cords and WCMA Response**

In 1981, CPSC staff conducted an extensive review of available information regarding consumer-product related accidental ligature strangulations of children less than five years of age (Rutherford & Kelly, 1981). The investigators identified 298 such strangulations in the period from 1973 to 1980, based on CPSC in-depth investigations, consumer complaints and news clips, death certificates, and other files. Among the cases identified were 41 fatalities associated with window covering cords. The report noted that most cases specifically referenced that a child was in a crib at the time of the incident.

Taking this report into consideration, CPSC staff attempted to identify ways in which hazards associated with ligature strangulations could be addressed. The subsequent reports, however, suggested that potential design changes would likely not be effective with regard to window covering cords. Halupka (1981) identified window covering cords as an example of a product "not addressable by Commission action since they either are not intended for children or cannot be changed to reduce the hazard without drastically diminishing the utility" (p. 5). Similarly, Rogers (1982) reported drapery or blind cords to be among products that "do not appear amenable to product design changes or elimination as a potential strangulation risk" (p. 2). The report further stated, "...increasing consumer awareness of the hazard appears to be the only viable approach" (p. 7).

Consistent with this interpretation of available data, ensuing efforts focused on increasing consumer awareness of the potential hazard. In December of 1985, a release by the CPSC and the AWCMA (the previous name for the WCMA) warned of the danger of child strangulation associated with window blind or drapery cords. The opening sentence of the release specifically mentioned that the concern was related to "pull cords." The release stated, "Most of the children were under two years of age and were in cribs which had been placed near window covering

Michael L. Weiss, Esq.
December 3, 2007
Page 4

pull cords. Other victims were children who were not in cribs, but who were playing with the cord." Suggested means of keeping cords out of children's reach included using clamps or clothes pins, cleats, or tie-down devices, or tying the cord to itself. Following this alert, Mr. Peter Rush, senior advisor to the WCMA, testifies that a number of companies voluntarily began putting warning labels on their products. These labels employed language and a pictogram based on those used in the CPSC release.

In the early 1990's, studies were conducted by myself and others at Exponent to evaluate cord management alternatives and to quantify child strangulation risk. Our findings were provided to the WCMA and the CPSC for their consideration. Additionally, Exponent has examined a number of CPSC in-depth investigations of fatal child strangulations associated with window coverings occurring between 1988 and 1991. None of the 28 records reviewed clearly identified an inner cord as the component associated with the strangulation.

Mr. Rush testifies that the WCMA, along with a number of other companies, met with CPSC in 1994 and discussed a corrective action program, including the submittal of an education program, which was approved by CPSC. At this time the Window Covering Safety Council (WCSC) was formed.

CPSC announced a program to address child strangulation from window covering cords in October of 1994. The announcement noted that the program consisted of three parts: (1) installation of safety tassels to improve the safety of existing window coverings, (2) modifying future production, and (3) implementation of an educational campaign, including product alerts in packaging, brochures, and posters. The release further included the recommendation that one should "Never place a child's crib within reach of a window blind." While the 1985 release had suggested to "Wrap or tie the cord to itself," the new release stated, "CPSC recommends against knotting or tying the cords together because this creates a new loop in which a child could become entangled." In 1995, newly manufactured two-corded horizontal window blinds no longer had pull cords ending in loops.

*ANSI/WCMA A100.1 1996, American National Standard for Safety of Corded Window Covering Products*, was approved in November of 1996. This standard, developed in cooperation with CPSC, addressed the use of various devices and components to reduce the possibility of injury, including strangulation. It further specified the use of warnings, including bottom rail labels and hang tags, related to potential hazards to young children. Mr. Rush testifies CPSC's human factors division was involved in the construction of these warning labels. As evidenced by published reports and my own independent investigation into the strangulation hazards associated with window coverings, the information available during the time of the development of the 1996 standard was not sufficient to identify the "inner cord" as posing significant strangulation hazard.

