## UNITED STATES DISTRICT COURT

## DISCTRICT OF ALASKA

| | | |
|---|---|---|
| THE ESTATE OF APRIL LYNN COX, Et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | 3:04-cv-00112 CV (JWS) |
| WINDOW COVERING MANUFACUTERERS ASSOCIATION, | ) ) ) | |
| Defendant. | ) ) ) | |

### PLAINTIFF'S OPPOSITION TO WCMA'S MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF STUART STATLER

**I.    Introduction**

The WCMA motion to exclude the testimony of Stuart Statler broadly claims that the opinions Mr. Statler offers are unsupported in the record.  The factual background provided to support that claim is not even one page long.  (See, Motion Memorandum at pp. 3-4).  That is not a fair basis upon which to evaluate either the relevancy, reliability, or accuracy of Mr. Statler's opinions.  For that reason, plaintiff herein will set out a complete description of the factual record in this case as it has done so in its previously filed summary judgment.  The actual exhibits that support that description are attached.  (The hard copy provided to the court as a courtesy will contain one set of all the exhibits with a single numbering system for use in reference to all three of the opposition briefs now being filed).  The important record facts are shown below.

**II.    Document Record Facts**

The timeline of significant events in this case is as follows:

1.   4/7/90—AWCMA (WCMA predecessor) Board of Directors meet and get an update on the number of cases involving child strangulation from legal counsel Ira Marcus.  Minutes indicate: "Mr. Marcus mentioned the possibility of looking into a database of strangulation litigation cases and all present agreed that this was a good idea."  (Exhibit 1, p. 101)  (All page reference are to the large 3 digit numbers in lower right hand corner of all exhibits)  No such database was created (or at least not produced) in this litigation;

2.   8/14/90—Child strangulation death settlement reached for defendant manufacturer's failure to warn consumers about the danger of "support cords" where <u>inner cord</u> strangulation occurred of 20-month-old boy.  Case is reported in Product Safety and Liability Reporter.  (Exhibit 2, p. 003).  Case defendant claims this is the first incident resulting in an inner cord death.  Attorney calls the distinction spurious "noting that pull and support cords are actually two ends of one cord."  Attorney further notes CPSC study attributed six deaths to pull cords but didn't specify what cords are responsible for more than 70 other deaths. (p.004);

3.   9/5/90—Attorney Tony Griesbach (who represented a family of child strangulation victim in death settlement described in preceding paragraph) writes Peter Rush of the AWCMA and describes the inner cord death.  She informs Rush that "limiting warnings to 'pull cords' may be misleading."  She states "parents will be mislead into thinking that the pull cord is the only danger on the window covering when, in fact, all cords in window coverings are potential strangulation hazards to young children."  (Exhibit 3, p. 002).

4.      4/7/94—WCMA Membership meeting.  Minutes reflect 37 deaths in three years.
(Exhibit 4, p. 021).  New CPSC Commissioner wants action within two to three
weeks.  CPSC says warning is not enough since there has been no decrease in
deaths.  <u>CPSC is reportedly willing to forego promulgating a consumer product
safety rule with respect to future products based on WCMA's progress in devising
voluntary safety standard through ANSI</u>.  Rush notes two items in two weeks
have been recalled by CPSC.  Minutes note CPSC "has a large number of
weapons in its arsenal" including:  public notice of the defect, a recall, a repair, a
replacement order, or refund order for such products.  John Schnebly, of Comfort
Text Corp., is reported to believe "<u>all cordage is a problem.</u>"  (underline added).
(p. 022).  The summary of recommendation includes independent testing for
whatever products are produced in the future and an application to ANSI to begin
drafting a safety standard with respect to future products.  (p. 024);

5.      5/3/94—WCMA Technical Committee meeting minutes.  Peter Rush, Executive
Director, explains that the safety alerts developed by WCMA and CPSC were
released in '85, '89, '93.  Nevertheless, the number of deaths remains high.
(Exhibit 5, p. 025).  Rush notes the CPSC has made safety of window covering
cords a priority and is investigating corrective actions.  Rush emphasizes that if a
standard can be produced using ANSI, the CPSC will adopt it.  Rush notes
WCMA has applied for accreditation as a standards writing organization under
ANSI.  (<u>Id.</u>);

6.      5/10/94—CPSC identifies 118 deaths related to young children entangled in pull
cords between 1981 and 1991.  (Exhibit 6).  Deaths continue despite warning.

Public information release by Rush states WCMA Technical Committee will be involved in writing the standard. (p. 082). Article notes "CPSC and the WCMA are working together to develop safety devices" to be part of the window coverings. (Id.);

7.    9/00/94—Rush memo to WCMA members states the strangulation hazard "is primarily though not exclusively the looped cord." (underline added). (Exhibit 7);

8.    10/15/95—Newspaper articles report WCMA effort "to eradicate this danger" by altering free tassel ends that can be installed after a looped cord is cut. The article reports "Free tassel ends take danger out of blinds" and provides a phone number for the WCMA tassel end outlets. (Exhibit 8);

9.    12/22/95—WCMA Executive Director Rush writes corporate member who is balking about dues payment: "In 1994, the Window Covering Industry confronted the potential hazard of Window Covering Products to young children. Through a combined effort, the industry prevented a recall of the products and negotiated some time to effectively modify its products. . . . In 1995, the number of deaths from window coverings has not diminished significantly. . . . [Y]ou and your manufacturers must look at this issue based upon the potential liability and other costs you will incur not participating in this program." (underline added). (Exhibit 9);

