```
                                                              1

 1
 2   UNITED STATES DISTRICT COURT
 3   DISTRICT OF ALASKA
 4   Case No. A04-0112cv (JWS)
 5   ----------------------------------------x
 6   VALERIE ROUNTREE, Individually and as
 7   Personal Representative of the Estate of
 8   APRIL LYNNE COX, MORGAN SCHEDIWY, a minor,
 9   through her natural mother and guardian
10   VALERIE ROUNTREE; and CHRISTOPHER COX,
11                           Plaintiffs,
12        - against -
13   CHING FENG BLINDS INDUSTRY CO. LTD., a
14   Taiwanese corporation; JENCRAFT
15   CORPORATION a/k/a JENCRAFT MANUFACTURING
16   CO., INC., a New Jersey Corporation;
17   WAL-MART STORES, INC., a Delaware
18   Corporation; and WINDOW COVERING
19   MANUFACTURERS ASSOCIATION,
20                           Defendants.
21   ----------------------------------------x
22                           February 16, 2006
                             10:20 a.m.
23
24
25
```

**Page 2**

DEPOSITION of WINDOW COVERING MANUFACTURERS ASSOCIATION by PETER RUSH, taken by the Plaintiffs, pursuant to Notice, held at the offices of King & Spalding, LLP, 1185 Avenue of the Americas, New York, New York, before Debbie Zaromatidis, a Shorthand Reporter and Notary Public of the State of New York.

**Page 3**

APPEARANCES:

BURKE & BAUERMEISTER, PLLC
Attorneys for Plaintiffs
    921 West 6th Avenue
    Suite 250
    Anchorage, Alaska 99501
BY:  DON C. BAUERMEISTER, ESQ.
    - AND -
LAW OFFICES OF CHARLES W. RAY, JR.
    711 H Street, Suite 310
    Anchorage, Alaska 99501

RICHMOND & QUINN, LLP
Attorneys for Defendant
Ching Feng Blinds Industry Co., Ltd.
    360 K Street, Suite 200
    Anchorage, Alaska 99501
BY:  DANIEL T. QUINN, ESQ.

**Page 4**

A P P E A R A N C E S:  (CONTINUED)

LANE POWELL, LLP
Attorneys for Defendant
Wal-Mart Stores, Inc.
    Suite 301
    301 W. Northern Light Boulevard
    Anchorage, Alaska 99503-2648
BY:  WILLIAM A. EARNHART, ESQ.

KING & SPALDING, LLP
Attorneys for Defendant
Window Covering Manufacturers Association
    191 Peachtree Street
    Atlanta, Georgia 30303-1763
BY:  JAMESON B. CARROLL, ESQ.
    MICHAEL WEISS, ESQ.

ALSO PRESENT:
DWIGHT WALLACE, Wal-Mart Corporation

**Page 5**

THE VIDEOGRAPHER: Good morning. We are on the record. Today's date is February 16, 20006, and the time is 10:20 a.m. This is the videotape deposition of Peter Rush in the case of Rountree versus Ching Feng Blinds Industry Company Limited, et al., case number 804-0112 CV, case filed in the United States Court for the district of Alaska.

At this time will counsel please state their appearances.

MR. EARNHART: William Earnhart for Wal-Mart.

MR. QUINN: Dan Quinn for Ching Feng.

MR. CARROLL: Jamie Carroll for WCMA.

MR. BAUERMEISTER: Don Bauermeister here for plaintiff in the action. Chuck Ray is also with me for plaintiff in this action.

MR. WEISS: I am Mike Weiss dialing in for WCMA in this an action.

MR. EARNHART: We also have on

Page 6

```
 1              RUSH
 2   the phone device Dwight Wallace from
 3   Wal-Mart.
 4        MR. BAUERMEISTER: Mike Weiss,
 5   do I understand you are not in the room?
 6        MR. WEISS: That is right. I
 7   am actually back in Atlanta calling in.
 8        MR. BAUERMEISTER: Okay. Are
 9   you going to be making the objections for
10   the witness, if any, or is another lawyer
11   going to do that?
12        MR. CARROLL: Jamie Carroll.
13   I have already put my appearance on the
14   record. I will.
15        MR. BAUERMEISTER: I
16   understand. Okay.
17   P E T E R  R U S H,
18   having first been duly sworn by a Notary
19   Public of the State of New York, was
20   examined and testified as follows:
21   EXAMINATION BY MR. BAUERMEISTER:
22        Q. Would you state your name for
23   the record, please.
24        A. Peter Rush.
25        Q. Would you spell your last name?
```

Page 7

```
 1              RUSH
 2        A. R-U-S-H.
 3        Q. And could you given us your day
 4   time address and phone number, Mr. Rush?
 5        A. 355 Lexington Avenue, New York,
 6   New York 10017, (212) 297-2122
 7        Q. Mr. Rush, my name is Don
 8   Bauermeister. I don't believe you and I
 9   previously met. I am an attorney in
10   Anchorage, Alaska, and I am speaking to
11   you on the phone from Anchorage, Alaska
12   doing a telephonic deposition.
13           What I would like to do -- have
14   you had your deposition taken before, sir?
15        A. Yes.
16        Q. How many times?
17        A. Probably four or five.
18        Q. All right.
19           Sir, if at any point you want to
20   take a break during this deposition, just
21   please say I would like to take a break,
22   and we will stop immediately, give you a
23   chance to stretch your legs or get a glass
24   of water, whatever you would like to do.
25           If at any point you don't
```

