54

1 RUSH
2 root cause of entanglement?
3     MR. CARROLL:  I object to the
4 extent that he didn't write the document.
5 The document speaks for itself.  Subject
6 to that, he can answer.
7     A.  That is not all potential
8 strangulations would happen -- would
9 necessarily happen in a noose.
10    Q.  All right, sir.  Could you read
11 the next paragraph for the record, please.
12    A.  "Ideas to rereview.  In the
13 process of cleaning up the clerical errors
14 and trying to organize the data in our own
15 minds we discovered a few inconsistencies
16 that we think the committee needs to
17 revisit before we can proceed.  One or two
18 relate to the description of the operating
19 system and system type and design versus
20 what we actually know.  Most deal with
21 whether the cord was wrapped around the
22 victim's neck, the victim was caught in a
23 loop or we just don't know.  It appears
24 that often we were swayed by the casual
25 word choices in the incident reports and

55

1 RUSH
2 the police report narratives rather than
3 the medical examiner's finding of the
4 ligature marks if available to determine
5 if the victim was caught in a loop or the
6 cord was wrapped around the neck.  In
7 turn, this can cause whether -- this can
8 change whether the cause of entanglement
9 should be listed as victim caused, product
10 caused or unknown."
11    Q.  Now, can you tell the jury what
12 ligature marks are?
13    A.  I can't tell you from a
14 technical standpoint.  I --
15    Q.  Do you have any understanding as
16 a nineteen-year employee of the WCMA that
17 promulgated the two standards here?
18        MR. CARROLL:  I object to the
19 extent it has already been established
20 that he is not an employee, but subject to
21 that objection he can answer.
22    A.  Based upon my just say general
23 knowledge I would say ligature would mean
24 some sort of mark on someone's body based
25 upon -- I don't know it is a medical term.

56

1 RUSH
2    Q.  You've not seen it before?
3    A.  I don't have a definition in my
4 mind.  No, I don't, sir.
5    Q.  Why are your employees concerned
6 with ligature marks if you've never heard
7 what they are before?
8    A.  Consumer Products Safety
9 Commission is involved in this with their
10 human factors development.  Again, as I
11 say, this was a technical report done in
12 conjunction with the Consumer Products
13 Safety Commission to try to examine these
14 in more detail.
15    Q.  Well, if you know, can you tell
16 me how the existence of ligature marks can
17 change whether the cause of entanglement
18 should be listed as victim caused, product
19 caused or unknown?
20    A.  I cannot elaborate more than
21 what is in the document, sir.
22    Q.  All right.
23        Now, could you read the
24 paragraph following the numerical listings
25 there called "inner cord categorization."

57

1 RUSH
2    A.  "Inner cord categorization.
3 Finally we like the group to rethink our
4 original decision to automatically list
5 victim manipulation as a root cause factor
6 with inner cord death.  Although we agree
7 that the victim had to manipulate the
8 inner -- manipulate the product to
9 activate -- actively cause the loop, in
10 retrospect it seems wrong not to list the
11 inner cord death as product caused given
12 the inherent design deficiencies of the
13 blind not having cord stops.  Please
14 consider this and let us know if you think
15 inner cord deaths should be listed as
16 victim caused, product caused or both
17 victim and product caused."
18    Q.  Sir, why would the original
19 listing process decision automatically
20 list victim manipulation as the root cause
21 factor with inner cord deaths?
22    A.  I do not know.
23    Q.  Why would Caroline Jennings
24 state that in retrospect it seems wrong
25 not to list the inner cord deaths as

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868                                    516-608-2400

EXHIBIT 42-B

## Page 58

```
 1        RUSH
 2   product caused given the inherent design
 3   deficiencies of blinds not having cord
 4   stops?
 5       A.   The Window Covering
 6   Manufacturers Association -- safety
 7   council, I am sorry, the safety council
 8   had entered into a corrective action plan
 9   with the Consumer Products Safety
10   Commission prior to this actually in 2000
11   at which point products had been modified
12   and redesigned to include products -- cord
13   stops.  In looking at that information or
14   in developing that new safety standard to
15   address that potential hazard, the
16   industry was fairly -- well, the industry
17   was aware of it at that point and was
18   certainly wanting to make certain that we
19   got this report as right as possible.
20       Q.   How is it that initially the
21   industry in attempting to get this as
22   right as possible made the original
23   decision to automatically list victim
24   manipulation as the root cause factor with
25   inner cord deaths?
```

## Page 59

```
 1        RUSH
 2       MR. CARROLL:   Let me object to
 3   the extent there is no foundation.  It
 4   hasn't been established that the
 5   agency -- that the association did that.
 6   You can answer subject to that objection.
 7       A.   Well, and I can't say that the
 8   industry did because CPSC was involved in
 9   setting up many of these original
10   categories as well.
11       Q.   Sir, given your 18 years of
12   involvement with the WCMA, do you agree or
13   disagree with Caroline Jennings that in
14   retrospect it seems wrong not to list
15   inner cord deaths as product caused given
16   the inherent design deficiencies of blinds
17   not having cord stops?
18       MR. EARNHART:   Vague as to
19   time.
20       MR. CARROLL:   Subject to that,
21   you can answer.
22       A.   As of the date this is written,
23   I would agree with Caroline's assessment.
24       Q.   Okay.  The date this was written
25   was 10/9/03; is that right?
```

## Page 60

```
 1        RUSH
 2       A.   Yes, it was.
 3       Q.   How much earlier from that point
 4   in time would you have disagreed with her
 5   assessment?
 6       A.   This is looking at the
 7   particular discussion of this report, so
 8   this report was only being done in this
 9   time frame.
10       Q.   So before this date, you would
11   not have agreed in retrospect it seems
12   wrong not to list inner cord death as
13   product caused?
14       A.   I'm not quite sure I understand
15   your question.
16       Q.   I thought I asked you whether or
17   not you agreed with Ms. Jennings' opinion,
18   and I thought you said you did but
19   qualified it as to this point in time;
20   that is the point in time of her E mail
21   here.
22       What I am trying to establish is
23   how much earlier than that was it when you
24   first decided this opinion was correct?
25       MR. CARROLL:   I object to
```

