Page 110

```
 1              RUSH
 2   That would be fine with me.
 3        MR. CARROLL:  Yes.  Why don't
 4   we try to get back on in like 45 minutes
 5   because I would assume that there would be
 6   something across the street.
 7        MR. BAUERMEISTER:  Okay.  40
 8   minutes would be 1 o'clock your time.
 9        MR. CARROLL:  Why don't we say
10   about 1:05 call back in.
11        MR. BAUERMEISTER:  1:05.  I
12   will call back at 1:05.  If you are five
13   or ten minutes later, I won't complain.
14        MR. CARROLL:  We will do that,
15   and as soon as Mike calls back in we will
16   tie you in and you could tie Dwight in.
17        MR. WEISS:  Okay.
18        MR. BAUERMEISTER:  That sounds
19   good.
20        THE VIDEOGRAPHER:  The time is
21   12:22 p.m.  We are off the record.
22        (Luncheon recess: 12:22 p.m.)
23
24
25
```

Page 111

```
 1              RUSH
 2        A F T E R N O O N   S E S S I O N.
 3               1:14 p.m.
 4        THE VIDEOGRAPHER:  We are back
 5   on the record.  The time is 1:14 p.m.
 6        MR. BAUERMEISTER:  Are we on the
 7   record?
 8        MR. CARROLL:  I think we are
 9   now.
10        MR. BAUERMEISTER:  All right.
11   Thank you, sir.
12   P E T E R   R U S H, resumed.
13   CONTINUED EXAMINATION
14   BY MR. BAUERMEISTER:
15        Q.  Mr. Rush, you should have in
16   front of you the notebook that is labeled
17   1.  You should be looking at exhibit tab 3
18   with page 003.
19            Do we have that in front of you,
20   sir?
21        A.  Yes, we do.
22        MR. CARROLL:  And for
23   the -- for the record, fellas, this is
24   another document that is not in the
25   production set.  October 20, 2005, CPSC
```

Page 112

```
 1              RUSH
 2   news release.
 3        MR. BAUERMEISTER:  Yes, sir.
 4        Q.  Okay.  Mr. Rush, that was the
 5   correct date on this news release, right,
 6   October 20, 2005.
 7        A.  That is what it says on it.
 8        Q.  All right.
 9            And the -- if you read the large
10   black lettering title, there is two lines
11   and titles up there.
12            Could you read that for the
13   record, please?
14        A.  "Federal government warns of
15   hidden hazard to young children.  Old
16   window coverings pose strangulation risk."
17        Q.  All right.
18            And could you read the second
19   paragraph down beginning with "most
20   people"?
21        A.  "Most people" --
22        MR. CARROLL:  Let me just make
23   one global objection so as not to
24   interrupt the record.  I'll just object to
25   the extent that of course the witness can
```

Page 113

```
 1              RUSH
 2   read what the document says, but we are
 3   not waiving any objections as to
 4   admissibility or hearsay, whatever else,
 5   but he can certainly read whatever
 6   somebody else wrote.  Go ahead, Mr. Rush.
 7        A.  "Most people don't think about
 8   window coverings as something that can
 9   harm their child, said CPSC Chairman Hal
10   Stratton.  We continue to lose children in
11   tragic incidents of entanglement and
12   strangulation in older window covering
13   cords."
14        Q.  Could you read the next
15   paragraph, sir?
16        A.  "Since 1991, CPSC has received
17   reports of about 200 strangulation deaths
18   involving cords and chains on window
19   coverings.  Most strangulation deaths
20   involve the outer pull cords.  At least 20
21   of these deaths involve the inner cords
22   which run through the horizontal blinds."
23        Q.  This really seems to be pretty
24   much the same statement that the chairman
25   released on September 30, a year earlier,
```

### Page 114

 1  RUSH
 2  isn't it?
 3       MR. CARROLL: The document
 4  speaks for itself. You can answer.
 5    A.  I think they are similar
 6  statements, yes.
 7    Q.  Well, they are identical in
 8  terms of the quote about most people don't
 9  think about window coverings as something
10  that could harm their child; isn't that
11  correct?
12    A.  It does seem to be an identical
13  quote.
14    Q.  Now, in your conversation with
15  Mr. Stratton, did you ever raise with him
16  your opinions at any time following
17  October 20 of 2005 that he is wrong about
18  this fact that he claims that most people
19  don't think about window coverings as
20  something that can harm their child?
21       MR. CARROLL: I object to the
22  extent I believe it mischaracterizes the
23  witness' testimony. Subject to that, he
24  can answer.
25    A.  I have never had that discussion

### Page 115

 1  RUSH
 2  with Chairman Stratton.
 3    Q.  Okay. Have you seen this
 4  document before in the ordinary course of
 5  business?
 6    A.  The 2005 document?
 7    Q.  Yes, sir.
 8    A.  I believe I did, yes.
 9    Q.  All right.
10       Would you look at CPSC public
11  information about window covering
12  strangulation problems; is that right, as
13  part of your job?
14       MR. CARROLL: I object to the
15  form or -- or object to the form of the
16  question is labeling that document as CPSC
17  problem.
18    A.  No, this particular document was
19  in conjunction with window coverings
20  safety month that the Window Covering
21  Safety Council and Consumer Product Safety
22  Commission jointly sponsored in 2005.
23    Q.  And what was your role with the
24  Window Covering Safety Council at that
25  time?

