RUSH

"CPSC is concerned that since the voluntary corrective action went into effect in 1994 there have been 60 deaths." Is that correct?

A. Yes, that is what it says.

Q. And is that number correct, were there 60 deaths?

A. I will assume at this time, 2000, I was -- I would accept that that was the correct number.

Q. Okay. Now, the first sentence of the third paragraph reads, "Many companies have not focused on this issue for a number of years."

What did you mean by that?

A. Have not focused on the Window Covering Safety Council public information and education program.

Q. Well, I thought companies were participating in this corrective action program. How could they not be focused on the issue?

A. They can participate but not necessarily be focused on it.



RUSH

Q. What does that mean?

A. It was not a prime issue for a number of companies.

Q. The sentence after that reads "However, significant government action is very likely in the near future." That is your sentence?

A. Yes, it is.

Q. And why were you telling them that?

A. Because we were in the process of negotiating a new corrective action plan.

Q. What is the single large black letter word at the middle at the top of this memo?

A. Urgent.

Q. Why did you put that up there?

A. To get the attention of the membership.

Q. And what is urgent?

MR. CARROLL: I object to form. You can answer if you understand it.



RUSH

A. Two issues. One sis that they participate in the organization. Secondly to make certain that they are paying their dues.

Q. And was it urgent that significant government action is very likely in the near future?

A. That was one of the elements, yes.

Q. How is that an element of urgency?

A. Companies, if they wanted to participate in the discussion, would have to be participatory and would have to be members. The companies that were members were actively participating in all of the discussions we had with the government.

Q. Is one of the purposes of voluntary participation in standard setting by an organization like the WCMA the avoidance of government action?

MR. CARROLL: I object to the form. You can answer.

A. Not necessarily. Under the



RUSH

Consumer Product Safety Commission law, Consumer Product Safety Commission is encouraged to work with industry and to adopt industry standards where applicable. The U.S. Consumer Product Safety Commission in discussion with us urged the Window Covering Manufacturers Association to become a standards writing organization, but there are many standards out there that have nothing to do with a government action.

Q. So in your view the industry is not really concerned with government regulation as much as getting standards that are useful to the industry and the public set?

MR. CARROLL: I object. It mischaracterizes the witness' testimony. Subject to that, he can answer.

A. No, the industry from the beginning has been voluntarily cooperating with the government to address issues that they brought before us, and we -- the industry has responded very quickly and





EXHIBIT 42-D

RUSH

and has cooperated with the Consumer Products Safety Commission at every turn.

Q. But in your view that is because they are trying to do the right thing, not because they are afraid of urgently avoiding government regulation?

A. I -- we were not at all concerned about urgently avoiding government regulation.

Q. If you turn to 076, me.

MR. CARROLL: 11304.

Q. Is that an April 18 letter from Peter Rush?

A. 2001.

Q. And to Mr. Drew Bentley, president of Marietta Drapery and Window Coverings?

A. Yes, it is.

Q. Would you read the third paragraph of your letter to Mr. Drew Bentley, sir?

A. "Until deaths from window coverings are at zero, the industry will continue to be under the threat of ongoing



RUSH

regulation. I am certain that Marietta Drapery continues to believe that its contribution of 2500 dollars annual is an insignificant price in potentially preventing the death of a young child".

Q. Would you tell the jury, sir, what is the threat of ongoing regulation?

A. That under the consumer product safety, they always had the power to go under a rule 15 rule making that was always available to them. However, they never did undertake that because of the actions that the industry continued to do.

Q. Could you explain to us please how an industry is under the threat of ongoing regulation? What does that mean?

A. Any industry or a company who sells a product in the United States that comes under the perview of the U.S. Consumer Products Safety Commission is always under the threat of regulation.

Q. Threats are all something we all seek to avoid, aren't there?

MR. CARROLL: Argumentative.



RUSH

Form. You can object -- I mean you can answer.

A. Personally, I don't particularly like them. No.

Q. Okay. So why do we want to avoid ongoing regulation?

A. There was -- we were not being regulated at that point, and in fact the voluntary standards approach with cooperation of the U.S. Consumer Products Safety Commission and their participation not only would allow us to get a standard to the public sooner it would probably be more complete, and if Consumer Product Safety Commission found it to be -- meet their criteria that they would be the organization that had the enforcement power of that standard.

Q. That might cost your members money, mightn't it?

MR. CARROLL: I object to the form.

A. Would you repeat the question?

MR. BAUERMEISTER: Madam



RUSH

reporter, would you read the question back to the witness, please.

