RUSH

**Q. When did it become accredited?**

**A. I believe 1995.**

**Q. All right, sir. I would like you to turn back to exhibit volume 1, and we want to look at the first tab.**

MR. CARROLL: Okay.

**Q. All right.**

**This is the notice of the 30(b)6 deposition, and have you had a chance to read through that notice prior to this deposition?**

**A. Yes, I did review it.**

**Q. Can you tell me, sir, whether all of the previously produced documents from the WCMA are true and accurate copies of the original?**

**A. Yes, to the best of my ability.**

MR. BAUERMEISTER: Counsel, can we have a stipulation to that point?

MR. CARROLL: You can have a stipulation that they are true and correct copies of what was made available to you. Of course it doesn't go to admissibility, but sure as for production in discovery,



RUSH

yes.

MR. BAUERMEISTER: I am looking for the stipulation as to foundation that they are authentic, accurate and true copies.

MR. CARROLL: They are authentic and true as to the foundation. That still doesn't go to whose going to put it into evidence, and I will not give you that stipulation.

MR. BAUERMEISTER: No, I understand that.

MR. CARROLL: Okay.

MR. BAUERMEISTER: But you are stipulating that all documents produced by WCMA with their production numbers on them are authentic and true copies of the originals?

MR. CARROLL: That's correct.

MR. BAUERMEISTER: Thank you, sir.

**Q. Mr. Rush, were you consulted on the responses to the admissions given in this case?**



RUSH

**A. Yes, I believe I was consulted.**

**Q. Were you consulted as well on the responses to the complaint answer?**

**A. Yes, I was.**

**Q. Okay. I would like to go to the complaint in this case and refresh your recollection of paragraph 11, which is at 011. We are looking at tab one, and now we are looking for 011, and paragraph 11 on page 011.**

**Do you have that, sir?**

**A. Yes, I do.**

**Q. Okay. Let me read that, and you correct me if I make a mistake on it. "The blinds were defectively designed, manufactured and/or packaged in that the accessible inner cord could pull to form a loop which posed an unreasonable risk to young children of death or injury by strangulation, and the blinds lacked any warning of the danger posed by accessible inner cord."**

**Did I read that correctly?**

**A. Yes, you do.**



RUSH

**Q. All right.**

**Could we turn to the answer by the Window Covering Manufacturers Association to that paragraph shown at page 018.**

**Do you have that, sir?**

**A. Yes, I do.**

**Q. And it states "WCMA denies all allegations contained in paragraph 11 of plaintiff's complaint," correct?**

**A. Yes, it does.**

**Q. Actually, sir, going back to page 11 and looking at paragraph 11, can you tell me what facts, if any, to your knowledge are true in that paragraph?**

MR. CARROLL: To the extent it calls for a legal conclusion, I'll object.

**A. I can't answer any of the questions since I have never seen the product. I don't know what is in the product, and I would not be in a position to decide whether it was correctly done or not.**

**Q. Have you ever asked to see the**





EXHIBIT 42-E

RUSH

product?

A. No, I have not.

Q. Does the Window Covering Manufacturers Association have any interest in seeing the product that killed April Cox?

MR. CARROLL: I object to the form. You can answer.

A. No, it does not.

Q. All right, sir.

Going back to the 30(b)6 notice, sir, I have already asked you about your knowledge of the factual basis of the events relating to the death of April Cox.

Is there any employee of the WCMA that would have more knowledge about that factual basis than yourself?

A. No, there is not.

Q. Okay. Would there be anyone, sir, at Kellen who would have more knowledge than yourself about the factual basis for the death of April Cox?

A. No, there would not.

Q. Okay. Now, sir, if you'll look



RUSH

at page 003 of the 30(b)6 notice, I would like to ask you about paragraph 10. What knowledge does the WCMA have about all field engineers reports concerning matters identified in the preceding paragraph, and that preceding paragraph relates to the incident probability, possibility and/or risk of injury or death to children by strangulation connected in any way to any of the products described in the ANSI standards WCMA A 100.1.

So the question to you, sir, is what knowledge does the WCMA have about field engineer's reports concerning all of those probalities, possibilities, and risks?

A. I don't know of any field engineer's reports.

Q. Have you ever sought any field engineer's reports?

A. No, we have not.

Q. Do you know what a field engineer's report is?

A. No, I do not.



RUSH

Q. Now, the WCMA standard 100.1 issued in 1996 contains a warning to consumers; is that correct?

A. It -- it contains several warning labels.

Q. Were you involved in the warning label construction?

A. No, I was not.

Q. Do you know of any safety engineer who was involved in that warning label construction?

A. Human factors division of the Consumer Products Safety Commission.

Q. Okay. But other than government officials, do you know of any persons from private industry including the WCMA that had any engineering background that was used to create the warning signs of -- for that standard?

