**Page 30**

1  Q. When did I say that?
2  A. When you asked me about that.
3  Q. Well, I certainly don't mean any confusion. The
4  testimony you've given before, does that apply to the WCMA?
5  A. I would think so, yes.
6  Q. Do you know of an organization called the Window
7  Covering Association?
8  A. No. But you're the one that mentioned it earlier. I
9  thought that was a trick question.
10 Q. No. I'm not going to give you trick questions. For
11 the rest of the deposition is WCMA understandable to you as an
12 acronym for the Window Covering Manufacture Association?
13 A. Yes.
14 Q. Do you know who the members of the WCMA were, say, in
15 1994?
16 A. No.
17 Q. Do you know who they were in 1990?
18 A. No.
19 Q. How about 1985?
20 A. No.
21 Q. Do you know when an individual member of the WCMA
22 first became aware of the hazards of window blind strangulation?
23 A. No. There are no records in my file that indicate
24 that, although I understand there was a -- I believe a case with
25 an attorney's that happened in the late '80s. That resulted in

**Page 31**

1  a settlement of the case, so therefore at least one of the
2  members was aware of that.
3  Q. Are you aware whether that company was a member of the
4  WCMA?
5  A. I think they were, but I'm not sure because I don't
6  know the membership list.
7  Q. Why do you think they were?
8  A. I didn't cross-reference it, but I think they probably
9  were. But I --
10 Q. I'm just trying to find out your basis for that
11 understanding.
12 A. There is a lot of material. I didn't go back and read
13 everything in those details, but I think the company was
14 Levolor, and I believe they were a member. So we're going on
15 that level of my recall at that point.
16 Q. But you saw some document that indicated that Levolor
17 was a member at that time?
18 A. I believe so, yes.
19 Q. Let me go back. As you described that opinion
20 earlier -- pardon me for the ripping sounds on the phone, Don --
21 but I think as part of that opinion you talked about safety
22 studies being developed by the manufacturers, or perhaps you
23 meant the manufacturers association.
24 A. Well, I would think that in the absence of safety
25 studies by the manufacturers, the manufacturers association

**Page 32**

1  should be aware of that and should be doing that. They should
2  have something that is going to assess and evaluate the hazards
3  in the product if it's universal to the industry, because that
4  would be a service, a function, a part of the association that
5  would be reasonable to be undertaken. And, if not, it would be
6  surprising that it's not part of their overall task.
7  Q. I guess I'm having a little trouble, and I'll ask you
8  a little more about the obligations of a trade association. And
9  if I'm hearing you correctly, I think you're saying that a trade
10 association needs to be aware of any safety issues facing its
11 members.
12 A. I would expect that to be the case, yes.
13 Q. What would you say a trade association is obliged to
14 do? I guess any manufacturer trade association.
15 A. I don't know all the things they should do, but they
16 should have -- it would appear that the sale of a product that
17 they all universally were putting out in the marketplace should
18 be as safe and hazard free as they can do in concert. If there
19 is a universal problem to all manufacturers, they should work
20 together to do that. It should be one of the tasks that a
21 combined organization should have. To not do so would be
22 negligent. To not do so is avoiding the task that should be
23 done.
24 Q. So any trade group that does not address any safety
25 issues of its members is negligent?

**Page 33**

1  A. I would think so. From my standpoint, if an
2  organization that I belong, which is the American Society of
3  Mechanical Engineering, the first canon of ethics is the safety
4  and health of the general public, not design of the products.
5  So, therefore, I'm going from my background as a mechanical
6  engineer to say that this is how, you know, I foresee my role as
7  a practicing engineer.
8      Following my directives, I would think that as an
9  association that is not a government agency that has that in
10 front of them. I would think a similar type of directive on the
11 part of the Window Covering Manufacturers Association would also
12 be an important function, goal, guidelines, directive, task,
13 however you want to put it.
14 Q. Does the manufacturer have that obligation?
15 A. Absolutely.
16 Q. If a product you worked on were discovered to have a
17 safety hazard, would you be responsible individually?
18 A. That's a legal question.
19 Q. Well, I mean, you just testified about organizations
20 being negligent. Are you not able to answer?
21 A. I have worked on products that I believe are not as
22 well designed as possible, and, you know, I'm hoping that my
23 involvement makes them better products. And it is my intent to
24 reduce the hazard risk, increase the factor of safety of the
25 design to the point where it is a safe product.

