**Page 62**

1 revised standard, mean that there was a problem with the first
2 one?
3   A. At NFPA they have a standard cycle time where they go
4 back and review and reissue.
5   Q. And that's every certain amount of years, the standard
6 must be --
7   A. Apparently so. It allows them to have an updated
8 standard and sell new copies and make more money.
9   Q. Do you know if ANSI has a similar requirement?
10   A. I don't know. I can't recall.
11   Q. The first standard you helped develop for the NFPA,
12 was it inadequate?
13   A. I don't recall. It addressed the things that we were
14 working on at that time.
15   Q. Did it address every hazard that could occur on a
16 recreational vehicle.
17   A. Probably not. I'm sure you could find a hazard that
18 was not.
19   Q. Are there hazards that are addressed in subsequent
20 standards that weren't addressed in the first standard?
21   A. Yes.
22   Q. Does the fact that it didn't -- the fact that the
23 first standard didn't address hazards that are addressed
24 subsequently, does that mean that the first standard was
25 inadequate?

**Page 63**

1   A. It was a standard that was adequate at the time.
2   Q. Does a safety standard for a product have to address
3 every possible hazard involved with that product?
4   A. It should address the things that are most evident and
5 most important.
6   Q. Are the hazards that were addressed only in subsequent
7 additions of the NFPA standards the ones that were not
8 important?
9   A. I don't recall. There is changing technology, there
10 was changing use, there was changing design, there was new
11 alterations in how people were building that came up that
12 weren't in existence before.
13   Q. Is that everything that was a change? Does every
14 change fall into that category?
15   A. No. There were a variety of reasons why things were
16 changed.
17   Q. When determining what to address with the standard,
18 was there any analysis of which was the most pervasive hazard?
19   A. I don't think there was a scaling factor used.
20   Q. Was there any study of which one was most likely to
21 occur.
22   A. It would have been the previous answer. There was no
23 scaling factor.
24   Q. Was there -- was there any guarantee issued with the
25 standard?

**Page 64**

1   A. I don't believe so.
2   Q. There was no -- it is not a guarantee that the product
3 that complies with the standard is safe?
4   A. There is no guarantee associated with the standard.
5   Q. And a person who buys an RV that complies with the
6 standard, does that person have a right to believe that there is
7 no danger associated with that RV?
8   A. No. There are dangers associated with it because of
9 its use factor. They could drive it into another RV and the
10 occupants in both could be injured.
11   Q. Let's go back. You had specified earlier in the
12 deposition that you had two main opinions, and I think we went
13 through the first one.
14     Did I miss any elements of the first one that you
15 recall?
16   A. I don't recall.
17   Q. In the second one, I think if I can summarize -- and,
18 again, please correct me if I'm misstating -- the opinion was
19 that essentially the design change that addressed inner cord
20 stops, I think your term was slow in coming and only because it
21 was encouraged by the CPSC.
22   A. That appeared to be the case.
23   Q. Does that accurately address your summary?
24   A. That's a good summary.
25   Q. You said it was long in coming. Is it your belief

**Page 65**

1 that that was addressed in the 2000 standard we addressed
2 earlier?
3   A. It was addressed in the second standard, yes.
4   Q. When you say "slow in coming," when should it have
5 been addressed?
6   A. Initially in the first standard.
7   Q. So the slow and coming is really the time difference
8 between the first and second standard?
9   A. Yes. But it should have been included in the product
10 prior to even the first standard.
11   Q. The manufacturer should have included cord stops prior
12 to the first standard?
13   A. The association of manufacturers should have had that
14 hazard designed out of the product initially.
15   Q. Is that the manufacturers' responsibility?
16   A. I would say the manufacturer and the manufacturers
17 association are all involved in that, yes. If the manufacturers
18 were not, the association would have identified that.
19   Q. What role does the association have in dictating the
20 designs of window blind products?
21   A. I'm not sure they dictate the design. They have the
22 performance, which is part and parcel of the design. The design
23 should be to performance, but they should be aware of the
24 predominant -- the hazards, the risks, the incidents, the nature
25 that presents to the public and then have that information

