Westlaw.

373 F.3d 998
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
(Cite as: 373 F.3d 998)

Page 1

Hangarter v. Provident Life and Acc. Ins. Co.
C.A.9 (Cal.),2004.

United States Court of Appeals,Ninth Circuit.
Joan HANGARTER, Plaintiff-Appellee,
v.
PROVIDENT LIFE AND ACCIDENT INSUR-
ANCE COMPANY, Defendant,
andThe Paul Revere Life Insurance Company; Un-
umProvident Corp., Defendants-Appellants.
No. 02-17423.

Argued and Submitted Feb. 10, 2004.
Filed June 25, 2004.

**Background:** Insured chiropractor brought di-
versity suit against insurer for discontinuing total
disability benefits, alleging breach of California
Unfair Competition Act (UCA), breach of contract,
breach of covenant of good faith, and intentional
misrepresentation. After jury returned verdict for
$7.6 million in compensatory and punitive damages
and attorney fees, the United States District Court
for the Northern District of California, James Lar-
son, United States Magistrate Judge, 236 F.Supp.2d
1069, denied insurer's motion for judgment as mat-
ter of law or new trial and issued permanent injunc-
tion under UCA. Insurer appealed.

**Holdings:** The Court of Appeals, Clifton, Circuit
Judge, held that:
(1) definition of total disability under California
law controlled over policy definition;
(2) insured chiropractor's ability to perform clerical
duties incidental to her occupation did not preclude
finding of total disability under occupation disabil-
ity policy;
(3) evidence supported jury determination of total
disability;
(4) issue of bad faith was for jury;
(5) future damages in form of future policy benefits
were available for bad faith denial of claim;
(6) issue of punitive damages was for jury;

(7) punitive damages were not constitutionally ex-
cessive;
(8) expert's testimony that disability insurer devi-
ated from industry standards was admissible;
(9) deposition testimony of insurance expert from
another case was admissible;
(10) claims handling evidence was relevant;
(11) certain insurance documents produced in an-
other case were admissible;
(12) experts' testimony about total disability pay-
outs was irrelevant and potentially confusing;
(13) refusal to bifurcate was not abuse of discre-
tion; and
(14) insured did not have Article III standing to
seek injunctive relief under UCA.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Federal Courts 170B ⚖➞776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases
Denial of a motion for a judgment as a matter of
law (JMOL) is reviewed de novo. Fed.Rules
Civ.Proc.Rule 50(a), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⚖➞2608.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(E) Notwithstanding Verdict
            170Ak2608 Evidence
                170Ak2608.1 k. In General. Most
Cited Cases
Judgment as a matter of law (JMOL) should be
granted only if the verdict is against the great
weight of the evidence, or it is quite clear that the
jury has reached a seriously erroneous result.
Fed.Rules Civ.Proc.Rule 50(a), 28 U.S.C.A.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 61

373 F.3d 998
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
(Cite as: 373 F.3d 998)

Page 2

**[3] Federal Civil Procedure 170A ⟶2331**

170A Federal Civil Procedure
   170AXVI New Trial
      170AXVI(B) Grounds
         170Ak2331 k. In General. Most Cited Cases

**Federal Civil Procedure 170A ⟶2339**

170A Federal Civil Procedure
   170AXVI New Trial
      170AXVI(B) Grounds
         170Ak2338 Verdict or Findings Contrary
to Law or Evidence
         170Ak2339 k. Weight of Evidence.
Most Cited Cases
A new trial is proper only if the verdict is contrary
to the clear weight of the evidence, or is based upon
evidence which is false, or to prevent, in the sound
discretion of the trial court, a miscarriage of justice.

**[4] Federal Courts 170B ⟶825.1**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)4 Discretion of Lower Court
            170Bk825 New Trial or Rehearing
               170Bk825.1 k. In General. Most
Cited Cases
Court of Appeals reviews a district court's denial of
a motion for a new trial for clear abuse of discre-
tion.

**[5] Federal Courts 170B ⟶776**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General
            170Bk776 k. Trial De Novo. Most
Cited Cases
Court of Appeals reviews de novo jury instructions
that are challenged as a misstatement of law.

**[6] Federal Courts 170B ⟶908.1**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)6 Harmless Error
            170Bk908 Instructions
               170Bk908.1 k. In General. Most
Cited Cases
Jury instruction errors are subject to harmless error
review.

**[7] Insurance 217 ⟶2561(3)**

217 Insurance
   217XX Coverage--Health and Accident Insur-
ance
      217XX(C) Disability Insurance
         217k2553 Nature or Degree of Disability
            217k2561 Total Disability
               217k2561(3) k. Substantial or Ma-
terial Performance. Most Cited Cases
Under California law, definition of "total disabil-
ity" under state law, as inability to perform the sub-
stantial and material duties of insured's own occu-
pation in the usual and customary way with reason-
able continuity, was properly substituted for defini-
tion contained in occupational disability policy
even assuming that policy definition was unam-
biguous.

**[8] Insurance 217 ⟶2561(3)**

217 Insurance
   217XX Coverage--Health and Accident Insur-
ance
      217XX(C) Disability Insurance
         217k2553 Nature or Degree of Disability
            217k2561 Total Disability
               217k2561(3) k. Substantial or Ma-
terial Performance. Most Cited Cases
Under California law, courts must deviate from the
explicit policy definition of "total disability" in the
occupational policy context where it is necessary to
offer protection to the insured when he is no longer
able to carry out the substantial and material func-
tions of his occupation.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[9] Insurance 217 ☜2561(3)**

217 Insurance
   217XX Coverage--Health and Accident Insurance
      217XX(C) Disability Insurance
        217k2553 Nature or Degree of Disability
         217k2561 Total Disability
          217k2561(3) k. Substantial or Material Performance. Most Cited Cases

**Insurance 217 ☜2561(5)**

217 Insurance
   217XX Coverage--Health and Accident Insurance
      217XX(C) Disability Insurance
        217k2553 Nature or Degree of Disability
         217k2561 Total Disability
          217k2561(5) k. Ability to Engage in Any Occupation. Most Cited Cases
Under California law, "total disability" for purposes of occupational disability policy was properly considered as insured's inability to perform substantial and material duties of her own occupation, notwithstanding that policy also conditioned total disability as not being "engaged in any other gainful occupation."

**[10] Insurance 217 ☜2561(3)**

217 Insurance
   217XX Coverage--Health and Accident Insurance
      217XX(C) Disability Insurance
        217k2553 Nature or Degree of Disability
         217k2561 Total Disability
          217k2561(3) k. Substantial or Material Performance. Most Cited Cases

**Insurance 217 ☜3579**

217 Insurance
   217XXXI Civil Practice and Procedure
      217k3579 k. Instructions. Most Cited Cases
Under California law, instruction that defined total disability as inability to perform substantial and

material duties of insured's occupation did not differ from occupational disability insurance policy's use of phrase "important duties."

**[11] Insurance 217 ☜2561(3)**

217 Insurance
   217XX Coverage--Health and Accident Insurance
      217XX(C) Disability Insurance
        217k2553 Nature or Degree of Disability
         217k2561 Total Disability
          217k2561(3) k. Substantial or Material Performance. Most Cited Cases
Under California law, fact that insured chiropractor possibly earned income while performing tasks incidental to her primary occupation, such as clerical tasks around her office, was immaterial to whether she was unable to perform the substantial and material duties of insured's own occupation and thus was totally disabled under occupational disability policy.

**[12] Insurance 217 ☜2561(1)**

217 Insurance
   217XX Coverage--Health and Accident Insurance
      217XX(C) Disability Insurance
        217k2553 Nature or Degree of Disability
         217k2561 Total Disability
          217k2561(1) k. In General. Most Cited Cases
Provision in occupational disability insurance policy for residual or partial disability benefits did not alter requirement that definition of total disability under California law, rather than policy definition, be employed in determining total disability.

**[13] Evidence 157 ☜571(1)**

157 Evidence
   157XII Opinion Evidence
      157XII(F) Effect of Opinion Evidence
        157k569 Testimony of Experts
         157k571 Nature of Subject

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
(Cite as: 373 F.3d 998)

157k571(1) k. In General. Most Cited Cases

**Insurance 217 ☞2578**

217 Insurance
   217XX Coverage--Health and Accident Insurance
      217XX(C) Disability Insurance
         217k2573 Evidence
            217k2578 k. Weight and Sufficiency. Most Cited Cases
Evidence, including testimony of three physicians that insured chiropractor could not maintain continuous normal chiropractic occupation due to her medical condition and that insured had hired another chiropractor to keep her practice going, was sufficient to support determination that chiropractor was "totally disabled" under occupational disability insurance policy, notwithstanding that chiropractor made handful of futile attempts to perform chiropractic adjustments, that she performed clerical tasks incidental to her primary occupation, or that her practice made profit through hired chiropractor.

**[14] Insurance 217 ☞3419**

217 Insurance
   217XXVIII Miscellaneous Duties and Liabilities
      217k3416 Of Insurers
         217k3419 k. Bad Faith in General. Most Cited Cases
Under California law, plaintiff may recover tort damages for insurance bad faith, or breach of the implied covenant of good faith and fair dealing in the insurance context.

**[15] Insurance 217 ☞3382**

217 Insurance
   217XXVII Claims and Settlement Practices
      217XXVII(C) Settlement Duties; Bad Faith
         217k3378 Actions
            217k3382 k. Questions of Law or Fact. Most Cited Cases
Court may issue judgment as a matter of law

(JMOL) in context of insurance bad faith claim when it is undisputed or indisputable that basis for insurer's denial of benefits was reasonable; insurer is not entitled to JMOL where, viewing facts in light most favorable to plaintiff, jury could conclude that insurer acted unreasonably.

**[16] Insurance 217 ☞3382**

217 Insurance
   217XXVII Claims and Settlement Practices
      217XXVII(C) Settlement Duties; Bad Faith
         217k3378 Actions
            217k3382 k. Questions of Law or Fact. Most Cited Cases
The reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact in insurance bad faith suit under California law.