Michael L. Weiss, Esq.
December 3, 2007
Page 5

In 1997, the *Journal of the American Medical Association* printed an article co-authored by a CPSC employee, which reviewed pediatric window-cord strangulations in the United States from 1981 to 1995 (Rauchschwalbe & Mann, 1997). CPSC (1997) characterized the study as "the first study to so thoroughly investigate how these deaths occur." The analysis considered data from 4 different CPSC data sources, including death certificates, in-depth investigations (INDP), the Injury or Potential Injury Incident (IPII) file, and the National Electronic Injury Surveillance System (NEISS). The article identified the specific window-covering component implicated with reported injuries: pull cords (88%), slat strings (7%), bottom horizontal cord (3%), and torn curtain fabric (2%). Based on accident investigations, two injury scenarios were identified as common: "(1) infants in cribs near windows may become entangled in drapery pull cords while sleeping or playing, or (2) toddlers may be suspended from pull cords after jumping or falling from furniture placed near a window" (p. 1697). Pull cords were clearly emphasized with regard to potential safety measures: "Measures can be taken to reduce mortality caused by window pull cords" (p. 1698).

In 1999, the CPSC began a new investigation of window blind deaths, an "extensive review" in which it "found that children could also become entangled in the inner cords that are used to raise the slats of blinds" (CPSC, 2000). CPSC contacted WCSC, which in turn provided a corrective action plan that CPSC accepted.

CPSC and WCSC announced a recall to repair window blinds, specifically intended to address the possibility of inner cord loops, in November of 2000. The release reported that CPSC had received reports of 130 strangulations involving cords on window blinds since 1991, of which 16 involved inner cords. A toll-free number and web address for the WCSC were provided to assist consumers in obtaining free repair kits for existing blinds. The release noted, "the industry has further redesigned window blinds. Newly manufactured blinds have attachments on the pull cords so that the inner cords can't form a loop if pulled by a young child." A revision to the ANSI/WCMA standard was approved in August of 2002. This revision incorporated requirements specific to inner cords and updated the warnings and safety information to be provided.

Mr. Statler asserts that "even the most casual review of the available in-depth investigations, and literature on the subject" would have revealed risk associated with inner cord strangulations (p. 13). However, prior to 1999, the CPSC's own public releases and reviews of available data repeatedly emphasized pull cords as the primary area of concern. Indeed, the WCMA's actions have been commensurate with available knowledge at the time. In the mid-1980's, when CPSC analyses had suggested that increasing awareness was the "only viable approach" to preventing child strangulations, the AWCMA joined in approaches targeted at informing consumers of potential hazards. In the mid-1990's, design changes and retrofit kits focused on hazards associated with pull cords, which comprised a considerable majority of incidents that had been identified. After CPSC recognized hazards related to inner cords in 1999, the WCMA-sponsored standard was amended with increased emphasis on this issue. Although official approval of the

Michael L. Weiss, Esq.
December 3, 2007
Page 6

ANSI/WCMA standard took place in 1996 and 2002, certain design changes were in fact incorporated by the industry more than a year before both of these dates.

In his report, Mr. Statler claims that the 1996 standard lacked "any warning, or any reference at all, concerning the documented strangulation risk associated with the looped, inner cord" (p. 10) and that it "did not even recognize any risk at all associated with inner cord strangulations" (p. 13). Such claims are demonstrably false. In fact, the standard specified generic hang tags that included the statement, "Young children can strangle in the loop of pull cords, chain and bead cords, and cords that run through window coverings" (5.1.2).

Mr. Statler's assertion that WCMA had "unfettered discretion to set product safety standards" (p. 13) fails to recognize the process employed to develop the ANSI/WCMA standard. In his testimony, Mr. Rush describes a process that included provisions for public comment and review by a canvass committee made up of various types of representatives. CPSC has publicly noted their involvement in the development of this standard (e.g., Rauchschwalbe, 1997).