10.   2/23/96—CPSC writes Rush noting since October 4, 1994 CPSC/WCSC press conference, 14 child deaths have occurred and one serious near strangulation in which a child lost both his sight and hearing. (Exhibit 10);

11.    12/5/96—WCSC Meeting minutes indicate CPSC officials note an unchanged number of deaths associated with window coverings.  (Exhibit 11, p. 038).  Rush notes "the industry needed to work quickly to adopt the standard."  He asks members to supply him with production timeframes under the assumption an ANSI standard is adopted in January of 1997.  WSC notes indicate its membership represents the lion's share of the industry and that "WCSC as an organization wanted to be leading the way in setting standards."  (p. 039);

12.    00/00/96—undated document listing ANSI canvas list shows 15 participants including five manufacturers, four retailers, three professional trade associations, and only three consumer contacts.  One consumer abstains, another does not return its ballot, and the third (a CPSC employee) is an affirmative vote.  (Exhibit 12).  (The industry dominated canvas group soon passes a November 27, 1996 standard number A100.1.  (Exhibit 50).  It contains no protection for children from inner cord death hazards).

13.    1/15/97—WCMA Press Release notes "most cord-entanglement incidents occur with children between the ages of 8 months and 3 years; their natural curiosity draws them to the dangling loops of window cords.  (Exhibit 13, p. 054).  Of particular concern are cords within the reach of a child's crib or at a window.  "WCSC says most older blinds and shades can be fixed by cutting the pull loop just above the pull tassel, and placing separate tassels at the ends of the resulting two cords."  (Id.);

14.    11/19/97—WCSC minutes: members indicate they are in full compliance with standard 100.1.  (Exhibit 14);

15.     2/18/00—Retired firefighter Robert Nevins writes ANSI to complain that WCMA had plenty of notice of inner cord death of strangulation and nevertheless passed its first standard without addressing inner cord strangulations.  (Exhibit 15, p. 044).  Nevins writes that he has done two years of research and believes the public "is being deceived because they are not aware that the WCMA and ANSI Committee are one in the same."  (p. 045);

16.     3/31/00—Rush writes WCSC stating the CPSC is concerned since 60 deaths have occurred since voluntary corrective action was begun in '94.  Rush says "CPSC is determined to re-launch the effort on window cords including the new issue of the interior cord."  Rush notes "however, significant government action is very likely in the near future."  (Exhibit 16);

17.     4/3/00—Rush writes memorandum to WCSC including articles on $400,000 civil penalty against toy manufacturers for keeping known problems quiet by conducting internal investigations on product injuries but never telling the owners of the product or the government.  Rush says "the article is self-explanatory." (Exhibit 17);

18.     4/5/00—CPSC draft Product Safety Report issued to determine if cord stops can prevent strangulation of children by the inner cords.  (Exhibit 18).  CPSC tests reveal "the cord stop prevented the blind cord from being pulled from the internal slide through the locking mechanism . . . all three types of washers/cord stops were effective in preventing the window blind cord from being pulled through the slots of the blinds and through the head railing locking mechanism" (p. 005);

19.    5/5/00—Notes of Peter Rush meetings indicating importers and retailers will resist internal cord fixes because they will have 3 million units in route over the ocean that will be non-compliant.  (Exhibit 19, p. 043);

20.    7/6/00—Peter Rush gets handwritten notes from Maria Ungaro indicating CPSC proposed warning that the "product is unquestionably a danger and that consumer must install cord stops" is unacceptable.  "In other words, suggest if they try for stronger language then they'll have to go to court to prove it."  (Exhibit 20, p. 117);

21.    0/0/96—WCMA publication indicates "the association advises government agencies on technical and safety issues to insure that views and concerns of its members are considered.  Recently, WCMA met with the Consumer Product Safety Commission (CPSC) in response to a CPSC alert that young children might be strangled by blind cords.  WCMA helped shape the report on the subject."  (underline added).  (Exhibit 21);

22.    11/1/00—CPSC announces largest ever product recall, but it is limited to "a recall to repair" which means that consumers who call in can get free cord stops which they themselves install.  (Exhibit 22).  WCSC talking points note products manufactured after September 15, 2000 have been redesigned to eliminate the inner cord problem.  (p. 029).  The WCSC recommends not installing cord stops if you don't have children living in your home.  (p. 031).  The WCSC recommends that if it is noted that deaths go back as far as 1991, and a question is raised why this problem wasn't addressed earlier, you should answer: "No one was actually aware of the problem until this year, when the Consumer Product

Safety Commission did an in-depth investigation of past cord death reports and discovered the involvement of inner cords."  (p. 032);

23.    12/00/00—WCSC article claims window covering industry assumes a leadership role with consumer product safety by transforming itself into a consumer product safety advocate.  (Exhibit 23);

24.    4/18/01—WCMA director Rush writes business member that "the industry will continue to be under the threat of ongoing regulation."  (Exhibit 24);