Page 8

```
 1              RUSH
 2   understand a question I have asked because
 3   I mumble my words, I don't speak loud
 4   enough or I use a word that is unfamiliar,
 5   would you please stop me and ask me to
 6   reask the question, so we have clear
 7   communication?
 8        A. Yes.
 9        Q. This is not meant to be a long,
10   grueling event. If you want to take a
11   break just because you are a little bit
12   tired, feel free to tell me that, and I am
13   happy to let you have the time you want
14   just to let you stretch your legs. All
15   right?
16        A. Yes.
17        Q. Have you had a chance to look at
18   the two notebooks of materials that we
19   have sent to New York that are in the room
20   there with you?
21        A. I had a chance to briefly glance
22   at them this morning before coming into
23   this deposition.
24        Q. Okay. Let me represent to you
25   that the bulk of those materials are
```

Page 9

```
 1              RUSH
 2   documents that were produced in this
 3   litigation from WCMA, and to the extent at
 4   any point you want to stop and read the
 5   whole document or you want to look for
 6   other documents that will help you give us
 7   your best answer to any question, would
 8   you feel free to do that?
 9        A. Yes.
10        Q. I want you to feel free at any
11   point to take the time that is useful to
12   you. I don't want to delay the procedure.
13   I would like to get done earlier today if
14   we can, and you folks can be done early as
15   well. On the other hand, I want you to
16   feel like you could use the materials and
17   give us your best answer. It is not a
18   memory contest. We are simply trying to
19   get the clearest record we can. Is that
20   understandable?
21        A. Yes, it is.
22        MR. CARROLL: Just -- just for
23   record, we got them about 9:15 this
24   morning, so I don't know that -- that Mr.
25   Rush has had an opportunity to look
```

```
                            10
 1              RUSH
 2  through all of them. Really we just had
 3  an opportunity to glance through the two
 4  notebooks. So if there is anything else
 5  you can point out for him that would be
 6  useful, I would appreciate it if you
 7  would.
 8       MR. BAUERMEISTER:  Okay. Let
 9  me point out a couple of things for
10  everybody. We did this a little bit off
11  the record, but you'll notice the
12  notebooks are divided into twelve
13  sections. The sections are marked as each
14  one with a separate exhibit, but really
15  some of the sections contain multiple
16  documents. Within each section, there is
17  a three-digit number stamped by the
18  reproducing company in the lower
19  right-hand corner. So at any point if I
20  wanted to get you to a particular
21  document, I will simply announce a number
22  from one of the tabs, which is the exhibit
23  number. For example, 10 and then I will
24  announce a number in the lower right-hand
25  corner such as 003, and that should take
```

```
                            11
 1              RUSH
 2  you to the same page that I am on.
 3       Q.  Does that seem clear, sir?
 4       A.  Yes.
 5       Q.  In the same way, if you want to
 6  direct my attention to a document that
 7  helps you explain your answer that you
 8  happen to see is in the group, please feel
 9  free to ask me to turn to the appropriate
10  exhibit number and then the page number
11  within the exhibit number, and we will get
12  on the same page. If counsel at any point
13  wants us to put into the record also the
14  Bates stamp number that -- with the
15  production number we are happy to do that
16  as well.
17       MR. CARROLL:  Yes, if we could
18  at any time we refer to it, I think it
19  will be easier to define the documents
20  later. So I would appreciate if we could
21  try to do that.
22       MR. RAY:  I am going to speak
23  just briefly, Jamie. I am not going to be
24  voicing things, but for record the other
25  number that is referred to will be the
```

```
                            12
 1              RUSH
 2  seven-digit number beginning with zeros.
 3  For example, I am looking at our Exhibit
 4  4, page 2. The equivalent is 001583. If
 5  we can dispense with the zeros, but that
 6  is just so everybody understands -- some
 7  of -- there are multiple numbers on these
 8  documents.
 9       MR. CARROLL:  Right. If -- if
10  we go with the one that starts with zeros
11  and then just give the actual number
12  without the zeros in front that will be
13  fine because I think -- I believe Wal-Mart
14  requested a copy of those documents, so I
15  know that for us and Wal-Mart it will be
16  easier. I don't know that Ching Feng has
17  a copy, but obviously you are welcome to
18  them if you want them, Dan.
19       MR. QUINN:  Right. I would --
20  I would at some point like to get them.
21       MR. BAUERMEISTER:  All right,
22  gentleman.
23       Q.  Mr. Rush, this again is Don
24  Bauermeister, do you have any questions at
25  all before we start?
```

```
                            13
 1              RUSH
 2       A.  No.
 3       Q.  All right, sir.
 4            Have you had a chance to look at
 5  the 30(b)6 deposition notice here today?
 6       A.  Yes, I had.
 7       Q.  And when did you first see that
 8  notice?
 9       A.  I don't recall exactly. I guess
10  once it was delivered to us.
11       Q.  Okay. When you say delivered to
12  us, who is us?
13       A.  Delivered to the association.
14       Q.  Okay. And have you been
15  selected by the association to appear here
16  on behalf of the association to give
17  testimony as a 30(b)6 deponent?
18       A.  Yes, I have.
19       Q.  And do you understand that means
20  that you will be testifying on behalf of
21  the association?
22       A.  Yes, I do.
23       Q.  All right.
24            And your answers will be those
25  of the association?
```