## Page 61

```
 1        RUSH
 2   form.  You can answer.
 3       A.   In 1999, the Window Coverings
 4   Safety Council was notified by the U.S.
 5   Consumer Products Safety Commission
 6   regarding the evaluation that a number of
 7   window covering cord deaths had occurred
 8   within the inner cord of window covering
 9   products.  The industry at that point
10   worked very quickly with the U.S. Consumer
11   Products Safety Commission to redesign the
12   products, to enter into a corrective
13   action program, and to reopen the ANSI
14   standard to make certain that we included
15   inner cords in the -- in the WCMA product
16   standard.
17       Q.   So if I understand you and
18   Caroline, you would have had Caroline's
19   opinion that inner cord deaths should be
20   listed as product caused given the
21   inherent design deficiencies of blinds not
22   having cord stops from approximately 1999?
23       A.   I -- in 1999, I would say that
24   would be the correct position.  I believe
25   it was late in the year 1999.
```

## Page 62

    RUSH
Q. Okay. And you haven't changed that belief from then until today, have you?
A. That in 1999 the action that we took was in conjunction with Consumer Products Safety Commission, no, I have not changed that opinion.
Q. Okay. So from 1999 until today, which is 2006, you would have had the opinion that inner cord deaths are product caused given the inherent design deficiencies of blinds not having cord stops?
A. From 1990 -- as of 1999 the products needed to be redesigned in order to have cord stops, yes.
Q. All right, sir.
    Can you tell me who April Cox was?
    MR. CARROLL: If you are looking at a document, it would be helpful if you would mention it to him.
Q. Have you seen the complaint in this action?

## Page 63

    RUSH
A. Yes, I have.
Q. Is April Cox the child who died in an inner cord strangulation here in Alaska on May of 2002?
A. May I refer to the document?
    MR. CARROLL: Sure.
A. To make certain.
Q. Yes, sir.
    MR. CARROLL: It is at tab one.
    (Pause.)
    MR. CARROLL: The second document.
    (Pause.)
A. Yes, sir.
Q. April is the little girl that brings us here, right?
A. Yes. Yes, she is.
Q. Can you tell the jury what you know about her death?
A. That she died in a window covering cord accident.
Q. Do you know anything more than that?

## Page 64

    RUSH
A. I believe that she was entangled in an inner cord.
Q. Do you know anything else?
A. No, sir.
Q. Do you know what standards the window covering that strangled April Cox was manufactured to?
A. No, I do not.
Q. Do you know if it met the November '96 standard promulgated by the WCMA?
A. No, I do not.
Q. Have you attempted to find that out?
A. No, I have not.
Q. Has anybody from the WCMA attempted to find that out?
A. Not that I know of.
Q. Does the WCMA have any interest in whether or not the blind that April Cox was strangled by had the WCMA first standard warning on it?
    MR. CARROLL: I object to the form. Argumentative. You can answer.

## Page 65

    RUSH
A. The Window Covering Manufacturers Association has no enforcement powers over the standard. That rely -- that remains with the U.S. Consumer Products Safety Commission.
Q. Let me represent to you, sir, that the warning on the blind which killed April Cox in May of '02 was the standard warning produced by the WCMA in November of 1996.
    Can you tell the jury what that standard warned April Cox's family about concerning inner cord strangulation?
    MR. CARROLL: Let me object to -- to the form of the question and a lack of foundation that any standard was produced by the WCMA on that blind. Subject to that, you can answer.
A. The standard WCMA standard had a variety of warning labels depending upon the particular product. I am not familiar with the particular product that is involved in this case. The warnings, which were agreed to and approved by the

Page 66

```
 1              RUSH
 2   ANSI process as well as the Consumer
 3   Products Safety Commission, had a variety
 4   of warnings regarding cords.
 5      Q.  Sir, can you tell me whether or
 6   not these standards have been important in
 7   the attempt in America to stop child
 8   strangulation by window coverings?
 9          MR. CARROLL:  Let me object to
10   the form of the question.  You -- subject
11   to that, you can answer.
12      A.  I believe that the U.S. Consumer
13   Products Safety Commission and the Window
14   Covering Manufacturers Association
15   developed a standard that was a
16   significant step forward in providing
17   a -- a safer product in the market place.
18      Q.  How does the standard promote a
19   safer product in the marketplace?
20      A.  There are a variety of fairly
21   specific design requirements, performance
22   tests that a product must meet in the
23   standard.
24      Q.  How does that make a safer
25   product?
```

Page 67

```
 1              RUSH
 2      A.  It -- it has eliminated the loop
 3   cord for the most part or provided other
 4   methods of I guess -- other methods that
 5   companies could take in terms of how to
 6   deal with corded window covering products.
 7      Q.  And who did that standard make
 8   safer?
 9          MR. CARROLL:  I object to the
10   form.  If you understand it, you can
11   answer it.
12      A.  The -- the product -- the
13   standard itself was a standard for the
14   manufacturing process and is a performance
15   standard regarding how to make the
16   product.  How the product is used is
17   something that is certainly not covered in
18   the particular standard.
19      Q.  Okay.  The WCMA promulgated a
20   second standard in September of 2002; is
21   that right?
22      A.  That's correct.
23      Q.  And how did that standard differ
24   from the earlier standard of November '96?
25      A.  The major difference between the
```

Page 68

```
 1              RUSH
 2   two standards was the specific inclusion
 3   of inner cord strangulation potential
 4   danger and inclusion of some sort of
 5   mechanism on the cord to reduce the
 6   possibility of it being pulled through the
 7   head rail.
 8      Q.  Okay.  So the September '02
 9   standard attempted to do both a warning
10   about the inner cord hazard as well as
11   manufacturer out of the risk by changing
12   whether the cord could be pulled out from
13   the center; is that right?
14      A.  Those -- those are two, yes,
15   major changes in the 2002 standard.
16      Q.  Why weren't those changes made
17   in 1999 when you were aware that the inner
18   cord risk of strangulation was such that
19   these products were defective?
20      A.  In fact, the corrective action
21   plan that Window Covering Safety Council
22   and the U.S. Consumer Products Safety
23   Commission agreed to in 2000 required or
24   the manufacturers agreed to immediately
25   make that change in manufacturing to
```