### Page 116

 1  RUSH
 2    A.  I was the executive director of
 3  the Window Covering Safety Council.
 4    Q.  So you have been highly familiar
 5  with this document?
 6       MR. EARNHART: I am going to
 7  object as beyond the scope of the 30(b)6
 8  deposition notice at this point.
 9    A.  I -- yes, I am familiar with
10  this document.
11    Q.  All right, sir.
12       Isn't it true that between
13  September 30, 2004 and October 20, 2005
14  the CPSC reports an additional 20 deaths
15  by strangulation of children?
16    A.  Would you repeat that question?
17    Q.  Yes, sir. At page 001, the
18  document indicates from January '91
19  through August '04 CPSC received reports
20  of about 180 strangulation deaths, right?
21    A.  Yes.
22    Q.  And at 003, it says since 1991,
23  CPSC has received reports of about 200
24  strangulation deaths?
25    A.  Yes.

### Page 117

 1  RUSH
 2    Q.  We have gone up 20 in a year's
 3  time?
 4       MR. EARNHART: Foundation.
 5    A.  I did not think the actual
 6  numbers back -- the actual statistics from
 7  Consumer Products Safety Commission
 8  actually backed those numbers.
 9    Q.  Okay. There are about 20
10  children a year dying in America from cord
11  strangulation?
12    A.  In 1995, I believe the number
13  was four according to the U.S. consumer
14  products safety commission.
15       MR. CARROLL: You said -- I
16  think we have got an error in the witness'
17  statement. What year do you believe you
18  were saying?
19       THE WITNESS: 2005.
20       MR. CARROLL: Okay. I think
21  you said 1995.
22    A.  No, 2005. There were four.
23    Q.  How -- how do you know that many
24  deaths are happening in that year?
25    A.  A report from the Consumer

**Page 118**

```
 1           RUSH
 2  Products Safety Commission.
 3      Q.  Does your organization ask your
 4  members to count deaths that they become
 5  aware of?
 6      A.  No, it does not.
 7      Q.  Does your organization do
 8  anything to canvass consumers to identify
 9  actual deaths?
10          MR. EARNHART:  Which
11  organization are we talking about?
12          MR. CARROLL:  Mr. Rush can
13  respond on behalf of the WCMA.  He is here
14  for that purpose.
15      Q.  Go ahead, sir.
16      A.  No, it does not.
17      Q.  Does the WCMA have any
18  understanding as to the number of average
19  annual deaths due to window cord
20  strangulation of children in America?
21      A.  We have the reports from the
22  U.S. Consumer Products Safety Commission.
23      Q.  And what do you know about those
24  reports?
25      A.  That U.S. Consumer Products
```

**Page 119**

```
 1           RUSH
 2  Safety Commission compiles incidents on an
 3  annual basis.
 4      Q.  Do they have a statistical
 5  coding system whereby they project the
 6  actual number of losses compared to the
 7  known losses?
 8      A.  You would have to ask CPSC that
 9  question.
10      Q.  So you don't know?
11      A.  I do not know.
12      Q.  So if the factor of known losses
13  is one and they project three, you don't
14  know whether that is true or not?
15          MR. CARROLL:  I object to the
16  form of the question.  I don't understand
17  it, but if the witness does he can answer
18  it.
19      A.  No, I did not understand.
20      Q.  All right.  Let's try to make it
21  simple.
22          The CPSC may have mathematical
23  modeling systems by which their long
24  experience teaches them that that they
25  don't get every known product danger,
```

**Page 120**

```
 1           RUSH
 2  death or injury report when they all
 3  happen.  Instead what they get is a
 4  percentage of them.  Based on that long
 5  history from the percentage that they
 6  actually get, they can project a number
 7  that they believe is the actual number
 8  occurring.
 9          Have you ever heard that before,
10  sir?
11          MR. CARROLL:  Let me object to
12  the question as vague, ambiguous, calls
13  for speculation, involves a hypothetical
14  for which there is no basis.  They may
15  have a lot of things.  If a frog had
16  wings, he may not bump his ass when he
17  jumped.  I would ask for another question.
18  If you understand it, however, you can
19  answer it.  Let --
20      A.  No, I do not understand it or
21  know anything about it.
22      Q.  You've never heard of a
23  statement that CPSC uses to protect actual
24  deaths from known deaths?
25      A.  No, I have not.
```

**Page 121**

```
 1           RUSH
 2      Q.  Do you know if anybody at the
 3  Window Covering Manufacturers Association
 4  has ever become familiar with that system?
 5      A.  I don't know of anyone, no.
 6      Q.  Do you think not knowing that
 7  system is in any way detrimental to your
 8  understanding of the scale of the problem
 9  of child strangulation deaths due to
10  window coverings?
11          MR. CARROLL:  I object to the
12  form.  You can answer.
13      A.  Not knowing about a system that
14  I don't know about, I -- I -- it is very
15  difficult for me to answer about something
16  I don't know about.
17      Q.  Okay.  Let's go back to notebook
18  number 2, sir.  We are looking at exhibit
19  tab 10.  We are going to page 061.
20          MR. CARROLL:  That would be
21  24566.
22      Q.  Okay.  Now, we previously
23  discussed this letter from Mr. Nevins that
24  had been received by your office even
25  though it had had been directed to ANSI,
```

Page 122

RUSH

Q. correct?
A. It had been sent to our office by ANSI though it was directed to ANSI.
Q. Okay. Does ANSI normally send you correspondence?
MR. CARROLL: Asked and answered. You can answer this one again.
A. Only when it would pertain to us.
Q. Okay. Let's look at 067, sir. Do you see that there?
MR. CARROLL: That is document Bates numbered 24572, gentlemen.
Q. Have you seen that before, sir?
A. I can't recollect that I have.
Q. Do you know was this an attachment to one of Mr. Nevins' letters to ANSI, which was then referred to you?
A. I do not know whether it was or it was not.
Q. Okay. What is 067?
A. I am -- I am speculating based upon what it says on it is that --
MR. CARROLL: I would ask the