(Record read.)

MR. CARROLL: And if you didn't hear that, I'll object. Argumentative, form. You can answer.

A. I do not ever remember a question of cost being brought up in a meeting.

Q. Turn to 077, please.

MR. CARROLL: 11306.

Q. Is that a letter draft from you, Mr. Rush?

A. Yes, it is.

Q. Do you know who that was to be sent to?

A. Members of the Window Covering Safety Council.

Q. Okay. Could you read the first sentence of the second paragraph from the end beginning with "the first reason"? Actually read that whole paragraph, please.

A. "The first reason is the

174

RUSH

existing campaign has been so successful in reaching households with potential situations that we have spent over 350,000 dollars in hot line and fulfillment costs alone. We are still running at nearly 10,000 inquiries a month. Two, there are still hundreds of millions of products in place in households around the country. Three, tragically there have already been three deaths in this -- in this year already with window covering products. Four, the window covering industry is committed to safety and does not want any child to be injured with our products."

Q. You wrote that paragraph, correct?

A. Yes, I did.

Q. Who spent 350,000 dollars in hot line and fulfillment costs?

A. The Window Covering Safety Council.

Q. Where did they get that money?

A. From its members.

Q. Now, this indicates they are

175

RUSH

running at 10,000 inquiries a month?

A. Yes, that is what it indicates.

Q. That would be about 120,000 dollars inquiries a year?

A. I -- with that math, yes.

Q. And that costs about 350 dollars to get that type of inquiry response?

A. Yes, it did.

Q. And then in point two you say there is still hundreds of millions products in place in households around the country; is that right?

A. Yes.

Q. 10,000 inquiries a month will never reach hundreds of millions of product placements, will it?

A. Eventually it will.

Q. How long would that eventually be?

A. The issue for the industry of course was that potentially affected subsets of the number of households that have products was substantially smaller than a hundred -- the hundreds of

176

RUSH

millions. Secondly is that each inquiry represented multiple windows rather than one single window.

Q. And when you say eventually that will reach these folks, how long is the Window Covering Manufacturers Association willing to wait to reach out to people who have these dangerous products in their home?

MR. CARROLL: I object to the form. You can answer.

A. Window Covering Manufacturers Association was not doing anything on the public information and education program.

Q. How about the WCSC?

A. WCSC was actively involved in a public information and education program.

Q. Now, has a program of some type of education been going on for more than 20 years?

A. A public information and education program began in 1994.

Q. So about 12 years?

A. Yes.

177

RUSH

Q. What percentage of households that have these products that threaten the lives of very young children have been contacted with this information?

MR. CARROLL: I object to form. You can answer.

A. I do not have that information.

Q. So the WCMA does not know that?

A. The WCMA does not know that.

Q. The WCSC does not know that?

A. We do not know that either.

Q. All right, sir.

Turn to 078, please.

MR. CARROLL: 12768.

Q. Now, this document says "Draft only. Not for use" in the upper right-hand corner; is that right?

A. Yes, it does.

Q. And was this document just a draft that was never used?

A. Yes, it is.

Q. All right.

If you turn to 081, please.

MR. CARROLL: 12756.

178

RUSH

Q. Can you tell me what this document is, sir?
A. It seems to be a -- an article from a trade magazine, a window fashions magazine.
Q. Okay. Does it have a WCMA production number of 12757?
A. Yes it does.
Q. Why was this in your file?
A. Because we probably put it in the file as a -- we tend to document any coverage that we have gotten of -- of the issue over the years.
Q. Okay. Now, if you would read the last sentence of the second paragraph.
A. "But beyond advising means to secure cords out of reach -- out of children's reach. CPSC and WCMA are working together to develop safety devices which are a part of the window covering itself."
Q. Okay. Was the Window Covering Manufacturers Association working to develop safety devices that are part of

179

RUSH

the window covering itself?
A. No.
Q. So this is incorrect?
A. That is incorrect.
Q. Right. And this special report is written by Lenia C. Addison?
A. Yes.
Q. Who is that?
A. I do not recall.
Q. Okay. Let's look at page 082, please.
MR. EARNHART: What is the Bates number?
MR. CARROLL: 12757.
Q. Could you read the first full paragraph of that page, please?
A. "Indeed the Window Covering Manufacturers Association has already begun work on ANSI, American Standard -- National Standards Institute safety standard for window covering products. According to Peter Rush, executive secretary for WCMA, the technical committee will actually be

180

RUSH

involved in the writing of the standard on a performance basis, meaning it will explain what the product has to do, but it will not tell manufacturers how to make the product. When the ANSI standard is approved, it will be adopted by the CPSC."
Q. Now, are you Peter Rush, executive secretary to the WCMA at this time?
A. Actually my title at this point was executive director.
Q. Do you recall a conversation with Lenia C. Addison before this article was published?
A. I don't recall it specifically, no.
Q. Do you know whether or not you would have said that the technical committee will be actually involved in writing the standard on a performance basis, meaning it would explain what the product has to do?
A. That is the nature of an ANSI specification. So yes, that is true.