A. There were a number of engineers from the industry on the technical committee.

Q. Can you name those persons, please?



RUSH

A. Paul Josephson from Springs, Don Frasier from Hunter Douglas are two names that come to mind.

Q. And they are engineers?

A. Yes, they are.

Q. Have you ever discussed with them the problem of the warning labels suggesting to parents as a letter to you from the lawyer in 1990 suggested that by informing parents that they can take away the risk of the cord by putting it out of reach that they are falsely lulling the parent into believing the cord window covering is now safe for their children to be around?

MR. CARROLL: I object to the form. Mischaracterizes the witness' testimony and argumentative. Subject to that, you can answer.

A. I do not remember any discussion along those lines.

Q. Do you know what number of -- I apologize if I have asked you this question already. Perhaps you've already

230

RUSH

testified. WCMA does not know the number of children who died from strangulation by these cords; is that correct?

A. I --

MR. CARROLL: I just object to what by these cords means. Inner cord, pull cord.

MR. BAUERMEISTER: Both.

MR. CARROLL: All right. With that -- with that explanation, you can answer.

A. The information regarding the number of children who have died with window covering cords is the information kept and provided to us by the U.S. Consumer Products Safety Commission.

Q. As you are sitting here today, sir, do you know what number of child deaths the CPSC has attributed to inner and outer cords?

A. The exact number right now, no, I do not.

Q. Do you know a general number?

A. Somewhere in the neighborhood of

231

RUSH

185.

Q. All right, sir.

We have noticed in this 30(b)6 notice several claims or question inquiries that are shown at items 19, 20 and 21.

MR. BAUERMEISTER: Counsel, I can ask these questions of the witness or you can state an objection for the record, and I'll move on if you believe that discovery at this time is premature.

MR. CARROLL: Well, it depends on what you want to ask, but we have lodged objections that I believe you received to portions or all of 19, 20 and 21. I am glad to restate them on the record. If you want to ask, it doesn't matter to me.

MR. BAUERMEISTER: No, I am willing to accept that you are going to object at this time and instruct the witness not to answer on these three, 19, 20 and 21.

MR. CARROLL: Well, I -- I

232

RUSH

guess the best thing I can say is we objected to portions, but I think we answered as best we could 19. I believe that we objected but said we didn't have anyone to bring to you to talk about 20, and then on 21 the only thing we said is that we can't provide any information on net income of member companies because we don't get that, and then we did object to providing net worth, but as a 501 C 6 our job is not to have any net worth. It is a nonprofit. So I -- you know, I am -- I'm glad to do that. I am not instructing the witness not to answer because I think we actually answered 19, 20 and 21 while stating objections to some -- to some of the parameters of the notice.

MR. BAUERMEISTER: Okay. Well, perhaps I will go through them and get this witness' knowledge, and if you have objections, please state them.

MR. CARROLL: Okay. The -- the only thing I would ask is with respect to 19, 20 and 21, I am holding

233

RUSH

the -- the objections, and it might make it easier -- well, no. Go ahead. That is fine. If I -- if I have got a problem with it, I will wait until it comes up.

MR. BAUERMEISTER: Okay.

Q. Mr. Rush, what knowledge do you have about any prior claims for punitive damages against the WCMA or any of its members?

A. I know of no punitive damages against WCMA and know some member companies have been sued, but I do not know any of the terms or facts of how that litigation played out.

Q. Does the WCMA do any information collecting to stay abreast of what punitive damages any of its members have paid for deaths relating to window covering products?

A. No, it does not.

Q. Does the WCMA consider that information unimportant to the work that it does?

MR. CARROLL: I object to the

RUSH

form. You can answer.

A. I would think it -- we might feel that it would be illegal to collect.

Q. Illegal to collect it?

A. Yes.

Q. Why would that be?

A. The terms and conditions of sale under the trade association might violate the antitrust rules.

Q. Sir, are you familiar with any punitive damages claims being made against Jencraft Corporation?

A. No, I am not.

Q. Are you familiar with any lawsuits of any type being made against Jencraft Corporation for window covering products?

A. I am not familiar with any specifics of Jencraft at this point.

Q. The same two questions about Wal-Mart?

MR. EARNHART: Foundation.