9 (Pages 30 to 33)

**Page 34**

1  Q. When you say "a safe product," does that mean the hazard is eliminated?
3  A. Well, there are many hazards, but in the
4  identification of a hazard, if there is a design solution and
5  it's possible to design that out, then that's an obligation on
6  the part of the manufacturer. Not all hazards, per se, can be
7  designed out. There is a safety hierarchy that you can't design
8  out the hazard because the function would be diminished. You
9  can't sell dull knives because knives have to be sharp to
10 function, or you can't turn off the electricity in an electrical
11 box because it has to be there so you have to close it, you put
12 a guard around it, you put a fence around it.
13      And if you can't through design reduce the hazard,
14 then the last thing you might do is to use a way of
15 communicating to the user a means to be aware of the hazard and
16 to modify their behavior so that they reduce the risk. So
17 that's only after you haven't been able to do the first two.
18 Q. Let's go back to the original question, though. If
19 you're an engineer and you're helping develop a product and the
20 product does not eliminate all risks, are you responsible as an
21 engineer for any injury that occurs?
22 A. You might be. You know, usually working for a company
23 the company bears the responsibility; however, design engineers
24 sometimes believe that they in turn are the most exposed person
25 and at times they have been used as the whipping boy for the

**Page 35**

1  problems.
2      So am I ultimately responsible? Usually not. An
3  organization of individual members who are employees usually
4  don't have that risk.
5  Q. Why is that?
6  A. Because usually the organization has an overarching
7  responsibility.
8  Q. And that responsibility supersedes that of the
9  engineer?
10 A. No. The engineer should be designing safe products.
11 Q. I understand. But does the overarching responsibility
12 stem from the fact that the ultimate responsibility for the safe
13 product is the manufacturer?
14 A. The manufacturer is responsible for producing a safe
15 product, yes. And they would assume that their engineers are
16 operating in a professional manner, assisting in producing safe
17 designs.
18 Q. If an engineer designs a product that turns out to be
19 unsafe, is the American Society of Manufacturing Engineers
20 liable or responsible?
21 A. Not for an individual product.
22 Q. Why not?
23 A. If they haven't been part of monitoring that specific
24 group.
25 Q. So their responsibility comes from what they -- the

**Page 36**

1  responsibility they choose to take on is not inherent with the
2  group?
3  A. Their group, as a mechanical engineering society,
4  would say that the first function is to have the safety health
5  of the general public paramount to the design.
6  Q. Does it monitor all engineers to make sure they're
7  designing safe products -- all product engineers?
8  A. No.
9  Q. Does it test products to make sure engineers are
10 working properly?
11 A. No.
12 Q. Does it come into the shop and check over the designs
13 and --
14 A. No.
15 Q. Do you know if -- it is the ASME; is that correct?
16 A. Yes.
17 Q. Is the ASME aware that some of its engineers may be
18 working on products that may have potential safety risks?
19 A. They may be.
20 Q. Do you think they are?
21 A. I don't know what they know.
22 Q. Let's pick a product. You talked earlier about coffee
23 roasters -- and this is before the deposition started -- with
24 your friend, Bill; is that correct?
25 A. Yes.

**Page 37**

1  Q. Are coffee roasters a product that have a safety risk?
2  A. Yes.
3  Q. They get hot?
4  A. Yes.
5  Q. If the ASME was aware that there was a hazard with
6  coffee roasters and -- they may be aware of that, you don't
7  know?
8  A. Well, they're a heated vessel.
9  Q. It's an obvious hazard?
10 A. There is a personal hazard to contact with
11 temperatures over -- surfaces that are above a particular
12 temperature.
13 Q. Does the ASME have an obligation to monitor engineers
14 that are working on the design of coffee roasters to make sure
15 those roasters are safe or safer?
16 A. Specifically, I don't know. No, I don't think they
17 have that, per se. They have some things that they specifically
18 do have codes and standards on.
19 Q. The codes you're referring to are the ones you
20 mentioned before, the code of ethics for the engineers that are
21 members?
22 A. That's the code of ethics, but there are other design
23 codes. They have pressure vessel codes that they monitor. The
24 ASME was originated to monitor, design and develop the standards
25 for the design of pressure vessels.