**Page 66**

1 communicated to the individual manufacturers through that
2 hazards from the product.
3   Q. We talked earlier that we don't know who made these
4 blinds; is that correct? I shouldn't say we.
5       You don't know who made the blinds?
6   A. I don't know. There is a reference in the expert
7 reports to possibly who made the blinds.
8   Q. Is it your understanding that there is no certainty
9 about who made these blinds?
10  A. I have not seen a definitive statement on that.
11  Q. You're aware that there is no manufacturer in the case
12 at this time?
13  A. I haven't seen a manufacturer in the case, from my
14 standpoint.
15  Q. Is it fair to say, then, that we don't know if the
16 manufacturer -- or I guess I'll say, you don't know that the
17 manufacturer is a member of the WCMA?
18  A. I don't think so at this time. They said there were
19 only three manufacturers at this point that are members.
20  Q. You had a reference earlier to seeing the name of an
21 Asian manufacturer?
22  A. Apparently I tried to make that judgment based upon
23 the spelling of the name.
24  Q. If I represent to you that the manufacturer originally
25 named in this case was Chiang Fang, does that sound familiar to

**Page 67**

1 you?
2   A. That would sound similar to something I read.
3   Q. Do you know if Chiang Fang is a member of WCMA?
4   A. No.
5   Q. Do you know what kind of entity can be a member of the
6 WCMA?
7   A. I don't know their member requirements.
8   Q. You don't know if an Asian manufacturer could be a
9 member?
10  A. I don't know that.
11  Q. You said that it came as a consequence of being pushed
12 by the CPSC?
13  A. That appeared to be the case from my reviewing of the
14 information.
15  Q. When you say that, are you speaking of the inner cord
16 hazard specifically.
17  A. I would believe all of the work that went into the
18 development of the standards was motivated by interaction with
19 the CPSC.
20  Q. Are you aware of at any time prior to -- well, let's
21 just say prior to the time of the development of the 1996
22 standard, of the CPSC discussing the issue of inner cord
23 strangulation with the WCMA?
24  A. I'm not aware of that.
25  Q. Have you seen any documents in which the CPSC brings

**Page 68**

1 that to the WCMA's attention?
2   A. I'm not aware of that.
3   Q. Are you aware of any request by CPSC to address inner
4 cord strangulation in the 1996 standard?
5   A. No.
6   Q. Are you aware of any by the CPSC to address it in the
7 2000 standard?
8   A. I don't recall. It may have been because it was
9 included, but I can't cite a source.
10  Q. So, from your knowledge, it may have been encouraged
11 by the CPSC, or it may have been -- I was going to say respond
12 to lawyers, but on the WCMA's own initiative?
13  A. I don't know the overall motivation. Since they claim
14 they were working in concert, then I can't say exactly how that
15 did come about.
16  Q. Sure. If it's okay with you, I'm going to turn back
17 to your expert report, which I've already forgotten the exhibit
18 number. But you should have it in front of you.
19  A. No. 4.
20  Q. I'll just go through it quickly and make sure I
21 understand all the points you made here. Again, if an opinion
22 in here comes outside of the scope of the two we discussed
23 earlier, please call it to my attention; although I understand
24 it could be subsets of the same opinion.
25      You talked about the -- you mention in the bottom of