**[17] Evidence 157 ☞571(1)**

157 Evidence
   157XII Opinion Evidence
      157XII(F) Effect of Opinion Evidence
         157k569 Testimony of Experts
            157k571 Nature of Subject
               157k571(1) k. In General. Most Cited Cases

**Insurance 217 ☞3381(5)**

217 Insurance
   217XXVII Claims and Settlement Practices
      217XXVII(C) Settlement Duties; Bad Faith
      217k3378 Actions
         217k3381 Evidence
            217k3381(5) k. Weight and Sufficiency. Most Cited Cases
Insurer's expert's testimony demonstrating a genuine dispute as to liability will not automatically insulate an insurer from a bad faith claim based on a biased investigation.

**[18] Insurance 217 ☞3361**

217 Insurance
   217XXVII Claims and Settlement Practices

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
(Cite as: 373 F.3d 998)

217XXVII(C) Settlement Duties; Bad Faith
    217k3358 Settlement by First-Party Insurer
        217k3361 k. Investigations and Inspections. Most Cited Cases
An insurer's bias, for purposes of bad faith claim under California law based on biased investigation, may be shown through the following factors: breach of the implied covenant of good faith and fair dealing in insurance context, lying by insurer's employees in depositions or to the insured, dishonest selection of insurer's experts, unreasonableness of insurer's experts, or failure to conduct a thorough investigation.

**[19] Insurance 217 €══3382**

217 Insurance
    217XXVII Claims and Settlement Practices
        217XXVII(C) Settlement Duties; Bad Faith
            217k3378 Actions
                217k3382 k. Questions of Law or Fact. Most Cited Cases
Issue whether disability insurer engaged in biased, and thus bad faith, investigation in terminating chiropractor's total disability benefits was for jury in suit in which there was evidence that insurer used termination letter that was deceptive, misleading and fell below industry standards, repeatedly used same independent medical examiner who had denied 13 out of 13 claims for total disability, and engaged in "round table claim reviews" with apparent objective of terminating expensive claims of disabled professionals.

**[20] Federal Courts 170B €══630.1**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
            170BVIII(D)2 Objections and Exceptions
                170Bk630 Instructions
                    170Bk630.1 k. In General. Most Cited Cases
Failure to object to jury instruction on availability of future contract benefits under disability insurance policy in bad faith tort suit did not waive objection, as it would have been pointless formality to object after making unsuccessful objection to admission of evidence of future policy benefits. Fed.Rules Civ.Proc.Rule 51, 28 U.S.C.A.

**[21] Federal Courts 170B €══386**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(B) Decisions of State Courts as Authority
            170Bk386 k. State Constitutions and Statutes, Validity and Construction. Most Cited Cases
State court's interpretation of its statutes is binding on the federal courts unless a state law is inconsistent with the federal Constitution.

**[22] Insurance 217 €══3374**

217 Insurance
    217XXVII Claims and Settlement Practices
        217XXVII(C) Settlement Duties; Bad Faith
            217k3373 Amount and Items Recoverable
                217k3374 k. In General. Most Cited Cases
Under California law, disability insurer could be held liable for future damages in form of future policy benefits based on tort theory of liability for bad faith denial of claim.

**[23] Insurance 217 €══3382**

217 Insurance
    217XXVII Claims and Settlement Practices
        217XXVII(C) Settlement Duties; Bad Faith
            217k3378 Actions
                217k3382 k. Questions of Law or Fact. Most Cited Cases
Under California law, issue of punitive damages for insurer's bad faith termination of total disability benefits under occupational disability policy was for jury; there was evidence that insurer disregarded state law definition of total disability, engaged in biased medical examinations, misinformed insured

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
**(Cite as: 373 F.3d 998)**

regarding her potential benefits, and employed practices to achieve net termination ratios. West's Ann.Cal.Civ.Code § 3294(a).

**[24] Constitutional Law 92 🔗4427**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)19 Tort or Financial Liabilities
                92k4427 k. Punitive Damages. Most Cited Cases
        (Formerly 92k303)

**Insurance 217 🔗3376**

217 Insurance
    217XXVII Claims and Settlement Practices
        217XXVII(C) Settlement Duties; Bad Faith
            217k3373 Amount and Items Recoverable
                217k3376 k. Punitive Damages. Most Cited Cases
Punitive damages award of $5 million for bad faith termination of total disability benefits under occupational disability insurance policy was not constitutionally excessive under Due Process Clause; ratio between compensatory and punitive damages was approximately 2.6: 1, well within constitutional range. U.S.C.A. Const.Amend. 14.

**[25] Evidence 157 🔗506**

157 Evidence
    157XII Opinion Evidence
        157XII(B) Subjects of Expert Testimony
            157k506 k. Matters Directly in Issue. Most Cited Cases
In suit alleging bad faith termination of insurance benefits, expert witness's testimony that disability insurer deviated from industry standards in terminating total disability benefits did not violate rule against expert opinions on ultimate issue of law. Fed.Rules Evid.Rule 704(a), 28 U.S.C.A.

**[26] Evidence 157 🔗506**

157 Evidence
    157XII Opinion Evidence
        157XII(B) Subjects of Expert Testimony
            157k506 k. Matters Directly in Issue. Most Cited Cases
In suit alleging bad faith termination of insurance benefits, expert witness's testimony that disability insurer deviated from industry standards in terminating total disability benefits did not improperly usurp the court's role by instructing jury as to applicable law, even though witness relied in part on his understanding of state unfair settlement claims law; reference was ancillary to ultimate issue of bad faith.

**[27] Federal Courts 170B 🔗900**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)6 Harmless Error
                170Bk896 Admission of Evidence
                    170Bk900 k. Expert and Opinion Testimony. Most Cited Cases
District court's error, in contract and bad faith suit against disability insurer, in ruling that *Daubert* reliability factors did not apply to non-scientific and non-technical expert testimony was harmless, where court nonetheless performed its gatekeeping function by making reliability determination after probing insurance expert's knowledge and experience. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[28] Evidence 157 🔗540**

157 Evidence
    157XII Opinion Evidence
        157XII(C) Competency of Experts
            157k540 k. Conduct of Business, Custom, or Usage. Most Cited Cases

**Witnesses 410 🔗37(2)**

410 Witnesses
    410II Competency
        410II(A) Capacity and Qualifications in Gen-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
**(Cite as: 373 F.3d 998)**

Page 7

eral
　　410k37 Knowledge or Means of Know-
ledge of Facts
　　　410k37(2) k. Source of Knowledge.
Most Cited Cases
Insurance executive and board-certified specialist
in insurance medicine, who was formerly director
of insurer's medical department, was qualified
either as expert or percipient witness to testify
about insurer's handling of disability claims in bad
faith suit. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[29] Evidence 157 ⟶578**

157 Evidence
　157XIII Evidence at Former Trial or in Other
Proceeding
　　157k578 k. Opportunity for Cross-Ex-
amination. Most Cited Cases

**Federal Civil Procedure 170A ⟶1437**

170A Federal Civil Procedure
　170AX Depositions and Discovery
　　170AX(C) Depositions of Parties and Others
Pending Action
　　　170AX(C)5 Suppression; Use and Effect
　　　　170Ak1432 Use
　　　　　170Ak1437 k. Different Use Than
That for Which Taken; Different Proceeding. Most
Cited Cases
Deposition testimony of insurance expert from an-
other case was admissible as testimony of unavail-
able witness, where expert was outside court's sub-
poena power and partner of opposing party's attor-
ney had cross-examined expert at deposition and
had similar motive to develop testimony. Fed.Rules
Civ.Proc.Rules 32(a)(3), 45, 28 U.S.C.A.;
Fed.Rules Evid.Rule 804(b)(1), 28 U.S.C.A.

**[30] Evidence 157 ⟶515**

157 Evidence
　157XII Opinion Evidence
　　157XII(B) Subjects of Expert Testimony
　　　157k515 k. Conduct of Business. Most

Cited Cases
In bad faith insurance case, expert's testimony
about claims handling procedures at parent prior to
merger was relevant to claims handling procedures
of subsidiary of parent after merger, where same
executive controlled claims handling at both entit-
ies. Fed.Rules Evid.Rule 402, 28 U.S.C.A.

**[31] Evidence 157 ⟶146**

157 Evidence
　157IV Admissibility in General
　　157IV(D) Materiality
　　　157k146 k. Tendency to Mislead or Con-
fuse. Most Cited Cases
Probative value of expert's deposition testimony
about claims handling practices of parent prior to
merger in bad faith suit against subsidiary after
merger was not substantially outweighed by the
danger of unfair prejudice; deposition was corrob-
orated by a number of internal documents from
both entities, and by testimony of other witnesses.
Fed.Rules Evid.Rule 403, 28 U.S.C.A.

**[32] Evidence 157 ⟶373(1)**

157 Evidence
　157X Documentary Evidence
　　157X(D) Production, Authentication, and Ef-
fect
　　　157k369 Preliminary Evidence for Au-
thentication
　　　　157k373 Form and Sufficiency in Gen-
eral
　　　　　157k373(1) k. In General. Most
Cited Cases
Insurance documents originally produced by prede-
cessor insurer in another lawsuit prior to merger
were properly authenticated at bad faith trial
against insurer and its subsidiary as business re-
cords exempt from hearsay rule where custodian
certified that documents were those of predecessor
and its affiliated companies and had been produced
in response to document production request.
Fed.Rules Evid.Rule 803(6), 28 U.S.C.A.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
**(Cite as: 373 F.3d 998)**

Page 8

**[33] Insurance 217 ☞3381(4)**

217 Insurance
    217XXVII Claims and Settlement Practices
        217XXVII(C) Settlement Duties; Bad Faith
          217k3378 Actions
            217k3381 Evidence
              217k3381(4) k. Admissibility. Most
Cited Cases
Documents produced by predecessor insurer in another lawsuit were relevant to claims handling practices at subsidiary after merger, in bad faith suit, given evidence that claims handling practices of predecessor were adopted by subsidiary after merger. Fed.Rules Evid.Rule 402, 28 U.S.C.A.