Indeed, in contrast to Mr. Statler's portrayal, multiple CPSC releases emphasize the collaborative nature of the actions undertaken with the WCMA or WCSC. For instance, in the 1994 release, CPSC Chairman Ann Brown claimed, "This collaborative effort... epitomizes how government and industry can work together to save lives." Indeed, the CPSC's website includes work with industry with regard to window pull cords among its "Success Stories" (CPSC, 1996).

**Safety Information Provided with the Product**

On-product safety warnings provide information for users relevant to reducing the likelihood of injury associated with window covering cords. On the bottom rail of the incident blinds, separated from other text and contained within a colored bounding box, is a safety alert symbol (an exclamation mark within a triangle), and the signal word "WARNING." To the left of the bounding box is an illustration of a child reaching for a window covering cord with a prohibition symbol (a circle with a diagonal slash), and to the right of the bounding box is the warning, "Young children can become entangled and strangle in cord or bead loops. Use safety devices to reduce access or eliminate loops." As indicated on the label, this information is consistent with *ANSI/WCMA A100.1-1996, American National Standard for Safety of Corded Window Covering Products*.

It is not known from what retailer or on what date the blinds were purchased. Although Mr. Rountree testifies the blinds were installed in the early 1990's and Mr. Cox testifies that Mrs. Ilene Rountree told him the blinds were purchased around 1994 to 1996, the warning label on the blinds suggests that they were manufactured after the adoption of *ANSI/WCMA A100.1*, approved in 1996.

Michael L. Weiss, Esq.
December 3, 2007
Page 7

The standard established by the Window Covering Manufacturing Association (WCMA) required additional warnings and safety information to have accompanied the product. For example, in addition to the safety information provided on the bottom rail of the blinds, the blinds would have come with a warning hang tag containing the following statements: "Young children can strangle in the loop of pull cords, chain and bead cords, and cords that run through window coverings. They can also wrap cords around their necks," and "To avoid strangulation and entanglement, keep cords out of reach of young children. Also, 1. Install safety devices that remove the cord loop or reduce access to cords, and 2. Move cribs and furniture away from window covering cords."

The warnings and safety information presented in *ANSI/WCMA A100.1* clearly communicate the hazards associated with window coverings posed to children. The standard calls for warnings relating to this to be incorporated in multiple locations. An on-product warning is located on the underside of the bottom rail, where it can be viewed without interfering with the aesthetics of the product as a user interacts with the product throughout its life. An obtrusive warning may interfere with the decorative nature of window furnishings and could encourage user alteration or removal. Additionally, a hang tag is included, removal of which would require user interaction, often at the time of installation or first use. The warnings at each of these locations were required to comply with standards relating to the format of warnings existing at the time of publication, and were developed with the assistance of human factors scientists employed by the CPSC. Indeed, the warnings required by *ANSI/WCMA A100.1* were adequate in terms of content and location given the knowledge of window covering cord hazards at the time of development.

**Behaviors that Violated Safety Information and Increased Chance of Child Injury**

The Rountrees and Mr. Cox failed to comply with safety information provided on the product and engaged in several unsafe practices. This pattern of behaviors makes it unlikely that any additional or alternative information would have changed the behaviors observed in the present instance.

Research on the effectiveness of warnings has shown that certain criteria must be met before information presented can affect and change user behavior (Ayres et al., 1994). The most basic premise of whether a warning will be effective necessitates that the user seek such information and, as a minimum, read it. Mr. Rountree assumes that he installed the blinds, but he doesn't remember ever seeing a warning label, nor does he remember hanging the blinds, getting the blinds out of the box, the instructions, or seeing a warning label. Mr. Rountree testifies that he would not necessarily have read the instructions that came with the blinds, as it was his practice only to do so if it looked difficult. Indeed, he testifies that he does not believe that he read the instructions on the box when installing other blinds throughout the house. Ms. Rountree also testifies that she did not see warnings on the blinds prior to the incident.