25.    6/10/01—Retired firefighter Nevins again writes Peter Rush noting at least 16 inner cord strangulation deaths and stating "the Window Covering Manufacturer's saved money by not addressing the inner cord strangulation problems . . ." (Exhibit 25).  Nevins further complains that Rush wrote the CPSC on August 20, 2000 claiming that shades with a stop ball don't have this problem even though five months earlier "a two-year-old infant child strangled to death in the loops above the cord stop."  Nevins says "I can not believe the secretary of the Window Covering Safety Council does not know [this]."  (p. 005);

26.    6/25/01—WCSC Press Release from Sumner Rider and associates noting 85 million window blinds are sold each year while only about 1 million per year call the safety hotline.  "This means that millions of homeowners may still be using potentially dangerous blinds."  (Exhibit 27);

27.    7/17/01—WCMA President Peter Rush writes letters to eight separate manufacturers and retailers confirming that they have decided <u>not</u> to participate in the corrective action plan dated September 12, 2000.  (Exhibit 28);

28.   00/00/01—WCSC document claims inner cord strangulation risk was discovered in late 2000. (Exhibit 29);

29.   5/2/00—Fax to Sumner Rider with documents using charts and columns to show annotated inner cord deaths from 1991 – 1999 (with final document showing deaths as late as 2001). (Exhibit 30, p. 028). Document confirms ten inner cord strangulation deaths and one near death from 1991 – 1996. (p. 016). The summary of internal cord strangulation incidents notes: "It is important to note that at least 12 out of 16 consumers were aware of the pull cord hazard and had placed the pull cord out of reach from the child." (underline added). (p. 016). Document also notes that approximately 10% of deaths since '94 are internal cord deaths. (p. 028);

30.   00/00/02—WCSC marketing plan for 2002 from Sumner Rider & Associates. "Ironically, WCSC's success in its communication efforts now defines its major obstacle: overcoming the 'we already know that' attitude of both the media and the general consumer. Specifically, WCSC needs to convince its targeted audiences that window cord hazards are indeed real and need to be conscientiously and continually addressed to avoid child strangulations. Moreover, the council must work to differentiate for the consumer the 'inner cord' versus the 'looped cord' hazard, and to persuade the consumer that fixing the looped pull cords of yesteryear has not addressed the inner cord hazard nor the inherent danger of any cord (looped or otherwise) within a child's reach." (underline added). (Exhibit 31);

31.    2/6/02—CPSC writes Rush about limited progress being made on the revision of the ANSI/WCMA 100.1 standard.  (Exhibit 32).  Letter states: CPSC staff believes the voluntary standard must contain provisions that will <u>reasonably</u> <u>attempt to eliminate all strangulation hazards from window covering products</u>. (underline added)  (p. 007);

32.    12/5/02—Rush writes WCMA member company stating "[I]t must be acknowledged that there are still hundreds of millions of potentially dangerous products in place around the country. . . . A new ANSI safety standard for window coverings was adopted this year that you must be in compliance with for current production . . . Please help insure that no more children will be injured or killed because <u>someone didn't know</u> that the product in their home was potentially dangerous."  (underline added)  (Exhibit 33);

33.    12/17/02—WCMA member representative writes Rush saying that after five years of involvement he understands that the WCSC, like the WCMA Technical Committee, is just one of the subdivisions under the hierarchy of WCMA. (Exhibit 34, pp. 079-080).  He notes "we have made several payments in amount due but could have cut checks for such payments by confusing the payables to WCSC with WCMA, or vice versa.  In short, we had no idea what and whom we had paid for."  (p. 079);

34.    00/00/02—Estimated U.S. window covering market units shows close to 100 million units a year of new production are added with approximately a billion-and-a-half units in the market by 2002.  (Exhibit 35);

35.    00/00/02—Total window covering market annual dollar sales at retail are

approximately $7,100,000,000.00.  Total sales of corded products are

$4,387,800,00.00.  Approximately 96 million units of corded products are sold

annually.  (Exhibit 36);

36.    1/6/03—Rush writes WCSC member and notes WCMA "is the author and

publisher of ANSI/WCMA A100.1.  (Exhibit 37);

37.    4/3/03—Window covering strangulation deaths from 1991 – 2003 (April) show

21 inner cord deaths.

38.    10/13/03—Carolynn Jennings memoranda concerning WCMA tech committee

action being needed.  (Exhibit 39).  She notes that in a review of death case

information print-outs that "we discovered a few inconsistencies."  "It appears

that often we were swayed by the casual word choices in the incident report . . .

This can change whether the cause of entanglement should be listed as victim-

caused, product-caused, or unknown. . . . [W]e'd like the group to rethink our

original decision to automatically list 'victim manipulation' as the root cause

factor with inner-cord deaths. . . . In retrospect it seems wrong not to list inner-

cord deaths as product-caused, given the inherent design deficiencies of blinds not

having cord stops."  (p. 013).