Page 14

```
 1              RUSH
 2    A.  Yes.
 3    Q.  Do you know how you were
 4  selected to -- perhaps you selected
 5  yourself.  I don't know.  How were you
 6  selected to be the
 7  responding -- responding person today?
 8    A.  I selected myself with -- in
 9  conjunction with discussion with the
10  president.
11    Q.  Okay.  And now what is your role
12  with the WCMA?
13    A.  Right now I am the senior
14  advisor to the WCMA.
15    Q.  Okay.  And for the record, would
16  you tell the jury what the WCMA is?
17    A.  The Window Covering
18  Manufacturers Association is an
19  association -- trade association a 501 C 6
20  not for profit corporation registered in
21  New Jersey that represents manufacturers
22  and suppliers of hard -- window coverings
23  manufactured in North America.
24    Q.  Okay.  When you say represents
25  manufacturers and suppliers of window
```

Page 15

```
 1              RUSH
 2  coverings, what do you mean by represents?
 3    A.  We conduct business that can be
 4  lawfully conducted on behalf of
 5  manufacturers under U.S. law.
 6    Q.  Can you help the jury understand
 7  a little more particularly what it is you
 8  do that represents manufacturers?
 9    A.  The association is a accredited
10  standards writing organization under the
11  American National Standards Institute.  In
12  that capacity, it develops ANSI standards,
13  which are recognized throughout the United
14  States.  The association also runs an
15  annual product innovations award program
16  to help recognize and encourage
17  innovations in the industry.
18    Q.  Does the organization do any
19  lobbying on behalf of the industry?
20    A.  No.
21    Q.  Is there an arm of the
22  organization that does such lobbying?
23    A.  No.
24    Q.  Is there any organization of
25  which you are aware that does lobbying for
```

Page 16

```
 1              RUSH
 2  window covering manufacturers in America?
 3       MR. CARROLL:  Beyond the scope
 4  of the notice.  The witness can answer.
 5    A.  No organization does lobbying as
 6  far as I know.
 7    Q.  Okay.  Can you tell us what an
 8  ANSI standard is?
 9    A.  ANSI -- American National
10  Standards Institute is a body that
11  oversees thousands of voluntary standards
12  that are promulgated throughout the United
13  States.  ANSI is the official United
14  States representative to the International
15  Standards Organization.  An ANSI standard
16  by its development process goes through a
17  fairly rigorous concensus process allowing
18  a broad involvement across all interested
19  parties as well as general public,
20  government agencies to comment on the
21  development of an ANSI standard.
22    Q.  Can you tell us about that
23  rigorous process before the standards are
24  adopted?
25    A.  I will confess I am not an
```

Page 17

```
 1              RUSH
 2  expert on the ANSI process.  The -- my
 3  understanding, however, of the process
 4  that we use and the process that the
 5  window covering manufacturers have used,
 6  which is a canvass method approach, is
 7  that a standard is developed by an open
 8  group of people knowledgeable about the
 9  product.  The standard has a specific
10  form, which is an ANSI dictated type
11  format stating the purpose and working
12  through the particulars of the product at
13  which point once the draft standard is
14  developed, the draft standard is balloted
15  within the group of developers.
16       Once that ballot is counted, any
17  negatives in that ballot must be
18  addressed.  Once acceptance of the
19  internal balloting is completed, the
20  standard is sent to ANSI for consideration
21  as an ANSI standard.  The ANSI standard
22  process provides a public notification of
23  the -- of the proposed standard.  The
24  proposed standard is then opened for
25  public comment.
```

```
                                                    18
 1            RUSH
 2       At the same time the proposed
 3  standard is sent to a -- a what is called
 4  a canvass committee. The canvass
 5  committee, which can represent no more
 6  than -- can have no more than one third
 7  representation among manufacturers, it
 8  usually -- our particular case included
 9  users, retailers as well as general
10  consumers. The canvass process has a
11  certain period of time in which
12  it -- ballots must be received. Once the
13  ballots are received, any negatives must
14  be addressed by the standards developer
15  and once -- if there are significant
16  negative ballots, then the standard
17  generally has to be either reworked or a
18  satisfactory addressing of those negatives
19  must be within the ANSI process.
20       Upon acceptance at the canvass
21  level, ANSI will as an organization affirm
22  the standard, and the standard will then
23  be published. Under the ANSI rules, a
24  standard must be revised or reaffirmed
25  ever five years.
```

```
                                                    19
 1            RUSH
 2  Q.   Okay. Does ANSI do that work or
 3  does it accept the work as done by
 4  organizations that propose the standard?
 5  A.   The --
 6       MR. CARROLL:   I object to the
 7  form. You can answer.
 8  A.   The -- under the ANSI process,
 9  organizations are recognized -- must apply
10  and be recognized as standard developing
11  bodies.
12  Q.   And is the WCMA so recognized?
13  A.   Yes, it is.
14  Q.   So when you produce a standard
15  and provide it to ANSI, they accept it?
16       MR. CARROLL:   I object to the
17  form. Not what the witness stated. You
18  can answer.
19  A.   No, ANSI does not accept it. It
20  must go through ballot and must be
21  accepted at the -- through the canvass
22  process.
23  Q.   Yes. No, I understood that. I
24  mean once -- once you are done with it and
25  the WCMA has a standard it wishes to
```

```
                                                    20
 1            RUSH
 2  promulgate, it then sends it over to ANSI,
 3  and ANSI accepts that as opposed to doing
 4  any work before accepting the standard; is
 5  that right?
 6  A.   I am not --
 7       MR. CARROLL:   I object to the
 8  form. You can answer.
 9  A.   I am not quite sure I understand
10  what your question is.
11  Q.   Okay. Once the WCMA sets a
12  standard and it sends that standard over
13  to ANSI, does ANSI do anything further
14  with the standard or simply accept it and
15  publish it?
16  A.   WCMA works through the ANSI
17  canvass process, so before a standard is
18  accepted it must be publicly balloted.
19  There is public notification and a public
20  ballot. If there are objections on the
21  public ballot, then the standards
22  developers are required to respond to
23  those negative ballots. When all
24  negatives are resolved and the process
25  then allows the standard to be affirmed
```

```
                                                    21
 1            RUSH
 2  and there is no appeal to the ANSI board
 3  of standards review, then the standard
 4  will be accepted.
 5  Q.   Okay. Now, when you talked
 6  about -- I may not have the second word
 7  right, but a third of the canvass group or
 8  circle could be manufacturers
 9  representatives but not more than that.
10  Did I get that right?
11  A.   That's correct.
12  Q.   And that canvass circle, is it
13  called a circle?
14  A.   No, canvass list.
15  Q.   Canvass list. Okay.
16       Why is there a rule that no more
17  than one third of the canvass list can be
18  manufacturers representatives?
19  A.   I can't answer that. I do not
20  know.
21  Q.   Who would know?
22  A.   ANSI.
23  Q.   Can you think of any reason from
24  your years of experience with this why
25  they would limit that canvass list to
```