Page 69

```
 1              RUSH
 2   include the stop cord.  The process of
 3   revising a standard however has a time lag
 4   over the -- what could be changed in the
 5   manufacturing process because the ANSI
 6   process requires a certain amount of time
 7   for notification, for review, but rather
 8   than wait for the standard to actually be
 9   formally changed the manufacturers changed
10   production very quickly and began
11   producing to what later would become the
12   standard.
13      Q.  Why did the manufacturers
14   immediately begin changing production?
15      A.  I -- you would have to ask each
16   individual manufacturer, but the sense of
17   the industry I had was that as we had from
18   the very beginning that the industry was
19   very quick to when a problem was
20   identified that we would try to address it
21   immediately in cooperation with the U.S.
22   Consumer Products Safety Commission.
23      Q.  So the manufacturers recognized
24   the serious threat to children's lives
25   this posed and then immediately corrected
```

Page 70

```
 1         RUSH
 2  it in their manufactured products. Is
 3  that what you are telling me?
 4       MR. CARROLL:  I object to
 5  form.  You can answer.
 6    A.  That is -- yes, we signed a
 7  corrective action program with the U.S.
 8  Consumer Products Safety Commission in
 9  which manufacturers changed the production
10  of their products.
11    Q.  You say we signed.  Who is we?
12    A.  The Window Covering Safety
13  Council.
14    Q.  Why would the Window Covering
15  Safety Council sign an agreement with the
16  CPSC?
17    A.  The Window Covering Safety
18  Council had been the organization that had
19  been working with the Consumer Products
20  Safety Commission since 1994 and had a
21  corrective action program already in place
22  with CPSC, and it was the organization
23  that represented the broad scope of
24  companies involved in the window covering
25  industry.
```

Page 71

```
 1         RUSH
 2       MR. EARNHART:  I am going to
 3  interject an objection again.  We are
 4  going beyond the scope of the deposition
 5  notice.
 6    Q.  Sir, do you feel that the
 7  manufacturers did the right thing upon
 8  learning that there was this inner cord
 9  risk to immediately begin manufacturing
10  new product to eliminate that risk to the
11  best of their ability?
12    A.  Yes, I believe that the -- the
13  members of the WCSC acted correctly in
14  doing that.
15    Q.  Why is that?
16    A.  As we had done in previous
17  situations when a -- in 1994 is that the
18  industry would rather be proactive and
19  begin change -- change in manufacture
20  rather than wait for a standard to be
21  developed.
22    Q.  Is that because if you are not
23  proactive children can die?
24       MR. CARROLL:  Object to the
25  form.  Argumentative.  You can answer.
```

Page 72

```
 1         RUSH
 2    A.  The industry has been concerned
 3  very -- from the very beginning regarding
 4  the the potential hazard that corded
 5  window covering products could have for
 6  children.
 7    Q.  What do you mean by from the
 8  very beginning?
 9    A.  From the first time that the
10  manufacturers association was notified by
11  the Consumer Products Safety Commission.
12    Q.  When was that?
13    A.  1985.
14    Q.  Sir, what did the manufacturers
15  do as they immediately responded to this
16  inner cord problem by changing their
17  manufacturing processes, what did they do
18  with products that had already been
19  manufactured?
20    A.  I could not speak for all
21  manufacturers.  The -- the Window Covering
22  Safety Council, however, provided free
23  retrofit kits that included the ball stop
24  for products existing in the field.
25    Q.  Tell me which manufacturers
```

Page 73

```
 1         RUSH
 2  withdrew the products that they no longer
 3  would manufacture because they weren't
 4  safe according to the standard.
 5       MR. CARROLL:  Beyond the scope
 6  of the notice.  If Mr. Rush knows, he can
 7  answer.
 8    A.  I do not know.
 9    Q.  Do you know of a single
10  manufacturer that took their shelf --
11  their product off the shelf because it was
12  no longer safe according to their
13  manufacturing standards?
14       MR. CARROLL:  Asked and
15  answered.  Argumentative.  You can answer
16  again.
17    A.  I did not know.
18    Q.  Could you tell me, sir, why an
19  industry would begin an immediate change
20  in manufacture to prevent the risk to
21  children from occurring from a known risk
22  and not take its known defective products
23  off the shelf?
24    A.  I would say the major issue
25  would be to make certain that the products
```

## Page 74

1  RUSH
2  being currently manufactured were being
3  manufactured as best they could be.
4  Q. Don't you put children at risk
5  by leaving those products on the shelf and
6  having them walk out of the store?
7      MR. EARNHART: Speculation.
8  Beyond the scope of the notice.
9      MR. CARROLL: Foundation.
10  Subject to that, you can answer.
11  A. Retrofit kits were readily
12  available for all products, and they are
13  available free.
14  Q. Were they effective?
15  A. I can't say that I have
16  knowledge to answer that one way or
17  another, sir.
18  Q. Well, let's look at Exhibit 10,
19  001 --
20      MR. EARNHART: What is the
21  Bates number on that?
22      MR. BAUERMEISTER: 31645.
23  A. Is it --
24      MR. CARROLL: The same one.
25  Oh, I am sorry. You are right, Peter.