Page 123

RUSH

witness not to speculate.
A. All right.
Then it says it is window covering related strangulations of children reported to the U.S. Consumer Products Safety Commission since 19 -- 1/1/81.
Q. And it has columns listed, dates, age, sex and investigation number; is that right?
A. Yes, that is what it has.
Q. And we have got about, what, three or four pages of these single space typed cases of deaths?
A. Yes. One, two, three, four.
Q. All right, sir. You've never seen these documents before?
A. If I have, I can't recollect in what regard I did.
Q. Okay. Do you see the column on page 067 there under age?
A. Yes.
Q. Could you read the first ten entries or so, please?

Page 124

RUSH

MR. CARROLL: I'll object again that the document speaks for itself, but he can answer. Go ahead.
A. Twelve months, three years, two years, two years, 12 months, four months, eighteen months, thirteen months, two years, thirteen months, two years, 11 months.
Q. Sir, do those ages reflect what you know to be the typical ages of children strangled by window cords?
A. Window Covering Safety Council and the Consumer Products Safety Commission recommends for children under the age of 5 that cords be kept out of their reach.
Q. Yes, but in this column virtually everything is under two, isn't it?
A. No, there is a four-year -- four years, a four years.
Q. Read the next ten, please.
A. Two years, twelve months, sixteen months, twenty-one months, ten

Page 125

RUSH

months, sixteen months, fifteen months, two years, fourteen months, seven months, seventeen months, three years, four years, three years, two and a half years.
Q. All right.
Are these from your knowledge and experience typical ages for kids that have been strangled by these cords?
A. It is -- according to the Consumer Product Safety Commission's data, children under the age of five are at more risk, yes.
Q. Is this a particularly vulnerable age of -- for consumers?
MR. EARNHART: Vague.
MR. CARROLL: I object to the form.
A. I don't think I can answer that question.
Q. Okay. Is your WCMA standard concerned with the age of the victims of cord strangulation?
A. The standard is concerned with the exposure of the cord. I would -- I

126

1  RUSH
2  don't know -- I cannot recall whether
3  there is any mention of specific age in
4  the standard itself though.
5      Q.  Okay.  But in analyzing the
6  risks that these cords pose, does WCMA in
7  any way consider age of the known victims?
8      A.  WCMA?
9      Q.  Yes.
10     A.  In terms of what data was -- has
11 been worked on in developing the standard
12 with Consumer Products Safety Commission,
13 specifically children under the age of
14 five are a prime area that we may -- try
15 to make certain that the product is -- the
16 product standard was directed at.
17     Q.  Why are children under the age
18 of five the prime persons the product
19 standard was directed at?
20     A.  Because according to this
21 Consumer Product Safety Commission, that
22 is the age of most of the incidents that
23 they have -- are reported.
24     Q.  So kids of this age group are
25 the most vulnerable that strangulation by

127

1      RUSH
2  these cords posed.  Is that true?
3      A.  Yes.
4      Q.  Sir, I would like you to turn to
5  page 077, please.
6          MR. CARROLL:   That is 5660.
7          MR. BAUERMEISTER:   Yes, sir.
8      Q.  Do you recognize that, sir?
9      A.  Let me read it a second.
10     Q.  All right.
11         (Pause.)
12     A.  Yes, sir.  I do.
13     Q.  What is that, please?
14     A.  It is a membership renewal
15 letter to Roll Ease and to an Terry
16 McDonald.
17     Q.  Who is Roll Ease?
18     A.  Roll Ease is a member of
19 the -- they are a manufacturer of
20 component parts for window covering
21 products.
22     Q.  Okay.  And the letter is signed
23 by you?
24     A.  Yes, it is.
25     Q.  Now, would you read the

128

1      RUSH
2  paragraph third from the bottom beginning
3  "even though"?
4      A.  "Even though the existing
5  campaign has been very successful in
6  reaching many, it must be acknowledged
7  that there are still hundreds of millions
8  of potentially dangerous products in place
9  around the country.  Strategically the
10 CPSC has reported seven deaths to date
11 caused by window covering products, this
12 in 2002.  Our efforts will not be
13 completely successful until we are able to
14 report that no children have died or
15 injured because of window covering
16 product."
17     Q.  Would you read the last
18 paragraph of your letter, sir?
19     A.  "WCSC is committed to fulfilling
20 its mission but we could not do it without
21 your continuing support.  Please help us
22 ensure that no more children will be
23 injured or killed because someone didn't
24 know that the product in their home was
25 potentially dangerous."

129

1      RUSH
2          MR. EARNHART:   I am going to
3  object to the question, and, you know, I
4  think part of this is brought on by not
5  having a set of exhibits for all of us,
6  but again the scope of this deposition is
7  the WCMA not WCSC.
8          MR. BAUERMEISTER:   I will give
9  you a standing objection to that point if
10 you want it, sir.  I think the --
11         MR. EARNHART:   That is --
12         MR. BAUERMEISTER:   The -- the
13 inquiry is whether or not I am asking a
14 question that is seeking relevant
15 information or may lead to relevant
16 information.
17         MR. EARNHART:   Then you
18 shouldn't have done a 30(b)6 deposition
19 notice of WCMA within -- that asks a
20 specific scope of questions.
21         MR. BAUERMEISTER:   Well, I am
22 happy to give you that objection for every
23 question I ask on the record.  If you want
24 to make it a record once, that is fine
25 with me.