181

RUSH

Q. Okay. Did you write or call Ms. Addison when you received this article to explain to her that she had made an error on the first page of the article in saying that the CPSC and WCMA are working together to develop safety devices?
A. No, I did not.
Q. Why not?
A. I didn't call her to tell her that CPSC and Window Covering Manufacturers Association are warning parents, which would have been the window covering -- safety council or that O.B. Kelly was in fact the president of Window Covering Safety Council, not the Window Covering Manufacturers Association. So this was already in print. It really did not make much difference to try to correct her at this point but rather to try and correct information going forward.
Q. All right, sir.
Could you look at 083, please.
MR. CARROLL: 24386.
Q. Do you recognize that letter,

RUSH

Mr. Rush?
A. Yes, I do.
Q. You wrote it on December 22, 1995 to Mr. Michael McCullough at Window Concepts?
A. Yes, I do.
Q. What was the purpose of the letter?
A. To try and enlist their support for the Window Covering Safety Council.
Q. Could you read the last paragraph, please?
A. "While I appreciate the concerns you have regarding costs, you and your manufacture -- and your manufacturers must look at this issue based upon the potential liability and other costs you will incur by not participating in this program. Our costs for 1996 are 50 percent less per unit than in 1995. I urge you to consider all the potential ramifications of nonparticipation in the next year of the program."
Q. Why did you tell Mr. McCullough



RUSH

the things in that paragraph?
A. Which specifically?
Q. Okay. You say you appreciated the concerns he had concerning costs. What concerns were those?
A. Everything is a cost. They did not particularly want to spend money.
Q. They didn't want to spend money on making window coverings safer?
A. You would have to ask him that question.
Q. Well, but you wrote to him saying "While I appreciate the concerns you have regarding costs." What did you mean when you wrote that?
A. That he was not going to renew his membership in the Window Covering Safety Council.
Q. That is the only cost you are referring to?
A. Yes.
Q. You then say "You and your manufacturers must look at this issue based upon the potential liability and



RUSH

other costs you will incur by not participating in the program." What did you mean by that?
A. Potential liability. We told each of our member companies they should consult with their own attorneys to decide what that was. Not participating in the program opened them up to potentially for having to recreate the program on their own totally at their own cost.
Q. Was part of the mission of the Window Covering Manufacturers Association to assist its members in limiting potential liabilities?
A. No.
Q. How do you know that?
A. It would probably be -- fall under the antitrust rules that we could not participate in any such activity as a joints basis.
Q. Tell me the kind of activity you could not participate in.
A. Anything covered under the U.S. antitrust laws, including any discussion



RUSH

of price, terms of sale, channels of sale, any collective actions that would potentially impact the market, any collusion of any sort. It is a fairly broad statute.
Q. Well, when you refer to potential liability in this sentence, aren't you talking about manufacturers being liable for deaths their products caused to children?
A. I am not speaking specifically of that, no.
Q. What are you speaking about?
A. Of any product liability that you might have as a manufacturer.
Q. Go to 084, please.
MR. CARROLL: The next page in the index, 24387.
MR. BAUERMEISTER: That's correct.
Q. This is a memo to John Baker from Peter Rush dated February 6, 1997; is that correct?
A. Yes, it is.

186

RUSH

Q. And under the first bullet it states, "label number 1: According to standard, Products without bottom rails or in your case too small to fit a label shall be labeled at a location visible to consumers to be determined by manufacturer or importer." Is that correct?

A. Yes, that is what it says.

Q. Okay. Now, what are we talking about there?

A. Compliance with the ANSI standard.

Q. Okay. So tell me what a product without a bottom rail is?

A. A vertical blind that does not have a bottom rail.

Q. Okay. And it says "shall be labeled in location visible to consumers." Where would you label a vertical blind so consumers could see the label?

A. That would be determined by the manufacturer or the importer.

Q. Okay. Has labeling blinds been a difficult problem because of the limited

187

RUSH

number of places the labels could be placed?

MR. CARROLL: I object to the form. You can answer.