A. I am aware of Wal-Mart is involved in one litigation. I do not



RUSH

know -- I am not familiar with the specifics of it however.

Q. How about Ching Feng Blinds Industry?

A. I do not know anything about Ching Feng Blinds.

Q. Have you ever had any contact with any members or representatives or employees of Ching Feng blinds?

A. Not that I know of.

Q. Do you know anything about the products they produce?

A. No, I do not.

Q. All right, sir. Question 21 looks like it is -- no, I guess it is correctly numbered. Question 21 here, what information, if any, do you have about the WCMA's net worth?

A. I see their financials and file --

Q. What is the net worth of the WCMA?

MR. CARROLL: I am going to object to the extent that this question



RUSH

has no bearing on the lawsuit.

THE WITNESS: Shall I answer?

MR. CARROLL: You can answer.

A. The net worth of the association is less than 50,000 dollars.

Q. Can you tell us what the annual gross income from all sources for the WCMA is?

MR. CARROLL: I will make the same objection but will allow the witness to answer.

A. About a 135,000 dollars.

Q. And can you tell us the sources of that income?

A. Dues are the primary -- prime source of income. There is a small secondary source of income for a product innovation awards program, and it is simply the entry fee.

Q. Has that products innovations award program ever made an award for safety features added to window covering blinds to protect small children?

A. It has -- the product innovation



RUSH

awards program has added a category in safety, and awards have been made in that product category.

Q. Have any of them related to window covering blinds?

A. Window coverings in general and safety cords is -- was one -- one of the areas that I believe award have been given in.

Q. When did the program making awards in safety begin?

A. I would have to consult notes, but I would say probably in '96 or '97.

Q. What analysis of safety does the WCMA make to make those awards concerning window covering products?

A. The window covering manufacturers do not make any analysis. The awards are judged by third parties who are not affiliated with Window Covering Manufacturers Association.

Q. Who are those third parties?

A. Retailers, a professor from the Fashion Institute of Technology, and

RUSH

generally a consumer magazine editor.
Q. Have you identified in your interrogatory answers all of the companies who were members of the WCMA at the time of the November '96 standard issuance?
A. Yes.
Q. Have you identified in your interrogatory answers all of the companies who were members of the organization during the September 2 standard issuance?
A. Yes.
Q. And have you identified in your interrogatory answers the names of all the companies who were members of the window coverings association to date?
MR. CARROLL: If you would, counsel, point him to the interrogatory answer, and he can tell you. I believe it is number 4, Peter. Number 5 --
A. What --
MR. CARROLL: I apologize. It is tab one beginning at page 091. I don't believe the interrogatories request any information about the -- who was a member



RUSH

at the time of the 2002 standard, so to the extent that was one of your questions I will object.
I apologize. It is in number four. I withdraw the objection.
(Pause.)
A. So we are at interrogatory 4?
MR. CARROLL: Um hum. If you'll just read the answers to four and five, so you could be fully informed when you respond to those two questions and the answer if necessary.
A. Yes, those are correct.
Q. All right, sir. It is just about on the hour again. Do you want to take a break or do you want me to continue?
A. No, let's continue.
Q. I would say I have less than an hour's worth of questions left here.
A. Let's continue.
Q. All right.
I want to go, sir, to your admissions answers. Please look at 068.



RUSH

Do you have that page, sir?
A. Yes, I do.
Q. Now, admission answer 62 states that WCMA admits that at the time of April Cox's death Peter Rush was executive director of both WCMA and WCSC, and that is true, isn't it?
A. Let me double-check.
Q. Is that true, sir?
MR. CARROLL: May 27, 2002 would be the date of death.
A. 2002. I believe that to be true.
Q. Sir, for how many years were you the executive director of both the WCMA and the WCSC?
A. I have been the executive director of WCSC from 1994 to the present. I was the executive director, and I do not have the specific date when I was appointed executive director of WCMA, but I would -- my recollection would be somewhere about 1989.
Q. Until what date?



RUSH

A. Until sometime in 2002.
Q. And that is when Caroline Jennings became executive director?
A. That's correct.
Q. Now, during the entire time that you were the executive director for both organizations, they had the same office address, the same mailing address, and the same facsimile number; is that correct?
A. That is correct.
Q. Tell me what steps the WCMA participated in to start the WCSC.
A. The WCMA -- I represent -- I participated in meeting with the U.S. Consumer Products Safety Commission I believe it was March 30, 1994 as a -- as the executive director of the Window Covering Manufacturers Association in addition to a -- a number of other companies, both members of WCMA and members -- companies who were not members of WCMA.
At that meeting, the issue of a -- some type of corrective action

RUSH

program was discussed with CPSC, and at that point it became readily apparent that the Window Covering Manufacturers Association because of the narrow focus of the eligibility for membership could not include all the other companies that were currently involved in the business. Upon advice of counsel, we established a new 501 C 6 called the Window Covering Safety Council, which was incorporated in I believe June of 2000 -- of 1994 whose membership requirements were extremely broad that said any company that was involved in the window covering industry was eligible to join.