**Page 38**

1  Q. Is that boilers and bigger -- what are you talking
2  about?
3  A. Yes, I'm talking boilers. That is why it started.
4  And because there was a risk to the general public, there is
5  also a risk to the owners of the business. So the business went
6  boom along with the risks to the people. So there is now also
7  not just fired pressure vessels like boilers but unfired
8  pressure vessels, which I have worked with and designed and have
9  tested.
10      And as a consequence, they in turn, because they have
11 standards, will have ASME inspectors that will go to an
12 installation and actually do the testing and ensure that it does
13 meet the standards. So I have had to have my work examined and
14 tested in plants by ASME certified inspectors.
15      So there is, as part of ASME, a function for the areas
16 that are identified as risks to the population, that they do
17 that and go out to the public. So, therefore, as an
18 association, they do that because of the risk associated with
19 that.
20  Q. Do they do that for every product that has risk?
21  A. No.
22  Q. How do they decide which ones to promote the standards
23 for and which ones not?
24  A. They have a selection process that they establish. I
25 don't know what their process is. But there are associations

**Page 39**

1  that do do that for particular products that they believe are --
2  that do require that. So if it is a dominant thing that needs
3  to be tested and evaluated, then they have a standard.
4      So there are ASME standards associated with some of
5  the products that are hazardous and they must follow the rules
6  of design on the front end and also performance standards on the
7  back end. Some standards are only performance standards at the
8  back end and some are design standards at the front end.
9  Q. Do you know if they do that for any consumer products?
10 A. I don't know.
11 Q. If they go through that process with a boiler and
12 there is a boiler accident -- I assume there may be boiler
13 accidents with products that meet the standard?
14 A. There can be, yes.
15 Q. Is the ASME responsible, in your opinion?
16 A. If they have done their duty to be sure that the
17 product meets final functional responsibility and they've
18 established it, then they have done their, probably, due
19 diligence because they have provided the standards and
20 performance standards at the back end.
21 Q. What if it's a product that has a standard but does
22 not require ASME inspection?
23 A. Well, they have at least put out a standard if there
24 is something there that says there is a guideline for someone to
25 follow.

**Page 40**

1  Q. And that would mean they're not responsible for an
2  accident or incidents that occur?
3  A. If they've done something, then they have taken that
4  into account rather than having a known hazard to the industry
5  and avoiding anything. So they should do something.
6  Q. They have taken what into account?
7  A. If there is a standard associated with the product.
8  Q. So they've done something and that's sufficient?
9  A. They should be aware of the problem. There are
10 industries that are aware of the problems that their product
11 presents to the public: electrical hazards, explosion hazards,
12 impact hazards.
13 Q. Let's go back to where we were a bit earlier about the
14 studies and such that were not undertaken.
15     MR. BAUERMEISTER: This is Don. I'd like to apologize
16 for the interruption, but I've got about 10:20 here. If we
17 could have a break in the short-term, I would appreciate it.
18     MR. WEISS: Whenever anybody wants a break, I'm happy
19 to have one.
20     Dr. Jacobson, do you want to take one now? This is a
21 perfect time for one.
22     THE DEPONENT: Fine.
23     (Recess taken.)
24     MR. WEISS: Back on the record.
25 Q. (By Mr. Weiss) Before the break we had, I guess, just

**Page 41**

1  switched over to talking about -- I think there was an opinion
2  about design studies or safety studies. And as I read your
3  report, which you should have in front of you, too, as
4  Exhibit 4, you say in the second paragraph, five lines down:
5  "There is no reference to any form of thorough product testing
6  or formal product evaluation in relation to existence of an
7  elimination of the hazard of cord-induced strangulations?"
8      Do you see that?
9  A. Yes.
10 Q. You say there is no reference to any testing. Are you
11 aware of whether there is any testing?
12 A. No.
13 Q. Or studies?
14 A. No.
15 Q. Do you feel like you looked at the full body of
16 documents related to strangulation of young children?
17 A. I haven't looked at all documents in terms of
18 strangulation of young children, but I have not seen anything
19 within the Window Covering Manufacturers Association data that I
20 was presented with that shows that the predominant task was to
21 write a standard for the elimination of that. So that appeared
22 to be the major hazard that this product presented to the
23 general public. And they had no data, and I saw nothing in the
24 data presented to me that they had accumulated that data as a
25 means to make judgments or modify the manufacturing of these

**Page 42**

products.