**Page 69**

1 the first paragraph the safety hierarchy.
2   A. Yes.
3   Q. And you say that the WCMA did not follow the safety
4 hierarchy in 1996. Is that what I read that sentence to say?
5   A. That appears to be the case, yes, because I've been
6 discussing that throughout this deposition today.
7   Q. And correct me if I'm wrong about the safety
8 hierarchy, but that essentially is that first you attempt -- if
9 there is a hazard in the product, first you would attempt to
10 address it in the design and then -- well, why don't you tell me
11 what the safety hierarchy is.
12  A. Well, the hazard should be eliminated in the design of
13 the manufacturer of the product. That not being the case, then
14 you shall attempt to provide a guard or barrier or separation of
15 some sort to isolate that hazard from potential consequences,
16 personal injury.
17  Q. And is there another element? I'm sorry.
18  A. That -- then, thirdly, you would provide warnings,
19 instructions, directions, things to the user to provide them
20 with information to the existence of that hazard to attempt to
21 have them modify their behavior to reduce the consequences of a
22 hazard.
23      There also would be a fourth point, which would be if
24 they're all of the above -- the prior three don't work, as in
25 chemical hazards, you need to provide an anecdote for exposure

**Page 70**

1 should none of the others work.
2    Q. Am I correct in that these are not necessarily
3 absolute and distinct steps; that, for example, you might be
4 able to design a hazard not necessarily out of the product but
5 reduce the risk of it and then warn about the remaining danger?
6    A. The reason of the hierarchy is that you can't remove
7 the risk of some features or the hazard of some features. We
8 couldn't sell dull knives because the knives wouldn't function.
9 By removing the risk you would also remove the function.
10    Q. I'm asking if it's possible to reduce the hazard by
11 design but not eliminate it. Are there circumstances where that
12 occurs?
13    A. Sure. Because you could have a more hazardous product
14 device. You can reduce some, most, all, and still have some
15 left that you can't remove. There are some products that have
16 done so. They have taken a good share of the hazard level out
17 of the product but some still remains.
18    Q. Do you warn against that residual hazard?
19    A. Or you guard against and then warn against it.
20    Q. But somewhere lower on the hierarchy?
21    A. You may not need the level that you needed initially.
22    Q. We talked about the 1996 standard before the break. I
23 think you testified that there was a design change; is that
24 correct?
25    A. From the '96 standard or in the design?

**Page 71**

1    Q. In the '96 standard.
2    A. Well, yeah. There is the cord performance standard.
3    Q. And that would be to -- if I am saying it correctly,
4 it would be either a cord separation device, if pressure was
5 placed on the loop, or perhaps two separate the loops with
6 separate --
7    A. Yes. With sheer separation, yes.
8    Q. I guess what I'm confused about, then, is how does the
9 '96 standard violate the safety hierarchy?
10    A. Because it doesn't include the interior cords; so,
11 therefore, there is nothing there and there is no warning if
12 there's not included a design change to eliminate the hazard of
13 the interior cords. They haven't designed it out, they haven't
14 provided a guard and they haven't provided a warning.
15    Q. I see what you're saying. I guess what I'm wondering
16 is how -- is any standard that doesn't address a safety issue a
17 violation of the hierarchy?
18    A. In relation to the interior cords, yes, because they
19 didn't treat it and it is one of the strangulation hazards with
20 window coverings.
21    Q. Okay. Then maybe I'm confused because what I'm
22 wondering is: Is there a difference between the failure to
23 address a hazard and the failure to address it according to the
24 safety hierarchy?
25    A. Well, they didn't address it, and they didn't use the

**Page 72**

1 hierarchy to even look at that. They didn't address it, so
2 therefore they missed it completely.
3    Q. And is that a violation of the hierarchy? I guess I
4 see it as more of a method by which to address a hazard.
5 Correct me if I'm wrong.
6    A. Well, there was an implication that secondarily they
7 may have included the reference to interior cords by using the
8 word "cord." So that being the case, if they had, in a
9 backhanded manner, included interior cords by cords only, then
10 they did not meet the safety hierarchy by specifically
11 identifying the cord and then going through the process.
12       So they basically backhandedly inadvertently or
13 totally avoided dealing with the interior cords in the '96
14 standards. So it was avoided completely and was not created;
15 therefore, they didn't meet the standard. They didn't meet it
16 under any of the three steps.
17    Q. Continuing on, we talked earlier about whether the
18 hazard of cord strangulation was identified by the CPSC; is that
19 correct?
20    A. Yeah, we talked about it.
21    Q. I want to make sure we covered everything, and that's
22 why I'm asking.
23       And we also discussed the issue of whether there was a
24 reference to any product testing or evaluation?
25    A. I did see that in that operation.