**[34] Evidence 157 ☞146**

157 Evidence
    157IV Admissibility in General
        157IV(D) Materiality
          157k146 k. Tendency to Mislead or Confuse. Most Cited Cases
Testimony of defense witness that paid monthly disability claims and total pay-outs for disability insurance line increased during relevant period could be excluded as irrelevant and prejudicially confusing in bad faith claims handling suit concerned only with termination of benefits under "own occupation" disability policies that generally had higher payouts than disability policies in general. Fed.Rules Evid.Rules 402, 403, 28 U.S.C.A.

**[35] Federal Courts 170B ☞822**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
          170BVIII(K)4 Discretion of Lower Court
            170Bk822 k. Conduct of Trial in General. Most Cited Cases
A district court's refusal to bifurcate a trial is reviewed for an abuse of discretion. Fed.Rules Civ.Proc.Rule 42(b), 28 U.S.C.A.

**[36] Federal Civil Procedure 170A ☞1961**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(A) In General
          170Ak1959 Separate Trial of Particular Issues
            170Ak1961 k. Damages. Most Cited Cases
Refusal to bifurcate issues of liability for contract damages and liability for punitive damages for tortious breach of disability insurance policy in terminating total disability benefits was not abuse of discretion; correct instructions were given regarding differing burdens of proof, and evidence of insurer's profits, financial condition, and financial statements helped establish alleged incentives to breach contract as well as punitive damages claim. Fed.Rules Civ.Proc.Rule 42(b), 28 U.S.C.A.

**[37] Antitrust and Trade Regulation 29T ☞290**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(E) Enforcement and Remedies
          29TIII(E)1 In General
            29Tk287 Persons Entitled to Sue or Seek Remedy
              29Tk290 k. Private Entities or Individuals. Most Cited Cases
    (Formerly 92Hk32 Consumer Protection)
Former insured did not have constitutional standing to seek injunctive relief against disability insurer under California Unfair Competition Act (UCA) directing insurer to refrain from future violations, as former insured was not personally threatened by insurer's future conduct and thus could not demonstrate real or immediate threat of irreparable injury. U.S.C.A. Const. Art. 3, § 2, cl. 1; West's Ann.Cal.Bus. & Prof.Code § 17200.

**\*1003** Horace W. Green, San Francisco, CA; Evan M. Tager, Washington, DC (argued); Christopher C. Wang, Washington, DC, for the defendants-appellants.
Ray Bourhis, San Francisco, CA; Alice Wolfson,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
(Cite as: 373 F.3d 998)

Page 9

San Francisco, CA; Daniel U. Smith, Kentfield, CA (argued), for the plaintiff-appellee.

Appeal from the United States District Court for the Northern District of California; James Larson, Magistrate Judge, Presiding. D.C. No. CV- 99-05286-JL.

Before: GOODWIN, TASHIMA, and CLIFTON, Circuit Judges.

CLIFTON, Circuit Judge:
Joan Hangarter, a chiropractor who operated her own business, obtained an "own occupation" disability insurance policy in 1989 from Paul Revere Life Insurance Company. She filed a claim for total disability in July 1997 based on shoulder, elbow, and wrist pain. Paul Revere paid Hangarter benefits for an eleven-month period and then terminated her benefits based upon the opinion of its medical examiners and claim investigators that Hangarter was not "totally disabled" and continued to work and earn income, making her ineligible for benefits under the policy. Hangarter brought a diversity action alleging violation of Cal. Bus. & Prof.Code § 17200 (the Unfair Competition Act, or UCA), breach of contract, breach of the covenant of good faith and fair dealing, and intentional misrepresentation against Paul Revere and its parent company, UnumProvident Corp. The jury returned a $7,670,849 verdict in Hangarter's favor, $5 million of which was for punitive damages. Raising a multitude of issues, Defendants appeal the district court's post-verdict denial of judgment as a matter of law (JMOL), the jury's award of damages, and a permanent injunction issued by the district court under the UCA.

We affirm the district court's denial of a JMOL and the jury's award of damages. We reverse the district court's permanent injunction under the UCA.

## I. BACKGROUND

Joan Hangarter owned her own chiropractic practice in Berkeley, California. On a typical day, she would treat between 30 and 50 patients. In 1989, Hangarter purchased an individual "own occupation" *1004 disability insurance policy from Paul Revere. In 1993, Hangarter began to experience severe recurrent shoulder pain. She sought treatment from a chiropractor in her office, Dr. England, who adjusted her daily. In 1995 and 1996, Hangarter also saw an orthopedist, Dr. Isono. As a result of ongoing, severe pain in her shoulder, arm, and neck, Hangarter in 1997 started to see Dr. Linda Berry, a chiropractor, and to attend physical therapy sessions. Although Hangarter continued this treatment for approximately eight weeks, her pain was not alleviated. She filed a claim for benefits under her disability insurance policy in May 1997 and began receiving payments in October 1997. She was also in an auto accident in October 1997, which aggravated her pain.

Though she continued to be treated by Drs. Berry and Isono, Hangarter's condition did not improve. Between 1996 and 2000 Hangarter had 3 Magnetic Resonance Imaging studies (MRIs), which Dr. Isono interpreted as having abnormal findings. The third MRI in May 2000 showed her condition to be growing worse, despite treatment by Drs. Berry and Isono. Dr. Berry diagnosed Hangarter's symptoms as epicondylitis, cervicalintervertebral disk syndrome, and tendinitis. Dr. Isono offered only surgery to correct the problem, which Hangarter rejected based on her past negative experience with post-surgery pain medication. Hangarter eventually discontinued seeing Dr. Isono and was treated solely by Dr. Berry, whose chiropractic manipulations gave her some pain relief.

In 1999, Paul Revere employed an "independent medical examiner" (IME), Dr. Aubrey Swartz, to examine Hangarter and her medical records. In contrast to the findings of Drs. Isono and Berry, Dr. Swartz concluded that Hangarter's condition was "normal" and that she would be able to see two chiropractic patients an hour. Dr. Edward Katz, an orthopedic surgeon, at the request of Hangarter's counsel, reviewed her medical records [FN1] and ex-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
(Cite as: 373 F.3d 998)

amined her in July 2001, two years after Dr. Swartz. Dr. Katz disagreed with Dr. Swartz's conclusions. He found 75% range of motion in her neck, spasm and tenderness in the right trapezius muscle, and reduced grip strength in her arm. Dr. Katz also found evidence of cervical disk disease, a depressed biceps reflex on Hangarter's right side along with numbness and tingling of the middle finger of her right hand, an indicator of nerve root compression affecting the sensory portion of the nerve going down the arm. Dr. Katz reviewed the reports of the MRI scans of Hangarter's cervical spine taken in May 1997, finding mild to minimal central canal stenosis, a narrowing of the spinal canal which causes some compression on the spinal canal or the nerve roots. He concluded that Hangarter suffered from lateral epicondylitis, more commonly called tennis elbow, cervical disk disease, and rotator cuff tendinitis, and that her condition was worsening. Drs. Katz, Berry, and Isono testified that Hangarter could not maintain a normal, continuous chiropractic occupation.

> FN1. These records included the files of Dr. Isono, the MRI reports of Hangarter's right shoulder and cervical spine taken in 1997, the records and deposition of Dr. Linda Berry, the electromyogram ("EMG") studies of March 6 and March 30, 1998, the report of Dr. Swartz and another doctor retained by Paul Revere, and the MRI report of May 12, 2000.

While Hangarter was receiving benefits from her policy, she hired Dr. Parissa Peymani to adjust patients while she assisted with office management. Dr. Peymani testified that after she started working, Hangarter stopped seeing all but five to seven of her patients, which Dr. Berry *1005 had encouraged her to do to see if her condition was at all improving. Dr. Peymani testified that during the year-and-a-half she worked for her, Hangarter performed adjustments for only 5 out of over 9,000 patient visits. Hangarter ceased employing Dr. Peymani in May 1999, because she could no longer afford to pay her. She then sold her practice.

On May 21, 1999, Paul Revere terminated Hangarter's "total disability" benefits. The letter claimed that Hangarter was ineligible for benefits under the policy as she was not "totally disabled" and was working and earning income. After Paul Revere terminated Hangarter's benefits, it attached her bank account for the insurance premiums, until the account was drained, at which point the company cancelled her policy. Hangarter subsequently brought a diversity action against Defendants alleging violation of § 17200 of the Unfair Competition Act, breach of contract, breach of the covenant of good faith and fair dealing, and intentional misrepresentation. After eleven days of trial, a jury of six returned a unanimous verdict for Hangarter. The total award was $7,670,849, including $5,000,000 for punitive damages, $1,520,849 for past and future unpaid benefits, $400,000 for emotional distress, and $750,000 for attorneys' fees. The district court also issued a permanent injunction under the UCA. Defendants filed a motion for a JMOL or for a new trial, which the district court denied. See Hangarter v. Paul Revere Life Ins. Co., 236 F.Supp.2d 1069 (N.D.Cal.2002). This appeal followed.

## II. DISCUSSION

[1] We review the denial of a motion for a JMOL de novo. See Monroe v. City of Phoenix, 248 F.3d 851, 861 (9th Cir.2001). JMOL is appropriate "when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.' " Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting Fed.R.Civ.P. 50(a)). When reviewing the record as a whole, "the court must draw all reasonable inferences in favor of the nonmoving party," keeping in mind that " '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' " Id. at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
**(Cite as: 373 F.3d 998)**

Page 11

150,120 S.Ct. 2097 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

[2][3][4] JMOL should be granted only if the verdict is "against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *EEOC v. Pape Lift, Inc.,* 115 F.3d 676, 680 (9th Cir.1997) (citations and quotation marks omitted); *see also Mockler v. Multnomah County,* 140 F.3d 808, 815 n. 8 (9th Cir.1998) (noting that reversal is warranted only if the verdict is not supported by "such relevant evidence as reasonable minds might accept as adequate to support a conclusion" (internal quotation marks omitted)). A new trial is proper only if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs,* 251 F.3d 814, 819 (9th Cir.2001) (citations and quotation marks omitted). We review a district court's denial of a motion for a new trial for clear abuse of discretion. *Saman v. Robbins,* 173 F.3d 1150, 1154 n. 4 (9th Cir.1999).