703376 A0T0 1207 CTW1

Michael L. Weiss, Esq.
December 3, 2007
Page 8

Despite not having read the warning accompanying the blinds, Ms. Rountree testifies that she had known of the hazard posed to children by the pull cord of blinds prior to the incident, stating, "I've always just known about it." Despite this knowledge, Ms. Rountree determined that April's crib should be placed next to the window, putting the blinds within reach of April. Additionally, Ms. Rountree testifies that even if she had seen the warning on the blinds, she would "probably not" have arranged the furniture any differently.

Though Ms. Rountree testifies that she had tied up the pull cord on the blinds in April's room so they were out of reach of the children because "it's an obvious danger," Mr. Rountree states that nothing was done to secure the cord of the window and that it was hanging straight down. Ms. Rountree also testifies that she did not attempt to tie other pull cords elsewhere in the house that would be accessible to children, and does not remember if her parents had done so.

Previous safety-related behaviors and violation of warned against activities on the part of Ms. Rountree make it unlikely that had any additional safety information been provided, it would have been followed. For example, Ms. Rountree testifies that despite having seen and being familiar with the warnings that accompany cigarettes, she currently smokes and testifies that she occasionally did so while pregnant. Ms. Rountree also testifies that she did not seek child safety advice or information from sources such as periodicals or websites prior to the incident.

Methods used by parents and caretakers to protect children from harm generally include providing supervision, controlling their environment (e.g., installing smoke detectors, adding child-resistant latches to cabinets, using baby gates), and teaching children safety rules (Morrongiello et al., 2004). Children whose caretakers fail to supervise or control the environment and merely rely on the children not to interact with hazards in the home have higher rates of injuries (Morrongiello et al., 2001). In this regard, Ms. Rountree was unsure as to whether electrical outlet covers were present in the home and doesn't remember looking for them, recalls that most of the cabinets did not have locks to deter child access, doesn't know if blocks were put on oven dials, and remembers that there was no lock on the toilet seat to keep it from being raised. Additionally, Mr. Cox testifies that objections he had concerning what he perceived to be a safety hazard in the girls' bedroom (sharp edges on Morgan's bed) were dismissed because Ms. Rountree wanted to keep it for the space underneath.

**Summary of Opinions and Conclusions**

In summary, I offer the following opinions to a reasonable degree of scientific certainty:

- The response of the WCMA in the mid-1990's to the identification of child strangulation hazards associated with window covering cords and the developmental process engaged in by the WCMA to address these concerns was reasonable given the accumulated knowledge about patterns of incidents related to these hazards.

Michael L. Weiss, Esq.
December 3, 2007
Page 9

- The warnings and safety information required by *ANSI/WCMA A100.1-1996* were reasonable in terms of content and location, reflecting the scientific understanding and state of knowledge of hazards at the time of its publication.

- The Rountrees and/or Mr. Cox did not read, seek, attend, or follow numerous warnings associated with the product in question and demonstrated a history of disregard for safety information. There is no scientific reason to believe that additional or alternative information would have elicited a greater degree of compliance.

- No additional or alternative safety information would have averted this incident. This incident could have been prevented if the safety information associated with *ANSI/WCMA A100.1-1996* had been read and followed.

It is my understanding that discovery is ongoing in this matter. I reserve the right to supplement this report and to expand or modify my opinions based on review of material as it becomes available. If you have any questions about this report, please do not hesitate to contact me.