## III.    **Formal Admission Facts**

WCMA has made formal admissions summarized as follows:

1.    Any manufacturer can utilize the warnings promulgated in WCMA A100.1-1996 or
WCMA A100.1-2002.  (Exhibit 40 p. 044);

2.    WCMA admits it has never developed a plan for facilitating a full recall of corded
window covering products.  WCMA further states "it would not recall window

coverings—even if it could—that comply with these voluntary standards, <u>since such blinds would not be defective</u>."  (underline added)  (Exhibit 40 p. 045);

3.  WCMA admitted it is not "aware what its members knew and when" concerning the strangulation death information possessed by its members.  (Exhibit 40 p. 047);

4.  WCMA admitted it was aware of one report of a strangled child in inner cords at the time WCMA A1001.1-1996 was published.  (Exhibit 40 p. 048);

5.  WCMA admitted "it has never required its members to report to it any claims of injuring related to their products."  (Exhibit 40 p. 070);

6.  WCMA admitted "it has never engaged an employee, independent contractor or otherwise, any engineer or other professional to examine the safety of corded window covering products."  (Exhibit 40 p. 073);

7.  WCMA has admitted "it has no procedure for tracking injuries or deaths caused by corded window covering products."  (Exhibit 40 p. 074);

8.  WCMA admits that the photograph of the label attached to the bottom rail of the window coverings involved in the death of April Cox "appears to have been produced after the adoption of WCMA A100.1-1996."  (Exhibit 40 p. 077);

In response to a request for production, WCMA indicated <u>it could locate no documents that it relied upon in identifying the risk of strangulation in corded window covering products prior to the publication of the 1996 standard</u>.  It made the same statement concerning not finding any documents responsive to a request for those relied upon to identify the risk of strangulation in corded window coverings between the publication of the 1996 standard and publication of the 2002 standard.  (Exhibit 41 p. 084).

### IV.  WCMA 30(b)(6) Deposition Admissions

Exhibit 42 is a copy of the 30(b)(6) deposition of the former long-time executive director of the WCMA, Peter Rush.  He admitted on behalf of the WCMA to the following (all cites are to Exhibit 42 with page numbers for specific cites):

1.  Mr. Rush was the Executive Director of the WCMA for twelve years and was with the entity for eighteen (p. 24);

*Rountree, et al. v. Window Covering Manufacturers Association*

2. Rush is now a Senior Advisor to the WCMA (p. 14);

3. Rush is not an expert on the ANSI process. (pp. 16-17);

4. Rush was the Executive Director when the 1996 A100.1 standard was issued as well as when the A100.1-2002 standard was issued. (pp. 24-25);

5. Rush refused to answer whether or not the standards were meant to provide protection for the public. (pp. 27-28);

6. Rush is not an expert in safety. (p. 30);

7. Rush said he couldn't answer what safe means. (p. 30);

8. Rush is not a safety engineer. (p. 31);

9. Rush has no engineering background. (p. 31);

10. Rush has no safety professional training. (p. 32);

11. Rush has no occupational or work-place safety training. (p. 32);

12. Rush has college degrees in International Relations and English. (p. 32);

13. The WCMA had no safety engineers on staff when it passed the two safety standards. (p. 32);

14. The WCMA did not ask any persons with any special expertise to be involved in the development of the standards. (pp. 33-34).

15. When the '96 standard was adopted, the WCMA had zero employees (p. 37). The same was true of the WCSC. (p. 37);

16. Neither of these organizations paid Rush a direct salary (p. 37). Both of these organizations had a contract for management with Sumner Rider & Associates (p. 37);

17. Rush was President of Sumner Rider. (p. 38);

18. Sumner Rider was in the business of association management and public relations. (p. 39);

19. WCMA work at the time the standard was passed in 1996 only took about 10% of the Director's time (p. 40). The rest of the time he worked with other clients. (p. 41);

20. He was at the same time the Executive Director of the Building Hardware Manufacturing Association.  (p. 42);

21. He at the same time did the public relations work for the Cooper Development Association.  (pp. 42-43);

22. Sumner Rider was paid $3500 a month to run the WCMA.  (p. 45);

23. The WCMA never maintained statistics on accidents, deaths, injuries or causes of accidental death and injuries relating to window coverings (p. 48).  It has never done so.  (p. 48);

24. He did not know what the medical examiners reference to ligature marks around the strangulation victim's neck would mean.  (p. 55-56);

25. He agreed with the Carolyn Jennings report that it was wrong not to list inner cord deaths as product caused given the inherent design deficiencies of blinds not having cord stops (p. 59).  He has had that opinion since 1999.  (p. 62);

26. The major difference between the November 1996 standard and the September 2002 standard "was the specific inclusion of inner cord strangulation potential danger and inclusion of some sort of mechanism on the cord to reduce the possibility of it being pulled through the head rail" (pp. 67-68).  A corrective action with the CPSC was agreed to by the WCSC in 2000 to immediately make the change in manufacturing to include the stop cord. (pp. 68-69);

27. Rush knew of no manufacturer who took their product off the shelf after it was determined that products without stop cords were unsafe.  (p. 73);

28. Rush was unable to say whether the WCMA warning to parents to correct only the hanging cord could mislead them into believing the product was now safe for children to be around.  (p. 86);

29. Rush stated that if the association (or CSP) had identified this as an issue in 1994, "we would have addressed in the first standard, and we would have addressed it in the first corrective action program."  (p. 98);

30. (With the statistics in hand), this correction would have happened whether or not the CPSC had raised the issue.  (p. 98);

31. The WCMA does not ask its members to count deaths that they become aware of.  (p. 118);

32. Rush was unaware of how the CPSC reporting system for death or injury and product connections operated.  (pp. 119-120);

33. Rush knew of no one at the WCMA who would understand the CPSC system.  (p. 121);

34. Rush said the voluntary standards approach (as opposed to regulation by the CPSC) would get a standard to the public sooner and that standard would probably be more complete.  (p. 172);

35. Rush said the WCMA does not know what percentage of households with dangerous window coverings threatening the lives of young children have been contacted with WCSC corrective information.  (p. 177);

36. Rush had never discussed the issue of whether or not consumers tend not to read warning labels at the bottom of window shades.  (pp. 187-188);

37. Rush admitted he had received a letter about an inner cord child death by strangulation approximately <u>ten years</u> before the CPSC investigation concerning inner cord death risk announced its findings.  (pp. 209-210).