22

RUSH

Q. ...manufacturers having only one third of the contacts?

A. ANSI standards are concensus documents, and thereby needing a broad concensus for a -- for a standard to be adopted, and ANSI's process has been to be inclusive to permit multiple points of view.

Q. Okay. Sir, do you have notebook one in front of you?

A. Yes.

Q. Could you look at exhibit tab 5 and page 028, the lower right-hand corner.

MR. EARNHART: Don, what is the longer Bates number on it?

MR. CARROLL: Is that 19357?

MR. BAUERMEISTER: Yes.

MR. CARROLL: I will try to help with that, Will. Don, the way we have it, just so you know, I've got one notebook, and Mr. Rush has the other.

MR. BAUERMEISTER: Okay.

Q. Mr. Rush, did you have a chance to look at document 028 and the page

23

RUSH

following 029 from exhibit tab 5?

A. Yes.

Q. Can you tell us what that document says?

A. It says ANSI canvass list for WCMA 100.1.

Q. And what is WCMA 100.1?

A. That is the first standard that WCMA issued.

Q. And when was that issued?

A. 1997 I believe.

Q. Might it have been November of '96?

A. November of '96. You may have that in front of you. I don't have the standard in front of me.

Q. Okay. Now, this is the canvass list for that standard?

A. Yes, that is correct.

Q. And --

MR. CARROLL: Let me just -- are you -- do you know that that is the whole document? Yes or no because I need to know that in order to make an

24

RUSH

objection or not.

THE WITNESS: I cannot tell you absolutely that this is the list that went out.

MR. CARROLL: Don, sorry to interrupt. I'll just object to the extent that I do not know apparently and witness does not know if this is the en -- the entire document produced or if it is merely a subset.

Q. Mr. Rush, how long were you the executive director of the WCMA?

A. Actually, executive director probably 12 years.

Q. And how many years total have you been with the WCMA?

A. Probably eighteen.

Q. Okay. How many standards have you used a canvass list in those eighteen years to set --

A. For WCMA?

Q. Yes, sir.

A. Two.

Q. Okay. So your first standard

25

RUSH

was in November of '96. Your second standard was in September of '02?

A. That is correct.

Q. Can you tell us, sir, whether or not this exhibit at tab 5, page 028, 029 is the total list of the ANSI canvass group or the first standard?

A. This appears to be the list that we sent the canvass ballot to, yes.

Q. All right. And looking at page 1, the first two persons are listed as interested consumers?

A. Yes.

Q. And then the next six entities are what?

A. There is a trade association. There are two retailers, and there are manufacturers.

Q. Okay. Now, let's look at the next page. How many canvass persons or entities are on that page?

A. Seven.

Q. How many of them are a retailer, professional trade association or

## Page 26

RUSH

manufacturer representative?

A. There are two retailers, two manufacturers, two trade associations, and one interested consumer.

Q. Okay. Does this group meet the ANSI standard of only one third of the group being involved in the industry?

A. I -- the ANSI rules in this list goes to ANSI for approval prior to us using it as a canvass list. It does in fact meet that criteria.

Q. I am sorry. You say it does meet that?

A. It does meet the criteria of having no more than one third manufacturers.

Q. Okay. So when you say only one third manufacturers, you don't just mean people in the business. You mean literally people who manufacture these items?