## Page 75

1  RUSH
2  Exhibit 10, the first page.
3  Q. Mr. Rush, do you have that
4  document?
5  A. Yes, I do.
6  Q. Have you seen that document
7  before?
8  A. Yes, I have.
9  Q. What is it?
10  A. It is notes from a window
11  covering technical committee of 2002.
12  Q. Were you present for that
13  meeting?
14  A. No, I was not.
15  Q. Was Caroline Jennings?
16  A. Yes, she was.
17  Q. Who was she at that time?
18  A. She was program director at
19  WCMA.
20  Q. Okay. Now, at the third dot
21  from the bottom under notes, do you see
22  those bullets there?
23  A. Yes.
24  Q. Do you see the heading note, and
25  then there is a bunch of bullets down on

## Page 76

1  RUSH
2  the side? The third one from the bottom
3  says "The committee voted unanimously to
4  recommend reopening the standard."
5  Does your document say that?
6  A. Yes, it does.
7  Q. All right.
8  The first bullet at the top
9  says, "committee met to discuss reopening
10  ANSI WCMA A 100.1-202 for revision"; is
11  that right?
12  A. Yes.
13  Q. So this is the second standard
14  that WCMA produced, and now November 26,
15  2002 it is being reopened; is that right?
16  A. That's correct.
17  Q. Can you tell the jury what
18  reopening means?
19  A. Reopening means that the
20  document is in a form that additional work
21  can be considered. A reopening of the
22  document must happen at the least every
23  five years, and in this case the committee
24  wanted to keep the -- the document open or
25  reopen the document as -- soon after it

## Page 77

1  RUSH
2  had been accepted rather than wait for the
3  five years.
4  Q. Why is that?
5  A. In order to make certain that
6  the document continues to be in a
7  situation where it can be updated if need
8  be.
9  Q. Had problems been reported with
10  the second standard?
11  A. Not that I can attribute to the
12  second standard.
13  Q. Do you know whether a third
14  standard is being developed as we speak?
15  A. I believe a third standard is in
16  development.
17  Q. Why is that?
18  A. As I said, to continue to refine
19  the document to make it the best document
20  available.
21  Q. What are you aware of needs to
22  be changed with the second standard that
23  will be reflected by changes in the third
24  standard?
25  A. I believe there are issues over

```
                                    78
1           RUSH
2   testing methodology in terms of the break
3   away tassel. I believe there are some
4   changes in the type of and the amount of
5   warning labels. Aside from that, I can't
6   tell you specifically without referring to
7   the document.
8       Q.   All right, sir.
9            If you would turn to page 018 of
10  Exhibit 10.
11           MR. CARROLL:   2790 is the
12  Bates number.
13           MR. BAUERMEISTER:   Yes.
14      Q.   Could you tell the jury what
15  that document is, Mr. Rush?
16      A.   It is --
17           MR. CARROLL:   Take your time
18  to read it if you need to.
19           (Pause.)
20      A.   It -- they are minutes of an
21  April 1991 committee meeting of the
22  windows -- of the -- meeting of the Window
23  Covering Manufacturers Association.
24      Q.   And is your name listed as in
25  attendance?
```

```
                                    79
1           RUSH
2       A.   Yes, it does.
3       Q.   And you are listed as in
4   attendance on behalf of who?
5       A.   At that time it was the American
6   Window Covering Manufacturers Association.
7       Q.   And is that any different than
8   the WCMA?
9       A.   It is a predecessor
10  organization -- well, it is the same
11  organization with a different name.
12      Q.   Okay. Now, under revision of
13  by-laws, the last paragraph on this page
14  indicates "Agenda item 12 on future
15  direction from the association was
16  discussed."
17           Do you see that entry?
18      A.   Yes.
19      Q.   "Two key areas were identified,
20  education and government regulation." Do
21  you see that entry?
22      A.   Yes.
23      Q.   What was the key area about
24  government regulation that was discussed
25  at this executive committee meeting of the
```

```
                                    80
1           RUSH
2   American Window Covering Manufacturers
3   Association?
4       A.   Environmental Protection Agency
5   and issues at that point of volatile
6   organic chemicals or VOCs out gassing in
7   indoor areas.
8       Q.   And why would the WCMA be
9   concerned about government regulation?
10      A.   It is an informational program
11  primarily.
12      Q.   All right.
13           Would you turn to the next page,
14  sir, 019.
15      A.   Um hum.
16      Q.   Do you have that, sir?
17      A.   Yes, I do.
18      Q.   And please note at any point if
19  you want more time to read more parts of
20  these documents, you can take as much time
21  as you want. I have only a few questions
22  for you on each page, so it is probably
23  faster for everybody if I direct you to a
24  section. But when I do so, if you prefer
25  to read more, feel free to do so. I want
```

```
                                    81
1           RUSH
2   your best available answer.
3            Do we understand each other?
4       A.   Yes, sir.
5       Q.   Thank you very much.
6            MR. QUINN:   What is the Bates
7   number on that one?
8            MR. BAUERMEISTER:   2791. That
9   is the next one.
10      Q.   Mr. Rush, do you have that?
11      A.   Yes, I do.
12      Q.   The second paragraph at the top
13  indicates that "Education of retailers to
14  be more effective in selling products was
15  addressed."
16           What does that mean?
17      A.   There were several initiatives
18  going on by both the magazines in the
19  industry and the decorative products
20  association on training retailers to sell
21  different types of window coverings.
22      Q.   So does the WCMA today concern
23  itself with educating retailers to be more
24  effective in selling products?
25      A.   No, it does not.
```

Page 82

```
                RUSH
1
2    Q.  And why is that?
3    A.  There is no member interest in
4  the association doing that.
5    Q.  How do you know that?
6    A.  Because they have not asked for
7  the program.
8    Q.  If you would turn to the next
9  page, which is 020 in Exhibit 10.
10       MR. CARROLL:   2762.
11       MR. BAUERMEISTER:   Yes, sir.
12   Q.  Mr. Rush, do you recognize that
13 document?
14   A.  Yes, I do.
15   Q.  What is it?
16   A.  It is a warning label order form
17 for bottom rail labels and/or hang tags
18 that date to I would say circa 1986, '87.
19   Q.  I don't see any date on here.
20 How could you tell that?
21   A.  Because the Window Covering
22 Manufacturers Association after the
23 initial product alert in conjunction with
24 the Consumer Product Safety Commission in
25 1985 a number of member companies
```