130

1   RUSH
2       MR. EARNHART: To the extent
3   you are asking for WCSC information or
4   WCSC documents other than within the scope
5   of the -- of the deposition notice, which
6   I think would entail the knowledge of the
7   WCMA, I have an objection, and please give
8   me a continuing objection to that.
9       MR. BAUERMEISTER: I will.
10  Q.  Mr. Rush, could you turn Exhibit
11  11, page 006.
12      MR. CARROLL: That is 19333.
13      MR. BAUERMEISTER: Yes, sir.
14  A.  Yes, I have it.
15  Q.  All right, sir.
16      Could you tell us what that is,
17  please?
18  A.  It appears that it is a list of
19  the ANSI canvass list as of
20  7/1990 -- 1996.
21  Q.  Okay. So this is July of '96,
22  which is about four or five months before
23  November of '96 when you -- WCMA listed
24  the first standard, correct?
25  A.  That's correct.

131

1   RUSH
2   Q.  All right.
3       Now, there is a series of names
4   and some people just have addresses, some
5   have titles or companies they are
6   connected with. Can you tell me, for
7   example, the third name here on the list
8   is David Bowlen, Director Of building,
9   American Institute of Architects, and you
10  have no response. What does that mean?
11  A.  The way I would read this and
12  without checking ANSI records is how they
13  voted on the -- the ANSI canvass.
14  Q.  Okay. So what would no response
15  mean?
16  A.  That we had not heard back from
17  him.
18  Q.  Okay. Now, Kay Villa down at
19  the bottom for American Textile
20  Manufacturers, behind her name or
21  manufacturers institute, behind her name
22  is no. Correct?
23  A.  Yes. No -- I will correct that
24  statement. In looking at it, I believe
25  this list is asking them if they want to

132

1   RUSH
2   participate on the ANSI canvass.
3   Q.  Okay. So this is just
4   questioning for participation?
5   A.  Correct.
6   Q.  How do you know that?
7   A.  Because on the actual ballot
8   itself we did not receive -- receive any
9   negative responses.
10  Q.  How many responses did you
11  receive on the actual ballot?
12  A.  I don't recall that information.
13  I believe we looked at that previously
14  though.
15  Q.  Would it be several hundred?
16  A.  No.
17  Q.  50?
18  A.  No.
19  Q.  A dozen?
20      MR. CARROLL: I believe the
21  document that you showed him a little
22  earlier speaks to it. So we could go
23  through this, and you could show him the
24  document. Go ahead, Mr. Rush.
25  A.  I believe the canvass list was

133

1   RUSH
2   fifteen.
3   Q.  Okay. Could we turn, sir, to
4   Exhibit 11, page 002, please.
5       MR. CARROLL: It is 19347.
6       MR. BAUERMEISTER: Yes, sir.
7   Q.  To get your bearings on this
8   document, if you look back to 020, it
9   appears to be a Consumer Product Safety
10  Commission letter dated February 3, '96 to
11  Mr. Peter Rush, executive director of
12  Window Coverings Safety Council.
13  A.  Where are we?
14      MR. CARROLL: Exhibit 11, 002
15  is not that. Exhibit --
16      MR. BAUERMEISTER: I am sorry.
17  It is 020.
18      MR. CARROLL: Okay. That is
19  27399, fellas.
20  Q.  Do you have that in front of
21  you, Mr. Rush?
22  A.  Yes, I do.
23  Q.  If we go back to page 022, it
24  shows the letter signed by a Mark
25  S-C-H-O-E-N. Do you know how to pronounce

134

1  RUSH
2  that?
3    A.  022?
4    Q.  In the lower right-hand corner
5  would be 022.
6    A.  Mark Schoen.
7    Q.  Okay. Now, Mr. Schoen wrote you
8  this letter, correct?
9    A.  Yes, he did.
10   Q.  In the first sentence of the
11 second paragraph from the end, he says
12 "The compliance staff realizes that for
13 the program to be a success all industry
14 members must participate. What is he
15 talking about there?
16   A.  That all people involved in the
17 window covering industry should
18 participate in the program.
19   Q.  What program is he talking
20 about?
21   A.  I would say the Window Covering
22 Safety Council. I believe this was
23 addressed to me at the Window Covering
24 Safety Council.
25       MR. EARNHART:  Same objection.

135

1  RUSH
2    Q.  So he is talking just about
3  joining that council or about that
4  council's attempt to educate the public?
5       MR. CARROLL:  I would ask the
6  witness to read the paragraph before
7  responding.
8    Q.  Feel free, Mr. Rush. Whatever
9  you need to look at.
10      (Pause.)
11   A.  Would you repeat your question?
12   Q.  Yes, sir. I am trying to
13 understand why Mr. Schoen is saying the
14 compliance staff realizes that for the
15 program to be a success all industry
16 members must participate. What was
17 he -- what did you understand when you
18 received the letter from him that that
19 sentence meant?
20   A.  That all companies should be
21 part of and agree to the activities that
22 we had agreed -- that the Window Coverings
23 Safety Council has agreed to with Consumer
24 Products Safety Commission in the
25 corrective action program.