A. I have not heard any complaints about ability to label or comply with the standard.

Q. Have you had any survey of consumer response to labels placed on the bottom of the rail at the bottom of a mini blind?

A. No.

Q. Do you have any information that consumers tend not to read labels on the bottom of the rail on the bottom of a mini blind?

A. No, I do not.

Q. No one has ever brought that to your attention before today?

MR. CARROLL: I object to the fact it hasn't been brought to his attention yet because there is no evidence supporting that, but subject to that he can answer.

188

RUSH

A. No, I have no information on that subject.

Q. All right, sir. Go to page 087, please.

MR. CARROLL: 23963.

MR. BAUERMEISTER: Yes, sir.

Q. And this document runs all the way over to 095.

A. 87.

Q. Do you know what this document is, Mr. Rush?

A. Give me a minute to read it.

Q. All right.

(Pause.)

MR. CARROLL: While he is reading, I'll just go ahead and put an objection on the record. It does not look like a document at all but rather nonconsecutive Bates numbers cobbled together.

(Pause.)

A. Okay.

Q. Do you recognize what these pages are from?

189

RUSH

A. The best I can tell is they are a variety of notes taken at different times. I can't even tell that all these times are consecutive. I do not know about the first page.

Q. Do you recognize the printing of any of the pages?

A. The first page I do not recognize.

Q. Right.

A. The other -- let's see 088, 089, 090, 091 and 092 I would say maybe 093 I am -- I am not positive, but I can -- of who they belong to, but I do believe they belong to Maria Ungaro.

Q. Could you spell that name for us, please?

A. U-N-G-A-R-O.

Q. Who was Maria Ungaro?

A. She was a program director for me at WCSC.

Q. Do you know why these notes would have been in production materials from the association?

RUSH

A. Because when we were subpoenaed to supply all information, we supplied all information.

Q. Why would the notes of the WCSC meetings be in the WCMA production materials?

A. I believe that all of the materials that were supplied to King & Spalding covered both organizations.

Q. And why did you do that?

A. Under subpoena.

Q. All right, sir.

If we could look at 090, please.

MR. CARROLL: 24012.

MR. BAUERMEISTER: What was that, Jamie?

MR. CARROLL: 24012.

MR. BAUERMEISTER: Okay. That is sort in the middle of the page.

Q. Actually I wanted to go to 092, which would be 24092, and we are looking at tab 11.

Q. Mr. Rush, do you know if you participated in a meeting at which



RUSH

Ms. Ungaro took these notes?

A. I would say yes, I did.

Q. Okay. And down here there is a note "Peter-send names recalcitrant players." What does that refer to?

A. Companies who are not participating in the Window Coverings Safety Council.

Q. And what -- what names for recalcitrant players were you trying to identify?

A. I would have to go back and look at the time periods that this was written in, but companies who had not renewed Window Coverings Safety Council participation.

Q. Okay. Let's look at the next page 093.

MR. CARROLL: 24015.

Q. Now, this document has a date on it, correct?

A. Yes, it does.

Q. 6/2/2000?

A. That is correct.



RUSH

Q. All right.

Do you have any reason to believe that is not the date this document was created?

A. I have no reason not to believe that that is a correct date.

Q. Okay. There is a question or rather it looks like a statement "Peter, can we advertise cordless?"

Did you make such a statement at a meeting?

A. I think that is a question.

Q. You were asking could we advertise cordless?

A. Yes.

Q. Why was that being asked?

A. Was there enough product in the marketplace.

Q. Okay. An then under that it says "Alan says yes," and then under Peter it says "Recall, a legal term."

Do you know what you are talking about there?

A. No -- what specific -- what the



RUSH

specific legal definition of recall is.

Q. And why was that being discussed?

A. Because we were about to work out a recall to repair.

Q. Okay. And then the next longer entry next to the name Peter, could you read that for the record, please?

A. "Importers and retailers will resist 90 days products on sea. 40 million, 3 to 4 million.

Q. Okay. What do your comments "importers and retailers will resist" mean?

A. That importers and retailers -- importers of products who had had product in transit might resist a specific date for the changeover of production.

Q. And it say 90 days of products on sea. What does that mean?

A. That that was an approximate time of -- between shipment and delivery of product coming from the Orient.

194

RUSH

Q. And then you say, 40 million and then 3-4 million. What did those numbers mean?

A. That I do not recall.

Q. Will that be the number of products, that 40 million?

A. That would be an annual production probably, so that is -- that is too high.

Q. So it states importers and retailers will resist 90 days of products on sea, 40 million and then 3-4 million, but you don't know what that means?