Q. All right, sir.

Do you know Elise Gatto?

A. The name is not familiar to me.

Q. Let's look at notebook number 2 and tab 12 and page 118.

MR. CARROLL: 5024.

A. Okay.

(Pause.)

A. Yes, I am there.



RUSH

Q. Do you have that, sir?

A. Yes, I do.

Q. Okay. Now, this is a WCMA document?

A. Yes, it is.

Q. And it indicates that at the meeting of the Window Covering Manufacturers Association held at Hyatt O'Hare Hotel in Chicago on Wednesday, June 29, 1994 pursuant to call and notice of association members and invited importers of window products, the following members and guests were in attendance; is that correct?

A. That's correct.

Q. And the WCMA members are listed in the first column with both an individual representative and his corporate connection, correct?

A. That's correct.

Q. And the same thing happens with importers, but they are not WCMA members in the second column, right?

A. Well, yes. Below them are the



RUSH

nonmembers, the importers.

Q. Now, in the importers list, we have Jencraft represented by Sharon -- do you -- I don't have a -- it doesn't look like a complete copy here of that.

Do you know Sharon's last name?

A. I think it is Defeo, D-E-F-E-O.

Q. Defeo?

A. I believe so.

Q. Have you ever met Sharon Defeo?

A. I believe I met her at this meeting.

Q. Okay. And Jencraft showed an interest in the substance of this meeting?

A. They attended the meeting, yes.

Q. And what was the substance of the meeting?

A. The substance of the meeting was -- of the meeting was to form a -- well, it was basically to involve -- talk about the corrective action plan, the proposed retrofit program, and at the same time we spoke about starting a new organization.



RUSH

Q. Okay. So the WCMA had already taken the baton on the corrective action plan and was now discussing a new organization at this meeting?

A. Well, actually the Consumer Products Safety Commission had presented to us what they expected in a corrective action plan.

Q. Okay.

A. And we presented it to the broader industry.

Q. Okay. Now, another importer there was Wal-Mart represented by Elise Gatto, G-A-T-T-O, right?

A. Yes.

Q. You are shown as present, Peter Rush for WCMA, correct?

A. That's correct.

Q. Now, the pages that follow, have you read this document before?

A. Yes.

Q. And can you summarize it for us, what -- what happened?

MR. CARROLL: I am going to

246

RUSH

object to a request for a summary. It says what happened. If you've got any questions for him, he can answer.

(Pause.)

**Q. Okay, sir. Can you tell me are the meeting notes all this -- this appears to me to be the notes of two meetings.**

**Is the first meeting shown at 118 through 120 and then a second meeting at Hyatt O'Hare on Tuesday May 3, '94, which is shown at 121 through 122?**

MR. CARROLL: 5012-5013 is the second meeting, gentlemen.

MR. BAUERMEISTER: Yes, sir.

**A. Yes, they appear to be the notes of two separate meetings**

**Q. Now, you made a presentation at this meeting; is that right?**

**A. Which meeting are we discussing?**

**Q. The one shown at 118, 119, and 120?**

**A. Yes, I did.**

**Q. What was the substance of your presentation?**

247

RUSH

**A. The substance of my presentation was the information provided to us by the Consumer Products Safety Commission regarding deaths in window covering cords and the substance of the corrective action plan that CPSC had proposed that the industry implement.**

**Q. Okay. Now, looking at page 119, there is a heading there called the corrective action retrofit program, correct?**

**A. Yes, there is.**

**Q. Why don't you read that first paragraph to us, please.**

**A. "Mr. Rush explained that in a meeting at CPSC in Washington on March 30 CPSC urged that a voluntary program funded by the industry begin immediately. CPSC specifically requested that the program called a corrective action addressed window coverings in households nationwide. CPSC's guidelines for the corrective action include a public information program and a distribution program of**

248

RUSH

**safety devices approved by CPSC. The two CPSC approved products for distribution are tassels and a break through tassel both of which would be installed to the hang cord after the loop was cut."**