Q. And the data presented to you is what is in the packet of information we have here?

A. Yes.

Q. And you received that from either Mr. Ray or Mr. Bauermeister?

A. Yes.

Q. What sort of independent research did you do to find out if there were any studies or testing done?

A. I didn't do any independent work.

Q. What sort of studies -- scratch that.

Are you aware if the CPSC did any studies?

A. I don't know if they did any studies. I know they accumulated data.

Q. Have you seen that data or those data?

A. I've seen lists of it throughout this, yes.

Q. Can you point to those data in this pile here?

A. (Deponent complied.) I believe this appears to be a summary of it.

Q. This is what you're talking about?

A. I believe that's it, I've seen other presentations of the data, Consumer Product Safety Commission assessment report, product safety assessment report, and we've got reported window deaths. And we've got some other summaries, so they're --

Q. Please make sure. I'm going to take these while

**Page 43**

you're looking there, Dr. Jacobson.

A. I think that's -- they may be listed in other places, but that's basically what I have.

Q. Okay. Let's take these, go through these real quick, if that's okay.

MR. WEISS: Can you mark this, please.

(Exhibit 5 was marked for identification.)

Q. (By Mr. Weiss) This is Exhibit 5, and this is a document entitled "A Study of Design Factors and Other Influences Impacting Window-Covering Cord Strangulation Death as Recorded by the Consumer Product Safety Commission Between 1996 and 2002."

A. Yes.

Q. And this is the -- appears to be drafted by the ANSI-WCMA 100.1 technical subcommittee?

A. Yes.

Q. And it says, comprised of WCMA members and CPSC staff?

A. Yes.

Q. And it's dated December 2003?

A. Yes.

Q. Is this a WCMA study?

A. They are the second firm on it, ANSI and WCMA.

Q. Do you know what the ANSI-WCMA 100.1 technical subcommittee is?

A. They're probably the collective group that writes the

**Page 44**

standards for the 100.1 -- the two.

Q. So this is the same committee or maybe it's a subcommittee of the same group that wrote the standard?

A. I don't know. I don't see in my review of who all is a member of this committee.

(Exhibit No. 6 marked for identification.)

Q. (By Mr. Weiss) this is Exhibit 6. This is a set of documents that on the cover says, "Report of Window Cord Deaths 1981 to 1997," with a graph showing the number of deaths. Who's document is this? I'm not asking if it's yours. I'm asking who generated this document.

A. I don't know. It's got some numbers on the corner, so I don't know.

Q. And then --

A. But it's got a nice graph on the cover.

MR. WEISS: Let's mark this as No. 7.

(Exhibit No. 7 marked for identification.)

MR. WEISS: I may have fallen down on the job, but at the last deposition I told them I would read the Bates number. This is 24572 through 24577.

Q. (By Mr. Weiss) Do you know what this document is?

A. This appears to be a listing of strangulations reported to the U.S. Consumer Product Safety Commission since January 1st, 1981.

Q. Do you know who generated this report?

**Page 45**

A. I don't know who generated it. It was a compilation by the Consumer Product Safety Commission, but I don't know who put it together.

Q. Do you know who Robert Nevins is?

A. Yes. In reference to some letters and communication in this matter, I do know.

Q. I'm going to put your stack here, and I believe you -- I don't see it here, but I believe in your reference materials there was a letter from Robert Nevins.

A. Should be in there somewhere.

Q. Here it is.

Do you know if Robert Nevins might have generated that list?

A. I don't know that.

Q. And then the last document you gave me, which we'll make number --

(Exhibit No. 8 marked for identification.)

Q. (By Mr. Weiss) it's a CPSC product safety assessment report draft, and if I'm not mistaken this is testing a cord stop device.

A. Yes.

Q. Let's talk a little bit about the timing of things in this case. You're aware that this case involves the strangulation death of a young girl?