**Page 73**

1    Q. I'm a little confused by the fourth sentence in the
2 second paragraph where it says, "The response of the code
3 development has been to develop a code but to not include the
4 reference that the code represented the minimum standard and
5 noted in the return ballot of Donald Vasis," V-a-s-i-s.
6       Could you explain that?
7    A. Well, he essentially said that -- he implied that this
8 was a bare minimum standard and there was nothing that -- he
9 thought that it should indicate that this was a minimum standard
10 and more should be done than what is included in the standard.
11 So he said he was -- he wanted people to know that this was not
12 an inclusive standard, that it was a bare minimum, and he wanted
13 that noted that is why he abstained.
14    Q. Is that in your pile of materials, that ballot?
15    A. Maybe.
16    Q. I have a copy. I'm just asking, is it included in
17 yours? Can I see it, please?
18    A. (Witness complied.)
19    Q. Let's mark this.
20       (Exhibit No. 11 marked for identification.)
21    Q. (By Mr. Weiss) Is it your understanding --
22 Dr. Jacobson, you've given me a bunch of materials here that
23 appear to be numbered out of sequence. Are you --
24    A. That was the file, the unitary file, that was sent to
25 me by Chuck Ray, so each one of the paper-clipped units that I

**Page 74**

1  have were sent to me as an individual transmission. So I have a
2  lot of separate transmissions from Mr. Ray, and that was one of
3  the separate files that came, whether it was a compilation of
4  multiple ones or it was an individual one.
5      Q. Before I mark this as an exhibit, I'm going to show
6  you two pages which are labeled CWR 01337 and 1338. This is not
7  all the questions, but is it your understanding this is the
8  complete ballot of Donald Vasis that you relied upon in your
9  opinion?
10     A. This appears to be.
11     Q. Then let's mark those together, please, as the next
12  exhibit.
13         (Exhibit No. 12 marked for identification.)
14     Q. (By Mr. Weiss) Now, is it your understanding,
15  Dr. Jacobson, that this is his ballot to state his position on
16  whether the 1996 standard should be adopted?
17     A. Yes.
18     Q. And he did not object to the standard; is that
19  correct?
20     A. No. He abstained at the final thing.
21     Q. Well, there are three possibilities of what he could
22  do; is that correct?
23         He had three possible votes. See in the middle of
24  this document?
25     A. Yes.

**Page 75**

1      Q. One is concur?
2      A. Yes.
3      Q. And one is object?
4      A. Yes.
5      Q. And one is abstain?
6      A. Right.
7      Q. He didn't object to the standard?
8      A. No. He wanted a more complete standard.
9      Q. Why did he choose to abstain rather than object?
10     A. He attached some comments and he wanted those included
11  in the standards; and, therefore, he said he was abstaining
12  because he had additional information that he wanted to include.
13  He didn't object to it as it was proposed. He wanted more
14  information, and he offered additional information which was
15  part of the attached.
16     Q. Because he believed it was an improvement; is that
17  correct?
18     A. Yes.
19     Q. Do you take that to mean that he believed this was
20  better than not having a standard?
21     A. Yes.
22     Q. Do you believe this is better than not having a
23  standard?
24     A. Yes.
25     Q. And he attached some comments. These are the changes