A. Total Disability

      1. Jury Instruction

[5][6] We review de novo jury instructions that are challenged as a misstatement*1006 of law. *See Mockler,* 140 F.3d at 812. Jury instruction errors are subject to harmless error review. *See Shaw v. City of Sacramento,* 250 F.3d 1289, 1293 (9th Cir.2001).

Defendants argue that the district court's jury instruction on the meaning of "total disability" was a misstatement of California law. The district court's instruction to the jury stated:

**TOTAL DISABILITY**

    Plaintiff's policy defines "total disability" as fol-

lows:

    "Total Disability" means that because of Injury or Sickness:

    a. you are unable to perform the important duties of your Occupation; and

    b. you are not engaged in any other gainful occupation; and

    c. you are under the regular and personal care of a physician.

    This means, according to the law in California, that plaintiff is eligible for benefits if she is unable to perform the substantial and material duties of her own occupation in the usual and customary way with reasonable continuity.

The district court's jury instruction was based upon the California Supreme Court's holding in *Erreca v. Western States Life Ins. Co.,* 19 Cal.2d 388, 121 P.2d 689 (1942), that "the term 'total disability' does not signify an absolute state of helplessness but means such a disability as renders the insured unable to perform the substantial and material acts necessary to the prosecution of a business or occupation in the usual or customary way." *Id.* at 695.

[7][8] Defendants argue that because the "total disability" provision of Paul Revere policy was unambiguous, the district court's imposition of *Erreca's* definition of "total disability" was unwarranted under California law. Contrary to Defendants' position, California law *requires* courts to deviate from the explicit policy definition of "total disability" in the occupational policy context [FN2] where it is necessary to "offer protection to the insured when he is no longer able to carry out the substantial and material functions of *his* occupation." *Austero v. Nat'l Cas. Co.,* 84 Cal.App.3d 1, 148 Cal.Rptr. 653, 667 (1978) (emphasis added), *overruled on other grounds by Egan v. Mut. of Omaha Ins. Co.,* 24 Cal.3d 809, 169 Cal.Rptr. 691, 699 n. 7, 620 P.2d 141 (1979). Indeed, "California courts oppose strict adherence to a highly limited definition of 'total

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
(Cite as: 373 F.3d 998)

disability' in both non-occupational and general occupational disability policies." *Id.; see also Moore v. American United Life Ins. Co.,* 150 Cal.App.3d 610, 197 Cal.Rptr. 878, 882-83 (1984) (stating that the unambiguous "policy language *misstated* California law as it has existed since [*Erreca* ]. When coverage provisions in general disability policies require total inability to perform 'any occupation,' the courts have assigned a common sense interpretation to the term 'total disability' " (emphasis added)).

> FN2. The California Supreme Court in *Erreca* defined total disability in the context of a general, nonoccupational disability policy. Hangarter's policy was an *occupational* policy, as opposed to a nonoccupational policy which "does not insure the plaintiff in respect to any particular occupation. The general or total disability which it insures against is akin to ... provisions defining total disability as that which prevents the insured 'from engaging in any occupation, or performing any work whatsoever for remuneration or profit.' " *Joyce v. United Ins. Co. of America,* 202 Cal.App.2d 654, 21 Cal.Rptr. 361, 367 (1962) (emphasis added). California courts have specifically applied Erreca in the context of occupational policies. *See, e.g., Austero,* 148 Cal.Rptr. at 666 ("We see no reason for distinguishing between non-occupational and occupational disability policies in terms of the definition of 'total disability' ...").

**\*1007** [9][10][11] The policy in this case defined "total disability" as being "unable to perform the important duties" of one's occupation and to not be "engaged in any other gainful occupation." As Defendants concede, Hangarter's policy was an occupational policy that insured Hangarter against the loss of her ability to perform *her* occupation as a chiropractor, not any other occupation. Given the occupational nature of the policy, the district court

appropriately formulated a jury instruction that only referred to Hangarter's ability to perform the important duties of her own occupation. California courts have specifically upheld jury instructions in the occupational policy context that defined "total disability" as the inability to perform the substantial and material duties of one's *own* occupation. *See Austero,* 148 Cal.Rptr. at 665 (upholding the instruction if the "plaintiff was 'rendered unable to perform the substantial and material duties of *his* occupation in the usual and customary way,' that he was totally disabled" (emphasis added)). Additionally, for all practical purposes there is no difference between *Erreca's* use of the phrase "substantial and material duties" and the policy's use of the phrase "important duties." [FN3]

> FN3. Although the instruction eliminated the policy's requirement that Hangarter not be engaged in "any other gainful occupation" in order to receive "total disability" benefits, that appears proper under California law, even if the policy language seems unambiguous. *See Moore,* 197 Cal.Rptr. at 882-83, 892-93. Given that this case involved an occupational disability policy, the district court did not err in formulating a jury instruction that focused solely on Hangarter's ability to perform the substantial and material duties of her occupation, not any other occupation. Moreover, as discussed in the following section, occasional though futile attempts to engage in one's occupation-possibly in violation of the precise terms of the policy-are insufficient to reverse the jury's determination of total disability under *Erreca's* definition of "total disability." *See Joyce v. United Ins. Co. of America,* 202 Cal.App.2d 654, 21 Cal.Rptr. 361, 368 (1962). Additionally, the fact that Hangarter possibly earned income while performing tasks incidental to her primary occupation is also immaterial under *Erreca's* definition. *See Erreca,* 121 P.2d at 695-96. In any event, even if the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
**(Cite as: 373 F.3d 998)**

Page 13

district court erred in eliminating this portion of the policy in its jury instruction, the error was harmless because Defendants conceded that, at the time benefits were terminated, Hangarter was not working.

[12] Defendants also contend that the imposition of Erreca's definition of total disability in this case obviated the policy's partial or residual disability provision.[FN4] This argument also disregards California law. In *Wright v. Prudential Ins. Co. of America,* 27 Cal.App.2d 195, 80 P.2d 752 (1938), cited approvingly by the California Supreme Court in *Erreca,* the California District Court of Appeal specifically rejected the defendant's contention that the California judicial "rule [regarding 'total disability'] does not apply where the policy provides for 'various degrees of disability' ":

> FN4. The policy provides residual disability benefits if the insured is unable to perform one or more of the important duties of her occupation; is unable to perform the important duties of her occupation for more than 80% of the time normally required to perform them; or her loss of earnings is equal to at least 20% of her former earnings while engaged in her occupation or another occupation; and she is under the regular and personal care of a physician.

No logical reason appears, however, why the same rule should not be applied where the policy provides for both total and partial disability in order to make the total disability clause 'operative and to prevent a forfeiture' of the indemnity provided by that clause. In either case a literal interpretation of the total disability clause would defeat the very purpose of insurance against total disability, *1008 because it rarely happens that an insured is so completely disabled that he can transact no business duty whatever. *The rule quoted has been applied in many cases where the policy in suit provided for both total and partial disability ....* The fact that the insured may do some work or transact some business duties during the time for which he claims indemnity for total disability or even the fact that he may be physically able to do so is not conclusive evidence that his disability is not total, if reasonable care and prudence require that he desist.

*Id.* at 761-62 (citations omitted) (emphasis added). The fact that the policy in this case contained a residual or partial disability clause does not make the district court's jury instruction inconsistent with California law.[FN5]

> FN5. Defendants rely on *Dietlin v. Gen. Am. Life Ins. Co.,* 4 Cal.2d 336, 49 P.2d 590 (1935) for the proposition that a "literal construction" of the policy controls where a partial disability provision exists. *Dietlin* pre-dated *Erreca,* and though the court in *Dietlin* declined to apply the judicial construction of total disability, it did *not* justify its approach based on the fact that there was a partial disability provision in the policy. The court simply decided to "adhere to the construction placed upon the language of the policy" without further explanation. *Id.* Tellingly, the California Supreme Court in *Erreca* subsequently interpreted *Dietlin* by stating that the court denied benefits in that case because "the climbing of scaffolds did not constitute a substantial portion of [Dietlin's] duties," a view consistent with *Erreca's* definition of "total disability." *Erreca,* 19 Cal.2d at 398, 121 P.2d 689. The court in *Erreca* made no mention at all of the existence of partial benefits language in the *Dietlin* policy.

The district court therefore did not erroneously misstate California law in its jury instruction.

### 2. Jury's Total Disability Finding

"[T]he question of what amounts to total disability is one of fact...."*Erreca,* 121 P.2d at 696. "[W]e re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998                                                                              Page 14
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
**(Cite as: 373 F.3d 998)**

view the factual findings made by the jury under the substantial evidence test....*Sarkisian v. Winn-Proof Corp.,* 688 F.2d 647, 651 (9th Cir.1982).

The jury's special verdict made the specific finding that at the date her benefits were terminated by Defendant, "Plaintiff was unable to perform the substantial and material duties of her own occupation in the usual and customary way with reasonable continuity."Defendants argue that "undisputed evidence" demonstrates that Hangarter "continued to manage her business profitably" and engaged in a "gainful occupation" in violation of the precise terms of the policy. Given that the district court correctly applied California law in formulating its jury instruction for "total disability," our relevant inquiry is only whether the jury's factual finding of total disability, pursuant to the jury instruction, was supported by substantial evidence. The fact that some evidence might demonstrate that Hangarter violated the precise terms of the policy is immaterial.

[13] There was sufficient evidence for the jury to find that Hangarter was totally disabled. Though there is conflicting evidence in the record regarding Hangarter's medical condition, the jury's determination that before the date of termination Hangarter was physically unable to perform "the substantial and material duties of her own occupation in the usual and customary way with reasonable continuity" is supported by substantial evidence. Three doctors testified that Hangarter could not maintain a continuous, normal chiropractic occupation. While Defendants note that Hangarter made a handful of attempts to perform chiropractic adjustments, futile attempts to return to one's previous occupation*1009 are insufficient to reverse the jury's determination of total disability under California law. *See Joyce,* 21 Cal.Rptr. at 368 ("[A] finding that the plaintiff was 'wholly and continuously disabled' is not precluded by the fact that he made two futile attempts to return to his job. Such finding must be upheld since the evidence shows that on each occasion of his return to work, he was unable to perform

the duties of his occupation ...").