Sincerely,

*Chris Wood*

Christine T. Wood, Ph.D.
Principal Scientist
Director, Human Factors
(650) 688-7134 Direct
(650) 328-2981 fax
cwood@exponent.com

703376 A0T0 1207 CTW1

Michael L. Weiss, Esq.
December 3, 2007
Page 10

## List of Materials
## Rountree v. Window Coverings Manufacturers
## 703376

- Summons in a civil case for Carolyn Jennings
  - Demand for trial by jury
  - Complaint
- Anchorage Police report (# 02-25880)
- Deposition
  - Valerie Rountree 04/27/06
  - Christopher Cox 04/28/06
  - Paul Rountree 07/27/05 (with exhibits)
  - Ilene Rountree 07/27/05
  - Peter Rush 02/16/06
- Photograph of bottom rail warning
- ANSI/WCMA A100.1 1996
- ANSI/WCMA A100.1 2002
- ANSI/WCMA A100.1 2007
- Report of Jon Jacobson
- CV and list of testimony for Jon Jacobson
- Report of Stuart Statler
- CV, list of testimony, and fee schedule for Stuart Statler

- Ayres, T. J., Gross, M. M., Wood, C.T., Horst, D. P., Beyer, R. R., & Robinson, J. N. (1994). What is a warning and when will it work? In K. R. Laughery Sr., M. S. Wogalter, & S. L. Young (eds.), *Human factors perspective on warnings: Selections from Human Factors and Ergonomics Society annual meetings 1980-1993* (pp. 1-5). Santa Monica, CA: Human Factors and Ergonomics Society.
- Halupka, S. W. (1981). *Analysis of string and elastic hazards to children* [CPSC memorandum]. U.S. Consumer Product Safety Commission.
- Morrongiello, B. A., Midgett, C., & Shields, R. (2001). Don't run with scissors: Young children's knowledge of home safety rules. *Journal of Pediatric Psychology, 26*, 105-115.
- Morrongiello, B. A., Ondejko, L., & Littlejohn, A. (2004). Understanding toddlers' in-home injuries: II. Examining parental strategies, and their efficacy, for managing child injury risk. *Journal of Pediatric Psychology, 29*, 433-446.
- Rauchschwalbe, R. (1997). Window covering pull-cords. *Consumer Product Safety Review, 1*(4), 7. Available online: http://www.cpsc.gov/cpscpub/pubs/cpsr_nws04.pdf

Michael L. Weiss, Esq.
December 3, 2007
Page 11

- Rauchschwalbe, R., & Mann, N. C. (1997). Pediatric window-cord strangulations in the United States, 1981-1995. *Journal of the American Medical Association, 277*, 1696-1698.
- Rogers, T. (1982). Briefing paper on alternative strategies to address accidental ligature strangulations of children less than five years of age. U.S. Consumer Product Safety Commission.
- Rutherford, G. W., Jr., & Kelly, S. (1981). *Special report: Accidental strangulations (ligature) of children less than 5 years of age.* U.S. Consumer Product Safety Commission.
- U.S. Consumer Product Safety Commission in-depth investigation reports.
- U.S. Consumer Product Safety Commission. (1985). *CPSC warns of the danger of children strangulation in window blind or drapery cords* [Release #85-069]. Available online: http://www.cpsc.gov/CPSCPUB/PREREL/prhtml85/85069org.html
- U.S. Consumer Product Safety Commission. (1994). *CPSC and industry redesign products to save lives* [Release #95-003]. Available online: http://www.cpsc.gov/CPSCPUB/PREREL/PRHTML95/95003org.html
- U.S. Consumer Product Safety Commission. (1996). *CPSC works with industry to save lives: Window pull-cords and strangulations.* Available online: http://www.cpsc.gov/CPSCPUB/PUBS/SUCCESS/cords.html
- U.S. Consumer Product Safety Commission. (1997). *The number of children who strangle in window cords has been under-reported according to a new study in JAMA* [Release #97-136]. Available online: http://www.cpsc.gov/CPSCPUB/PREREL/PRHTML97/97136org.html
- U.S. Consumer Product Safety Commission. (2000). *CPSC, window covering industry announce recall to repair window blinds: New investigation of children's deaths leads to redesigned window blinds* [Release #01-023]. Available online: http://www.cpsc.gov/CPSCPUB/PREREL/prhtml01/01023org.html