38.   Rush stated that WCMA members are required upon learning of a safety omission or defect in any standard to bring that issue to the intention of the WCMA.  <u>No member had ever done so.</u>  (pp. 219-220);

39. Rush admitted that all of the concerns of Terry Griesbach to him in 1990 had finally been addressed in the September 2002 standard including inner cord risks.  (p. 221);

**40.** During the time Rush was Executive Director of the WCMA his business also represented the Builder's Hardware Manufacturer Association, The New York Women in Communication, The Comic Magazine Association of America, The Health Care Food Services Managers Association, The New York Women in Communications Foundation, The New York Chapter of the International Design Association, The Plastic Bag Association, The Certified Plastic Manufacturers Association, and the National Table Top Association.  (pp. 263-264).

## V.    <u>Law</u>

Federal Rule of Evidence 702 provides that an expert may testify "in the form of an opinion or otherwise" if his or her "specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue."

In <u>Daubert</u>, the Supreme Court, in addressing admissibility of "scientific expert evidence," held that FRE 702 imposes a "gatekeeping" obligation on the trial judge to "insure that any and all scientific testimony . . . is not only relevant, but reliable."  509 U.S. at 589, 113

S.CT. 2786.  While holding that the trial court has substantial discretion in discharging its

gatekeeping obligation, it suggested a number of factors that the court might consider:

    (1)  Whether a theory or technique can be tested;

    (2)  Whether it has been subjected to peer review and publication;

    (3)  The known of potential error rate of the theory or technique; and

    (4)  Whether the theory or technique enjoys a general acceptance within the
         relevant scientific community.

Id. at 592-94, 113 S.CT. 2786.

    In Kumho Tire, the Court clarified that the gatekeeping function is not limited to

"scientific" expert testimony, but applies to all expert testimony.  119 S.CT. at 1175-79.  Kumho

Tire heavily emphasizes that judges are entitled to broad discretion when discharging their

gatekeeping functions.  Id. at 1175-76.  Indeed, not only must the trial court be given broad

discretion to decide whether to admit expert testimony, it "must have the same kind of latitude in

deciding how to test an expert's reliability."  Id. at 1176.

    The Daubert factors were not intended to be exhaustive nor to apply in every case.

Kumho Tire, supra, at 1178.  However, a trial court may consider the specific factors identified

in Daubert where they are reasonable measures of the reliability of proper expert testimony.

Whether Daubert's suggested indicia of reliability apply to any given testimony depends on the

nature of the issue at hand, the witnesses' particular expertise, and the subject of the testimony.

It is a fact-specific inquiry.  See, U.S. v. Hankey, 203 F.3d 1160 (9th Car. 2000).  There the court

quotes the 5th Circuit case of Skidmore for the above proposition.  See, Hankey at p. 1168.  (The

Hankey opinion is attached at Exhibit 58.  The exhibit numbers are a continuance of the number

sequence from Exhibits 1 – 57 attached to Plaintiff's Opposition to the Motion for Summary

Judgment).

In considering the admissibility of testimony based on "other specialized knowledge," Rule 702 generally is construed liberally.  See, United States v. Ramsey, 165 F.3d 980, 984 (D.C.Cir. 1999).  Thus, admissibility of expert testimony generally turns on the following preliminary questions of law determinations by the trial judge under Federal Rule of Evidence 104(a):

- Whether the opinion is based on scientific, technical, or other specialized knowledge;

- Whether the expert's opinion would assist the trier of fact in understanding the evidence or determining a fact in issue;

- Whether the expert has appropriate qualifications – i.e., some special knowledge, skill, experience, training or education on that subject matter;

- Whether the testimony is relevant and reliable;

- Whether the methodology or technique the expert uses "fits" the conclusions;

- The expert's credibility is a question for the jury, not the judge.

See, U.S. v. Hankey, *supra*, at p. 1168.

Rule 702 requires that a testifying expert be "qualified as an expert by knowledge, skill, experience, training, or education."  The rule itself "contemplates a broad conception of expert qualifications."  Moreover, "the advisory committee notes emphasize that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert."  See, Hangarter v. Provident Life and Accident Insurance Co., 373 F.3d 998 (9th Cir. 2004) at p. 1015. (The case is shown at Exhibit 61).  The case notes, "in certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."  Id.  The Hangarter court was concerned with a Daubert challenge to the admission of testimony of an insurance bad faith claim expert and found his testimony both reliable and admissible.  The court recognized

the trial court's broad discretion in charging its gatekeeping function and said such discretion

applied both to determining how testimony is reliable and whether it is reliable.  Id. at 1017.