A. Manufacturers, yes, sir.

Q. Okay. Would it be possible to have an ANSI canvass list made entirely of

## Page 27

RUSH

people who are in the business as professional trade associations, retailers and manufacturers?

A. I do not know, sir.

Q. Would there be any problem with such a canvass list if it was composed of those three groups and no other persons?

MR. CARROLL: I object to the extent it is beyond the scope of the notice. The witness may answer.

A. The different organizations represent different levels of interests within a product or product group.

Q. Sir, is setting these safety standards an important safety protection for the public?

A. Any standard is important to provide at least a baseline of product performance.

Q. In your opinion, do these standards protect the public?

A. I would say that the WCMA standards are a significant improvement over the fact that no standard was in

## Page 28

RUSH

existence prior to their development.

Q. Do these standards protect the public?

MR. CARROLL: Asked and answered. You can answer again.

A. They are a significant step in terms of providing a baseline for products to be judged as to whether they are -- meet that standard.

Q. Are the standards meant to protect the public?

A. The standard is meant to provide a baseline for products to be manufactured. They are performance based standards.

Q. So it is not meant to provide protection for the public?

MR. CARROLL: Asked and answered. You can answer again.

A. The -- the purpose of the standard is stated in the first, I believe, opening paragraph of the standard. Standards that are voluntary standards are developed as performance

## Page 29

RUSH

standards which are then used by manufacturers and/or other groups as a basis for their product.

Q. Sir, I -- I gues I am having trouble understanding whether or not these standards are supposed to protect the public or not. You can't give me any more answer than you have?

A. The purpose of a performance standard is to provide a baseline for the manufacture of a product.

Q. Can public consumers of these products rely on this standard to tell them anything?

A. In as far as a product is manufactured to a particular performance standard and if that performance standard goes through the process of ANSI accrediation and has -- it provides again a certain level of confidence that a product has been manufactured to an acceptable level of performance.

Q. What kind of confidence do you have?

**Page 30**

RUSH

A. Of the acceptable level of performance, I think the products that meet these -- products that meet these standards are acceptable products.

Q. Does that mean safe products?

A. I don't think I am in a position to answer what safe means.

Q. Why is it that you couldn't answer what safe means?

A. I am not an expert in safety.

Q. But you were the executive director of the WCMA for 12 years?

MR. CARROLL: Asked and answered.

A. Yes, sir.

Q. And during your tenure, the two safety standards issued by your organization were issued; is that correct?

A. Yes, sir.

Q. Were those important standards from the point of view of job work that you wanted to get done?

A. They were important standards, yes.

**Page 31**

RUSH

Q. What made them important?

A. They advanced the -- the baseline ability to manufacture products. They were excellent performance standards which were developed with the complete cooperation of the United States Consumer Products Safety Commission.

Q. Did America become safer after these standards were produced?

MR. CARROLL: I object to the form of the question.

A. The United States Consumer Products Safety Commission, who is the recognized authority in the United States, I believe feel that the products did address their significant concerns.

Q. Now, you told us you were not a safety professional?

A. That is correct.

Q. So you are not a safety engineer?

A. No, sir.

Q. Do you have any engineering background?

**Page 32**

RUSH

A. No, sir.

Q. Do you have any safety professional training?

A. No, sir.

Q. Do you have any occupational or workplace safety training?

A. No, sir.

Q. What is your educational background?

A. I have a bachelors degree and a masters degree.

Q. And in what areas were you trained?

A. International relations and English.

Q. How many safety engineers did the WCMA have on staff when it passed these two safety standards?

MR. CARROLL: I object to the form of the question. You can answer.

A. No safety engineers on staff.

Q. How many safety professionals on staff when the WCMA passed these two standards?

**Page 33**

RUSH

MR. CARROLL: I object to passed these two standards. Subject to that, you can answer.

A. No safety engineers on staff.

Q. How many safety professionals and occupational safety workplace or product safety were consulted by the WCMA to produce these standards?

A. The U.S. Consumer Products Safety Commission, who participated in the development of both standards, included human factors, engineering, product compliance people, all who were part of the technical committee that developed both of these standards.

Q. And were there any industry representatives or only government representatives?

A. There were industries.

Q. Did you select any of those persons?

A. No, I did not.

Q. Did WCMA ask that any persons with any special expertise be involved in

**Page 34**

```
 1            RUSH
 2  the development of these standards?
 3      A.   No, they did not.
 4      Q.   Sir, I would like you to look at
 5  notebook 2 at Exhibit 10.
 6          MR. CARROLL:  Notebook 2,
 7  Peter.
 8          (Pause.)
 9      Q.   Do you have that in front of
10  you, sir?
11      A.   Yes, I do.
12      Q.   All right.
13          I would like you to look at page
14  010, page 10.
15          MR. CARROLL:  8464 is the
16  Bates number.
17          MR. EARNHART:  Thanks.
18      Q.   There should be a document with
19  the caption at the top "Meeting on window
20  blind cord strangulation, December 15,
21  1996."
22          Do you have that, sir?
23      A.   Yes, I do.
24      Q.   About midway down the left hand
25  column, there is a Peter Rush, WCSC and
```