Page 83

```
                RUSH
1
2  voluntarily decided to begin
3  labeling -- putting warning labels on
4  their products.  There had been an initial
5  thought that if the companies purchased
6  these products in masse through the
7  association that they would get better
8  pricing.  They used the language and
9  pictogram from the U.S. Consumer Products
10 Safety Commission's product alert as
11 its -- as the warning.
12   Q.  Okay.  Now, when you say
13 pictogram, are you talking about this
14 warning picture here on the right side?
15   A.  Yes.
16   Q.  And that warning, could you read
17 for the record what the warning says under
18 the big black letter warning?
19   A.  "Warning.  Parents should know
20 that children could accidentally get
21 strangled in window covering cords.  Keep
22 cords out of the reach of children.  Use
23 these devices available at local hardware
24 stores or window covering stores, clamp or
25 close pin, cleat, tie cord to itself.  Tie
```

Page 84

```
                RUSH
1
2  down device."
3    Q.  And below that is a picture of a
4  child reaching for a cord with the
5  international don't do this symbol stamped
6  over his hand, right?
7    A.  Yes, that's correct.
8    Q.  And then at item 2 of the four
9  listed there, you've got a pictorial for
10 each one of the one through four how to
11 make this safer advice, correct?
12   A.  That's correct.
13   Q.  And number two is cleat, and
14 then there is a cleat shown there at
15 number two, correct?
16   A.  Correct.
17   Q.  How does the use of the cleat
18 make these windows coverings safer for
19 children?
20   A.  It would take the cord out of
21 the reach and hold it in place.
22   Q.  Okay.  So a parent who saw this
23 warning would deduce that taking the cord
24 and putting it up on a wall on a cleat
25 would make the window covering safe for
```

Page 85

```
                RUSH
1
2  kids; is that right?
3    A.  It would make it safer, yes.
4    Q.  Okay.  Is that what April Cox's
5  parents did?
6    A.  I do not know.
7    Q.  If they did that, would they
8  have been making it safer for their child?
9    A.  If the cord had been cleated to
10 the wall?
11   Q.  Yes, sir.
12   A.  It should have been safer than
13 hanging -- having a hanging cord.
14   Q.  But this warning doesn't say
15 anything about middle cord strangulation,
16 does it?
17   A.  No, in 1985, it -- '86 it did
18 not.
19   Q.  Okay.  How about the 1996
20 warning promulgated by WCMA, did it say
21 anything about middle cord strangulation?
22   A.  Are you -- are you referring to
23 the ANSI standard, sir?
24   Q.  Yes.
25   A.  The ANSI standard in 1996 did
```

Page 86

```
 1            RUSH
 2   not have a specific warning about inner
 3   cord strangulation as --
 4      Q.   Sir, would a warning that told a
 5   parent to cleat up the hanging end cord to
 6   make this thing safe mislead a parent into
 7   believing they have done what they could
 8   to protect their child and now their child
 9   can be around this device?
10          MR. CARROLL:   I object to
11   form.  Argumentative.  You can answer.
12      A.   I wouldn't know the specific
13   answer to that.  A cleated window covering
14   cord is definitely safer than a loose,
15   hanging window covering cord.
16      Q.   But the child exposed to the
17   cleated cord isn't going to get hurt from
18   that cord, but it could still be strangled
19   to death by the inner cord which isn't
20   even mentioned in this warning, correct?
21          MR. EARNHART:   Which warning?
22          MR. BAUERMEISTER:   The one
23   right here at page 020 from whatever year
24   that is as well as the warning in 1996.
25      A.   The inner cord strangulation
```

Page 87

```
 1            RUSH
 2   hazard is not mentioned in this warning.
 3      Q.   Sir, could we go to page 050 in
 4   Exhibit 10.
 5          MR. CARROLL:   That is 24548
 6   for everybody on the call.  The document
 7   appears to be in at 24546.
 8      Q.   I am sorry, sir.  I think the
 9   document begins at 048, 049 through 052,
10   the one I am speaking about.  It begins
11   with ANSI at the top.  It is dated
12   December 1, 2000.
13          MR. CARROLL:   I believe we are
14   on the same document.
15      Q.   Mr. Rush, have you seen that
16   document before?
17      A.   Yes, I have.
18      Q.   And it is dated December 1,
19   2000?
20      A.   Yes, it is.
21      Q.   And it is written to a Mr.
22   Robert Nevins in New York, Mr. Peter Rush
23   in New York, and Mr. Dick Hudna in New
24   Jersey, correct?
25      A.   Yes.
```

Page 88

```
 1            RUSH
 2      Q.   And at that time Mr. Peter Rush
 3   was executive director of the WCMA?
 4      A.   Yes, he was.
 5      Q.   Who was Robert Nevins?
 6      A.   Robert Nevins is a private
 7   citizen.
 8      Q.   Do you know him?
 9      A.   No, I have never met him.
10      Q.   Have you read any correspondence
11   from him?
12      A.   I have received correspondence
13   from him.
14      Q.   What correspondence has he sent
15   you?
16      A.   A number of documents over the
17   years.
18      Q.   And what were they about?
19      A.   Product modifications
20   and -- regarding window covering cords or
21   window coverings and safety.
22      Q.   Is he a knowledgeable private
23   citizen about those issues?
24      A.   I could not tell you that.
25      Q.   Do you know anything about his
```

Page 89

```
 1            RUSH
 2   background?
 3      A.   I believe he said he was a
 4   former firefighter, but I cannot validate
 5   that or confirm it.
 6      Q.   Do you recall ever acting on any
 7   of the information that Mr. Nevins sent
 8   you about his concerns about safety cords
 9   or window cords?  Excuse me.
10      A.   I believe Mr. Nevins was
11   advancing specific product designs, which
12   he was looking to sell to manufacturers.
13      Q.   Okay.
14      A.   Those products, designs and/or
15   information were given to manufacturers
16   and/or sent to manufacturers by Mr.
17   Nevins.  The association was not involved
18   nor could it be involved in commercial
19   development of products.
20      Q.   Could we turn to page 051 of
21   this document.
22          MR. CARROLL:   24549,
23   gentlemen.
24          MR. BAUERMEISTER:   Yes, sir.
25      Q.   Do you have that, Mr. Rush?
```