136

1  RUSH
2    Q.  Okay. So this was about the
3  corrective action program?
4    A.  I would think so. Yes, sir.
5    Q.  And this man is saying that for
6  that program to be a success all industry
7  members must participate?
8    A.  That is what the language in the
9  document says.
10   Q.  All right. Could you turn to
11 page 032, tab 11, please.
12      MR. CARROLL:  15022 is the
13 Bates number.
14      MR. BAUERMEISTER:  Yes, sir.
15   A.  I have it.
16   Q.  Could you tell us what that is,
17 sir?
18   A.  It is a letter to Akeem Import
19 discussing the fact that they decided not
20 to participate in the corrective action
21 plan in 2001.
22   Q.  Okay. And you wrote that
23 letter?
24   A.  Yes, I did.
25   Q.  Why did you write them that

137

1  RUSH
2  letter?
3    A.  Because they were no longer
4  participating in the corrective action
5  plan.
6    Q.  You carbon copied that to Alan
7  Schoen at the CPSC?
8    A.  Yes, I did.
9    Q.  Let's look at 033, the letter
10 that follows.
11      MR. CARROLL:  15023.
12   Q.  Is that a similar letter
13 confirming that Custom Craft Company,
14 craft Ridgefield name made has decided not
15 to participate in the corrective action
16 plan?
17   A.  Yes, it is.
18   Q.  And it is signed by you?
19   A.  Yes, it is.
20   Q.  And it is carboned to CPSC?
21   A.  Yes, it is.
22   Q.  Look at 034. Is that a letter
23 written by you?
24   A.  Yes, it is.
25   Q.  Of July 17, 2001?

```
                                                    138
 1              RUSH
 2    A.  Yes, it is.
 3    Q.  To the Home Depot confirming
 4  that Home Depot has decided not to
 5  participate in the corrective action plan
 6  dated September 12, 2000 between the WCSC
 7  and CPSC?
 8    A.  That's correct.
 9    Q.  Okay.  035.
10        MR. CARROLL:  15025.
11    Q.  The same letter written by you
12  to J.C. Penney's confirming that they will
13  not participate, correct?
14    A.  That's correct.
15    Q.  036.  Is that the same letter
16  written by you confirming that Kenny
17  Manufacturing Company will not
18  participate?
19    A.  Yes, it is.
20    Q.  037.
21        MR. CARROLL:  15027.
22    Q.  Is that the same letter written
23  by you confirming that Loew's companies
24  has decided not to participate?
25    A.  Yes, it is.
```

```
                                                    139
 1              RUSH
 2    Q.  038.
 3        MR. CARROLL:  15028.
 4    Q.  Is that the same letter written
 5  by you indicating that Marietta Drapery
 6  and Window Coverings has decided not to
 7  participate?
 8    A.  Yes, it is.
 9    Q.  039.  Is that the same letter
10  written by you indicating that Tex Decs
11  Corporation and Rich View Window Coverings
12  has decided not to participate?
13    A.  Yes, it is.
14    Q.  Did those participation declines
15  decrease the effectiveness of the
16  attempted program of consumer education
17  and refitting of these dangerous cords?
18        MR. CARROLL:  I object to the
19  form.  You can answer.
20    A.  Several of the companies
21  in -- in here decided to rejoin the Window
22  Coverings Safety Council efforts.  Some
23  have not.  I don't think that that
24  materially effected the ongoing program
25  that we had had or the activity that we
```

```
                                                    140
 1              RUSH
 2  had with the U.S. Consumer Products Safety
 3  Commission.
 4    Q.  Could you turn to page 042,
 5  please.
 6        MR. CARROLL:  It is 14443.
 7        MR. BAUERMEISTER:  I am sorry.
 8  It is 14428.
 9        MR. CARROLL:  Oh.  I was on
10  41.  14428.
11        MR. BAUERMEISTER:  Okay.
12    Q.  Mr. Rush, the number in the
13  lower right-hand corner should be 042.
14    A.  Okay.
15    Q.  Do you recognize that, sir?
16    A.  Yes, I do.
17    Q.  And it is June 25, 2001 for
18  immediate release.  What is it?
19    A.  It is a press release.
20    Q.  And who is the press release
21  from?
22    A.  The Window Coverings Safety
23  Council.
24    Q.  And who is the contact person
25  listed in the press release?
```

```
                                                    141
 1              RUSH
 2    A.  Natalie Klein at Sumner Rider &
 3  Associates.
 4    Q.  Is that the same Sumner Rider
 5  Associates that was your employer?
 6    A.  Yes, it is.
 7    Q.  Are they still your employer
 8  today?
 9    A.  No, they are not.
10    Q.  Is it the same company with a
11  different name today?
12    A.  It is a subsequent company, yes.
13    Q.  What is the name of that
14  company?
15    A.  Kellen, K-E-L-L-E-N company.
16    Q.  And what business is Kellen in?
17    A.  Association management.
18    Q.  Is that their only business?
19    A.  They have divisions in
20  communications and in web design.
21    Q.  And when you say communications,
22  what do you mean?
23    A.  It is a broad range of
24  communications.  It is public relations.
25  It is also industry information, trade
```

142

RUSH

1 show promotion, meeting promotion.
2 Q. I am sorry. You said public
3 relations, trade show promotion. What was
4 the third one?
5 A. Meetings promotion.
6 Q. Meetings promotion?
7 A. Yes.
8 Q. So these are services to trade
9 associations?
10 A. Trade associations and
11 professional societies.
12 Q. Okay. Do they do public
13 relations work for any other entities?
14 A. They do some public relations
15 work for outside associations and a few
16 corporations.
17 Q. Looking at 042, which you have
18 in front of you, would you read the second
19 paragraph for the record, please.
20 A. "Although some 85 million
21 window blinds are sold each year, the
22 number of consumers who call the Consumer
23 Products Safety Council is only about one
24 million. This means that millions of home

143

RUSH

1 owners may still be using potentially
2 dangerous blinds."
3 Q. Is that true, sir?
4 A. I cannot verify that.
5 Q. Why would Sumner Rider &
6 Associates send that out if it were not
7 true?
8 A. I believe there is a note there
9 to check those numbers.
10 Q. Do we have a document where that
11 number has been checked?
12 A. I do not know if -- I -- if it
13 had been, it would have been produced.
14     MR. CARROLL: Or for the
15 record, it would have been made available.
16 A. Made available.
17     MR. CARROLL: Plaintiff's
18 counsel decided what was to be produced.
19 Q. All right, sir.
20     Could we look to the 052,
21 please.
22     MR. CARROLL: 12612.
23     MR. BAUERMEISTER: Yes, sir.
24 That's correct.