A. No, not specifically. I do not recall.

Q. Okay. Look at 094, please.

MR. CARROLL: 24021.

Q. Now, there we have a different date up at the top. It looks like 5/5/00; is that right?

A. Yes, it is.

Q. So this might have been notes from a meeting before the meeting of the page that preceded it; is that correct?

195

RUSH

A. That is what it looks like.

Q. Okay. There is a large arrow under -- at the top there is Peter Rush with a phone number and then an arrow "doesn't pass the choke test."

Can you tell me what that means, please?

A. Yes, the original product fix that the Consumer Products Safety Commission proposed did not meet its own standards for choking hazard.

Q. And what standard are we talking about?

A. It is a toy safety standard.

Q. Okay. Then there is a note by Peter, "180 days to change new production of imported blinds." What did you mean by that?

A. That that would be the approximate time it would take to totally change production of products based upon what I was told by the importers.

Q. So that is about six months?

A. That is about six months.

196

RUSH

Q. And then below that it says, "For six months no internal cord production." Is that right?

A. That is what it says, yes.

Q. What did you mean by that?

A. I do not recall. Just it would take them that long to manufacture and get into production, this change.

Q. So for six months they would be without any produced internal cord products?

A. At this point, I would say there is not an agreement in place, so there is no particular deadline one way or another.

Q. Doesn't the specter of six months of nonproduction cause manufacturers to fear for loss of profits?

MR. CARROLL: I object to the form. You can answer.

A. I would assume it would, yes.

Q. Now, your name next appears under the Fed Ex thing. It says Peter -- could you read what follows there, please?

A. "If not installed at OEM."

197

RUSH

Q. And.

Below that?

A. "3 million on water."

Q. Okay. What does "if not installed on OEM" mean?

A. It would go back to the comment above of Alan, which would have been Alan Schoen, that a sticker lable on the outside with the fix and a warning in a package was his proposal for product that was not already installed.

Q. What does OEM mean?

A. Original equipment manufacturer.

Q. Okay. So does your comment mean if the original equipment manufacturer doesn't install that label, there will be 3 million on the water -- three million products at sea coming in that don't have a fix?

A. That would be a guess.

Q. Where did you get that guess?

MR. CARROLL: I would ask you not to guess.

A. I can't tell you where I got it

198

RUSH

at the time.

Q. Okay. Page 096, please.

MR. CARROLL: 23858.

Q. Now, this document begins with the line stating "suggested Peter Rush sound bites for VNR."

Can you tell our jurors what VNR is, Mr. Rush?

A. It is a video news release.

Q. Okay. Is that something to be placed on network news or cable news or all of that?

A. It is sent out for news -- to news stations to decide upon its -- its value as a news item.

Q. Okay. Could you read the third paragraph to us, please?

A. "Because cords of any kind can pose a danger to young children, the Window Covering Safety Council, encourages parents to consider using cordsless blinds in rooms where children sleep or play."

Q. When -- did you record a sound bite making that statement and was it put

199

RUSH

over the air?

A. I believe I did record this, and it would probably have been as part of the -- after 2000.

Q. Okay. And is it your feeling as you sit there today that parents should consider using cordless blinds in rooms where children sleep or play?

A. I do, and -- and or the wide variety of other window covering products that they can use such as curtains, shutters, roll up blinds.

Q. Okay. And why do you have that opinion?

A. We have -- as a representative of the Window Covering Manufacturers Association and as a message of the Window Covering Safety Council, we believe that some of the cords -- the cordless product is a safer alternative than the traditional corded product.

Q. Sir, could you get the other notebook, which is notebook number 1, and look at tab 3 or page 025.

200

RUSH

A. Tab 3,. 025.

MR. CARROLL: This is a -- from the Window Covering Safety Council web site, so it wasn't produced by us. It is 2/13/06 is the date it was printed.

Q. Mr. Rush, do you recognize that document?

A. I recognize the look of the document, yes. It is from the Window Covering Safety Council web site.

Q. So you can go on the web site, and you can find this window covering, learn how to keep your children safe section, and then you can actually play this audio clip by clicking on that icon there, correct?