**Q. And the next paragraph, sir, would you read that, please?**

**A. "The education program sumbimtted by WCMA and approved by CPSC includes the following, a media kit, press conferences, distribution of new safety alert, ongoing media relations, video news releases, public service announcements, satellite, and market -- major market and radio tours, a consumer brochure, and posters in both English and Spanish."**

**Q. Now, why was the WCMA preparing an education program and submitting it here to the CPSC for approval?**

**A. In order to be responsive to the Consumer Products Safety Commission.**

**Q. Okay. Did the WCMA follow up on the media press conferences, news safety alerts and all the things listed in this**

249

RUSH

**paragraph?**

**A. No, all of those activities were taken over by the Window Covering Safety Council once it was established.**

**Q. Okay. But they were first submitted by WCMA and approved by the CPSC in the form of various it looks like public relations information steps here in this paragraph; is that right?**

**A. They were basically proposed to the industry by the Consumer Products Safety Commission, which we then submitted back to them to see if we made certain of all the things they would require on this public information and education program.**

**Q. All right, sir.**

**If you would look at notebook number one under tab 1, we are looking for admissions answers again, and I would like you to look at page 074. Do you have that, sir?**

**A. Yes, I do.**

**Q. Okay. The answer to admission number 72 was: "WCMA, which is a**

RUSH

voluntary organization admits it has no procedure for tracking injuries or deaths caused by corded window covering products."

Is that true?

A. That is true.

Q. And why do you have no procedure for tracking injuries or deaths caused by corded window covering products?

A. Because the Consumer Products Safety Commission has the statutory ability and the mechanisms to comply with gathering that kind of information.

Q. All right, sir. I would like you to look at request for production number 31, which is at page 087. Do you have that there, sir?

A. Yes, I do.

Q. Question 31 was: "Please produce at all documents sent to you or received by you from the CPSC which discuss death or injury by strangulation of corded window covering products," and your answer was: "WCMA has searched its



RUSH

records in the ordinary course of business and has not located documents responsive to that request."

Is that an accurate answer?

A. All the documents that we have responsive to that answer were contained in the documents that were made available to you.

Q. Well, do you have documents responsive to that or not? This says you don't. Is that true or not is what I am asking you.

A. Any documents that would be or could have been produced are -- were in the files that you had access to.

Q. Okay. All right, sir. What I would like to do now is take a short break. I am very near the end of my questioning. I thank you for your patience, and I would like to go off record with counsel's permission for about five minutes and then come back and finish my examination.

MR. CARROLL: That is



RUSH

perfectly all right. Thanks.

THE VIDEOGRAPHER: The time is 4:14 p.m. We are off the record.

(Recess taken.)

THE VIDEOGRAPHER: We are back on record. The time is 4:25 p.m.

MR. CARROLL: Okay. He is ready.

Q. All right. We want to look at volume one of the exhibit notebooks. We are looking under tab one at the admissions answers.

Are you ready, sir?

A. Yes.

Q. Look at page 055 of the admissions answers, looking at request for admission number 34. The question -- have you found it, sir?

A. Yes.

Q. The question is: "Please admit that you undertook to develop the 1996 standard on behalf of your members," and what was the WCMA answer?

A. "WCMA admits it and its members



RUSH

developed the voluntary standard codified as WCMA A 100.1-1996 in conjunction with the consumer products -- CPSC and in accordance with the standards and practices of ANSI. WCMA further states it did not participate in any design, manufacture, inspection, testing, distribution, or sale of any window covering product, and it denies that by developing the voluntary standard codified as WCMA A 100.1-1996 it assumes any duties or responsibilities of any other entity or acted on any other entity's behalf."

Q. All right, sir.

Have you participated or reviewed the answer draft to that admission?

A. Yes, I did.

Q. Okay. I take it you are not an attorney?

A. That's correct.

Q. Okay. I am not interested in any legal opinion. I am interested in your understanding of the statement that

254

RUSH

it denies that by developing the voluntary standard the WCMA assumed any duty or responsibility of any other entity or acted on any other entities behalf. What does that mean to you as the former executive director of the WCMA?

MR. CARROLL: I will still interpose an objection. Since it was crafted by lawyers, it is going to seek an understanding of -- of language that was put in there by lawyers, but to the extent he can answer, he is allowed to.

A. The WCMA standard is a voluntary ANSI based standard.

Q. Is that your total answer, sir?

A. Yes, it is.

Q. Does the WCMA intend for product purchasers to rely on the standards when they are shown on products that are purchased?