A. Yes.

**Page 46**

1  Q. Do you know when the blinds involved were sold?
2  A. No.
3  Q. Do you know when they were made?
4  A. No.
5  Q. Do you have any idea of a time frame for when they
6  might have been made?
7  A. I don't think the records are clear in that regard.
8  Q. I assume they couldn't have been manufactured after
9  the accident, so assuming that is the end point --
10 A. It's a barrier on the time, yes.
11 Q. -- is there a time earlier than that where you can say
12 it had to have been made or sold before that?
13 A. I don't know that. You're going to have to go to the
14 records of the parties in this case.
15 Q. You didn't look at those records that would show that?
16 A. Not precisely, no.
17 Q. Is there a starting point?
18 A. The only way I have it is from reviewing the expert
19 reports that makes some reference to that.
20 Q. The expert reports of plaintiffs' experts or
21 Defendant's excerpts?
22 A. Defendant's experts.
23 Q. So at the time you made your own expert report, you
24 didn't know when the blinds were made?
25 A. Yes.

**Page 47**

1  Q. And you don't know that now, but you think you may
2  have seen it, or you don't recall --
3  A. I don't even know if they manufactured it.
4  Q. You don't know who the manufacturer is?
5  A. I think they have possibly indicated who they believe
6  the manufacturer is, but I don't know -- I don't recall who it
7  would be.
8  Q. When you say "they have indicated who they believe,"
9  who are you talking about?
10 A. I have seen a references that's to a Asian
11 manufacturer of the window blinds, but I don't recall the name
12 at this time.
13 Q. Do you know who -- when you say you saw a reference to
14 an Asian manufacturer, do you know who made that?
15 A. No.
16 Q. Okay. Do you know who sold the window blinds, the
17 retailer?
18 A. No.
19 Q. Do you know if there is a distributor or importer,
20 anybody in between?
21 A. No. There probably is, but it is likely that there
22 was not.
23 Q. Understood. I may have asked this before. I want to
24 make sure we're clear.
25    Do you know of the start time before which these

**Page 48**

1  blinds could not have been manufactured?
2  A. There is a reference to the warning that is on the
3  blinds, which is consistent with the '96 standard, so it would
4  appear that if it has the warning it was made after that point.
5  Q. Okay.
6  A. But I don't know, per se.
7  Q. Looking at Exhibits -- excuse me one second --
8  5 through 8, the date on Exhibit 5, which is the design factor
9  study --
10 A. Yes.
11 Q. -- I understand that must be after the incident; is
12 that correct?
13 A. I believe so.
14 Q. The one -- the chart here that has the graph that you
15 like goes through October 31, 1997, so presumably that document
16 occurred after 1997, correct?
17 A. I would assume this document was made after the date
18 this existed.
19 Q. Fair enough. And as I look through the list of
20 reports here, I see that some of the latest ones are in 2000; is
21 that correct?
22 A. Look at the bottom of that last page. It appears to
23 be the last one is February of 2000.
24 Q. And Exhibit 8 actually has a date on it of April 4th,
25 2000; is that true?

**Page 49**

1  A. Yes.
2  Q. I'm assuming, which maybe I shouldn't do, that when
3  you say that WCMA -- well, you said you don't know exactly what
4  they did, but you're talking about the time frame prior to the
5  manufacture of the blinds?
6  A. Yes.
7  Q. But I believe you testified a moment ago that the CPSC
8  did some sort of investigation or investigative work into child
9  strangulations on window blinds.
10 A. I -- there was -- there appeared to be a motivation on
11 their part as a result of accumulated data to motive the Window
12 Covering Manufacturing Association to proceed and to be aware of
13 the data and to begin to write the ANSI document.
14 Q. Do you know if the CPSC presented its data to the
15 WCMA?
16 A. I don't know what the process was. I just know, in
17 reading through Mr. Rich's [sic] deposition, he was aware that
18 they had to begin the process of writing the standard.
19 Q. I believe you mean Mr. Rush.
20 A. Sorry. I know a Peter Rich, and this is a Peter Rush.
21 Q. No problem at all. CPSC has expertise in the product
22 safety issues, would you agree?
23 A. Well, they are aware of this. I'm not sure what all
24 their expertise is, but they do have employees that are part of
25 product safety, yes. But I don't know the entire personnel and

## Page 50

what all their capabilities are.