**Page 76**

1  he proposed?
2      A. Yes.
3      Q. And you mentioned what I think is the second one,
4  essentially, these were minimum standards.
5      A. Right.
6      Q. Would that have changed the efficacy of the standards
7  by having the word minimum as he proposed?
8      A. It would have indicated if it's a minimum that the
9  design produced by the manufacturers should be to a higher
10  standard than just meeting this as the gold standard. It should
11  be a higher standard.
12     Q. Does the 1996 standard limit or restrict a
13  manufacturer from taking -- making any other design changes or
14  safety devices?
15     A. No.
16     Q. Is there anything in the document that suggests that
17  it restricts a manufacturer from taking additional steps?
18     A. No.
19     Q. Do you have any reason to state that if the word
20  minimum was included in Section 2.1, as Mr. Vasis suggested,
21  that it would have prevented the incident that occurred?
22     A. No.
23     Q. What is the objective of the 1996 standard?
24     A. To produce a document that will remove the hazard
25  strangulation deaths due to window coverings.

**Page 77**

1      Q. You're aware there is a section in the standard called
2  "Objective"?
3      A. Yes.
4      Q. Could you pull that out, please. Here is my copy.
5  Would that be all right?
6      A. I'm sorry.
7      Q. Does that appear to be the 1996 standard, as well?
8      A. Yes.
9      Q. Did you find it?
10     A. Yes.
11     Q. Is the objective of the standard to remove the risk of
12  strangulation from window blinds?
13     A. (Witness reading.)
14     Q. Doctor, you're welcome to read the whole thing, but
15  the section is on Page 4. Again, you're welcome to read more
16  than that.
17     A. Yes. What --
18        MR. WEISS: Can you read back the last question,
19  please.
20        (Record read.)
21        THE WITNESS: Only from the flexible loop device used
22  to operate the product.
23     Q. (By Mr. Weiss) okay.
24     A. It doesn't include the interior cords.
25     Q. Okay. And does the objective say that it's to remove

**Page 78**

1 the possibilities of injury?
2  A. Reduce the possibility of injury.
3  Q. Let's go back through your report. I think we're
4 halfway down the report.
5     In the third paragraph -- you're still on the second
6 page of your report, but the first page -- you talk about the
7 warnings. I'm a little confused by the last sentence in your
8 report, in which you state, "In the 2002 version, Section 6.6,
9 acknowledges the inner cord may be accessible and give
10 guidelines and cover the amount of cord that can be pulled out
11 to create a loop."
12     Why did you put that in your report?
13  A. Because that identifies the fact that the inner cord
14 was covered, and they give you a criteria on how that may
15 produce a loop and the requirements for that, which are not at
16 all in the first version.
17  Q. Okay.
18  A. So it gives a quantitative assessment of how that
19 would function.
20  Q. And you agree, to the best of your knowledge, that
21 would be appropriate?
22  A. Four-inch diameter would be more likely than not less
23 than the diameter of the head of an infant.
24  Q. Do you know what the diameter of the head of an infant
25 is?

**Page 79**

1  A. I would think it would be bigger than a four-inch
2 diameter. It's closer to the -- the head of a normal adult.
3 The head size is larger per body size in infants. And we
4 haven't talked about the size of heads. I have some of that
5 information, and I could give a better answer to that if I
6 looked at my charts and graphs.
7  Q. Did you do any study for this case to determine
8 whether that is effective, aside from your general experiences?
9  A. It seemed to be a reasonable number. I didn't compare
10 it with other separations for children's heads between slats of
11 stairs and things.
12  Q. So am I correct that you didn't put this in the
13 document to say that it was ineffective, you put it in to show
14 what was later done?
15  A. I was doing this to show that quantitative guidelines
16 were given in the 2002 scheduled.
17  Q. In the next paragraph of your report, which is on the
18 third page, if I were to sum it up, I guess I would read that to
19 say that there are still design alternatives that are not being
20 considered.
21  A. Sure.
22  Q. Do you believe that the items you discuss in that
23 paragraph had any effect on the incident that we're here for?
24  A. Well, I didn't treat directly the interior cords in
25 this paragraph.