Though Hangarter hired another chiropractor from 1997-1999 to treat her patients while she performed clerical tasks incidental to her primary occupation, this is insufficient to disqualify her from being "totally disabled" under California law. Hangarter had an *occupational* policy with Paul Revere, and was insured against losses stemming from her inability to perform her occupation as a chiropractor. Her occasional stints as an office manager do not constitute the occupational practice of chiropractic medicine. Under California law, the performance of tasks *incidental* to one's profession does not demonstrate that an individual is not "totally disabled." *See Culley v. New York Life Ins. Co.,* 27 Cal.2d 187, 163 P.2d 698, 701 (1945) ("Recovery is not precluded under a total disability provision because the insured is able to perform sporadic tasks, or give attention to simple or inconsequential details incident to the conduct of business" (citations and quotation marks omitted)).

Similarly, the fact that Hangarter's enterprise possibly made a profit during this time period is also immaterial. As the California Supreme Court noted in *Erreca:*

> The insurer also stresses the magnitude of the respondent's enterprise and his income therefrom. Such matters have *no proper place* in the determination of whether respondent is totally disabled from performing remunerative work. Disability insurance is designed to provide a substitute for earnings when, because of bodily injury or disease, the insured is deprived of the capacity to earn his living....*It does not insure against loss of income.* The respondent receives his income from his ranches as an owner or lessor; his labor contributes nothing toward it. The contention of the insurer would lead to the strange conclusion that a bedridden merchant is not totally disabled from performing gainful work because he receives a substantial income from a business, the management of which he has been forced to abandon to others.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
**(Cite as: 373 F.3d 998)**

Page 15

*Erreca,* 121 P.2d at 695-96 (emphasis added).[FN6]

FN6. Hangarter testified that "most of the money [earned during this time] went all to overhead." Though the record is unclear on this issue, Hangarter and Dr. Peymani testified that Hangarter saw, at most, five to seven patients during a year. Hangarter then hired Dr. Peymani to "take over" her practice. She later replaced Dr. Peymani, and shortly afterward sold her practice altogether. When her benefits were terminated, she was not engaged in any occupation.

Substantial evidence supports the jury's finding that Hangarter was unable to perform the substantial and material duties of her occupation as a chiropractor in a normal and continuous way. The district court therefore did not err in declining to disturb the jury's finding that Hangarter was totally disabled.

B. Jury's Bad Faith Determination

[14][15][16] A cause of action for breach of the implied covenant of good faith and fair dealing in the insurance context is characterized as insurance bad faith, for which a plaintiff may recover tort damages. "The key to a bad faith claim [under California *1010 law] is whether or not the insurer's denial of coverage was reasonable.... [T]he reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact." *Amadeo v. Principal Mut. Life Ins. Co.,* 290 F.3d 1152, 1161 (9th Cir.2002) (citations and quotation marks omitted). Where there is a genuine issue of an insurer's liability under a policy, a court can conclude that an insurer's actions in denying the claim were not unreasonable as a matter of law. *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.,* 90 Cal.App.4th 335, 108 Cal.Rptr.2d 776, 784 (2001). "The genuine issue rule in the context of bad faith claims allows" a court to grant JMOL when "it is undisputed or indisputable that the basis for the in-

surer's denial of benefits was reasonable.... [A]n insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably." *Amadeo,* 290 F.3d at 1161-62 (citations omitted).

[17][18] Though the existence of a "genuine dispute" will generally immunize an insurer from liability, a jury's finding that an insurer's investigation of a claim was biased may preclude a finding that the insurer was engaged in a genuine dispute, even if the insurer advances expert opinions concerning its conduct. *See Chateau Chamberay,* 108 Cal.Rptr.2d at 785 ("an [insurer] expert's testimony [demonstrating a genuine dispute as to liability] will not *automatically* insulate an insurer from a bad faith claim based on a biased investigation"); *see also Guebara v. Allstate Ins. Co.,* 237 F.3d 987, 996 (9th Cir.2001) ("Our decision does not eliminate bad faith claims based on an insurer's allegedly biased investigation. Expert testimony does not automatically insulate insurers from bad faith claims based on biased investigations."). An insurer's bias may be shown through the following factors:

1. The insurer may have misrepresented the nature of the investigatory proceedings;

2. The insurer's employees lied in depositions or to the insured;

3. The insurer dishonestly selected its experts;

4. The insurer's experts were unreasonable; or

5. The insurer failed to conduct a thorough investigation;

*Chateau Chamberay,* 108 Cal.Rptr.2d at 785; *cf. Sprague v. Equifax, Inc.,* 166 Cal.App.3d 1012, 213 Cal.Rptr. 69, 79 (1985) (fraudulent termination exists if insurer arranges "an inadequate medical examination, producing a false conclusion, which would form an apparently plausible basis for wrongfully terminating payments").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
(Cite as: 373 F.3d 998)

[19] Substantial evidence was presented at trial that the jury could have relied upon in determining that Defendants engaged in a biased investigation. Frank Caliri testified that Paul Revere's letter terminating Hangarter's benefits was misleading, deceptive, and fell below industry standards as it incorrectly advised Hangarter about her rights under the policy.[FN7] The letter claimed that Hangarter was "working," and therefore was in violation of the policy. This statement, as Paul Revere acknowledged in the same letter, was false because Hangarter had already sold her chiropractic business. Indeed, the letter went on to deny Hangarter any *1011 residual benefits, claiming that because she had "sold" her business and "was not working," she was ineligible for them. Moreover, the letter made no mention of recovery or rehabilitation benefits, and when Hangarter specifically asked about such benefits before the letter was issued, she was erroneously told that she was ineligible for them. Finally, the termination letter incorrectly stated that the policy was governed by ERISA. If true, this would have meant that Hangarter had no available remedies under state law, including punitive damages.[FN8]

> FN7. Defendants respond to Caliri's testimony by stating that under California law the insurer has no obligation to inform the insured about benefits set forth clearly in the policy. This, however, does not rebut Caliri's observation that Defendants' failure to inform Hangarter fully about her rights under the policy generally fell below industry customs and norms.

> FN8. If an insurance policy is part of an employee welfare benefit plan governed by ERISA, then a plaintiff's state law claims relating to that policy are preempted and federal law applies to determine recovery. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56-57, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Kanne v. Conn. Gen. Life Ins. Co.*, 867 F.2d 489, 493-94 (9th Cir.1988)

(per curiam) (holding that plaintiffs' "state statutory claims for compensatory and punitive damages" were preempted under *Pilot Life* even if the statute fell within ERISA's saving clause).

Evidence was also presented that Defendants exhibited bias in selecting and retaining Dr. Swartz as the IME. Paul Revere used Dr. Swartz nineteen times from 1995 to 2000. Caliri testified that when an insurer "use[s] the same [IME] on a continual basis," the medical examiner becomes "biased" because they "lose their independence." Similarly, evidence showed that in thirteen out of thirteen cases involving claims for total disability, Dr. Swartz rejected the insured's claim that he or she was totally disabled. Moreover, Defendants' letter retaining Dr. Swartz, written by an in-house medical consultant who had never examined Hangarter, claimed that there were no objective findings for a disabling injury. Caliri testified that this letter "bias[ed]" and "predispos[ed] the doctor" against finding disabling injuries by "telling him [Defendants'] opinion."

Additionally, Hangarter offered evidence that Defendants had developed and applied to her case file a comprehensive system for targeting and terminating expensive claims, such as those stemming from "own occupation" policies where the insured was a disabled professional who had been receiving benefits for months or years. Dr. William Feist testified that Defendants in the mid-to-late 1990s had instituted "unethical" policies such as "round table claim reviews" that were made with the goal of achieving a "net termination ratio" (the ratio of the value of terminated claims compared with new claims).[FN9] Caliri similarly testified that the round table process violated the insurance industry principle of looking at each policy claim objectively and on a case-by-case basis.

> FN9. Caliri also testified, based on internal Provident documents, that Defendants set goals for terminating whole blocks of claims without reference to the merits of individual claims for benefits; e.g., a dir-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
**(Cite as: 373 F.3d 998)**

ective that each adjuster will maintain a list of ten claimants "where intensive effort will lead to successful resolution of the claim. As one drops off another name will be added."He referred to testimony by Ralph Mohney and Sandra Fryc that "resolution" of claims meant their "termination." Caliri testified that Hangarter's case file was taken to a round table on September 9, 1997.

Viewing the evidence in Hangarter's favor, we conclude that the district court did not err in determining that the jury had substantial evidence before it to find that the Defendants engaged in a biased, and thus "bad faith," investigation.

C. Future Damages Jury Instruction

[20] The district court instructed the jury that if it found that Defendants "breached [their] duty of good faith and fair dealing," it could award Hangarter "an amount of future contract benefits that you reasonably conclude after examination of the policy and other evidence that plaintiff would receive had the contract been honored by the insured." Defendants argue that the district court misstated California law in its jury instruction. Though Defendants failed to object to the jury instruction, they did not waive this argument.[FN10]

> FN10. Fed.R.Civ.P. 51 provides that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51 (2002). Though Defendants did not object to the jury instruction, they did object to the admission of evidence of future policy benefits in their motion in limine no. 3. While "deficient in terms of the plain language of Rule 51," this objection "fall[s] within the limited exception we have recognized for a

pointless formality." *Voohries-Larson v. Cessna Aircraft Co.,* 241 F.3d 707, 714 (9th Cir.2001). "Where the district court is aware of the party's concerns with an instruction, and further objection would be unavailing, we will not require a futile formal objection." *Gulliford v. Pierce County,* 136 F.3d 1345, 1348 (9th Cir.1998) (citations and quotation marks omitted).

Nonetheless, Defendants' argument is unavailing on the merits. In *Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141 (1979), the California Supreme Court stated that:

> We have never held, however, that future policy benefits may not be recovered in a valid tort cause of action for breach of the implied covenant of good faith and fair dealing.... Thus, in applying to these facts the *general rule for fixing tort damages ..., the jury may include in the compensatory damage award future policy benefits* that they reasonably conclude, after examination of the policy's provisions and other evidence, the policy holder would have been entitled to receive had the contract been honored by the insurer.