Concerning the reliability of non-scientific testimony, such as that at issue in Hangarter,

the court said the "Daubert factors (peer-review, publication, potential error rate, etc.) simply are

not applicable to this kind of testimony, whose reliability depends heavily on the *knowledge and*

*experience* of the expert, rather than the methodology or theory behind it."  Id.  At footnote 14

the court noted that the expert had testified concerning whether defendants' practices were

consistent with insurance industry standards.  This sort of analysis the court determined was

dependent upon the witnesses knowledge of, and experience within, the insurance industry.

While defendants challenged the expert during voir dire (arguing that his selection of documents

for review to sustain his opinion went to the reliability of his "methodology" as an expert), the

Hangarter court approved the district court's determination that this issue went merely to the

"weight" of the expert's testimony—an issue properly explored during direct cross-examination.

The court quoted the Eighth Circuit for the proposition:

> The factual basis of an expert opinion goes to the credibility
> of the testimony, not the admissibility, and it is up to the opposing
> party to examine the factual basis for the opinion and cross-
> exanimation.

Hangarter, *supra*, at 1017, footnote 14, quoting Children's Broad.Corp. v. Walt Disney, 357 F.3d

860, 865 (8th Cir. 2004).

The Hangarter court acknowledged that the trial court was required to make some kind of

reliability determination to fulfill its gatekeeping function.  It decided the District Court satisfied

this obligation by probing the extent of the expert's knowledge and experience before trial in

considering a motion in limine, and a detailed ruling during voir dire, and in an order denying

defendant's motion to strike.  The trial court's ultimate conclusion that the experts "experience,

training, and education" provided a sufficient foundation for the reliability of his testimony was affirmed on appeal. The court noted that a "separate, pretrial hearing on reliability is not required."

The Hangarter court also had the issue before it of whether or not an expert may testify to ultimate issues in his testimony. The court noted that "it is well established that expert testimony concerning an ultimate issue is not per se improper." Id. at 1016. The court noted that Federal Evidence Rule 704(a) provides that expert testimony that is "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Id. While acknowledging that instruction upon the law can only come from the judge, the court noted that in the case before it the expert's testimony that defendants had departed from insurance industry norms relied in part on the expert's understanding of the requirements of state law. The Hangarter court noted "a witness may refer to the law in expressing an opinion without that reference rendering a testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts and evidence even though reference to those facts is couched in legal terms." Hangarter, supra, at 1017 quoting Specht v. Jensen, 853 F.2d (805), 809 (10th Cir. 1988). (For a discussion of Daubert in application to science based testimony see Haines v. Energy West, Inc., 211 F.3d 1193 (10th Cir. 2000). (The case is shown at Exhibit 59).)

## VI.    Argument

### A.    Mr. Statler is Permitted to testify in the form of ultimate issues (responsive to WCMA argument 1 at p. 6 of defendants' brief

Federal Rule of Evidence 704 states that testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. A note to that rule in the 2008 edition of the Federal Rules from Thomson West states:

> The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier-of-fact. In order to render this approach fully effective and to allay any doubt on the subject, the so-called "ultimate issue" rule is specifically abolished by the instant rule.

<u>See</u>, Federal Civil Judicial Procedures and Rules, 2008 Edition by Thompson West, at p. 455.

It should be first recognized that all of Mr. Statler's opinions are based on his extensive history of involvement with the CPSC (seven years as a commissioner) in the field of product safety and regulation for more than thirty years. <u>See</u>, Statler Report, CV, Publications and Testimony list shown at Exhibit 51. His broad background, especially including seven years with the CPSC, in addition to the lengthy materials record reviewed by Mr. Statler, provide him a unique position from which to opine about ultimate issues in this case.

WCMA's complaint that he should not be allowed to even suggest they had assumed a duty to properly perform their standard settings function elevates form over substance which is precisely what Federal Evidence Rule 704 is designed to eliminate. How does an expert remain helpful to the jury with this background and preparation (by review of the important materials in this case) if he is not permitted to testify in terms like "inadequate failure to warn" or "failing to meet industry standards"? Plaintiffs wholeheartedly agree that Mr. Statler may not instruct the jury on the law. However, the motion to exclude all of this opinions is not any narrow attempt by the WCMA to insure that only the judge instructs the jury.[1]

Mr. Statler's opinions on ultimate issues such as "inadequate failure to warn" and "systemic disregard for safety" are natural expressions of the opinions which his background knowledge and experience reaches based on the facts presented to him in this case. Compare the

---

[1] Even defendants' expert declared the WCMA "was not negligent". <u>See</u>, Defendant Expert report at Exhibit 57, p. 6.

Federal Civil Judicial Procedures and Rules discussion under Rule 704 opinion on ultimate issue

with the position that the WCMA is trying to take:

> These provisions afford ample assurances against the admission
> of opinions which would merely tell the jury what result to reach,
> somewhat in the matter of the oath-helpers of an earlier day. They also
> stand ready to exclude opinions phrased in terms of inadequately
> explored legal criteria. Thus the question, 'Did T have capacity to make
> a will?' would be excluded, while the question, 'Did T have sufficient
> mental capacity to know the nature and extent of his property and the
> natural objects of his bounty and to formulate a rational scheme of
> distribution?' would be allowed.