**Page 35**

```
 1            RUSH
 2  then a phone number to the right of that.
 3          Do you see that?
 4      A.   Yes, I do.
 5      Q.   Is that your signature?
 6      A.   Yes, it is.
 7      Q.   Can you tell the jury what the
 8  WCSC is?
 9      A.   Window Coverings Safety Council
10  is a not for profit C 6 New Jersey
11  corporation.
12      Q.   Okay.  Were you employed as
13  executive director of the Window Coverings
14  Manufacturers Association on December 5,
15  1996?
16      A.   Yes, I was.
17      Q.   And why isn't WCMA behind your
18  name here?
19      A.   I was also the executive
20  director of the Window Coverings Safety
21  Council at that time.
22      Q.   So you held two executive
23  directorships?
24      A.   I actually held more than that.
25      Q.   Well, let's talk about those
```

**Page 36**

```
 1            RUSH
 2  two.  These both relate to window
 3  coverings safety; is that right?
 4      A.   Not necessarily, sir.
 5      Q.   And what do you mean by that?
 6      A.   Window Coverings Safety Council
 7  was specifically a safety -- set up
 8  regarding the safety issue in window
 9  coverings.  Window Covering Manufacturers
10  Association had been in existence for many
11  years prior to, and its specific focus
12  continued to evolve.
13      Q.   On December 5, 1996, were you
14  the executive director of both the Window
15  Coverings Safety Council and the Window
16  Covering Manufacturers Association?
17      A.   Yes, I was.
18      Q.   Do you see any conflict in
19  holding those two positions?
20      A.   No, sir.
21      Q.   Did these two nonprofits as you
22  call them maintain separate offices?
23      A.   No, sir.
24      Q.   Do they have separate staff?
25      A.   They have some overlapping staff
```

**Page 37**

```
 1            RUSH
 2  and some separate staff.
 3      Q.   Okay.  In December 5, 1996 in
 4  that time frame, how many employees did
 5  the Window Covering Manufacturers
 6  Association have?
 7      A.   Zero.
 8      Q.   How many employees did the
 9  Window Coverings Safety Council have?
10      A.   Zero.
11      Q.   Well, if you were the executive
12  director, weren't you an employee?
13      A.   No, I was not.
14      Q.   Did neither of these
15  organizations pay you a salary?
16      A.   Neither of the organizations
17  paid me a direct salary.
18      Q.   What do you mean by a direct
19  salary?
20      A.   Both of these organizations
21  were -- had a contract for management with
22  Sumner Rider & Associates.
23      Q.   Okay.  What is a contract for
24  management?
25      A.   It's a contract by which the
```

Page 38

```
1        RUSH
2   organization contracted with a company to
3   provide it with association management
4   services.
5       Q.   Okay. And who -- I am sorry.
6   That other phrase or name you used was
7   Sumner Rider Corporation?
8       A.   Sumner Rider & Associates, yes,
9   sir.
10      Q.   Could you spell that for the
11  record?
12      A.   S-U-M-N-E-R R-I-D-E-R and
13  associates.
14      Q.   Okay. And Sumner Rider &
15  Associates provides association management
16  services?
17      A.   Yes, it did.
18      Q.   And you were an employee then of
19  Sumner Rider?
20      A.   Yes, I was.
21      Q.   And what was your title with
22  Sumner Rider?
23      A.   I was president.
24      Q.   And how many employees does
25  Sumner Rider have?
```

Page 39

```
1        RUSH
2       A.   At the time of 1996, we had I
3   would venture 21 employees.
4       Q.   What kind of work does Sumner
5   Rider do?
6       A.   It was in the business of
7   association management.
8       Q.   Anything else?
9       A.   A well as communications.
10      Q.   And what do you mean by
11  communications?
12      A.   The general area of
13  communications including public relations
14  was the prime focus.
15      Q.   Is Sumner Rider primarily a
16  public relations agency?
17      A.   No, it had equal split of
18  business between association management
19  and public relations.
20      Q.   Can you tell me about the public
21  relations work you did at Sumner Rider?
22      A.   We did general corporate and
23  trade association public relations.
24      Q.   For the jurors that don't know
25  what general corporate and trade
```

Page 40

```
1        RUSH
2   association public relations is, could you
3   be a little more specific?
4       A.   We put out press releases. We
5   created brochures. We put out -- those
6   are the two major functions that we were
7   involved in. Brochures, collateral and
8   press releases.
9       Q.   For trade associations?
10      A.   For trade associations and
11  corporations.
12      Q.   Okay. In December 5 of 1996
13  when you were meeting on the window blind
14  cord strangulation group that we show here
15  at tab 10, Exhibit 010, how much of your
16  time were you spending on Window Covering
17  Manufacturers Association work versus
18  public relations work?
19      A.   Window Covering Manufacturers
20  Association --
21      Q.   Yes, sir.
22      A.   -- was probably only 10 percent
23  of my time.
24      Q.   How about the Window Covering
25  Safety Council, how much of your time was
```

Page 41

```
1        RUSH
2   that?
3       A.   That may have been -- at this
4   point in time, that may have been 30 to 40
5   percent of my time.
6       Q.   What did you do with the other
7   50 to 60 percent of your time?
8       A.   Work on other clients, run the
9   business.
10      Q.   What clients were those?
11          MR. CARROLL:   Don, he said
12  work -- work on other clients, run the
13  business. I want to make sure the record
14  was clear that he was answering the same
15  time you were asking, so you could hear
16  what he said.
17      Q.   Let me apologize. Mr. Rush, I
18  am a long ways away on the phone, and I
19  can't see you all the time although you
20  are a good witness and pausing between
21  questions and answers, and I appreciate
22  that.
23          If at any point I start asking a
24  second question because I can't see you
25  pausing and restarting an answer, just
```