Page 90

```
                      RUSH
 1
 2    A.   Yes, I do.
 3    Q.   Now, the center paragraph there
 4  kind of sticks out on the left -- of all
 5  the indented paragraphs. I will read it
 6  quickly and tell me if I read it
 7  correctly. "Finally, the BSR wishes to
 8  point out that WCMA recently submitted an
 9  announcement that revision activity would
10  soon commence in connection with this
11  standard."
12       Did I read that correctly?
13    A.   Yes, you did.
14    Q.   What standard is -- are you
15  referring to or is being referred to
16  there?
17    A.   The WCMA 00.1.
18    Q.   Okay. And is this entire
19  correspondence about a withdrawal for
20  cause request of the WCMA 100.1 standard?
21       MR. CARROLL:   I object to the
22  misstatement of what the document is.
23  Subject to that, you can answer.
24    A.   Yes, the document is a -- is a
25  response by ANSI to Mr. Robert Nevins and
```

Page 91

```
                      RUSH
 1
 2  with -- with copies to us regarding his
 3  request for withdrawal of the safety
 4  standard, of the WCMA standard.
 5    Q.   And why did he want to withdraw
 6  the WCMA standard?
 7       MR. CARROLL:   I object to
 8  foundation. You can answer.
 9    A.   I don't recall the specifics. I
10  have to go back and look at it.
11    Q.   Was the WCMA standard ultimately
12  withdrawn?
13    A.   No, it was not.
14    Q.   Is it present to this date?
15    A.   Excuse me?
16    Q.   Is standard 100.1 still an
17  effective standard to today, 2006?
18    A.   No, it is -- it is superceded by
19  a subsequent standard.
20    Q.   Okay. So it is not withdrawn.
21  It is merely superceded?
22    A.   Correct.
23    Q.   What does superceded means?
24    A.   It means that the next revision
25  of that standard takes precedent over the
```

Page 92

```
                      RUSH
 1
 2  previous standard.
 3    Q.   Okay. Can you tell the jury
 4  what a member of the public should do if
 5  they find a product attempting to be sold
 6  to them that has this superceded standard
 7  on it? Should they buy that product?
 8       MR. CARROLL:   I object to the
 9  form. Lack of qualification. You can
10  answer.
11    A.   Well, the current standard that
12  is in effect is the accepted ANSI standard
13  for window covering products.
14    Q.   All right.
15       But there are products on the
16  shelf that have the standard from November
17  of '96, isn't that right?
18    A.   I do not know that answer.
19    Q.   Do you have any reason to
20  believe all of the pre-September 2002
21  manufactured window covering products have
22  been withdrawn from the market?
23    A.   I would have no way of knowing
24  that one way or another.
25    Q.   Do you have any information
```

Page 93

```
                      RUSH
 1
 2  about a single window covering shade being
 3  withdrawn from the market because it was
 4  manufactured to the November '96 standard
 5  which doesn't meet the September '02
 6  standard?
 7    A.   I would have no information on
 8  that.
 9    Q.   You don't know of one?
10    A.   I do not personally, no, sir.
11    Q.   Sir, I have got just a minute or
12  so after 12. Do you want to break for
13  lunch or would you like to go forward?
14  Gentlemen, let me know what you would like
15  to do. I will follow your wishes.
16    A.   I'll go another half an hour if
17  you want.
18       MR. CARROLL:   Okay. The
19  witness said he is glad to go for another
20  half hour if we could stop at 12:30.
21       MR. BAUERMEISTER:   That would
22  be fine.
23       MR. CARROLL:   Okay. Thanks.
24    Q.   If we turn to Exhibit 10, page
25  053, please.
```

**Page 94**

```
1              RUSH
2       MR. CARROLL:  24634.
3   Q.  Do you have that, Mr. Rush?
4   A.  Yes, I do.
5   Q.  And does that appear to be a
6   three-page letter from Robert Nevins to
7   you?
8   A.  Yes, sir.
9   Q.  And it was dated June 10, 2001?
10  A.  Yes, sir.
11  Q.  Have you read it before?
12  A.  Yes, I have.
13  Q.  Okay.  Could you read the first
14  two paragraphs for the record, please.
15  A.  "In 1987 and 1990 the U.S.
16  Consumer Products Safety Commission and
17  the Window Covering Manufacturers
18  Association were notified by certified
19  mail from lawyers Toni Greisbach and
20  Jeffrey Morris that the inner cords on
21  blinds and shades were a potential deadly
22  strangulation hazard to infants and
23  children.  Ms. Greisbach indicated the
24  infants she represented in a successful
25  lawsuit against a window manufacturer had
```

**Page 95**

```
1              RUSH
2   been strangled to death in the inner cord
3   of a blind or shade.  A member or members
4   of the Window Covering Manufacturers
5   Association stated that this is a once in
6   a lifetime freak accident and could never
7   happen again."
8   Q.  All right, sir.
9       Do you remember reading this
10  letter from Mr. Nevins in 2001?
11  A.  Yes, I do.
12  Q.  And did you take any steps to
13  confirm the information presented to you
14  in those first two paragraphs?
15  A.  At this point, the U.S. -- the
16  U.S. Consumer Products Safety Commission
17  and the Window Covering Manufacturers
18  Association were already in process of
19  changing the manufacture.  In fact, the
20  letter dated to us in December '99 from
21  U.S. Consumer Products Safety Commission
22  did identify that there were a number of
23  deaths on inner cords.
24  Q.  Did you investigate whether or
25  not anybody from the WCMA stated as is
```