144

RUSH

1 A. 052, okay.
2 Q. Mr. Rush, have you seen that
3 document before?
4 A. I may have seen when it came in.
5 Q. Okay. It is carboned to you
6 down at the bottom, is it not?
7 A. Yes.
8 Q. It is a letter from who to who?
9 A. I do not know who Fred Tanenbaum
10 is.
11 Q. Okay.
12 A. Vince Paul was vice president of
13 marketing of Joanna which was a window
14 covering producer.
15 Q. Okay. Would you read the last
16 two sentences of first full paragraph,
17 please?
18 A. Of the last -- again
19 which -- which document?
20 Q. The last two sentences of the
21 first full paragraph.
22 A. "The association estimates that
23 the industry's approximately seven
24 manufacturers would face -- would be faced

145

RUSH

1 with a conservative estimate of
2 approximately 3 million dollars to supply
3 the tassel with postage being the largest
4 cost. Our question is what, if any, is
5 our legal obligation to such a settlement.
6 The association must respond to the CPSC
7 by May 7."
8 Q. Okay. Who is the association?
9 A. At this point it would be Window
10 Coverings Manufacturers Association.
11 Q. Okay. And who at the WCMA
12 estimated that the industry approximately
13 seven manufacturers would be faced with a
14 conservative estimated costs of
15 approximately 3 million dollars to supply
16 the tassel with postage being the largest
17 cost?
18 A. I cannot tell you.
19 Q. What was your role in April of
20 1994 such that you would have received
21 this letter?
22 A. I was the executive director of
23 the Window Covering Manufacturers
24 Association.

146

RUSH

Q. And is it possible that the association made this estimate of a 3 million dollar cost without you knowing about it?

A. I don't believe the association ever made an official estimate of anything.

Q. Can you tell me what this reference to the association is then?

A. I would think it is Mr. Paul's opinion as to what he thinks it might cost.

Q. Do you know why he would say the association estimates if it is in fact Mr. Paul estimating it?

A. Mr. Paul did not regularly participate in the association.

Q. Sir, could we look at page 063.

MR. CARROLL: 12478.

MR. BAUERMEISTER: That's correct.

A. 63, yes.

Q. Sir, have you seen this document before?

147

RUSH

A. I see the document, yes. I -- I would assume I have seen it before, but it is undated, so I can't tell you exactly.

Q. Well, that is exactly the question I was going to ask you. Are -- can you tell me the date or approximate time that this WCMA roster of members represents?

A. I would say sometime late '80s perhaps.

Q. Is it true that the roster of members for the WCMA vacillates with some repetition?

A. Yes, there were changes in membership of WCMA.

Q. Okay. Are some of the members that have been with it since its inception still there today?

A. As -- in terms of corporate successors to original members, yes, I believe there are at least one or two.

Q. Tell me who that is, please.

A. Hunter Douglas and Levolor Corporation, which is no longer Levolor

148

RUSH

but now part of Newell.

Q. Okay. Why is there so much turnover in the other members?

A. Because of buying and selling of the companies.

Q. Could we turn to 064, please.

MR. EARNHART: Is there a document number on what?

MR. CARROLL: I apologize. 12459.

MR. BAUERMEISTER: Yes, sir. That is correct.

Q. Mr. Rush, that is a letter dated May 16, 1997 to you as executive director of the WCSC, correct?

A. Yes, it is.

Q. Could you read the paragraph please of the letter?

A. "After careful review, we have decided not to participate in the 1997 WCSC public information program. This decision is based primarily on our need to direct our attention to the extraordinary requirements brought about by the led

149

RUSH

situation. Our participation in the 1998 program will be reviewed next year."

Q. And it is signed?

A. Ron Gitkin -- Ronald Gitkin, president.

Q. Of Jencraft Corporation?

A. Jencraft Corporation.

Q. Tell me what you know about Jencraft.

A. Jencraft was an importer of primarily vinyl blinds.

Q. What as the program they were being asked to participate in that they are declining here?

A. The corrective action program signed to by the Window Covering Safety Council and the Consumer Products Safety Commission.