A. That's correct.

Q. Have you done that?

A. I cannot say I have done it recently.

Q. Do you know what the audio clip says?

A. What the current one says?

201

RUSH

Q. Yes, sir.

A. I do not recall it by memory.

Q. Does Karen Jennings appear on that clip?

A. On the audio clip, I -- she has recorded one. Whether that is the current one up there, I cannot tell you.

Q. Have you heard one that she records where she says "kids and cords don't mix"?

A. Yes, I do.

Q. And tell me why kids and cords don't mix?

A. Well, as the U.S. Consumer Products Safety Commission has established over the years, any cord in the hands of a young child is potentially dangerous such as with clothing, toys, and many other products that CPSC has worked with industry to eliminate. The same thing with the window covering cord.

Q. Do you believe along with Carol Jennings that kids and cords don't mix?

A. In fact, it is a -- it has been

RUSH

the major theme of the window covering safety month over the last four years.

Q. All right, sir.

If we could go back to the other notebook. We are at tab 11. I want to look at page 098.

MR. CARROLL: 23842.

MR. BAUERMEISTER: That's correct.

Q. Mr. Rush, I note on my watch here that we have been going about an hour again. Would you like a break or shall we go ahead and continue?

A. Yes, let's take a break.

THE VIDEOGRAPHER: The time is 3:01 p.m. and we are off the record.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:12 p.m.

BY MR. BAUERMEISTER:

Q. Mr. Rush, are you ready?

A. Yes.

Q. All right, sir.

You should have in front of you



RUSH

the second notebook with the tab 11, page 098 before you.

A. Yes.

Q. This is a document produced by the WCMA as 0023842.

Do you recognize this document?

A. Yes, I do.

Q. What is it?

A. It is a draft press release from the Consumer Products Safety Commission, which would be jointly with the Window Covering Safety Council announcing the recall and repair with the fix of the inner cord.

Q. Okay. So the CPSC and the WCMA or WCSC are working together on this release?

A. That's correct.

Q. And are these your draft notes on the release?

A. Yes, they are.

Q. Okay. Could you read for us the paragraph that begins "Last year," the kind of big paragraph or before the last



RUSH

one on the page.

A. "Last year CPSC began a new investigation of window blind deaths. In an extensive review of incidents, CPSC found that children could also become entangled in the inner cords that are used to raise the slats of blinds. This entrapment occurs when a young child pulls on the inner cord, and it forms a loop that can hang the child. All of these deaths involve children in either cribs placed next to windows. In most cases the outer pull cords were placed out of reach, but the children strangled when they pulled on the inner cord of the blind. The strangulation victims ranged in age of nine months to seventeen months."

Q. Could you read the next paragraph as well, sir?

A. "As a result of the new CPSC investigation, the industry has agreed to further redesign window blinds. Newly manufactured blinds will have attachments on pull cords, so that the inner cord



RUSH

can't form a loop if pulled by a young child. Consumers with existing blinds should have them repaired. The repair can be done in minutes without removing the blinds."

Q. Now, this replease was sent to you before the CPSC released it to the public; is that correct?

A. That's correct.

Q. And they wanted your notations and changes for their consideration before the release; is that correct?

A. Yes, it was ultimately their release however.

Q. Okay. And the two paragraphs that you read, were those ultimately released to the public?

A. I don't have the final draft in front of me, and whether they put the minor editorial changes we suggested I do not recall.

Q. Okay. But the substance of what you just read was released to the public. CPSC released shortly after you did these

RUSH

notes; is that correct?

A. Yes, that's correct.

Q. Okay. Now, the date on this in the upper left top is shown as I guess there is a -- mine has got kind of a half line that looks like a fax indicator showing 10/15/2000, 17:58.

Can you read that on yours?

A. Yes, it says October 15, 2000.

Q. Okay. It looks like it is a fax coming over to you, correct?

A. That is what it looks like, yes.

Q. All right.

Do you remember getting this and making these changes?

A. I don't recall the actual process of it, no.

Q. Okay. Now, in the first paragraph you read it says, "Last year CPSC began a new investigation of window blind deaths."

Can you tell me why it wasn't until -- well a year or so before October of 2000 that inner cord window blind



RUSH

deaths were being investigated?

A. Repeat the question, please.

Q. Yes, sir. Why wouldn't -- why did the CPSC begin a new investigation, this says last year and it is dated October 5, 2000, so approximately a year earlier, why did they begin an investigation of inner cord death at that time?

A. That is a question that can be better answered by the Consumer Products Safety Commission.

Q. Well, didn't you personally know and say so in your earlier testimony about these inner cord problems as early as 1999?

A. That would be the prior year to 2000.

Q. Okay. And didn't you know about it at that point?

A. CPSC presented a report to us in December of 1999 which spelled out this investigation that we are talking about in this particular release that the industry



RUSH

acted upon with a new corrective action plan and product modification in conjunction with CPSC.