MR. CARROLL: I object to the form. You can answer.

A. The voluntary standard is a standard which the U.S. Consumer Products

255

RUSH

Safety Commission relies on to be -- that window covering products must comply with. As far as I know, it is the only standard that a window covering product must comply with, but that is a -- that is based upon the U.S. government's Consumer Products Safety Commission's enforcement of that standard. The WCMA has no enforcement power at all.

Q. I understand that. What I am trying to determine is if the WCMA expects that when consumers buy products manufactured under the WCMA standard and carrying the WCMA warning as promulgated that those consumers can rely on that warning as something that will help make the product that they use safe?

MR. CARROLL: To the extent the question calls for a legal conclusion about reliance or consumer expectations, I object. Mr. Rush can answer based on his knowledge and experience.

A. The WCMA has no particular program to consumers regarding the

256

RUSH

standard or what is in the standard. That requirement falls to the individual manufacturers who manufacture products and make product claims about their products.

Q. Okay. So if I am an ordinary purchaser, not a lawyer, just trying to buy a safe window covering for my child's room and see the WCMA warning placed on that window covering, should I rely on that warning to suggest to me how safe the window covering is?

A. You --

MR. CARROLL: Let me object that -- that the timing is not made clear. You mean today for the purpose of the question.

MR. BAUERMEISTER: Any time.

MR. CARROLL: Okay. I object in that it is not limited to any time. You can answer.

A. WCMA cannot attest that any particular manufacturer is actually manufacturing to that standard. The -- the standard and the warning labels

257

RUSH

of that standard are readily available and commercially available from ANSI as well as WCMA, but we have no -- we have no ability to judge whether any individual product is manufactured to comply with that standard.

Q. Well, do the manufacturers tell consumers that it is manufactured in accordance with WCMA ANSI standards?

A. You would have to consult the individual manufacturers on that.

Q. You've never seen a manufacturers box that said this is manufactured to that standard?

A. I do not recall anyone putting that on their box.

Q. So the public would have no way of knowing that you produce a standard?

A. The public?

Q. Yes, sir.

A. I do not know whether they would or they would not. The standard is a performance standard that is used as a production standard and is enforced by the

RUSH

Consumer Products Safety Commission to a level that they feel is acceptable in terms of the product performance.

Q. So people who go to the store and buy window coverings that bear the exact warning that the WCMA standards say should be on these blinds shouldn't assume that that warning tells them accurately how safe this blind is?

MR. CARROLL: I will object, and -- to the extent it asks for a comment beyond what the WCMA itself can say, but with that objection Mr. Rush can answer.

A. Again, WCMA has no way of knowing or policing how a product is manufactured.

Q. Well, as a general matter, manufacturers of these products owe consumers a duty to make reasonably safe products. Isn't that true?

MR. CARROLL: To the extent you are not asking Law Professor Rush, he can answer.

A. Manufacturers of window covering



RUSH

products should be complying with the current ANSI standard on any product that they are -- that they are offering to the public for sale. If not, they are subject to enforcement actions by the U.S. Consumer Products Safety Commission.

Q. And why is that?

MR. CARROLL: Asked and answered. You can answer again.

A. Because the U.S. Consumer Products Safety Commission has the statutory authority to determine products which are safe to sell in the United States.

Q. And the way we tell whether a product is safe to sell is whether it meets the ANSI WCMA standard, correct?

MR. CARROLL: I object. Mischaracterizes the witness' testimony. You can answer again.

A. The U.S. Consumer Products Safety Commission enforces voluntary industry standards that -- accepted standards that it feels are sufficient to



RUSH

meet its goal of providing a safer environment for U.S. citizens.

Q. So the WCMA goal is to provide a safer involvement for U.S. citizens?

MR. CARROLL: Mischaracterizes the witness' testimony. You can answer again.

A. I believe I said that is the duty of U.S. Consumer Products Safety Commission.

Q. Okay. My question to you is is that the mission of the WCMA?

A. No, the mission of the WCMA is -- is to represent the wishes of its members as an organization.

Q. And it is not concerned with whether products are safe or not for consumers?

MR. CARROLL: Mischaracterizes the witness' testimony. Nice try, but he can answer again.

A. No. The WCMA has developed a voluntary standard, ANSI standard that the U.S. Consumer Products Safety Commission



RUSH

is enforcing regarding the safety of window covering products.

Q. Well, I apologize. I am having trouble understanding.

MR. CARROLL: Do we need to turn the volume up?

MR. BAUERMEISTER: I don't think that would help.