Q. Do you know if they have design engineers on staff?

A. I just said in the last answer that I don't know what the staff is and their capabilities. I don't know how the personnel is.

Q. Do you know who Stuart Statler is?

A. No.

Q. I'm going to hand you what we'll call Exhibit 9.

(Exhibit No. 9 marked for identification.)

Q. (By Mr. Weiss) This is an article I'll purport to be written by Stuart Statler entitled, "Reporting Guidelines Under Section 15 of the Consumer Product Safety Act."

If you'll look at the bottom of the first page, Dr. Jacobson, you'll see a little biographical information about Mr. Statler.

A. Yes.

Q. He's a member of the Consumer Product Safety Commission and a former acting chairman.

A. Yes. That's as of 1984 when this was written.

Q. Do you see a date in which this article is written?

A. It's -- I see -- I don't know when it was written. I see it was published in 1984. It's at the top of the first page.

Q. I see.

A. General Products Liabilities, Volume 7, Page 89 to

## Page 51

106, 1984.

Q. If you could turn to page -- if you could turn to Page 96, please, in that article. Back up. Keep turning the page.

But let me pack up. Would you agree that if Mr. Statler was indeed a commissioner of the CPSC he would have knowledge of what the CPSC does?

A. I certainly hope so.

Q. And presumably you wouldn't be in a position to dispute that unless you had some sort of personal knowledge to contradict it?

A. I don't have any knowledge one way or the other.

Q. If you'll look on Page 96 under Item 2, in that paragraph you'll see that I'm going 1, 2, 3, 4, 5, 6, 7 lines down.

A. You started out on line 6.

Q. I'm sorry. I apologize. I'll keep reading: "A firm immediately taps the commission's wealth of experience with risk assessment and corrective actions as well as technical and public affairs expertise?"

Does this indicate to you that perhaps the commission may have expertise in matters that are available to companies or groups that are dealing with product safety issues?

A. It appears that they have some expertise in these areas. It says so.

## Page 52

Q. If you'll turn back a page to 95, in the second paragraph right after that little Footnote 19, I believe it says, "The agency and the reporting firm become partners in a mutually beneficial effort to determine the nature of the hazard and what, if anything, needs to be done to correct it."

A. Yes.

Q. Do you have any reason to dispute that is how a company and the CPSC work together?

A. No.

Q. Okay. If the CPSC, with its expertise in consumer product safety, were to conduct studies or testing, is an industry entitled to rely on those studies?

A. I would think it would be prudent to consider them, yes.

Q. If the CPSC and the company or organization were, as it says, "partners in a mutually beneficial effort," is it fair for them not to duplicate, say, analysis of incident data?

A. Well, duplicating the effort would be extra effort.

Q. Is it a necessary effort?

A. I'm not sure how to answer that.

Q. I'll be more concrete. Are you aware whether hazard information is communicated to the CPSC?

A. I don't know if they communicate hazard information. They usually consider information that is the result of adverse consequences, but I don't know that the hazards are communicated

## Page 53

to the CPSC. They are probably more aware of adverse results from these products.

Q. By that, do you mean the CPSC is aware of incidents that occur?

A. That would be an incident but necessarily whether they know the hazard --

Q. Okay. Well, let me --

A. -- which would be part of the cause and how the incident occurred or what precipitated the incident.

Q. And that may have been a poorly phrased question on my part, I guess. What I meant to ask: Is the CPSC made aware of incidents involving the safety of consumer products?

A. They have some information on that, yes.

Q. And I believe you showed me a document that appears to list incidents that were reported to the CPSC.

A. Yes.

Q. If the CPSC were to analyze those incidents, would that be -- well, do you believe the CPSC has the appropriate expertise to analyze that?