**Page 80**

1  Q. You didn't what?
2  A. I didn't treat the interior cords, per se, in this
3 paragraph.
4  Q. You have the letter from Ms. Elder in your materials;
5 is that correct?
6  A. I believe so.
7  Q. May I see that, please?
8  A. (Deponent complied.)
9  Q. Let's mark that, please, as an exhibit.
10     (Exhibit No. 12 marked for identification.)
11  Q. (By Mr. Weiss) And this is the letter that you relied
12 on from Ms. Elder to Peter Rush concerning window blind
13 strangulation?
14  A. Yes.
15  Q. What's the date on that letter?
16  A. February 6, 2002.
17  Q. Do you believe that the WCMA's responsiveness or lack
18 thereof to this letter had any effect on the death of April Cox?
19  A. No, because it was after the death.
20  Q. I can represent to you --
21  A. It was after the date of the accident.
22  Q. I can represent to you it was actually a little bit
23 before?
24  A. Oh, it is?
25  Q. Yes, a few months before.

**Page 81**

1  A. Okay.
2  Q. Does that change your --
3  A. No.
4  Q. Are you aware if any of these concerns were addressed
5 by WCMA?
6  A. This would be probably after the graph or the
7 publication of the 2002 standard, so I don't believe they were
8 included. But I haven't looked.
9  Q. So you didn't prepare this letter to the 2002 standard
10 to see if it was addressed?
11  A. No.
12  Q. You don't have any knowledge as to whether this
13 actually made it into the standard?
14  A. I can't say at this time.
15  Q. Given that this may not have affected the incident and
16 you don't know whether they were actually responded to, would
17 that change your decision to put this paragraph in your report?
18  A. No.
19  Q. And the last paragraph, you talk about warnings in the
20 form of hang tags.
21  A. Yes.
22  Q. And you say that is the least certain of the measures?
23  A. Yes.
24  Q. Is that hang tags specifically or warnings in general?
25  A. Warnings in general; hang tags even more specifically,

## Page 82

1  because hang tags are oftentimes removed. So if hang tags and
2  attached warnings are included together, then the hang tag is
3  less certain because oftentimes it tends not to be a permanent
4  part of the device -- the product.
5      Q. Are you aware if there was a permanent warning on the
6  blinds in this case?
7      A. Apparently there was a warning on the bottom rail.
8  That's why they were able to identify its date of manufacture as
9  subsequent to the first standard.
10     Q. Why do manufacturers put hang tag warnings on
11 products?
12     A. Because they are probably going to be met with the
13 initial use of the standards, so therefore they probably are
14 going to be a little bit obnoxious. They will find them
15 initially. They're not part of the function of the product, so
16 they're going to be on it. They're going to be an extra
17 feature. They oftentimes are removed.
18     Q. Do you mean consumer's will find them obnoxious?
19     A. They're probably going to be obnoxious because they're
20 not part of the overall esthetic of the product, and that's part
21 of the reason for putting them on so they call their attention
22 to the information that is included. But then they're lost
23 afterwards when they're removed, so the first user finds them
24 but not subsequent users.
25     Q. And is that why you might combine it with a warning on

## Page 83

1  the product?
2      A. You would --
3      Q. I'm sorry. A permanent warning.
4      A. Well, yeah. In concert the two of them would have an
5  overall higher effectiveness than the warning that remains on
6  the product. It may also allow you to have a larger surface for
7  providing information.
8      Q. Do blinds have a large surface for providing
9  information.
10     A. No.
11     Q. We've gone through your full report; is that correct?
12     A. Apparently so. As far as I can see.
13     Q. As we've read it again together, are there other
14 opinions aside from the two you identified in the beginning of
15 the deposition that you expect to offer, were asked to offer or
16 intend to offer in this case?
17     A. Not that I'm aware of. In talking with
18 Mr. Bauermeister, we may have other information that I'm asked
19 to look at, comment on.
20     Q. And I understand that you're going to answer the
21 questions that you're asked, but --
22     A. Well, I hope so.
23     Q. Or at least attempt to. But as you sit here today,
24 you don't expect to offer -- there are no other opinions that
25 you expect to offer?