*Id.* at 149 n. 7 (emphasis added). The California Court of Appeal in *Pistorius v. Prudential Ins. Co.,* 123 Cal.App.3d 541, 176 Cal.Rptr. 660 (1981) interpreted *Egan* as holding, generally, that future damages for bad faith claims based upon tort theories of liability are appropriate. *Id.* at 666 ("Defendant's position that compensatory damages based on a *contractual* cause of action for breach of an implied covenant of good faith in a disability insurance policy cannot include a sum for future benefits is correct. However where the damages are based on a *tort theory,* the situation is different."(citation omitted) (emphasis added)).

[21][22] It is well established that a state court's interpretation of its statutes is binding on the federal courts unless a state law is inconsistent with the federal Constitution. *Adderley v. Florida,* 385 U.S.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998                                                                                    Page 18
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
(Cite as: 373 F.3d 998)

39, 46, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). The court in *Pistorius* reasonably interpreted *Egan* to apply to insurance bad faith claims generally. Though Defendants espouse a theory of tort law, nowhere mentioned within *Egan,* that would limit the application of tort damages in this case to present and past harms, the California Supreme Court in *Egan* was quite clear in emphasizing that it had "*never held*... that future policy benefits may not be recovered in a valid tort cause of action for breach of the implied covenant of good faith and fair dealing" and that when applying the "general rule for fixing tort damages ... the jury may include in the compensatory damage award future policy benefits." *Egan,* 169 Cal.Rptr. 691, 620 P.2d at 149 n. 7 (emphasis added). The California Court of Appeal's announcement of a rule of law " 'is a datum for ascertaining state law which is not to be disregarded by a federal court unless it **\*1013** is convinced by other persuasive data that the highest court of the state would decide otherwise....' "*Hicks v. Feiock,* 485 U.S. 624, 630 n. 3, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988) (quoting *West v. Am. Tel. & Tel. Co.,* 311 U.S. 223, 237-38, 61 S.Ct. 179, 85 L.Ed. 139 (1940)). Defendants have not advanced any persuasive argument to suggest that the California Supreme Court would not have allowed future damages in *Pistorius* or the instant case.

The district court therefore did not misstate California law in instructing the jury that Defendants could be liable for future damages.

D. Punitive Damages

1. Availability under California Law

[23] We review de novo the availability of punitive damages. *EEOC v. Wal-Mart Stores, Inc.,* 156 F.3d 989, 992 (9th Cir.1998). Under California law Hangarter was entitled to punitive damages if she proved "by clear and convincing evidence that [Defendants] ha[ve] been guilty of oppression, fraud, or malice." Cal. Civ.Code § 3294(a).

"Viewing the facts in a light most favorable to the judgment," we conclude that the jury's award of punitive damages was consistent with California law. *Bertero v. Nat'l Gen. Corp.,* 13 Cal.3d 43, 118 Cal.Rptr. 184, 529 P.2d 608, 624 (1974). California courts have upheld the awarding of punitive damages based on conduct nearly identical to that alleged of Defendants. In *Moore,* the court held that the fact that an insurance policy disregards applicable California law could serve as "[o]ne factor to consider in evaluating an award of punitive damages.... The jury could reasonably conclude that certain aspects of defendant's deceptive claims practices were particularly invidious because lay persons would be unlikely to discover the deception." *Moore,* 197 Cal.Rptr. at 895. Indeed, "lay persons would be unlikely to know that they had an established right under California law to have coverage determined using the broader *Erreca* standard rather than the explicit language of defendant's policy." *Id.* at 895-96.

Additionally, California courts have stated that biased medical examinations and claims targeting practices could serve as a basis for punitive liability under California law. *Id.* at 897. As the court in *Moore* held,

[l]ooking at the record, as we must, in a light most favorable to the judgment, it appears the jury could properly have concluded the conduct of defendant in this case was highly reprehensible. The jury could conclude that defendant consciously pursued a practice or policy of cheating insureds out of benefits by obtaining incorrect opinions of total disability from treating physicians.

*Id.* (citations omitted). Moreover, the jury "could conclude that plaintiff's own treating physician was misled by defendant's systematic claims practices and that defendant acted in bad faith by summarily denying plaintiff's claim even though her treating physician had indicated she could not work at her regular occupation."*Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Finally, California courts have held that punitive damages are warranted where the cumulative evidence "supports a finding of intent to injure, since [e]vidence establishing 'conscious disregard of another's rights' is evidence indicating that the defendant was aware of the probable consequences of his or her acts and willfully and deliberately failed to avoid those consequences." *Notrica v. State Comp. Ins. Fund,* 70 Cal.App.4th 911, 83 Cal.Rptr.2d 89, 113 (1999) (internal quotation marks omitted). The evidence proffered at trial that Defendants disregarded *Erreca's* definition of total disability, engaged in biased **\*1014** medical examinations, misinformed Hangarter regarding her potential benefits, and employed policies to achieve net termination ratios could support a jury's finding that Defendants had a "conscious course of conduct, firmly grounded in established company policy" that disregarded the rights of insureds. *Neal v. Farmers Ins. Exch.,* 21 Cal.3d 910, 148 Cal.Rptr. 389, 582 P.2d 980, 987 (1978).

The district court therefore did not err in concluding that the jury's award of punitive damages was consistent with California law.

## 2. Constitutional Due Process

[24] Current Supreme Court jurisprudence instructs courts reviewing the constitutionality of punitive damages awards to consider the "reasonableness of a punitive damages award," of which the "most important indicium ... is the degree of reprehensibility of the defendant's conduct." *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). The court in *Gore* laid out several important factors that are relevant in determining the reprehensibility of the defendant's conduct, including whether the harm caused was physical as opposed to economic; tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.* at 576-77, 116 S.Ct. 1589.

The jury's awarding of punitive damages in this case satisfies the general framework laid out in *Gore.See State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 1525, 155 L.Ed.2d 585 (2003) ("While States enjoy considerable discretion in deducing when punitive damages are warranted, each award must comport with the principles set forth in *Gore.*"(emphasis added)). The evidence, viewed in Hangarter's favor, can support the conclusion that Defendants' conduct was in reckless disregard of the rights and the physical well-being of Hangarter; was threatening to an individual who was economically vulnerable; was part of a general corporate policy and not an isolated incident; and caused harm in a deceitful manner.

Defendants argue that the Supreme Court's decision in *State Farm* compels the conclusion that, in order to be constitutional, punitive damages in this case should be limited to no more than $1,000,000. Defendants' argument is essentially that because their conduct in this case is less invidious than the defendant's conduct in *State Farm,* the 1:1 ratio of punitive damages to compensatory damages applied in that case should equally apply here. *State Farm's* 1:1 compensatory to punitive damages ratio is not binding, no matter how factually similar the cases may be.[FN11] Indeed,**\*1015** the Court in *Gore* stated that "we have *consistently rejected the notion* that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award...."*Gore,* 517 U.S. at 582, 116 S.Ct. 1589 (first emphasis added). Likewise, the Court in *State Farm* stated that "We decline again to impose a bright-line ratio which a punitive damages award cannot exceed." *Id.* at 1524 (citations omitted). "[B]ecause there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those ... previously upheld [by the Court] may comport with due process where a particularly egregious act has resulted in only a small

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
**(Cite as: 373 F.3d 998)**

amount of economic damages." *Id.* (citations and quotation marks omitted).

> FN11. That said, there are important factual distinctions between State Farm and the case at bar. In *State Farm* the "compensatory damages for the injury suffered ... likely were based on a component [ (emotional distress) ] which was duplicated in the punitive award." *State Farm,* 123 S.Ct. at 1525. Indeed, the plaintiff in *State Farm* "suffered only minor economic injuries"; her award was primarily for emotional distress, the result of conduct which "it is a major role of punitive damages to condemn." *Id.* In contrast, Hangarter's damages for emotional distress were only one third of her pecuniary damages, suggesting that *State Farm's* concern over a duplicative award is not as strongly present here. Moreover, the defendant's out-of-state conduct in *State Farm,* which was legal in the jurisdiction where it occurred, bore little relation to the plaintiff's harm. *Id.* at 1522-1523. Here, Defendants do not assert that their alleged conduct is legal in any U.S. jurisdiction. Additionally, unlike in *State Farm,* a legally sufficient nexus existed between Defendant's allegedly widespread corporate policies and the termination of Hangarter's benefits. While the Court in *State Farm* noted that the conduct that harmed the plaintiffs was "scant," evidence presented in this case indicates that Defendants' challenged policies were company-wide. *Id.*

The ratio in this case is approximately 2.6: 1, well within the Supreme Court's suggested range for constitutional punitive damages awards. *See id.* ("Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution ..."). Given that due process prohibits only a "grossly excessive" award, leaving to the states "*considerable*

*flexibility* in determining" whether "the damages awarded [were] reasonably necessary to vindicate the State's legitimate interest in punishment and deterrence," the district court did not err in concluding that the jury's award of punitive damages was within constitutional parameters. *Gore,* 517 U.S. at 568, 116 S.Ct. 1589 (emphasis added).

### E. Evidentiary Errors

"To reverse a jury verdict for evidentiary error," Defendants must show that the district court abused its discretion and that the error was prejudicial. *Tennison v. Circus Circus Enters., Inc.,* 244 F.3d 684, 688 (9th Cir.2001). "A reviewing court should find prejudice only if it concludes that, more probably than not, the lower court's error tainted the verdict." *Id.*

#### 1. Expert Witness Frank Caliri

##### a. Qualifications

Rule 702 requires that a testifying expert be "qualified as an expert by knowledge, skill, experience, training, or education." Fed.R.Evid. 702. Rule 702 "contemplates a *broad conception* of expert qualifications." *Thomas v. Newton Int'l Enters.,* 42 F.3d 1266, 1269 (9th Cir.1994) (emphasis added). Moreover, "the advisory committee notes emphasize that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert." *Id.; see also* Fed.R.Evid. 702 advisory committee's note ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").