Federal Civil Judicial Procedure and Rules, Thomson West Edition 2008, at p. 455. If anything,

the sheer comprehensiveness of Mr. Statler's 18 page report is strong evidence that he is

providing the far more comprehensive opinions suggested in the Federal Rules Handbook as

admissible on ultimate issues. On this point, the WCMA's brief has to yield to Federal Rule of

Evidence 704 (and the sensible rationale and policy underlying the rule) so that experts with

substantial knowledge can be helpful to the jury without being handcuffed by wordplay.[2]

    For all these reasons, the WCMA is not permitted to turn back Federal Rule Evidence

704 to a former day. Opinions on ultimate issues are expressible in modern courts. If there is

---

[2] The real attack in this section by the WCMA comes from its reference to another judge's determination that Mr. Statler's opinion on a riding lawnmower case did not flow from his admittedly well-credentialed background and experience on "consumer product safety generally, manufacturer and seller responsibility, and the consideration of dangerous products by the CPSC." See, defense Exhibit A at p. 4. First, Mr. Statler is not here to talk about riding lawnmowers. Second, all of his opinions flow naturally from his lifetime of work connected to consumer product safety, manufacturer and seller responsibility and CPSC oversight. Third, the judge's claim in that case that Statler's opinions should be excluded because they were "apparently prepared solely for this litigation" improperly borrows a Daubert scientific standard for use in attacking an experience-based opinion. Hangarter, supra, noted that the reliability of non-scientific testimony (such as that of an insurance industry expert) can not be tested for reliability by the Daubert factors: peer-review, publication, potential error rate, etc. Hangarter, supra, at 1017.

    A scientist who prepares a proposed scientific opinion not in his area of normal work is subject to attack for preparing an opinion solely for a court appearance. That is because a scientist normally works with repetitive conduct that is peer-reviewed and determined as reliable in part because of experimental repetition. That repetition, by definition, is missing from a science opinion repeated or developed only for a single time for one trial. None of that impeaches or makes unreliable an opinion by a person with high experience who provides a single evaluation based on that experience for any particular case. The standard for reliability there is primarily the extent of knowledge and experience of the expert "rather than the methodology or theory behind the opinion." See, Baumgarter, supra, at 1017.

any issue perceived by the court in any opinion as infringing on an instruction the court will give

the jury, that is a matter easily handled by direction to the expert prior to trial rather than the

draconian striking of the expert sought by the WCMA here.  The motion by the WCMA to

eliminate the Statler opinions on ultimate issues should be denied under the direct authority of

Federal Rule 704.

> **B.  Mr. Statler's opinion about the inadequacy of the warning in this matter is admissible and based on the record (response to WCMA argument 2 at p. 8).**

Mr. Statler's opinions concerning the inadequacy of the warning by the WCMA to

families like that of April Cox is far broader than this section suggests.  It also extensively based

on the above listed factual record which was provided to Mr. Statler.  The specific attack on the

hangtag warnings as merely a common sense belief is simply an unrealistic assessment of the

value of thirty years of experience in the business of safety, product defects, and product

warnings.  See, U.S. v. Hankey, 203 F.3d 1160 (9th Cir. 2000) at 1168-1169.  (In cases where the

Daubert factors are not applicable because it is based on knowledge and experience of the expert,

reliability is first tested by that knowledge and experience).  Here, by far the greater problem in

warning is not product placement of labels.  It is dealing with the fact that the improperly

promulgated 1996 standard suggests to manufacturers and consumers alike that only the pull

cords are a strangulation hazard for small children.  Nothing could be further from the truth.  In

that context, Statler's comment as to placing an important warning on the bottom of a rail is a

sensible one:

> Moreover, as a practical matter, what purpose is accomplished
> by placing a critical safety warning-one addressed to the most tragic
> of risks involving the strangulation of a young child-in a place at
> manner where it is least likely to be seen?

Statler opinion at p. 14.  The meaning of this comment in the context of the product manufacturer's admission that it was successful in heading off the recall of hazardous corded products is far more subtle and important than just the warning tag placement issue in isolation. For these reasons, plaintiff requests the court to examine the entirety of Mr. Statler's report, including especially the comprehensive list of materials he has reviewed and historical description of his training in this area, in determining whether opinions like this can be isolated for purposes of a reliability analysis or whether they must be taken as part of the entire opinion for purposes of deciding whether they will be helpful to the jury.

### C.   There is a substantial basis for Mr. Statler's opinion that the WCMA knew or should have known about the risks of inner cord blind strangulation (responding to WCMA argument 3 at p. 10 of the defense brief).

WCMA attacks Mr. Statler's opinion that the organization "knew or should have known about the risk of inner cord blind strangulation in 1994 when it began development of its safety standard.  See, opposition brief at p. 11, subheading A.  The rendition of the facts above cited establish that the material reviewed by Mr. Statler contained significant information informing the WCMA about the hazard of inner cord strangulation long before it issued its November 1996 first standard.  Statler's report in this regard should be reviewed by the court.  Please see, Exhibit 51 at pp. 8-10.