Page 42

RUSH

1  interrupt me, so you could get your whole
2  answer on the record. Would you do that,
3  please?
4     A.  That is fine.
5     Q.  I will do my best not to
6  interrupt because I want to get your whole
7  answer. Is that clear?
8     A.  Yes, sir.
9     Q.  Thank you.
10        So in on December 5, 1996 you
11  worked for other clients besides the WCMA,
12  WCSC. Who were those clients?
13    A.  To the best of my memory, the
14  Builders Hardware Manufacturers
15  Association, the Cooper Development
16  Association.
17    Q.  And were you executive director
18  of the Builders Hardware Manufacturing
19  Association?
20    A.  Yes, I was.
21    Q.  And were you executive director
22  of the Cooper Development Association?
23    A.  No, I was not.
24    Q.  What did you do for them?

Page 43

RUSH

1     A.  They -- public relations work,
2  press releases.
3     Q.  Tell me about the brochures that
4  your company created. What were those
5  for?
6     A.  Mostly general informational
7  brochures, product brochures.
8     Q.  Were these to promote an
9  industry, an association or a specific
10  company or all three?
11    A.  Each brochure would have a
12  specific purpose. Some were to
13  create -- promote an industry. Some were
14  to promote industry products in general.
15  If it was a corporate brochure, it might
16  be for a specific product.
17    Q.  Did you ever work on a brochure
18  for a window covering manufacturer?
19    A.  For a manufacturer, no.
20    Q.  Why not?
21    A.  We did not handle any window
22  covering manufacturers as clients.
23    Q.  Why not?
24    A.  There would be a perceived

Page 44

RUSH

1  conflict in our own mind of working for
2  one manufacturer while handling the
3  association.
4     Q.  What would the perceived
5  conflict be?
6     A.  The other members of the
7  association wouldn't particularly be happy
8  with it.
9     Q.  Why is that?
10    A.  Because they are competitors.
11    Q.  What were the terms of the
12  contract between Sumner Rider and the WCMA
13  in December of '96?
14    A.  We were engaged on a monthly
15  retainer fee.
16    Q.  And you were engaged to do what?
17    A.  Run the association.
18    Q.  Do you know how much that fee
19  was?
20    A.  I believe from memory it was
21  3500 dollars a month.
22    Q.  Did the WCMA have any other
23  source of income during that time?
24    A.  Other than what?

Page 45

RUSH

1     Q.  The 3500 a month.
2        MR. CARROLL: I object. That
3  is not the witness' testimony.
4     Q.  I see. So the WCMA paid Sumner
5  Rider?
6     A.  That's correct.
7     Q.  And where does the WCMA get
8  funds to pay Sumner Rider?
9     A.  Membership dues.
10    Q.  How many members would the WCMA
11  have had in December of '96, if you know?
12    A.  Perhaps ten.
13    Q.  And what were the dues for those
14  entities?
15    A.  It varied depending upon
16  classification, but if I remember
17  correctly the dues went from 6,000 dollars
18  a year to 1500 dollars a year.
19       MR. EARNHART: Don, can we
20  take --
21    Q.  So total budget for the WCMA in
22  '96 would have been approximately how
23  much?
24    A.  Under a hundred thousand

**Page 46**

1  RUSH
2  dollars.
3  MR. EARNHART: Don, can we take
4  a five-minute break just to use the rest
5  room here real quick?
6  MR. BAUERMEISTER: Any time,
7  gentlemen, and, Mr. Rush, any time you
8  need a break you let me know as well.
9  THE WITNESS: Okay. Thank you.
10  MR. BAUERMEISTER: We will
11  stay on the phone.
12  MR. CARROLL: Yes, we will
13  leave you muted. The rest room is about
14  ten steps away.
15  THE VIDEOGRAPHER: The time is
16  11:05 a.m. We are off the record.
17  (Recess taken.)
18  THE VIDEOGRAPHER: We are back
19  on the record. The time is 11:10 am.
20  BY MR. BAUERMEISTER:
21  Q. Mr. Rush, looking at Exhibit 10,
22  page 010, just below your name is -- it
23  looks like Doug MacElwayne from Wal-Mart.
24  Is that right?
25  A. Yes.