**Page 96**

```
1              RUSH
2   quoted in the letter "This is a once in a
3   lifetime freak accident and could never
4   happen again"?
5   A.  No, I did not.
6   Q.  So you don't know whether that
7   is true or not?
8   A.  I do not know.
9   Q.  All right.
10      Could you read the next
11  paragraph, sir?
12  A.  "Since 1990, there are more than
13  sixteen freak accident -- freak infant and
14  child strangulation deaths in the inner
15  cords of window covering -- inner cords of
16  corded window covering products.  Lawyer
17  Greisbach's inner cord death is not among
18  this list of inner cord strangulation
19  deaths.  It occurred in 1987 and is not
20  included.  I believe the number to be
21  around 20.  The window covering
22  manufacturers save money by not addressing
23  the inner cord strangulation problem, and
24  a large number of infants and children
25  lost their lives in strangulation deaths.
```

**Page 97**

```
1              RUSH
2   These infant and children strangulation
3   deaths will probably never stop now
4   because instead of fixing the problem back
5   in 1990, the window covering association
6   and other manufacturers have sold another
7   billion corded window covering products or
8   a billion products with an inner cord
9   problem."
10  Q.  All right, sir.
11      What did you do upon reading
12  that paragraph in 2001, if anything?
13      MR. CARROLL:  Asked and
14  answered.  You can answer again.
15  A.  As -- as I have already stated,
16  the Window Covering Safety Council was
17  already actively working with the U.S.
18  Consumer Products Safety Commission to
19  address the inner cord issue both by
20  changing its manufacturing process, by
21  entering into a corrective action program,
22  and in reopening the standard in order to
23  address it at the standard -- the ANSI
24  standard level as well.
25  Q.  Sir, in your view, was Mr.
```

## Page 98

```
 1              RUSH
 2   Nevins correct or incorrect in alleging
 3   that the window covering manufacturers
 4   saved money by not addressing the inner
 5   cord strangulation problem and a large
 6   number of infants and children lost their
 7   lives in strangulation deaths?
 8      A.   I would say the manufacturers
 9   did not save money by not addressing it.
10   In fact, it would have -- if -- if the
11   association and if CPSC had identified
12   this -- this as an issue in 1994, we would
13   have addressed it in the first standard,
14   and we would have addressed it in the
15   first corrective action program.
16      Q.   Now, if the CPSC didn't raise
17   the issue, would you have addressed it as
18   an industry organization anyway?
19      A.   If we had had the statistics to
20   back it up, CPSC presented us with
21   the -- the industry with their analysis
22   based upon their research and their
23   professional knowledge of product safety
24   in terms of where products were causing
25   potential dangers and where accidents had
```

## Page 99

```
 1              RUSH
 2   happened, and the industry acted upon that
 3   information extremely quickly and with the
 4   full cooperation and input from the
 5   Consumer Products Safety Commission, in
 6   fact with their oversight in most cases.
 7      Q.   If you would turn to page 061
 8   please in Exhibit 10.
 9          MR. CARROLL:   24566.
10      Q.   Do you have that document, sir?
11      A.   Yes, I do.
12      Q.   It is another letter by Mr.
13   Nevins, correct?
14      A.   Yes, it is.
15      Q.   Have you seen it before?
16      A.   Yes, I believe I have.
17      Q.   At page 063, he signs "Robert L.
18   Nevins, retired New York City
19   firefighter." Is that right?
20      A.   Yes, he does.
21      Q.   Was he a retired New York City
22   firefighter?
23      A.   I do not know.
24      Q.   Have you ever attempted to
25   determine that?
```

## Page 100

```
 1              RUSH
 2      A.   No, I have not.
 3      Q.   Okay. Going back to page 061,
 4   sir. Do you have that page?
 5      A.   Yes, I do.
 6      Q.   This was a letter dated April 8,
 7   2000, correct?
 8      A.   Yes, it is.
 9      Q.   If you look down the left side
10   under "Dear ANSI," the letter is actually
11   written to the American National Standards
12   Institute board of standards review,
13   correct?
14      A.   Yes, that is who it is addressed
15   to.
16      Q.   Do you know how this came to be
17   in the files of the Window Covering
18   Manufacturers Association?
19      A.   I would believe that ANSI would
20   have forwarded it to us based upon the
21   fact that this looks to be a -- what we
22   previously referred to in terms of an ANSI
23   review of the -- of the window covering
24   standards that this may be the letter that
25   prompted that review.
```

## Page 101

```
 1              RUSH
 2      Q.   Okay. So this letter did some
 3   good.
 4          MR. CARROLL:   I object to
 5   the -- lack of foundation. You can
 6   answer.
 7      A.   I believe the issue was that it
 8   prompted a review, and the review affirmed
 9   that the window covering standard was in
10   fact a -- was not withdrawn and the window
11   covering standard was upheld.
12      Q.   Isn't that standard reopened
13   right now?
14      A.   Yes, it is.
15          MR. CARROLL:   Asked and
16   answered.
17      Q.   Isn't there a third standard
18   being proposed right now?
19      A.   Yes -- no, there is a revision
20   of the existing standard being proposed
21   right now.
22      Q.   All right.
23          At page 061, if you go down to
24   the left side, it is kind of hard to read
25   the typing here. It doesn't look like he
```

**Page 102**

1  RUSH
2  spaces all that well. You see a paragraph
3  that begins "This list of strangulation
4  deaths"?
5      A.  Yes, sir.
6      Q.  Okay. Would you read that,
7  about the next four sentences, please?
8      A.  "This list of strangulation
9  deaths also includes the length of time
10 that these window covering manufacturers
11 have had to make these strangulation cords
12 infant and child safe. In 19 -- 1991
13 until the present year 2000, that is
14 nineteen years or you can go back to 1971
15 when the U.S. CPSC began to count, and
16 that would be 29 years that the Window
17 Covering Manufacturers Association have
18 had to come up with a solution to corded
19 window products and the deadly
20 strangulation cords. 29 years without a
21 solution from an industry that grosses 3
22 billion dollars a year. To allow an
23 industry such as the Window Covering
24 Manufacturers Association to set standards
25 for their own products that are involved