Q. By not participating in that program, what difference does it make to their consumers?

MR. CARROLL: Calls for speculation on the part of the witness. If you know, you can answer.

```
                                               150
 1          RUSH
 2    A.  To their particular consumers,
 3  it is -- I cannot answer for their
 4  corporation.
 5    Q.  Well, you wanted them to
 6  participate, right?
 7    A.  We -- we wanted all
 8  members -- all companies involved in the
 9  window covering industry to participate.
10    Q.  Why is that?
11    A.  Because the more participation
12  we had the broader reach we felt we had
13  and the -- and the overall program would
14  be more successful.
15    Q.  For the greater protection of
16  the public that would be achieved,
17  correct?
18    A.  We would expect -- we would hope
19  that the program would help
20  increase public safety, yes.
21    Q.  What does Jencraft have to do
22  with the death of April Cox?
23        MR. CARROLL:  I object to the
24  form.  You can answer.
25    A.  I believe that the product
```

```
                                               151
 1          RUSH
 2  alleged is a Jencraft product.
 3    Q.  Sir, could you turn to 066,
 4  please.
 5        MR. CARROLL:  12418.
 6        MR. BAUERMEISTER:  That's
 7  correct.
 8    Q.  Is this a list of the WCSC
 9  participants in 1994 and '97?
10    A.  Yes.
11    Q.  And there is two columns here.
12  One is '94,'97 and one is '97 only.  Can
13  you tell me what that means?
14    A.  That those companies only
15  participated in that particular year..
16    Q.  Okay.  We show Jencraft in the
17  only column down there about eight from
18  the bottom, right?
19        MR. CARROLL:  I believe the
20  document has been mischaracterized.  It is
21  '94,'96 under which Jencraft is listed,
22  not '97 only.
23    A.  Yes, under 1994 through 1996
24  Jencraft is included.
25    Q.  Excuse me.  I am looking at 066.
```

```
                                               152
 1          RUSH
 2        MR. CARROLL:  Yes, you
 3  just --
 4    Q.  Association -- I see.  I see.  I
 5  thought there was only one year at the top
 6  of the column.  This column actually has
 7  multiple years in it.  All right.  I
 8  thought that the left column was 1994
 9  through '97.
10        You tell me what this means
11  because if -- if you have seen this
12  before.
13    A.  It just basically is a document
14  which lists what companies participated
15  during what period of time from '94
16  through '97.
17    Q.  Okay.  So these -- this full
18  list on the left side here starting with
19  three-day blinds, Wal-Mart is third from
20  the bottom there, ends with Wilmar, those
21  companies all participated in '94, '95,
22  '96 and '97 with the WCSC?
23    A.  That's correct.
24    Q.  And on the right -- and there is
25  only one yearly range on that whole
```

```
                                               153
 1          RUSH
 2  column.  On the left side we actually have
 3  multiple yearly ranges; is that correct?
 4    A.  That's correct.
 5    Q.  But you have '97 only at the
 6  top, and then you've got '96 only, '94-'96
 7  only, and '94-'95 only.
 8        So tell me what each of those
 9  headings mean for the companies below the
10  company of headings?
11    A.  It means that the companies in
12  those categories only participated with
13  the WCSC during those particular years.
14    Q.  Okay.  Now we have got Jencraft
15  under the 1994 through 1996 only, correct?
16    A.  That's correct.
17    Q.  So we could tell it didn't
18  participate in 1997?
19    A.  That's correct.
20    Q.  Go to page 067, please.
21        MR. CARROLL:  11959.
22        MR. EARNHART:  959?
23        MR. CARROLL:  11959.
24    Q.  Mr. Rush, is that a letter dated
25  April 21, 1995?
```

Page 154

RUSH

Q. And it is signed by you?
A. Yes, it is.
Q. And it is directed to Mr. David Smeltzer at the CPSC?
A. Yes, it is.
Q. All right.
    Could you read the second paragraph for the record, please?
A. "However, let me set the record straight on several points raised in your letter. First importers are well represented on the technical committee. Newell and Kenny are primarily importers and have -- and have ranked in the top ten importers for the last ten years. Springs, Kirsch and Joanna are also top ten importers. Those other importers who are not present at the technical meetings are not there by their choice. This process has been open from the beginning. Getting companies to participate has been the challenge. Consumer participation is welcome at the canvass level. Any

Page 155

RUSH

consumer can be asked by supplying the name to WC -- WCMA. However, individuals with commercial interests in any products must reveal that information upon submission of the name."
Q. Okay. Now, why were you telling Mr. Smeltzer that getting companies to participate has been the challenge?
A. There were a number of companies who were not -- were not interested in or did not feel they needed to participate in this program.
Q. What program are we talking about?
A. Window Coverings Safety Council program and the corrective action program with the Consumer Products Safety Commission.
Q. Okay. Now, your sentence "those other importers who were not present at the technical meetings are not there by their choice," what did you mean by that?
A. This is referring to the technical committee that anyone who was

Page 156

RUSH

not showing up for meetings, it was not because they were not invited but because they were not showing up.
Q. Okay. Do you have statistics kept by the WCSC indicating what percentage of the industry players participated in this effort?
    MR. CARROLL: Beyond the scope of the notice. I object. Subject to that, you can answer.
A. No, we don't have specific statistics.
Q. Do you have any idea roughly speaking whether you had 90 percent of the players or 10 percent of the players or 50 percent of the players?
    MR. CARROLL: Again, to the extent it involves WCSC, I object. You can answer.
A. I would say that the WCSC cumulatively may have represented about between 75 percent and maybe 80 percent of the total number of units.
Q. I am sorry. Total number of

Page 157

RUSH

what?
A. Units sold in a given year.
Q. Oh. So that while there may be multiple manufacturers or dealers or importers, some are small players and some are larger players, you are giving me a weighted average for unit sales or --
A. Well --
Q. Was that what your answer was connected to?
    MR. CARROLL: I object to the form of the question as vague, but to the extent you understand it you can answer.
A. The industry has small players -- small players and large players, yes.
Q. Okay. Do you know the total number of companies that have been involved in window covering manufacturing or import in the eighteen years that you have been involved in the industry?
A. No, I do not.
Q. Do you have any idea of that number?