Q. All right.

Had you heard about inner cord deaths of children at any time prior to that?

A. Yes.

Q. And how much earlier had you heard about it?

A. I believe I received a letter at least ten years earlier.

MR. EARNHART: Just for clarification, are we talking about WCMA, the WCSC or Mr. Rush personally or any other organization he may be involved with?

MR. BAUERMEISTER: Let's work with Mr. Rush personally.

Q. Okay. Let's turn to the other notebook at tab 6. All right. Page 001.

MR. CARROLL: 5087.

MR. BAUERMEISTER: Yes, sir. That is correct.



RUSH

Q. Mr. Rush, do you recall receiving this letter from Mr. Or Ms. Toni Greisbach?

A. Yes, I do.

Q. Okay. Is Toni a gentleman or a lady?

A. I believe she is a lady.

Q. Okay. And did you receive this letter shortly after September 5, 1990, which is the date at the top of the letter?

A. Yes, I did.

Q. And what did the letter tell you?

A. It related a case that this attorney had been involved in regarding the death of a child in a window covering cord.

Q. And that occurred on October 5, 1986; is that right?

A. I do not --

MR. CARROLL: It calls for speculation by the witness.

A. I do not not see that

RUSH

information in the letter.

Q. Would you read for the jury the first paragraph of the letter, please.

A. Okay. "As -- as you may or may not be aware, I am an attorney that represented a family whose 18-month old son was killed on October 5, 1986 when it was entangled on a cord in the back of a woven wood shade. My client's lawsuit has just been settled."

Q. Okay. And could you read the last paragraph on that front page?

A. "In the particular case that I handled, the parents were aware of the danger of pull cords and in fact placed the crib at the opposite send of the window from where the pull cord was located. The window shade was eight feet long, and so the child's crib was approximately seven feet away from the pull cord. The child became entangled in what was referred to as the support cord on the back of the woven shade. His crib overlapped the shade by only several



RUSH

inches, but he got entangled -- but he got behind the shade to look out the corner of the window and became entangled and was unable to free himself. His parents found him at the end of his nap."

Q. And could you read the middle paragraph, please.

A. "I am writing at this time to urge you and your organization to expand your efforts in warning the general public about the dangers posed by cords on window coverings. I realize that most of the members of your organization initiated warnings regarding pull cords in the past two years. These efforts are commendable, but I am afraid that they don't go far enough. In fact, limiting warnings to pull cords may be misleading."

Q. Go to the next next page at 5088, please 02002.

A. Where --

Q. And read the first two paragraphs there, please.

A. "This support cord was an even



RUSH

more incidious danger than pull cords because the support cord was hidden from view. The cord did not even show from the front where the shade was rolled up because the shade flapped up in such a way that the cords were invisible."

Q. All right. And the next paragraph, please.

A. "In my opinion as well as the opinion of the expert safety analyst that consulted with me in this case, limiting warnings to simply the pull cord is insufficient because a parent would -- will be mislead into thinking that the pull cord is the only danger on the window covering when in fact all cords on window coverings are potential strangulation hazards to young children. During our investigation of this particular case, we learned that pulling that -- that -- we learned that the cord on many models of venetian blinds and mini blinds can be pulled away from the blinds to form a noose like strangulation hazard,



RUSH

even though the cording is threaded to each individual slat. This can occur when the blinds are in the completely lowered position because in some models there is no tension on the cording when it is in that position."

Q. Okay. Now, the letter ends with the second paragraph with a request that you and your members take action immediately, does it not?

A. "I hope you will discuss these issues with your members and recommend that they will take action immediately. It would certainly be better for the industry if the industry policed itself on these matters."

Q. And the date on the letter -- the date is actually a different date. It says September 4, 1990 on page 2, but it was September 5, 1990 on page 1, right?

A. Yes, that's correct.

Q. What steps, if any, did you take in response to this letter from Toni

214

RUSH

Griesbach?

A. I forwarded copies of the letter to the members of the Window Covering Manufacturers Association.

Q. What steps did they take?

A. I do not know what steps they particularly took.

Q. Now, the first standard for outer pull cord warning and a manufacturing was promulgated by WCMA in November of '96, correct?

A. That's correct.

Q. And that is six full years after you received this letter, right?

A. Yes, it is.

Q. Why did it take six years?

A. The industry was not involved in producing standards at that point. The association was not an accredited standards writing organization, and the industry was not -- did not have sufficient information.

MR. CARROLL: Let's go off the record for a second.