MR. CARROLL: Okay.

MR. BAUERMEISTER: What would be useful is if the witness could say what reliance consumers should place on corporations that adopt ANSI standards promulgated by WCMA.

MR. CARROLL: To the extent it does not call for a legal conclusion about reliance and consumer expectations, the witness can answer the question again.

A. With -- WCMA has no control over whether any corporation adopts or does not adopt, manufactures or does not manufacture to the WCMA standard. That is totally within the perview of the U.S. Consumer Products Safety Commission, not

RUSH

the association.

Q. Now, does the organization have a regulation that requires members to report companies who are producing products that don't meet the WCMA standard for window covering products?

MR. CARROLL: Asked and answered. You can answer again.

A. No, it does not.

Q. So there is no duty to identify manufacturers of products that are unsafe for the public?

A. No --

MR. CARROLL: I object to the form. You can answer.

A. There is -- the WCMA has a requirement within the organization standards writing. If the standard is unacceptable or if there are problems with the standard, but in terms of reporting to WCMA, no. The issue again relies on the U.S. Consumer Products Safety Commission, and any product defects should be reported to the Consumer Products Safety Commission



RUSH

under their statute.

MR. BAUERMEISTER: I have no further questions.

MR. EARNHART: This is Will Earnhart, I have got a few follow-ups.

EXAMINATION BY MR. EARNHART:

Q. Mr. Rush --

MR. EARNHART: Let me Mike up just a second, gentleman.

MR. CARROLL: I think he wants this one. Just a second fellas. We are having technical difficulties.

Q. This is Will Earnhart. I've got a few follow-up questions.

First of all, Mr. Rush, what entities share the same fax numbers and address as the WCMA?

A. Over what time period? Currently?

Q. Why don't we start with currently, and then we can go back to how about 2000 and back to 1995.

A. Okay. Currently, the Builders Hardware Manufacturers Association, the



RUSH

New York Women in Communication, the Comic Magazine Association of America, the Healthcare Food Services Managers Association, the New York Women in Communications Foundation, the New York Chapter of the International Design Association.

Q. Do any of those entities have anything to do with window coverings?

A. No.

Q. Okay. Back in 1995, was it a similar group?

A. Other groups that may have been in that time frame, let's say from '90 through current would be entities such as the Plastic Bag Association, the Certified Plastic Manufacturers Association, the National Tabletop Association that come to mind.

Q. Now, these are all entities that the Kellen company or its predecessor was hired to manage the affairs of; is that correct?

A. Yes, that's correct.



RUSH

Q. The WCMA, what is it? What is it its purpose; how long has it existed?

A. The WCMA is a 501 C 6 trade association of companies who manufacture or supply to manufacturers based in North America.

Q. What is the purpose of it?

A. The purpose of the association is to I guess promote whatever activities that the members choose to be involved in.

Q. And how long has it existed?

A. The current association actually I don't have the exact beginning, but it goes back to the 50s when it was the United States Venetian Blind Association.

Q. And how is the WCSC different from the WCMA?

A. The WCSC is a 501 C 6 that is open to all companies or individuals for that matter who are involved in the window covering business including retailers, importers, installers, and it has no geographic boundaries in terms of their involvement. The primary purpose of the

RUSH

Window Covering Safety Council was to implement a corrective action program with the United States Consumer Products Safety Commission and maintains an ongoing program of public information and education as well as distribution of free retrofit kits.

Q. Okay. Now, has Wal-Mart -- is Wal-Mart or has Wal-Mart ever been a member of the WCMA?

A. No, Wal-Mart has not been a member of the WCMA.

Q. Given that the WCMA and WCSC are different entities, does the WCMA share all of its knowledge, history or documents with the WCSC?

A. No, we maintain separate sets of documents and financials for both organizations -- each organization. We file individual tax returns for each organization each year.

Q. Okay. So information that the WCMA may have may -- is likely not necessarily made available to members of



RUSH

the WCSC?

A. They do not share all information. That is correct.

Q. And information you may have as executive director of the WCMA since 1989 isn't necessarily made available to members of the WCSC; is that correct?

A. No, not necessarily.

Q. Prior to 1996, was the WCMA or any of its members involved in warnings or otherwise publicizing safety issues in regard to blinds?

A. In 1985, the American Window Covering Manufacturers Association in conjunction with the U.S. Consumer Products Safety Commission jointly issued a product alert. That product alert was subsequently reissued as a cooperation -- cooperative effort between the Window Covering Manufacturers Association and the CPSC.