A. They may and they may not.

Q. But you don't know?

A. I don't know. There are lots of in-depth analyses that they may or may not have.

Q. Okay. We had talked a second ago about the timing of this issue, and you're aware that there are -- well, how many

**Page 54**

1 safety standards are there or incarnations of the safety
2 standard that address window covering products?
3   A. Two that I'm aware of.
4   Q. And what are those?
5   A. There is the ANSI standard that was produced in 1996
6 and it's revised form in 2002.
7   Q. Can you tell me roughly what the revisions were?
8   A. In regards to this case, the only revision that I was
9 focused on was the condition of cord stops, although it did
10 include a more extensive warning label description.
11   Q. But the revision you're concerned with is the
12 condition of cord stops?
13   A. That would be the primary concern because that is part
14 of the overall design, which is the up-front part of designing
15 the hazards out rather than going to the warning at the other
16 end.
17       So, therefore, the first thing is to provide a design
18 that does not have the hazard included. It's only after you
19 can't design that out that you put the warning on.
20   Q. Does the 2000 standard include design change?
21   A. It mentions cord stops, yes, in 2002. Yes.
22   Q. Does it require that a product with inner cords have a
23 cord stop to comply with the standard?
24   A. I believe it does.
25   Q. How does the cord stop work?

**Page 55**

1   A. It prevents the inner cord from being pulled out of
2 the line while it is extending, so it cannot, you know, be
3 pulled out further and produce a loop.
4   Q. Does it do that effectively?
5   A. I've not evaluated its effectiveness. That cord stop
6 performance is left to the judgment of the manufacturer and
7 designer.
8   Q. I'm not sure what you mean.
9   A. Well, they're the ones that are going to put it on.
10 You don't need to have a design that apparently is a cord stop
11 that doesn't function right. So just to require that doesn't
12 necessarily tell you how it performs in the field.
13   Q. So --
14   A. You could produce something you say is a cord stop,
15 and it may not be. So it's basically, you know, dictated on a
16 performance standards that you have to evaluate to see whether
17 they have accomplished that properly. But it recognizes that it
18 should be there.
19   Q. Okay. And maybe my question is too broad. If a
20 manufacturer were to follow the 2000 standard design
21 requirements, would it prevent the inner cord from being pulled
22 out?
23   A. I hope so.
24   Q. Aside from a manufacturing issue with that cord stop.
25   A. I would hope it does, yes.

**Page 56**

1   Q. So is it fair to say that generally speaking you
2 believe a cord stop is an effective design to reduce the risk of
3 inner cord strangulation?
4   A. Yes.
5   Q. Do you know if these blinds -- the blinds at issue in
6 this case were manufactured in accordance with the 2000
7 standard?
8   A. I don't believe they were.
9   Q. How do you know that?
10   A. From the information that is presented, they were not.
11 And the indication from the information I had was the Rountrees
12 said that they believed the blinds were bought in the early
13 1990s, whereas the presence of warning sticker indicates that
14 they were probably purchased after the application of the '96
15 standard but not after the second publication of the revised
16 standard, because the accident happened before that happened, I
17 believe.
18   Q. Are you aware if there were any changes to the product
19 prior to the publication of the 2000 standard?
20   A. No.
21   Q. Do you know -- have you examined the blinds?
22   A. No.
23   Q. Have you seen them?
24   A. No.
25   Q. Have you read any report that examines -- report that

**Page 57**

1 memorializes an inspection or report?
2   A. No.
3   Q. Do you know if they comply with the 1996 standard?
4   A. Only insofar as the dates the time of manufacture is
5 after the '96 standard. That's all I know.
6   Q. Have you read the '96 standard?
7   A. I have reviewed it.
8   Q. You're aware that it contains a number of requirements
9 to meet the standard; is that fair?
10   A. It's liking in the document.
11   Q. I'll ask this sort of again. Are you -- can you say
12 one way or the other whether the blinds, as a whole, comply with
13 that standard?
14   A. I haven't seen the blinds and I haven't seen a report,
15 so I can't say.
16   Q. What is the 1996 standard intended to address?
17   A. It's to address the problem with strangulation, the
18 problem with cords.
19   Q. Does it include a design change?
20   A. It appears to have a design change that relates to
21 part of the strangulation problem.
22   Q. And what is that?
23   A. There is a test that is there that indicates the force
24 with which strangulation cords should not reach -- a loop
25 underneath the mannequin's chin would separate under a given