## Page 84

1      A. Not that I recall from the discussion I had with
2  Mr. Bauermeister prior to this.
3      Q. Do you know when WCMA learned about the hazard of
4  inner cord strangulation?
5      A. Well, there was a letter from an attorney in the early
6  '90s, and then I think the major impact of inner cord
7  strangulation is -- see, inner cord strangulation probably came
8  from the information from CPSC.
9      Q. In the letter part of your material?
10     A. I don't recall. I think the information was probably
11 communicated to Mr. Rush in a manner that is not included in the
12 materials I have.
13     Q. Have you read the letter itself?
14     A. I don't recall.
15     Q. Do you know what product is identified in the letter?
16     A. No.
17     Q. Do you know if it's a product that is made by any
18 member of the WCMA?
19     A. No.
20     Q. Do you know if it's a type of product that is made by
21 any member of the WCMA?
22     A. No.
23     Q. Do you know who else, if anybody, received a copy of
24 the letter?
25     A. No.

## Page 85

1          MR. WEISS: Don?
2          MR. BAUERMEISTER: Yeah.
3          MR. WEISS: Are you there?
4          If it's okay with you, I think I may be done. I'd
5  like, if it's okay, to take a couple minutes to go over my notes
6  and make sure I'm not missing anything. But certainly I don't
7  have much more if anything. That may be it.
8          Is that all right with you?
9          MR. BAUERMEISTER: All right.
10         (Recess taken.)
11         MR. WEISS: Back on the record. Unfortunately, I do
12 have just a few more questions that I would like to ask, but I
13 think we'll be done quickly.
14     Q. (By Mr. Weiss) We talked a bit, Dr. Jacobson, about
15 your prior testimony in cases. Have you ever testified in a
16 case before where the product met a safety standard?
17     A. Probably.
18     Q. Have you ever -- let me narrow it down, then. Have
19 you ever testified in a case where the safety standard, whether
20 met or unmet, was an issue in the case?
21     A. Probably. I don't recall. Maybe, maybe not.
22     Q. Do you recall giving any testimony about whether or
23 not a product met a safety standard?
24     A. No.
25     Q. And do you recall giving any testimony before about

## Page 86

1  the adequacy of the safety standard?
2    A.  No.
3    Q.  And do you recall giving testimony or otherwise being
4  involved in a case in which the sponsor of the safety standard
5  was a party?
6    A.  No.
7    Q.  I think we talked before that you're not sure whether
8  the manufacturer was a member of WCMA?
9    A.  Yes.
10   Q.  How about the retailer?
11   A.  Give me a better question.
12   Q.  Do you know if the retailer was a member of the WCMA?
13   A.  No.
14   Q.  Can a retailer be a member of the WCMA?
15   A.  I don't think so because they're not a manufacturer.
16  That would be my assumption, although I don't know the
17  requirements for membership.
18   Q.  The WCMA, did they inspect the blinds in this case?
19   A.  I haven't seen any information that they had.
20   Q.  Do you know if WCMA inspects any products?
21   A.  I have not seen any information that they do.
22   Q.  Do they certify any products?
23   A.  I have not seen any information that they do.
24   Q.  And so you, then, don't have any information as to
25  whether they go out to the plant and look at the manufacturing

## Page 87

1  process?
2    A.  No information on that at all.
3    Q.  Does anybody -- anybody outside the manufacturer
4  inspect or certify compliance with the safety standard?
5    A.  Not that I'm aware of because there are no members --
6  there are no staff members of the WCMA.
7    Q.  I'm asking if anybody does in the world.
8    A.  I'm sure the manufacturer does.
9    Q.  Does anybody aside from the manufacturer inspect the
10  manufacturer's product for compliance?
11   A.  Probably the retailer and purchaser, maybe the
12  distributor.
13   Q.  And they inspect for compliance with the safety
14  standard we're discussing today?
15   A.  I wouldn't know.
16   Q.  Just to make sure I'm clear on something -- you still
17  have it in front of you, the pile of documents that you relied
18  on for your report?
19   A.  Yes.
20   Q.  And those were sent to you by the attorneys for the
21  plaintiff?
22   A.  Yes.
23   Q.  And you didn't seek out documents aside from those?
24   A.  Yes.
25   Q.  No, you didn't, right?  Bad question.