Defendants assert that the district court abused its discretion in admitting the testimony of Caliri because he lacked sufficient qualifications to testify about claims adjustment standards in the context of an insurance bad faith claim.[FN12] Caliri has **\*1016** twenty-five years' experience working for insurance

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

companies and as an independent consultant. His experience has included evaluating insurance claims, assisting insureds in dealing with insurance companies to obtain payment of their claims, marketing insurance products, and evaluating insurance policies. Caliri worked for both Unum and Provident as a representative at the time many of the own occupation disability policies like Hangarter's were sold and has received training on how insurance companies in general, and Defendants in particular, adjust claims. He has also been found qualified to testify on insurance practices and standards within the industry twelve times before (once in an insurance bad faith case), and has never been found to be unqualified. Moreover, Caliri's expertise has been employed by defense firms (including one involved in this litigation) 35-40% of the time he has served as an expert.

> FN12. Defendants' argument that Caliri lacked specialized knowledge as to insurance bad faith claims relies heavily on *City of Hobbs v. Hartford Fire Ins. Co.,* 162 F.3d 576 (10th Cir.1998), in which the Tenth Circuit held that the district court did not abuse its discretion in finding that the witness "lacked specialized knowledge on New Mexico bad faith cases and his experience was with first party, not third party insurance disputes." *Id.* at 587. The court acknowledged that the witness possessed expertise as to the "general field," but reasoned that "the expert who lacks specific knowledge *does not necessarily* assist the jury." *Id.* (emphasis added). Defendants' reliance on this case is unavailing. The Tenth Circuit merely held in *Hartford* that the district court did not commit *clear error* in excluding a witness who lacked specialized knowledge. The court in no way held that it would have been an abuse of discretion to admit the testimony of an expert with general knowledge of the field to testify on specific bad faith claim issues.

"Clearly, this lays at least the *minimal foundation* of knowledge, skill, and experience required in order to give 'expert' testimony" on the practices and norms of insurance companies in the context of a bad faith claim. *Thomas,* 42 F.3d at 1269 (emphasis added). Given Caliri's significant knowledge of and experience within the insurance industry, the district court did not abuse its discretion in concluding that he was qualified to testify as an expert witness.

### b. Ultimate Issue Testimony

"It is well-established ... that expert testimony concerning an ultimate issue is not per se improper." *Mukhtar v. Cal. State Univ., Hayward,* 299 F.3d 1053, 1066 n. 10 (9th Cir.2002). Indeed, Fed.R.Evid. 704(a) provides that expert testimony that is "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." That said, "an expert witness cannot give an opinion as to her *legal conclusion,* i.e., an opinion on an ultimate issue of law." *Mukhtar,* 299 F.3d at 1066 n. 10. Similarly, instructing the jury as to the applicable law "is the distinct and exclusive province" of the court. *United States v. Weitzenhoff,* 35 F.3d 1275, 1287 (9th Cir.1993) (citations and quotation marks omitted).

[25] Defendants contend that Caliri's testimony that Defendants failed to comport with industry standards inappropriately reached legal conclusions on the issue of bad faith and improperly instructed the jury on the applicable law. This argument is unavailing. Caliri's testimony did not improperly embrace the issue of bad faith under Fed.R.Evid. 704(a). While Caliri's testimony that Defendants deviated from industry standards supported a finding that they acted in bad faith, Caliri never testified that he had reached a legal conclusion that Defendants actually acted in bad faith (i.e., an ultimate issue of law). *See Ford v. Allied Mut. Ins. Co.,* 72 F.3d 836, 841 (10th Cir.1996) (concluding that "expert witness for [the defendant] was permitted to testify" to "*the issue of bad faith* " by showing that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the defendant relied on both "Iowa law" and "industry practice that before there is payment ..., one looks at the total coverage available at *1017 the time of the accident" (emphasis added)).[FN13]

> FN13. Defendants rely heavily on *Thompson v. State Farm Fire & Cas. Co.,* 34 F.3d 932 (10th Cir.1994), where the Tenth Circuit held that "it is plainly within the trial court's discretion to rule that [bad faith] testimony inadmissible because it would not even marginally 'assist the trier of fact.' " *Id.* at 941. The Tenth Circuit in *Thompson,* however, merely held that a district court did not abuse its discretion in ruling such testimony inadmissible, *not* that the admission of such testimony would be a per se abuse of discretion.

[26] Moreover, Caliri's testimony did not improperly usurp the court's role by instructing the jury as to the applicable law. Although Caliri's testimony that Defendants departed from insurance industry norms relied in part on his understanding of the requirements of state law, specifically California's Unfair Settlement Claims Practice § 2695, "a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." *Specht v. Jensen,* 853 F.2d 805, 809 (10th Cir.1988). Caliri's references to California statutory provisions-none of which were directly at issue in the case-were ancillary to the ultimate issue of bad faith.

The district court therefore did not abuse its discretion in concluding that Caliri's testimony did not improperly invade the province of the jury or the court.

### c. Reliability

Rule 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), "require that the judge apply his gatekeeping role ... to all forms of expert testimony, not just scientific testimony." *White v. Ford Motor Co.,* 312 F.3d 998, 1007 (9th Cir.2002).

That said, "far from requiring trial judges to mechanically apply the *Daubert* factors-or something like them-to both scientific and non-scientific testimony, *Kumho Tire* heavily emphasizes that judges are entitled to broad discretion when discharging their gatekeeping function." *United States v. Hankey,* 203 F.3d 1160, 1168 (9th Cir.2000). Indeed, as we recently noted in *Mukhtar,* a "trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding *how* to determine the testimony's reliability." *Mukhtar,* 299 F.3d at 1064 (citing *Hankey,* 203 F.3d at 1167) (emphasis added). Concerning the reliability of non-scientific testimony such as Caliri's, the "*Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it." *Id.* at 1169 (emphasis added); *see also Kumho Tire,* 526 U.S. at 150, 119 S.Ct. 1167 ("Engineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases.... In other cases, the relevant reliability concerns may focus upon *personal knowledge or experience.*"(emphasis added)).[FN14]

> FN14. Caliri testified as to whether Defendants' practices were consistent with insurance industry standards. This sort of analysis is dependent upon the witness's knowledge of, and experience within, the insurance industry. Although Defendants

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
**(Cite as: 373 F.3d 998)**

during voir dire argued that Caliri's selection of documents to review went to the reliability of his "methodology" as an expert, the district court correctly surmised that questions regarding the nature of Caliri's evidence went more to the "weight" of his testimony-an issue properly explored during direct and cross-examination. *See Children's Broad. Corp. v. Walt Disney Co., 357 F.3d 860, 865 (8th Cir.2004)* ("[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."(citation and quotation marks omitted)).

**\*1018** **[27]** While the district court erred in stating that *Daubert* did not apply to Caliri's non-scientific testimony, that error was harmless. We "require a district court to make some kind of reliability determination to fulfill its gatekeeping function." *Mukhtar,* 299 F.3d at 1066 (emphasis in original). The district court satisfied this obligation by probing the extent of Caliri's knowledge and experience before trial in considering a motion in limine, in a detailed ruling during voir dire, and in an order denying Defendants' motion to strike.[FN15] The court ultimately concluded that Caliri's "experience, training, and education" provided a sufficient foundation of reliability for his testimony. Even though the district court did not hold a formal *Daubert* hearing, the court's probing of Caliri's knowledge and experience was sufficient to satisfy its gatekeeping role under *Daubert. See Mukhtar,* 299 F.3d at 1064 (noting that a "a separate, pretrial hearing on reliability is not required"); *Hankey,* 203 F.3d at 1169 ("The district court probed the extent of this knowledge ... and experience during the motion in limine-FRE 104 hearing, and therefore did not abuse its discretion in determining how best to conduct an assessment of the expert testimony."); *see also United States v. Alatorre,* 222 F.3d 1098, 1102 (9th Cir.2000) ("Nowhere in *Daubert, [General Elec. Co. v.] Joiner* [522 U.S. 136, 118 S.Ct.

512, 139 L.Ed.2d 508 (1997)], or *Kumho Tire* does the Supreme Court mandate the form that the inquiry into relevance and reliability must take....").

> FN15. We grant Defendants' February 10, 2004 motion to augment the Excerpts of Record with Defendants' Motion to Strike Caliri's testimony.

Given that, unlike scientific or technical testimony, the reliability of Caliri's testimony was not contingent upon a particular methodology or technical framework, the district court did not abuse its discretion in finding Caliri's testimony reliable based on his knowledge and experience. We thus conclude that the district court's inquiry was sufficient to comply with its gatekeeping role, as we have interpreted it in *Mukhtar,* 299 F.3d at 1066.

### 2. William Feist's Deposition

#### a. Qualifications

**[28]** As discussed, Fed.R.Evid. 702"contemplates a broad conception of expert qualifications." *Thomas,* 42 F.3d at 1269 (emphasis added). Though it is somewhat unclear whether Feist testified as an expert witness or a percipient witness, the district court nonetheless held an extensive hearing on the Feist deposition, and gave detailed reasons for finding Feist sufficiently qualified as either an expert or percipient witness. Feist, a board-certified specialist in insurance medicine and Provident's vice-president and director of its medical department through 1996, has been educated on insurance policy law and disability policy language. At Provident he was active in the practice of claims adjudication where he participated in round tables in which Provident employees discussed terminating disability policies. **\*1019** He is also familiar with insurance policy ethics from educational and practical experience.

The district court therefore did not abuse its discre-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998                                                                                                    Page 24
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
**(Cite as: 373 F.3d 998)**

tion in finding Feist qualified to discuss Provident's handling of disability claims.

### b. Unavailability

[29] Defendants argue that the district court erred in finding Feist "unavailable." Feist's residence in Alabama placed him outside of the court's subpoena power under Fed.R.Civ.P. 45, and he was thus unavailable pursuant to Fed.R.Civ.P. 32(a)(3), which permits deposition testimony where "the witness is at a greater distance than 100 miles from the place of trial or hearing." The admitted deposition was from the Alameda County Superior Court case *United Policyholders v. Provident Life and Accident Ins. Co., UnumProvident Corp., and Bay Brook Med. Group.* In the *United Policyholders* case, a partner of Defendants' counsel, representing Provident Life & Accident Insurance Co. and UnumProvident, cross-examined Feist. Defendants therefore had ample opportunity to cross-examine Feist and satisfied Fed.R.Evid. 804(b)(1). *See*Fed.R.Evid. 804(b)(1) ("Testimony given ... in a deposition ... [is admissible where] the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.").