The WCMA's claim that he simply had no basis to argue that the WCMA should have known about an inner cord strangulation hazard is ridiculous.  The WCMA's claim that the Tony Griesbach letter did not adequately warn Peter Rush and the WCMA of the hazard of inner cord strangulation is also ridiculous.  The contents of that letter are discussed at paragraph 3 of section II above.  The product liability reporter discussion of the same case is shown at paragraph 2 of section II.  The actual exhibits are shown at 2 and 3 to the summary judgment opposition and

will be in hard copy form in the court's chambers as Exhibits 2 and 3. A reading of those two

exhibits strongly demonstrates clear notice was provided to Peter Rush from attorney Greisbach

about strangulation hazards represented by the inner cords of window covering products. This is

exactly what Statler said. The WCMA's motion claim that the letter did not give such notice is

just plain wrong.

### D.  Mr. Statler's opinions of the WCMA as a façade or sham are admissible and correct (responding to WCMA motion argument 5 at p. 13).

The WCMA objects to Mr. Statler's report statement that:

> When the formulation of a truly effective safety standard
> may imperil members' profits, and association in the WCMA's
> vaunted position may have an incentive to set the bar unrealistically
> low, oblivious to the safety concerns it is purporting to address.

Opposition memorandum at p. 14, quoting Statler report at 13. This is precisely the type of

testimony that experts like Mr. Statler routinely give. It is informs the jury of the nature of

existing incentives within the industry that they should be considering when they review the

conduct and claimed motives of the WCMA. Here, the sister corporation run from the same

office by the same director, the WCSC, has claimed that it has assumed a leadership role and

turned itself into a consumer product safety advocate. See, Section II above at paragraph 23.

(The actual document is shown at Exhibit 23 to the opposition to defendant's summary judgment

motion). Compare the "safety advocate" claim with a letter from the joint director of the WCSC

and the WCMA to a corporate member of his organization stating the fact that "through a

combined effort, the industry prevented a recall of the products and negotiated some time to

effectively modify its products . . . in 1995, the number of deaths from window coverings has not

diminished significantly . . . [Y]ou and your manufacturers must look at this issue based upon the

potential liability and other cause you will incur not participating in this program." See, section

II above at paragraph 9. <u>See</u>, Exhibit 9 in the Exhibits attached to the opposition to the motion for summary judgment. Certainly the jury attempting to understand the conduct of this defendant will be assisted in its understanding by an expert with seven years experience on the CPSC informing them that some manufacturers "may" have an incentive to set performance bars unrealistically low. This opinion cannot be objectionable.

The claim that Mr. Statler should not use the word sham or façade because they are inflammatory is simply incorrect. What they are is descriptive. A safety standards setting organization with no safety engineers, no safety professionals, no record of injuries or deaths, no intent to keep such records, run out of the same office as the Comic Magazine Association of America, is likely to be perceived as a shell or façade organization by any knowledgeable safety professional. There is nothing improper about describing an organization in terminology that describes what it is.

## VII.    <u>Conclusion</u>

Mr. Statler's testimony is both relevant and reliable. It is well founded in his review of a significant amount of record materials through the lens of substantial experience and training in the area of product safety and regulation. <u>Hangarter</u>, *supra*, is clear authority for the proposition that this type of experience, training, and education provides a sufficient foundation of reliability for testimony of this type. <u>See</u> <u>Hangarter</u>, *supra*, at 1018. Similarly, <u>U.S. v. Hankey</u>, describes a reliability analysis that would be substantially approving of the admissibility of testimony like that proposed for Mr. Statler. <u>See</u>, <u>Hankey</u>, *supra*, at 1168-1169. The claim these opinions are not reliable because they were prepared solely for litigation is an inappropriate application of a <u>Daubert</u> science standard to a witness who is testifying based on experience. In sum, the testimony cannot be excluded for lack of relevancy or lack of reliability. Nor can it be assailed

for methodology.  All of the opinions given are adequately based in a complex factual record

reviewed by the witness and repeatedly referenced in his written report.  The <u>Daubert</u> challenge

must fail.

The claim that certain portions of his testimony should be isolated and eliminated for a

variety of other in limine reasons is unfounded.  What would a securities expert call a shell

organization meant to defraud creditors?  The rationale of Federal Rule 704, if not the rule itself,

certainly would permit a shell organization to be described as such.  The motion in limine as to

Mr. Statler's opinions above discussed should be denied.

DATED this 18th day of April, 2008, at Anchorage, Alaska.

<u>/s/Don C. Bauermeister</u>

Burke & Bauermeister, P.L.L.C.
921 W. 6th Ave., Ste. 250
Anchorage, AK 99501
Phone: (907) 277-6177
Fax: (907) 277-6111
E-mail: <u>bblaw@alaska.com</u>
<u>dcblaw@alaska.com</u>
ABA# 82060005

I hereby certify that on 21 April 2008, a copy of the foregoing document
Was served electronically on:

Donald C. Thomas
Delaney, Wiles, Hayes, Gerety, Ellis & Young
<u>DCT@delaneywiles.com</u>
<u>jaf@delaneywiles.com</u>
<u>usdcuser@delaneywiles.com</u>

Charles W. Ray, Jr.
Law Offices of Charles W. Ray, Jr., P.C.
<u>Craylaw@aol.com</u>
dlcraylaw@acs.alaska.net

Michael Weiss
King & Spalding LLP
191 Peachtree St.
Atlanta, GA 30303
Mweiss@KSLAW.com

Dan Quinn
Richmond & Quinn
dquinn@richmondquinn.com
cesary@richmondquinn.com

By: s/Don C. Bauermeister