**Page 47**

1  RUSH
2  Q. And he was at this meeting with
3  you on window blind cord strangulation on
4  December 5, 1996?
5  MR. EARNHART: I am going to
6  object. This a window covering -- this
7  is -- I don't think this is a window
8  covering manufacturers meeting. I think
9  it is beyond the scope of the 30(b)6
10  deposition.
11  Q. All right.
12  Can you answer the question,
13  sir?
14  A. Yes, he was at the meeting.
15  Q. And what was the meeting about?
16  A. It was a meeting -- I don't have
17  the -- I don't see the notes to the
18  meeting, but it was a meeting regarding
19  window covering strangulation hazard.
20  Q. Do you know why Wal-Mart would
21  have a representative there?
22  A. The safety council. This is a
23  safety council meeting.
24  Q. Right.
25  A. And Wal-Mart was a member of the

**Page 48**

1  RUSH
2  safety council.
3  Q. Were they selling products that
4  were involved in window blind cord
5  strangulation?
6  MR. CARROLL: I object to the
7  form.
8  MR. EARNHART: I object.
9  Foundation.
10  MR. CARROLL: You can answer.
11  A. Wal-Mart was a retailer of
12  window covering cords -- of window
13  covering products.
14  Q. Sir, did the WCMA maintain
15  statistics on accidents, deaths, injuries,
16  causes of accidents death and injuries
17  relating to window coverings?
18  A. No, it did not.
19  Q. Has it ever done so?
20  A. No, it has not.
21  Q. Sir, could you turn forward two
22  pages to 012, please.
23  MR. CARROLL: That would be
24  Bates number 29666.
25  MR. BAUERMEISTER: Yes, sir.

**Page 49**

1  RUSH
2  Q. Do you have that, Mr. Rush?
3  MR. CARROLL: No, he does not,
4  Don. He meant -- he said turn forward,
5  but he meant back. Go to 012 by those
6  three numbers, yes.
7  Q. It should just be three pages
8  down in the document.
9  MR. CARROLL: I believe he has
10  it.
11  Q. In the bottom of that document
12  there appears to be an E mail from a
13  Caroline Jennings; is that right?
14  A. Yes, it is.
15  Q. And can you tell the jury who
16  Caroline Jennings is, please?
17  A. Caroline Jennings works for me.
18  Q. And what does she do for you,
19  sir?
20  A. She was -- she is an account
21  executive with our firm.
22  Q. Okay. What does an account
23  executive do?
24  A. She will handle certain
25  activities depending upon the client

## Page 50

```
1              RUSH
2    assignment.
3       Q.   So does she work in public
4    relations?
5       A.   No, she does not.  She works in
6    association management.
7       Q.   Okay.  Could you read the first
8    three sentences there that begins Tom,
9    bash and I, for the record, please?
10      A.   Okay.  This is the one dated
11   October 10, 2003?
12      Q.   It looks like October 9 to me,
13   but --
14      A.   October 9.  Okay.
15      Q.   Caroline 10/9/03, 10:56 a.m.  Do
16   you have that entry?
17      A.   Yes.
18      Q.   And what is the first -- if you
19   could read the first paragraph below that?
20      A.   "Tom, Barb and I met on Tuesday
21   to review the IDI data and to begin
22   drafting a preliminary summary.
23   Unfortunately the more we look at the data
24   the more questions kept cropping up.
25   Consequently we are asking for some
```

## Page 51

```
1              RUSH
2    additional input from all of you to help
3    us proceed."
4       Q.   Okay.  Now, who is are Tom, Barb
5    and I?
6       A.   Tom Mazerack from Comfort Techs,
7    who is a member, and Barb would be Barb
8    Miller from our our firm, and I would be
9    Caroline Jennings.
10           MR. EARNHART:  Just for the
11   record, member of what?
12           THE WITNESS:  Member of -- Tom
13   Mazerack would be a member of
14   manufacturers association and of safety
15   council.  Comfort Techs is the company.
16      Q.   And what is it that Barb Miller
17   does for your company?
18      A.   She is on I would say the
19   government affairs technical side and some
20   public relations.
21      Q.   Okay.  Now, do you see the
22   heading there at the bottom of the page
23   errors, heading changes?
24      A.   Yes.
25      Q.   And then that goes into a
```

## Page 52

```
1              RUSH
2    paragraph at the top of the next page?
3       A.   Yes.
4       Q.   Could you read that for the
5    record, please.
6       A.   "Errors:  Heading changes.  The
7    errors we caught are pretty insignificant.
8    Wrong incident death dates, data cell
9    transpositions, errors in ages, those that
10   should not be applicable, et cetera.  The
11   recommended heading changes center on the
12   cause of noose.  Tom suggested it should
13   be changed to root cause of entanglement
14   since noose still connotes a loop to most
15   readers.  I agree entangle is much
16   better -- is much better but please let me
17   know if you disagree.  In the
18   subcategories under the root cause of
19   entanglement we are also suggest we be a
20   little bit more descriptive for clarity's
21   sake and change victim to victim
22   manipulation, consumer to consumer alert
23   and product to product design."
24      Q.   Sir, does consumer -- should
25   that be consumer altered?
```

## Page 53

```
1              RUSH
2       A.   Consumer altered, yes.  I am
3    sorry.
4       Q.   Thank you.  Now, can you tell me
5    what your employees are talking about
6    here, what are they trying to do?
7       A.   The WCMA set up a technical
8    subcommittee in 2003 to work directly with
9    the Consumer Products Safety Commission
10   who was involved in this committee to
11   develop a report to analyze in more detail
12   the number of strangulation deaths that
13   the Consumer Products Safety Commission
14   had in their database over a period of
15   time.
16      Q.   All right.
17           And your staff is talking here
18   about changing cause of noose to root
19   cause of entanglement?
20      A.   This is still from what I could
21   see very preliminary discussions as to how
22   best to classify, how to categorize and
23   how to develop an understandable report.
24      Q.   How does it benefit
25   understanding to change cause of noose to
```