**Page 103**

1  RUSH
2  in such a high number of strangulation
3  deaths over such a long period of time is
4  contrary to the public interest and to our
5  national interest. It is my own personal
6  opinion a national disgrace."
7      Q.  Sir, if you stop there. Could
8  you tell the jury your response to Mr.
9  Nevins?
10     A.  The window covering industry has
11 cooperated a hundred percent with the
12 United States Consumer Products Safety
13 Commission. We have implemented a
14 significant change -- significant changes
15 both in the manufacture and the production
16 of window covering products. We have
17 established and worked with the U.S.
18 Consumer Products Safety Commission and
19 the American National Standards Institute
20 to put in place a national standard for
21 window coverings, and that standard has
22 been updated and will continue to be
23 updated as -- as frequently as necessary.
24     Q.  But Mr. Nevins seems to be
25 charging that this has been going on for

**Page 104**

1  RUSH
2  30 years. It is a 3 billion dollar
3  industry, and it hasn't stopped the death.
4      Is that an industry that is
5  taking care of business?
6      MR. CARROLL:  I object to the
7  form. You can answer.
8      A.  That is probably one best
9  answered by Mr. Nevins.
10     Q.  Sir, is it your opinion that the
11 public education programs undertaken by
12 the WCMA or the WCSC have effectively
13 alerted the public to the dangers that
14 window coverings present to children?
15     A.  The public information and
16 education programs have been very
17 effective in notifying the general public.
18     Q.  All right.
19     Sir, I am going to ask your
20 attorney to hand you the other notebook
21 and let's go to Exhibit 3.
22     MR. CARROLL:  We have it.
23     Q.  All right. The first document
24 is 001.
25     MR. CARROLL:  Guys, this is

**Page 105**

1  RUSH
2  not a Bates numbered document. It
3  is -- it looks like a printout on 2/13/06
4  from the CPSC. So I don't have anything
5  to refer you to.
6      MR. EARNHART:  Do we have
7  copies of this document, Don?
8      MR. BAUERMEISTER:  You have it
9  in your hands. I mean do you -- I don't
10 understand your question.
11     MR. EARNHART:  Has it been
12 produced in this litigation?
13     MR. BAUERMEISTER:  No, we just
14 pulled it off the Internet yesterday or
15 whenever the date shows there.
16     MR. CARROLL:  Yes, 2/13/06.
17     MR. BAUERMEISTER:  Right.
18     MR. CARROLL:  It is -- it was
19 actually released September 30, '04.
20     Q.  Mr. Rush, have you seen this
21 document before?
22     A.  Yes, I have.
23     Q.  What is it?
24     A.  It is a news release from the
25 U.S. Consumer Products Safety Commission.

106

1       RUSH
2   Q.  All right.
3       Could you read the paragraph for
4   the record that has the quote beginning
5   "most."
6   A.  "Most people don't think about
7   window coverings as something that can
8   harm their child, said CPSC chairman Hal
9   Stratton. We continue to lose children in
10  tragic incidents due to entanglement and
11  strangulation in older window covering
12  cords."
13  Q.  Read the next paragraph, please.
14  A.  "From January 1991 through
15  August 2004 CPSC received reports of about
16  180 strangulation deaths involving cords
17  and chains on window coverings. Most
18  strangulation deaths involve the outer
19  pull cord. At least 20 of these deaths
20  involve inner cords which run through the
21  horizontal blinds."
22  Q.  All right, sir.
23      Can you tell me have you ever
24  had any discussions with CPSC chairman Hal
25  Stratton about his opinion on September 30

107

1       RUSH
2   of 2004 that most people don't think about
3   window coverings as something that could
4   harm their child?
5   A.  We have had -- I have had
6   conversations with Chairman Stratton
7   regarding CPSC's continued support for the
8   window covering industry and the Consumer
9   Products Safety Commission public
10  information and education campaign, and
11  Mr. Stratton has been supportive and
12  cooperative in assisting the window
13  covering industry in continuing to get
14  this message out.
15  Q.  Is he correct in saying that
16  most people don't think about window
17  coverings as something that can harm their
18  child?
19  A.  I don't know what basis he has
20  of that information.
21  Q.  And you don't know whether he is
22  correct or not in that regard?
23  A.  The Window Covering Safety
24  Council has on an annual basis conducted
25  national public opinion research to

108

1       RUSH
2   ascertain where and what knowledge there
3   is out there of window -- potentially
4   window covering strangulation, and the
5   indications of that research has shown
6   that the -- the -- the general public is
7   very knowledgeable about the potential
8   strangulation hazards of window coverings.
9   Q.  So, in your view, the chairman
10  of the Consumer Products Safety Commission
11  thinking that most people don't think of
12  window coverings as something that could
13  harm their child is just wrong?
14      MR. CARROLL: Misstates the
15  witness' testimony. You can answer.
16  A.  As I said, I don't know where
17  commissioner Stratton has gotten this
18  particular information. We supplied to
19  CPSC the results of that survey, and they
20  have been involved with us at the very
21  beginning of designing that -- those
22  questions to the public.
23  Q.  All right, sir.
24      Could you turn to page 003 in
25  Exhibit 3.

109

1       RUSH
2       MR. CARROLL: Hay, Don, before
3   you give Peter questions on this document,
4   our videographer needs to change tapes.
5   If we could go off the record for just a
6   second.
7       MR. BAUERMEISTER: Would this
8   be a good time to do the noon break?
9       MR. CARROLL: Yes, 12:20. It
10  probably is.
11      MR. BAUERMEISTER: All right.
12  We will go off the record and then take
13  the break until 1:20.
14      MR. CARROLL: That sounds
15  great.
16      MR. BAUERMEISTER: Thank you,
17  gentlemen. If we could, I would ask that
18  people try and cooperate be back at 1:20
19  if that is possible. I would like to get
20  done with you and keep you as much as I
21  can out of rush hour, but I imagine that
22  is kind of all afternoon there. I don't
23  know. That is not in New York.
24      MR. EARNHART: I will defer to
25  Jamie, but we can take a shorter break.