158

1  RUSH
2  A. Total number, no. I -- I do not
3  know that total number.
4  Q. Do we know if it is hundreds or
5  thousands?
6  A. Probably would be closer to the
7  hundred side.
8  Q. Do you have any idea of what the
9  total number of members of WCMA have ever
10 been out of those hundreds of industry
11 players or hundred players?
12 A. Would you repeat your question?
13 Q. Yes, sir. Of the
14 industry -- the companies that are
15 importing or selling or manufacturing,
16 what percentage of those companies have
17 ever belonged to the WCMA?
18 A. In terms of total volume of
19 products or just in terms of total number
20 of companies that are out there?
21 Q. Given us both numbers if you can
22 help us with both.
23     MR. CARROLL: Let me object to
24 the extent the question is ambiguous
25 because I don't know what time frame we

159

1  RUSH
2  are talking about, since the WCMA has been
3  around for many years.
4  A. Well, the --
5     MR. CARROLL: If you
6  understand it, you can answer.
7  A. No -- answering for the WCSC has
8  represented on aggregate somewhere between
9  70 and 75 percent of the unit products
10 sold in the United States as part of the
11 original corrective action plan. In terms
12 of number of the companies involved in the
13 business, the number of smaller marginal
14 players I can't really speculate how many
15 of those are out there.
16 Q. Okay. How about for the WCMA?
17 A. Well, WCMA's by-laws have
18 restricted membership to companies who
19 manufacture product in North America.
20 Q. And how many such companies are
21 there of that type at present?
22 A. At present in 2005 -- 2006, I
23 believe there are three companies who
24 manufacture in North America.
25 Q. And how many of those companies

160

1  RUSH
2  belong to the WCMA?
3  A. All three.
4  Q. Okay. How about ten years
5  earlier?
6  A. Independent companies who
7  manufactured in North America, there may
8  have been eight or nine.
9  Q. And how many belong to the WCMA?
10 A. Pretty much all of them.
11 Q. All right. Sir. Could you turn
12 to page 068, please.
13     MR. CARROLL: 11936.
14 Q. Mr. Rush, by my watch, we have
15 been going about an hour. I would rather
16 get done earlier today than later. On the
17 other hand, I don't want you to feel
18 either rushed or tired any more than
19 necessary.
20     If you want to take a break at
21 any point, I want to remind you that is
22 your right, and I will acquiesce in any
23 request for a break that you have.
24     MR. CARROLL: Let's go off for
25 just a second because somebody called the

161

1  RUSH
2  conference room.
3     THE VIDEOGRAPHER: The time is
4  2:06 p.m. We are off the record.
5     (Discussion held off the
6  record.)
7     THE VIDEOGRAPHER: We are back
8  on the record. The time is 2:12 p.m.
9  BY MR. BAUERMEISTER:
10 Q. Mr. Rush, we are looking at page
11 068 of Exhibit 11.
12 A. Yes.
13 Q. That is a memorandum from you to
14 several company representatives; is that
15 right?
16 A. That's correct.
17 Q. In fact, you are writing for the
18 gentlemen working for Three Day Blinds,
19 Pier One Imports, J.C. Penney and Hunter
20 Douglas?
21 A. That's correct.
22     MR. EARNHART: What is the
23 number on the document?
24     MR. CARROLL: Same one as we
25 finished with, 119367.

**Page 162**

                RUSH
Q. And you are writing as Peter Rush, WCSC executive director on November 21, 1995; is that correct?
A. That's correct.
Q. And concerning your response to the CPSC November 7 letter?
A. Yes.
Q. Okay. Now, the first line there is "Following is our response to CPSC's 'Investigation' of retail distribution," and it is the letter that follows that your response?
A. Yes, it is.
Q. Okay. What was the CPSC's investigation that you are responding to?
A. CPSC had -- had visited several stores in the metropolitan Washington area. So it was not a formal investigation rather it was anecdotal information at which point the major concern they had was that the display models of units of window coverings in those stores did not have the corrective -- correct -- corrective action

**Page 163**

                RUSH
program product on display.
Q. And was that complaint accurate or not accurate?
A. I did not investigate it personally, but what I came to find out was in fact that it was probably accurate in terms of the display models. However, all the products on the shelves did comply with the corrective action program.
Q. Now, what was the problem with the display models?
A. Is that that they had not yet been changed out.
Q. So they were still defective products?
A. It --
    MR. CARROLL: I object to the form.
A. They for the most part still had loop cords.
Q. Does that mean they were defective?
A. That meant --
    MR. EARNHART: Legal

**Page 164**

                RUSH
conclusion.
A. That meant that they did not comply with the corrective action plan.
Q. In your opinion as the director of the two organizations, the CPSC -- excuse me -- the CPSC and the Window Covering Manufacturers Association -- excuse me -- WCSC, were those products defective?
    MR. CARROLL: I object to the extent it calls for a legal conclusion. You can answer.
A. Well, in as much as those products were not for sale, since they were display models only I don't know whether that would really apply.
Q. Okay. So exhibiting defective products to the public that aren't for sale makes them nondefective?
    MR. CARROLL: I object, form. Argumentative.
A. The products that were for sale did comply with the corrective action plan.

**Page 165**

                RUSH
Q. Ultimately were the improper product displays changed out?
A. Yes, they were.
Q. Did you have any participation in making sure that happened?
A. No, I did not.
Q. Who did?
A. That is a -- that was between the individual manufacturer and retailer.
Q. Okay. Could we look at 075, please.
    MR. CARROLL: 11308.
Q. Could you tell us what that is, Mr. Rush?
A. It is a letter to the Window Covering Safety Council from me regarding the corrective action plan of 2000 which the Window Covering Safety Council and the industry undertook the manufacturing change to include the inner cord stop ball as well as to relaunch the public information and education program.
Q. Okay. Now, the last sentence of the first paragraph in your memo says,