215

RUSH

MR. BAUERMEISTER: All right.

THE VIDEOGRAPHER: The time is 3:25 p.m. We are off the record.

(Discussion held off the record.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:27 p.m.

MR. CARROLL: We are back on.

Q. Remembering what we were just talking about, as -- I had asked a question about why it took six years from Toni Griesbach's letter being received by you for the first standard issuance in November of '96 by the WCMA and your answer was?

A. The Window Covering Manufacturers Association at that point in time in 1990 was not an accredited standards writing organization. The organization was not involved in writing any standards, and in fact the idea of standards was -- had never been discussed in the organization.

Q. Okay. Could we go to notebook

216

RUSH

number 2 and look at tab 11, please.

A. Okay.

Q. That document is entitled "Window Covering Manufacturers Association Inc."

MR. CARROLL: What -- what page are you at?

MR. BAUERMEISTER: Sorry, 001.

MR. CARROLL: 19346.

(Pause.)

Q. Are you ready, Mr. Rush?

A. Yes, I am.

Q. And the title of this document is "Window Covering Manufacturers Association Inc.;" is that right?

A. That's correct.

Q. And what was the address there?

A. 355 Lexington Avenue.

Q. 17th floor, New York, New York?

A. Correct.

Q. (212) 292- 122?

A. That's correct.

Q. That is your office?

217

RUSH

A. That's correct.

Q. Is that your number?

A. Yes, it is.

Q. What does the first paragraph of this document say, please? Would you read it into the record?

A. "Window Covering Manufacturers Association, WCMA, has been engaged in developing standards since January 1966. In 1970 a policy of offering those standards to the American National Standards Institute, ANSI, for approval was adopted by most of the WCMA organizational sections."

Q. Is that true, sir?

A. No.

Q. All right. And what document is this?

A. That opening section actually refers to the Builders Hardware Manufacturers Association from which these procedures were borrowed.

Q. Okay. So the Builders Hardware Manufacturers Association does this, but

218

RUSH

the window covering folks don't?
A. The Builders Hardware Manufacturers Association has been engaged in developing product standards since January 1966 and in 1970 began offering them as ANSI standards.
Q. So if the public received this document, it would be misleading for them to read this and think that the WCMA has been engaged in developing product standards since January 1966?
MR. CARROLL: I object to the foundation that the public received it. Subject to that, you can answer it.
A. This is an internal document for development of standards within the WCMA.
Q. All right, sir.
Could you turn to page 002, please.
MR. WALLACE: What is the Bates?
MR. CARROLL: Next page, 19347.
Q. That's correct. Could you read

219

RUSH

paragraph 11 into the record, sir?
A. "A WCMA member company upon learning of safety omission or defect of any WCMA standard or WCMA ANSI standard shall bring to the attention WCMA for appropriate discussion and revision of the standard."
Q. Now, is that false as well or is that true?
A. That is --
MR. CARROLL: I object to the form. You can answer.
A. That would be a procedural direction, yes.
Q. So that is accurate?
A. Yes.
Q. But the introductory paragraph should be deleted because it is not accurate?
A. The dates should be revised to correctly reflect when WCMA actually became an ANSI accredited standards writing developing association.
Q. Now, with paragraph 11 at 002,

220

RUSH

tell me what the responsibility is of a member company who believes that a standard has a defect?
A. It shall bring it to the attention of the WCMA for section discussion and an appropriate revision of the standard.
Q. Can you tell me the names of companies that were members of the WCMA that have brought to the WCMA notice that there is a -- ommission or defect in WCMA standards?
A. I do not know of any.
Q. Never happened on your watch?
MR. CARROLL: Asked and answered.
A. No, it has not.
Q. Does the system of voluntary policing within an industry perform actually poorly?
MR. CARROLL: I object to the form. You can answer.
MR. EARNHART: Foundation.
A. The Consumer Products Safety

221

RUSH

Commission seems very happy with the current voluntary standard and has actively participated in the revisions and feels comfortable that the industry is in compliance with the standards.
Q. Has the present standard promulgated in September of '02 adopted virtually all the positions that Terri Griesbach wrote you about in 1990 as far as risks of internal cords?
A. The standard goes well beyond what she wrote.
Q. But certainly what she wrote was correct, wasn't it?
A. Those areas are definitely covered in the existing standards as are the dangers from vertical blinds, drapery cords and other window covering products.
Q. How could the WCMA and the industry have that letter at hand and not produce a standard for six years?
A. The industry was not -- WCMA was not in a position to write standards at that time.