Q. And substantively, what was that product alert?

A. It substantively warned parents



RUSH

of potential strangulation risks with window covering products and warned them to keep cords away from the children.

Q. Was any -- was anything said in specific to cribs and their proximity to corded window coverings?

A. The issue of keeping cribs away from windows, I cannot tell you specifically when that came into the literature, but it was very early in the -- in the program.

Q. Pre-1990?

A. Yes, I believe so.

Q. How does the Consumer Products Safety Commission participate with the WCMA in creating these regulations?

A. Which regulations are you speaking of?

Q. ANSI or any other regulations?

A. Well, the ANSI standard is -- has a technical committee, which is the actual body that writes the standard. CPSC provides fully as -- participates fully as voting members of the committee



RUSH

as well as providing technical information and guidance on a number of the areas within the standard. CPSC is also on the canvass list for the ANSI standard through the ANSI process.

Q. How about in regard to the CPSC's work, how does that involve -- not CPSC but the WCSC, how does that involve the -- the CPSC?

A. The Window Covering Safety Council works cooperatively with CPSC on the whole corrective action plan, and that includes regular communication with CPSC. We produce an annual report to CPSC of the activities of the Window Covering Safety Council. CPSC has cosponsored with the Window Covering Safety Council window covering safety month over the past three years, which included allowing the joint industry program to use the CPSC logo and wording. Chairman Stratton has done public service announcements on behalf of Window Covering Safety Council as did his predecessor Ed Brandt.

RUSH

Q. Does the CPSC approve the voluntary actions of the Window Covering Safety Council?

A. The voluntary corrective action plans were approved by the Consumer Product Safety Commission.

Q. And if the Consumer Product Safety Commission was not satisfied I assume that they could bring to bear their full power to -- against manufacturers and retailers?

A. Yes, they could.

Q. You've used the term several times in regard to both the ANSI standards and the action plan. What do you mean by voluntary?

A. An ANSI standard unless mandated by law is by definition a voluntary standard. The -- the application of whether a standard is going to be enforced by the Consumer Products Safety Commission depends upon what CPSC determines to be the potential or the need for that standard to be enforced and according to



RUSH

the CPSC I guess underlying legislation that they are to look to industry standards where applicable.

Q. Is the WCMA a voluntary organization?

A. Yes, it is.

Q. And what do you mean by a voluntary organization?

A. A company can choose to join or not join.

Q. Does the WCMA have any power to enforce any actions against its members or make its members meet any standards?

A. No, it does not.

Q. How about the Window Covering Safety Council, is it a voluntary organization as well?

A. Yes, it is.

Q. And does it have any power to enforce any regulations, standard or conduct of its members?

A. No, it does not.

Q. Does either organization have any power over nonmembers of



RUSH

organizations?

A. No, it does not.

Q. And I take it a company can opt in or opt out of any program or even membership in these organizations at any time; is that correct?

A. Yes, we have no control over whether a company becomes a member or decides to discontinue its membership.

Q. Just a second here. Let me go through my notes.

(Pause.)

MR. EARNHART: I don't have any further questions.

MR. QUINN: No questions. This is Dan Quinn for Ching Feng.

MR. CARROLL: I don't have any questions for Mr. Rush at this time for WCMA.

MR. BAUERMEISTER: Mr. Rush, this is Don Bauermeister. I want to thank you for your patience today.

THE WITNESS: Thank you.

MR. CARROLL: The witness will



RUSH

read and sign.

MR. QUINN: Hey, Don, this is Dan --

MR. BAUERMEISTER: Yes, sir. Are we off the record now?

MR. CARROLL: I believe we are. You want to announce it.

THE VIDEOGRAPHER: The time is 4:50. We are off the record. This ends the deposition for today.

(Time noted: 4:49 p.m.)

PETER RUSH

Subscribed and sworn to before me this day of , 2006





RUSH
CERTIFICATION

I, DEBBIE ZAROMATIDIS, a Shorthand Reporter and a Notary Public, do hereby certify that the foregoing witness, PETER RUSH, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

DEBBIE ZAROMATIDIS



RUSH
LITIGATION SUPPORT INDEX

DIRECTION TO WITNESS NOT TO ANSWER

Page Line Page Line

(NONE)

REQUEST FOR PRODUCTION OF DOCUMENTS

Page Line Page Line

(NONE)

INFORMATION TO BE FURNISHED

Page Line Page Line

(NONE)

QUESTIONS MARKED FOR A RULING

Page Line Page Line

(NONE)