**Page 58**

1  mode with the separation device.
   Q. And where is the loop you're talking about, and would
3  it be helpful to mark that as an exhibit and look at the
4  standard? I'm not trying to test your memory of it.
5     A. There is -- Figure 1A has a sketch and a drawing, and
6  they indicate the mannequin's specs and other things. And they
7  tell you what the force is for the cord release or cord sheer
8  device to function. They give you a release force.
9     Q. So the standard -- I guess I'm a little confused with
10 what you're saying. Is the hazard the standard addresses
11 different from the inner cord strangulation?
12    A. Yes.
13    Q. How so?
14    A. Because it doesn't specifically call out the inner
15 cord, and it appears to have a loop that is covered by what
16 would be possibly a tassel or a multiple cord that extends down
17 and in its fashion, which could be a circular loop, has a
18 separation device on it that will break if it goes over or under
19 the chin of an infant, whereas the inner cords are not
20 specifically identified in this standard.
21    Q. Okay. I'm still a little confused.
22    A. There is no separation device called for like this in
23 the standard for the inner cords. It appearance that this is
24 maybe the end tassel for raising and lowering the blinds.
25    Q. So this would be the pull cord that is on the side of

**Page 59**

1  the set of blinds to lift them up and down.
2     A. That appears to be what is indicated and what the
3  warning labels are illustrating when they have an illustration
4  on the warning label.
5     Q. Okay.
6     A. And they don't specifically call out the inner cord.
7     Q. And if I'm understanding you correctly, you're talking
8  about the pull cord. This would prevent there being a loop at
9  the bottom of the pull cord?
10    A. It would not prevent there being a loop; but if there
11 were a loop, this loop would separate the forces and would not
12 be sufficient to produce strangulation.
13    Q. Can it actually -- can it actually eliminate the loop
14 on the pull cord to meet the standard by, say, having separate
15 tassels?
16    A. I don't recall if it could or not.
17    Q. Does the 1996 standard address strangulation
18 incidents? Does it --
19    A. Well, if it's got a test at the back that shows a cord
20 underneath a mannequin or an infant's chin, the simple
21 conclusion would be that that appears to be a strangulation
22 event that it's testing for. It would be hard to make a
23 judgment otherwise. It's pretty clear that that is what it's
24 testing for. At least it's clear to me.
25    Q. The separation device, is it effective?

**Page 60**

1     A. It would appear to be effective. If it is at that
2  level that it requires, which is about five pounds, I would hope
3  that that is effective.
4     Q. Do you have any reason to say that a product meeting
5  the standard would not be effective in reducing strangulations
6  on the pull cord part?
7     A. I would think it would have an effect at reducing
8  strangulations at the test level, five pounds.
9     Q. Are you aware -- do you know why five pounds is
10 selected?
11    A. No. But I would think it would be greater than the
12 weight of an infant; so, therefore, they would find their volume
13 weight caused the cord to separate.
14    Q. Is it fair to say that children who are able to move
15 around are more than five pounds?
16    A. From my knowledge of young children, I would assume
17 that is a proper statement.
18    Q. Do you know the proportion of strangulations that are
19 reported that are on the pull cord versus the inner cord?
20    A. I believe there are more strangulations on the pull
21 cord than on the inner cords.
22    Q. By what factor?
23    A. Probably 9 to 1 -- 8 to 1, 9 to 1.
24    Q. Okay. We haven't done this yet, but why don't we mark
25 this as an exhibit, the 1996 standard.

**Page 61**

1        THE WITNESS: Do you mind if I take a quick run to the
2  restroom for a minute?
3        MR. WEISS: That is okay.
4        (Recess taken.)
5        (Exhibit No. 10 marked for identification.)
6        MR. WEISS: We're back on the record.
7     Q. (By Mr. Weiss) Dr. Jacobson, you testified earlier
8  about your involvement with the safety standard involving
9  recreational vehicles for the NFPA.
10    A. Yes.
11    Q. And I think you said there were a number of
12 incarnations of that standard that you were involved with.
13    A. I was with several versions.
14    Q. And with each version they would make alterations
15 presumably in the interest of furthering the safety of the
16 product?
17    A. Yes.
18    Q. The first version, what year was that, roughly?
19    A. I don't recall. I started in the early '80s.
20    Q. I can gather that each standard is an improvement on
21 the previous?
22    A. Let's hope it is.
23    Q. It's certainly intended to be?
24    A. That's the purpose, yes.
25    Q. And does the fact that there is a second standard, a