## Page 88

1    Is it correct to say that you did not seek out
2  documents aside from those provided to you by plaintiffs'
3  counsel?
4    A.  Yes.
5    Q.  Did you request any additional documents?
6    A.  No.
7    Q.  And to your understanding, the documents listed on the
8  first page of your report and actually continuing to the top of
9  the second page is the sum total of your reliance material
10  specific to this case?
11   A.  Yes.
12   Q.  Which is in theory coextensive to that pile?
13   A.  And the disk.
14   Q.  And the disk from the deposition.
15     We've gone through your report, and I've asked you
16  about some of the documents that are listed here.  Is it fair to
17  say that, for the extent you rely on these documents, it's
18  reflected in the body of your report?
19   A.  I hope so.  That's all I had to go on.
20      MR. WEISS:  Then in that case I have no further
21  questions.  I don't know if Don has anything to ask or add.
22      MR. BAUERMEISTER:  Yes.

## Page 89

1            EXAMINATION
2  BY MR. BAUERMEISTER:
3    Q.  This is Don Bauermeister.  Just one question, sir.
4    Is it your opinion that April Cox would be alive today
5  if the inner cord had been made a part of the window blinds in
6  her room?
7    A.  From what information I have at this time, apparently
8  so.
9      MR. BAUERMEISTER:  I have no further questions.
10     MR. WEISS:  I just have a couple.
11         FURTHER EXAMINATION
12  BY MR. WEISS:
13   Q.  Dr. Jacobson, did you review any reports -- medical
14  examiner's, police reports -- regarding the death of April Cox?
15   A.  No.
16     MR. WEISS:  I have no further questions.
17     MR. BAUERMEISTER:  Thank you, sir.  And thank you
18  Dr. Jacobson.  We'll be in touch soon.
19     (Discussion off the record.)
20     (Ending time:  1:32 p.m.)

```
 1   STATE OF WASHINGTON )
                         ) ss.
 3   COUNTY OF KING      )
 4
 5
 6        I, the undersigned, declare under penalty of perjury
 7   that I have read the foregoing transcript, and I have made any
 8   corrections, additions, or deletions that I was desirous of
 9   making; that the foregoing is a true and correct transcript of
10   my testimony contained therein.
11
12
13        EXECUTED this _____ day
14   of_____, 19_____, at
15   _____.
16     (City)         (State)
17        _____
18        JON O. JACOBSON, Ph.D.
19
20
21
22
23
24
25
```

Page 90

REPORTER'S CERTIFICATE

```
 3       I, JUDY BONICELLI, C.S.R. NO. 9091, Certified Shorthand
 4   Reporter, certify:
 5       That the foregoing proceedings were taken before me at
 6   the time and place therein set forth, at which time the witness
 7   was put under oath by me;
 8       That the testimony of the witness, the questions
 9   propounded, and all objections and statements made at the time
10   of the examination were recorded stenographically by me and were
11   thereafter transcribed;
12       That the foregoing is a true and correct transcript of
13   my shorthand notes so taken.
14       I further certify that I am not a relative or employee
15   of any attorney or of any of the parties, nor financially
16   interested in the action.
17       I declare under the penalty of perjury under the laws
18   of the State of California that the foregoing is true and
19   correct.
20       Dated this 15th day of February, 2008.
21       _____
22       JUDY BONICELLI, C.S.R. No. 9091
23
24
25
```

Page 91

24 (Pages 90 to 91)