### c. Fed.R.Evid. 402 and 403

[30] To be admissible, evidence must be relevant under Fed.R.Evid. 402 and its probative value must not be substantially outweighed by the danger of unfair prejudice under Fed.R.Evid. 403. Defendants argue that Feist's testimony regarding the claims-handling procedures at Provident should have been excluded because it bore no direct relationship to Paul Revere's handling of Hangarter's claim and was therefore irrelevant and prejudicial.

[31] The jury could have reasonably inferred that the claims handling procedures at Provident were carried over to Paul Revere as a subsidiary of Un-

umProvident after Unum and Provident merged. This inference was not unwarranted given that Ralph Mohney controlled claims-handling at both Provident and Paul Revere and Paul Revere's handling of Hangarter's claim employed practices similar to those used at Provident. *See Murray v. Toyota Motor Distribs., Inc.,* 664 F.2d 1377, 1379-80 (9th Cir.1982) (ruling admissible deposition testimony of an unavailable former employee of a company against an affiliated company with a similar motive where both affiliates were controlled by the same parent company).[FN16] Moreover, the deposition was corroborated by a number of internal Provident and Paul Revere documents, and by the testimony of Chris Ryan, Ralph Mohney, Joseph Sullivan, Sandra Fryc, and Frank Caliri. Any possible prejudice caused by the deposition was thus marginal.

> FN16. Ralph Mohney, the former vice president of claims for Provident, assumed responsibility for group disability claims with Provident's acquisition of Paul Revere in 1997 and maintained this role after the merger with Unum in 1999 for UnumProvident. Mohney was Senior Vice President, Customer Care, for UnumProvident at the time Hangarter's claim was investigated and her policy terminated.

The district court therefore did not abuse its discretion in concluding that Feist's deposition was relevant to Hangarter's claims.

### 3. Provident Documents

[32] Defendants argue that some of the documents produced by Provident in *1020 another lawsuit were erroneously admitted because they were not properly authenticated and lacked a sufficient nexus to this case. Regarding authentication, witness Robert Parks certified that all the documents were *produced by Provident* and its affiliated companies which eventually became UnumProvident in response to a document production request. " 'Requiring the custodian to identify or authenticate

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998                                                                    Page 25
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
**(Cite as: 373 F.3d 998)**

the documents for admission in evidence merely makes explicit what is implicit in the production itself.' " *United States v. Blackman,* 72 F.3d 1418, 1426 (9th Cir.1995) (quoting *Braswell v. United States,* 487 U.S. 99, 114-15, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988), which is quoting *Curcio v. United States,* 354 U.S. 118, 125, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957)); *see also FTC v. H.N. Singer, Inc.,* 668 F.2d 1107, 1114 (9th Cir.1982). Additionally, Defendants at trial conceded that the overwhelming majority of the documents relied upon at trial were business records of Provident, and Caliri testified to their genuineness. The documents were thus properly authenticated as business records exempt from the hearsay rule. *See* Fed.R.Evid. 803(6); 801(b).

[33] The documents also had a sufficient nexus to Hangarter's claim. The documents confirmed that Provident's claims handling practices were adopted by Paul Revere after Provident merged with Unum in 1999 to form UnumProvident. *See* Exhibits 153/155 (stating that it was necessary to "Bring Wooster [ (Paul Revere headquarters) ] reporting into conformance with Chattanooga [ (Provident) ] standards."). Additionally, Caliri testified that depositions of Provident employees demonstrated that the companies worked together to transition Provident's claims handling practices to Paul Revere. Finally, Caliri testified that Hangarter's claim went to a round table review on September 9, 1997 and that the adjuster handling her claim stated that the purpose of the review was to "explore[ ] termination options," consistent with the alleged corporate policies of UnumProvident.

The court therefore did not abuse its discretion in allowing Hangarter to introduce documents produced by Provident in another lawsuit.

#### 4. Stephen Rutledge Testimony

[34] Defendants argue that the district court improperly excluded the testimony of Stephen Rutledge, who was to testify that both the percentage

of monthly individual disability claims that Paul Revere paid and Paul Revere's total pay-outs for the individual disability line of insurance increased during the relevant time period.

Defendants' contention is unpersuasive. The district court rejected Rutledge's testimony because it related to *all individual* disability claims, and not to only own occupation disability claims. Hangarter's entire case was premised upon the theory that Defendants purposefully terminated her claim because it was a high cost, own occupation disability claim. An increase in disability payouts does little to disprove Hangarter's theory that Defendants intended to terminate claims such as Hangarter's. The district court therefore was within its discretion in excluding this evidence as irrelevant and prejudicial under Rules 402 and 403, particularly given its potential to confuse the jury. *See McEuin v. Crown Equip. Corp.,* 328 F.3d 1028, 1034 (9th Cir.2003) (citing *Longenecker v. Gen. Motors Corp.,* 594 F.2d 1283, 1286 (9th Cir.1979) ("[T]rial judges are better able to sense the dynamics of a trial than we can ever be, and broad discretion must be accorded them in balancing probative value against prejudice.")).

#### *1021 F. Bifurcation

[35] "Rule 42(b) of the Federal Rules of Civil Procedure confers broad discretion upon the district court to bifurcate a trial, thereby deferring costly and possibly unnecessary proceedings...."*Zivkovic v. S. Cal. Edison Co.,* 302 F.3d 1080, 1088 (9th Cir.2002). A district court's refusal to bifurcate a trial is accordingly reviewed for an abuse of discretion. *Hilao v. Estate of Marcos,* 103 F.3d 767, 782 (9th Cir.1996).

Defendants argue that the district court abused its discretion in trying the issues of liability for contract damages and liability for punitive damages for tortious breach of that contract together before the same jury. Defendants cite *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and *Connecticut v. Doehr,* 501 U.S. 1, 111 S.Ct.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998                                                                                                                                           Page 26
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
**(Cite as: 373 F.3d 998)**

2105, 115 L.Ed.2d 1 (1991), for support of the quite novel proposition that due process required that the issues of liability for contract damages be bifurcated from liability for punitive damages for tortious breach. Neither *Mathews* nor *Doehr* mention bifurcation at all; such cases concern what due process must be afforded by a state statute enabling the government on its own initiative or an individual enlisting the aid of the state to deprive another of his or her property by means of a prejudgment attachment or similar procedure. Rule 42(b) merely *allows*, but does not require, a trial court to bifurcate cases "in furtherance of convenience or to avoid prejudice." Fed. R. Civ. Proc. 42(b).

[36] The district court's decision to decline to bifurcate the trial comported with normal trial procedure. "[S]ince the evidence usually overlaps substantially, the normal procedure is to try compensatory and punitive damage claims together with appropriate instructions to make clear to the jury the difference in the clear and convincing evidence required for the award of punitive damages." *McLaughlin v. State Farm Mut. Auto. Ins. Co.,* 30 F.3d 861, 871 (7th Cir.1994). Defendants concede that the district court issued correct jury instructions regarding the different burdens of proof. Additionally, Defendants' profits, financial condition, and financial statements helped establish Defendants' alleged business strategies, incentives, and practices, all of which were relevant to Hangarter's claim for breach of contract. *Cf. EEOC v. HBE Corp.,* 135 F.3d 543, 551 (8th Cir.1998) ("The evidence of racially discriminatory conduct was relevant on issues of liability ... and punitive damages.... [T]he district court did not abuse its discretion in declining to bifurcate the issues.").

The district court therefore did not abuse its discretion in trying the issues of liability for contract damages and liability for punitive damages for tortious breach of that contract together before the same jury.

G. Standing and the UCA

[37] The district court held that Defendants violated the UCA and in turn ordered them to "obey the law" and refrain from "future violations, including, but not limited to, targeting categories of claims or claimants, employing biased medical examiners, destroying medical reports, and withholding from claimants information about their benefits."

The district court erred in concluding that Hangarter had Article III standing to pursue injunctive relief under the UCA. "Article III standing requires an injury that is actual or imminent, not conjectural or hypothetical. In the context of injunctive relief, the plaintiff must demonstrate a *real or immediate threat* of an irreparable injury." *Clark v. City of Lakewood,* 259 F.3d 996, 1007 (9th Cir.2001) (emphasis **\*1022** added) (citations and quotation marks omitted). Hangarter currently has no contractual relationship with Defendants and therefore is not personally threatened by their conduct. Even if Cal. Bus. & Prof.Code § 17204 permits a plaintiff to pursue injunctive relief in California state courts as a private attorney general even though he or she currently suffers no individualized injury as a result of a defendant's conduct,[FN17]"a plaintiff whose cause of action [under § 17204] is perfectly viable in state court under state law may nonetheless be foreclosed from litigating the same cause of action in federal court, if he cannot demonstrate the requisite injury" to establish Article III standing. *Lee v. Am. Nat'l Ins. Co.,* 260 F.3d 997, 1001-02 (9th Cir.2001); *see also*Cal. Bus. & Prof.Code § 17204 (authorizing civil action to enforce § 17200 by "any person acting for the interests of ... the general public").

> FN17. We reach no conclusion as to whether Hangarter's UCA claim is viable on the merits under California law.

Because Hangarter lacked standing to prosecute an UCA claim for injunctive relief, on remand, the district court shall vacate the injunction.

### III. CONCLUSION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

373 F.3d 998
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655
(Cite as: 373 F.3d 998)

Page 27

We affirm the district court's denial of a JMOL and the jury's award of damages and reverse the district court's permanent injunction under the UCA.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.** Defendants to bear costs.[FN18]

> FN18. As noted in footnote 15 above, we grant Defendants' February 10, 2004 motion to augment the Excerpts of Record with Defendants' Motion to Strike Caliri's testimony.

C.A.9 (Cal.),2004.
Hangarter v. Provident Life and Acc. Ins. Co.
373 F.3d 998, 04 Cal. Daily Op. Serv. 5615, 2004 Daily Journal D.A.R. 7655

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.